## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

KATHRYN KNOWLTON, DANA McCORMICK, TRACY COLE, TALEAVIA COLE, TAHUDAH COLE, TRISTIANA WALLS, ANDREW AARON, KAMILA AHMED, ROBERT AGNEW, ISIAH BALDWIN, JACQUELINE BOGENBERGER, RAINE CICH, STEVEN CONKLIN, RACHEL DULAY, ANNE DELESSIO-PARSON, ERIK FANNING, JILL FERGUSON, BREON FOSTER, JOANNA GEISER, JOSEPH HAYES, PERCY HAYES, DESTINEY JONES, SEAN KAFER, JOEY KOEPP, SONORA LARSON, HOLLY LAVORA, LAZARITO MATHEU, MOLLY NILSSEN, CARMEN PALMER, (JUVENILE) PALMER, (JUVENILE) PALMER, LEAH PORTER, AIDALI RIVERA, WILLIAM RIVERA, HECTOR RODRIGUEZ, JOSE HERNANDEZ RAMIREZ, OSCAR CONCEPCION RODRIGUEZ, ROSALIND ROGERS, NATHAN SABEL, WILLIAM SCHROEDER, MARIAH SMITH, PETER SPARKS, ANGEL VEGA, CHRISTINA VITOLO-HADDAD, GABRIELLA VITUCCI, SUZANNE WELLS, BRANDON WILBORN, KATELYN WOJNAR, SONJA WORTHY, KHALIL COLEMAN, and MEMBERS OF THE PEOPLE'S REVOLUTION AN UNINCORPORATED ENTITY hereinafter referred to as (TPR), on behalf of themselves and all others similarly situated,

     Plaintiffs.

     v.                                    Case No. 20 CV 01660

CITY OF WAUWATOSA
CITY OF WAUWATOSA CHIEF OF POLICE BARRY WEBER In his individual capacity
DENNIS McBRIDE, in his individual capacity.
AND JOHN DOES OFFICERS in their individual capacities,
     Defendants.

---

### FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

---

NOW COMES the above named Plaintiffs, by their Attorneys Kimberley Cy.

Motley of Motley Legal Services and E. Milo Schwab of Ascend Counsel, LLC,

and complains against the above-named Defendants, and for their claims for

relief, allege and shows to the court as follows:

### I.    INTRODUCTION

1

1. Throughout the summer of 2020, the United States was immersed in the largest social justice movement in history. In a repudiation of anti-Black racism, white supremacy, police violence, mass criminalization, and mass incarceration, millions joined demonstrations around the globe in solidarity against police violence which was inspired by the tragic deaths of persons like George Floyd, Breonna Taylor, Alvin Cole, Sandra Bland, Jay Anderson, Dontre Hamilton, Elijah McClain, and far too many other black Americans killed at the hands of police.

2. Many of the Plaintiffs as well as thousands of other organizers, activists, and community leaders throughout the State of Wisconsin - multi-racial, varying gender orientations, and intergenerational in composition - engaged in a wide variety of actions throughout the summer and fall of 2020, which included rallies, marches, and other creative protests that consistently opposed police violence and demanded police accountability within the criminal justice system.

3. This is a civil action brought pursuant to 42 U.S.C. §1983. Plaintiffs seek damages for injuries sustained by Plaintiffs as a result of Defendants' violation of their constitutional rights. Plaintiffs also seek to enjoin the City of Wauwatosa and Wauwatosa Mayor Dennis McBride from issuing unlawful emergency orders and Police Chief Barry Weber and other Wauwatosa Police Officers from issuing and enforcing unlawful policies including dispersal orders to peaceful citizens based on alleged unlawful assembly or other group misconduct by others.

4. Plaintiffs are citizens of the U.S. who were ticketed, arrested, and/or harassed in the City of Wauwatosa for being physically present or engaging in peaceful protests in the wake of the homicides of George Floyd, Alvin Cole, and the shooting

2

of Jacob Blake, as well as peacefully protesting the inequitable justice imposed upon persons of color who have been severely hurt or killed by police officers.

5. Plaintiffs are entitled to this Court's protection of their constitutional right to peacefully protest. This Court must check the unrestrained power of the actions of the City of Wauwatosa, Chief Barry Weber, Mayor Dennis McBride, and the other aforementioned defendants.

6. This case primarily arises from the City of Wauwatosa's Emergency Order unlawfully and unilaterally passed and signed by the Mayor Dennis McBride, on September 30, 2020 in anticipation of civil unrest following the release of the Milwaukee County District Attorney's findings in the matter of Wauwatosa Police Officer Joseph Mensah's killing of Alvin Cole on February 2, 2021. The Mayor's Order gave rise to the Wauwatosa Police Department's response which included the mobilization of over forty-five (45) operational partners, including over twenty additional state and local law enforcement agencies including but not limited to the Milwaukee Police Department, Marquette University Police Department, etc.…, as well as federal agencies including but not limited to the Wisconsin Department of Justice, the FBI (Federal Bureau of Investigations), the ATF (the Bureau of Arms, Tobacco, Firearms and Explosives), the Wisconsin National Guard, etc. **See Exhibit #1** - DA Announcement Civil Unrest Operational Plan Approved 10/06/20 by Captain Vetter.

7. The WPD, other Wauwatosa City Agencies, and other operational partners responded to the demonstrations often with brutal, violent, and unconstitutional tactics that were clearly intended to injure, silence, and intimidate Plaintiffs as well as other citizens. These abusive tactics included violently beating protestors,

3

engaging in false arrests, the creation of false arrest records, use of chemical agents, and kettling protestors in enclosed areas.

8.   The WPD has consistently targeted nonviolent protesters, medics, journalists, and individuals recording the demonstrations with retaliatory and unlawful police tactics.

9.   The actions of the WPD has often gone unchecked by the City of Wauwatosa.  In particular the  Mayor of Wauwatosa and its Police and Fire Commissioners have done little to nothing to address the decades of inequitable policing to persons of color and violence against protestors.

10.  In fact, Wauwatosa's Police and Fire Commission in the Fall of 2020 unanimously voted to change the time limit for persons filing citizen complaints against Wauwatosa Police Officers to within 120 days of the incident when prior to this there was no time limit.

## II.    THE PARTIES TO THIS COMPLAINT

11.  Plaintiff Andrew Aaron resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and  attended a protest in Wauwatosa on August 14, 2020.

12.  Plaintiff Robert Agnew resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and  attended a protest in Wauwatosa on  ---

13.  Plaintiff Kamila Ahmed resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and  attended a protest in Wauwatosa on August 14, 2020 and August 30,  2020.

14.  Plaintiff Isiah Baldwin resides in the City of Milwaukee, State of Wisconsin.

4

Plaintiff uses he/him pronouns and he attended protests on August 14, September 6, and October 10, in Wauwatosa.

15. Plaintiff Jacqueline Bogenberger resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and attended a protest in Wauwatosa on September 30, 2020. On October 9, 2020, plaintiff was arrested in the city of Milwaukee after leaving a protest in Wauwatosa.

16. Plaintiff Raine Cich resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 plaintiff was arrested in the city of Milwaukee after leaving a protest in Wauwatosa.

17. Plaintiff Tracy Cole resides, in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

18. Plaintiff Taleavia Cole resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

19. Plaintiff Tahudah Cole resides in the City of Milwaukee County, State of Wisconsin. Plaintiff uses she/her pronouns and on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

20. Plaintiff Khalil Coleman resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on August 13, 2020.

21. Plaintiff Oscar Concepcion Rodriguez resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 7, 2020 plaintiff was Arrested while he was working in Wauwatosa.

5

22. Plaintiff Steven Conklin resides in the City of Watertown, State of Wisconsin. Plaintiff uses he/him pronouns and on September 30, 2020 plaintiff was mailed a ticket weeks later after protesting in Wauwatosa.

23. Plaintiff Anne Delessio-Parson resides resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 plaintiff was arrested while she was protesting in Wauwatosa.

24. Plaintiff Rachel Dulay resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 8, 2020 plaintiff was arrested while protesting in Wauwatosa.

25. Plaintiff Erik Fanning resides in the City of Wauwatosa, State of Wisconsin. Plaintiff uses he/him pronouns and on October 8, 2020 plaintiff was arrested while he was trying to leave a protest in Wauwatosa.

26. Plaintiff Jill Ferguson resides in the City of West Allis, State of Wisconsin. Plaintiff uses she/her pronouns and on October 11, 2020 plaintiff was arrested while she was protesting in Wauwatosa.

27. Plaintiff Breon Foster resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 9, 2020 plaintiff was arrested while he was protesting in Wauwatosa.

28. Plaintiff Joanna Geiser resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 plaintiff was arrested while she was protesting in Wauwatosa before the curfew began.

29. Plaintiff Christina Vitolo-Haddad resides in the City of Madison, State of Wisconsin. Plaintiff uses they/them/he pronouns and on October 9, 2020

was arrested while leaving a protest in Wauwatosa.

30.  Plaintiff Joseph Hayes resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and  on August 14, 2020, October 8, 2020, and October 9, 2020 plaintiff was arrested while protesting in Wauwatosa.

31.  Plaintiff Percy Hayes resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and  was told that he had a ticket for Carotid / Neck Restraint from Wauwatosa Police which he has never received.  Plaintiff believes that they are trying to give him this ticket for protesting in Wauwatosa.

32.  Plaintiff Jose Hernandez Ramirez resides in the City of Milwaukee, State of Wisconsin.  Plaintiff uses he/him pronouns and  on October 8, 2020 plaintiff was arrested while he was trying to leave a protest in Wauwatosa.

33.  Plaintiff Destiney Jones resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and  on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

34.  Plaintiff Sean Kafer resides in the City of Milwaukee, State of Wisconsin.  Plaintiff uses he/him pronouns and  on August 14, 2020 plaintiff was mailed a ticket while he was filming a protest in Wauwatosa.

35.  Plaintiff Kathryn Knowlton resides in the City of Wauwatosa, State of  Wisconsin. Plaintiff uses she/her pronouns and  on October 10, 2020 plaintiff was arrested in Wauwatosa.

36.  Plaintiff Joey Koepp resides in the City of Greenfield, State of Wisconsin.

Plaintiff uses he/him pronouns and  on September 3, 2020 plaintiff was arrested while protesting in Wauwatosa.

37.     Plaintiff Sonora Larson resided in the City of Milwaukee the State of Wisconsin. Plaintiff uses she/her pronouns and  on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

38.     Plaintiff Holly Lavora resides in the City of Milwaukee, State of  Wisconsin. Plaintiff uses she/her pronouns and  on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

39.     Plaintiff Lazarito Matheu resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and  on October 9, 2020 plaintiff was arrested while he was in Wauwatosa.

40.     Plaintiff, Dana McCormick resides in the City of Wauwatosa, State of Wisconsin.  Plaintiff uses she/her pronouns and  on October 10, 2020 plaintiff was arrested while she was in Wauwatosa.

41.     Plaintiff Molly Nilssen resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and  on October 10, 2020 plaintiff was arrested while she was in Wauwatosa.

42.     Plaintiff Carmen Palmer resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and  on October 8, 2020 plaintiff was arrested while she was protesting in Wauwatosa.

43.     Plaintiff (Juvenile) Palmer resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and  on October 8, 2020 plaintiff was arrested while she was with her parent in Wauwatosa.

44. Plaintiff (Juvenile) Palmer resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 8, 2020 plaintiff was arrested while she was with her parent in Wauwatosa.

45. Plaintiff Leah Porter resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 was arrested while leaving a protest in Wauwatosa

46. Plaintiff Aidali Rivera resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 plaintiff was arrested while she was in Wauwatosa.

47. Plaintiff William Rivera resides in the City of Wauwatosa, State of Wisconsin. Plaintiff uses he/him pronouns and on October 9, 2020 plaintiff was arrested while he was in Wauwatosa.

48. Plaintiff Hector Rodriguez resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 9, 2020 plaintiff was arrested while he was in Wauwatosa.

49. Plaintiff Rosalind Rogers resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on September 6, 2020 plaintiff was arrested while she was peacefully protesting in Wauwatosa.

50. Plaintiff Nathan Sabel resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 8, 2020 plaintiff was arrested while he was trying to leave a protest in Wauwatosa.

51. Plaintiff William Schroeder resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 9, 2020 plaintiff was

arrested while he was protesting in Wauwatosa before the curfew began.

52. Plaintiff Mariah Smith resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on August 13, 2020 and September 5, 2020 plaintiff was protesting in Wauwatosa and was later mailed a ticket.

53. Plaintiff Peter Sparks resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 10, 2020 plaintiff was in Wauwatosa.

54. Plaintiff Angel Vega resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses he/him pronouns and on October 9, 2020 plaintiff was in Wauwatosa.

55. Plaintiff Gabriella Vitucci resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on August 13, 2020 and August 14, 2020 plaintiff was protesting in Wauwatosa and was later mailed a ticket. On October 9, 2020 Plaintiff was arrested in the city of Milwaukee after leaving a protest in Wauwatosa.

56. Tristiana Walls resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 8, 2020 plaintiff was detained while she was trying to leave a protest in Wauwatosa.

57. Plaintiff Suzanne Wells resides in the City of Milwaukee, State of Wisconsin. Plaintiff uses she/her pronouns and on October 8, 2020 plaintiff was arrested while she was trying to leave a protest in Wauwatosa.

58. Plaintiff Brandon Wilborn resides in the City of Milwaukee, State of Wisconsin.

Plaintiff uses he/him pronouns and on August 14, 2020 and September 30, 2020 was in Wauwatosa protesting.

59. Plaintiff Katelyn Wojnar resides in the City of Stevens Point, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 plaintiff was arrested in the city of Milwaukee after leaving a protest in Wauwatosa.

60. Plaintiff Sonja Worthy resides in the City of Madison, State of Wisconsin. Plaintiff uses she/her pronouns and on October 9, 2020 was arrested while leaving a protest in Wauwatosa.

61. Plaintiffs the People's Revolution (TPR) an unincorporated entity consisting of a group of individuals who participated in various actions throughout the State of Wisconsin during the summer and fall of 2020 which originated in in Milwaukee, Wisconsin created after the George Floyd killing which took place on May 25, 2020.

62. Defendant City of Wauwatosa is a municipality incorporated in the State of Wisconsin.

63. Defendant Barry Weber is the Chief of Police for the Wauwatosa Police Department hereinafter referred to as "WPD" located at 1700 North 116th Street, Wauwatosa, WI 53226, County of Milwaukee, State of Wisconsin, with a phone number of 414-471-8430 and an email of bweber@wauwatosa.net, and is, on information and belief an adult resident of the State of Wisconsin residing in Washington County, within the Eastern District of Wisconsin. Defendant Weber is the Chief of Police for Wauwatosa and in that capacity has final responsibility for

establishing the rules of engagement for police deployments responding to protests and civil unrest and as directed by the Mayor. Chief Weber is named in his official capacity for declaratory and injunctive relief only. At all times pertinent and material to this Complaint, Defendant Weber was acting within the scope of his employment and under color of the statutes, ordinances, customs, policies, and usages of the State of Wisconsin.

64. Defendant Dennis McBride, Mayor of Wauwatosa, Wauwatosa City Hall located at 7725 West North Avenue, Wauwatosa, WI 53213, County of Milwaukee, State of Wisconsin, with a phone number of 414-479-8917 and an email of dmcbride@wauwatosa.net, and is, on information and belief, an adult resident of the State of Wisconsin residing in Milwaukee County, within the Eastern District of Wisconsin. Defendant McBride is the Mayor of Wauwatosa, and in that capacity is chief executive officer, responsible to direct the Chief of Police. Mayor McBride is named in his official capacity for declaratory and injunctive relief only. At all times pertinent and material to this Complaint, Defendant McBride was acting within the scope of his employment and under color of the statutes, ordinances, customs, policies, and usages of the State of Wisconsin.

65. John Does 1-100 are individual police officers of the City of Wauwatosa, who effectuated arrests, caused bodily harm, created fabricated arrest records, or ticketed individuals at issue in this case. Their identities are currently unknown to Plaintiffs but are known to Defendant City of Wauwatosa. They are each public employees of Wauwatosa who were operating under the color of state law. When their identities are determined, this Complaint will be amended to name

12

each individual officer to the extent that they violated the rights contemplated in this suit.

### III.     JURISDICTION AND VENUE

66.   This Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1343(a)(3) and (4) (civil rights jurisdiction), 28 U.S.C. §§2201, 2202 (declaratory judgment jurisdiction), and 28 U.S.C. §1367 (supplemental jurisdiction).

67.   Venue is proper in the United States District Court for the Eastern District of Wisconsin under 28 U.S.C. §1391(b)(1) and (2) because defendants (including entities) are therein located, and because a substantial part of the acts or omissions giving rise to the claims herein occurred in this judicial district.

### IV.     HISTORICAL BACKGROUND OF RACIAL ISSUES In WAUWATOSA AND THE WAUWATOSA POLICE DEPARTMENT

68.   From 1920 through at least the 1950's Wauwatosa was known as a restrictive zoning city in which African Americans were not welcome.[1] For decades well into the 1960s it was not uncommon to see signs in Wauwatosa excluding black people or seeing property deeds which explicitly, "excluded non-whites from "purchasing, owning, leasing or occupying."[2]

69.   As it relates to policing in Wauwatosa, in 1989 the City of Wauwatosa hired

---

[1] https://www.jsonline.com/story/news/solutions/2019/06/18/centuries-old-racism-haunts-efforts-treat-milwaukee-trauma-epidemic/2580146002/

[2] Id.

Franklin M. Kimmel of the Consortium of Governmental Counselors, Inc. an outside research firm to conduct a comprehensive study on the Wauwatosa Police Department.

70. As a result of the study, it was recommended that seventeen police officer positions be eliminated within a four-year time period. As far as we know this did not happen.

71. Researchers also noted that the Wauwatosa Police "department is overstaffed, over specialized, deficient in supervision, operational planning, and case handling."

72. The findings of the study also concluded that there was an, "inadequacy of leadership," as well as "inefficient training of officers and misallocation of personnel." In addition to this, it was noted that the Police Non-supervisory union was too powerful, suggesting that the union relinquish some of its power, and also called for the City of Wauwatosa to expedite the removal of the then police chief, Roy Wellnitz, who had his position since 1975. Based on this study, the Wauwatosa Police Department Peace Officers Union aggressively pushed back disputing that the department needed to reduce its police department.

See Wauwatosa Times Article January 12, 1989. (Please note Wauwatosa Times publication is no longer in existence and as such the below articles are archived articles from the Wauwatosa Times located at the Wauwatosa Public Library.)



73. Ultimately, then-Police Chief Wellnitz was forced to leave in August 1989 according to news reports because he violated the department's residency requirement when he moved out of Wauwatosa. Chief Wellnitz also left the Wauwatosa Police Department amid controversy in the community for racially insensitive actions by officers working within the police force.

74. Interim Chief Fred Basting, replaced Wellnitz and served in that role from August 1989 through May 1990.

75. Around this time, a civilian clerk named John Kutz, reported to the Wauwatosa's Police and Fire Commission that Wauwatosa Police officers were hosting and attending racist events labeled the Martin Luther King Parties "MLK parties."

76. According to Mr. Kutz, these parties were racially themed and held in 1988 and 1989 at the house of then Police Sergeant John Bozevich. Mr. Kutz reported that officers wore nametags bearing the name of minority persons, they advertised the parties using pictures of minorities who had been arrested, and he alleged that Ku Klux Klan materials and Confederate flags were displayed at the parties. Wauwatosa Times 03/29/90





77. Sadly, there was no dispute that the parties occurred. The main crux of the arguments from the officers were that they have a 1st Amendment freedom of speech right to participate in such gatherings regardless of their role in protecting the civil rights of citizens of Wauwatosa.

78. Wauwatosa's Common Council and the Police and Fire Commission from 1990 – 1991 continued with its investigations regarding the MLK Parties while also conducting a nationwide search for a police chief.

79. Although the MLK parties were allegedly held while officers were off duty many were minimally disciplined by then interim Chief Basting for their participation in the parties and suspended for several days without pay.

80. Of note, Sqt. Bozevich was given a twenty-day suspension and James Zalewski was given a thirty-day suspension while the matter was being investigated. Wauwatosa Times April 19, 1990.

81. This conduct laid bare the public perception that policing in Wauwatosa was racially motivated and discriminatory,



82. Amid this controversy, the City of Wauwatosa continued its nationwide search to replace police Chief Wellnitz and Chief Barry Weber was hired in May 1990 and is the current chief of the Wauwatosa Police Department.

83. Chief Weber was originally touted as a "problem solver" who was hired from Iowa City to essentially move the police department in a positive direction.

84. Instead of reforming and ending the racist tendencies of the police department, Mr.

17

Weber, as Chief of Police, protected and promoted those involved with the racist MLK parties.

85.     The MLK parties investigation was closed then reopened and while the investigation was taking place, Chief Weber, promoted Sqt. Bozevich, who was the host of two of the Martin Luther King Parties in 1989 and 1990. Sqt. Bozevich ultimately became the second in command with the WPD for over a number of years. Chief Weber also promoted and protected many of the other officers who were a part of the MLK parties and who were harassing John Kutz the civilian clerk during the investigation.

86.     Of note, in 1991 Kutz felt threatened and testified to the Police and Fire Commission that an officer Howard Bacon "fired a revolver at him later to learn it was loaded with blanks." This occurred inside next to Kutz's desk while he was working at the Police Department. Kutz even reported being harassed by Chief Weber at the time and felt in fear for his safety.

87.     Simply put, Kutz was subjected to retaliation by the Wauwatosa Police and its leadership for calling out racism in the department.

88.     Ultimately, the Police and Fire Commission determined that the thirteen officers involved had a constitutionally protected right to participate and host the MLK parties and all suspensions were reversed and it appeared as though people were given back pay.

89.     Chief Weber promoted these officers through the ranks of the WPD and many became upper management within the WPD.



# Police clerk's testimony charges harassment, fear

By Mary Hoehne

Wauwatosa Police clerk John Kutz said he was scared for his physical safety and feared the third-shift police officers, he testified before the Police and Fire Commission investigating on-duty conduct of some third-shift police officers.

Although he described himself as the department's "whipping boy," he kept the alleged incidents to himself out of fear, he said.

"They (the police officers) are all friends and I was one lone person by myself," Kutz said. "I had no union, nobody to go to. I feared retaliation."

**Instead he remained silent and** said he was the brunt of harassment, he claimed. Some of the antics were more than horseplay, he said. Kutz testified an officer fired a revolver at him, later to learn it was loaded with blanks; other officers threw lit firecrackers at him; and officers damaged his car when they moved it from the Police Department parking lot and decorated it with Christmas lights, signs and traffic cones, he testified.

Despite the antics he termed "harassing," Kutz continued to socialize with fellow third shift workers because he said he was afraid to not participate in the parties.

"I attended the parties for fear of retaliation if I didn't go," Kutz said. The parties he attended included the two Martin Luther King parties, Christmas parties and a party at Long Lake.

Kutz cooperated with a departmental investigation led by then-Acting Chief [illegible] into the alleged [illegible] and 1988 Martin Luther King Day parties. All charges related to the parties were dropped in November by the Police and Fire Commission because it ruled officers have a constitutional right to privacy during off-duty time.

**The investigation revealed** some on-duty misconduct by officers Howard Bacon, David Breitlow, Lt. James Zalewski, Sgts. John Bozicovich and Mark Tebo and Det. Thomas Simon.

Another 20 to 24 hours of testimony is expected before the Police and Fire Commission renders a ruling on whether disciplinary actions against the officers should be upheld or dropped. The six police officers have yet to testify.

Attorney Linda Vanden Heuvel questioned why Kutz did not file his allegation charges immediately and directly to the Police Department hierarchy. She said it was obvious he understood the chain of command because he reported the Martin Luther King parties.

Kutz said he has additional harassment allegations against first-shift employees. He said his mail has not been given to him and he has had problems with fellow desk clerks and some other officers.

**Even Police Chief Barry Weber** is causing him problems, Kutz said. The chief asked him about his relationship with his attorney and questioned him if he was getting his money's worth, Kutz testified.

"I'm not welcome on the first shift and I'm an easy target," he said. He said he wants to work the third shift and not the first shift and filed a grievance against the city because he was assigned to the first shift.

YOU DESERVE T

90. John Kutz also filed a complaint against newly hired Chief Weber and others in September 1990 and January 1991.

91. Kutz claimed that Weber harassed him and was surprised that Chief Weber promoted officers, including John Bozevich who hosted two of the racist MLK parties at his house, and others who attended the parties while the investigation into the events were ongoing with the Police and Fire Commission.

Wauwatosa Times 09/13/90

 

92. The dark racial history of the WPD has carried over to present day in the policing of the community.

93. According to the latest U.S. census of Wauwatosa as of July 1, 2019, Wauwatosa has a population of approximately 48,118 and is a little over 13 square miles in area.

94. Since April 2010 the population has stayed relatively the same with about a 3.6% increase over the ten-year period. Ethnically, the population is 86.2% white, 5.3% black, Asian is 4.1%, 2.9% Hispanic population, and the remainder 1.8% is persons who identify with two or more races.[3]

95. Despite Wauwatosa having a 5.3% African American population, according to the arrest data 83% of the arrests in 2018 were of African Americans, 16% were of whites and 1% other.

---

[3] https://www.census.gov/quickfacts/wauwatosacitywisconsin





96. Based on the data of traffic stops in Wauwatosa from 2015 through 2017 the average length of a traffic stop is 11 minutes, 8 seconds.

97. In Wauwatosa, white drivers are stopped an average of 13 minutes and 17 seconds while black drivers are stopped on average 15 minutes and 26 seconds – which is over 2 minutes longer.

98. From 2015 – 2017 of those recorded on average 64% those stopped by officers in the WPD were of African Americans.

See graphs below.

Case 2:20-cv-01660-NJ   Filed 03/06/21   Page 21 of 136   Document 24



99. Disappointingly, Mayor McBride in October 29, 2020 refused to acknowledge that racism still exists in Wauwatosa and particularly in policing. He stated that "The Wauwatosa of today is not a racist community. Wauwatosa is a welcoming community. There are lots of nice people. We are facing a difficult time here. But it's a place where people want to come."[4]

## V. <u>BACKGROUND</u>

100. Following the George Floyd killing in Minneapolis on May 25, 2020, the city of Wauwatosa (along with cities across the country), began to experience protests calling for police reform.

101. On Sunday, August 23, 2020, Jacob Blake was attacked by an officer working in the Kenosha Police Department ("KPD"). The events of Mr. Blake's attack were captured on video by a bystander and have renewed our national debate on systematic racism and police brutality directed at Black Americans. Mr. Blake was transported to a local hospital, where he underwent multiple surgeries. He

---

[4] https://www.wpr.org/wauwatosa-latest-wisconsin-city-grapple-policing-racism

remains paralyzed.

102.   But such police violence against African Americans is not only an outside issue - Wauwatosa has seen multiple police killings over the past decade, including the killings of three young Black men by the same officer in just the past five years.

103.   On February 2, 2020 former Wauwatosa Police Department ("WPD") Officer Joseph Mensah shot and killed 17-year-old Alvin Cole at Mayfair Mall.

104.   The prior two persons killed by Mensah were Jay Anderson, Jr. was killed on June 23, 2016 and Antonio Gonzales killed on July 15, 2015 all occurred while Mensah was an officer with the WPD.



105.   From February 2, 2020 through October 7, 2020 the Milwaukee County District Attorney was engaged in an investigation into the death of Alvin Cole.

106.   After the killing of George Floyd on May 25, 2020, the public was informed on June 1, 2020 that Officer Joseph Mensah was the WPD officer responsible for shooting Alvin Cole.

107.   Since June 1, 2020 Wauwatosa has been the center of several protests while the

23

Alvin Cole shooting was under review by the Milwaukee County District Attorney's office.

108. The protests in Wauwatosa were largely peaceful.

109. Over these months of protests, the Wauwatosa police have responded, often with excessive force. The Police Department has taken an apparent personal affront to demands for reform and have engaged in a campaign to harass and intimidate those who dare question police conduct.

110. One way that the WPD has done so has been to unlawfully target and survey protestors, particularly those within The People's Revolution, hereinafter referred to as "TPR." In violation of expectations of privacy and in retaliation for exercise of first amendment rights, the WPD has developed and has kept a list of known and suspected Protesters. ***See Exhibit 2*** *(Email, Updated Protestor List July 14, 2020)*.

111. It is important to note that an updated list of protestors was circling within the WPD as early as July 14, 2020. This updated list was created before Joseph Mensah was suspended on July 15, 2020, before the Jacob Blake Shooting on August 23, 2020, and before DA John Chisholm's decision on the Alvin Cole shooting was announced on October 7, 2020.

112. The campaign to shut down protestors used by many officers within the WPD of actively targeting persons affiliated with TPR or others critical of Wauwatosa's City Government has resulted in more distrust and has revealed many problems within the WPD and the City of Wauwatosa Government.

113. Without cause and only because TPR is critical of the racism and abusive practices of the WPD, some officers have begun referring to TPR as "a terrorist organization."

114. On July 15, 2020 Wauwatosa Police and Fire Commission suspended Officer Joseph Mensah with pay.



A. **CITY OF WAUWATOSA's Curfew From October 7 - 12, 2020**

115. On September 30, 2020, Mayor McBride decided that he alone should have the power to pass and sign a "Proclamation of Emergency" for the City of Wauwatosa which enacted a curfew restricting "pedestrian and vehicular traffic on Wauwatosa streets" from 7pm to 6am, to commence on October 7 and continue to October 12, 2020. **See Exhibit 3** (*September 30, 2020 Proclamation of Emergency signed by Mayor McBride*).

116. Defendant Mayor McBride alone signed and declared the curfew.

117. At the time that Mayor McBride signed the emergency declaration there were no credible threats to the City of Wauwatosa. At no time thereafter did any credible

25

threats become known.

118. Under Wisconsin statute, he lacked the legal authority to make the Proclamation of Emergency as signed on September 30, 2020.

119. Under Wis. Stat. 323.11, an emergency order may only be declared under two circumstances. The primary circumstance provides that:

> "The governing body of any local unit of government may declare, by ordinance or resolution, an emergency existing within the local unit of government whenever conditions arise by reason of a riot or civil commotion. The period of the emergency shall be limited by the ordinance or resolution to the time during which the emergency conditions exist or are likely to exist."

120. Wis. Stat. §323.14(4)b also provides an emergency exception that permits an executive to declare an emergency *only where the emergency necessitating the proclamation prevents the governing body from meeting.*

121. Under the statute, when an executive issue such an emergency order, a meeting of the governing body must be called as soon as possible.

122. None of this happened.

123. For reasons unknown, Defendant McBride withheld his emergency proclamation from the public and also Wauwatosa's Common Council.

124. It is unclear why an order to keep the streets clear for fear of violence would need to be kept secret.

125. What is clear is that Defendant McBride did not want the public nor the Common Council to question his unlawful declarations.

126. To be clear, nothing prevented the Wauwatosa Common Council from meeting on September 30, 2020 to decide on an emergency proclamation or curfew.

127. Certainly, there was no civil unrest which could have denied the Common Council the ability to meet.

128. The conditions required under Wisconsin law which permit an executive in narrow circumstances to declare a state of emergency never existed.

129. But Defendant McBride did not care about state law nor protesters' rights to assemble and protest.

130. His intent was to stop these protests. To end them before they began. To declare them unconstitutional for the simple reason that they called his and his administration's misconduct into question.

131. When Defendant McBride was presented with the opportunity to discuss the need for an emergency proclamation and curfew with the only entity with legal authority to declare one, he instead kept his curfew secret. Apparently he did not want the scrutiny that comes with declaring First Amendment activity unlawful for the sole reason that he did not want to be criticized.

132. On October 6, 2020, one week after Defendant McBride's secret executive order, the Wauwatosa Common Council held a normal meeting.

133. Although Defendant McBride had put in his secret order that the proclamation would become effective the next day, he actively denied the elected officials of Wauwatosa any knowledge of his intentions.

134. This is because the Common Council would have denied his request.

135. Since this denial would have allowed protests of his conduct, of the conduct of Defendant Weber, of the conduct of a police department where one man could kill three persons of color in 5 years and discharge his weapon 17 times without

anyone questioning why such force was necessary, Defendant McBride willfully deceived the governing body of Wauwatosa.


*al*

136. Chief Weber has been the Chief of Police for the city of Wauwatosa for over thirty years.

137. Chief Weber knew that the Common Council was not aware of and did not issue the Proclamation of Emergency.

138. On October 7, 2020 Weber instructed the Wauwatosa Police Department as well as other police departments to arrest protesters under an order he knew to be unlawful.

139. On September 21, 2020 Chief Weber was interviewed by Wauwatosa's Police and Fire Commission Special Investigators Attorney Steven Biskupic and Attorney Michelle Jacobs who were hired in relation to the citizen complaint brought forward by Jay Anderson, Jr's Family against former Wauwatosa Police Officer Joseph Mensah. **See Exhibit 4** (*Transcript of interview with Chief Barry Weber and Wauwatosa's Police and Fire Commission Investigator Attorney Steven Biskupic 092120 pg.102*).

28

140. In this interview, Chief Weber acknowledged that he is legally obligated not to follow an illegal order even if it comes from the Mayor.

141. Specifically, in the interview of 09/21/20, Chief Weber was instructed by the Police and Fire Commission on July 15, 2020 that Officer Joseph Mensah was suspended with pay. Weber indicated that he was not happy with this decision and referred to it as an "illegal order." Specifically, Weber stated,

> *"When the city put him on the --- you know, they gave me the order the day before the police and fire commission meeting and said, you and the city administrator are ordered to make this guy' employment change or whatever. I told the city, 'That's an illegal order. I'm not following it.' Because by law I have to follow lawful written orders of the police –mayor and/or common council, and that's an illegal order."* **See Exhibit 4** (*Transcript of interview with Chief Barry Weber 092120 pg.102*).

142. Clearly, Weber acknowledged and agreed that he has a legal obligation to not follow illegal orders, even if those orders come from Mayor McBride.

143. The Emergency Declaration unilaterally signed and passed by McBride was one such unlawful order.

144. Nonetheless, Defendant Weber instructed the WPD and other law enforcement agencies to arrest protesters without a legal basis and for conduct he knew not to be a crime.

145. The police response was shocking and terrifying. Video footage shows that the police presence was less about trying to protect the public from potential violence of protestors on the streets of Wauwatosa with no other outlet to peacefully protest and it was more about trying to deny people's constitutional

29

right to assemble and protest. **See Exhibit 5** (See Video of the Wauwatosa Protests 100720 – 101220 https://www.youtube.com/watch?v=5Cb6CTcNVOc).

146. For several nights, protesters came out to stand up to police violence. They were met with more police violence. Rubber bullets were shot at people. Chemical agents were used on people. People's cars were run into by police vehicles. Police tackled protesters.

147. The Wauwatosa police punished protesters for their speech questioning police misconduct. It was retaliation for the message of those protesters.

B. **PLAINTIFFS' ALLEGATIONS as to the Curfew in Wauwatosa from October 7, 2020 – October 12, 2020**



i. **Plaintiffs Kate Knowlton and Dana McCormick - October 10, 2020**

148. On the evening of October 10, 2020, Plaintiffs Kate Knowlton and Dana McCormick went to downtown Wauwatosa to protest against police misconduct and police violence.

149. At approximately 7:15pm, armored vehicles and lines of armed military-style personnel wearing riot gear, helmets, and shields, blocked both North Avenue westbound, and 76th Street southbound from the intersection of 76th Street and North Avenue, making those streets completely impassible.

150. A crowd of fewer than 50 people had previously formed and then dispersed eastward and beyond the intersection, such that there were no persons in the area other than Plaintiffs Knowlton and McCormick, who were sitting on the lawn of City Hall.

151. Plaintiffs were nonetheless ordered to disperse without cause and forcibly arrested without the ability to comply with the dispersal order, in violation of their Fourth Amendment rights to be free from unreasonable seizures. Plaintiffs were then detained and interrogated before being given citations for a City ordinance (curfew) violation.



152. At approximately 7:30pm, flood lights were trained on the lawn, and directly into

the eyes of the Plaintiffs from the line of armed military personnel and vehicles from North Avenue. Knowlton stood up and requested to speak to a Wauwatosa police officer.



153. A bull horn announcement stated that Plaintiffs were in violation of Wisconsin Statute 947.06 for unlawful assembly, and if they did not disperse, they would be subject to arrest. Knowlton stated that there were only 2 people on the lawn, and that the statute required three or more people, and again requested to speak to a Wauwatosa police officer. There was no response.

154. At this time, no crime was being or about to be committed by either Plaintiff nor by anyone else in the area.

155. There was no threat to any person and no property was at risk of being destroyed.

156. Plaintiffs were simply sitting.

157. The WPD declared their conduct unlawful because they had been part of a protest aimed at police violence.

158. Knowlton again asked about the lack of 3 people as required under state law and then turned around. Knowlton saw that the line of personnel and vehicles spanning

32

across the entire Southbound 76th Street had expanded into and across the lawn of City Hall to the wall of the actual building and was approximately 20-30 yards away from Plaintiffs' picnic blanket. The line was "shoulder to shoulder" and provided no egress to Plaintiffs.

159. Knowlton called out towards that line requesting to speak with a Wauwatosa police officer. The line continued to move steadily towards North Avenue, blocking any exit. A bull horn from the direction of Southbound 76th Street then yelled something unintelligible to Plaintiffs. Knowlton called out that she could not understand what was said. Knowlton stated that if she needed to leave, her home was South and she needed to go in that direction and asked again for a Wauwatosa police officer's assistance. There was no response.

160. The line continued to move toward the Plaintiffs. Knowlton again asked for a Wauwatosa police officer as the line approached Knowlton. At least four armed personnel without any identifying insignia grabbed both of her arms and forcibly pulled her through the line of personnel toward the South parking lot of the City Hall. Knowlton asked what was going on and asked again for a Wauwatosa police officer. There was no response.

161. McCormick was following Knowlton and stated to the police, "I'm going home, it's that way" and pointed South. Unidentifiable personnel in riot gear responded to her, "Oh no you're not" without providing any further information.

162. Two other riot-geared personnel pulled McCormick's arms behind her back and forcibly moved her forward going in the same direction as Knowlton.

163. Knowlton continued to ask at least three more times for a Wauwatosa police officer and asked "what is going on?" No response was provided.

33

164. Throughout this entire episode, there were no acts by Plaintiffs Knowlton nor McCormick, nor acts by any other People that they witnessed, which could constitute non peaceable assembly. They were simply sitting on a blanket, in front of City Hall as participants in a peaceful protest against police brutality.

165. Knowlton was brought to the back of a Wauwatosa police truck, told to separate her feet, her book was taken out of her hand, her arms were pulled and held behind her back, she was handcuffed with plastic zip-ties, and patted down.

166. Knowlton's back pockets were searched and her cell phone was taken.

167. Knowlton was asked her name and birthdate, which she provided.

168. The police officer directed her to get in the back of the truck. Knowlton asked why she had been arrested and was told, "unlawful assembly." Knowlton responded that there were only two people on the lawn and this was an unlawful arrest.

169. Knowlton stated that she wanted to speak to an attorney immediately. The police officer responded, "it doesn't work that way, you can talk to an attorney after you are released." Knowlton stated, "I am an attorney and I want to speak to my attorney right now." No one responded or said anything else.

170. McCormick was patted down and her property was taken, including her library book.

171. McCormick was directed to get into the truck without any further explanation or questions.

172. At no time was McCormick asked her name or any other identifying information.

173. At no time was either Plaintiff advised of any of their rights.

174. The Plaintiffs asked where they were being taken and were told, "you'll find out

when you get there."

175.  The truck drove away for some time, and then stopped to pick up additional person, who was loaded into the truck in handcuffs, crying and asking why she had been arrested and where the truck was going. Again, law enforcement did not respond and stated that they would not disclose any location.

176.  The truck drove on for another 10-15 minutes and stopped again in a dark and quiet parking lot. Law enforcement opened the back of the truck and stated that another vehicle would be transporting Plaintiffs and the additional person to yet another location which they would not disclose.

177.  A Brookfield police truck arrived and at that point, for the first time, McCormick was asked her name by a Brookfield police officer who wrote it in his notebook. Then Plaintiffs and the additional person were loaded into the Brookfield police truck which only had two seatbelts. Knowlton called this to the attention of law enforcement and another vehicle was called to transport so that all detainees had seatbelts.

178.  McCormick was then separated from Knowlton and the additional person and put into the back of a police squad car alone and seat belted. She was not advised any further, but she was then able to identify that location as Our Redeemer Lutheran Church on North Avenue in Wauwatosa. McCormick was then able to observe the direction and location of both vehicles.

179.  After another transport of about 10 minutes, Plaintiffs, and the additional person were brought into what appeared to be a police processing room. There were no identifying signs as to where or what this location was.

180.  Four Wauwatosa-uniformed officers proceeded with an additional search,

35

including under the clothes, and seized other property missed in the first search. Plaintiffs' shoes and handcuffs were removed.

181. Two agents who identified themselves and provided credentials for the United States Federal Bureau of Investigation asked for interviews.

182. The Wauwatosa police officers then asked for social security numbers, about employment, family history, and if Plaintiffs were members in "Antifa" and "the People's Revolution" in addition to other questions.

183. Antifa is a common boogeyman of the Trump administration.

184. The Wauwatosa police asking about protesters' affiliations with the Peoples' Revolution, a group dedicated to ending public brutality and racism, was a common theme throughout this week. It has become readily apparent through their conduct that the Wauwatosa Police have and continue to engage in targeting people for their association with a peaceful organization on the basis of their speech against police abuse.

185. Plaintiffs and the additional person were photographed.

186. At no time were Plaintiffs advised of their Constitutional rights.

187. After another hour or so, Plaintiffs and the additional person were both issued tickets for being in violation of emergency order with the name of Lt. Jeffrey Farina to which the WPD put the maximum fine of $1321.

188. According to Wis. Stat. 323.28 the maximum forfeiture for Violation of an Emergency Order municipal citation that can be given is $200.

189. McCormick inquired as to why an arrest was made for an ordinance violation. The officer responded that it is "policy" to "always" bring in parties who had violated municipal ordinances.

190. Law enforcement then told all three detainees that they would be leaving in a police van and dropped off at a point of law enforcement's choosing. The additional person became upset and asked why she was not free to leave on her own. Law enforcement then stated that "policy" required law enforcement transport as a "courtesy." Law enforcement further stated that Defendant Weber did not want people gathering at the police station.

191. When the additional person cried and expressed fear and claustrophobia in having to get back into a police transport, she was told that she was risking additional arrest for a curfew violation, and it would be "safer" to take the law enforcement "courtesy" transport.

192. After seeing the hostility of the officers towards this third party, Plaintiffs understood that they were not free to go and feared that challenging the police would lead to further risk of another arrest.

193. McCormick then asked to be taken to "our homes" (to avoid risk of arrest because of curfew violation), she was told "no, we will drop you off in Wauwatosa."

194. Plaintiffs were then told to leave the building with two Brookfield law enforcement officers who would do the transporting. The additional person was walked out of the parking lot accompanied by a police officer.

195. Plaintiffs' property was given to the Brookfield officers. Once outside, one of the Brookfield officers said he was going to use handcuffs again and stated that it was required "policy." McCormick stated Plaintiffs would rather walk. The other Brookfield officer then stated something like "forget it, let it go," and Plaintiffs were told to get into the back of the truck. The officers then discussed how to get

to the intersection of 76th Street and Milwaukee Avenue. Knowlton stated that Wauwatosa East High School was located there and they could use google maps.

196. Plaintiffs were dropped off at that intersection where Wauwatosa East High School is located and told they could still be arrested for curfew violation. Plaintiffs' belongings were then returned and Plaintiffs walked to their respective homes.

197. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

198. Plaintiffs continue to experience post-traumatic stress and fear on-going retaliation.

199. At no time were either of the Plaintiffs provided *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention, and interrogation.

200. At no time did the Wauwatosa Police have reasonable suspicion to search Plaintiffs.

201. Knowlton was specifically denied her right to Counsel though she had specifically invoked. Further, her Counsel had identified himself to law enforcement and attempted in person to speak with Knowlton before the vehicle left the initial incident location or be advised as to her location. This was denied. Knowlton was never advised of these attempts.

202. McCormick was never identified by or to law enforcement prior to her being handcuffed, detained, and removed from the initial incident location. That is, she did not have any identification, and law enforcement did not ask even her name

38

until a different transport occurred.

ii. **Plaintiffs Tahudah Cole, Taleavia Cole, Tristiana Griggs, & Tracy Cole - October 8, 2020**

203. On October 8, 2020 petitioners, Taleavia Cole, Tahudah Cole, Tristiana Griggs, and Tracy Cole were protesting in Wauwatosa, Wisconsin.

204. Tracy Cole is the mother of Alvin Cole.



205. Tahudah Cole, Taleavia Cole, and Tristiana Griggs are the sisters to Alvin Cole.

206. Alvin Cole was a seventeen-year-old Black man who was shot and killed by former Wauwatosa Police Officer Joseph Mensah. Alvin was the third person whom Joseph Mensah killed within five years of being an officer with the WPD.

207. Both Tahudah and Taleavia Cole were driving in one car and Tracy Cole and Tristiana Griggs were driving in a separate car on October 8, 2020 in Wauwatosa.

208. After 7:00p.m. armored vehicles and lines of armored military-style personnel wearing riot gear, helmets, shields, without identifying badges or names on their

39

uniform entirely blocked the streets of Wauwatosa where peaceful protestors were outside.



209. At approximately 8 p.m. Taleavia Cole, Tahudah Cole, Tristiana Griggs, and Tracy Cole were attempted to leave Wauwatosa. Tracy Cole is an advocate against the type of police violence that killed her son and frequently goes to protests to support her desired political change.

210. That evening, she, along with Jacob Blake's father, had spoken to the crowd about the need for change to protect Black men from police shootings and killings.

211. While all four Plaintiffs were trying to leave Wauwatosa the cars that they were traveling in were being "kettled" by numerous, unidentifiable law enforcement vehicles, who were putting stop sticks on the ground in front of their car and the unidentified officers were forcing the car to arrive at a predetermined destination, preventing them from leaving and preventing them from safely driving away.

212. Plaintiffs were stopped by unidentified police officers and persons whom they believe were with the National Guard.

213. Several law enforcement officers yelled at Tracy, Tahudah, Tristiana, and

Tracy "Get out the fucking car before I bust your windows!"

214. Plaintiff Taleavia Cole was violently pulled out of her vehicle by one police officer while another officer pointed a gun at her head. Thankfully, unlike her brother, she was not killed. She was, however, thrown to the ground.

215. While Taleavia Cole was laying on the ground and in front of several witnesses, a police officer put her knee in the back of Taleavia's neck.

216. Plaintiff Tahudah Cole was also forced out of the car and told to lay down on the ground.

217. Tristiana Griggs was also forced on the ground violently by the officers.

218. Plaintiff Tracy Cole was violently pulled out of the car by several officers.

219. In addition to pulling Tracy Cole's hair, several officers punched Tracy Cole in the face while she was yelling, "I'm Alvin Cole's mother. You killed my baby and now you are trying to kill me!"

220. Plaintiff Tracy Cole is handicapped and walks with a cane. She has never been arrested in her life.

221. Tracy Cole screamed her name at least four times and officers claimed they did not know who she was. At one point she screams, ""I can't believe y'all did this to me. Y'all killed my son."

222. About a minute later, Tracy Cole can be heard saying on video: "He hit me in my head and pulled my hair. One of these cops over here. My head is bleeding."

223. The officer who was previously heard giving Cole orders responded with, "Well, that's too bad."

224. While Tracy Cole was on the ground, with at least one officer on her back

she repeatedly yelled that she couldn't breathe. The officers were unfazed by this.

225. Over the course of her arrest, officers threw Tracy Cole to the ground, tased her, pulled her hair, punched her in the face multiple times and put handcuffs on her extremely tightly to the point that she thought her arm was broken.

226. While officers were violently attacking Tracy Cole they kept yelling, "stop resisting."

227. At no time was Tracy Cole resisting her arrest.

228. Taleavia Cole was recording on her phone the immediate interactions with the police but the police took her phone away.

229. To be clear, none of the Coles nor Griggs had committed any crime. They were not a risk to others and were not engaged in property destruction. They are civic leaders who were going home after speaking out against police violence. Nonetheless, they were subjected to punishment and violence at the hands of police officers.

230. After Tracy Cole's violent arrest she was approached by Wauwatosa Police Lt. Jeffrey Farina whom her daughters summoned over to assist her.

231. Lt. Farina did not participate in Tracy Cole's assault by other law enforcement officers and in fact, helped Tracy Cole after the arrest of her daughters, Tahudah and Taleavia Cole.

232. Lt. Farina walked Tracy Cole to a bench and said that he was taking "full responsibility" for her and called an ambulance for her.

233. Tracy Cole sustained several visible injuries captured by multiple journalists who were at the scene that night while she was being carried on a stretcher in an ambulance to Froedtert.

42



Tracy Cole on a stretcher taken by a TMJ4 photographer)

https://www.tmj4.com/news/local-news/alvin-coles-mother-arrested-during-protest-in-wauwatosa)

234. Tracy Cole and Tristiana Griggs went to Froedtert Hospital late in the evening of October 8, 2020 and Tracy Cole was treated for multiple injuries she sustained as a result of the violent police contact.

235. Tracy Cole's injuries included a concussion, cuts to her face, a swelling to her forehead, and a sprained arm.

236. In addition to the excessive force physical injuries, Tracy Cole is also still seeking medical assistance for the extreme mental trauma that she experienced at the hands of the police on October 08, 2020.

237. Taleavia Cole was arrested by police and the U.S. Marshalls. She was then placed in a van with several other persons and was eventually driven to Waukesha.

238. While she was searched the then unidentified officer took Taleavia Cole's phone without her permission and she never gave them consent to search her phone.

239. Taleavia Cole and others tried to identify police officers but none of the officers had name badges on.

240. Taleavia Cole's hand restraints were extremely tight and she asked repeatedly that they be loosened up which the officer would not loosen.

241. Taleavia Cole repeatedly asked the officers why she was under arrest. She also Stated that she wanted to talk to her attorney, Kimberley Motley but was ignored.

242. After leaving the area, Taleavia Cole was in the van with others and they were taken somewhere on Mayfair Road where the police van parked for about an hour.

243. Taleavia and others were then taken to the Waukesha County Jail where they sat in the van for another hour.

244. While they were in the van at Waukesha their pictures were taken.

245. Plaintiff Taleavia was eventually taken inside the Waukesha County Jail building where she was forced to change into orange jail clothes. While she was changing an officer was in the room watching her get naked and Taleavia was told by the officer that it was protocol.

246. Taleavia repeatedly said that she wanted to talk to her attorney, Kimberley Motley and repeatedly asked why she was under arrest.

247. Taleavia was told that she had to talk to the FBI. She did not want to answer any questions of the FBI and repeatedly told the police and the FBI that she wanted to talk to her attorney Kimberley Motley.

248. Despite Taleavia's repeatedly asserting her right to remain silent and her right to an attorney who she specifically named the FBI agents continued to ask her

44

questions.

249. The FBI asked several questions like what happened. Why was she protesting? Why did the Wauwatosa Police Department want her phone? Was she with TPR.

250. The FBI agents voluntarily shared with Taleavia that the Wauwatosa Police were coming to get her phone.

251. Lt. Shane Wrucke came to the Waukesha County Jail and took Taleavia's phone without her permission and without any probable cause that she had committed any crimes.

252. No warrant was ever issued for Taleavia's phone either.

253. Taleavia was eventually released from the jail after midnight and the Lt. Wrucke kept her phone with no explanation why.

254. Before leaving the Waukesha County Jail, about four hours after she had been arrested, she was given a municipal ticket for Violation of an Emergency Order.

255. Taleavia Cole went back to the area where her car was and discovered that it had been towed.

256. The towing of Taleavia Cole's car was yet another vindictive response by officers within the WPD.

257. The Towing of Taleavia's car was in violation of WPD's Towing policy.

258. At no time was Taleavia advised of her Constitutional rights. But that evening would not be the end of the Wauwatosa police's deprivation of her rights.

259. For twenty-two days the Wauwatosa Police Department through illegally kept Taleavia's phone claiming that WPD was trying to get a search warrant.

260. Plaintiff Taleavia Cole did not give consent for the Wauwatosa Police Department to seize, retain or search her phone.

45

261.  No such warrant was ever issued. Upon information and belief, no warrant was ever even requested.

262.  The Wauwatosa Police Department had no lawful basis to have retained possession of her phone for twenty-two days and they claimed that they were trying to get a search warrant which never happened.

263.  Taleavia, through her lawyers, requested the return of the phone on October 9, 12, 13, 14, & 15th and was advised by the Wauwatosa Police Department that they would not return the phone.

264.  That since Taleavia's phone was in the Wauwatosa Police Department's possession her Facebook and Instagram has disappeared.  In addition to this, her iCloud account which has updated photos, many attorney-client privileged documents, and other pertinent information to which she has never consented to a search has been tampered with.

265.  On October 15, 2020 undersigned counsel asked the WPD to produce a search warrant for the phone and/or probable cause to keep the phone both of which the WPD did not produce. A search warrant is generally required before search of a cell phone *Riley v. California*, 573 US 373 (2014).

266.  As a result of the Wauwatosa Police Department refusing to give Taleavia's phone back, Plaintiff Taleavia Cole through her counsel filed a motion to return her property with the Milwaukee County District Court Judge Pocan's Court 20 CV 6184.

267.  On October 30, 2020 Milwaukee Circuit Court Judge Pocan ordered the City of Wauwatosa's Police Department to immediately return Taleavia's phone.

268.  Taleavia through her counsel, also argued to the court that due to the

46

tremendous abuse of power by the WPD that they should be forced to pay costs at the maximum amount allowed by statute.

269. In case 20 CV 6184, on December 22, 2020 Judge Pocan agreed and imposed the maximum $300 sanction as allowed by law to be awarded to Taleavia.

270. When Taleavia finally received her phone, she had it inspected and it was determined that the police had tampered with her phone.

271. Plaintiff Tahudah Cole was arrested by the police for violation of an emergency order and taken to the West Allis Jail by officers who refused to identify themselves.

272. Tahudah Cole and others tried to identify police officers but none of the officers had name badges on.

273. Tahudah Cole's hand restraints were extremely tight and she asked repeatedly that they be loosened up.

274. Tahudah Cole repeatedly asked the officers why she was under arrested and also that she wanted to talk to her attorney who she specifically named as Kimberley Motley and received no response from any officers.

275. Tahudah and others were taken to the West Allis Jail.

276. Tahudah repeatedly said that she wanted to talk to her attorney.

277. Tahudah was told that she had to talk to the FBI. She did not want to answer any questions of the FBI and repeatedly told the police and the FBI that she wanted to talk to her attorney.

278. Despite Tahudah's repeatedly asserting her right to remain silent and her right to an attorney the FBI agents continued to ask her questions. They asked why was she protesting? Was she a part of TPR?

279. Before leaving the West Allis County Jail, a few hours after her arrest, she was

47

given a municipal ticket for Violation of an Emergency Order.

280. Tahudah Cole went back to the area where she left her car was and discovered that it had been towed.

281. Towing of Tahudah's car was a violation of Wauwatosa's Towing policy.

282. At no time was Tahudah advised of her Constitutional rights.

283. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, head trauma, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

284. Plaintiffs continue to experience post-traumatic stress and fear of on-going retaliation.

285. Tracy Cole was not given any tickets or citations on the evening of October 8, 2020.

286. On December 10, 2020, unbeknownst to her, Tracy Cole was placed on the Wauwatosa municipal court docket for violating an emergency order and resisting or obstructing.

287. Tahudah and Taleavia Cole were given noncriminal tickets for violating an emergency order and appeared in Wauwatosa Municipal Court in December 10, 2020.

288. On December 10, 2020 Tracy Cole and counsel went to court and asked the court to dismiss the ticket on its face for its failure to establish probable cause that an offense had been committed within the four corners of the ticket.

289. Counsel also asked the City Attorney for notification of when Tracy Cole was given the ticket and he had no answer only to say it was mailed to her providing no proof.

48

290. Plaintiff Tracy Cole was never notified that she received a Violation of Emergency Order Ticket in the amount of $1,321.00.

291. Plaintiffs Tracy Cole, Taleavia Cole, and Tahudah Cole all eventually were given tickets for being in violation of emergency order with the name of Lt. Jeffrey Farina to which the WPD put the maximum fine of $1321.

292. According to Wis. Stat. 323.28 the maximum forfeiture for Violation of an Emergency Order municipal citation that can be given is $200.

293. At no time were Tracy, Tristiana, Taleavia, or Tahudah Cole provided *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention, and interrogation.

294. Taleavia and Tahudah Cole were specifically denied their right to Counsel though they both had specifically invoked this right and specifically named their attorney.

295. Taleavia and Tahudah Cole were specifically denied their right to remain silent though they both had specifically invoked this right.

### iii. William Rivera, Aidali Rivera, Hector Rodriguez, and Mathew Lazarito - October 9, 2020

296. On October 9, 2020 William Rivera, Aidali Rivera, Hector Rodriguez, and Mathew Lazarito were driving home from work in the City of Wauwatosa.

297. William Rivera worked as a security guard at Cricket in 6th and Mitchell and had just finished a shift at 7:00 P.M.

298. After work, William Rivera, was picked up by his mother Aidali Rivera, her boyfriend Matthew Lazarito, and his friend Hector Rodriguez.

299. William lives on 80th North Avenue in Wauwatosa, and to get home it required

49

that they drive up North Avenue.

300. While they were driving up North Avenue, a crowd of people started running towards them.

301. Not wanting to hurt anyone, Lazarito stopped the car and he believed the National Guard started approaching their vehicle.

302. There were people in front of and behind their car.

303. Lazarito, who was driving, slowly tried to back his vehicle up.

304. While in the car, one of the armored vehicles rammed the back of the car that all of them were in.

305. The police immediately surrounded the car pointing their guns at the four occupants who all put their hands outside of the windows.

306. William Rivera, Aidali Rivera, Hector Rodriguez, and Mathew Lazarito were all unaware of the curfew in Wauwatosa.

307. Because the car was violently rammed on the back passenger side, the car was so damaged that William Rivera had to get out on the back driver's side and Aidali Rivera who was sitting in the front passenger seat had to get out on the driver's side.

308. The National Guard threatened to shoot them in the car.

309. While they were out of the car they all repeatedly told the officers that they were dropping William off at home.

310. William Rivera, Aidali Rivera, Hector Rodriguez, and Mathew Lazarito all individually and collectively tried to explain to the National Guard and the law enforcement officers that they were not part of the protests but that they were taking William home, giving the officers his Wauwatosa address.

311. As can be seen below, William Rivera, still in his security guard uniform is on the left and Hector Rodriguez on the far right.



312. William Rivera told one of the arresting officers, pictured below and filmed by CBS58 News, that he was on his way home from work. In response, the officer, defendant Detective Timothy Warren, said to Mr. Rivera "at this time it doesn't matter because you are black."



313. The police put twist ties on their wrists for all four people extremely tightly, causing bruising as can be seen in the photo below..



314. All four complained repeatedly about the wrist ties being too tight to law enforcement but they were ignored.

315. Several television news crews, including CBS 58 News, were there and they filmed

the interaction.

316.    The police put Aidali Rivera, Lazarito, and Hector on one side of the street, while William was put on the other side of the street.

317.    Aidali Rivera suffered significant injuries as a result of the car accident and the police called an ambulance to take her to Froedtert Hospital.

318.    While waiting for the ambulance, Aidali Rivera saw a person who she believed was with the National Guard get in her car and drive it to a nearby parking lot.

319.    Plaintiff Aidali Rivera went back the next day to the area where she had last seen her car and discovered that it had been towed.

320.    The Towing of Plaintiff's car was in violation of WPD's Towing policy.



321.    Aidali was put into a paddy wagon where she was in extreme pain due to the car crash and the extremely tight wrist ties.

322.    A young woman in the paddy wagon yelled for the police and firefighters to help

Aidali and that she needed medical attention.

323. The firefighters appeared to be very angry at everyone and seemed annoyed that she wanted medical attention.

324. Aidali Rivera was taken to Froedtert in an ambulance by herself and she was never given a ticket by any officers.

325. William, Lazarito, and Hector were under arrest and put into a van by an unidentified officer.

326. William continued to tell the officer that he just got off of work, was wearing his work uniform and was trying to go home.

327. The emergency proclamation specifically exempted anyone returning from work. Apparently, those exceptions did not apply to him.



328. Once William, Hector, and Lazarito arrived at the Wauwatosa Police Department, the tight wrist ties were cut loose.

329. William, Hector, and Lazarito continued to voice their objections that they were not a part of the protests but were just trying to take William home from work.

330. The Wauwatosa Police Officers continued to ignore their objections and stated that they were arrested for violating curfew.

331. William, Hector, and Lazarito were forced to give the Wauwatosa Police Officers their cell phones.

332. William, Hector, and Lazarito all gave the Wauwatosa Police Officers their home addresses.

333. Despite William giving Wauwatosa police officers his current Wauwatosa address his address was noted with a Milwaukee address.

334. William, Hector, and Lazarito were all forced to sit and talk with the FBI individually.

335. Before walking into the interrogation room, William who was wearing his work shirt, was told by a Wauwatosa Police Officer to take his shirt off before talking to the FBI.

336. When William, Hector, and Lazarito got into the interrogation room they all said that they wanted a lawyer.

337. William, Hector, and Lazarito were all questioned by the FBI if they were a part of the People's Revolution and why they were out there.

338. William explained, once again to the FBI that he was working a ten-hour shift and

was trying to get home.

339. Hector, and Lazarito told the FBI that they had picked William up from work and were taking him home.

340. William, Hector, and Lazarito were then forced to wait in the Wauwatosa Police station for hours.

341. Eventually, at around 3 a.m. they were told they could leave.

342. William, Hector, and Lazarito all asked for their cellphones back but were denied this request.

343. William, Hector, and Lazarito were all given a ticket by Officer Dexter Schleis for Violating an Emergency Order.

344. William, Hector, and Lazarito asked to use the police phone so they could call for a ride and were all denied a phone call.

345. William, Hector, and Lazarito all wanted to walk out of the Wauwatosa police Station to walk home. As with other Plaintiffs and protesters throughout the night, even though their detention was apparently over, the police continued to detain them and restricted their freedom of movement.

346. The Wauwatosa Police forced them to get back in the car with the police, detaining them for a second time.

347. William, Hector, and Lazarito did not want to get in the police car but they were told that they did not have a choice.

348. The Wauwatosa Police Officer told William, Hector, and Lazarito that he would take them home.

349. Only because they did not think they had a choice William, Hector, and Lazarito got into the police car.

350. The officers took William, Hector, and Lazarito to 35th and Kilbourn in Milwaukee which is nowhere near where any of them live but is a dangerous neighborhood in Milwaukee especially at 3 a.m. They were told by the police that you are going to have to find your own way home.

351. The Wauwatosa Police Officer dropped them off on the street and left all three of them there and they walked home.

352. The next day Aidali Rivera and Lazarito Matthew went to the place where they were originally arrested and realized that their car had been towed.

353. When they went to Dennis Transportation Service tow lot they were told that they would need to pay $299.25 to get their car out of the tow lot and could not view the car before they paid.



354. Once they paid $299.25 for the car, they were told that the car came in without a key and that the police lost it.

355. They were also told that the reason why the car was in the tow lot was because it had crashed into a fence.

356. Aidali and Lazarito went to the car and saw that it as completely trashed with a flat tire, money missing from inside, and the car looked completely totaled.

 

357. They asked the tow lot manager what happened, and the tow lot manager threatened William calling him the "n" word and pulled out his gun.

358. Aidali and Lazarito immediately left the tow lot worried that they were going to be shot and have not been back since.

359. The City of Wauwatosa police department never contacted them to return their phones.

360. Hector and William called and got their phones returned a few weeks later.

361. Lazarito was not able to get his phone back until January 2021.

362. Plaintiffs were all denied their right to an attorney and their right to remain silent.

363. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from being hit by an armored vehicle and having their arms handcuffed behind their backs, head trauma, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

364. Plaintiffs continue to experience post-traumatic stress and fear on-going retaliation.

365. At no time were William Rivera, Aidali Rivera, Hector Rodriguez, and Mathew Lazarito provided *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention, and interrogation.

366. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, head trauma, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

   **iv.    Jackie Bogenberger, Raine Cich, Gabriella Vitucci, Angel Vega, & Katelyn Wojnar October 9, 2020**

367. Jackie Bogenberger, Raine Cich, Gabriella Vitucci, Angel Vega, and Katelyn Wojnar were all in the City of Wauwatosa on October 9, 2020.

368. While they were in Wauwatosa after 7 p.m. they witnessed the police deploying tear gas against people to people located at 76th and North Avenue near City Hall. All of a sudden people started running east down North Avenue towards Milwaukee.

369. People started running away from the tear gas and Jackie, Raine, Gabriella, and Katelyn all decided to leave Wauwatosa and walk to Raine's house because they did not have vehicle transportation and the police were not allowing cars to drive in the area.

370. While walking an unmarked four door truck was following the ladies and a lady in a red car pulled up to ask if they were all ok.

371. Gabriella and Raine were together and when the officers approached them, The officers did not identify themselves and they did not have a badge or a name plate on as it customary for officers to have.

372. The officers physically threw Raine, and Gabriella on the ground face down.

373. Officer Stephen Schmidt arrested Gabriella and Officer Dan Mitchell arrested Jackie.

374. Officer Mitchell had Jackie on the ground and was on top of her back for no reason. Officer Schmidt threw Gabriella to the ground and was on top of her back for no reason.

375. While they were on the ground an elderly couple came out of their home and asked the cops why they were being so aggressive with Jackie and Gabriella.

376. The cops tackled this elderly woman to the ground who came out of her house questioning the excessive force used by the police.

377. The husband then started yelling at the police for tackling his wife and they then arrested him in front of his home.

378. As appears to be their policy, Wauwatosa police used excessive force on this

couple simply for questioning them. This couple had violated no law and could not be understood to have violated any curfew order. They simply stood up to wanton and excessive police violence.

379. Eventually, Officer Schmidt put wrist restraints on Gabriella which were extremely tight to the point that their hands were turning purple. Officer Schmidt also put wrist restraints on Raine which were just as tight and to the point that their hands were turning purple.

380. Jackie, Raine, and Gabriella immediately complained about the restraints being extremely tight but were told that they could not switch out the restraints.

381. While both Jackie and Gabriella were on the ground, an officer took their picture.

382. Gabriella was carrying a backpack which contained her phone and Detective Warren searched her backpack without her permission.

383. Detective Warren was teasing Gabriella and Jackie saying, "oh you thought you were going to get away." Officer Mitchell and Officer Schmidt took both Jackie and Gabriella's ids and compared them, saying "look who we got".

384. Jackie's phone was taken away from her. At no time did she give anyone permission to search her phone.

385. Both Jackie and Gabriella asked the officers why they were being arrested and none of the officer answered.

386. Both Jackie and Gabriella asked for a lawyer.

387. Raine Cich and Katelyn Wojnar were also arrested.

388. Raine recalled Detective Warren as the one who took everyone's identification cards and their phones.

389. At one point, in an effort of disclosure, Gabriella told the arresting officers she had

61

a pocketknife in her bag.

390. An officer told Gabriella if she had her pocket knife out he was trained to shoot her in the head.

391. Eventually the plaintiffs were put in separate vans and taken away. In one van was Raine, Gabriella, Katelyn, and the elderly women. The elderly women clearly needed medical attention but did not get any until an hour or so later.

392. Raine, Gabriella, and Katelyn were driven by the officers to the parking lot at the Wauwatosa Police Department where they sat for a couple of hours.

393. Eventually Raine, Gabriella, and Katelyn were booked at the Wauwatosa Police Department where they had their pictures and fingerprints taken. When fingerprinting Gabriella and Raine the officer doing the finger printing started to make fun of the protesters trying to provoke a reaction by bragging about the Non prosecution of Joseph Mensah as it related to the Alvin Cole case, and talking poorly about the 3 victims saying he would have reacted the same way Mensah did. Gabriella and Raine ignored him.

394. While at the Wauwatosa Police Department Raine, Gabriella, and Katelyn were all made to talk to the FBI.

395. All three told the agents that they wanted an attorney and that they did not want to answer any questions.

396. Despite their invoking their right to remain silent and their right to an attorney they still tried to ask them questions. They were asked why are you protesting? Are you a member of TPR?

397. Before they left the police station they were given tickets for violation of an emergency order in the amount of $1,321.

62

398. According to Wis. Stat. 323.28 the maximum forfeiture for Violation of an Emergency Order municipal citation that can be given is $200.

399. After Jackie was arrested she was placed in a van and asked the police why they were arresting her.

400. After they were arrested the officer driving the van identified himself as a Waukesha Officer and that the Officer did not know what was going on and drove the arrested persons to a parking lot located on 101st and North Avenue at Our Redeemer Church and School.

401. While they were in the parking lot, Wauwatosa squad cars came and take them to Mayfair Mall by the Cheesecake Factory where they are driven around.

402. They eventually are taken to the loading dock in Mayfair Mall where there appears to be a makeshift police station that was setup.

403. Before the car pulled into the underground shipping garage at Mayfair Mall as code was required to get in.

404. One of the occupants in the van was the elderly neighbor who was arrested for speaking out about excessive force, and who became unresponsive. Angel screamed at the police to do something, which they ignored him and the unresponsive man for about five minutes. Eventually they did something.

405. Once they were let out of the van and went through the booking process at Mayfair Mall, they then took their wrist restraints off.

406. While at Mayfair Mall Jackie and Angel had their pictures and fingerprints taken.

407. While at the Mayfair Mall Jackie and Angel were made to talk to the FBI.

408. Jackie and Angel both told the agents that they wanted an attorney and that they did not want to answer any questions.

409. Despite their invoking their right to remain silent and their right to an attorney the FBI still tried to ask them questions.

410. At the end of the booking Jackie and Angel were not given their phones back.

411. Angel and Jackie were both given the below municipal tickets by Patrolman Hodgson.

412. After they were told that they could leave the police refused to allow them to call for a ride.

413. Jackie and Angel wanted to leave the makeshift Mayfair police station but were told that they had to take a ride back by the police who were directed by the Wauwatosa Police Department that they had to accept the ride.

414. Jackie and Angel did not want a ride from the police and were fine to leave the makeshift police station at Mayfair on their own.

415. Jackie and Angel were told by the police that they were going to be driven back to where they were arrested which was around 67th and North Avenue.

416. Despite Jackie and Angel's objections the police made them get back in the police car again detaining them without probable cause.

417. Angel and Jackie did not have a choice and were forced to accept the ride from the two police officers.

418. The officers dropped Angel and Jackie off with no cell phones around 3rd and Locust which is approximately 7.3 miles away from where they were arrested and is a very dangerous neighborhood in Milwaukee especially at midnight on any given day.

419. At no time were Plaintiffs advised of their Constitutional rights.

420. Plaintiffs suffered physical discomfort and injury, including soreness and bruising

64

from having their arms handcuffed behind their backs, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

421. Plaintiffs continue to experience post-traumatic stress and fear on-going retaliation.

422. Plaintiffs Bogenberger, Ciche, Wojnar, and Vitucci have been physical issues as result of the trauma and chemical agents which law enforcement used.

423. At no time were either of the Plaintiffs provided *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention, and interrogation..

**v.    Joanna Geisler and William Schroeder  - October 9, 2020**

424. Plaintiffs Joanna Geisler and William Schroeder  are members of the Milwaukee Alliance who were together in Wauwatosa on October 9, 2020 at around 6:00p.m.

425. While they were protesting peacefully Plaintiffs were both holding banners which read, "Stop Police Crimes Now"

426. Plaintiffs arrived in Wauwatosa at around 6 p.m.12.    While walking in the crosswalk Plaintiff's were arrested by P.O. Ralph Salyers and P.O. Gee at approximately 6:38p.m.

427. Plaintiffs asked what they were being arrested for and were told rioting.

428. Plaintiff's phones were taken away.

429. Plaintiffs were not committing any crimes nor violating any ordinances.  They were

arrested in retaliation for the banners challenging police violence that they were holding.

430. Plaintiffs were then transported to the WPD where they were photographed and fingerprinted.

431. While at the Wauwatosa Police Department Plaintiffs were made to talk to the FBI.

432. Despite asserting her right to remain silent, the FBI continued to ask Plaintiff Geisler questions.

433. Plaintiffs wanted to leave the police station on their own but were told that they had to take a ride back by the police who were going to take them to their car.

434. The Officers refused to give Plaintiffs their phones back.

435. Plaintiffs did not want a ride from the police and told that them that they could not leave the police station on their own.

436. Once Plaintiffs were in the car, the unidentified officer in the car said, "Don't be mad but my lieutenant said we have to drop you off on 35th and Kilbourne."

437. Plaintiff Schroeder was given a municipal ticket in the amount of $1,321 for Disobeying A Lawful Order signed by Lt. Jeffrey Farina.

438. Plaintiff Geisler was given a ticket for Violation of an Emergency Order in the Amount of $1,321 despite the fact that it is noted that she was arrested at 6:32p.m. when the curfew started at 7:00p.m.

439. According to Wis. Stat. 323.28 the maximum forfeiture that can be given is $200.

440. Plaintiff suffered physical discomfort and significant emotional distress and

trauma, including the fear about where she would be taken and what would be done to her while she was being unlawfully arrested and detained.

441. Plaintiffs continue to experience post-traumatic stress and fear of on-going retaliation.

442. At no time were plaintiffs provided *Miranda* warning, or informed in any way of Any legal rights they had incident to an arrest, search, seizure, detention and interrogation.

### vi.    Anne Delessio-Parson - October 9, 2020

443. Plaintiff Anne Delessio-Parson was in Wauwatosa on October 9, 2020 at around 6:30p.m.

444. She noticed there was a great National Guard and police presence and they were collaborating with other law enforcement agencies.

445. While in Wauwatosa, Anne witnessed the National Guard and officers dressed in military-style fatigues forming a line on 76th Street across North Avenue.

446. Anne talked to a few of the officers, who did not have badges or name plates on which is customary attire for officers.

447. While talking with the officers another officer came from behind the shields and arrested Anne.

448. After officers put wrist restraints on Anne she was put in the back of the van where there were two other occupants.

449. While they were in the van, they asked the officers to keep the door open for air but the officers refused.

450. At no time was she given her Miranda rights or told why she was being arrested.

451. They were told that they would move the van once it was "filled up" by other

67

persons whom the police were going to presumably arrest.

452. While they were in the van there was an elderly woman with a walker who was also arrested and brought inside the van.

453. The woman in the van practically begged the officers for medical assistance which the police ignored.

454. Finally, the officers drove three of them to another location.

455. When the van stopped, Anne witnessed the police aggressively shove several males of color into the back of the van. One of the young men was very upset and was wearing what appeared to be a uniform.

456. All men had their wrist restraints on very tight and the police refused to loosen the restraints.

457. Anne witnessed their hands turning bluish/purple and they were becoming very cold to the touch.

458. One of the men was having an anxiety attack but the police did give them any medical assistance.

459. Eventually they all arrived at the Wauwatosa Police Department and were told that they would be made to talk to the FBI.

460. Anne was photographed, fingerprinted, and made to talk with an FBI agent who stated his name was "Brett."

461. Despite the lack of probable cause for state and federal crimes she was both forced to sit and talk to FBI agents.

462. The FBI asked them questions and she told them she wanted a lawyer and specifically told them that she did not want to answer any questions.

463. Before she left the police station she was given a ticket by the officers.

464. Anne was given a ticket by Officer Dexter Schleis for Violating an Emergency Order.

465. Anne asked to use the police phone so she could call for a ride and was all denied a phone call.

466. Anne wanted to walk out of the Wauwatosa police Station to walk home.

467. The Wauwatosa Police forced her to get back in the car with the police, detaining Anne for a second time.

468. Anne did not want to get in the police car but she was told that she did not have a choice.

469. The Wauwatosa Police Officer told Anne that they would take her home.

470. Only because she was forced to did Anne get into the police car.

471. The officers took her and dropped her off at around 35th and Kilbourn in Milwaukee which is nowhere near where close to where she lives but is instead a dangerous neighborhood in Milwaukee especially at 3 a.m. and they were told by the police that you are going to have to find your own way home.

472. The Wauwatosa Police Officer dropped her off on the street and left her there in the middle of an unfamiliar neighborhood to walk home.

473. Plaintiff suffered physical discomfort and significant emotional distress and trauma, including the fear about where she would be taken and what would be done to her while she was being unlawfully arrested and detained.

474. Plaintiff continues to experience post-traumatic stress and fear of on-going retaliation.

475. At no time was Anne provided *Miranda* warning, or informed in any way of any legal rights she had incident to an arrest, search, seizure, detention and interrogation.

### vii. Holly Lavora and Nathan Sabel - October 8, 2020

476. Plaintiffs Nathan Sabel and Holly Lavora were in the city of Wauwatosa on October 8, 2020 at around 6:30p.m.

477. While they were driving up North Avenue they were blocked in by the police while trying to leave the area.

478. An unmarked police car blocked them in and then they were then told to get out of the car which they did and were arrested.

479. The police officers who approached the car did not have name tags or badges identifying themselves.

480. The police searched Lavora's car while they were arrested.

481. Plaintiff Lavora did not give them permission to search her car.

482. While Plaintiff was under arrest she saw another officer drive her car, which was legally parked, to Wauwatosa's City Hall.

483. Plaintiff's car was then towed from Wauwatosa's City Hall.

484. Plaintiff Lavora's had to pay $157.50 to get her car from the tow lot.

485. The towing of Plaintiff's car was another vindictive response by officers within the WPD.

486. The Towing of Plaintiff's car was in violation of WPD's Towing policy.

487. The police put wrist restraints on Plaintiff's Sabel and Lavora which were extremely tight.

488. The police took Lavora's cell phone.

489. At no time did Lavora give them permission to search her cell phone.

490. They were then told to stand on the grass which they did while they waited for someone to transport them to wherever the police were supposed to take them.

491. Eventually a police van showed up and they were driven to the parking lot of what they believed was a school.

492. They were then told to get out of the van and they were taken into another car and were not told where they were going to be taken and the officer who transported them did not identify themselves.

493. Eventually they were taken to the West Allis police station.

494. While they were at the West Allis police station it appeared as if the police were annoyed as they were complaining that Wauwatosa did not give them information on the process and were "taking too long."

495. It appeared as if all of the officers were intentionally trying to conceal their identities from Lavora, Sabel, and others.

496.  The officer who helped to book them had taped over his name badge.

497.  Lavora and Sabel were photographed, fingerprinted, and made to sit with the FBI.

498.  Despite the lack of probable cause for state and federal crimes they were both forced to sit and talk to FBI agents.

499.  The FBI asked them questions and they told them that they did not want to answer any questions.

500.  Eventually Lavora and Sabel were released by the West Allis police department.

501.  Before they left the West Allis police station, Lavora asked to get her phone back which they refused to give to her.

502.  When Lavora repeatedly tried to get her phone back from the Wauwatosa police department in the ensuing days they continued to refuse to give her phone back.

503.  She was told that they could keep her phone as long as they wanted and they were trying to get a search warrant which they never did.

504.  Eventually, Lavora got her phone back and it appeared to be tampered with and several months of information had been erased, including pictures that she took of the police.

505.  When they were released from West Allis, Lavora and Sabel were given tickets written Wauwatosa Police Lt. Jeffrey Farina.

506.  In the tickets it accurately notes that Sabel and Lavora were both arrested at

6:32p.m.

507. Plaintiffs were all denied their right to an attorney and their right to remain silent.

508. Plaintiffs suffered physical discomfort and injury, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

509. Plaintiffs continue to experience post-traumatic stress and fear of on-going retaliation.

510. At no time were Plaintiffs provided with their *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention and interrogation.

511. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, significant emotional distress, and trauma, including fear of where they would be taken and what would be done to them, from their unlawful arrest and detention.

### viii. Rachel Dulay and Jose Hernandez Ramirez - October 8, 2020

512. Plaintiffs Rachel Dulay and Jose Hernandez were driving in Wauwatosa on October 8, 2020.

513. While at a stop sign, the police surrounded their car putting "stop sticks" underneath the wheels preventing them from leaving.

514. Officer Cory Wex and Detective Joseph Lewandowski arrested Plaintiffs Dulay and Hernandez.

515. While stopped, the officers asked Plaintiff to take the keys out of the car, which

he immediately did and Detective Lewandowski forcefully pulled Hernandez out of the car ripping his shirt while yelling 'stop resisting' which plaintiff was not doing.

516. Detective Lewandowski continually yelled 'stop resisting' but plaintiffs never resisted.

517. It appears that officers believe that if they simply scream stop resisting, they can magically use excessive force regardless of whether an individual is in fact resisting.

518. After Detective Lewandowski forcefully pulled Hernandez out of the car he pointed his gun at Dulay.

519. Plaintiff Dulay was trying to record the interaction on her phone and Detective Lewandowski said not to record.

520. Officers took plaintiffs phones and at no time did they give permission to search their phones.

521. Detective Lewandowski later claimed that he thought Plaintiff Dulay had a gun, which she did not and for which Detective Lewandowski has no reasonable basis.

522. After plaintiff Dulay got out of the car they forcefully threw her to the ground.

523. Plaintiff Dulay was never told why she was being arrested and the officers refused to identify themselves.

524. Plaintiffs were told not to speak.

525. Plaintiffs hands were bound for hours with wrist restraints which were extremely tight.

526. Plaintiffs asked the police to loosen the restraints which they refused.

527.  Plaintiffs were forced into a van and were not told where they were being taken to.

528.  Plaintiff Dulay's car was searched she did not give them permission to search her car.

529.  While Plaintiff was under arrest her car was towed.

530.  The Towing of Plaintiff's car was in violation of WPD's Towing policy.

531.  Eventually Plaintiffs were taken to West Allis.

532.  While at the West Police Department Plaintiffs were made to talk to the FBI.

533.  The FBI asked plaintiffs individually if they, were "members of a terrorist group like TPR, BLM, or ANTIFA."

534.  Plaintiff Dulay laughed when they told her that TPR is a terrorist organization. And the FBI replied that TPR was a terrorist gang because they went to Mensah's house.

535.  Plaintiff Dulay asked for a phone call which they refused to give her.

536.  Plaintiffs left the police station and were given tickets.

537.  Officers told Plaintiff multiple times that her car had not been towed.

538.  The next day, Plaintiff went to N & S Towing, Inc. and was told that the WPD had called to get her car towed.



539. Plaintiff had to pay $121.33 to get her car out of the tow lot.

540. At no point while Plaintiffs were under arrest was she told her Miranda rights.

541. Plaintiffs continue to experience post-traumatic stress and fear on-going retaliation.

542. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms tied behind their backs, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them from his unlawful arrest and detention.

543. Plaintiffs were given a municipal ticket in the amount of $1,321 for Violation of an Emergency Order signed by Lt. Jeffrey Farina.

544. According to Wis. Stat. 323.28 the maximum forfeiture that can be given is $200.

### ix. Oscar Concepcion - October 7, 2020

545. Plaintiff Oscar Concepcion was in Wauwatosa working on October 7, 2020.

546. At around 9p.m. he picked someone up at McDonald's located at 98th Lisbon

547. While in Wauwatosa, Mr. Concepcion witnessed the National Guard and officers

dressed in military-style fatigues in Wauwatosa.

548. While he was on 101st and Lisbon he saw police, National Guard, and citizens in the streets.

549. As he was driving UBER he tried to leave the area but was immediately trapped in by the National Guard.

550. While he was blocked in, the National Guard started throwing tear gas at the crowd.

551. Immediately after tear gas was thrown at the crowd unidentified National Guard members ran to his car and demanded that he get out of his car immediately and threatened to break his windows.

552. He tried to get out of the car and while doing that he was physically dragged out of his car and thrown on the ground.

553. After he was thrown to the ground, they put handcuffs on him extremely tightly.

554. He tried to explain to the National Guard and the officers that he was working but they refused to listen to him.

555. He complained about his handcuffs being extremely tight but they did not want to listen to him.

556. At one point, Lt. Farina of the Wauwatosa Police Department came to him and said, "he's one of the leaders."

557. This was apparent justification that was used to arrest him despite the fact that he pleaded with the officers to check the UBER app which they refused.

558. Mr. Concepcion tried to identify other officers but he noticed that they had black tape over their names.

559. Mr. Concepcion asked why he was being arrested and he did not receive an answer.

77

560. He noticed that police were entering some information on an app.

561. Mr. Concepcion was eventually put in the back of a SWAT car and they drove him around for about 45 minutes.

562. The car that Mr. Concepcion was in eventually met up with another van and the cars met bumper to bumper.

563. Mr. Concepcion despite his repeated questioning was never told why he was arrested or where he was being taken to.

564. Mr. Concepcion was told to get into the second vehicle, which he did, and he was driven around for what seemed like hours.

564. It seemed as though the police were confused as to where he was supposed to be taken to.

565. Eventually Mr. Concepcion was taken to West Allis Police Department where he was booked.

566. While he was there they took his pictures and he was made to talk to the FBI.

567. There was no probable cause that Mr. Concepcion committed any state or federal crimes.

568. Mr. Concepcion stated to the FBI that he did not want to talk to them and that he wanted his attorney.

569. Despite invoking his right to remain silent and his right to an attorney the FBI continued to ask him questions.

570. After being forced to talk to the FBI, Mr. Concepcion, he was finally released from West Allis.

571. Mr. Concepcion was given a ticket for violation of an Emergency Order for $1,321.

572. According to the Emergency Proclamation signed by Mayor Dennis McBride persons going "to and from work" are supposed to be exempted from the Curfew.

574. On October 7, 2020 when Mr. Concepcion was arrested he was working and despite that he was arrested and ticketed.

**x.** **Leah Porter, Christina Vitolo Haddad, and Sonja Worthy - October 10, 2020**

575. Leah Porter, Christina Vitolo Haddad, and Sonja Worthy were in the City of Wauwatosa on October 10, 2020 to serve as street medics.

576. The three came to Wauwatosa prepared to serve in a street medic capacity and brought the necessary equipment to triage general issues that people may have.

577. Porter, Haddad, and Worthy were in Wauwatosa before 7pm where they attended a candlelight vigil outside Wauwatosa's City Hall which lasted after 7pm.

578. While there they witnessed the national guard and various law enforcement agencies in armored vehicles and wearing tactical gear.

579. According to the Emergency Declaration, social service workers were exempt from the curfew.

580. Porter, Haddad, and Worthy were serving in as street medics and should have been exempt from the curfew as they were acting in a social service worker

capacity.

581. Sometime after 7p.m. the police were issuing dispersal orders.

582. While at Wauwatosa Porter, Haddad, and Worthy provided waters to various people.

583. Seeing that there was no need for them to provide medical assistance Porter, Haddad, and Worthy left the City Hall area to leave to go home.

584. While they were walking to their car shortly after dispersal orders were given Porter, Haddad, and Worthy were stopped by a Wauwatosa police officer in a car.

585. One officer did not have a name tag or badge but had a blue lives matter tattoo on his forearm asked them where they were going.

586. Despite the fact that Haddad, Porter, and Worthy were trying to leave, they were arrested and all of their medical bags were checked as well as their cellphones was taken away.

587. At no time did Haddad, Porter, or Worthy give consent to search their cell phones or their bags.

588. While they were under arrest and before they were put in the police vehicle an officer took a picture of all three of them with his cell phone.

589. Vitolo repeatedly told the officers that she was not going to answer any questions.

590. Despite Vitolo asserting her right to remain silent, the officers continued to answer her questions.

591. While Haddad, Porter, and Worthy were arrested and in the car they were told by the unidentified officer that, "Uh oh ladies it sounds like the feds want to talk to you."

592. Haddad, Porter, and Worthy were taken to Mayfair Mall where there was a makeshift police Station after 8p.m.

593. While they were at Mayfair mall they were booked in by an unidentified female police officer.

594. While at Mayfair Mall, Officer Benjamin Ziegler also came to the mall.

595. The police took front and side pictures of their face.

596. They were told that they had to talk to two FBI agents.

597. Haddad, Porter, and Worthy all together were forced to talk to two FBI agents despite their previous assertions that they did not want to answer any questions.

598. While they were in custody they were asked if they were affiliated with the People's Revolution.

599. Haddad, Porter, and Worthy continued to tell the FBI agents that they were not going to answer any questions.

600. While they were with the FBI, one of the agents took a picture of them with his cellphone.

601. Eventually, the FBI agents stopped questioning them then they were given a ticket by Wauwatosa Officer Benjamin Ziegler.

602. One of the Dane County officers drove them from Mayfair Mall back to their car.

603. While they were in the car, the officer before dropping them off said, 'Ladies your not going to do anything like this again, right?'

604. At no time were they given their Miranda rights.

605. At no time did they consent to a search of their belongings.

606. Plaintiffs were all denied their right to an attorney and their right to remain silent.

607. Plaintiffs suffered physical discomfort and injury, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

608. Plaintiffs continue to experience post-traumatic stress and fear of on-going retaliation.

      **x.    Destiney Jones - October 8, 2020**

609. Plaintiff Destiney Jones was in Wauwatosa on October 8, 2020.

610. While she was in Wauwatosa driving in her car and trying to leave and Officer approached her car with a gun pointing it at her head..

611. He immediately forced her to get out of the car which she did.

612. Plaintiff Jones' car was searched even though she did not give them permission to search her car.

613. While Plaintiff was under arrest her car was towed.

614. The towing of Plaintiff's car was another vindictive response by officers within the

WPD.

615. The Towing of Plaintiff's car was in violation of WPD's Towing policy.

616. A female officer put her hand restraints extremely tight and refused to loosen them up.

617. Ms. Jones was then forced to go into a van that arrived to take her somewhere.

618. After leaving the area, Ms. Jones was in the van with others who also were arrested.

619. At first they were taken somewhere on Mayfair Road where they parked for about an hour.



620. Ms. Jones and others were then taken to the Waukesha County Jail where they sat in the van for about an hour.

621. While she was in the van outside of the Waukesha County Jail their pictures were taken.

622. When Ms. Jones was eventually taken inside the Waukesha County Jail building

she was forced to change into orange jail clothes. While she was changing an officer was in the room watching her get naked and she was told by the officer that it was protocol.

623. The Waukesha County Jail took inventory of all the items of clothing that they took from her.

624. While at the Waukesha County Jail, Ms. Jones was told that she had to talk to the FBI.

625. Ms. Jones was photographed, fingerprinted, and made to talk with an FBI agent.

626. Despite the lack of probable cause that she had committed any state or federal crimes she was still forced to sit and talk to FBI agents.

627. Ms. Jones was told that she had to talk to the FBI. She did not want to answer any questions of the FBI and repeatedly told the police and the FBI that she wanted to talk to her attorney.

628. Despite Ms. Jones's repeatedly asserting her right to remain silent and her right to an attorney the FBI agents continued to ask her questions.

629. The FBI asked several questions like what happened. Why was she protesting?

630. Ms. Jones was eventually released from the jail after midnight and the police kept her phone with no explanation why.

631. Before leaving the Waukesha County Jail, about four hours after she had been arrested, she was given a municipal ticket for Violation of an Emergency Order signed by Lt. Jeffrey Farina.

632. Plaintiff suffered physical discomfort and significant emotional distress and

trauma, including the fear about where she would be taken and what would be done to her while she was being unlawfully arrested and detained.

633. Plaintiff continues to experience post-traumatic stress and fear on-going retaliation.

634. At no time was Plaintiff provided the *Miranda* warning, or informed in any way of any legal rights she had incident to an arrest, search, seizure, detention and interrogation.

### xi.    Erik Fanning and Sonora Larson - October 8, 2020

635. Plaintiffs Erik Fanning and Sonora Larson are activists who were in the City of Wauwatosa on October 8, 2020.

636. While Plaintiffs Fanning and Larson were trying to leave Wauwatosa the car that they were traveling in was being "kettled" by numerous, unidentifiable law enforcement vehicles, forcing the car to arrive at a predetermined destination (corner of Milwaukee Avenue & Wauwatosa Avenue), where they were stopped by unidentified police officers and persons whom he believes were with the National Guard.

637. Also, while Plaintiff's were trying to leave Wauwatosa law enforcement officers threw stop spike strips in front of and between the tires of the car which prevented Plaintiffs and the other occupants of the car from leaving.

638. Several law enforcement officers including Detective James Short threatened to break the windows of the car, pointed rifle(s) at the rear driver-side window, and used excessive force to physically pull Plaintiffs Fanning and Larson out of the car.

639. Plaintiffs were forcefully pulled out of the car.  Fanning was dragged across

pavement and struck with blunt object(s) while face-down on the ground.

640. Plaintiff's phones were taken by law enforcement officers with no explanation as to why their phones were being taken.

641. Plaintiffs were then made to get into a Wauwatosa Police Department van parked near this staging ground. Plaintiffs Larson and Fanning were next taken to unknown rendezvous point, then placed in a Waukesha County Jail van driven and taken to the Waukesha County Jail by Officer Maria Albiter and a Waukesha County Sheriff's Deputy.

642. Plaintiffs were forced to be in close proximity of each other and other persons arrested, while their hands were tightly bound in zip ties for hours.

643. Plaintiffs were around different police officers, who refused to identify themselves, and who were not wearing masks and who also refused to give them masks.

644. While at the Waukesha County Jail, Plaintiffs Larson and Fanning were told that they had to talk to the FBI.

645. While at the Waukesha County Jail Plaintiffs were made to change into inmate clothing, photographed, fingerprinted, and made to talk with several FBI agents present at the jail that evening.

646. Plaintiff Larson was made to take all of her clothes off in the presence of an Officer which was meant to humiliate her as such is not normal procedure for a

potential violation of a noncriminal municipal ordinance.

647. Despite the lack of probable cause that Plaintiffs had committed any state or federal crimes, they were both individually forced to sit and talk to FBI agents.

648. Plaintiffs were told that they had to talk to the FBI. They did not want to answer any questions of the FBI.

649. Despite Plaintiff's repeated assertions of their right to remain silent and their right to an attorney the FBI agents continued to ask them questions.

650. The FBI asked several questions like what happened? Who did you travel with? Why were they protesting? Who led the protests? Are you a member of TPR?

651. While at the Waukesha County Jail for hours, Plaintiffs were denied water and use of the bathroom.

652. Plaintiffs were eventually released from the jail around 1:00a.m. and Officer Arbiter told them that Wauwatosa needed their phones for "evidence."

653. The Waukesha Police officers did not allow them to call for a ride and released them from the station after 1:00a.m.

654. Plaintiffs suffered physical injuries, discomfort, and significant emotional distress and trauma, including the fear about where they would be taken and what would be done to them while being unlawfully arrested and detained.

655. Plaintiffs continue to experience post-traumatic stress, and fear on-going retaliation by the Wauwatosa Police Department.

656. At no time were Plaintiffs given their *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention and

Interrogation.

### xii.    Breon Foster - October 9, 2020

657.    On October 9, 2020 Breon Foster was peacefully protesting in the City of

Wauwatosa.

658.    While he was trying to leave Wauwatosa at around 8:30p.m. he was violently

grabbed by unidentified police officers from behind who refused to identify

themselves.

659.    The officers had tape over their nametags.

660.    The unidentified officers put zip ties on Plaintiff extremely tight for at least an

hour.

661.    Plaintiff was photographed, booked, and fingerprinted while he was at the

WPD.

662.    Eventually, plaintiff was taken to the Wauwatosa Police station where he was

questioned.

663.    Before he was questioned by the FBI he stated that he wanted his lawyer,

Kimberley Motley.

664.    Despite plaintiff invoking his right to remain silent the FBI continued to question

him.

665.    After he was questioned by the FBI, he was then questioned by Wauwatosa's

Detective Joseph Lewandowski.

666.    Before being questioned by Detective Joseph Lewandowki, plaintiff stated that he

wanted his lawyer Kimberley Motley before going into the interrogation room.

667. Despite his invoking his constitutional right to remain silent, Detective Lewandowski still made plaintiff go into the interrogation room to be questioned.

668. Plaintiff felt that he had no choice but to talk to Detective Lewandowski.

669. The interrogation of Detective Lewandowski and Plaintiff occurred after 2:00a.m.

670. The Wauwatosa Police Department released the video of the interrogation to the public on January 7, 2021.

671. Detective Lewandowski was wearing a blue lives matter mask throughout this interview which was very intimidating for Plaintiff.

672. During this interrogation, Detective Lewandowski specifically dissuaded plaintiff from Kimberley Motley being his lawyer and made disparaging remarks to him.

673. Specifically, Detective Lewandowski told Plaintiff,

> "But that's what The People's Revolution is doing to Joe Mensah. They don't have the facts. They're at least not willing to talk about the facts. But yet they're terrorizing the city of Wauwatosa because they're pissed off because the D.A. didn't rule the way that they wanted. So, you all are lucky because you were able to uh, you were able to uh, get our chicken shit mayor to do what you all wanted to do and telling us if he stopped and then that's pissing People's Revolution off, that- and then now here we are, right? And you know what the worst part of this is? This all started

because of Motley, 'cause Motley came in, and I'm sure she told the family, "I can get you money." You know why? 'Cause they always do. She is victimizing those families even worse than what Joe Mensah's doing. ' 'Cause she, I guarantee you, she promised them everything under the sun, "We're gonna get this, we're gonna get this, we're gonna get 'em fired, we're gonna get the chief fired." She told you all this, didn't she? She's gonna get the family money. She told you all this, didn't she? What just happened? He was ruled justified. You think the family's getting money? You think, you think Mensah's gettin' fired? you think Chief Weber's getting fired? And you know what the messed up thing is? She knew this was gonna happen from day number one. So who do you think the real crook is here? She knew exactly how the DA's office was gonna rule. Why? 'Cause she was with the family from day number one. You think this is the first time she's been involved in an officer-related use of force thing? She knows what they have to prove to, to whether or not they charge someone or not. And I gotta tell ya, I am aware of all of the specifics of all three incidents and all three incidents are justified.

But I'll tell you what, this is the most cleanest cop one of them all as far as justification goes, and she knew this. But that didn't stop her from coming and saying, "Hey I can get ya this. I can do this." Why do you think she did

that?"

675. Detective Lewandowski asked if Plaintiff Foster was a member of TPR.

676. At the end of the interview, Plaintiff's inside of his mouth was swabbed and Detective Lewandowski took saliva samples for the purposes getting his DNA.

677. Plaintiff continues to experience post-traumatic stress and fear on-going retaliation.

678. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having his arms tied behind his back, and significant emotional distress and trauma, including fear about where he would be taken and what would be done to him, from his unlawful arrest and detention.

679. Plaintiff was eventually given a municipal ticket in the amount of $1,321 for Violation of an Emergency Order signed by Lt. Jeffrey Farina.

680. According to Wis. Stat. 323.28 the maximum forfeiture that can be given is $200.

**xiii.   Jill Ferguson - October 11, 2020**

681. Jill Ferguson is an activist who was filming people protesting in Wauwatosa on October 11, 2020.

682. At around 7:30p.m. Plaintiff was videotaping the interactions between the police and protestors from her car.

683. Plaintiff's car has numerous bumper stickers regarding a wide variety of social justice issues.

684. Plaintiff was  immediately stopped and targeted by the police.

685. While driving, there were about six unmarked vehicles who stopped and

91

surrounded her car.

686. After they stopped her car, they asked her to step out of her car and immediately took her cell phone.

687. They forcefully pushed her on the trunk of car and put handcuffs on her extremely tight.

688. Plaintiff was purportedly arrested for a noncriminal ordinance violation and asked that they loosen the handcuffs, which they did not, as she has severe arthritis in her hands.

689. Police at the scene taunted her as to why was supporting a terrorist group - Inferring that TPR and BLM are terrorist organizations.

690. Police at the scene asked her why she was associating with "thugs" in TPR and BLM.

691. At no time did the officers identify themselves and they had black tape over their names.

692. The video that plaintiff was recording was erased from her phone by the police.

693. At no time did she give the officers permission to search her phone.

694. Eventually she was taken to the Wauwatosa Police Department where she was photographed and fingerprinted. While at the Wauwatosa Police Department Plaintiff was made to talk to the FBI.

695. Despite asserting her right to remain silent, the FBI asked her if she, "was a member of a terrorist group like TPR, BLM, or ANTIFA."

696. Plaintiff wanted to leave the police station on her own but was told that she had to take a ride back by the police who were going to take her to her car.

92

697.  Plaintiff did not want a ride from the police and told that she could not leave the police station on her own.

698.  Despite Plaintiff's objections the police made her get back in the police car essentially arresting her again with no probable cause.

699.  Officers told Plaintiff that her car had not been towed.

700.  While Plaintiff was under arrest her car was towed.

701.  The towing of Plaintiff's car was another vindictive response by officers within the WPD.

702.  The Towing of Plaintiff's car was in violation of WPD's Towing policy.

703.  The officers dropped Plaintiff off miles away from her car, with no cell phone, after 2 a.m.

704.  Plaintiff continues to experience post-traumatic stress and fear on-going retaliation.

705.  Plaintiff suffered physical discomfort and injury, including soreness and bruising from having her arms tied behind her back, and significant emotional distress and trauma, including fear about where she would be taken and what would be done to her from his unlawful arrest and detention.

706.  Plaintiff was eventually given a municipal ticket in the amount of $1,321 for Violation of an Emergency Order signed by Lt. Jeffrey Farina.

707.  According to Wis. Stat. 323.28 the maximum forfeiture that can be given is $200.

708.  The next day, Plaintiff went to Dennis Towing and Transportation and was told that the WPD had called to get her car towed.

709.  Plaintiff had to pay $157.75 to get her car out of the tow lot.

710.    At no point while Plaintiff was under arrest was she told her Miranda rights.

### xiv.    Pete Sparks - October 10, 2020

711.    Plaintiff Sparks was attempting to film protesting in the City of Wauwatosa on October 10, 2020.

712.    He rode his bicycle near the Wauwatosa Library and then noticed an unmarked car with their lights off, driving very fast next to him.

713.    He thought that they were counter protestors and he was near a cemetery near 76th and Burleigh.

714.    It appeared as though he was being kettled toward the cemetery and all of a sudden several people in military fatigues came running out of the area yelling at him to stop.

715.    Some other guys came and they jumped him and then they cuffed him tightly never announcing that they were police officers.

716.    Plaintiff told them that they never announced themselves as police officers.

717.    Plaintiff was then dragged into the cemetery where the officers started beating and kicking him.

718.    The police also took his cellphone.

719.    Police kept bending plaintiff's knee back which was extremely painful.

720.    The officers at the scene also damaged plaintiff's bike which made it immobile and also had several broken pieces when he recovered it.

721.    The officers at the scene refused to identify themselves as he was repeatedly asking and was eventually taken to the Wauwatosa Police Department.

94

722. At the police station Plaintiff complained about the excessive force that was used against him by the Wauwatosa Police Officers to the FBI officers.

723. Plaintiff was photographed, fingerprinted, and booked at the WPD.

724. Plaintiff was made to talk to the FBI despite their being no probable cause that he had committed any federal crimes to justify talking to them.

725. Plaintiff was eventually given a municipal ticket in the amount of $1,321 for Violation of an Emergency Order signed by Lt. Jeffrey Farina.

726. According to Wis. Stat. 323.28 the maximum forfeiture that can be given is $200.

727. Plaintiff suffered physical discomfort and injury, including soreness and bruising from his arms being handcuffed behind his backs, and significant emotional distress and trauma, including fear about what would be done to him, from his unlawful arrest and detention.

728. Plaintiff continues to experience post-traumatic stress and fear on-going retaliation.

729. At no time was Plaintiff Sparks provided *Miranda* warning, or informed in any way of any legal rights he had incident to an arrest, search, seizure, detention, and interrogation.

   **xv.    Carmen Palmer, (Juvenile) Male Palmer, and (Juvenile) Female Palmer – October 8, 2020**

730. Carmen Palmer and her two teenaged children, were in Wauwatosa protesting on October 8, 2020.

731. While Plaintiff Palmer was driving she was "kettled" and then trapped in by numerous, unidentifiable law enforcement vehicles and stop spike strips were thrown in front of her car forcing her to stop and preventing her from leaving.

732. Police then pointed guns at Plaintiff Palmer and her two children and forced them all out of the car.

733. Plaintiffs were all forcefully pulled out of the car and thrown down on the ground.

734. Plaintiff's kids were trying to record the incident but the police stopped them.

735. Plaintiff told the officers that she wanted to call someone to get her children and was told to shut up.

736. The police put handcuffs on Plaintiffs which were extremely tight and they refused to loosen up.

737. Officers took all the phones of the Plaintiffs and refused to return it to them immediately upon her release.

738. Eventually Plaintiffs were taken to the West Allis police station.

739. Plaintiff was photographed, fingerprinted, and made to sit with the FBI.

740. Plaintiff was made to talk to the FBI despite their being no probable cause that she had committed any federal crimes to justify talking to them.

741. Eventually Plaintiffs were released by the West Allis police department.

742. There were no acts by Plaintiffs, nor acts by any other people that the Plaintiff's witnessed, which could constitute non peaceable assembly. They were simply protesting and trying to leave a peaceful protest against police brutality.

743. When Plaintiffs were eventually released from West Allis each of them were given

a violation of an emergency order ticket in the amount of $1,321.

744. According to Wis. Stat. 323.28 the maximum forfeiture for Violation of an Emergency Order municipal citation that can be given is $200.

745. Plaintiff Palmer's car was towed at the direction of the WPD.

746. The Towing of Plaintiff's car was in violation of WPD's Towing policy.

747. When plaintiff went to get her car out of the tow lot she saw that it had been completely ram sacked and all of her windows were down.

748. Plaintiff did not give anyone permission to search her car.

749. Plaintiff continues to experience post-traumatic stress and fear of on-going retaliation.

750. At no time were Plaintiffs provided with their *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention and interrogation.

751. Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, significant emotional distress and trauma, including fear of where they would be taken and what would be done to them, from their unlawful arrest and detention.

xvi.  Molly Nilssen – October 10, 2020

752. Plaintiff was in the city of Wauwatosa on October 10, 2020 peacefully protesting.

753. At around 7:00p.m. Plaintiff was arrested.

754. Plaintiff's Nilssen's wrist restraints were extremely tight and the officers did not seem to care.

755. Plaintiff was put in a van with two other women, identified as Dana McCormick

97

And Kate Knowlton.

756. Plaintiff Nilssen's phone was taken away with no explanation.

757. Plaintiff never gave anyone permission to search her phone.

758. Plaintiff was eventually taken to the WPD and while there, she was photographed, fingerprinted, and made to talk with two FBI agent.

759. Despite the lack of probable cause that Plaintiff had committed any state or Federal crimes she was still forced to sit and talk to FBI agents.

760. Plaintiff was told that she had to talk to the FBI despite her stating that she did not want to answer any questions.

761. Despite Plaintiff's repeated assertions of her right to remain silent and her right to an attorney the FBI agents continued to ask her questions.

762. Plaintiff complained to the FBI agents of getting hit with rubber bullets and being tear gassed.

763. The FBI asked several questions like what happened. Why was she protesting? Who was she with? If she was with TPR?

764. After the questions, Plaintiff was told by the officers that she would be leaving in a police van and dropped off at a point of law enforcement's choosing.

765. Plaintiff Nilssen was upset and asked why she would not be free to leave on her own.

766. The unidentified Law enforcement officer stated that "policy" required law enforcement transport as a "courtesy." Law enforcement further stated that Defendant Weber did not want people gathering at the police station.

767. Plaintiff Nilssen was told that if she continued to be upset that she would be

98

arrested again for a curfew violation, and that it would be "safer" to take the law enforcement "courtesy" transport.

768.   Plaintiff was  walked out of the parking lot accompanied by a police officer.

769.   Plaintiffs were eventually released from the jail and the police kept her phones with no explanation why.

770.   Plaintiffs were dropped off at that intersection where Wauwatosa East High School is located and told they could still be arrested for curfew violation. Plaintiffs' belongings were then returned and Plaintiffs walked to their respective homes.

771.   Plaintiffs suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, and significant emotional distress and trauma, including fear about where they would be taken and what would be done to them, from their unlawful arrest and detention.

772.   Plaintiffs continue to experience post-traumatic stress and fear on-going retaliation.

773.   Plaintiff was given a ticket for Violation of an Emergency Order in the amount of $1,321.

774.   According to Wis. Stat. 323.28 the maximum forfeiture that can be given is $200.

775.   At no time was Plaintiff provided *Miranda* warning, or informed in any way of any legal rights she had incident to an arrest, search, seizure, detention and interrogation.

### xix.   Suzanne Wells – October 8, 2020

776.   Suzanne Wells was in Wauwatosa protesting on October 8, 2020.

777. While Plaintiff Wells was trying to leave Wauwatosa the car that they were traveling in was being "kettled" by numerous, unidentifiable law enforcement vehicles and stop spike strips were thrown in front of her car forcing her to stop and preventing her from leaving.

778. The police put wrist restraints on Plaintiff which was extremely tight and they refused to loosen up.

779. Eventually a police van showed up and they were driven to the parking lot of what she believed to be a school.

780. She was then told to get out of the van and taken into another car and was not told where she was going to be taken and the officers who transported her did not identify themselves.

781. Eventually she was taken to the West Allis police station.

782. Plaintiff was photographed, fingerprinted, and made to sit with the FBI.

783. Plaintiff was made to talk to the FBI despite their being no probable cause that she had committed any federal crimes to justify talking to them.

784. Eventually Plaintiff Wells was released by the West Allis police department.

785. She was told that they could keep her phone as long as they wanted and they were trying to get a search warrant which they never did.

786. Eventually, Plaintiff Wells got her phone back and it appeared to be tampered with.

787. When Plaintiff was eventually released from she was given a violation of an emergency order ticket in the amount of $1,321.

788. According to Wis. Stat. 323.28 the maximum forfeiture for Violation of an Emergency Order municipal citation that can be given is $200.

789. Plaintiff Wells car was towed at the direction of the WPD.

790. The Towing of Plaintiff's car was in violation of WPD's Towing policy.

791. Plaintiff continues to experience post-traumatic stress and fear of on-going retaliation.

792. At no time was Plaintiff provided with their *Miranda* warning, or informed in any way of any legal rights they had incident to an arrest, search, seizure, detention and interrogation.

793. Plaintiff suffered physical discomfort and injury, including soreness and bruising from having their arms handcuffed behind their backs, significant emotional distress and trauma, including fear of where they would be taken and what would be done to them, from their unlawful arrest and detention.

**C.** **Regarding Protesting in Wauwatosa between August 13, 2020 – September 30, 2020 and Fabricated Arrest Records**

**i.** **Khalil Coleman - August 13, August 14, 2020, September 17, and September 29, 2020**

794. Plaintiff Khalil Coleman was in Wauwatosa on August 13, August 14, 2020, September 17, and September 29, 2020 peacefully protesting for police accountability.

795. On all four dates of August 13, August 14, 2020, September 17, and September 29, 2020 Plaintiff was never arrested nor booked.

796. A few weeks after the August 13th and August 14, 2020 protests Plaintiff was mailed municipal tickets for Obstruction in the amounts of $1321 and $691.

797. A few weeks after the September 17 and September 29, 2020 protests Plaintiff was mailed municipal tickets for Special Events Permit Required in the amounts of $1321.

798. The Wauwatosa Police Department lacked probable cause in giving Plaintiff tickets for Special Event Permit Required.

799. Ticketing  Plaintiff without any justification, was done in accordance with the WPD's  custom and practice of retaliation and targeting purported leaders who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

800. On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

801. It was within this release of documents that Plaintiff discovered that WPD had a fabricated arrested and booking record of Plaintiff.

802. Plaintiff was never arrested nor booked by the WPD on any of the four dates that the WPD had arrest records for.

803. Creating a false arrest record of Plaintiff and then releasing to the public  without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliating and targeting persons who record the police violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### ii.     Mariah Smith  – August 13, 2020 and September 5, 2020

804.  Plaintiff Mariah was in Wauwatosa on August 13, 2020 peacefully protesting for police accountability.

805.  The Wauwatosa Police Department lacked probable cause in giving Plaintiff Smith a ticket for Obstruction of Traffic in the amount of $439.

806.  On September 5, 2020 Plaintiff was peacefully protesting in Wauwatosa.

807.  The Wauwatosa Police Department lacked probable cause in giving Plaintiff Smith an Obstructing Traffic ticket.

808.  Ticketing  Plaintiff without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

809.  On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

810.  It was within this release of documents that Plaintiff discovered that Wauwatosa Police Department had an arrest and booking record for Plaintiff Smith on 8/13/20.

811.  Plaintiff was not arrested nor booked by the WPD on 8/13/20.

812.  Creating a false arrest record of Plaintiff and then releasing to the public  without any  justification  was  done  in  accordance  with  the  WPD's   de-facto  policy, regulation, decision or custom condoning retaliation and targeting persons who

were engaging in peacefully protesting police accountability violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### iii.     Brandon Wilborn  – August 14, 2020 and September 30, 2020

813.    Plaintiff Brandon Wilborn was in Wauwatosa on August 14, 2020 and September 30, 2020 peacefully protesting for police accountability.

814.    A few weeks after participating in the August 14, 2020 protest Plaintiff was mailed a ticket for Special Event Permit Required in the amount of $691.00.

815.    The Wauwatosa Police Department lacked probable cause in giving Plaintiff Wilborn a ticket for Special Event Permit Required.

816.    On September 30, 2020 Plaintiff was peacefully protesting in Wauwatosa.

817.    A few weeks after participating in the September 30, 2020 protest Plaintiff was mailed a ticket for Obstructing Providing False Information to Officer in the amount of $1,321.00.

818.    Ticketing  Plaintiff without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

819.    On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released its arrests and booking records of persons from the Summer and Fall of 2020 file to journalists, lawyers, and other members of the community.

820.    It was within this release of documents that Plaintiff discovered that the WPD had a fabricated arrest and booking record on him.

821. Plaintiff has never been arrested nor booked by the WPD.

822. Creating a false arrest record of Plaintiff and then releasing to the public without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation and targeting persons who were engaging in peacefully protesting police accountability violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### iv. Andrew Aaron – August 13, 2020

823. Plaintiff Andrew Aaron was protesting in Wauwatosa on August 13, 2020 and July 7, 2020.

824. While protesting on August 13, 2020, Plaintiff was identified as a "leader of TPR" and was targeted by officers with the WPD.

825. Plaintiff routinely was working to make sure that protestors were safe and would often record the protests.

826. While standing on his bicycle Plaintiff was tackled to the ground by three Wauwatosa Police Officers.

827. Police arrested Plaintiff at the scene and took his Go Pro camera.

828. At the police station Plaintiff complained about the excessive force that was used against him by the Wauwatosa Police Officers.

829. Plaintiff was photographed, fingerprinted, and booked at the WPD on August 13, 2020.

830. There was no probable cause that he had committed any state crimes to justify placing him under arrest.

831. Upon his release from the WPD they did not return his camera claiming that they did not have it.

832. Plaintiff received his camera back weeks later damaged.

833. Plaintiff was given a Disorderly Conduct municipal ticket in the amount of $1,321 signed by Detective Timothy Warren.

834. Plaintiff suffered physical discomfort and injury, including soreness and bruising from his arms being handcuffed behind his back, and significant emotional distress and trauma, including fear about what would be done to him, from his unlawful arrest and detention.

835. Plaintiff continues to experience post-traumatic stress and fear on-going retaliation.

836. At no time was Plaintiff Sparks provided *Miranda* warning, or informed in any way of any legal rights he had incident to an arrest, search, seizure, detention and interrogation.

### v. Joey Koepp – September 3, 2020

837. Plaintiff Joey Koepp was in Wauwatosa on September 3, 2020 peacefully protesting for police accountability.

838. While protesting plaintiff was arrested and given three tickets in retaliation for protesting. Failure to Yield in the amount of $250, violation of red traffic light in the amount of $98.00, and Obstruction providing False Information in the amount of $691.00.

839. The Wauwatosa Police Department lacked probable cause in giving Plaintiff tickets and ultimately arrested him.

840. Ticketing Plaintiff without any justification, was done in accordance with the

106

WPD's de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

**vi.     Sean Kafer - August 14, 2020**

841.   Plaintiff Sean Kafer was in Wauwatosa on August 14, 2020 filming people peacefully protesting for police accountability.

842.   On this date he never spoke or interacted with the Wauwatosa Police Department

843.   A few weeks later Plaintiff was mailed a municipal ticket for Obstruction False Information to Officers in the amount of $1,321.00 signed by Lt. Farina.

844.   The Wauwatosa Police Department lacked probable cause in giving Plaintiff Kafer a ticket for Obstruction / False Info to Officer.

845.   Ticketing Plaintiff without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

846.   On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

847.   It was within this release of documents that Plaintiff discovered that WPD had a fabricated arrested and booking record of Plaintiff.

848.   Plaintiff has never been arrested nor booked by the WPD.

849.   Creating a false arrest record of Plaintiff and then releasing to the public without

any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliating and targeting persons who record the police violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### vii.    Steven Conklin - September 30, 2020

850. Plaintiff Steven Conklin was in Wauwatosa on September 30, 2020 peacefully protesting for police accountability.

851. On this date he never spoke or interacted with any officers in the WPD.

852. At some point, a ticket was mailed to his former address.

853. A few weeks after this peaceful protest Plaintiff was mailed a ticket for Special Event Permit Required in the amount of $691.00.

854 The Wauwatosa Police Department lacked probable cause in giving Plaintiff. Conklin a ticket for Special Event Permit Required.

855. Ticketing  Plaintiff without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

856. On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

857. It was within this release of documents that Plaintiff discovered that the WPD had a fabricated arrest and booking record.

858. Plaintiff has never been arrested nor booked by the WPD.

859. Creating a false arrest record of Plaintiff and then releasing to the public without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation and targeting persons who were engaging in peacefully protesting police accountability violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

**viii.    Kamila Ahmed – August 30, 2020**

860. Plaintiff Kamila Ahmed was in Wauwatosa on August 30, 2020 peacefully protesting for police accountability.

861. On this date she never spoke or interacted with the Wauwatosa Police Department

862. At some point, a ticket was mailed to her.

863. According to the Wauwatosa Police Department report Plaintiff Ahmed was identified by Lt. Jeffrey Farina and had a brief conversation with him.

864. In this conversation, Lt. Farina claims to have told her that she should not block traffic.

865. At no time was she asked nor did she say that she was an organizer of the protest.

866. A few weeks after this peaceful protest Plaintiff Ahmed was mailed a ticket for Special Event Permit Required in the amount of $691.00.

867. The Wauwatosa Police Department lacked probable cause in giving Ms. Ahmed a ticket for Special Event Permit Required.

868. Ticketing Plaintiff without any justification, was done in accordance with the

WPD's de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

869. On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

870. It was within this release of documents that Plaintiff discovered that the WPD had a fabricated arrest and booking record on her.

871. Plaintiff has never been arrested nor booked by the WPD.

872. Creating a false arrest record of Plaintiff and then releasing to the public without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation and targeting persons who were engaging in peacefully protesting police accountability violating person's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### ix.     Jacqueline Bogenberger – September 30, 2020

873. Plaintiff Jacqueline Bogenberger was in Wauwatosa on September 30, 2020 peacefully protesting for police accountability.

874. On this date he never spoke or interacted with the Wauwatosa Police Department

875. A few weeks later Plaintiff was mailed a municipal ticket for Special Event Permit Required in the amount of $1,321.00.

876. The Wauwatosa Police Department lacked probable cause in giving Plaintiff

Bogenberger a ticket for Special Event Permit Required.

877. Ticketing Plaintiff without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

878. On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

879. It was within this release of documents that Plaintiff discovered that WPD had a fabricated arrested and booking record of Plaintiff.

880. Plaintiff was not arrested nor booked by the WPD on September 30, 2020.

881. Creating a false arrest record of Plaintiff and then releasing to the public without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliating and targeting persons who record the police violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

**viii.      Robert Agnew – September 5, 2020**

882. Plaintiff Robert Agnew was in Wauwatosa on September 5, 2020 peacefully protesting for police accountability.

883. On this date he never spoke or interacted with the Wauwatosa Police Department

884. A few weeks later Plaintiff was mailed a municipal ticket for Special Event Permit Required in the amount of $1,321.00.

885    The Wauwatosa Police Department lacked probable cause in giving Plaintiff
       Robert Agnew a ticket for Special Event Permit Required.

886.   Ticketing  Plaintiff without any justification, was done in accordance with the
       WPD's  de-facto policy, regulation, decision or custom condoning retaliation
       against persons who were engaging in peacefully protesting police accountability
       violating person's equal protection rights and plaintiff's right to peacefully protest.

887.   On January 7, 2021 the Wauwatosa Police Department through its officer Lt.
       Joseph Roy electronically released a huge file to journalists, lawyers, and other
       members of the community.

888.   It was within this release of documents that Plaintiff discovered that WPD had a
       fabricated arrested and booking record of Plaintiff.

889.   Plaintiff was not arrested nor booked by the WPD on September 5, 2020.

890.   Creating a false arrest record of Plaintiff and then releasing to the public  without
       any justification, was done in accordance with the WPD's  de-facto policy,
       regulation, decision or custom condoning retaliating and targeting persons who
       record the police violating Plaintiff's equal protection rights, due process rights,
       and plaintiff's right to peacefully protest.

       **xi.    Gabriella Vitucci – August, 13th and August, 14, 2020**

891.   Plaintiff Gabriella Vitucci was in Wauwatosa on August 13 and August 14, 2020
       peacefully protesting for police accountability.

892.   A few weeks later Plaintiff was mailed a municipal ticket for Obstruction False
       Information and Obstructing Traffic.

893.   The Wauwatosa Police Department lacked probable cause in giving Plaintiff any

tickets.

894. Ticketing Plaintiff without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

895. On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

896. It was within this release of documents that Plaintiff discovered that WPD had fabricated arrests and booking records of Plaintiff.

897. Plaintiff was not arrested nor booked by the WPD on August 13 or August 14, 2020.

888. Creating a false arrest record of Plaintiff and then releasing it to the public without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning retaliating and targeting persons who record the police violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### xii. Joseph Hayes – August, 14, 2020

889. Plaintiff Joseph Hayes was in Wauwatosa on August 14, 2020 peacefully protesting for police accountability.

890. On this date he never spoke or interacted with any officers from the Wauwatosa Police Department.

891. A few weeks later Plaintiff was mailed a municipal ticket for Disorderly

113

Conduct in the amount of $1,321.

892. The Wauwatosa Police Department lacked probable cause in giving Plaintiff a ticket.

893. Ticketing  Plaintiff without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability  violating person's equal protection rights and plaintiff's right to peacefully protest.

894. On January 7, 2021 the Wauwatosa Police Department through its officer Lt. Joseph Roy electronically released a huge file to journalists, lawyers, and other members of the community.

895. It was within this release of documents that Plaintiff discovered that WPD had a fabricated arrested and booking record of Plaintiff.

896. Plaintiff was not arrested nor booked by the WPD on August 14, 2020.

897. Creating a false arrest record of Plaintiff and then releasing to the public  without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliating and targeting persons who record the police violating Plaintiff's equal protection rights, due process rights, and plaintiff's right to peacefully protest.

### xiii.    Rosalind Rogers - September 5, 2020

898. Plaintiff Rosalind Rogers was in Wauwatosa on September 5, 2020 peacefully protesting for police accountability.

899. On this date she was arrested by WPD for not having permit for an event that she

did not host.

900. Plaintiff was given a ticket for Special Event Permit Required in the amount of $691.00.

901. The Wauwatosa Police Department lacked probable cause in giving Plaintiff. a ticket for Special Event Permit Required.

902. Ticketing  Plaintiff without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

**xiv.    Isiah Baldwin - September 5, 2020 and October 10, 2020**

903. Plaintiff Isiah Baldwin was in Wauwatosa on September 5, 2020 peacefully protesting for police accountability.

904. On this date he was arrested by WPD for Disorderly Conduct and given a ticket.

905. The Wauwatosa Police Department lacked probable cause in giving Plaintiff. a ticket.

906. Ticketing  Plaintiff without any justification, was done in accordance with the WPD's  de-facto policy, regulation, decision or custom condoning retaliation against persons who were engaging in peacefully protesting police accountability violating person's equal protection rights and plaintiff's right to peacefully protest.

903. Plaintiff Isiah Baldwin was in Wauwatosa on October 9, 2020 peacefully protesting for police accountability.

904. Plaintiff was given a ticket for Violation of an Emergency Order in the amount of $1,956.00.

905. According to Wis. Stat. 323.28 the maximum forfeiture for Violation of an Emergency Order municipal citation that can be given is $200

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF - Violation of Plaintiffs' Fourth Amendment Rights to be Free from Unlawful Seizure

**(As to All Plaintiffs Against All John Doe Officers, Barry Weber, and Dennis McBride)**

906. All paragraphs of this Complaint are realleged and incorporated as though fully set forth.

907. At all relevant times herein, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983 and acted under color of state law to deprive Plaintiffs of their constitutional rights.

908. The actions by the Defendant Officers in unlawfully and falsely detaining, arresting, and imprisoning Plaintiffs without reasonable suspicion or probable cause violated Plaintiffs' Fourth and Fourteenth Amendment Rights to be free from unreasonable searches and seizures.

909. Defendants Weber and McBride knew that the Wauwatosa Police Department were acting under an unlawful order and that the police did not have probable cause to arrest Plaintiffs. Defendants Weber and McBride in fact took actions with the expectation and intent that persons in Plaintiffs' situations would be arrested without probable cause.

910. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

116

911. That the Defendants' conduct constituted an unlawful and false arrest or unreasonable seizure and search of Plaintiff's Fourth Amendment Rights as incorporated by the Fourteenth Amendment and/or his equal protection rights guaranteed by that same Amendment.

912. At all times material, the Defendant Weber was a WPD Chief acting under color of the statutes, customs, ordinances, and usage of the city of Wauwatosa and was acting in the scope of his employment.

913. That the described conduct of the Defendants, as set forth above was a cause of the violations of Plaintiffs' constitutional rights, as well as injuries including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

914. The Defendant, Wauwatosa, is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against the individual employee Defendants in this action because said Defendants were acting within the scope of their employment when they committed the acts described above.

915. Law enforcement's arrest and detention of Plaintiffs were unjustified and unreasonable seizures of their persons.

916. Law enforcement actions were taken in willful, wanton, reckless and malicious disregard of the Plaintiffs' constitutional rights, for which Plaintiffs have suffered injury.

917. While acting under color of state law, law enforcement deprived Plaintiffs of their Fourth Amendment rights for which Plaintiffs are entitled to damages proximately caused thereby.

**SECOND CLAIM FOR RELIEF - Violation of Plaintiffs' Fourth Amendment Rights to be Free from Excessive Force**

(As to All Plaintiffs Against All Relevant Defendant Officers)

919.   All paragraphs of this Complaint are realleged and incorporated as though fully set forth.

920.   At all relevant times herein, the above-named Defendants were "persons" for purposes of 42 U.S.C. § 1983 and acted under color of state law to deprive Plaintiffs of their constitutional rights.

921.   As described above, Plaintiffs were participating in lawful, constitutionally protected activity on the public areas in the City of Wauwatosa.

922.   At all times material hereto, the Defendants used unnecessary, excessive force, without legal cause, in violation of Plaintiffs' rights under the Fourth and Fourteenth Amendment to the U.S. Constitution.

923.   That at the time the Defendants used excessive force there was no threat of death or serious bodily harm to the officers or anyone in the area.

924.   That the Defendants' conduct constituted excessive force without cause or justification in violation of Petitioner's Fourth Amendment Rights as incorporated by the Fourteenth Amendment and/or his equal protection rights guaranteed by that same Amendment.

925.   At all times material, the Defendants were WPD Officers acting under color of the statutes, customs, ordinances, and usage of the city of Wauwatosa and the WPD and were acting in the scope of their employment.

926. That the described conduct of the Defendants, as set forth above was a cause of the violations of Plaintiffs' constitutional rights, as well as injuries including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

927. The Defendants, Wauwatosa, is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against the individual employee Defendants in this action because said Defendants were acting within the scope of their employment when they committed the acts described above.

### THIRD CLAIM FOR RELIEF
**Violation of Plaintiffs' Sixth Amendment Right to Counsel – (As to Plaintiffs Kathryn Knowlton, Dana McCormick, Breon Foster, Taleavia Cole, and Tahudah Cole Against Defendant Joseph Lewandowski and yet unidentified Officers**

928. All paragraphs of this Complaint are realleged and incorporated as though fully set forth.

929. Law enforcement interrogation of Plaintiffs despite explicit notice that Plaintiffs had Counsel, and in addition to their specific and explicit invocation of her right to Counsel, is a violation of the Sixth Amendment.

930. Law enforcement actions were taken in willful, wanton, reckless and malicious disregard of the Plaintiffs' constitutional rights, for which Plaintiffs have suffered injury.

931. While acting under color of state law, law enforcement deprived Plaintiffs of their Sixth Amendment rights for which Plaintiffs are entitled to damages proximately caused thereby.

119

## FOURTH CLAIM FOR RELIEF

**Violation of First Amendment and Fourth Amendment Equal Protection, Freedom of Speech and Assembly, Intimidation and Retaliatory Use of Force (As to All Plaintiffs Against All Defendants)**

931.   All paragraphs of this Complaint are realleged and incorporated as though fully set forth.

932.   The policy and practice of Defendants City of Wauwatosa, Weber, and McBride of directing and ordering the emergency curfew and dispersal of people peacefully observing or passing by an allegedly unlawful assembly and then arresting those, who through law enforcement obstructive and excessive force action are made unable to comply, is unreasonable and unjustified and interfered with Plaintiffs' First Amendment rights of association and ability to observe, record and report their observations.

933.   Defendants City of Wauwatosa, Weber, and McBride, in implementing the policy and practice of ordering the emergency curfew and dispersal of people peacefully observing or passing by an allegedly unlawful assembly and then arresting those, who through law enforcement obstructive and excessive force action are made unable to comply, place Plaintiffs, and others similarly situated, at continuing and foreseeable risk of being arrested for exercising their First Amendment right of association and Fourth Amendment right to be free from excessive force and will not cease without injunctive relief.

934.   Defendants' actions were taken in willful, wanton, reckless and malicious disregard of the Plaintiffs' constitutional rights, for which Plaintiffs have suffered injury.

935.   While acting under color of state law, Defendants City of Wauwatosa, Weber and

120

McBride deprived Plaintiffs of their First and Fourth Amendment rights for which Plaintiffs are entitled a declaration that the policy and practice is unlawful and an injunction against that policy and/or practice.

## FIFTH CLAIM FOR RELIEF – MONELL CLAIM

### (As to All Plaintiffs Against City of Wauwatosa)

936.  Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

937.  The acts of the individual Defendants, including unlawfully arresting the petitioners without any justification, was done in accordance with the WPD's de-facto policy, regulation, decision or custom condoning excessive force in executing arrests, false arrests, and/or otherwise violating person's equal protection rights, including by the City's, and/or in this case to date, Defendant Weber's, failure to adequately train the WPD officers for such violations. That these respective de-facto policies were officially adopted, expressly or implicitly, or promulgated or practiced or ratified by the City of Wauwatosa, through its Chief of Police Barry Weber, and as such constitute a de-facto governmental custom in such department, even though such custom may not have received written formal approval by the City, and even though such de-facto policies are inconsistent with or even violate WPD's written policies.

938.  Such official or de facto policy of The City of Wauwatosa  through its Police Department, Mayor, and City Council has interrelated de facto policies, practices, and customs which include but is not limited to, inter alia:

a. Using excessive force against protesters without justification, including but not limited to beating protesters through punching, kicking, kneeing, using chemical agents like pepper spray and tear gas; tackling protesters to the ground; and hitting individuals with bikes.

b. Retaliating against protesters who record the police and/or speak out against police violence.

c. Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate WPD's animus toward protesters.

d. Falsely/unlawfully arresting protesters for engaging in protected speech and assembly.

e. Targeting those the WPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false/unlawful arrest.

f. Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas.

g. Using chemical agents like pepper spray and/or tear gas without prior warning.

h. Breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, etc.

i. Failing to intervene to prevent police violence and other forms of

misconduct.

j.     Failing to hold officers accountable who violate protesters' rights.

k.     Failing to train officers on how to appropriately respond to protesters.

l.     Maintaining, condoning, and failing to take any steps to end police misconduct that allows Wauwatosa police officers to violate protesters and other civilians' rights with impunity.

939.   The official or de facto policy or custom of utilizing excessive force and/or violating person's equal protection rights permitted, encouraged, tolerated and ratified the actions of Defendant Officers, and the unnamed John Doe Officers all in malicious or reckless disregard or with deliberate indifference to the Petitioner's Fourth and Fourteenth Amendment Rights by, among others, the Defendant Chief's failure to adequately discipline and supervise the officers for their unlawful conduct.

940.   That the described conduct on the part of all the Defendants, including Wauwatosa Chief Weber in his individual capacity was a cause of the plaintiff's injuries, losses and damages as set forth herein.

941.   The Defendant Wauwatosa is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against the individual employee Defendants in this action because said Defendants were acting within the scope of their employment when they committed the acts described above.

**SIXTH CLAIM FOR RELIEF - VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS – UNLAWFUL SEARCH & SEIZURE OR PROPERTY – 42 U.S.C. §§ 1983,**

**(As to Plaintiffs Kathryn Knowlton, Dana Mccormick, Tracy Cole, Taleavia Cole, Tahudah Cole, Oscar Concepcion Rodriguez, Anne Delessio-Parson, Rachel Dulay, Erik Fanning, Jill Ferguson, Breon Foster, Joanna Geiser, Christina Vitolo-Haddad, Joseph Hayes, Percy Hayes, Jose Hernandez Ramirez, Destiney Jones, Joey Koepp, Sonora Larson, Holly Lavora, Lazarito Matheu, Molly Nilssen, Carmen Palmer, (juvenile) Palmer, (juvenile) Palmer, Leah Porter, Aidali Rivera, William Rivera, Hector Rodriguez, Nathan Sabel, William Schroeder, Mariah Smith, Peter Sparks, Gabriella Vitucci, Suzanne Wells, Katelyn Wojnar, Sonja Worthy, Jacqueline Bogenberger, and Raine Cich Against All relevant Defendant Officers)**

942.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

943.    Count VI is alleged against all Relevant Defendant Officers including Joseph Lewandowski, Timothy Warren, and as yet unidentified John Doe Officers

944.    The actions by the Defendant Officers in knowingly searching and seizing Plaintiffs' property during the events described in the Complaint, without a warrant, Probable cause, or legal justification, violated Plaintiffs' right to be free from unreasonable search and seizure of Plaintiffs' property guaranteed by the Fourth and Fourteenth Amendments.

945. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

946.    As a direct and proximate result of the Defendant Officers' actions, Plaintiffs

suffered damages, including the loss of and damage to their property, as set forth

more fully above.

**SEVENTH CLAIM FOR RELIEF - RACIALLY MOTIVATED CONSPIRACY TO
DEPRIVE PLAINTIFFS OF THEIR CONSTITUTIONAL RIGHTS - 42 U.S.C. §§ 1983,
1985, 1986
(All Plaintiffs as against All Defendants)**

947.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

948.    Count Seven is alleged against all Defendants.

949. The named and unidentified Defendant Officers together reached an

understanding, engaged in a course of conduct, and otherwise jointly acted and/or

conspired among and between themselves to commit the unconstitutional overt

acts set forth in the facts above.

950.    Because said conspiracy or conspiracies and the overt actions in furtherance

thereof, including, but not limited to, each and every act alleged in the facts above,

were done with the knowledge and purpose of depriving Plaintiffs, many of whom

were protesting anti-Black racist police violence and in support of the movement

for Black lives, of the equal protection of the laws and/or of equal privilege and

immunities under the law, and with racial animus toward each and every Plaintiff

individually and as a group, either because of their identity and/or because of what

they were protesting, and the other victims of this racially motivated conspiracy,

the Defendants also deprived Plaintiffs of their right to equal protection of the laws

under the Fourteenth Amendment, and 42 U.S.C. § 1985.

951. Additionally or alternatively, the Defendants, knowing that the above §1985

conspiracy to deprive Plaintiffs of their constitutional rights was about to be

committed, and having the power to prevent or aid in preventing the commission

of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in

violation of 42 U.S.C. § 1986.

952. The actions of the Defendant Officers were the direct and proximate cause of the

violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental

distress, anguish, humiliation, and loss of personal freedom, as set forth more fully

above.

## Eighth CLAIM FOR RELIEF- 42 U.S.C. § 1983
**CONSPIRACY TO DEPRIVE PLAINTIFFS OF THEIR CONSTITUTIONAL RIGHTS**
**(As to All Plaintiffs against All Defendants)**

953. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

954. The 8th Claim is alleged against all Defendant Officers.

955. Each of the Defendants acting in concert with other known and unknown

co-conspirators, conspired by concerted action to accomplish an unlawful purpose

by unlawful means.

956. The Defendant Officers acted under the color of law, and under the authority of

one or more interrelated de facto policies, practices, and/or customs of the

Wauwatosa Police Department, to violate Plaintiffs' rights as set for in the preceding claims.

957. Each of the Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on certain Plaintiffs, and to detain and arrest certain Plaintiffs, knowing they lacked reasonable suspicions and/or probable cause to do so, and for the purpose of violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights.

958. In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiffs' rights. They accomplished this goal by using excessive force on all Plaintiffs and unlawfully arresting certain Plaintiffs.

959. Each individual Defendant Officer is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant Officer.

960. The City has acted with deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of the Plaintiffs. As a direct and proximate result of the acts and omissions of the City and WPD, the First, Fourth, and Fourteenth Amendment rights of the Plaintiffs have been violated.

961. Defendant Mayor McBride, Chief Weber, and the City of Wauwatosa had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

962. As a direct and proximate result of the Defendants conspiracy, Plaintiffs

suffered damages, including bodily injury, pain, suffering, mental distress, anguish,

humiliation, loss of personal freedom, and legal expenses, as set forth more fully

above.

## Ninth CLAIM FOR RELIEF– 42 U.S.C. § 1983
### FAILURE TO INTERVENE
### (As to All Plaintiffs Against All Defendants)

963. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

964. Plaintiff's 9th Claim  is alleged against all Defendants.

965. During the events described above, the Defendants stood by without intervening

to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth, and

Fourteenth Amendments, even though they had the opportunity and duty to do so.

966. The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly

established constitutional rights.

967. As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs

suffered damages, including bodily injury, pain, suffering, mental distress, anguish,

humiliation, loss of personal freedom, and legal expenses, as set forth more fully

above.

## 10TH CLAIM FOR RELIEF – 42 U.S.C. § 1983 ABUSE OF POWER

### (As to All Plaintiffs, Against All Defendants)

968. Plaintiff realleges and incorporates by reference all the allegations in the preceding paragraphs.

969. That the above-described conduct of all the individual Defendants actions against Plaintiffs were extreme, malicious, outrageous and/or intentional.

970. That such conduct was intended to cause Petitioners unnecessary and severe personal, physical, psychological, and emotional injuries.

971. That such conduct on the part of all the individual Defendants was a cause of the severe personal, physical, psychological, and emotional injuries, suffered by the petitioners.

972. At all times material hereto, the individual Defendants acted maliciously and/or with reckless disregard and/or with deliberate indifference towards Petitioners or in an intentional disregard of their rights, such as to subject all the individual Defendants to punitive damages.

973. The Defendant Wauwatosa is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against Plaintiffs in this action because said Defendants were acting within the scope of his employment when they committed the acts described above.

### 11TH CLAIM FOR RELIEF – 42 U.S.C. § 1983 Retaliation for Exercise of Free Speech
### (As to All Plaintiffs Against All Defendants)

974. Plaintiffs reallege and incorporate by reference all the allegations in the preceding paragraphs.

975. At all relevant times, Defendants were operating under color of state law.

129

As described in detail above, Plaintiffs were participating in lawful, constitutionally protected activity on the public streets of the City of Chicago.

976. The actions of the Defendant Officers described above violated Plaintiffs' rights to freedom of speech and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution, in that Plaintiffs were abruptly prevented from further exercising their rights and suffered retaliation for having exercised their rights.

977. The Defendant Officers retaliated against Plaintiffs for engaging in protected speech by subjecting them to excessive force without legal justification. Plaintiffs' protected speech was the substantial and motivating factor for the Defendant Officers' use of force against them. The Defendant Officers' actions were intended to make Plaintiffs and other people engaging in constitutionally-protected speech and assembly at the protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment.

978. At all relevant times, the Defendant Officers were aware that Plaintiffs were engaged in constitutionally-protected speech and assembly when they violated their rights. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

979. The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental

distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

## 12TH CLAIM FOR RELIEF – 42 U.S.C. § 1983 Equal Protection
## (William Rivera v. John Doe Officer)

980.  Plaintiff realleges and incorporates by reference all the allegations in the preceding paragraphs.

981.  Defendant was operating under the color of state law when he denied Plaintiff Rivera his equal protection rights.

982.  Defendant arrested Mr. Rivera on the basis of his race.

## 13TH CLAIM FOR RELIEF – 42 U.S.C. § 1983 Equal Protection
## (All Plaintiffs v. All Defendants)

983.  Plaintiffs reallege and incorporate by reference all the allegations in the preceding paragraphs.

984.  The named and unidentified Defendant Officers subjected Plaintiffs, some of whom are Black and all of whom were protesting anti-Black racist police violence and in support of the movement for Black lives, to excessive force and/or unlawful detention and arrest, and/or suppressed their right to freedom of speech and assembly, with discriminatory motive and intent, and racial animus toward each and every Plaintiff individually and as a group, either because of their identity and/or because of what they were protesting and therefore violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

985.  The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental

distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

### 14TH CLAIM FOR RELIEF – 42 U.S.C. § 1983 Equal Protection
### (All Plaintiffs v. All Defendants)

986.  Plaintiffs reallege and incorporate by reference all the allegations in the preceding paragraphs.

987.  The named and unidentified Defendant Officers together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional over acts set forth in the facts above.

988.  Because said conspiracy or conspiracies and the overt actions in furtherance thereof, including, but not limited to, each and every act alleged in the facts above, were done with the knowledge and purpose of depriving Plaintiffs, some of whom are Black and all of whom were protesting anti-Black racist police violence and in support of the movement for Black lives, of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward each and every Plaintiff individually and as a group, either because of their identity and/or because of what they were protesting, and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

989.  Additionally or alternatively, the Defendant Officers, knowing that the above § 1985 conspiracy to deprive Plaintiffs of their constitutional rights was about to be

committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

990. The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

### 15TH CLAIM FOR RELIEF – 42 U.S.C. § 1983 Violation of Right to Assemble. (All Plaintiffs v. City of Wauwatosa and Defendant McBride)

991. Plaintiffs reallege and incorporate by reference all the allegations in the preceding paragraphs.

992. Defendant McBride declared all protests in the city of Wauwatosa to be unlawful for the week of October 7, 2020.

993. When Defendant McBride made this declaration on September 30, no such protest had begun.

994. Defendant McBride had no knowledge of a credible threat as to potential violence.

995. Because the targeted protests had not begun, Defendant McBride in effect declared such future protests unpeaceable before they had so become.

996. Nonetheless, Defendant McBride declared all protests unlawful before they had a chance to become unlawful.

997. The actions of the Defendant McBride were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental

distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

WHEREFORE, Plaintiffs respectfully demand judgment against the Defendants jointly and severely as follows:

1.      An order finding the City of Wauwatosa's curfew of October 7 - 12, 2021 was unlawful and illegally enacted.

2.      An order finding the City of Wauwatosa curfew unconstitutional.

3.      A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the United States Constitution;

4.      An order as to the immediate cessation of the surveillance and monitoring of peaceful protest activity and a prohibition of police from keeping files on the views and expressive activities of peaceful activists and protest organizations.

5.      An injunction prohibiting the Wauwatosa Police Department from sharing its existing files with any other law enforcement or non-law enforcement agencies or municipalities.

6.      An order that the files on activists and peaceful protests be preserved as they are potential evidence in any lawsuits that may be brought to challenge the monitoring of peaceful protest activity;

7.      A permanent injunction barring Defendants from engaging in unlawful and unconstitutional conduct;

8. Damages compensating Plaintiffs for their injuries, including but not limited to compensatory, pecuniary, and medical expense damages;

9. An award of prejudgment interest;

10. An order enjoining Defendants from enforcing a policy ordering dispersal of people peacefully observing or passing by an allegedly unlawful assembly and then arresting those through law enforcement.

11. An order that Defendants and other law enforcement agencies whom the defendants engaged permanently delete any arrest records, booking photos, arrest information, fingerprint cards, and any and all data that they have regarding Plaintiffs.

12. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

13. All other relief the Court deems just.

Respectfully submitted this 5th day of March 2021.

PLAINTIFFS HEREBY DEMANDS A JURY TRIAL OF THIS MATTER ON ALL ISSUES SO TRIABLE.

s/ Kimberley Cy. Motley
State Bar No.: 1047193
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
Email : kmotley@motleylegal.com
Telephone : (704) 763-5413

E. Milo Schwab
State Bar No.:
3000 Lawrence Street
Denver, CO 80205

**ATTORNEYS FOR PLAINTIFFS**

136