UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


KATHRYN KNOWLTON, and
DANA McCORMICK, et al,

                              Case No. 20-CV-01660

    Plaintiffs,

    v.

CITY OF WAUWATOSA, BARRY WEBER,
In his individual capacity as Chief of Police, and
DENNIS MCBRIDE in his individual capacity, et al.

    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -



DEPOSITION OF SHANE WRUCKE



DATE TAKEN: August 20, 2021

TIME:        9:01 a.m. - 11:59 a.m.
LOCATION:    Knowlton Law Group
             7219 West Center Street
             Wauwatosa, Wisconsin 53210










TRANSCRIPT PREPARED BY:
Miriam Beckford, Professional Court Reporter

**APPEARANCES FOR THE PLAINTIFFS**.

KIMBERLEY CY MOTLEY, ESQ (via Zoom)
MOTLEY LEGAL SERVICES
(704)763-5413
Motleylegal.com

MILO SCHWAB, ESQ (non-appearance)
ASCEND COUNSEL, LLC
3000 Lawrence Street
Denver, Colorado 80205
(303)888-4407

KATHRYN KNOWLTON, ESQ.
KNOWLTON LAW GROUP
7219 West Center Street
Wauwatosa, Wisconsin 53210


**APPEARANCES FOR THE DEFENDANTS**

JASMYNE M. BAYNARD, ESQ.
GUNTA LAW OFFICES, S.C.
9898 West Bluemound Road #2
Wauwatosa, Wisconsin 53226
(414)291-7979

ATTORNEY KNOWLTON:  Good morning.

LIEUTENANT WRUCKE:  Good morning.

ATTORNEY KNOWLTON:  I am Kate Knowlton, I am cocounsel here.  We also have Kimberley Motley who is on Zoom.  And just, for the record, there is no objection to that?

ATTORNEY BAYNARD:  No objection.

ATTORNEY KNOWLTON:  We're here to conduct the deposition of Shane Wrucke.  That's the correct pronunciation?

LIEUTENANT WRUCKE:  Yes.

ATTORNEY KNOWLTON:  And what is your title?

LIEUTENANT WRUCKE:  Lieutenant.

ATTORNEY KNOWLTON:  Lieutenant with the Wauwatosa Police Department.  Today is Friday, August 20th.  It is 9:01 and this is case number 201660 civil action pending in the Federal District Court in the Eastern District of Wisconsin.  The deponent Shane Wrucke is here along with counsel for the defendant Jasmyne Baynard.  There is also the court reporter and stenographer and I will, actually, ask her as the notary as well to please swear in the witness.

SHANE WRUCKE,

a witness herein, having been duly sworn, testified as follows:

LIEUTENANT WRUCKE:  Yes.

BY ATTORNEY KNOWLTON:

Q    Okay.  First, see how much I can skip.  Have you been
     deposed before?

A    Yes.

Q    Okay.  When was the last time you were deposed?

A    About a month ago.

Q    Okay.  Great.  Then I'm probably going to go through
     this part quickly.  But just want to make sure that we
     are all on the same page in terms of what this entails
     today.  First, could you please spell your name -- your
     full name for the record?

A    Yes.  Shane, S-H-A-N-E, last name Wrucke, W-R-U-C-K-E.

Q    Okay.  And you are a lieutenant with the Wauwatosa
     Police Department?

A    Correct.

Q    And how long have you been in that position?

A    For about a year and a half.

Q    As a lieutenant?

A    Correct.

Q    And about how long have you been with the Wauwatosa
     Police Department?

A    10 and a half years.

Q    Okay.  In this deposition I'm going to be asking you
     questions and you're going to be answering them under

oath, do you understand this?

A    Yes.

Q    And there are a few differences between a deposition and a typical conversation and I just want to make sure we're all on the same page. First, obviously, there is a court reporter who is trying to transcribe everything so we want to make sure we don't and try and speak over each other, we wait until the person who is asking the question or the person responding is completely done with their response. Do you understand that?

A    Yes.

Q    Secondly, this is an oral transcription that means that nonverbals or head gestures or uh-huh's can't be transcribed as easily so all your responses need to be verbal. Do you understand that?

A    Yes.

Q    And finally, unlike a typical conversation, your answers today are under oath and this subjects you to potential criminal charges for perjury for "willfully giving false, misleading or incomplete testimony under oath". Do you understand that?

A    Yes.

Q    Is there any reason today such as being under any initial stress or physical or mental condition or being under the influence of any substance that would prevent

or limit you today from giving truthful testimony?

A    No.

Q    There is nothing wrong in asking -- anyone asking a question to repeat the question or to clarify a term if you don't understand it. However, if you do answer a question, we are going to assume that you understood it. Do you understand that?

A    Yes.

Q    And if you need a clarification, you need to look for the person asking the question for clarification not to anyone else. Do you understand that?

A    Yes.

Q    Sometimes when you ask -- when you are asked a question, you might have partial notice -- notice, might have personal knowledge, but not absolute or certain and complete knowledge. For example, if I ask you the temperature right now, you might not necessarily know the exactly the degree, but you can give me an approximate answer, even you couldn't -- or even if you couldn't give me an approximate answer, you can tell me whether it's really hot or really cold or somewhere in-between. In that circumstance, the answer of "I don't know," is not appropriate, but an answer giving a range or an estimate based on your own knowledge and experience with an explanation that it's a range or an

estimate is appropriate.  Do you understand that?

A     I do.

Q     Sometimes I might ask you a question that you may not
      have the answer to unless you reference a certain
      document.  For example, if I ask you the balance of your
      checking account on a certain date, you might not be
      able to provide that unless you looked at the banking
      statement.  I get to decide or whoever is asking the
      question gets to decided whether or not you may look at
      the answer or -- excuse me, the reference document or
      just to accept an estimated answer.  Do you understand
      that?

A     Yes.

Q     Also the attorneys may make objections while questions
      are being asked.  This is absolutely fine because that
      objection in terms of admissibility of evidence in this
      case, but that does not excuse you from answering the
      question.  Do you understand that?

A     Yes.

Q     So unless the attorney puts on record that this is about
      a counsel privilege you still need to answer any
      question regardless of any objections.  Do you
      understand that?

A     Yes.

Q     And do you consider Ms. Baynard your attorney today?

A    Yes.

Q    Do you understand that you could have your own attorney
     if you'd like?

A    Yes.

Q    And are you still willing and able and voluntarily
     participating in a deposition today?

A    Yes.

Q    Finally, I am entitled to what are considered complete
     answers, this my favorite one, that means an answer that
     fully and completely answer my question.  For example,
     if you had orange juice, toast and coffee for breakfast
     and I asked you what you ate for breakfast and you
     answer, "orange juice," that would not be a complete
     answer and you would not have properly answered the
     question.  Do you understand that?

A    Yes.

Q    However, you do not need to tell me what you had for
     lunch even if it's more interesting meal.  Okay.  Do you
     have any other questions before we begin?

A    No.

Q    Okay.  I wanted to just ask you quickly before
     Ms. Motley is going to start.  Your counsel provided
     documents, actually, she brought them yesterday, for
     your deposition today.  Did you have a chance to review
     what she brought?

A    Not all of it.

Q    Okay.  What -- what did you review?  What documents did you review before the deposition today?

A    I guess, I don't know what's all in there, what's all in your packet.

Q    Okay.  Why don't you tell me what you reviewed?

A    There was some use of force documents that I reviewed. That might be it.

Q    Okay.  Did you talk to anyone about your deposition today before coming?

A    No. Other than notifying the people, the proper people that I would be here.

Q    Okay.  What does that mean?

A    My -- my supervisors and my subordinates that I would be unavailable today.

Q    Okay.  And who are your supervisors?

A    Captain Jack Morrison.

Q    Okay.  Is that the only supervisor you work for?

A    He's my direct supervisor.

Q    Okay.  Did you talk to anyone else about it up your command chain line?

A    I don't think so.

Q    Okay.

               ATTORNEY KNOWLTON:  Okay.  Ms. Motley.

BY ATTORNEY MOTLEY:

Q    Good morning.

A    Good morning.

Q    So -- I'm sorry, what's your title?

A    Lieutenant.

Q    Okay.  Now, Lieutenant Wrucke, how long have you been
     with the Wauwatosa Police Department?

A    10 and a half years.

Q    Okay.  And how long have you been a lieutenant?

A    For approximately a year and a half.

Q    When did you become a lieutenant?

A    In March of 2020.

Q    Okay.  And what are some of your duties as a lieutenant?

A    I'm assigned to the investigative division.  I oversee
     day-to-day operations in that division.

Q    Okay.  What is the nerd lab?

A    That is the digital forensics unit.

Q    Okay.  And are you -- do you also deal with things in
     the nerd lab?

A    It is under -- it is within the investigative division,
     yes.

Q    Okay.  And specific to the nerd lab, what do you do
     there?

A    Oversee the personnel.  Primarily, is my responsibility.

Q    And who are the personnel in the nerd lab that you
     oversee?

A    Currently?

Q    Yes.  Well, let's start with the question.

Who are the personnel that you oversee in the nerd lab from May 25th, 2020 until now today's date August 20th, 2021?

A    Currently, the digital forensics units the two personnel assigned are Detective Martin Keck and Detective Bradley Isaacson.  Formally, within that timeframe detective, but now Sergeant Joseph Lewandowski.

Q    And now Sergeant Lewandowski is no longer part of the nerd lab staff?

A    Correct, he's no longer part of the digital forensics unit.

Q    Okay.  And that's what it is called the digital forensics unit?

A    Correct.

Q    And are there any civilians that you oversee within the nerd lab or within the digital forensic unit from May 25th, 2020 until today's date August 20th, 2021?

A    Not within that unit.

Q    I'm sorry?

A    Not within that unit.

Q    Okay.  Are there any personnel or civilians that you oversee that are outside the digital forensic unit from May 25th, 2020 until August 20th, 2021?

A    Yes.

Q    Who?

A    A crime analyst Dominick Ratkowski and a civilian
     property clerk Karen Roy.

Q    And is Karen Roy -- does she still work there?

A    Yes.

Q    Is she related to Joseph Roy?

A    No.

Q    Okay.  And Dominick Ratkowski -- you are the supervisor
     for Dominick Ratkowski, correct?

A    Yes.

Q    Okay.  And what unit does Dominick Ratkowski work in?

A    He's just within the investigative division.

Q    Okay.  So there is the investigative division, which is
     the big unit and under that unit there are several other
     units; is that correct?

A    There are subunits.  The entire division is not divided
     into all subunits.

Q    So within the investigative division, what are the units
     that exist under that?

A    The digital forensic digital unit, that we've already
     talked about, and the special operations group and there
     is two detectives that primarily handle sensitive
     crimes.

Q    So essentially three major -- major units the special

op's, the digital forensic and the special crime unit?

A    Correct.

Q    So -- okay.  Now which one of those units is Dominick
     Ratkowski?  Which -- which ones does he fall under?

A    So he doesn't fall under a unit.  There's personnel --
     those subcategories are just units within the
     investigative division.  There are general personnel
     that are just considered part of the investigative
     division.  He would be in that group.

Q    I see -- so you just kind of run him within the
     investigative unit wherever he is needed with special
     op's, the digital forensic and the special crime unit?

A    Correct, sensitive crimes.

Q    Okay, sensitive crimes, sorry.  And do you know how many
     Wauwatosa officers work in the special op's unit?

A    The special operations group or the sensitive crimes
     group?

Q    Yes, both the special operations group?

A    The special operations group is two detectives and then
     the digital forensics unit is partnered with them.

Q    So the digital forensics unit, is it the same two
     detectives that work in the special op's group?

A    No.

Q    So who are the two detectives that work in the special
     op's group?

A    Detective James Short and Detective Kelly Zielinski.

Q    So who are the -- are there any other detectives where Wauwatosa officers or city of Wauwatosa employees that work within this special op's group?

A    No.

Q    Okay.  Which the digital forensic unit -- which Wauwatosa Police Department personnel are assigned to that unit?

A    To the digital forensics unit?

Q    Yes.

A    Detectives Brad Isaacson and Martin Keck.

Q    Is there any other Wauwatosa Police Department officers that are not detectives that are also assigned to that unit?

A    No.

Q    Okay.  All right.  Now with the sensitive crimes unit, which officers, detectives, whatever their rank is are assigned to the sensitive crimes unit?

A    Currently, three detectives Detective Paula Roberson, Detective Joe Kutz and Detective Tim Kastner.

Q    Okay.  Is Tim Kastner, is he related to Alan Kesner?

A    Sorry, Kastner, so, K-A-S-T-N-E-R, not K-E-S-S.

Q    Okay.  And do you routinely work with the Wauwatosa Municipal Court?

A    I'm sorry?  Do I what?

Q    Do you like ever work with the Wauwatosa Municipal
     Courts?

A    Very infrequently.

Q    And what do you do with them?

A    In my capacity now, I've very, very limited contact with
     them.  In fact, I don't know that I've had contact with
     them since I've been a detective/lieutenant.  I have
     worked with them in the past as a liaison for officers
     and citations.

Q    Okay.  And prior to -- let's just say before your --
     well, could you please explain more specifically, you
     know, what you mean by you work with the court as a
     liaison to officers?  What does that look like?

A    If the Court had a subpoena for an officer, I would
     deliver it to them.  If they were being issue on a
     citation, I would make sure that it got corrected
     appropriately.

Q    Okay.  And would you do things like, you know, if there
     was a problem on a citation, would the Court contact you
     and say "oh, you need to fix this point on a citation,"
     is that something that would happen?

A    Yes.

Q    Okay.  If there were people that the Court wanted to be
     prosecuted, would they contact you about that and then
     you would move forward with that as well?

A    If the -- can you clarify?  If the Court wanted somebody
     prosecuted?  What do you mean by that.

Q    Sorry, bad question.  So if the Court was trying to help
     with those facilitate prosecution of people that you
     gave tickets to, is that something you would also work
     in coordination with them on?

A    Yes.

Q    And who would you work with?  Would you work with Robyn
     the clerk?

A    On occasion, most of the time if it came to like our
     cooperation with prosecution it would have been with, I
     think, his title is Assistant City Attorney George
     Schimmel.

Q    Okay.  But you wouldn't worked directly with the Court,
     with Judge Baker and with his clerk?

A    Not from the aspect of assisting with prosecution, I
     think, if I understand you correctly.

Q    Right.  But then from the perspective of, you know,
     correcting things that may be wrong with citations, is
     that something you would work with the Court on?

A    Yes.  We work directly with the Court on administrative
     matters like that, yes.

Q    And then in terms of -- with Attorney Schimmel, explain
     to me how a citation makes it to the Court, as you
     understand it?

A    I'm not entirely sure.  What I -- go ahead.

Q    Let me give you a better question.  Explain to me how
     you or any Wauwatosa police officers writing a citation,
     makes it to the Court for -- to the point where there is
     an initial appearance in front of the Judge.  How does
     that process work?

A    I believe they are transmitted electronically, but I
     don't know that for sure.

Q    Okay.  So let me just -- okay.  So let's just go step by
     step.  So if you have written -- have you ever written
     any, you know, citations for people within the last two
     years?

A    I don't think so.

Q    Have you ever -- have you ever supervised anybody who
     was issuing citations for anybody between May 25th and
     now, May 25th, 2020 and today's date?  Have you
     supervised anybody that issued a citation?

A    I believe -- yes, I believe so.

Q    Okay.  And so once a person writes a citation, does that
     citation go to the Court or does it go to the City
     Attorney, George Schimmel?

A    I believe it goes to the Court.

Q    Okay.  And so when a citation goes to the court, then
     how does it get to Attorney Schimmel?  Or do you guys
     give it to Attorney Schimmel?  How does that work?

A    That I'm not sure.

Q    Okay.  Have you ever had a contact with Attorney
     Schimmel regarding -- have you or anyone that you
     supervise that you know between May 25th of 2020 to
     present ever had any conversation whether verbal, you
     know, online or what have you, with Attorney Schimmel
     about citations that you're aware of?

A    I have not.  I'm not aware of any of the people that I
     supervise -- I'm not aware if any of the people that I
     supervise have.  It's entirely possible.

Q    Okay.  Is it your understanding that once you give --
     well, can you -- can you or any other Wauwatosa police
     officers, can you independently prosecute a citation in
     front of the municipal court?

A    I guess I would need clarification.  I don't understand
     what you mean.

Q    Can you act as a -- can you as a Wauwatosa officer or
     any other Wauwatosa officers take a citation and go to
     Judge Baker and based off of that he gives you an
     initial appearance for a defendant and you appear on
     behalf of the City to argue for that citation?  Can you
     guys do that as Wauwatosa's police officers?

A    No, not to my knowledge.

Q    Okay.  And the person that you know that does that is
     Attorney George Schimmel, correct, that appears in front

of the Judge on behalf of the city for citations that
are issued by Wauwatosa police officers?

A   Correct.

Q   So is it your understanding that Attorney Schimmel he
makes the charging decisions, ultimately, for citations
that are presented before the Court or is it the
Wauwatosa Police Department that makes those charging
decision for citations given in front of the judge?

A   Attorney Schimmel.

Q   Okay.  So there can be times where, you know, you give
or someone within the Wauwatosa Police Department, gives
a citation to George Schimmel and he reviews it and he
makes the legal determination whether there's probable
cause to bring that citation before the municipal court;
is that correct?

         ATTORNEY BAYNARD:  Objection to the form of
question.  Calls for speculation.  Go ahead.

A   That's what I believe happens, yes.

Q   Okay.  So Attorney Schimmel has the power that, for
instance, if you give him a citation and he evaluates it
and determines that it doesn't meet the municipal
ordinance elements, Attorney Schimmel has the power to
dismiss that citation; isn't that correct?

         ATTORNEY BAYNARD:  Objection to the form of
the question; calls for a legal conclusion.  Go ahead.

A    I believe he has the authority, yes.

Q    And Attorney Schimmel has the authority to essentially
     dismiss a citation even before it gets before a judge,
     correct?

                ATTORNEY BAYNARD:  Same objection.  Go ahead.

A    I believe so, yes.

Q    Because to your knowledge and based on your experience,
     ultimately, the charging decisions for citation to make
     it before the judge rests on Attorney Schimmel's powers?

A    Yes.

Q    Okay.  Thank you.  So I want to talk to you about --
     well, let me ask you this.  Did you go through Taleavia
     Cole's phone?

A    No.

Q    Do you know if anyone went through Taleavia Cole's
     phone?

A    Not to my knowledge.

Q    Did you take out Taleavia Cole's SIM card in her phone?

A    I did not.

Q    Do you know who took out the SIM card in Taleavia Cole's
     phone?

A    I do not.

Q    Do you know who put Taleavia Cole's phone through the
     Cellebrite or any other machine software?  Do you know
     who did that?

ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A   I don't believe anybody put Taleavia Cole's phone through any type of software.

Q   Why don't you believe that?

A   Because I don't.

Q   But why?  You -- you said you don't know.  Then why don't you believe that?  If you don't know if someone took her SIM card out, you don't know that someone looked through her phone then why is your answer completely different like, "I don't believe they did?"  Why -- why don't you believe they did that?

A   As a matter of practice, the Wauwatosa Police Department does not conduct any analysis of a phone without either consent or a search warrant.

Q   Is it a matter of practice to keep someone's phone for three weeks, who is not being criminally charged with any offenses and is not also being referred to any criminal charges?  Is that also a practice of Wauwatosa Police Department to hold people's phone hostage without any probable cause for a crime or anything?  Is that normal?

ATTORNEY BAYNARD:  Objection to the question; compound; argumentative.  Go ahead.

A   We do often keep -- keep people's cell phone during the

course of investigation.

Q    Okay.  So what was Taleavia Cole being investigated for?

A    For her potential involvement and knowledge of an
     incident at Patty's Swayka's house on August 8th and for
     a video that she posted threatening to release an
     intimate video of Patty Swayka's.

Q    Did you ever try to attempt to question Taleavia Cole in
     your investigation of her?

A    I don't believe so at the time.

Q    Did you ever try to issue a warrant for her arrest in
     your investigation of her?

A    Not at that time.

Q    But you're doing this investigation of her and not doing
     basic investigation of things to justify you keeping her
     phone; is that correct?

          ATTORNEY BAYNARD:  Objection to the form of
     the question; compound; argumentative.  Go ahead.

A    I'm sorry.  Can you repeat the question?

Q    You didn't do basic investigation 101 to justify keeping
     Taleavia Cole's phone for three weeks like questioning
     her, doing a basic warrant, things like that; isn't that
     correct?

          ATTORNEY BAYNARD:  Same objection.  Go ahead.

A    Not correct.  We attempted to get two search warrants
     for that phone.  We did not question her because I don't

believe that she would have been interested in speaking with us.

Q    Well, are you aware that we went to court sue the City of Wauwatosa to get her phone back?  Are you aware that that happened?

A    Yes.

Q    Are you aware that in that court hearing that the city attorney did not say that you had requested two search warrants to look through Taleavia Cole's phone.  So this is news to me.  So you're saying that that's the complete opposite of what the city attorney to testified in open court.  And you, actually, did apply for two search warrants for Taleavia Cole's phone; is that what you're saying today?

         ATTORNEY BAYNARD:  Objection to the form of the question; compound.  Go ahead.

A    I don't know what the city attorney said on the record.

Q    Okay.  But you are sure that the Wauwatosa Police Department applied for two search warrants of Taleavia Cole's phone?

A    The Wauwatosa Police Department was involved in the process of one.  The Greenfield Police Department was in process of the other.

Q    Now, we're getting somewhere.  So who is the Wauwatosa Police Department officer who applied for a search

warrant of Taleavia Cole's phone?

A   I believe it would have been Detective Lewandowski at
    the time.

Q   And to apply for a search warrant this is a written
    paperwork that he has to put in; is that correct?

A   Yes.

Q   Okay.  And do you know who he serve this paperwork to?

A   So I don't know, specifically, the process if --
    specifically, that process, if there was a draft
    submitted or who it was submitted to.

Q   Okay.  But who would that normally be submitted to?

A   There's not one point of contact at the DA's office that
    reviews search warrants.

Q   Okay.  So who are the -- name all of the points of
    contacts in the DAs office who review search warrants?

A   It could be any assistant district attorney.

Q   Okay.  Just give me some names so I know who to depose
    next.

A   You want me to name all of the assistant district
    attorneys that I know.

Q   No. I want you to name all the district attorneys that
    you know that deal with search warrants, specifically,
    because every single DA does not deal with search
    warrants.  I have practice in Milwaukee County for over
    six years and I've dealt routinely with the Milwaukee

County DAs and I know for a fact that they all do not deal with search warrants.

So my question to you is give me the names of all the DAs office -- the assistant DAs that you know of that you have dealt with or other Wauwatosa Police Department officers have dealt with that deal with search warrants. That's my question.

A   Since it's a matter of practice, I don't regularly take search warrants to the district attorney office. I don't know that I can answer that question.

Q   Okay. Give me five names.

ATTORNEY BAYNARD: Objection to the form of the question, lacks foundation.

A   Again, I don't -- if -- if you're saying that they don't all do search warrants, I guess maybe I don't know.

Q   So now you are confused. You have been a Wauwatosa Police Department for 10 and a half years and now you're confused with who does search warrants or who you can send these search warrants application to --

ATTORNEY BAYNARD: Objection to the form of the question --

Q   To the DA office?

ATTORNEY BAYNARD: Objection to the form of the question. Argumentative. Go ahead.

A    No. My understanding is that any assistant district
     attorney could review a search warrant.

Q    Okay.  Have you ever applied for a search warrant with
     the assistant district attorney's office in the 10 and a
     half years?

A    I have but it's been some time.

Q    Okay.  So who did you put your search warrants through
     with the assistant district attorney's office when you
     applied for a search warrant?

A    So at the time, it would have been the violent crimes
     group, Assistant District Attorney Tricia Daugherty,
     Assistant District Attorney Paul Hauer, Assistant
     District Attorney Steve Glamm.

Q    Sorry.  Let's spell these names for the court reporter
     that's right there.

A    Certainly.  I will spell them to -- to the best of my
     abilities.

Q    Thank you.

A    Patricia which I believe is common and Daughtery,
     D-A-U-G-H-T-E-R-Y; Paul Hauer, which is H-A-U-E-R;
     Steven with a V, Glamm, G-L-A-M-M; I believe Assistant
     District Attorney Brandon Wiggley, if I remember his
     name correctly, W-I-G-G-L-E-Y.  There's -- I can't
     recall the names.  There are two more that I can
     picture, but I can't remember their names.

Q    Okay.  So with regards to -- you mentioned that police officer Lewandowski attempted for a search warrant, do you recall when he did that?

A    When?

Q    Yes.  So if her phone was taken October 8th, 2020.  Do you recall how soon after unlawfully taking her phone that you applied for a search warrant?

        ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    The -- I believe the final conversation that we had with the DA's office regarding both the warrants occurred late the day before the hearing to have it returned.

Q    Okay.  And you mentioned that the Greenfield Police Department also try to get a search warrant for Taleavia Cole's phone, correct?

A    Yes.

Q    Did you request of the Greenfield Police Department to do that?

A    No.

Q    Why did they do that?  Was there probable cause?

        ATTORNEY BAYNARD:  Objection to the form of the question; calls for speculation.  Go ahead.

A    They were investigating an incident where there was a social media post from what has been described as being Taleavia Cole's live feed threatening to release an

intimate video of Patty Swayka, and that's what they
were investigating.

Q    Did Taleavia Cole, referring to this video, did she take
an intimate video of Ms. Swayka?

A    I don't believe so but I don't know for certain.

Q    Okay.  Is Ms. Swayka is an officer, right?

A    Yes.

Q    So did you tell the police department about -- so what
crime would Taleavia Cole have committed if she had
released that video?

A    Releasing an image depicting potential nudity.

Q    Sorry?

A    Releasing an image depicting potential nudity.

Q    Okay.  So what's the Wisconsin statutory number for that
because there's a lot of people that do that, legally.
So what specific crime with the statutory number was she
committing?

A    I don't know the number off the top of my head.

Q    But you're saying one exist?

A    There was a crime that we -- for which the Greenfield
Police Department wrote a search warrant.  I don't know
exactly what it is for, but it was something of that
nature.

Q    Did you -- were you coordinating with them to make sure
you had a lot of search warrant applications going on --

is that how they knew about this?  You pointed it out to them?

ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    No. We were made aware of the video and we referred it to them because they would have been the appropriate jurisdiction because Patty Swayka lived in that city at the time.

Q    Where does Taleavia Cole live?

A    I don't know.

Q    Does Taleavia Cole live in Greenfield?

A    I don't know.

Q    Do you have access to the TPR target list?

A    If you're referring to the intelligence document, I do have access to it.

Q    So for the TPR target list it has Taleavia Cole's address on it, correct?

A    It's not a target list and, yes, I believe her information is on it.

Q    So you have access on the TPR target list to Taleavia Cole's address to find that information out, correct?

ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    It's not a target list and if her address is on there, I would have access to it.

Q    So then it doesn't make any sense that you would also go
     to the Greenfield if you were putting in a search
     warrant application, because as you know and the
     information that was available to you, Taleavia Cole
     lives in Milwaukee, correct?  As noted in the TPR target
     list.

              ATTORNEY BAYNARD:  Objection to the form of
     the question.  Foundation.  Go ahead.

A    The case was referred to Greenfield because Patty Swayka
     the victim resided in Greenfield at the time.

Q    Okay.  So when you actually do investigations and issue
     charging decision, are those charging decisions based on
     the jurisdiction, based on where the victim lives or is
     it based on presumably where the crime occurs?

              ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    Depends on the circumstances.

Q    Okay.  So why didn't you go to the Milwaukee Police
     Department which is where Taleavia Cole lives,
     presumably where this fictitious crime would have
     occurred?  Why you didn't go to them because that would
     be the proper jurisdiction?

              ATTORNEY BAYNARD:  Objection to the form of
     the question; compound.  Go ahead.

A    As a matter of practice, when jurisdiction is unclear we

tend to default to the jurisdiction with where the
victim resides.

Q    But jurisdiction was clear because Taleavia Cole's
address is on the TPR target list as put on by your
subordinate Dominick Ratkowski.  So you knew exactly
where Taleavia Cole lived or at least had that
information accessible to you, correct?

          ATTORNEY BAYNARD:  Objection to the form of
the question; compound.  Go ahead.

A    I'm sorry, can you repeat the question?

Q    You knew what Taleavia Cole's address was because your
subordinate whom you supervised, Dominick Ratkowski,
created this TPR target list which had her address that
was readily available to you.  So there was no confusion
on where she lived.  And the appropriate jurisdiction
would have been to go to the City of Milwaukee which is
completely contradictory to you having no idea where to
put this.  Normally, you put investigations or ask for
search warrants where a crime occurs as opposed to where
a victim lives, correct?

          ATTORNEY BAYNARD:  Objection to the form of
the question; compound; argumentative.  Go ahead.

A    If we can definitively say where a crime occurred, yes,
we will refer to that jurisdiction.  However, in this
case, Taleavia Cole could have made a post, done

anything with that video from anywhere in the world where she is getting cellular reception. So a case like this, we would refer to the victim's jurisdiction.

Q   Okay. But you never bothered to try to question Taleavia Cole, correct, in your investigation?

A   Correct.

Q   You never bothered to try to, you know, give a warrant for her arrest in your "investigation"; isn't that correct?

A   Correct.

Q   What was the name of the Greenfield police officer that put in a search warrant for Taleavia Cole's phone? What's his name?

A   I believe it was Detective Jason Birshback. That is B-I-R-S-H-B-A-C-K, I believe.

Q   Detective Birshback is he your friend?

A   No.

Q   Is Birshback friends with Detective Lewandowski?

        ATTORNEY BAYNARD:  Objection; calls for speculation. Go ahead.

A   I don't know the relationship.

Q   What is the investigation -- what department is Detective Birshback in the Greenfield Police Department?

A   I'm sorry what?

Q   What department does Detective Birshback work at in the

Greenfield Police Department?

A    I don't know their structure.  I believe he's in their
     investigative division.

Q    Would you classify this as a -- never mind.  Scratch
     that.

           Do you know which district attorney Detective
     Birshback gave his search warrant application to?

A    I don't recall.

Q    Okay.  Do you know when he put in that search warrant
     application?

A    Not, specifically, but it would have been about that --
     the same time, the day before the hearing to get the --
     to have the phone returned.

Q    And you -- so basically, what you're testifying to is
     that we were asking -- Taleavia Cole requested of her
     phone immediately after you took it October 8th, are you
     aware of that?

A    Yes.

Q    Okay.  And are you aware that Taleavia Cole was
     immediately told that a search warrant application was
     applied for on October 10th; are you aware of that?

A    I'm not.

Q    But, according to your testimony, that simply just was
     not true, correct?

           ATTORNEY BAYNARD:  Objection to form of the

question.  Go ahead.

A    I -- I don't know who would have told her that.  I'm --
     I'm not aware of a search warrant that was drafted on
     the 10th.  Maybe there was.

Q    You just testified the search warrant wasn't drafted
     until the hearing was held to get her phone back which
     was 22 days later, which you testified to?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Misstates his prior testimony.  Go ahead.

A    I'm stating that on the date before the hearing for the
     property to be released is when the -- the search
     warrants were, ultimately, decided by the Assistant
     District Attorney's office.  They may have been drafted
     on the 10th.  The DA's office may have been involved.
     I'm not at all familiar with that timeframe.

Q    What do you mean by the district attorney may have
     ultimately -- what are you talking about?

A    There may have been consultation between the detectives
     and the district attorney for guidance, legal guidance.
     This happens often in cases.  I don't know.

Q    So when she -- with regards to all the phones that were
     taken from people from October -- for the October 7th
     through the 12th curfew, did you apply for any search
     warrants for any other phones?

A    I don't believe so.

Q     In regards to Taleavia Cole's phone, specifically, the
      search warrant is something that you had applied for in
      writing, correct?

A     Yes, typically.

Q     And is that typically a form you fill out or is that
      e-mail?

A     It is typically handled -- I believe they, with COVID,
      they are electronically submitted by e-mail.

Q     Is it typical for two different police departments to
      apply for two different search warrants for the same
      exact type of investigation?  Is that normal?

A     They weren't the exact same type of investigation; and
      yes, it's common for partnering jurisdictions to write
      search warrants together.

Q     Okay.  So what was the Wauwautosa Police Department
      investigating Taleavia Cole for?

              ATTORNEY BAYNARD:  Objection; asked and
      answered.  Go ahead.

A     Her potential involvement or knowledge of the incident
      at Patty Swayka's house on August 8th.

Q     And that was it?

A     Yes.

Q     Okay.  And what was the City of Greenfield investigating
      Taleavia Cole for?

              ATTORNEY BAYNARD:  Objection; asked and

answered.  Go ahead.

A    For a Facebook post from her account which threatened to release an intimate image of Patty Swayka.

Q    So you guys weren't coordinating with each other on that?

A    We were -- we were aware of both investigations, but it was the Greenfield's responsibility for their investigation and our responsibility for ours.

Q    Were you a part of those investigations yourself?

A    Not directly.

Q    Were you -- do you know of any other police department or federal agencies that were a part of this investigation of Taleavia Cole?

A    Specifically related to her phone?

Q    No. Specifically related to her as a person?

A    Do I have knowledge if anybody else investigated, is that what you're asking me?

Q    If any other -- I'm asking do you have knowledge if any other police department and/or federal agencies were investigating -- were also investigating Taleavia Cole for anything from May 25th, 2020 to today's date of August 20, 2021?

A    None to my knowledge.

Q    Okay.  And you testified that with regards to phones being taken away from people October 7th through the

12th, 2020, that no other phones that you're aware of was there a search warrant applied for?

A    None to my knowledge.

Q    Okay.  And with regards to the phones that were taken away during those dates, are you aware of any phones that were unlawfully searched without the owner's consent?

A    No.

Q    Are you aware of any phones that were taken from October 7th through 12th where the SIM cards were taken out without their consent?

A    I'm not aware of any.  It would -- would have likely occurred as a matter of practice.

Q    Explain that to me.

A    SIM cards are removed from phones to prevent their remote manipulation and to retain evidentiary items that may be contained.

Q    What does that mean?  Remote manipulation?

A    A cloud-activated erase.

Q    Okay.  And when you take people's SIM cards out of their phone, do you, you know, look at anything else on the SIM cards like try to get their phone numbers or any type of information on that?

A    No.

Q    Is that something that -- have you ever heard of

something like that happening?

A     I don't know.  I guess I don't know what's on a SIM
      card.  I just know it's a small card that comes out of
      the phone.

Q     But you're in charge of the digital forensic unit,
      correct?

A     I am.

Q     And you don't know these things about, you know, digital
      forensics what we get off of a SIM card?

              ATTORNEY BAYNARD:  Objection to the form of
      the question; argumentive.  Go ahead.

A     I don't know every detail about every position that I
      oversee.  I was never a cell phone analyzer.

Q     Okay.  Do you know anything about cell phones and
      analyzing period?

A     A little bit.

Q     Okay.  So you have someone's phone at the Wauwatosa
      Police Department, have you ever put a phone through the
      Cellebrite system?  Have you ever done that?

A     No.

Q     So what have you done with phones within the Wauwatosa
      Police Department?

A     My professional history is the only manipulation of
      phone would be like the physical analysis no different
      than how anybody else would manipulate their phone.

Q    So what do you mean by "physical analysis"?

A    So if in an investigation somebody would give us consent
     or we would get a search warrant for a phone, if we can
     enter that phone and bypass the password we would just a
     manual search.  That is the extent of my knowledge of
     phone analyzing.

Q    Okay.  And do you do that analyzing or do you send it to
     another person to do those things to the phone?

A    So under a circumstance like that, that would be
     conducted -- that could be conducted by me.  That
     wouldn't require any specialized training.

Q    Okay.  And do you know if anyone did exactly what you're
     talking about do that analysis for any of the phones
     that were taken from October 7th through 12th, 2020?

A    Not unless they would have obtained consent or received
     a search warrant.

Q    Okay.  You're positive about that?

A    Mm-hmm.

                ATTORNEY BAYNARD:  You have to say yes or no.

A    Oh, sorry.  Yes.

Q    What makes you positive about that?

A    Because as a matter of practice the Wauwatosa Police
     Department does not search cell phones without a search
     warrant or consent.

Q    Have you ever known any Wauwatosa police officer to do

```
         things that are outside what is procedurally allowed
         within the Wauwatosa Police Department?
A        No.
Q        You have never known that?
A        No.
Q        You have never known a Wauwatosa police officer to write
         a police report that's inaccurate or just a straight up
         lie that they have been submitted which would be against
         practice?  You have never known that to happen?
                   ATTORNEY BAYNARD:  Objection to the form the
         question; compound; asked and answered.  Go ahead.
A        No.
Q        Have you ever known a Wauwatosa police officer to lie?
A        No.
Q        You have never known a Wauwatosa police officer to lie?
                   ATTORNEY BAYNARD:  Objection; asked and
         answered.
A        No.
Q        Were you involved in the investigation of the Jay
         Anderson shooting?
A        No.
Q        Okay.  Were you involved in the investigation of the
         Alvin Cole shooting?
A        Not in the investigation, no.
Q        What were you involved in with that investigation?
```

Case 2:20-cv-01660-NJ   Filed 05/25/22   Page 40 of 126   Document 188-1

A    I conducted the administrative review.

Q    You were the one that conducted the administrative review?

A    Yes.

Q    And in your administrative review, did you find any issues that came up with regards to Joseph Mensah's action?

A    I would have to review the document, but not from a truthfulness standpoint.

Q    I didn't say "truthfulness." I said anyone that has done anything that did not follow policies, that's what I said, before and you said, no you didn't know any Wauwatosa police officers that have deviated from the policy.

Now I'm asking again, have you ever known any Wauwatosa police officers to deviate or not follow the policies for literally anything within your 10 and a half years at the Wauwatosa Police Department as an officer?

A    Yes.

Q    Give me an example.

A    Most commonly pursuit policy violations.

Q    Sorry. Can you say that again?

A    Most commonly our pursuit policy violations.

Q    Okay. And did you note any policy violations of any

Wauwatosa Police Department officers during any of the protests that occurred in the City of Wauwatosa from May 25th, 2020 to today's date of August 20th, 2021?

A    Did I note any policy violations?

Q    Yes.

A    None to my knowledge.

Q    So you didn't -- between that time period you didn't note any pursuit policy violations by any Wauwatosa police officers?

A    Can you be more specific?  I don't -- I don't think I'm understanding the question correctly.

Q    So you just testified that the common policy violations that you have seen involving with the Wauwatosa police officers is in relation to pursuit policy.  So I'm asking between May 25th, 2020 to today's date, are you aware of any pursuit policy violations by anyone within the Wauwatosa Police Department?

A    I can't think of a specific example, but with fair certainty I would say that there have been some.

Q    You can't think of one single example?

A    I'm not involved in the pursuit -- pursuit review process.

Q    Okay.  Between May 25th, 2020 to today's date August 20th, 2021, do you know of any use of force policy violations by any Wauwatosa police officer?

A    None specifically, no.

Q    If you're aware of, you know, someone with the Wauwatosa
     Police Department or an employee who works at the
     Wauwatosa Police Department violating policy, would you
     do anything about it?

A    Yes.

Q    If they were -- if you were supervising them and say,
     for instance, a Wauwatosa police officer or someone who
     works at the Wauwatosa Police Department was, you know,
     going into the DOT computer frame or using a username
     and password for that frame to get personal information
     against people they just personally don't like and there
     is no investigative purpose of getting that information,
     would you consider that to be a violation of policy?

A    Under those circumstances, yes.

Q    So under those circumstances, is that something that you
     would personally, you know, reprimand them for or do
     something about?

A    Yes.

Q    What would you do?

A    Conduct an internal investigation.

Q    And what does that look like?

A    Investigating the facts and circumstances regarding a
     violation.

Q    So conducting an internal investigation, I guess a

better question is, would you bring in somebody else or would you create a team of people to investigate a potential infraction?

So what would (Zoom freeze) -- thank you. What would an internal investigation look like if you were to investigate somebody, as we talked about, they are going on computers and using a password to get information on people they personally have an issue with to where there is no investigative purpose for it? What does that specifically look like? You mentioned you would start an investigation. So are we talking about you would personally do it yourself or would you get a team of different people to look into the matter? What would that look like?

ATTORNEY BAYNARD: Objection to the form of the question; compound. Go ahead.

A    Internal investigations are usually referred to the captain to assign out to a lieutenant.

Q    Okay. So you would delegate it to somebody else to handle that; is that correct?

A    The captain would make the decision as to who gets assigned.

Q    Okay. And which captain would that be? What's their name?

A    If there's an issue with my division, I would notify

Morrison, M-O-R-R-I-S-O-N.

Q    And have you ever within the last 10 and a half years referred anybody for such an investigation?

A    Have I ever what?

Q    Have you ever -- sorry.  Have you ever, within your 10 and a half years, have you ever referred anybody for such an investigation?

A    I don't believe so.

Q    Okay.  Now, let's talk about the TPR target list.

        Now you're the supervisor to Dominick Ratkowski, correct?

A    I am.

Q    And what are his duties?

A    He's a crime analyst.  So he analyzes --

Q    What does that mean?

A    He's analyzes data.

Q    So in relation to the TPR target list, who is the brain child of that?

A    It's not a target list.  It's a --

        ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    It's not a target list and I would -- can I get clarification on what you mean by "the brain child"?

Q    Who is the genius that came up with the idea of creating a TPR target list at the Wauwatosa Police Department?

ATTORNEY BAYNARD:  Objection to the form of question.  Go ahead.

A    It's not a target list and I don't know where it -- where it originally generated from.

Q    But this is your unit, correct, that you supervise?

A    Correct.

Q    And you have no idea how this list originated in your unit?

A    I don't know if Dominick started it on his own or if he was directed by anyone else to do it.

Q    Presumably that direction would come from you, correct?

A    It could come from any other supervisor above me.

Q    But they would presumably, you know, put you in a loop if they asked Dominick to do something, correct?

A    Most of the time, however, Dominick handles a large request for other matters for the captains.

Q    Would it surprise you to know that Dominick testified that he is the one that it was his idea to come up with the TPR target list?  Would that surprise you?

A    No.

Q    Why not?

A    I don't know it just doesn't.

Q    It doesn't surprise you that Dominick would create this TPR target list on his own without any -- with you not having any knowledge?  That doesn't surprise you?

ATTORNEY BAYNARD:  Objection to the form of
the question.  Go ahead.

A    So no, Dominick does a fair amount of work to help our
investigators obtain information and intelligence for
their investigations so no.

Q    So why do you keep correcting me when I call it a TPR
target list?

A    It's not a target list.

Q    Buy why do you keep correcting me?

A    Because it's not a target list.

Q    I mean, would you have a problem if someone within the
Wauwatosa police department was calling -- was
advertising that's what it was?  Would you have an issue
with that?

A    If somebody was advertising it as a target list?

Q    Yes.

A    Yes.

Q    Why?

A    Because that's not what it is.

Q    What is it?

A    An intelligence document.

Q    Would you have a problem if someone -- okay.  So it's
The People's Revolution then, correct?

A    It's an intelligence document.

Q    It's The People's Revolution's subject list, correct?

A     It's an intelligence document.

Q     Would you have a problem if anyone within the Wauwatosa
      Police Department was referring to it as such?

A     As what?

Q     As those things.  As a TPR target list, as The People's
      Revolution's list or as the -- The People's Revolution's
      subject list?  Do you have an issue with anyone in the
      Wauwatosa Police Department was advertising it to be
      that?

A     Yes.

Q     Why?

A     Because it's not what it is.

Q     So what would you do if you found out that someone in
      the Wauwatosa Police Department was doing that?  Would
      you actually do an investigation of them or what would
      you do about it?

A     Depends on the circumstances.

Q     What do you mean?

A     Not all policy violations are full internal
      investigations often times things are handled with
      corrective behavior -- or, I'm sorry, with corrective
      action.

Q     Okay.  So you said this is an intelligence document.
      Explain to me what you think this TPR target list is to
      you?

A    An intelligence document.

Q    What does that mean?

A    It is a document that provides us information about
     people that should we need to identify them as
     witnesses, victims, suspects who were routinely coming
     throughout Wauwatosa throughout the course of 2020.

Q    And are they attached to any type of protesting?

A    Yes.

Q    Okay.  So why isn't David Clarke on the list?

A    I don't know.

Q    Why am I on the list?

A    You were point of contact as I believe the attorney
     representing many people on that list.

Q    Okay.  Yes, I am one now.  But why was I put on the list
     and when was I put on the list?

A    I don't know when.

Q    When do you know the list was created?

A    I don't recall.

Q    Okay.  Let's try to figure it out.  So did you have
     access to this list after the George Floyd murder of May
     25th, 2020?

A    Would I have access to it?

Q    Did you have access to it?

A    I don't recall.  I don't know when it was created -- I
     don't recall the specific date it was created.

Q    Do you recall having access to the list on July 15th,
     2020, when Joseph Mensah was suspended with pay?

A    I don't recall.  But once it was created, I would have
     had access to wherever it was being kept.

Q    Okay.  So do you have access to this list as a .pdf
     document?

A    I would have.  I believe, yes.

Q    And how would you have acces, was it e-mailed to you?

A    I don't believe so.

Q    Where do you believe you had access to it?

A    In a folder on our server.

Q    And what's the name of that folder?

A    I don't recall the specific title.

Q    Okay.  Does this folder have other information as well?

A    I'm sure it does.

Q    And you have folders that -- that we've received e-mails
     entitled different things where you have videos and
     pictures and drone videos in relation to any protesting
     from May 25th, 2020, Wauwatosa through today's August of
     2021 -- 2021, correct?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    Yes, there are folder that contain that information.

Q    Okay.  And do you have folders on people within the
     Wauwatosa Police Department?

A    Not to my knowledge.

Q    Okay.  Why do you have a folder of me within the
     Wauwatosa Police Department?

A    I don't know.

Q    Isn't that something you should know?

A    Maybe.

Q    Is it common for the Wauwatosa Police Department to
     surveil and monitor attorneys that are doing their basic
     job in representing people?  Is that normal?

              ATTORNEY BAYNARD:  Objection to the form of
     the question; compound.  Go ahead.

A    Can you repeat the question?

Q    Is it normal for the Wauwatosa Police Department to
     monitor, surveil and have folders of attorneys who are
     representing clients in Wauwatosa?  Is that a common
     practice for you guys to do to monitor attorney who are
     doing their basic job of representing people?

              ATTORNEY BAYNARD:  Same objection.  Go ahead.

A    No.

Q    All right.  So if there were folders that I received
     from Dominick Ratkowski, which we have, that are labeled
     "Motley," that would be unusual for the Wauwatosa Police
     Department to do, correct?

A    I'm not sure.  I guess I'm not sure what are in those
     folders.

Q    Sorry.  What's that?

A    I'm not sure what are in those folders.

Q    Okay.  Now, with regards to the TPR target list, do you
     think it was an appropriate investigative tool?

A    It's not a target list, and yes.

Q    Do you think -- did you share this target list with
     anybody?

A    Not me personally, no.

Q    Okay.  Do you know anyone who shared it with anybody
     else outside the Wauwatosa Police Department?

A    Not specifically, no.

Q    Okay.  So who -- do you know if Attorney George Schimmel
     had access to the TPR target list?

A    It's not a target list and I don't know.

Q    Do you know if Attorney Alan Kesner or any City of
     Wauwatosa employees had access to the TPR target list?

A    It's not a target list and I don't know.

Q    Okay.  Do you know if anybody -- if the judge of the
     municipal court had access to The People's Revolution
     list?

A    I don't know.

Q    What was your role in creating or anything with regards
     to the TPR target list?

               ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    I had no personal role in it.

Q    Who was in charge -- so is it fair to say that Dominick
     Ratkowski was in charge of the TPR target list?

A    It's not a target list and he was the one developing the
     intelligence document, yes.

Q    So he was the one in charge of the TPR target list?

                 ATTORNEY BAYNARD:  Objection asked and
     answered.

A    Not a target list and, yes, he was the one that was
     creating it and working with it, developing it.

Q    Was there anybody else that was adding to the TPR target
     list that you're aware of?

A    I'm not aware of -- of any.

Q    Are you aware of anybody else other than Dominick
     Ratkowski that was, you know, that could on their
     computer add stuff to the TPR target list?

A    There may have been, but not to my knowledge.

Q    Okay.  And you testified that you yourself have not
     shared the TPR target list with anyone outside the
     Wauwatosa Police Department; is that what you're saying?

A    Yeah, I don't believe so, not that I recall.

Q    Do you know if anyone shared the TPR target list with
     any federal agencies?

A    I'm not sure.

Q    But it's possible, correct?

A    It's possible.

Q    Do you think it's appropriate for Dominick Ratkowski to create a TPR target list and to, you know, share it with other departments of federal agencies, do you think that an appropriate thing to do?

        ATTORNEY BAYNARD:  Objection to the form of the question; compound.  Go ahead.

A    As an intelligence document, yes.

Q    Why?

A    Part of his job duties are to network with other intelligence groups and they routinely share information.

Q    Okay.  So what's your home address?

        ATTORNEY BAYNARD:  Objection; irrelevant.  He's not give you his home address.

A    You can contact me at the Wauwatosa Police Department.

Q    No.  What's your home address?  That was my question.  I didn't ask you where I can contact you.

        ATTORNEY BAYNARD:  I'm instructing him not to give you his home address.

A    I heard your question, I'm not answering.

Q    Why was my home address put on this TPR list?

        ATTORNEY KNOWLTON:  Just for the record, I just -- Kim, so you can hear me.  I'm just stating that this is discoverable information and it's within our

rights to ask during the deposition.  So just for the record, I'm observing that.  Sorry, you want to repeat the question, Kim?

Q    Do you think it's appropriate to have my home address on the TPR target list?

A    Yes.

Q    Why?

A    As a method of contacting you if necessary.

Q    You have to contact me at my home address in North Carolina?

A    If there was a need.

Q    Okay.  Why isn't Dennis McBride on the TPR target list?

A    It's not a target list and we were familiar with the mayor and how to get a hold of him.

Q    Why isn't Heather Kuhl on the TPR target list?

A    For the same reason.

Q    Why isn't -- you know, literally, any, you know, pro-police protesters on the TPR target list?

A    The intelligence document was drafted over the course of several months based on groups that were continually coming back to the city and to my knowledge we were only -- we only had one, as you would call it, pro-Trump, pro-whatever rally and it happened once and that was it.  There wasn't a long enough time to compile anymore intelligence.

Q    But your intelligence document it was for, if you needed to, you know, contact people, correct?

A    Correct.

Q    Did you know at the time of the December 2020 curfew, the Pro-Trump protester that that was the one and only protest that they were supposedly going to have?  Could you see that in the future?  Did you know that at the time?

             ATTORNEY BAYNARD:  Objection to the form of the question; argumentative.  Go ahead.

A    No.

Q    Okay.  And you just failed in putting them -- or your subordinate Dominick Ratkowski failed to put them on this list, correct?

             ATTORNEY BAYNARD:  Same objection.  Go head.

A    This document wouldn't have been created for one specific incident.  It would have taken multiple and generated an intelligence document.

Q    How do you know?  You don't even know when it was created.  You don't even know why it was created.  So now you're saying that's why it was created?

             So let's just re-ask you the same question I asked you because now you're giving a different answer.  So when was the TPR target list created?

             ATTORNEY BAYNARD:  Objection to the form of

the question.  Go ahead.

A    I don't know the specific date.

Q    So why was the TPR target list created?

          ATTORNEY BAYNARD:  Same objection.

A    It was created as an intelligence document to identify
     people who could be potential witnesses, victims or
     suspects.

Q    How do you know that's why it was created?

A    Because as a matter of practice, that is why we compile
     intelligence documents.

Q    Did Dominick who was the one that created -- the creator
     of this list tell you that's why he created it?

A    I don't know that he told that to me specifically.

Q    Well, then how are you deducting that if you are not
     even talking to your subordinate, the creator, as to why
     it was created?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    Because as a matter of practice in investigation, he
     compiles intelligence documents.

Q    So who's Christian Berges, B-E-R-G-E-S.

A    I don't know.

Q    Okay.

          ATTORNEY MOTLEY:  So I want to share my
     computer screen, can you do that?

ATTORNEY KNOWLTON:  Yes.  Oh, I think so.
Okay, now you should be able to share.

ATTORNEY MOTLEY:  Okay, can I share my screen?

ATTORNEY KNOWLTON:  Yep.

BY ATTORNEY MOTLEY:

Q   Do you see my screen?

A   I do.

Q   All right.  Do you see this e-mail from Dominick
Ratkowski to Christian Berges on October 6th, 2020?

A   I do.

Q   Do you see how Dominick calls it the TPR target list?

A   I do.

Q   So the person that created is calling it the TPR target
list, right?

A   It appears that way.

Q   That's what it is, correct?

A   That's not what it is.

Q   Okay.  So what are you going to do about this?

A   I will review this e-mail.

Q   Okay.  You've reviewed it.  Now what are you going to do
about it?

A   I don't know.

Q   You don't know.  You don't know who Christian Berges is.
You don't know when he created this.  You don't know why
he created this.  What do you know about this TPR target

list?

               ATTORNEY BAYNARD:  Objection to the form of
the question; asked and answered.

               ATTORNEY MOTLEY:  I don't need an answer that.
I think I'm making my point.

Q   He's call it a TPR target list.  You have been
correcting me this whole time saying that's not what it
is.  But the brain child, the person that created this
and the person we have deposed for hours and hours has
communicated that this in fact a TPR target list.

               So why was Wauwatosa Police Department
targeting TPR?

A   I don't believe --

               ATTORNEY BAYNARD:  Objection to the form of
the question.  Go ahead.

A   I don't believe we were targeting TPR.

Q   Is Dominick Ratkowski a member or part of the Wauwatosa
Police Department, you know, personnel and family?

A   He is part of our staff, yes.

Q   So clearly he was targeting TPR by putting this in an
e-mail, correct?

               ATTORNEY BAYNARD:  Objection to the form of
the question; calls for speculation.  Go ahead.

               ATTORNEY MOTLEY:  It doesn't call for
speculation.  He typed this in.

ATTORNEY BAYNARD: Yes, it calls for speculation. So, that's an objection.

ATTORNEY MOTLEY: No, I get it.

ATTORNEY BAYNARD: You can answer.

A   He used the words. I don't know that he did any actions to specifically target the group.

Q   Well, it seems that he did because this TPR target list was forwarded to Christian Berges who you have zero idea who that is. That's an action, right? For typing an e-mail, forwarding it to somebody else. Wouldn't you call that an action?

A   I believe based on this e-mail I recognize that name now as a -- as a fellow crime analyst, I believe.

Q   Okay. So he did do an action to forward this TPR target list to somebody else. You just said, he did no action. Is taking the TPR target list, forwarding it to somebody else, whoever that may be; that's an action, right?

A   Yes, but I don't know the circumstances. I would need more information.

Q   So we're going to call this list what it is since your subordinate who is in charge of it labeled it as such. So this is a TPR target list?

ATTORNEY BAYNARD: Objection to the form of the question.

Q   Just like you're giving him the benefit of the doubt.

We're going to use his factual statement to refer to it
what it is a TPR target list.

ATTORNEY BAYNARD:  Objection.

Q    So why would the Wauwatosa Police Department target TPR?

ATTORNEY BAYNARD:  Objection to the form of
the question; compound; asked and answered;
argumentative; and again, calls for speculation with
regards to why that subject line was typed in that way.
So I mean I don't know.  I guess I'm not trying to make
a speaking objection, but I think your statement was
"we're going to call it the TPR target list."  I think
you can call it whatever you want.

ATTORNEY KNOWLTON:  The question was --

ATTORNEY MOTLEY:  I'm not calling it whatever
I want.  The person who created it called it that.  He
is the person that, your client right now, who is the
supervisor for and let him just freely create this list,
freely give it out, he doesn't know a lot of things and
has testified that this is the person who created it,
was in charge of it, and had something to do with it, he
labeled it that.  So I've seen zero e-mails of this is
an intelligence document.  What we do have an e-mail for
is this is a TPR target list.  So we're going to call it
that appropriately moving forward.

ATTORNEY BAYNARD:  And you can call it

whatever you want.

ATTORNEY KNOWLTON:  Okay.  The question was --

ATTORNEY MOTLEY:  I am calling it.  I want to be very clear.

ATTORNEY KNOWLTON:  Yeah.

ATTORNEY MOTLEY:  It's not coming from me.

ATTORNEY KNOWLTON:  But the question was, why is the Wauwatosa Police Department target TPR?  That was the question, right?

LIEUTENANT WRUCKE:  I don't believe we are targeting TPR.

BY ATTORNEY MOTLEY:

Q    Am I a member of TPR?

A    I don't know.

Q    What is TPR?

A    The People's Revolution.

Q    But what is it to you?

A    It's a group of people.

Q    Group of people doing what?  Just a group of people hanging out and sitting in their house on the couch?  What is the group of people?

ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    I believe they are a group that protests in their efforts of police reform.

Q    You believe the TPR, The People's Revolution, is a
     terrorist organization?

A    No.

Q    Do you believe that Black Lives Matter is a terrorist
     organization?

A    No.

Q    Is TPR even an organization (Zoom freeze) -- sorry.

          Is TPR even an organization?

A    I guess it depends on how you define an organization.

Q    I am asking you the question.  So you're the one that's
     defining it.

          Do you think that TPR is an organization?

A    Maybe in an unofficial capacity.

Q    Okay.  Do you agree with some of the things that TPR is
     protesting for?

A    I don't know, specifically, what they are protesting
     for.

Q    Okay.  What do you think they're doing, since we're
     going to play this game?  What do you think TPR is
     doing?

          ATTORNEY BAYNARD:  Objection to form of the
     question.  Calls for speculation.  Go ahead.

Q    Since you have no clue what they are protesting for
     let's play this game and just play dumb.  So what are
     they protesting?  What are they doing?

ATTORNEY BAYNARD:  Objection -- objection to the form of the question; argumentative.  He said are police reform.  Go ahead.

A    Exactly that.  I believe their objective is police reform.

Q    What kind of police reform?

A    I don't know specifically.

Q    You don't know specifically.  So there -- so you have no idea what TPR has been protesting for with police reform?  It's just completely clueless to you?

ATTORNEY BAYNARD:  Objection to the form of the question; argumentative.  Go ahead.

A    Again, I don't know, specifically, what items their agenda maybe that they have.  I don't know, specifically, what those are.

Q    So you don't know them to be protesting on behalf of the three families that had sons that were killed by Joseph Mensah?  That's something that you just don't know?  As a lieutenant of a department for 10 and a half years you just have no clue.

ATTORNEY BAYNARD:  Objection to the form of the question; compound; argumentative.  Go ahead.

Q    Do you know that now or is it ringing a bell?

A    Yes, that's part of it.

Q    Okay.  What else is part of it?

A    Again, I don't know what other reforms or agenda that
     they have.

Q    You don't know.  Do you monitor any of the activities
     for anybody that's on the TPR target list?

               ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    I do not.

Q    Do you know who is monitoring their activities?

               ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    I don't know -- the "monitoring" their activity is a
     pretty broad statement.  So I'm not sure how to answer
     that.

Q    Would it surprise you that your subordinate Dominick
     Ratkowski was just giving out this list to people
     indiscriminately for about eight to nine months, would
     that surprise you that he was doing that?

               ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    If that were the case it would.

Q    Would it surprise you to know that Dominick Ratkowski
     was routinely, and we have a lot of e-mails and still
     getting a lot more, was giving out this list to people
     that weren't even asking for it?  Would that surprise
     you?

ATTORNEY BAYNARD:  Objection to the form of
the question.  Go ahead.

A    Yes.

Q    If Dominick Ratkowski was giving out this list to people
unsolicited just because he thought, "hey, here's a list
I created TPR target list, you should have this."  Do
you think that's appropriate?

ATTORNEY BAYNARD:  Objection to the form of
the question.  Go ahead.

A    Depends on the circumstances.

Q    Okay.  If Dominick Ratkowski were giving out this list
to people with no explanation other than it's a TPR
target list, do you think that's appropriate?

ATTORNEY BAYNARD:  Objection to the form of
the question.  Go ahead.

A    Depends on the circumstances.

Q    Okay.  So why -- how am I being labeled on this list?

A    As a point of contact.

Q    How do you know that?  You didn't create it.  You didn't
put me on there.  How do you know that that's why he put
me on this list?  You haven't talked with him about it.

ATTORNEY BAYNARD:  Objection to the form of
the question; compound.  Go ahead.

A    As a matter of practice and how we work with
intelligence documents.

Q    So how many other lists do you have that are floating

     around the Wauwatosa Police Department other than lists

     involving sensitive crimes?  What other lists do you

     have involving, you know, people who are exercising

     their constitutional rights within the City of Wauwatosa

     so I can get the names of those list?  What other lists

     do you have?

                ATTORNEY BAYNARD:  Objection to the form of

     the question; compound.  Go ahead.

A    I don't know of any other specific lists that we have.

Q    So you don't have a list of Proud Boys that have come

     into Wauwatosa?  You don't have that list?

A    No, I'm not aware of any Proud Boys that have come into

     Wauwatosa.

Q    You don't have any lists of supporters of David Clarke

     and Donald Trump that were protesting in Wauwatosa

     several times?  You don't have that list?

A    I'm not familiar with the list of -- of that nature, no.

Q    And to your knowledge, no such list exist, correct?

A    To my knowledge.

Q    Would it surprise you to know that actually Luke Vetter

     testified that he sent a communication to David Clarke

     regarding people that were coming to protest about

     Wauwatosa?  Would that surprise you to know that he did

     that?

A    No.

Q    Would it surprise you to know that Luke Vetter also
     testified that people like the Proud Boys and certain
     elements that were coming inside of Wauwatosa were
     scaring him because the fact that they were, you know,
     armed and he was concerned about people's protection
     that were not part of the TPR?  Would it surprise you to
     know that Luke Vetter was concerned about these outside
     elements coming in Wauwatosa?

              ATTORNEY BAYNARD:  Objection to the form of
     the question; compound.  Go ahead.

A    It would not surprise me.

Q    Would it surprise you to know that after Luke Vetter
     sent this communication to David Clarke that, you know,
     David Clarke did not respond to him at all?  Would it
     surprise you to know that?

A    I don't know David Clarke, so maybe not.

Q    Okay.  So even -- would it surprise you to know that
     even after all that testimony with Luke Vetter claiming
     that he was scared about these other elements coming in
     and about these protesters outside in Mayfair he was
     concerned in December of 20, 2020, that zero of those
     people ended up on the TPR target list, would that
     surprise you?

              ATTORNEY BAYNARD:  Objection to the form of

the question.  Go ahead.

A    I'm sorry, can you repeat it one more time?

Q    Would it surprise you to know that Luke Vetter testified
     that he was scared about the Proud Boys coming into the
     City of Wauwatosa and he was concerned about David
     Clarke having people also protesting in Wauwatosa; and
     even after that happened, none of those people ended up
     on any list with the Wauwatosa Police Department?  Would
     that surprise you to know that?

               ATTORNEY BAYNARD:  Objection to the form;
     compound.  Go ahead.

A    It would not surprise me to believe that he was scared
     about potentially those people coming in.  And as far as
     their position on the list, again, I guess -- I don't
     know how to answer because it's a very complicated
     question.

Q    Okay.  Would you want to be on the TPR target list?

A    Would I want to be?

Q    Yes.

A    It really wouldn't matter to me.

Q    Okay.  What's your home number?  We'll put you on the
     list.  What's your home number?  I'll e-mail Dominick
     Ratkowski right now and put you on the list.  What's
     your phone number?

               ATTORNEY BAYNARD:  Objection; argumentative;

irrelevant.  I already told you that he is not going to provide that information and I don't think you have access to putting people on the list anyway.

ATTORNEY MOTLEY:  I do.  I have access to Dominick.  I -- I have more access than your client does to Dominick.

Q    What's your personal home phone number?

ATTORNEY BAYNARD:  He's not going to provide that information to you.

Q    I thought you said you don't have a problem being on this list?  Why aren't you giving us this information?

ATTORNEY BAYNARD:  Objection; argumentative.

Q    If you don't have a problem with being on this list then are you going to tell Dominick Ratkowski when you leave the deposition today to put you on this list since it's just a phonebook, are you going to do that?

A    No.

Q    Why not?

A    Because there's other lists around the police department where people know how to get a hold of me.

Q    Okay.  But you said you don't have a problem with this list.  And this is not just a list that's used by the Wauwatosa Police Department it's used by whether Dominick decides that he's going to forward it to and whoever they decide to forward it to, right?

ATTORNEY BAYNARD:  Objection to the form of the question, calls for speculation.

Q    Those people might not know how to contact you so put your name on the list.  Why not do it?

ATTORNEY BAYNARD:  Objection to the form of the question, argumentative; asked and answered.

A    I give information to other police department on how to contact me regularly.

Q    But you don't know -- you don't even know Christian Berges is.  You say he may be a crime analyst.  You have no idea who this list was sent to by Dominick; isn't that correct?

A    I don't know who Christian Berges is and I don't know every e-mail that Dominick Ratkowski has sent.

Q    Would it surprise you that Dominick Ratkowski testified that he's at least sent this list out at least -- he first testified in one day he only sent it out to two people.  Would it surprise you to know that he testified he only sent it out to the Wauwatosa Police Department and the FBI on June 23rd, 2021?  That's what he testified to.  Would that surprised you to hear that information?

ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    I don't know whether I would be surprise, but okay --

yes.

Q    Would it surprise you to know that he told those were the only two organization that he sent it to for his June 23rd, 2021 testimony?  Would that surprise you that he testified to that?

            ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    Yes.

Q    Would it surprise you to know that then -- we then deposed Dominick again in July and then he testified, "you know what?  There's ten other agencies that I forgot to tell you that I sent it to in addition to these two."  Would that surprise you that his testimony changed so dramatically from one month to the next of who he sent the list to?

            ATTORNEY BAYNARD:  Objection; form of the question.  Go ahead.

A    Wouldn't surprise me.  I'm sure Dominick corresponds via e-mail throughout the course of his day many times.

Q    Would it surprise you to know that we don't buy it that he didn't remember on June 23rd, 2021, that he didn't just send it to two departments?

            ATTORNEY BAYNARD:  Objection to the form of the question; argumentative; calls for speculation.  Go ahead.

A    You're asking me if I'm surprise that you don't buy it?
     No.

Q    Do you think that you should have a Wauwatosa Police
     Department employee to have such significant amnesia
     that he can't remember where he has given this TPR
     target list to from literally 30 days?

          ATTORNEY BAYNARD:  Objection to the form of
     the question --

Q    I mean --

          ATTORNEY MOTLEY:  Sorry.  Go ahead, Jasmyne.

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Also misstates his prior testimony.  He
     didn't recall off the top of his head who the list was
     sent to.  Compound, asked and answered.  I don't know if
     it was even a question.

          ATTORNEY MOTLEY:  It wasn't.  I'll rephrase.

Q    Do you have a problem with this list now?  Do you still
     think Dominick -- sorry.  Go ahead.

A    No.

Q    Would you have a problem with this list if 200 people
     sued you since you failed to properly supervise your
     subordinate in creating this list and indiscriminately
     giving it out with virtually zero explanation as to
     exactly what the TPR target list is --

          ATTORNEY BAYNARD:  Objection to the --

Q    -- would that concern you?

          ATTORNEY BAYNARD:  Objection to the form of
     the question and argumentative.  Go ahead.

A    Can you repeat the question?

Q    Would you be okay with this list of 200 people sue you
     personally because of this list and your lack of
     supervision of the person that created it?

          ATTORNEY BAYNARD:  Same objection;
     argumentative, but you can answer.

A    I think if I understand this correctly.  I would be okay
     with the -- the document as it is.  It's an intelligence
     document.

Q    What the hell is an intelligence document?  Do you have
     an e-mail calling it that?

A    I don't know.

Q    It's a target list.  It's a target list.

          ATTORNEY BAYNARD:  Objection to the form of
     the question.

Q    Why did you fail so significantly in supervising
     Dominick Ratkowski properly when he created and
     disseminated this TPR target list?

          ATTORNEY BAYNARD:  Objection to the form of
     the question and argumentative.  Go ahead.

A    I don't believe I failed.

Q    Okay.  So you're okay with -- have you talked to

Dominick Ratkowski at all about his deposition
testimony?

A    No. Other than, not the content of it, other than he is
required to notify me that he was going to participate
in this deposition and that he had some general
questions about courtroom testimony.

Q    Are you aware that since we have been deposing him
Dominick has not dared to update this list.  Are you of
that?

A    I'm not.

Q    Why do you think that is?

            ATTORNEY BAYNARD:  Calls for speculation.

Q    Why do you think that is that he has not updated this
list since we started deposing him?

            ATTORNEY BAYNARD:  Objection to the form of
the question.  Calls for speculation.  Go ahead.

Q    Since this is just a phonebook of information according
to you?

            ATTORNEY BAYNARD:  Also misstates his prior
testimony as well.  Go ahead.

A    I don't know when he -- I don't know the last time he
added any information to the list is.

Q    Don't you think you should know?

A    As a matter of my duties, I don't know that I can know
everything that every employee of mine does.

Q    Dominick, I think -- how many civilian analysts do you
     have?

A    One.

Q    How many civil crime analysts has the City of Wauwatosa
     ever had?

A    One.

Q    Okay.  So we're just basically talking about a
     department of one with one person, correct?

A    We're talking about one person, but I oversee a division
     of 18 or 19 people.

Q    Okay.  And you don't have a problem with your employee
     surveilling and creating target lists of people,
     including me?  Am I being investigated for any crimes by
     the Wauwatosa Police Department?

              ATTORNEY BAYNARD:  Objection to the form of
     the question, compound.

A    No, you're not being investigated.

Q    Am I -- do I have any tickets that I don't know about
     the Wauwatosa Police Department is just going to give
     me?

A    No.

Q    Are there any referrals by anybody within the Wauwatosa
     Police Department to the Milwaukee County District
     Attorney's office charging me with any criminal
     offenses?

A    No.

Q    So why the heck am I on this TPR target list then?

          ATTORNEY BAYNARD:  Objection to the form of
     the question; asked and answered.

Q    You can't even affirmatively answer why I am on this
     list because you have never had a conversation with
     Dominick Ratkowski as to who is exactly on this list;
     isn't that correct?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    Can you repeat the question?

Q    You cannot affirmatively answer why anybody is on this
     list because you have never had a conversation with
     Dominick Ratkowski about why he put certain people on
     this list; isn't that correct?

A    I don't know that we ever had a specific conversation
     about that, no.

Q    Does that concern you now that you don't know why over
     200 people were put on this list by Dominick Ratkowski,
     including certain Wauwatosa residents, who have elected
     positions or have run for elected position in the City
     of Wauwatosa?  Does it concern you that you don't know
     why Dominick chose to put certain people on this list?
     Does that concern you?

          ATTORNEY BAYNARD:  Objection to the form of

the question; compound.  Go ahead.

A    No.

Q    It doesn't concern you still?

ATTORNEY BAYNARD:  Same objection.

A    No.

Q    Why not?

ATTORNEY BAYNARD:  Asked and answered.  Go
ahead.

A    Because I believe Dominick in his capacity to create
this type of intelligence is doing so appropriately.

Q    Would it concern you that Dominick testified that the
reason why pro-Trump supporters are not on this list is
because typically they don't use social media?  Are you
surprise that he would testify to that?

ATTORNEY BAYNARD:  Objection to the form of
the question; lacks foundation.  Go ahead.

A    No.

Q    Would it surprise you to know that Dominick Ratkowski
would testify that during our deposition if people were
tagging me on social media or anybody and he was in the
room with that person just by the mere fact that they're
being tagged on social media and he knows that they're
not going to protest that he was still putting people on
this list?  Would that surprise you to know that he
testified to that?

ATTORNEY BAYNARD:  Objection to the form of
the question; misstates Dominick's testimony.  Go ahead.

ATTORNEY MOTLEY:  It doesn't.

ATTORNEY BAYNARD:  Do you have the transcript?
I'll pull it up.

ATTORNEY KNOWLTON:  Okay.

ATTORNEY BAYNARD:  Yeah, we definitely have
the transcript because I know that transcript.  When he
was sitting running in the back room about to throw up,
yeah I remember that day.

ATTORNEY KNOWLTON:  Can we take a break, Kim?

(Off the record 10:42 a.m.)

(On the record 10:55 a.m.)

ATTORNEY KNOWLTON:  Thank you.  It is 10:55.
We are back on the record after 13 minutes I think.  A
quick break.

ATTORNEY MOTLEY:  Yes.

ATTORNEY KNOWLTON:  Is there anything else you
wanted to wind up?

ATTORNEY MOTLEY:  Not right now.  Thank you.

ATTORNEY KNOWLTON:  Okay.  All right.  Okay.
We're going to try to meet our proposed deadline.  Okay.

ATTORNEY BAYNARD:  As of now, I have nothing
so I'm all about it.

BY ATTORNEY KNOWLTON:

Q    Okay.  So you are the direct supervisor of Dominick
     Ratkowski, correct?

A    He is in my report chain.  I do have two sergeants that
     work for me as well.

Q    Okay.  So that he would report something to a sergeant
     first?

A    He could go either way.

Q    Okay.  And the two sergeants are?

A    Brian Skornia, S-K-O-R-N-I-A, and Brian, B-R-I-A-N; and
     Joseph Zientek, Z-I-E-N-T-E-K.

Q    Okay.  So those two sergeants if we think about a work
     chart and a chain of command, you would be the -- you
     would be above them in terms of supervising the
     sergeants of the investigative unit of the Wauwatosa
     Police Department?

A    Correct.

Q    And so those two sergeants are also in charge of the
     three, previously, identified subunits of the digital
     forensic unit?

A    Yes.

Q    The SOG?

A    Yes.

Q    And the sensitive crimes?

A    Yes.

Q    Okay.  And so Dominick works throughout that

investigative unit, correct?

A    Yes.

Q    And so he could get direction or report a concern to either -- either of those sergeants or directly to you?

A    Yes.

Q    And who is above you?

A    Captain Jack Morrison, M-O-R-R-I-S-O-N.

Q    And how many captains are there?

A    Three.

Q    Okay.  So we've got Captain Morrison.  Captain...

A    Gary Garbrish, G-A-R-Y, G-A-B-R-I-S-H.

Q    And Captain Vetter?

A    Correct.

Q    Okay.  And those are the -- the three captains.  Again, work chart metaphor are above you?

A    Yes.

Q    And then the chief is above those three captains?

A    Yes.

Q    Okay.  So if Dominick describes submitting an e-mail or addressing an e-mail to command staff, who would that include?

A    I think it would depend.  Sometimes lieutenants are considered command staff, but sometimes they are not.  So sometimes it's captains and lieutenants; sometimes it could just be the captains.

Q    Okay.

A    Depending on how that person interprets that term.

Q    Fair enough.  How many lieutenants are there?

A    Six.

Q    Six lieutenants.  And you are a detective/lieutenant?

A    Correct.

Q    Are there additional other detective/lieutenants?

A    No.

Q    Okay.  Are the other lieutenants -- are there any other
     lieutenants in charge of the investigative unit or
     division?

A    No.

Q    Okay.  Okay.  So command staff for -- for Dominick
     Ratkowski most probably would be you as lieutenant and
     captains and chief potentially?

A    Yes.

Q    Okay.  Okay.  And he is a civilian crime analyst; he is
     not a sworn officer, correct?

A    Correct.

Q    What is his -- does he have an employment contract?

A    No.

Q    Okay.  What do you know his employment status or, you
     know, or category?

A    Well, just a regular full-time employee.

Q    Okay.  So in that regard, does he have regular reviews?

A   He would have reviews on the same schedule as the rest
    of personnel.

Q   Oh, what is that schedule?

A   Typically, we have done annual -- what's called neo-gov,
    N-E-O-G-O-V reviews, but they were suspended in 2020,
    and so far in 2021, because the human resource
    department has been redeveloping the process.

Q   Okay.  So has -- has Mr. Ratkowski had any reviews and
    let's just put this in the same context as we have been
    discussing from April/May of 2020 to present; so Spring
    of 2020 to present?

A   I don't believe so.

Q   Okay.  But generally speaking, because that is covering
    arguably almost 18 months period or at least 15 months
    period, he -- he would or should typically?

A   Typically, yes.  There would be an annual review, but
    human resources suspend that for redevelopment.

Q   Okay.  Does those happen on a calender basis or is it by
    date of hire basis?

A   By calender date they all happen at the same time on the
    same schedule.

Q   Oh, so that must be busy.  When does that happen?

A   I don't recall exactly, but I think it is in the Spring
    and it's not -- I don't believe it's a set date, but
    it's generally in the Spring.

Q    Okay.  So arguably -- my understanding is Mr. Ratkowski
     has been employed for four-plus years with Wauwatosa
     Police Department, correct?

A    Sounds correct.

Q    Okay.  And so he may have only had one employment review
     in that time; is that correct?

A    One or two potentially.

Q    Okay.  But, certainly, nothing since Spring of 2019, is
     what I'm hearing you say.

A    I believe that would be correct.

Q    Okay.  And are you a part of that review as his
     supervisor of the unit or division?

A    In this position I would be, yes.

Q    Okay.  So you were not a part of his previous reviews?

A    No.

Q    Okay.  When did you -- just since you were made a
     lieutenant, is that when you took this division head?

A    Yes.

Q    Okay.  But as a detective, you were in the investigative
     unit for how long?

A    I was never a detective in the investigative division.

Q    Okay.  So explain this to me.  How long have you been
     familiar with the investigative unit?

A    I was a sergeant in the investigative division in --
     from January of 2019 until March of 2020, upon my

promotion to lieutenant.

Q    Okay.  And upon your promotion to lieutenant, you stayed
     in the investigative unit?

A    No.

Q    No?

A    Upon my promotion, I was transferred to third shift
     patrol lieutenant until May of 2020, and then I was
     reassigned back as a detective/lieutenant.

Q    Is this a day job for you?  I mean are you a first shift
     job?

A    Yes.

Q    Okay.  Because third shift patrol lieutenant sounds
     dismal, honestly.

A    It can be difficult.

Q    Okay.  So since May of 2020 -- so frankly, from the time
     that Attorney Motley has been discussing, you have been
     indeed in the position that you're currently in; is that
     a fair statement?

A    Yes.

Q    Okay.  Okay.  So, I'm going to go back for a second.
     Again, you testified a lot about the warrant process and
     in the draft of a -- of a search warrant, would there
     be, if a draft indeed had been presented or a draft
     that's filed with the ADA, would there be a draft of
     that at the police department somewhere?

A    If a draft was created, yes.

Q    Okay.  So if we can't find that or if we had -- or if
     that had been produced to us, is that because it's lost
     or would we have to ask Mr. Lewandowski?

A    I don't know.

Q    Okay.  And I guess what I'm asking is, I'm sorry, would
     the person who draft the warrant application keep that,
     would they be responsible for keeping that draft
     somewhere?

A    Yes.

Q    Okay.  So -- okay.  Thank you.  And again, you testified
     that also a Greenfield Police Department, it was your
     understanding that something has been drafted, but you
     are not aware of what their procedure is in terms of
     keeping drafts?

A    Correct.

Q    Correct.  Okay.  In terms of the list created by
     Dominick Ratkowski, you've testified that you're not
     aware of when exactly the list was created.  Do you have
     a general understanding of when the list was created?

A    I believe it was created sometime in the Summer of 2020.

Q    Okay.  And the Summer was a busy one; is that a fair
     statement?

A    Yes.

Q    So can you narrow it a little bit?  Would it be

beginning summer, middle summer?  I can provide you with

some, maybe some context.  So if the -- you'd referred

to -- sorry, strike that.

How have you used the list created by Dominick

Ratkowski in your work?

A     I haven't used it.

Q     I thought you had previously referred to the incident at

Officer Mensah's house and using it as an intelligence

document after that incident.  Am I getting that wrong?

A     Not me, personally.

Q     Okay.  Not you personally.  So you are aware that other

officers have used the list and the specific example you

were providing was the incident at Officer Mensah's

house; is that correct?

A     Yes.

Q     So you have not personally accessed the list?

A     I have seen the list, I have not used it for purpose.

Q     Okay.  When did you see it?

A     I don't recall specific dates.

Q     What would cause you to -- to look for it or look at it?

A     I don't recall specifically.

Q     Okay.  Did someone bring it to your attention or did you

see it on your own?

A     It would have been brought to my attention I believe.

Q     Okay.  From someone who works in the investigative unit?

A    Likely.

Q    Okay.  So you're -- you don't have any recollection of suggesting someone use the list?

A    No.

Q    Okay.  So Mr. Ratkowski testified that he spent between ten and 15 hours per week on updating and maintaining and collecting information for this list.  That's -- so he's a full time employee, correct?

A    Correct.

Q    So that's 20 to 25 percent of his time?

A    Yes.

Q    Okay.  That is a significant amount of time, would you say?

A    Yes.

Q    So this was a significant undertaking that was taking a lot of his time and you're his supervisor, right?

A    Yes.

Q    Okay.  And you don't recall how you've maybe asked people to use this resource that he was generating?

A    No.  Other than maybe letting people know that it was in existence.

Q    Okay.  And you -- because you didn't create it, your testimony is you were not sure at it's creation what it's purpose was?

A    Could you repeat the question?

Q   Well, because you didn't create it, I'm paraphrasing,
    so.  My recollection of your testimony earlier was
    because you didn't create it, you were not sure what
    it's purpose was in it's creation; is that true?

A   I -- I would have recognized it was an intelligence
    document.

Q   Well, yes, I -- you're recognizing it as a intelligence
    document now, clearly, right?  That's how you have
    identified it and how you are suggesting other people
    use it, correct?

A   Mm-hmm; mm-hmm.

Q   But in terms of when it was created, you didn't direct
    Mr. Ratkowski to create it, right?

A   Correct.

Q   And you didn't direct the sergeants to tell him to
    create it, right?

A   Correct.

Q   So -- and are the detectives able to tell him to do
    something that's going to take 20 to 25 percent of his
    time?

A   They can ask for his assistance.  They don't have the
    authority to require his assistance.

Q   Okay.  So -- so that it makes sense to you if
    Mr. Ratkowski says they didn't direct him either that he
    wasn't directed to create this document?

A    Correct.

Q    Okay.  But without any of that direction, you can't be
     sure what his purpose was in creating it, can you?

              ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    I think based on the fact that he does this as part of
     his job as practice of gathering intelligence for the
     police department that it would be intelligence driven.

Q    Sure.  And there's a right way to -- to do that, right?

A    Yes.

Q    By "right," I mean legal.  There are legal ways that you
     need to do your job, correct?

A    Yes.

Q    And officers, police departments, whether they're sworn
     officers or not, are held to those standards; is that
     right?

A    Yes.

Q    So -- and you -- have you had training specific to your
     supervision of the digital forensics lab?

A    Supervision of that unit, specifically?

Q    Sure.

A    No.

Q    You have not?

A    No.

Q    Okay.  Have you had any training specific to accessing

the Department of Transportation record?

A    Yes.

Q    When did you to that?

A    We recertify that I think every two years.

Q    Okay.  Can you remember how long ago it was you took the original or is that still a part of every officer's training?

A    It would have been when I entered law enforcement full-time in 2005.

Q    What did you do before law enforcement?

A    College.

Q    Have you always worked for Wauwatosa?

A    No.

Q    Oh, where else did you work?

A    The Village of Jackson.

Q    So did you have the training when you were working for the Village of Jackson?

A    Yes.

Q    And that was your original -- was that your first law enforcement job?

A    Yes.

Q    Okay.  All right.

A    Let me correct that.  That is the first time that I would have went through that training.  I worked a short stint as a limited term for the department of national

Case 2:20-cv-01660-NJ  Filed 05/25/22  Page 91 of 126  Document 188-1

resources as a law enforcement ranger.

Q    And you didn't have the DOT training in that position?

A    Correct.

Q    Okay.  So once you went to the Village of Jackson, you had the department of transportation training?

A    Yes.

Q    And you've recertify for that every two years?

A    Yes.

Q    And do all of your personnel in your investigative unit have that training?

A    Yes.

Q    How do you know that?

A    I guess just the -- the knowledge of our training that everybody who accesses what is called the time system has to go through this certification.

Q    Right.  So I guess what I'm asking is what's the check on that?  What's the accountability on that, are you aware?

A    It's administered by a member of our department.

Q    Who's that?

A    A civilian clerk, Miaja, M-I-A-J-A, it's, Pzt -- Ptazek, P-T-A-Z-E-K, I think.

Q    Okay.  So when you say "administered by," is she a part of the human resources department?

A    No.

Q    Okay.  She's just a part of the admin?

A    She's a civilian clerk for the police department.

Q    Okay.  And so one of her duties is to confirm training, schedules and completion by the officers?

A    Yes.

Q    And does she have records of that?  Do you just send in an e-mail after you completed it or?

A    It's -- the training is online.

Q    Right.

A    And then I believe -- I believe we are supposed to also send her an e-mail.

Q    Okay.  And when you go through that training, do you get a unique password to log into access the department of transportation system?

A    We do.

Q    Okay.  Is that unique to the officer or to the department?

A    To the officer.

Q    Okay.  And then where -- do you have specific equipment that you use to access that or can any computer -- could you access it from anywhere?

A    You can access it from anywhere I believe.

Q    So it's probably just a website, web-based?

A    It's a web-based portal, yes.

Q    Okay.  And there is sensitive information inside that,

correct?

A    Yes.

Q    So those are not publicly accessible portals?

A    Correct.

Q    You have to be an Wauwatosa sworn officer -- sorry, law
     enforcement sworn officer or how did Dominick Ratkowski
     get that credential?

A    It's not, specifically, limited to sworn law enforcement
     officers.

Q    Okay.  So how did he get it?

A    It was probably part of his orientation when they
     brought him onboard.

Q    Okay.  So someone higher up from him in the Wauwatosa
     Police Department would have solicited permission from
     the department of transportation on his behalf or
     sponsored him?

A    Sponsored is probably more appropriate.  We have other
     civilian personnel with access.

Q    Okay.  Because it would have to be attached to the
     specific reasons inside the department of transportation
     policies and procedures and regulations for access to
     that information, right?

A    Say that again.

Q    So the reason that sponsorship is necessary is because
     there are -- there are standards and policies and

procedures, regulations that the department of
transportation has to maintain because of the
information that it contains, correct?

A    I believe so.

Q    So what I'm saying is the department of transportation
wants to know who is accessing this information?

A    Yes.

Q    And so one of the easy ways they do that is you go
through the training and you receive a unique log in.
And that way, you can tell who is logging in and what
they're looking at, correct?

A    Yes.

Q    And law enforcement certainly has an interest in getting
access to that information?

A    Yes.

Q    The public doesn't have an interest or a right I should
say, doesn't have a right to that information?

A    Correct.

Q    Okay.  So Dominick Ratkowski, he's not a sworn law
enforcement officer, right?

A    Correct.

Q    But because of his position at the Wauwatosa Police
Department, the Wauwatosa Police Department is -- well,
I said "sponsored," I feel like there's a better word.
So in reinforcing the idea that he is qualified to have

access at the same level as a law enforcement officer?

        ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    Yes.  I guess I don't know if that's -- they have certainly sponsored him to have access.  I don't know if there is a delineation there between him and the sworn law enforcement officer.

Q    Do you think there should be?

A    I don't think so.

Q    Okay.  Because why would Dominick Ratkowski access the department of transportation info?

A    He assist in investigations.

Q    Okay.  So accessing that information needs to be connected to an investigation of some kind; is that right?

A    Should have a law enforcement purpose.

Q    A law enforcement purpose.  Okay.  So because he's not a sworn officer which, frankly, training probably provides a baseline, you know, that the department of transportation can understand.  Then the Wauwatosa Police Department is representing to the department of transportation that Dominick Ratkowski should have that access?

        ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead.

A    Can you repeat the question?

Q    Yes.  The Wauwatosa Police Department is considering that Dominick Ratkowski is qualified and should have access to the department of transportation info?

A    Yes, that's a fair statement.

Q    At the same level as a law enforcement officer; is that correct?

A    Yes.

Q    Okay.  That's great.  All right.  Are you aware -- when you said, actually, you referred to Mr. Ratkowski's orientation, are you aware of what his orientation entailed?

A    No.

Q    No.  Because you just took over supervision of him in May of -- May of 2020?

A    Correct.

Q    Okay.  Have you provided him with any orientation or training since then?

A    Well, not provided.  I approve or deny any training requests he would submit.

Q    Has he submitted any that you recall?

A    I'm sure he has.  I don't know, specifically, one off the top of my head.

Q    Okay.  Has he submitted any that you thought were inappropriate?

A    No.

Q    Okay. So most likely he submitted training requests and you said, "yeah, go for it?"

A    Yes.

Q    Okay. But you can't recall off the top of your head what they were?

A    No.

Q    Okay. You have referred often in your testimony to things being a matter of practice --

A    Yes.

Q    -- in the Wauwatosa Police Department which is why you know something. Do you have confidence that Mr. Ratkowski also understand that in the same you as you?

        ATTORNEY BAYNARD: Objection to the form of the question; calls for speculation. Go ahead.

A    Yes.

Q    Why?

A    Because in the time that we've worked together, I have never seen him do anything that I thought was inappropriate.

Q    Okay. And not to belabor the point, but you were shown by Attorney Motley the e-mail labeled -- the list he created as the TPR target list. Is that something that would qualify your last answer?

A    I think there was a certainly a better way to type the subject line of that e-mail.

Q    What does "target" imply to you?

A    That there was something, an intention to do something to a thing or a person.

Q    Okay.  And so in a context of a police officer, using that term, what does that mean to you?

A    A target of an investigation could be similar exchange with like a suspect.

Q    Okay.  Do you think that Mr. Ratkowski has a different understanding of target when he used that word?

          ATTORNEY BAYNARD:  Calls for speculation.  Go ahead.

A    I don't know.

Q    But he's not a sworn officer?

A    Correct.

Q    Do you think that he has -- or, actually, what you testified in terms of the time that you worked together, would you qualify that as longer than you just supervising him or were you unaware of Mr. Ratkowski prior to that?

A    No, I'm aware of him from my time as a detective sergeant.

Q    Okay.  Have you ever asked him to put anything on the list?

ATTORNEY BAYNARD:  Asked and answered.  Go
ahead.

A    No.

Q    And that's right, you said you hadn't used the list
yourself?

A    Not investigatively.

Q    Okay.  What is the RMS whiteboard?

A    That is an accessible part of our records management
system.

Q    Okay.  What does that mean?  Accessible to who?

A    Anyone who has an access to the records management
system.

Q    Who would that be?

A    I believe it is just limited to police department
personnel.

Q    Okay.  So police department personnel would be more than
just sworn officers?

A    Yes.

Q    Are there police department personnel who do not have
access to the DOT information or portal I should say?

A    I don't know.  I don't think so.

Q    Do dispatchers have to get trained in DOT?

A    Yes.

Q    Okay.  Does the admin clerk, that you were talking
about, I'm sorry, Ptz --

A    Ms. Ptaszek.

Q    Ms. Ptaszek, are you aware if she has?

A    As the administrator, she would.

Q    Okay.  And so the RMS whiteboard is accessible to the whole department?

A    Yes.

Q    Okay.  Do you recall on August 14th, an e-mail that you sent to patrol supervisors stating that, "the most current protest identification list is posted in the RMS white board"?

A    I'm not -- I don't recall, but it's very well that I did.

Q    Okay.  What current protest identification list are you referring to?

A    Can I see the e-mail?

Q    No.

A    I can only speculate then that I was just referring to the working document at the time -- at its time.

Q    Okay.  What working document?

A    The intelligence document that was labeled the protest identification list.

Q    Okay.

A    Or the protester list.

Q    That you are in here now calling the "most protest identification list".  Why would you post that to the

RMS whiteboard?

A    And what was the date of that?

Q    August 14th, 2020?

A    So that would have been after the incident at Patty
     Swayka's house, where there was a shooting and I think
     there was a concern for the safety of -- of our officers
     and we saw how violent it could get.

Q    So you did use the list?

A    I made people aware of the list, yes.

Q    Okay.  Do you recall any other occasion that you made
     people aware of the list or published the list in a more
     readably accessible space?

A    Not off the top of my head, but I may have.

Q    Okay.  During the duration, the time duration that we're
     talking about, so again, I'll actually cut it down a
     little bit more to the summer.  So from May, the end of
     May 2020 through the middle of October 2020?

A    Okay.

Q    Can you tell me the position of Lieutenant Farina?

A    I believe at one point he was the day shift patrol
     lieutenant and then I believe he also was the early
     shift patrol lieutenant.

Q    Okay.  And so is he -- again, going back to the work
     chart, is he a lateral position with you?

A    Yes.

Q    Okay.  So you don't report to him or he doesn't report
     to you?

A    Correct.

Q    Okay.  You testified earlier too as, again, a little
     involved of your citation process.  Do you ever approve
     citations that your officers are looking to issue?

A    Not in this capacity.

Q    What does that mean?

A    Not as a detective lieutenant.

Q    In what capacity would you approve citations for
     officers?

A    Patrol supervisors are typically the ones that accept
     and approve citations.

Q    Okay.  Have you been -- and you were a patrol supervisor
     on third shift?

A    Yes, and day shift.

Q    When were you a patrol supervisor on day shift?

A    I believe March of '17 until December of '18.

Q    Okay.  So not in the time that we're talking about,
     right?

A    Correct.

Q    Okay.  So -- so, it would be unusual for -- you said
     Skornia is a captain?

A    No, he's a detective/sergeant.

Q    So he's a detective/sergeant so he is under you?

A    Correct.

Q    Okay.  Thank you for your patience on this one,
     honestly.

A    That's okay.

Q    And so would he -- would he potentially -- and again, I
     understand things were maybe a little bit -- people were
     not doing their conventional role perfectly titled roles
     during this last summer.  So would he at any point there
     be a reason for him get a approval for issuing a
     citation from you?  Get approval from you for him to
     issue a citation?

A    For Sergeant Skornia to get approval from me to issue a
     citation?

Q    Right.

A    It's possible.

Q    Okay.  But not typical?

A    Right.

Q    What is an OSA officer?

A    An OSA?

Q    Yes.

A    I don't know?

Q    Okay.  Fair enough.  Can you tell me about the fusion
     center?

A    A little bit.  Do you have a more specific question?

Q    What is it?

A    It's a unit based out of the Milwaukee Police Department
     that handles intelligence and threat assessment.

Q    Okay.  And do you -- does Wauwatosa contribute to it?

A    We have regular contact with them.

Q    What does that mean?

A    We share information.

Q    Okay.  So are you aware of when that happens?

A    No.

Q    Why not?

A    Because I think it happens frequently.

Q    Okay.  And so are they considered a law enforcement
     entity?

A    Yes.

Q    Okay.  Are there sworn officers that are in the fusion
     center?

A    I believe so.

Q    Okay.  Do you have a specific liaison to the fusion
     center?

A    I do not.

Q    Does the Wauwatosa Police Department?

A    No, I don't believe so.

Q    Okay.  Do you have any written understanding between the
     department and the fusion center?

A    No.

Q    Okay.  So how is it that you exchange information?  Is

that just something regularly you do with Milwaukee
police department as well?

A In the same manner we would exchange information with
all of our law enforcement partners.

Q Okay.  So they're considered law enforcement partner
even though inside the fusion center or people handling
the request or the info going out aren't necessarily
sworn officers?

A Yeah, I'm not -- I'm not completely familiar with their
personnel structure.

Q Okay.  Are you confident about their information
processing?

A I trust the Milwaukee Police Department.

Q So you consider the fusion center inside of Milwaukee
Police Department?

A It is.

Q That's who controls it.  So who supervises it?

A I don't know who the current captain in charge of it is.

Q Okay.  But they have an MPD Captain is in charge of
fusion center?

A I believe that's a structure.

Q Similar to you being in charge of a digital forensics
unit?

A Correct.

Q Got it.  Okay.  But you don't know what an OSA officer

is?

A    I don't.

Q    Okay.  Do you know who Jason Schultz is?

A    No.

Q    How about the Southeastern Wisconsin Threat Analysis
     Center?

A    That is part of fusion.

Q    Oh, so like a subpart of fusion?  It's separate?

A    My understanding they both operate out of the same
     place.

Q    Okay.

A    As part of the fusion center.

Q    Okay.

A    And my understanding is how it boils down to the
     funding.

Q    Okay.

A    And -- and my understanding of the State Threat
     Assessment Center, the STAC.

Q    Yes.

A    Is -- I think it's funded differently.  I don't know
     that it's funded by Milwaukee, by the City of Milwaukee.

Q    Okay.  Got it.  So OSA is actually an address.  It looks
     like an e-mail address.  It just says OSA@Milwaukee --
     or mil.gov?

A    Okay.

Q    Office of something.  You have no idea?  Cory Wex is
     what rank at the PD?

A    He's a sergeant.

Q    He's not your sergeant though?

A    No.

Q    You gave -- or he asked you about sharing the list with
     probation and parole, do you recall that?

A    I don't.

Q    September 11th, 2020?

A    Okay.

Q    Okay.  Do you -- so you don't recall what your answer
     was to that?

A    No.

Q    Okay.  Do you consider the -- the list to be information
     that is appropriate to be in the public domain?

A    No.

Q    Are you sure?

A    I'm sure.

Q    Okay.  You were a command -- in the command staff for
     the curfew enforcement; is that correct?

A    Yes.

Q    What was your position with that?

A    The -- I was in charge of all tactical operations.

Q    In charge of all tactical?

A    Tactical, correct.

Q    And when did you start planning for that?

A    I believe it was around the 13th of August.

Q    Okay.  And what initiated the planning or how and who?

A    I believe it was Captain Vetter and I don't recall
     exactly when he initiated it, but I recall having --
     starting to have conversations after the incident at
     Patty Swayka's house on August 8th.

Q    Okay.  And I just want to clarify because this is for my
     own understanding.  I thought you said that Patty Swayka
     was a resident of Greenfield?

A    She moved during this timeframe.

Q    Okay.  So -- because I had been thinking, you can
     correct me please, that the August 8th incident was
     actually at Joseph Mensah's house; is that incorrect?

A    That's incorrect.

Q    That's incorrect.  Okay.  Because Patty Swayka had
     already moved to Wauwatosa at that time?

A    Patty Swayka lived in Wauwatosa on August 8th and then
     moved to Greenfield a short time later.

Q    Oh, I see.  She moved to Greenfield after August 8th?

A    Correct.

Q    Thank you.  All right.  So around the August 13th you
     began planning for -- what did you begin planning for?

A    We began planning for whatever decision the DA's office
     was going to release regarding the February officer

involved shooting.

Q    Like to -- like drive him to the airport or like what do you mean?

A    For any type of public safety, we would need to put in place in the City of Wauwatosa.

Q    So you're anticipating a public safety issue?

A    Potentially.

Q    Why?

A    Because of the violence at Patty Swayka's house on October -- I'm sorry, on August 8th.

Q    Okay.  And that was -- there was an investigation with that, correct?

A    Yes.

Q    And you earlier testified that because of the intelligence document, you -- that investigation actually went very quickly.  People were identified quickly?  Am I confusing you with someone else?

A    I --

Q    All right.

A    Yes.  I don't know if we talked specifically about that investigation and it's speed.  I don't know 100 percent if the people that were involved on that investigation were on this list before or after or if they are even on it now.

Q    Okay.  Were people arrested with the incident on August

8th?

A    Yes.

Q    And charges were referred?

A    Yes.

Q    And they're currently pending right?

A    I believe so.

Q    I believe so -- they are still pending, yeah.  So that criminal matter or criminal investigation, which it might not be concluded -- because does the Wauwatosa Police Department consider that incident concluded in terms of, we referred charges?

A    I believe so.

Q    Okay.  So why are you planning for a -- a public safety issue?

A    Again, because of the violent incident that occurred.

Q    Okay.  And I can imagine that on August 13th, that's very fresh in your head, but charges are referred and you made arrests within weeks of that, but certainly before the end of August, right?

A    Yes.

Q    Yeah.  I mean you should take credit for that.  I'm not being sarcastic.  So, you know -- so do you recall when the U.S. Marshal service was approached to assist in Wauwatosa?

A    Not specifically, no.

Q    Was it before or after September?

A    I don't recall.

Q    Okay.  But so if I told you that there was an e-mail
     dated August 28th that would -- that would fit into your
     memory?

A    Yes.

Q    And you -- have you ever used private investigators in
     investigating instances?  And please again, let's
     restrict if for both of our sakes, from May 2020 to end
     of October 2020.

A    No.

Q    Okay.  So if you get a -- if you get something forwarded
     from the chief, what do you do as an e-mail suggestion
     forwarded from the chief and you think it's not a good
     idea.  What do you do with that?

A    I guess, it depends on what it is.

Q    What if the chief is recommending that you use a private
     investigator who specializes in social media to help
     with your investigation in September?

A    I don't believe that we acted on it.

Q    Okay.  How do you respond to the chief?

A    Typically at that time, I wouldn't correspond directly
     to the chief.  I would -- it would go through my chain
     of command.

Q    Okay.  So you wouldn't give it to Dominick as the social

media investigator?

A    I may have for his evaluation.

Q    Okay.  Would you give him any direction at that point?

A    I don't recall.

Q    Well, no. I mean would you -- do you think it would be good practice to give him direction at that point?

A    If I forward it to him, yes.

Q    Okay.  Do you think it's a good idea to just use a private investigator who solicits the police of chief and says, "hey, I have some info on social media"?

          ATTORNEY BAYNARD:  Objection to the form of the question.  Go head.

A    Is it somebody providing us with information?  I am confused.  I am sorry.

Q    Right.  If there is a offer made to provide Wauwatosa Police Department with information via social media and this is just one of those e-mails into police department to chief -- to the chief -- addressed to the chief.  You think that's something that...

A    We would have -- if someone was offering us information, we would certainly look at it and evaluate it.

Q    Okay.  And what would you tell Dominick about that?

A    Likely to conduct an assessment of it to verify it.

Q    Okay.  And if you're forwarding that and he sees that it's been forwarded by the chief of police, do you think

that he would feel an pressure to make sure that he, you know, comply with what is in the message with what the chief is saying to do?

ATTORNEY BAYNARD: Objection to the form of the question, calls for speculation. Go ahead.

A    I'm not sure if he would or not.

Q    Would you?

A    No.

Q    You wouldn't?

A    No.

Q    Okay. That's fair. You had mentioned that you have a private phone, right? A personal phone, correct?

A    I do.

Q    Okay. Do you ever use that for business?

A    No.

Q    How long have you had it?

A    A phone?

Q    Your personal phone?

A    A few years.

Q    So from before this incident happened, so before the time period of May 25th, have you had a new phone personally since May 2020?

A    No.

Q    Okay. Did you have a phone issued to you from the Wauwatosa Police Department?

A     Yes.

Q     What's that cell phone number?

A     414-331-4653.

Q     And how long have you had that phone?

A     (No response.)

Q     Sorry, have you had that phone since May 2020?

A     Yes.

Q     Okay.  So during -- again, the implicated dates, you had
      that 331-4653 as a cell phone you used for your police
      business?

A     Yes.

Q     Did you text or send any images or videos or anything
      like that during the curfew enforcement dates from that
      phone?

A     I'm sure I did.

Q     Okay.  Did you provide that today?  Those text messages
      or images?

A     I don't keep those.  I don't keep text messages on my
      phone for very long.

Q     Okay.  Were you advised that you were supposed to keep
      any messages or any media or any correspondence?  Were
      you ever advised of that?

A     At which time?

Q     Any time?

A     No.

Q   So your supervisor maybe within a week or a month or six
months of -- of the curfew enforcement never told you or
you were not advised in any routine way that you needed
to keep and preserve or any of those text messages or
correspondences?

A   Not that I recall.

Q   Did Gunta Law office ever tell you that you needed to
preserve anything?

A   Not during that time.

Q   When did they tell you?

A   I don't -- I guess, I don't know when we, specifically,
had that conversation.  The first I saw any mention of
text messages was on the, is it a subpoena?

Q   Oh, your notice of deposition?

A   Correct.

Q   That's the first time that you saw text messages that we
were asking for?

A   Yes.

Q   Okay.  All right.  Were you -- did you ever text back
and forth with Chief Weber?

A   I don't believe so.

Q   Did you have his cell phone number?

A   Yes.  I would have had access to it.  I don't remember
if it was in my phone or not.

Q   But that would be your work phone?

A     Correct.

Q     Okay.  Right.  And so your testimony is, for the record,
      you have not ever done any police business on your
      personal phone?

A     All of my correspondence should -- since I've had this
      work phone should be to and from the work phone.

Q     Okay.  How long have you had your work phone?

A     Since January of '19.

Q     Okay.

A     I've had the number.

Q     Okay.

A     The phone since maybe the Spring of '19.

Q     Okay.  That's fine.  So again, just to not be
      equivocating, for the implicated time period of May 2020
      through just October of 2020, you have not conducted any
      business, police business, on your personal phone?

A     I shouldn't have.  If I did, I don't recall.

Q     Okay.  Would you -- would you check on it for us,
      please?  Could you do that?  Could you please look at
      that and if you do find something that was on your
      personal phone would you please provide it to your
      attorney?

A     Yes.

Q     Okay.  Thank you.  Is an IR an internal report?

A     Incident report.

Q    Oh, incident report.  Okay.

                ATTORNEY MOTLEY:  I have a question.

                ATTORNEY KNOWLTON:  Yeah, go ahead.

     BY ATTORNEY MOTLEY:

Q    Do you supervise -- is Kurt Svatek, is he under your
     supervision -- do you supervise Kurt Svatek.

A    No.

Q    Do you know who does?

A    Currently, it's Lieutenant Brad Beckman, B-E-C-K-M-A-N.

Q    Did Wauwatosa Police Department have a sort of an
     unwritten policy to try to -- to try to get felony
     charges on people protesting in the City of Wauwatosa
     from May 25th, 2020 through August 20th, 2021?

A    No.

Q    Would it concern you that there are e-mails that we
     received from the Wauwatosa Police Department where
     they, explicitly, say that they are trying to get any
     opportunity they can get to send -- -- down for a
     felony, would that surprise you?

A    I missed part of that.  Would it concern, what?

Q    Would it surprise you if any Wauwatosa Police Department
     officers were sending e-mails stating that they are
     trying to take any opportunity they can to send
     offenders down on felonies, essentially for protesting?
     Would that surprise you if Wauwatosa Police Department

officers are doing that?

ATTORNEY BAYNARD:  Objection to the form of the question; calls for speculation.  Go ahead.

A    It would depend on the circumstances.

Q    Okay.  How do you feel about the protest that has been happening in the City of Wauwatosa?

A    That I take no personal feelings to people that want to protest for police reform as long as it's consistent with the -- the laws in place.

Q    Do you live in Wauwatosa?

A    No.

Q    Okay.  Have you had any protesting in the city that you live in?

A    I believe so.

Q    Okay.  Do you take any position for the protests that have occurred in the city that you live in for those that are protesting for police reform?

A    Have I participated in them?  Was that the question?

Q    No.  No.  Do you take any position -- how you do you feel about protests that happen in your city about police reform?

A    I have no problem with that.

Q    Okay.  As long as the law is followed, correct?

A    Yes.

Q    Do you think that people have the right to protest over

police reform in the City of Wauwatosa?

A    Yes.

Q    Do you believe that the people have a right to protest
     in Wauwatosa for police reform without fear of being
     targeted by Wauwatosa police officers?

A    Yes.

Q    Do you think that people have the right to protest in
     the City of Wauwatosa for police reform without the fear
     of being arrested and detained by police officers?

A    Yes, so long as they are following the law.

Q    Do you believe that everyone within the Wauwatosa Police
     Department officers holds the same view that you have
     with regards to, you know, the ability of people to
     protest that are following the law without the fear of
     retaliation or without the fear of being arrested or
     detained?  Do you think your other colleagues holds the
     same views as you in that regard?

             ATTORNEY BAYNARD:  Objection to the form of
     the question; speculation.  Go ahead.

A    Yes.

Q    Do you think that -- are you a part of the WPOA?

A    I'm sorry, what?

Q    Are you a member of the WPOA?

A    No.

Q    Okay.  Do you also think that Mayor McBride was chicken

shit like your colleague Detective Lewandowski?

A    No.

Q    Do you think that people that are arrested have the right with the Wauwatosa Police Department officers for the curfew of October 7th through October 12th, 2020, they have an right to an attorney?

A    Yes.

Q    Why weren't people allowed to have an attorney during that time period by the Wauwatosa Police Department officer?

        ATTORNEY BAYNARD:  Objection to the form of the question; foundation.  Go ahead.

Q    I have a better question.  Why was Taleavia Cole strip searched on October 8th when she was arrested?  Why did that happen?

        ATTORNEY BAYNARD:  Objection to the form of the question; foundation.  Go ahead.

A    I had no knowledge of that.

Q    Do you think that's appropriate to strip search somebody for a civil ticket?

A    I don't know the circumstances.

Q    Does that shock you to learn of those -- of that having happened?

        ATTORNEY BAYNARD:  Objection to the form of the question; lacks foundation.  Go ahead.

A    I wasn't aware of it.

Q    Do you think it's appropriate for your officers when they are interrogating a suspect for them to discourage the suspect, like Detective Lewandowski did, when they know that I'm the attorney for people to discourage them from me being their attorney and it being video recorded.  Do you think that's appropriate for Wauwatosa police officers to do that tape to my clients while they're being videoed and interrogated?

         ATTORNEY BAYNARD:  Objection to the form of the question; lacks foundation.  Go ahead.

A    It would depend on the circumstances.

Q    So what circumstances would there be for Wauwatosa police officers to interrogate a suspect and this disparage their attorney to them while they are interrogating them to discourage them to have representation.  Explain to me when that's okay by the Wauwatosa Police Department?

         ATTORNEY BAYNARD:  Same objection.  Go ahead.

A    Again, it would depend on the circumstance and the context of the conversation.

Q    Okay.  So you actually think there's a time that a Wauwatosa police officers has a suspect in custody and says that, you know, this attorney X, Y, Z shouldn't be your attorney, you think that's okay?  You think that's

acceptable circumstances for that to happen?

        ATTORNEY BAYNARD: Objection to the form of the question; compound. Go ahead.

A    Again, I would have to make a case by case analysis.

Q    Okay. Well, create a case analysis when that's acceptable for us?

A    I don't know that I can create a hypothetical.

Q    You don't know? Have you heard anybody within the Wauwatosa Police Department doing that?

A    Not specifically, no.

Q    Okay. So if you knew that an officer with the Wauwatosa Police Department had arrested people, had them in custody, were interrogating them and during that video interrogation was telling people that they shouldn't have specific attorneys representing them, if you knew that was happening, do you think that warrants an internal investigation? Just so you can find out what exactly happened?

        ATTORNEY BAYNARD: Objection to the form of the question; compound. Go ahead.

A    Depends on the circumstances.

Q    I'm telling you. I'm telling you that's the circumstances. You can't keep hiding from the question. That's the circumstances?

A    Yes, but I don't have enough context.

Q    Right.  And that's why you do that, an investigation,
     right, to get that context?

A    Sometimes.

Q    Okay.  So Detective Lewandowksi interrogated Breon
     Foster and in that interrogation, he disparaged the fact
     that I'm representing Breon Foster.  So after this
     deposition, are you going to start an internal
     investigation so you can get the context of what
     happened in that situation so that we can all perhaps,
     understand what, if anything, the context around that
     situation happened?  Are you going to do that?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    Potentially.

Q    Potentially.  Is there anything that Attorney Knowlton
     and I said today that would warrant you perhaps looking
     into something to see if correct procedures were
     followed by any of the Wauwatosa officers and employees
     that were mentioned and the situations that we
     discussing with you today?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.

A    I don't think so.

Q    You don't think so.  Okay.  So you don't think it was
     inappropriate for Taleavia Cole to be strip searched?

You're just, "seems okay to me?"

ATTORNEY BAYNARD:  Objection --

Q    That wouldn't (Zoom freeze) -- just to see, basically

why something like that might have happened?

ATTORNEY BAYNARD:  Objection to the form of

the question; lacks foundation; asked and answered.

A    I don't have any knowledge of it.

Q    So you're a lieutenant that doesn't investigate your own

police officers and policies and procedures, correct?

ATTORNEY BAYNARD:  Objection to the form of

the question; argumentative.

ATTORNEY KNOWLTON:  Okay.  I'm going to -- I'm

going to jump in here, Kim?

ATTORNEY MOTLEY:  Right, go ahead.

(Deposition adjourned 11:59 a.m.)

STATE OF WISCONSIN )

                     )

MILWAUKEE COUNTY    )


        I, MIRIAM BECKFORD, Official Court Reporter,

do hereby certify that I have reported the foregoing

proceedings; that the same is true and correct as

reflected by my original machine shorthand notes taken

at said time and place.



        Dated September 1, 2021



_____

        Miriam Beckford