IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

KATHRYN KNOWLTON, *et al.*,

        Plaintiffs,

v.                                                          CASE NO. 20 CV 01660

CITY OF WAUWATOSA, *et al.*,

        Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT

Defendants City of Wauwatosa, Dennis McBride, Jeffrey Farina, Dominick Ratkowski, and Joseph Roy by their attorneys, Wirth + Baynard, submit these Proposed Finding of Fact in Support of their Motion for Summary Judgment seeking dismissal of all claims against them.

**FIRST CLAIM FOR RELIEF -PROCLAMATION OF EMERGENCY CURFEW**

1. On September 30, 2020, the City issued a Proclamation of Emergency based upon protests concerning the employment of Officer Joseph Mensah by the Wauwatosa Police Department and upon community response to decisions and actions regarding police officers nationwide. (McBride Decl. ¶ 2; Ex. A)

2. At that time the Proclamation was issued, Mayor McBride anticipated the Milwaukee County District Attorney would release his findings in the matter of the investigation of Officer Joseph Mensah regarding the killing of Alvin Cole in the City of Wauwatosa in February 2020. (McBride Decl. ¶ 2; Ex. A)

3. At that time the Proclamation was issued, the nation at large was facing civil unrest concerning officer involved shootings and in August 2020, nearby Kenosha County faced civil unrest stemming from an officer involved shooting that resulted in businesses being burned to the ground,

and the shooting death of two protesters. (McBride Decl. ¶ 5; Ex. A)

4. The Proclamation did not take effect until October 7, 2020, after the District Attorney issued a statement announcing that he would not charge Officer Mensah in the Alvin Cole shooting. (McBride Decl. ¶ 3; Ex. A)

5. In the Proclamation, Mayor McBride imposed a curfew between the hours of 7:00 p.m. and 6:00 a.m. each night beginning at 7:00 p.m. on October 7, 2020, and ending at 6:00 a.m. on October 12, 2020, which prohibited pedestrian and vehicular traffic on Wauwatosa streets – except for persons traveling to or from work and government officials, social service workers, and credentialed members of the press acting in their official capacities – during those hours. (McBride Decl. ¶ 4; Ex. A)

6. Later, at the request of the American Civil Liberties Union, the City also allowed legal observers credentialed by the ACLU to be on the streets during the curfew. (McBride Decl. ¶ 4)

7. The curfew's purpose was to protect "people and property" and City of Wauwatosa systems and services, especially after the violence that had occurred in other cities in similar situations. (McBride Decl. ¶ 2; Ex. A)

8. Several weeks earlier, in Kenosha, Wisconsin, during the week of unrest that followed the police shooting of an African-American man named Jacob Blake, two "Black Lives Matter" advocates had been killed and one had been seriously wounded, and Mayor McBride did not want protesters in Wauwatosa to be similarly harmed. (McBride Decl. ¶ 5)

9. Mayor McBride also wanted to protect against the widespread property damage (including the burning of several blocks of buildings) that had occurred in Kenosha during that unrest. (McBride Decl. ¶ 5)

10. Under the authority granted to him by Sections 323.11 and 323.14(4)(b) of the Wisconsin Statutes, Mayor McBride declared that the above conditions will be likely to give rise to and create an imminent threat of a riot or civil unrest which will impair transportation, fire, health,

and police protection and operation of other critical systems and will thereby create a state of emergency in Wauwatosa, and that the proclamation of an emergency is necessary and expedient for the health, safety, and protection of people and property in Wauwatosa. (McBride Decl. ¶¶ 5-6; Ex. A)

11. Mayor McBride believed the curfew would protect people and property by removing traffic and pedestrians from Wauwatosa streets, limiting the supply of flammable materials, reducing access to certain facilities, and preserving City of Wauwatosa resources for expected responses. (McBride Decl. ¶ 6)

12. The City and Mayor McBride had no intent to selectively enforce the curfew to prohibit First Amendment activities based on a person's race, the content of his or her speech, or any other factor. (McBride Decl. ¶ 7)

13. Protests of all types were allowed between 6:00 a.m. and 7:00 p.m. on all days in which the curfew was in effect. (McBride Decl. ¶ 8)

14. Mayor McBride did not instruct any law enforcement officer to selectively apply the content-neutral curfew. (McBride Decl. ¶ 8)

15. Mayor McBride did not communicate in any way with any law enforcement officer about selectively applying the content-neutral curfew. (McBride Decl. ¶ 9)

16. Mayor McBride is not aware of any evidence that the curfew was selectively enforced based on race, content of speech, or any other factor by the City. (McBride Decl. ¶ 8)

17. In accordance with Wis. Stat. § 324.14(4), the Proclamation was subject to ratification, alteration, modification, or repeal by the Wauwatosa Common Council as soon as that Council could meet. On October 13, 2022, the day after the curfew ended, and at the first Council meeting after the Proclamation took effect, the Council voted 10-4 to place the matter on file and thus to take no action to ratify, alter, modify, or repeal the Proclamation. (McBride Decl. ¶ 9)

18. The Proclamation of Emergency states "in order to protect the systems and services

described above, including the safety of persons and property, it will be necessary to remove traffic and pedestrians from Wauwatosa streets, limit the supply of flammable materials, reduce access to certain facilities, preserve resources for expected responses and protect the safety of public employees in the most expedient manner possible to reduce safety risks related to such activity and to protect persons and property in Wauwatosa." (McBride Decl. ¶¶ 2, 6; Ex. A)

19. In the months leading up to the October 7, 2021, curfew, including on October 7th, Mayor McBride released numerous statements affirming that the City of Wauwatosa has always supported and protected peaceful protests. (McBride Decl. ¶ 10, Ex. B)

20. In response to multiple communications from Wauwatosa residents who insisted that Mayor McBride prohibit the ongoing protests in the City—his response was always to say that protests are protected by the First Amendment and the City would protect the right to protest if the protesters obeyed the law. (McBride Decl. ¶ 11)

## ELEVENTH CLAIM FOR RELIEF-WILLIAM RIVERA

21. The unidentified officer pictured below is the officer William Rivera alleges arrested him and stated, "at this point it doesn't matter because you are black."



(Zellner Decl. ¶ ; Ex. A, p. 160-William Rivera RFA Response Nos. 3 and 4)

22. William Rivera believes the officer pictured is Wauwatosa Police Officer Michael McDermott. (Zellner Decl. ¶ ; Ex. A, p. 160-William Rivera RFA Response No. 4)

23. The officer pictured is not Wauwatosa Police Officer Michael McDermott. (McDermott Decl. ¶ 2)

24. Wauwatosa Police Officer Mike McDermott was off work from 2:00 PM on October 9 until October 15, 2020, due to contracting COVID-19. (McDermott Decl. ¶ 4; McDermott Ex. A)

25. Wauwatosa Police Department law enforcement officers do not have uniforms consisting of camouflage pants as worn by the officer in ¶ 21 photo. (McDermott Decl. ¶ 3; Roy Decl. ¶ 19)

26. The officer in ¶ 21 photo is not a City of Wauwatosa employee. (Roy Decl. ¶ 19)

**THIRTEENTH CLAIM FOR RELIEF-STATE LAW MALICIOUS PROSECUTION**

27. Officer Farina issued citations to Isiah Baldwin and Rosalind Rogers for violation of Wauwatosa ordinance 7.50.030 "because they were blocking off the road, almost like a block party. If you're gonna have a block party, you need a permit to block off that road." (Farina Depo. pp. 301-302)

28. Wauwatosa ordinance 7.50.030 provides:

No person or entity acting as an event organizer shall set up for, hold, or conduct a special event, within the municipal boundaries of the city of Wauwatosa without first obtaining a special event permit. The city administrator, or his designee, shall have the exclusive authority to determine whether or not a permit is required for any particular event.

(Wauwatosa Municipal Code 7.50.030-Permit Required)

29. On October 9, 2020, Aidali Rivera was arrested for being in the City of

Wauwatosa on a public street after 7:00 PM in violation of the emergency curfew. (Stipulated Facts ¶ 11; Zellner Declaration-Ex. B-RFA Response No. 5; Zellner Declaration Exhibit E-Aidali Rivera Individual Record Report for Arrest Data for Civil Unrest Command)

30. At the time she was arrested, Aidali Rivera was a passenger in a vehicle with William Rivera, Lazarito Matheu, and Hector Rodriguez after 7:00 PM in Wauwatosa. (Rivera Depo. pp. 16, 17, 92)

31. On October 9, 2020, Aidali Rivera did not work or live in Wauwatosa. (Zellner Declaration-Ex. B: Interrogatory Response Nos. 1 and 3)

32. Farina does not know and has never had any contact with Aidalia Rivera. (Farina Depo pp. 32, 36).

33. On September 5, 2020, at approximately 2345 hours Wauwatosa police officer Matthew Martell was assigned to an ordinance violation of 40-50 vehicles impeding traffic and driving recklessly throughout the city. (Martell Declaration ¶¶ 1-2; Ex. A)

34. Isaiah J. Baldwin and Rosalind Rogers were standing in the open door of one of the vehicles impeding traffic when PO Matthew Martell placed them under arrest for violation of Wauwatosa Ordinance 750.030. (Martell Declaration ¶¶ 3-5; Ex. A)

35. Farina did not personally arrest Plaintiffs, his name only appeared on their citations because he instructed officers to use his name on the citations during the relevant period. (Farina Depo. p. 285)

## SECOND CLAIM FOR RELIEF-PROTESTOR LIST

36. On or about June 5, 2020, crime analyst Dominick Ratkowski created a list of people who had been involved in some sort of protest in Milwaukee and/or Waukesha County. (Stipulated Facts ¶ 9; Ratkowski Declaration ¶ 2)

37. Ratkowski created the list because there was a large amount of civil unrest and violence occurring in Milwaukee and he was working with the Milwaukee Fusion Division to help them identify people who were involved in large caravans, reckless driving, and burning of buildings. (Ratkowski Declaration ¶ 2)

38. The purpose of creating the list was to prepare for crime or potential violence by providing a means to identify witnesses, victims and suspects of any potential violence or crime that may came out of a protest. (Ratkowski Declaration ¶ 4)

39. Part of Rakowski's role as a crime analysist is to help law enforcement officers solve crimes faster and the list allowed him to organize intel he was gathering for quick reference. (Ratkowski Declaration ¶ 5)

40. When Ratkowski would obtain personal information from DOT records for inclusion on the list—it was always part of the intel gathering process to assist in identifying potential witness, suspects, and victims throughout the course of an investigation or for a future investigation. (Ratkowski Declaration ¶ 6)

41. By mid-November of 2020, Ratkowski essentially stopped making the list because law enforcement agencies had stopped asking for his help in identifying people. (Ratkowski Declaration ¶ 7)

42. The information on the list was obtained and verified through numerous sources including Facebook, ZetX, officer observations, public resources including common council meeting minutes, public records, police department records, criminal histories, and open-source information. (Ratkowski Declaration ¶ 8)

43. ZetX is a law enforcement tool that allows officers to confirm a subscriber's name and associated phone number. ZetX was used by Ratkowski to confirm phone numbers on the list. (Ratkowski Declaration ¶ 9)

44. KGIS is a data base that interfaces with the Wauwatosa Police Department's record management system called ProPhoenix that allow Ratkowski to search other agencies record management systems for information like dates of birth. (Ratkowski Declaration ¶ 10)

45. TLO is a data base that allowed Ratkowski to search names and obtain corresponding addresses, phone numbers, and possible associates for the list. (Ratkowski Declaration ¶¶ 8, 12)

46. Home addresses for the list were obtained from various open-source information, including criminal histories, Milwaukee County Land Management Systems, and programs like Rate Me, which is a public information gathering site. (Ratkowski Declaration ¶¶ 12)

47. Vehicle information including make, model, license plate, and registration would be provided to Ratkowski from officers if they observed vehicles at protests. Ratkowski did not know what their process was to get him that information. (Ratkowski Declaration ¶¶ 8, 12)

48. The term "open-source information" means information available to the public including social media sources and would not include department of transportation records. (Ratkowski Declaration ¶ 14)

49. Dates of birth were obtained from various sources including criminal history reports, public records, police department records, and other open-source information. (Ratkowski Declaration ¶¶ 8, 12)

50. Ratkowski provided the list to the following law enforcement agencies only: the Wauwatosa Police Department, the FBI, the Milwaukee Police Department, Milwaukee County

Sherriff's Office, Marquette University crime analyst, Oak Creek Police Department analyst, Racine Police Department, Racine Sherriff's Office, Greenfield Police Department, Brookfield Police Department, City of West Allis Police Department, and Burlington Police Department, and the Milwaukee County District Attorney's Office for use in law enforcement activities and investigations. (Ratkowski Declaration ¶ 16)

51. When Ratkowski provided the list to other law enforcement agencies it was to assist those law enforcement agencies in their investigations by providing a means to identify who was at a protest so if something criminal would occur they would have knowledge of who may have seen it, who may be a victim, and who may be a suspect. (Ratkowski Declaration ¶ 17)

52. Ratkowski is unaware of the List being used by any law enforcement agency for a purpose other than law enforcement or crime prevention strategies. (Ratkowski Declaration ¶ 18)

### FOURTEENTH CLAIM FOR RELIEF-OPEN RECORDS RESPONSE

53. On January 7, 2021, Joseph Roy sent an email with the subject line "open records request response" and within the email provided a Dropbox link to various documents and videos requested through open records. (Roy Declaration ¶ 3; Stipulated Facts ¶ 10)

54. Roy had no knowledge that any of the videos provided in the Dropbox link disclosed personal information obtained directly from motor vehicle records. (Roy Declaration ¶ 6; Roy Exhibit B)

55. MORPHO is a law enforcement tool that allows officers to search fingerprints against state criminal history database. It is a handheld fingerprint device that provides real-time identification of an individual displaying the state criminal history number and name of individual. It is not a department of transportation record. (Roy Declaration ¶ 7)

56. The term "open-source information" means information available to the public

including social media sources. It would not include Department of Transportation records.

57. The term "police databases" would include the National Crime Information Center (NCIC), report management system, TRACS, and DOT records.

58. During a Wauwatosa Police Department booking process the booking officer would ask the arrestee for biographical information including name, date of birth, address, height, weight, hair and eye color, and phone number. (Roy Declaration ¶ 10)

59. The biographical information obtained during the booking process would be inputted into the Wauwatosa Police Department report management system for that individual. (Roy Declaration ¶ 11)

60. The inputted information would then be used to fill incident or arrest reports associated with the individual. (Roy Declaration ¶ 11)

61. The Wauwatosa Police Department report management system stores information for individuals previously inputted into the system and allows officers to search for individuals and personal information within the system. (Roy Declaration ¶ 12)

62. During the booking process a booking officer may use NCIC or DOT records to verify the information provided by the arrestee but not always. (Roy Declaration ¶ 13)

63. Department of Transportation records that are accessible to law enforcement would not include phone numbers. (Roy Declaration ¶ 14)

64. Information including age, hair color, eye color, weight, height, date of birth, address, driver license number, phone number, could come from numerous sources other than motor vehicle records including the report management system, NCIC, officer observations, or open-source information. (Roy Declaration ¶¶ 8-13, 15)

65. There is no way for Roy to know the source of the personal information contained

in the disclosed incident reports—specifically Bates Nos DEFS' RPD: 028984, 028983, 028916, 028917, 029018, 028842, 029152, 029157, 029163, 029166, 029167, 029282, 029103, 028980, 028843, 028892, 028870, 028893, 029028, 028955, 028958, 029133, 029387, 028981, 028836, 028839, 028848, 029153, 029155, 029161, 029179, 029180, 029423, 029306, 028914-028915, 028887, 028932, 028935, 029419, 028957, 029132, 028886, 028979, 029032, 029045, 029271, 029280, 028841, 028888, 029004, 029011, 029290, 029038, 029047-029048, 029051, 029053-029054, 029056, 029058, 029063, 029269, 028889, 029077-029078, 029084, 029094, 029095, 029097, 029100-029102, 029082, 029090, 028873, 028890, 029281, 029266, 029416, 029426, 029199, 029200-029202, 029106-029107, 029108, 029061, and 029279—because the personal information could have come from a variety of sources other than motor vehicle records (Roy Declaration ¶¶ 15-16; Roy Exhibit A)

66. Further the inclusion of phone numbers in the disclosed incident reports suggested to Roy the source of the information was not motor vehicle records—because phone numbers are not part of the motor vehicle records. (Roy Declaration ¶¶ 14, 16; Roy Exhibit A)

67. There is no way for Roy to know the source of the personal information contained in the non-traffic citations from Roy Exhibit A. (Roy Declaration ¶¶ 17, 19, Roy Exhibit A)

68. Bates Nos DEFS' RPD: 028825, 028823, 028800, 028779, 028774, 028805, and 028810 identify the source of the personal information as the plaintiffs or their driver licenses – not motor vehicle records. (Roy Declaration ¶ 17; Roy Exhibit A)

69. While the citations could contain information from DOT records, Roy would not have known if the officer generating the citations checked the DOT records to autofill the citation or inputted/changed the personal information from another source. (Roy Declaration ¶ 18; Roy Exhibit A)

70. Bates No DEFS' RPD 028816 contains a Wisconsin driver license number, but no expiration date which Roy would expect to see if the citation was auto populated by DOT records. (Roy Declaration ¶ 18; Roy Exhibit A)

71. The non-traffic citations, specifically Bates Nos DEFS' RPD: 028771- 028773 do not contain driver license identification numbers, vehicle, or license plate information making it unlikely the source of the personal information was motor vehicle records. (Roy Declaration ¶ 19; Roy Exhibit A)

72. Claim Fourteen Plaintiffs lack any personal knowledge about how the investigating officer completed his or her incident report or citation. (Zellner Decl. Ex. A—Interrogatory No. 2 Responses)

73. Claim Two and Fourteen Plaintiffs have not suffered any actual monetary damages related their DPPA claims. (Zellner Decl. Ex. F—Interrogatory No. 14 and/or 18 Responses)

Dated this 19th day of December 2022.

        **WIRTH + BAYNARD**
        Attorneys for Defendants

BY:   */s/ Kiley B. Zellner*
       Kiley B. Zellner, WI Bar No. 1056806
       9898 W. Bluemound Road, Suite 2
       Wauwatosa, Wisconsin 53226
       T: (414) 291-7979 / F: (414) 291-7960
       Email: kbz@guntalaw.com