UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KATHRYN KNOWLTON, and
DANA McCORMICK, et al,

                                    Case No. 20-CV-01660

    Plaintiffs,

    v.

CITY OF WAUWATOSA, BARRY WEBBER,
In his individual capacity as Chief of Police, and
DENNIS MCBRIDE in his individual capacity, et al.

    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


<u>DEPOSITION OF JOSEPH ROY</u>



        DATE TAKEN: July 26, 2021
        TIME:       1:52 p.m. - 4:49 p.m.
        LOCATION:   Knowlton Law Group
                    7219 West Center Street
                    Wauwatosa, Wisconsin 53210







TRANSCRIPT PREPARED BY:
Miriam Beckford, Professional Court Reporter

**APPEARANCES FOR THE PLAINTIFFS**

KIMBERLEY CY MOTLEY, ESQ
MOTLEY LEGAL SERVICES
(704)763-5413
Motleylegal.com

MILO SCHWAB, ESQ,(via Zoom)
ASCEND COUNSEL, LLC
3000 Lawrence Street
Denver, Colorado 80205
(303)888-4407

KATHRYN KNOWLTON, ESQ.
KNOWLTON LAW GROUP
7219 West Center Street
Wauwatosa, Wisconsin 53210


**APPEARANCES FOR THE DEFENDANTS**

JASMYNE M. BAYNARD, ESQ.
GUNTA LAW OFFICES, S.C.
9898 West Bluemound Road #2
Wauwatosa, Wisconsin 53226
(414)291-7979


**EXHIBITS**


#1P - Protester List
#2P - Redacted Protester List
#3P - Wauwatosa Police Department Incident Report
#4P - Wisconsin Non Traffic Citation
#5P - Wisconsin Non Traffic Citation
#6P - Wisconsin Non Traffic Citation
#7P - E-mail, 01/07/2021, Open Records Request Response

ATTORNEY KNOWLTON:  Good afternoon.  Thank you for being here.  I'm attorney, Kathryn Knowlton.  I am here with co-counsel, Kimberley Motley.

Is Milo on Zoom?

ATTORNEY MOTLEY:  Yes, he should be.

ATTORNEY KNOWLTON:  Okay.  So we have Attorney Milo Swab listening in, you know, just so you're all aware.  And we are here to conduct the deposition of Lieutenant Joseph Roy who is a lieutenant in the Wauwatosa Police Department in Wauwatosa, Wisconsin.  Today is Monday, July 26th and the time is 1:53.  And we want to make a note that this was a scheduled deposition for 1:00 p.m. and we agreed to take a break.  So it's our counsel's fault by stipulation that we are starting a little bit late.  But this is case number 20CV1660 of a civil rights action pending in the Federal District Court in the Eastern District of Wisconsin.  And Lieutenant Roy is here along with counsel for the defendant, Attorney Jasmyne Baynard.  And there is no other people here.  So I will ask, please for the notary to please swear the witness.

JOSEPH ROY,

a witness herein, having been duly sworn, testified as follows:

LIEUTENANT ROY:  I do.

ATTORNEY KNOWLTON:  Thank you.  Excellent.

ATTORNEY KNOWLTON:

Q    So, first, have you been deposed before?

A    No.

Q    Okay.  This is your first deposition?

A    Yes, Ma'am.

Q    Okay.  Great.  We'll go through this, it's kind of a
     script, we just want to make sure that everybody is on
     the same page.

                So first of all, could you just please state
     your name and spell your last name for the record?

A    Sure.  Joseph Roy, J-O-S-E-P-H, last name is Roy, R-O-Y.

Q    And you are aware that you are being deposed in a case
     on -- that is a civil rights action entitled *Knowlton et
     al versus the City of Wauwatosa et al* case No. 20CV1660
     in the Eastern District of Wisconsin?

A    I am.

Q    Okay.  In your deposition, I'm going to be asking you
     questions or counsel, all counsel is able to ask you
     questions and you are going to be answering them under
     oath.  Do you understand that?

A    Yes.

Q    There are a few differences between a deposition and a
     typical conversation that I want to make sure you're
     aware of.

First, as you noticed, there is a court reporter attempting to transcribe everything that we say. In a normal conversation people might interrupt or talk over each other, but it's important here that we wait for each other to finish asking or answering a question before the other person begins talking. Do you understand that?

A    I do.

Q    Second, this is an oral transcription which means the court reporter cannot indicate head nods or other non-verbals or even uh-huh's. So it's important that your answer is verbal. Do you understand that?

A    Yes.

Q    Excellent. Finally, unlike a typical conversation, your answers today are under oath and this subjects you to a potential criminal charge for perjury, which is "willfully giving false, misleading or incomplete testimony under oath". Do you understand that?

A    I do.

Q    Is there any reason today such as being under unusual stress or physically or mental condition or being under the influence of any substances that would prevent or limit you today from giving any truthful answers to questions?

A    No.

Q    And there is nothing wrong with asking anyone to repeat
     a question or -- or explain a term that you don't
     understand.  However, if you answer the question, it is
     going to be assumed that you understand what the
     question is.  Do you understand that?

A    Yes.

Q    Okay.  If you do need any clarification of a question,
     you need to look at the person who asked the question
     for clarification and not anyone else.  Do you
     understand that?

A    Yes.

Q    Sometimes when a question is asked, you might have
     partial knowledge, but not absolute certain or complete
     knowledge.  For example, if I asked you the temperature
     right now, you couldn't necessarily tell me the exact
     degree, but you could give me an approximate answer.
     And even if you couldn't you could probably know whether
     it's really hot or really cold or somewhere in between.
     In that circumstance, the answer 'I don't know' is not
     appropriate, but an answer giving a range or an estimate
     based on your knowledge and experience with an
     explanation, that it's a range or an estimate, is
     appropriate.  Do you understand that?

A    Yes.

Q    Sometimes I might ask you a question where you're not

sure of the answer, but if you reference a document, you would be to check -- to answer the question, you would be able to check and then answer with certainty after you reference it.  For example, if I ask you the balance of your checking account on a particular day, you can ask to see the banking statement before you can answer.  I can then decide, or whoever is asking the question, can decide whether or not to show you the banking statement to confirm your exact accurate response or if we are satisfied with an estimate.  Do you understand that?

A    I do.

Q    The attorney for -- the defendant, Attorney Baynard, may make objections while questions are being asked.  She is entitled to do this in terms of preserving an objection in the case of admissibility of evidence.  But making an objection does not mean that you don't have to answer the question.  Do you understand that?

A    I do.

Q    She is entitled to put the objection into the recording or on the record, that is, but you are still required to answer that unless it is based on a counsel privilege which she would say during the objection.  Do you understand that?

A    I do.

Q    And you understand you are a witness here today.  Do you
     understand that Attorney Baynard is acting as your
     attorney?

A    Yes.

Q    Okay.  Do you understand she is the attorney for the
     defendant, City of Wauwatosa, correct?

A    Correct.

Q    And so you understand that if you wanted to, anybody
     could, but you would be entitled to have an attorney
     just for you in this action right now today to
     participate with you.  Do you understand that?

A    I do.

Q    Do you want an attorney?

A    No.  I'm comfortable with Attorney Baynard.

Q    Okay.

A    Baynard.

Q    Baynard.  I do it to her too, so.  Thank you.

             Finally, I'm entitled to what are considered
     complete answers.  That means an answer that fully and
     completely answers my question.  For example, if you
     had orange juice, toast and coffee for breakfast and I
     asked you what you had for breakfast and you answered,
     orange juice, that would not be a complete answer and
     you would not have, properly, answered the question.
     However, you are under no obligation to tell me what

you had for lunch.  Do you understand that?

A     Yes.

Q     Okay.  Thank you.  Do you have any other questions before we get started?

A     No.

Q     Okay.  Excellent.  Can I just ask you a couple preliminary's then, which is, did you review any documentation before coming today for the deposition?

A     Not anything in particular.

Q     Okay.  Did you bring anything with you today?

A     I did not.

Q     Okay.  You have, however, prepared documentation that had been forwarded to Attorney Baynard previous to today; is that correct?

A     I have.

Q     Okay.  Have you spoken to anyone aside from Attorney Baynard before coming here today about this case?

A     No.

Q     Okay.  Not even to superior officers at the PD?

A     Not today.

Q     Okay.  And can I just ask, who are your superior officers?  If you could please explain the operational tree hierarchy.

A     The chain of command, I respond to -- I report directly to Captain Gary Gabrish, that's G-A-B-R-I-S-H.  And

Captain Gabrish then reports to Chief James Macgillis,
M-A-C-G-I-L-L-I-S.

Q    And that's quite new, correct?  When did Chief Macgillis
     start?

A    Friday.

Q    Friday.  Which was the 23rd.  Prior to Friday the 23rd
     who was in charge?

A    Chief Barry Weber, W-E-B-E-R.

Q    And he, actually, had retired, I believe, June 1; is
     that correct of, 2021?

A    I would have to look at the exact date.  It was -- it
     was the first part of June.

Q    Okay.  And in the interim, the active chief has been
     Luke Vetter; is that correct?

A    Correct.

Q    Okay.  So at the time, giving rise to this action, the
     chain of command for yourself would have been Captain
     Gabrish to Chief Barry Webber?

A    No.

Q    No?  Could you tell me what would have been at the time
     say September to January of, 2020 to January 2021?

A    It fluxed.  Initially, I reported to Captain Brian
     Zalewski, Z-A-L-E-W-S-K-I, and then it became Captain
     Jack Morrison, M-O-R-R-I-S-O-N.

Q    Do you have about the time period on that?

A    It would have been around August that the transition

     happened between Captain Zalewski and Captain Morrison.

Q    Okay.

A    And then Captain Morrison transitioned out so Captain

     Gabrish came in April of this year sometime.  I don't

     have an exact date.

Q    Okay.  So from, approximately, August of 2020, to

     approximately, April of 2021, your direct report has

     been Captain -- was Captain Morrison?

A    Correct.

Q    Okay.  And during that whole time the chief was still

     Chief Barry Webber?

A    Correct.

Q    And you said you didn't talk to anyone today about this

     case.  Have you talked with anybody at all since you got

     your notice of deposition?

A    Not, specifically, about the deposition.

Q    Okay.  Who did you talk to about the case?

A    Various superiors as I continue to work on items of

     discovery.

Q    Okay.  And you're continuing to work on items of

     discovery?

A    I am.

Q    Okay.  So it's not a completed process yet?

A    Correct.

Q    Do you have an estimate about when that might be
     completed?

A    I do not.  Not right now.  It's going to be some time
     yet.  I hope to get it completed as soon as I can.

Q    Is that like weeks or months?

A    My hope is it would not be months, but it's going to be
     more than weeks.

Q    Okay.  Have you talked to any council members, Common
     Council members about this case?

A    No.

Q    Have you talked to the City Administrator, James
     Archambo about this case?

A    No.

Q    Have you talked to any of the city employees outside of
     the police department about this case?

A    The city attorney.

Q    Okay.  When did you -- when did that conversation occur?

A    It's multiple conversations not one in particular.

Q    Okay.

     BY ATTORNEY MOTLEY:

Q    All right.  And which city attorney?

A    Alan Kesner.  It's K-E-S-N-E-R.

Q    Have you talked to Hanna Kolberg about this case?

A    As I sit here today, I don't recall.  I don't recall
     talking to her about it, but it's not to say I didn't.

I just don't recall.

Q    Do you recall talking to George Schimmel about this
case?

A    I don't recall.

Q    Okay.

BY ATTORNEY KNOWLTON:

Q    I just have a couple more of them.  But during the
actual curfew time, so between 7:00 p.m. on October 7th
to 6:00 a.m. on October 12th, were you on a special
schedule?

A    I was.

Q    Okay.  Can you tell me what the special schedule was?

A    I worked -- I started at 4:00 p.m. and worked until we
were done.

Q    Okay.  When was that usually?

A    It varied as the week progressed.  It was later the
first few nights 2:00 a.m., 4:00 a.m. that, kind of, and
then -- and then it got midnight.

Q    Okay.  And where were you operating from?

A    The operations command post.

Q    Which was where?  The operations command post?  Is this
at the CVMIC Building or at the Department of Public
Works?

A    I was at the Department of Public Works.

Q    Okay.  And, approximately, how many other people were

there with you?

A   I don't know.

Q   More than 100?

A   In the entire building?

Q   Well, in the entire building and related to the
operations.

A   I don't know.

Q   You can't say if it was more or less than 100 people?

A   I didn't count.  I'm sorry.

Q   Do you have a best estimate of what 100 people look
like, I mean, in terms of a quantity?

A   I was in one specific area so I wouldn't be qualified or
capable of giving you any answer of how many people were
in the building the whole time.

Q   Okay.  How many people were in the room with you?

A   It varied.  Anywhere from two to 12.

Q   Okay.  And was Dominick Ratkowski in the same room with
you?

A   No.

Q   Was Captain Vetter in the same room with you?

A   Yes.

Q   Did he stay with you the whole time?

A   Primarily.  We stepped out for restroom breaks, meal
breaks, meetings.

Q   And what else was in the room by way of equipment?

A    Computers.

Q    Okay.

A    TVs.

Q    Okay.  And what were you doing in the room?

A    I was helping assist take notes, keep a log and there to
     provide Captain Vetter any assistance he needed.

Q    Okay.  Take notes on what?

A    The happenings.  What was going on in the city.

Q    Okay.  Did you only report to Captain Vetter?

A    I did.

Q    Okay.  So you didn't ever report to anyone else
     directly?

A    No.  Correct.  Just Captain Vetter for that week.

Q    Okay.  So you didn't share any information, personally,
     and that's in phone call or verbal or e-mail or text
     message to anyone who was at the CVMIC Building?

A    No, that is incorrect.  I spoke to people at the CVMIC
     Building.

Q    Okay.  Who did you speak to at CVMIC Building?

A    Members of the public information team.

Q    Okay.  Who's on the public information team?

A    Currently, it's Captain Jack Morrison, myself, Sergeant
     Abby Pavlik, P-A-V-L-I-K, is the department's PIO and
     was at the time.  And that's it.  Those are the
     Wauwatosa PD members that were there at the time.

Q    Okay.  Did you share any information with anyone at
     CVMIC outside of that public information team?

A    Other than answered questions when, you know, Chief
     Webber called, that was it.

Q    So you never spoke directly with Mr. Archambo?

A    I don't believe so.  I think I called him there and he
     answered the phone, but I didn't talk to him.  I asked
     to speak to the chief.

Q    Okay.  I appreciate you being careful and accurate with
     your answers.  Honestly, I'm trying to be facetious at
     all, so.

A    Thank you very much.

Q    And so would your answer be similar or the same as to
     the Mayor?  Did you ever speak, directly, with the Mayor
     during that time?

A    I did not.

Q    Okay.

          ATTORNEY MOTLEY:  Sorry.  Can I just ask some
     questions just in relation to this?

          ATTORNEY KNOWLTON:  Yeah.  Thank you.  I'm
     done.

          ATTORNEY MOTLEY:  Oh, no.  You don't have to
     be done I just --

          ATTORNEY KNOWLTON:  No, no, that's okay.  That
     covers what I was...

BY ATTORNEY MOTLEY:

Q    Okay.  You said you called the CVMIC center and asked to speak to the chief.

A    That's not what I said.

Q    Please, tell me what you said.

A    I called over to the CVMIC center and the chief answered the phone.

Q    Okay.  So -- okay.  Thank you.  So was that an office phone that the chief answered?

A    Yes.  And I did -- I'll correct myself.  I did call and ask to speak with the chief.  As you're just saying that, yes, I did do that.

Q    Okay.  And do you recall what day that was?

A    I don't.

Q    Okay.  The phone -- do you recall what number you called?

A    I don't.

Q    Do you recall who you spoke to ask to speak to the chief?

A    I recall speaking to Mr. Archambo once.  I don't recall who else I spoke to.

Q    Okay.  And who told you the number for CVMIC?  Do you recall that?

A    I don't recall who told me.

Q    Okay.  Had you ever called CVMIC before the October 7,

2020, curfew?

A    In my entire career?

Q    Yeah.

A    I don't -- I don't know.  As I said, I don't know.

Q    Did you ever -- did you ever go to the CVMIC building
     from October 7th through the 12th?

A    I was in the CVMIC building once, but I don't remember
     exact the date.  I think it was prior to the 7th.

Q    Was it in September of, 2020?

A    I don't recall.  I've been to the CVMIC only a few
     times.  They hold trainings and different courses and
     things like that.  But I -- in preparation for this it
     might even been that first morning I did go over there
     to check in with the public information team.

Q    Okay.  On October 7?

A    I don't recall if that's the exact date, but --

Q    Okay.  Got it.

A    -- on or about that date.

Q    Okay.  But that was the first time and only time you've
     ever called CVMIC during the October 7th through the
     12th curfew in your life?

A    I don't know if that's the only time I have ever called
     CVMIC.

Q    Okay.  So let's -- let's just take a step back.  Okay.
     So for October -- for 2020, you were working that entire

year for the Wauwatosa Police Department?

A    Correct.

Q    And you're, currently, working with the Wauwatosa Police
     Department?

A    Correct.

Q    Okay.  And your title, you're a lieutenant, correct?

A    I am.

Q    And when did you get promoted?

A    August.

Q    August?

A    Of 2020.

Q    Okay.  And when did -- did Brian Zalweski he quit the
     Wauwatosa Police Department in August 2020, correct?

A    I don't remember the exact timeframe he quit, but I was
     promoted in August of 2020.

Q    Okay.  So between May 25th, 2020, until now, what are
     some of your duties as a law enforcement officer with
     the Wauwatosa Police Department?

A    So from May 25th 'til sometime in August when I got
     promoted and I don't recall the exact date of my
     promotion.  I'm sorry.  I had to look it up.  I don't
     have the exact date.  I was a sergeant assigned to the
     administrative division and my duties then have remained
     almost the same except I am now, as a lieutenant, I am
     one rank above sergeant.  It's police officer, sergeant,

lieutenant.  I am one rank, so now I'm a sergeant that
does those duties and I supervise.  That doesn't mean
that I don't do certain things it just means that,
generally, I'm one level above from most of that.  I
have taken on additional responsibilities.  But the
one -- a couple of the duties were I was assigned
overseer of the open records division, the open records
-- our internal civilian staff that deals with records.
I was in charge of civilian staff administrators
assistants.  In charge of the building, building
security, building safety.  In charge of helping
maintain fleet, fleet would be squad cars, equipment
like that; helping maintain equipment.  Being promoted
to lieutenant I kept most of those duties, again, but
not a supervisory level.  And add in charge of our
dispatchers at our dispatch center and our community
support division.

Q    You have a big job.

A    I do.  I have a lot to do.

Q    How many open records request have you received from May
25th, 2020, until present?

A    I don't have that number for you today.  We'd have to
look it up.

Q    It's a lot.

A    It's fair to say it's a lot.

Q    Okay.  And do you know who Dominick Ratkowski is?

A    I do.

Q    Who is he?

A    Dominick Ratkowski is the intelligence analyst for the
Wauwatosa Police Department.

Q    Okay.  Did Dominick Ratkowski ever e-mail to you the
protester list?

A    I don't recall if he did or not.  I don't believe so but
I don't recall.

Q    Okay.  Do you recall if anybody ever e-mailed to you the
protester list?

A    I don't recall.

Q    Okay.

          ATTORNEY MOTLEY:  Let's get that exhibit out.
So how do we want to do -- so, then, I guess, this will
be your fist exhibit.  Okay.  Let's mark it as Exhibit 1
for him.  If that's okay.

          THE COURT REPORTER:  I put his initials on
there, so we know it's his.

          ATTORNEY BAYNARD:  Sorry.  I want to put the
same objection on the record to this.  We produced this
document -- or Dominick document an un-redacted version.
I have indicated to Counsel that it needs to be redacted
prior it to being produced publicly.  Those are
discussions Counsel and I have.  And so I just put that

objection on the record and all of the depositions.
Thank you.

ATTORNEY MOTLEY:  And I want to put on the
record that this is a document created by Dominick
Ratkowski as he testified to on June 23rd, 2021.  This
is not a document that any of the plaintiffs created.
We are unaware of where this specific information has
come from.  And so we're going to put that on the record
as well.

BY ATTORNEY MOTLEY:

Q    What's the nerd lab?

A    That's a good question.  That's a really poor name for
     it.  I don't know where that moniker ever came from.
     It's kind of insulting actually.  We have a forensics
     lab that deals with, primarily, cell phone data.

Q    Are you aware of a en-mail that Martin Keck sent to
     several Wauwatosa Police Department officers where he
     called it the nerd lab?

A    I am not aware of it.

Q    Is the nerd lab also the place where the Wauwatosa
     Police Department takes cell phone and computers to look
     at them?

A    What do you mean to look at?

Q    To examine them.  To, you know, look at their contents.
     Go into the computers or cell phones to look at the --

the contents of these -- this equipment?

A    The contents of the phones?

Q    Yes.

A    Yes.  The forensic lab would be where that would occur.

Q    Okay.  And are -- is anyone with the Wauwatosa Police
     Department unlawfully taking out people's SIM card of
     their phones without the consent of the owners of those
     phones?

A    I don't know.

Q    Is anyone within the Wauwatosa Police Department looking
     at the contents of people's phones or computers
     unlawfully without the owner's consent of those items?

A    I don't know.

Q    But you yourself you don't deal with phones or
     computers; is that a fair assessment?

A    Evidentiary, no.  I mean I have a computer at work.

Q    Okay.  But you don't -- you're not the one -- you're not
     a -- what do you call it?

              ATTORNEY KNOWLTON:  Forensic examiner.

     BY MR. MOTLEY:

Q    You're not a forensic examiner in terms of, you know,
     you have not received people's phones or electronic
     items and tried yourself to look at the contents of
     these electronic items?

A    Not in relation to this case, no.

Q    Have you tried to that in relation to any other cases?

A    Yes.

Q    Okay.  Have you ever -- what cases?  From May 25th of
     2020, until now?

A    None.

Q    So between that time period you haven't?

A    Correct.

Q    Okay.  What cases have you done this for?

A    I'd have to look it up.  I was a forensic examiner when
     I was a detective.

Q    A detective for the Wauwatosa Police Department?

A    Correct.

Q    Okay.  Have you ever looked at anyone's electronic
     equipment unlawfully without their owner's consent?

A    We would need any owner's consent for a search warrant
     but in the absence of those two, no, one of the those
     two.

Q    Okay.  Have you ever put any software on a person's
     electronic devices without their consent?

A    Not without a search warrant.

Q    Okay.  Have you ever done it without a search warrant or
     without owner's consent?

A    No.

Q    So what cooperation did the Wauwatosa Police Department
     have with Milwaukee Fusion Center from May 25th of,

2020, until October 13th of, 2020?

A    I am not qualified to give you the scope of that.  I --

I don't know.  I don't know what level of cooperation.

I know there was cooperation.  I don't know to what

level.

Q    Okay.  What I have before you is the protester list

un-redacted copy which has already been marked as your

Exhibit 1.

Have you seen this document before?

A    I have.

Q    When?

A    A few weeks ago probably.  I don't recall the exact

date.

Q    Was that the first time you saw it was a few weeks ago?

A    Correct.

Q    Was that in July?  The month of July?

A    I -- I don't recall.  I'd have to go back and look.

Q    Okay.  So before a few weeks ago, had you ever seen this

document before?

A    Not like this.

Q    Have you ever seen a version of this document before?

A    I don't recall.

Q    So what do you mean by "not like this"?

A    A complete -- I mean this is the complete document.  I

have never seen -- I have never seen this until

recently.

Q    What do you think about this?

A    I'm not sure what you're asking.

Q    How do you feel about this document existing within the Wauwatosa Police Department?

A    I don't have an opinion on it.

Q    So I want to understand the mechanics of things. All right.

        So with regards to getting people's addresses on a document like this. How would a Wauwatosa Police Officer or how would a civilian like Dominick Ratkowski get someone's address to put it on this document?

A    I don't know how Dominick did it.

Q    Okay. So if he said he got it through the department of transportation, right, how do you look for addresses with the department of transportation?

A    As a police officer?

Q    Yes.

A    You could run a query or a driver's history file that's not the exact technical term for it. The state calls it something else, but that's just what it is.

Q    Okay. So when you say, as a police officer you could run a query for driver's -- like pretty much a person's DMV record; is that what you're talking about?

A    Correct.

Q    So with a person's DMV record, you can run a query and
     get their address as a law enforcement officer?

A    Correct.

Q    Okay.  So is that a phone call you make or you do it on
     the computer?  How does that happen?

A    It's computer based.

Q    Okay.  And is there a special username and password you
     have to put in order to get that information?

A    It depends on the portal you're using.  But, yes,
     there's a unique username and password.

Q    Okay.  And that unique username and password is
     something that's available to law enforcement officers?

A    Who are trained and certified.  It's available to people
     that pass the training.

Q    And what is that training?

A    I don't have the specifics of the training.  It is a
     Wisconsin CIB which, I believe, stands for Crime
     Information Bureau.  I may have it a little wrong, but
     it's -- we're required to take training on accessing
     those records.

Q    And who sponsors that training?

A    The State of Wisconsin.

Q    Is it through the department of transportation?

A    I actually and I might be incorrect, but I believe it's

the department of justice.

Q     So the department of justice holds a specific training,
      the CIB training, that everyone is required to take who
      wants to run DMV records of people?

A     Correct.

Q     Are you aware if Dominick Ratkowski took that training?

A     I'm not aware.

Q     Okay.  Are you aware if any City of Wauwatosa employees
      took that training?

A     I did.

Q     Okay.  Are you aware of any non -- non-law enforcement
      officers within, that work for the City of Wauwatosa,
      that have taken that training?

A     It's routine training.  I know as my position as the
      administrator of our civilian work staff, our civilian
      administrative staff, that did not include Dominick, but
      my civilian administrative staff they are all trained
      and authorized to do that.

      BY ATTORNEY KNOWLTON:

Q     I am sorry.  I just want to clarify.  You said also they
      have to past a test?

A     Correct.

Q     Okay.  So is the test incorporated into the training?
      Like at the end of the training you take a test?

A     Correct, it's a computer-based training.

Q    Okay.

          ATTORNEY KNOWLTON:  I'm sorry.  I just want to
     clarify.

          ATTORNEY MOTLEY:  You're fine.

     BY ATTORNEY MOTLEY:

Q    And with regards to -- you said your civilian
     administrative staff have taken this training?

A    Correct.

Q    And once your civilian administrative staff takes the
     training and pass it, are they then provided with a
     specific username and password?

A    Yes.

Q    And they can look up DMV records on any computer or is
     it a specific computer that has to be used?

A    Any of their work computers.

Q    Okay.  Any of the Wauwatosa -- City of Wauwatosa work
     computers?

A    Correct.

Q    And do typically City of Wauwatosa civilian or law
     enforcement officers; are their work computers, laptops?

A    It depends greatly.  We are moving more and more towards
     laptops based on our experiences with COVID last year
     and our -- as technology changes, so.  But I can't
     say that our entire staff has laptops.

          ATTORNEY MOTLEY:  What is that?

ATTORNEY KNOWLTON:  I don't know.  A walkie-talkie or something.

LIEUTENANT ROY:  No, it's not me.  That's it's the computer.

ATTORNEY KNOWLTON:  Yeah, maybe the computer or something.

ATTORNEY MOTLEY:  No. Maybe Milo -- maybe needs to be on mute.

ATTORNEY KNOWLTON:  Oh, sorry.  Milo's not on mute.

Q    All righty.  So with regards -- sorry, to just be on this.  I'm just really trying to understand this.  As a civilian employee or law enforcement employee, should you just be looking up -- should you look up -- like do you have the right to look up anybody's DMV record if there is not an investigative or work purpose --

(Off the record 2:26 p.m.)

(On the record 2:27 p.m.)

Q    Are people allowed to use --

ATTORNEY MOTLEY:  Could you please read that question back?

(Court reporter reads back)

Q    Do you have the right to look up people's DMV records if there is no work purpose for that?

A    No.

Q   Do you have the right to look up people's DMV records as
    a, you know, civilian or law enforcement officers just
    because you're curious to get people's information?

A   No.

Q   What are some acceptable reasons why someone should be
    looking at people's DMV records?

A   Well, I can't provide them all, but I can provide some
    that we routinely use people's DMV records to -- for
    investigative purposes.  Identifying somebody, finding
    an address, a height and weight, perhaps a date of
    birth.  All of those normal pieces of biographical
    information contained in a DOT record.  We do it
    primarily for investigations.  It would have to be
    investigatory in some fashion.

Q   Okay.  And is it -- so with this DOT computer -- or
    username and password that people have, this will --
    sorry.  Scratch that.

            This particular CIB training, is it just a
    one time training that you have to take?

A   No.  It's recurring.  I don't believe it's annual.
    There is a recurring period.  If it's biannual or
    triannual, I don't know.  It is recurring.

Q   Okay.  And do you have to -- with the continual
    training, do you have to pass a test every time you take
    this training?

A    Yes.

Q    And if you don't have -- say, for instance, you passed
     the training in January then you take the training again
     in June but don't pass, do they take away your username
     and password?

A    I don't know.  We would have to talk to the state about
     that.  I don't know what the -- the procedure is because
     I have always passed.  I -- I don't know.  You have
     to -- the test is part of the training.  You can't --
     it's -- once you start, I mean, I think you can pause
     but you have to complete it all, so.

Q    Okay.  How long is this training?

A    I don't -- it's more than an hour.  I don't know how
     much -- I can't recall.  I believe I'm at the end --
     maybe I just recertified.  It's probably an hour and a
     half.

Q    Okay.  And if you take the training like the CIB
     training, do you have to give the permission of your
     superiors to take this training?

A    No.

Q    What about a civilian that works at the Wauwatosa Police
     Department?  Would they have to get your permission or
     the permission of their bosses to take this training?

A    No, it's required.  If it's required of their position
     it's required that they take the training.

Q    Okay.  And do you know how much this training cost?

A    I don't believe there is a cost.

Q    Okay.  Now, with regards to the DMV records that is
     looked up on people, let's go back to the protester
     list, please.

            When you look up someone's DMV record, a
     name, does their driver's license picture come up?
     Can you look up a person's driver's license picture?

A    If you request it, yes, one will come up.

Q    What do you mean "if you request it"?

A    You have to -- in -- in -- the interfaces are different,
     but you have to check a box on many of them for a photo
     and then it will pop up a photo.  If there is a photo on
     file.  Sometimes people have driver's licenses and no
     photo on file.  I don't know how that happens, but it
     happens.

Q    And also with this access to the people's DMV records,
     can you look up their height, weight, eye color and
     things like that?

A    It's on their DMV -- you can't search by that.  But if
     you run somebody, if the State has it, it will show up.

Q    Okay.  And by looking at people's DMV records, if you
     put in their name, can you find their driver's license
     number or their state ID number as well?

A    Generally, you have to have more than just a name to

search for somebody, but, yes, if you have the proper
information you can get a DL or state ID number.

Q    Okay.  So what more information -- let's just take a
step back.

          So if you type someone's name in this with
looking -- trying to look up their DMV records only with
their names, what information will come back for you?

A    I haven't done that in a long time.  I don't -- I don't
recall.  Names can be similar so, I believe, that it
will populate a list of people in the state with similar
names and then you will have to narrow it down from
that.  I don't know what other information it provides
you on that list.

Q    Okay.  So in order to get someone's driver's license
number or their state ID number, what do you have to
type into get that information?

A    Their name and their date of birth.

Q    Okay.  And when you type in their name and their date of
birth, what's the information that comes back?

A    I need to add to that.  You need a -- I'm pretty sure
you still need -- you need a gender and a race as well,
so.

Q    So name?

A    Mm-hmm.

Q    Date of birth?

A    Mm-hmm.

Q    Gender and race.  You type all those things up.

A    Yep.

Q    What type of information can you receive back?

A    You will get their name, their last known address that
     the DOT has, their state ID number, their driver's
     license number either/or, the expiration dates, any
     history or traffic offenses that were, you know,
     citations they might have received, reportable crashes
     they were in, whether or not they were revoked or if
     they had a prior OWI.  Those kinds of traffic-related
     information.

Q    Okay.  And is that just with regards to people in the
     State of Wisconsin?

A    The Wisconsin DOT has the Wisconsin driver's files.  We
     can query other states as well.

Q    Okay.  And how do you query other states as well?

A    Depends on the interface.  You just choose the state you
     want it to run through.

Q    Do you use the same username and password?

A    Yes.

Q    Okay.  And would putting in the name, date of birth --
     what did you say?  Name, date of birth, race and
     gender --

A    Mm-hmm.

Q    -- would information such as their weight, height, eye
     color, hair color; would that also come up as well?

A    Out of state?

Q    Let's just talk about with the State of Wisconsin?

A    Yes.

Q    Okay.  What about out of state, would that information
     come up as well?

A    It depends on the state.  I don't -- I don't know what
     each state reports.

Q    Do you need any extra credentialing in order to look up
     people's DMV records out of -- outside the State of
     Wisconsin?

A    Not to the best of my knowledge, no.

Q    Okay.  And in terms of pictures that come up, that's
     another layer of what you have to do in order for that
     information to come up?

A    Correct.

Q    And what you need to do in order to get the picture to
     come up is you need to check a box?

A    Most of the interfaces that I'm familiar with, you check
     a box.

Q    Okay.  And when you check that box, can you print the
     picture?

A    Somehow, yes.  I don't know if there is a print option
     but you can print the picture.

Q    Okay.  If there are any driver's license or State of
     Wisconsin state ID pictures on this document, someone
     would have had to cut and paste that picture, correct?

A    Correct.  If the picture came from DOT, it would have to
     have been cut and paste.

Q    Because, for instance, let's look at the first person,
     Frank D "Nitty" Sensabaugh.  When you type in a person's
     name, date of birth, is -- is this how the information
     would come back aside from the social media post?

A    No, the -- the format is much different.

Q    What does the format look like?

A    I'd have to show you.

Q    Okay.

A    It doesn't look like this.

Q    Okay.

A    There is no phone numbers.  DOT doesn't have a phone
     numbers associated with it.

Q    So where would a person get the phone numbers?

A    I don't know.  There various sources.

Q    Like what?

A    Google.

Q    Okay.  Do you have any -- what about through NCIC?

A    It's been a long time since I looked at NCIC returns.
     But I don't believe NCIC returns have phone numbers.

Q    Do you have any internal equipment or access that would

turn -- that would give you people's phone numbers?

A    We have a report management system that catalogs people that we input the system into the system and if we capture the phone number during some interaction, it would be safe there.  We could find it.

Q    Okay.  And the report management system, is that something you also have to take a special training for?

A    Yes.

Q    That's a lot of training.

A    It is.

Q    So with regards to this report management system, that's how you would, in theory, get people's phone numbers?

A    Correct.

Q    Okay.  And can I as just a person have access to the report management system that you have access to get people's phone numbers?

A    No.

Q    Do you have to have a special username and password in order to have access to that?

A    Correct.

Q    Is that on a special computer within the Wauwatosa Police Department or is that something also that workers or that, yeah, employees can use on their work computers to get?

A    Correct.  They can access from their work computers.

Q    Okay.  If you found out that Dominick Ratkowski give
     this list to third parties, would that trouble you?

A    It depends on who the third parties are.

Q    If it was a non-law enforcement officer in any agency?

A    Again, it depends.  I mean there are civilian, employees
     that work at law enforcement agencies around the state
     that if he shared it with them, you know, if they were
     probably vetted I wouldn't have any issue with that.

Q    Okay.  Is Tracy Cole being investigated by Wauwatosa
     Police Department?

A    I have no knowledge of that.

Q    Are you aware of her ever being investigated
     Wauwatosa -- by the Wauwatosa Police Department?

A    I'm aware she was arrested.  I'm not aware if she was
     investigated.

Q    Are you aware if Christine Groppi was ever investigated
     by the Wauwatosa Police Department?

A    I'm not aware.

Q    Are you of Sean Kafer was ever investigated by the
     Wauwatosa Police Department?

A    I am not aware.

Q    Are you aware of Kathryn Knowlton was ever investigated
     by the Wauwatosa Police Department?

A    No.  Again, I know that Attorney Knowlton was arrested.
     I don't believe she was investigated.

Q    Have you ever met or seen Attorney Knowlton before
     today?

A    No, Ma'am.

Q    Are you aware if I am being investigated by the
     Wauwatosa Police Department?

A    I'm not aware.

Q    Okay.  Are you aware if Deja Vishny is being
     investigated by the Wauwatosa Police Department?

A    I'm not aware.

Q    Are you aware if David Bowen is being investigated by
     the Wauwatosa Police Department?

A    I am not aware.

Q    Okay.

     BY ATTORNEY KNOWLTON:

Q    Can I just ask -- on the first page.  I just wanted to
     ask about some of these people.  So because this was
     generated through the Wauwatosa Police Department I'm
     hoping you can help me.  So DOT I'm assuming is
     department of transportation?

A    Yep.

Q    What is KGIS?

A    That's a darn good question.  I don't know what those
     initials stand for.

Q    Okay.

A    It is a module in our report management system where we

can search information.

Q    Okay.  Okay.  Yeah.  Because it's a phone -- it looks to
     be a phone number.  I guess, I can't --

A    Correct.  That phone number came from KGIS.  I don't
     know what -- I'm sorry --

Q    No --

A    -- I don't know what the initials stands for.

Q    No.  That's fine.  So MCSO, is that the same thing?

A    No, that's Milwaukee Sheriff's Office.

Q    Oh, okay.  Milwaukee Sheriff's Office or okay -- so that
     was somehow compiled.  So how about TLO?

A    TLO is a --

Q    Does it stand for something or?

A    Again, it does, but I don't know what the initials stand
     for.  It's an information compiling service that you can
     subscribe to -- that we subscribe to that searches
     public records for information.

Q    Got it.  And so that's what my understanding of the ZETX
     as well.

A    I have never seen that before.  I don't even know what
     that is.

Q    Okay.  That just FYI, that we've learned, I think is the
     same thing it's a subscription service that can confirm,
     I believe, some social media stuff or phone numbers.
     Okay.  Thank you.  That's really helpful.

BY ATTORNEY MOTLEY:

Q    So through the -- could Dominick Ratkowski have
     retrieved people's DMV records and their vehicle
     information through the DOT access?

A    He could have.

Q    Okay.  And how does that work?  How -- how could I get
     someone's license plate number for instance?  What do I
     need to do within the computer to get that information?

A    Are you saying if I know a name and then would want to
     reverse search for a license plate number?

Q    Yes.

A    I have never done that.  You usually search the other
     way.  Get a license plate number and then find a name.
     I don't know if it's possible or not.  I would imagine
     it is.  I have never done it.  I don't know how to do
     it.

Q    Okay.  When you look up, let's say for instance, you get
     the license plate number, right, you have that
     information, if you put that into the system with the
     DMV record would the make, model and year of the car
     come up?

A    Yes, along generally with the vin.

Q    Okay.  And then also would the person's name that owns
     the car come up?

A    The registered owner, correct.

Q    And in order to get that information, would you also
     need to have a username and password to do that?

A    It's the same system, but yes.

Q    Okay.  So if you look like -- if you turn to, like, the
     last page of this document.  Let's just pick a name out.
     Let's say John Larry.  He's about ten in.  John Larry is
     a Wauwatosa resident, right?

A    I believe so.

Q    Okay.  And you can see his date of birth is there,
     correct?

A    My guess that is his date of birth.  I don't know if it
     is.  My guess is that's what it is.

Q    Okay.  And you see his make, model and license plate
     number here, correct?

A    I see a make, model, license plate number.

Q    Right.  A make, model -- but if that was his
     information, are you -- do you know if just putting in
     his name and date of birth will allow for someone, that
     has access to DMV records, to also get his license plate
     number and year, make, model of his car?

A    I'm not aware.  I am not saying it's not possible, but I
     don't know how to do it.  I have -- I have always gone
     from license plate to name.

Q    Okay.  And just, again, when you put someone's license
     plate and name in the system, what information comes up?

A    The same information we have been talking about.

Q    So date of birth.  Would their home address come up?

A    The address they have on file with DOT.

Q    Okay.  Would their driver's license number come up?

A    If you ran their driver's file.

Q    Okay.  So maybe we need to take a step back.

     BY ATTORNEY KNOWLTON:

Q    Well, yes, so to clarify.  If you -- do you run a
     license plate number you get a different set of
     information than if you run someone's name demographic,
     you know, gender, race and birth date?

A    Generally.

Q    Okay.  But that's -- those two searches are in the same
     system?

A    They are the same system, different windows.  Let's say
     different -- it's the same system.  It's just a
     different window in that system.

Q    Yeah, search functionality.

A    Correct.

Q    But you could get from one to the other?

A    Correct.

Q    Okay.  So if an officer called into dispatch and said,
     "Hey, can you run this plate because there is a
     suspicious vehicle?"  Then running just a plate number
     would get you the -- sorry.  Would get you the phone

number that's registered to that plate.

A    Correct.

Q    What else?

A    It would get you -- and it can change depending on who
     runs it, how they run it.  Generally, what happens is
     you would get the -- if we ran -- in this instance, if I
     ran that 523-SVS it would -- I'm going to, for the sake
     of today, say that that would come back.  It would show
     that it was a, 2013 Chrysler Town and Country.  I
     believe that's a van so there's a MV or a van symbol.
     And it would show, if that is Mr. Larry's license plate,
     I don't know if it is or not --

Q    Right.

A    -- it would show John Larry.

Q    As the registered owner.

A    Registered owner and I believe it provides his driver's
     license number.  There is some additional pieces of
     information.  Sometimes when you run it, it
     automatically runs the driver's file of the registered
     owner and that would just pop up the file.  Not always.
     Sometimes I don't know what differentiates the two.

Q    Okay.

               ATTORNEY KNOWLTON:  Okay.  So is that helpful?

               ATTORNEY MOTLEY:  Yes.

     BY ATTORNEY MOTLEY:

Q    Okay.  So in this system, as part of a person's DMV
     record, what information do you obtain?

A    I'm not sure what you're asking.

Q    So, with regards to a person's DMV records, when you put
     your username and password or -- in the system, is
     everything that you are able to pull up is that all
     considered -- that's all part of a person's DMV record?

A    Correct.  Information comes from the department of motor
     vehicle.  It's actually the department of transportation
     in the State of Wisconsin.  Information comes from the
     department of transportation is considered department of
     transportation records.

Q    Okay.

               ATTORNEY MOTLEY:  And what I want to do is
     mark this as Exhibit 2, please.

               ATTORNEY KNOWLTON:  I'm good, yep.

               ATTORNEY MOTLEY:  Yeah.  Sorry, I didn't make
     extra copies of this.  It's killing my ink.

               ATTORNEY BAYNARD:  No.  That's okay.  I think
     I have the same one.  It's the one I sent you, right?

               ATTORNEY MOTLEY:  Yes, same one.  Exactly.

     BY ATTORNEY MOTLEY:

Q    I'm showing you what's been marked as Exhibit 2.  Does
     this document look familiar to you?

A    It does.

Q    What is this?

A    This is a properly redacted version of the protester
     involvement list here.

Q    What do you mean by "properly redacted"?

A    This list is now ready for public release.

Q    Okay.  And you -- did you redact this?

A    I went through it line by line, but I had a clerk
     actually clicking the boxes for me.  But I stood right
     behind her and had it done.

Q    The clerk that redacted this for you, did she have a
     username and password to get into the DOT system?

A    Yes.

Q    Okay.  Who is that?

A    Her name is Carly, last name is Glavin, G-l-a-v-i-n.

Q    Okay.  So when you say "this is properly redacted," what
     are the things that should not have been publicly
     released?

A    Information obtained that's taken by the DPPA, the
     Driver's Protection Act.  So information obtained from
     the DOT can't be released and then anything obtained
     from a confidential source or informant cannot be
     released to the public.

Q    So like a person's address should not have been
     released?

A    Correct.

Q    A person's phone number should not have been released?

A    Correct.

Q    A person's driver's license never -- should not have been released?

A    Publicly, correct.

Q    Sorry, publicly. A person's date of birth, weight, height, eye color should not have been released publicly?

A    Publicly, correct.

Q    A person's driver's license plate should not have been released to the public?

A    That one I'm not sure of, but I know that in this case it was redacted out to protect people's privacy.

Q    Okay. A person's home address should not have been publicly released?

A    To the public, correct.

Q    Okay. A person's name should not have been publicly released?

A    That's not true. Names can be release.

Q    Please explain.

A    I mean we can release names of folks. We don't run a secret jails or secret investigations. We can release names. But personally identifying information is -- in this case if you take the first, the top one there, Mr. Sensabaugh's complete date of birth is not redacted.

That's the way I was informed to do it. So we redact the day out so that you don't have a complete date of birth.

Q   Who informed you how to redact this?

A   I was trained. I attended a training seminar. And then I know, not related to this case, in prior cases I worked with the city attorney's office to redact information for public release.

Q   Did you work with the city attorney's office to redact this information for public release?

A   No.

Q   With regards to this particular document, is it correct to say you redacted this document and released it to the public on July 2nd of, 2021?

A   I don't recall the exact day that it was done, but it was early in July.

Q   Do you recall -- why did you release it?

A   We had open requests for it.

Q   Okay. Let's turn -- I'm sorry this isn't -- the pages aren't numbered, but we didn't want to alter this document in any way. So if you don't mind going to Page 3. There's a picture of Jonathan Brostoff. Why wasn't his picture redacted?

A   I was informed that that is not a DOT picture. That was a picture obtained from the internet. So you could

obtain it just like we could obtain it.  So it was not
redacted.

Q     Okay.  Let's go at Page 1, if you don't mind.  The last
picture Andre Triplet.  The picture on the right where
he is shirtless holding a gun.  Is that a DOT picture?

A     It is not.

Q     Why wouldn't -- why wasn't that shown?

A     Because it was obtained from a confidential source.

Q     Do you believe that all the pictures that are in the
document that are redacted were obtained from a
confidential source?

A     I do.

Q     Who is that confidential source?

            ATTORNEY BAYNARD:  I'm going to object under
law enforcement privilege to the extent it would give up
the identity of a confidential -- a registered
confidential informant.  If there is a way for you to
explain without doing that, you can answer.

A     Sure.  There is -- there is no person that is a
confidential source.  The difference between -- on TV,
you'll see CI or snitch that's a confidential informant,
a person.  Confidential source may or may not be a
person.  We, generally, do not refer to it as a person
that belongs to the Wauwatosa Police Department.  It
comes from social media activity.

Q    Okay.  So did you sit down with Dominick Ratkowski and
     ask him where he retrieved all this information from?

A    Dominick told me that the pictures on that side of the
     page, every page, came from confidential sources.  We
     discussed, other than, he told me that if you refer to
     one, two, three, four, five, six, Page 7, the middle of
     the page you will see Attorney Kimberley Motley and Deja
     Vishny.  Dominick informed me that those were
     open-source photographs taken off the website -- off
     website's.

Q    Did he tell you which website those pictures were taken
     off of?

A    He did not.

Q    Okay.  Did you talk to Dominick Ratkowski to prepare for
     today's testimony?

A    No.

Q    Did Dominick Ratkowski share with you what he shared
     with us in relation to his deposition?

A    He did not.

Q    He never told you what he told us?

A    He did not.

Q    Did you ask?

A    I did not.

Q    Do you know if anyone has talked to Dominick Ratkowski
     about his testimony?

A    I don't know.

BY ATTORNEY KNOWLTON:

Q    Did you read his deposition?

A    I did not.

BY ATTORNEY MOTLEY:

Q    All right.  So let's -- did Dominick Ratkowski tell you
     where my picture came from?

A    He told me something to the effect that he got it off
     the internet.

Q    Okay.  Did Dominick Ratkowski tell you where he got my
     home address from?

A    He did not.

Q    Let's go to Page 6 -- sorry.  Seven is what you just
     referred to.

A    Okay.

Q    Sorry.

A    So 7 is the page with your picture on it, not six the
     one before?

Q    No, forget about six.  Let's go to Page 11 with the
     picture of William Lofton.  Why wasn't William Lofton's
     picture redacted?

A    That's a Wauwatosa Police Department booking photo which
     I'm not required to redact.  We don't run secret jails.

Q    Okay.  Let's turn the page.  David Bowen, why wasn't his
     picture redacted?

A    Again, I was informed that it was an open source photo.

Q    Who informed you?

A    Dominick.

Q    Did he sign an affidavit to this effect?

A    No.

Q    Do you believe him?

A    That he got it from an open source?

Q    Yes.

A    Yes.

Q    Okay.  Why?

A    I don't know how to answer that.

Q    How long have you worked with him?

A    Since the day he started.

Q    You work closely with him?

A    No.

Q    Do you see him every time you go to work?

A    Yeah, if he's there, yes.

Q    Have you ever asked him to, you know, look up anybody
     driver's license records?

A    Me, no.

Q    Okay.  Do you know if anyone has ever asked him to look
     up anybody's driver's license records?

A    I don't know.

Q    Okay.  Let's just continue down.  Jeremy "Hippy"
     Henderson.  Why was his photo not redacted?

A     That's a Wauwatosa Police Department booking photograph.

Q     And you guys don't run secret jails?

A     Correct.

Q     All right.  We're just going to go to every picture so
      if you can... with regards to Devante White, Elijah
      Cosey, C-O-S-E-Y --

A     Can I stop you?  Devante White, D-E-V-A-N-T-E, White,
      conventional spelling, that is a department of
      corrections photo available to anybody on the internet.

Q     Okay.  So that's why you didn't redact that?

A     Correct.

Q     So Elijah Cosey, same question?

A     That is a Wauwatosa Police Department booking
      photograph.

Q     Payton Huff?

A     Wauwatosa Police Department booking photograph.

Q     Deanna McKenzie.

A     Wauwatosa Police Department booking photograph.

Q     Whitney Roberson.

A     Again, Wauwatosa PD -- Wauwatosa Police Department
      booking photograph.

Q     Gilbert Lesky, L-E-S-K-Y.

A     Wauwatosa Police Department booking photograph.

Q     Do you have any e-mails in your possession that refer to
      or about the protester list?

A    Not currently here, no.

Q    Not in this room, but in your e-mail, do you have any
     e-mails that refer to about the protester list or the
     protester photos?

A    I have e-mails, that are not my e-mails, but I have
     copies of those e-mails referring to the protests list,
     yes.

Q    And were you cc'd on those e-mails?

A    No.

Q    Okay.  How did you get those e-mails?

A    I requested them.

Q    How did you -- who did you request them from?

A    The IT director for the City of Wauwatosa.

Q    When did you request those?

A    I'd have to look to be exact.

Q    Was it this month, July, 2021?

A    Again, I would have to look to be exact.

Q    Do you know how many e-mails that you received?

A    As I sit here today, I believe 29.

Q    Okay.  Did you hand those e-mails over to your counsel?

A    I did provide counsel a copy.

Q    When did you do that?

A    I would have to look.

Q    Was it within the month of July, 2021?

A    Yes.

Q    Okay.  Prior to you coming today, had anyone informed
     you that you needed to preserve any evidence in relation
     to protesting, the curfew in Wauwatosa of, 2020?  Did
     anyone inform you of that?

A    Yes.

Q    Who is that?

A    You.

Q    When?

A    Numerous times.  A number of documents.

Q    Directly to you?

A    To the police department delivered to me because it was
     my responsibility.

Q    Okay.  Thank you.  Did you get any e-mails, attachments
     to e-mails, texts correspondence, communications to or
     from any federal agencies or agents with the FBI, the
     U.S. attorney's office --

               ATTORNEY BAYNARD:  I was going to object to
     the question --

     BY ATTORNEY MOTLEY:

Q    So this is what I want to do.  Because I don't want to
     have to do what we just did.  So I'm going to ask you
     the same question and then I'm going to ask for each
     individual agency.

A    Okay.

Q    Because I don't want to repeat the same question.  So

this is the question that will refer to each individual
agency one by one.

Have you received any e-mails, attachment to
e-mails, texts correspondences, communications to or
from any of the agencies --

A    Can you provide some sort of timeframe?

Q    Yeah, I'll do that too.

-- which you sent, received or have in your
possession that refer to or about protesting and/or
about curfews from May 25th, 2020, through the
present?  Do you understand that question so far?  Do
you want me to repeat it?  I know it's a big question.
I know.

A    Yes, please repeat it.

Q    Okay.  Have you received any e-mails, attachment to
e-mails, texts correspondences, communication that you
have either sent, received or have in your position that
refer to or are about protesting and about -- and/or are
about curfew from May 25th, 2020, to the present from
the FBI, to or from the FBI any of these things?

A    I don't know how I'm going to be able to best and most
truthfully answer this question.  I received e-mails
routinely and it's rather easy to verify so I don't
know.  I know that I have seen e-mails to members of the
Federal Bureau of Investigation.  There is no singular

FBI.  There are people who worked there.  I have seen e-mails to those people.  I do not recall that I ever sent any or received them.

Q    Do you recall if you have ever been cc'd on any of these e-mails?

A    I don't recall.

Q    Or any communication?

A    I don't recall.

Q    Same question as it relates to the U.S. attorney's office about, they referred to or about protesting and/or curfew from May 25th, 2020, to the present?

A    I don't recall.

Q    Okay.  Same question U.S. Marshals?

A    I don't recall.

Q    Same question the CIA?

A    No.

Q    Same question the Department of Homeland Security?

A    I have been cc'd on e-mails from affiliates of the Department of Homeland Security.

Q    Did you turn those e-mails over to your counsel?

A    Yes.

Q    When did you do that?

A    I don't recall.

Q    Would it have been sometime in July of, 2021?

A    Yes.

Q    Do you know how many e-mails those were?

A    I don't.

Q    Same question, the Department of Homeland Security --
     oh, I'm sorry.  The FAA?

A    I don't recall.

Q    Same question, the Immigration and Customs Enforcement
     officers?

A    I don't recall.

Q    Same question the State or Federal National Guard?

A    Yes.  I have been on cc'd and on e-mails in
     correspondence with the State National Guard.  Yes.

Q    Did you turn those e-mails over to your counsel?

A    Yes.

Q    Do you know how many e-mails there were?

A    I do not.

Q    Do you know when you turned those e-mails over?

A    That i don't.

Q    Was that in July, 2021?

A    I believe it was before that, but I don't have the exact
     date.

Q    Okay.  Same question to any local law enforcement
     agency?

A    Yes.

Q    Which agency?

A    I don't -- wouldn't be able to tell you, specifically,

right now which ones.

Q    Do you know how many e-mails?

A    I do not.

Q    Is it more than ten?

A    I can't even begin to guess.

Q    Is it a lot?

A    Most likely.

Q    Okay.  Have you turned those e-mails over to your counsel?

A    Yes.

Q    When did you do that?

A    I don't recall.

Q    Okay.

A    It was before July of, 2021.

Q    Okay.  Do you have -- same question, as it relates to Dominick Ratkowski?

A    Do I have e-mails from or communications with Dominick Ratkowski?

Q    And this is not just e-mail.  This is e-mails, text messages and communications from May 25th, 2020, to present about curfews or about protesting?

A    Yes.

Q    Do you know how many e-mails?

A    I don't.

Q    Did you turn those over to your counsel?

```
A    I did.

Q    When did you do that?

A    I don't recall.

Q    Same question, Barry Webber.

A    Yes.

Q    Do you know how many e-mails?

A    I don't.

Q    How many text messages?

A    No.

Q    Any text messages?

A    Not that I recall.

Q    Did you turn those e-mails over to your counsel?

A    I did.

Q    Do you know when?

A    I don't.

Q    Any Wauwatosa police officers?

A    Are you asking me if we have e-mailed each other?

Q    Yes.  Or you've been cc'd.

A    Sure.

Q    Okay.  And -- and, again, this is about any e-mails in
     your possession or e-mails, communications, text
     messages that refer to or are about protesting and
     curfews from May 25th, 2020, to present.

A    Yes.

Q    Okay.  So Wauwatosa police officers is an obvious yes?
```

A    Yes.

Q    There are numerous e-mails and text messages?

A    E-mails.

Q    Is there numerous text messages?

A    Not directly that I can recall about protesting.

Q    What about curfew?

A    I do not that I recall.

Q    Did you turn all of those e-mails to your counsel?

A    I did.

Q    When did you do that?

A    I can't tell you.  I don't recall.

Q    Was it July, 2021?

A    No.

Q    Before?

A    Before.

Q    Okay.  Was it this year?

A    Well, your time period goes into this year so, I
     believe, it an ongoing thing.  I know they have been
     turned over.  I don't recall when.

Q    Okay.  Same question as it relates to James Archambo?

A    I don't recall if I have been cc'd on e-mails from
     Mr. Archambo or not.

Q    Okay.  Were you part of the planning for the protests of
     October 7th through the 12th curfew?

A    Not the action planning, no.

Q    Did you receive e-mails about that from James Archambo
     or anybody?

A    I don't recall receiving any from Mr. Archambo directly.
     Not to say that I didn't, but I don't recall.

Q    Okay.  Same question Dennis McBride.

A    I did not.  But I -- if I was cc'd on some with the
     Mayor, I don't recall.

Q    Same question with -- with any Wauwatosa Common Council
     member?

A    I don't recall.

Q    Same question for members of the PFC.

A    I don't recall if I was or not.  I don't recall.

Q    Same question any federal agencies.

A    Like federal law enforcement agency?

Q    No.  Any federal agencies.  Any federal agencies.

A    I don't recall.

Q    Okay.  Sorry, I'm going to say this a lot, but I'm just
     going through each one.

            Same question, any private business
     entities.

A    I don't recall if I was ever cc'd on an e-mail from any
     private business entity.

Q    Same question for any owners of Mayfair Mall?

A    I don't recall.

Q    Any owners of the CVMIC building?

A    I don't recall.

Q    Do you have any e-mails or attachment e-mails received from May 25th, 2020, through the present regarding the following; protesting in the City of Wauwatosa from June 1st, 2020, through the present?

A    What's an attachment e-mail?

Q    Like if someone sent you an e-mail and they like attach the operational plan.  That means like -- we are talking about metadata.  So the actual e-mail and any attachments added to that e-mail?

A    What's metadata?

Q    That's the actual e-mail not -- not what when you create it into a .pdf file.  The raw e-mail is a metadata for that e-mail?

A    Okay.  Thank you.  Can I -- you repeat the question again?

Q    No problem.  Did you have any e-mails or attachments to e-mails that were sent to or from -- or that you received from May 25th, 2020, through the present regarding the following; protesting the City of Wauwatosa June 1, 2020, through the present?

A    I'm sure I do.

Q    Did you turn all those over to your counsel?

A    Yes.

Q    When did you do that?

A    I don't recall.

Q    Was it in July, 2021?

A    I want to say it was before that, but I don't recall.

Q    What about anything regarding -- regarding law
     enforcement operations in regards of October 7th through
     the 12th, 2020, curfew in Wauwatosa?

A    Yes, I received e-mails in regards to that.

Q    Did you turn all those e-mails over?

A    I did.

Q    Do you recall when you did that?

A    I don't.

Q    Do you recall receiving any known -- any -- did you turn
     over any and all e-mails that mention or refer to the
     following persons in search terms?  Did you turn over
     all the e-mails that either mentioned or referred to the
     following search terms?  And we'll go through each
     search term.

A    Can I assume these search terms you provided to me?

Q    Yes.  In the notice of -- yes.

A    Thank you.

Q    In the notice of -- sorry.  I am just reading out.  If I
     had it printed out, I would give it to you but I don't.
              Kathryn Knowlton?

A    Yes.  They were turned over.

Q    Okay.  Do you recall how many e-mails where there?

A   I don't.

Q   Dana McCormick?

A   I don't recall if there were specific e-mails for
    Attorney Knowlton or Ms. McCormick.  But all those
    e-mails based on your search terms that you're going to
    go through I have turned over to counsel.

Q   Great.  Do you recall when you did that?

A   I do not recall.  There's been various.

Q   Was it July, 2021?

A   I believe it was before that.

Q   Okay.  Let's see.  Did you turn over any and all
    reports, notes, e-mails, messages with regards -- that
    referred to or are about any forms of force used by any
    law enforcement against anyone from May 25th, 2020,
    through October 13th, 2020.

A   Are you asking if I turned over use of force documents
    from May 25th?  I don't understand that.

Q   Did you -- I'm looking at request No. 9?

A   Okay.

            ATTORNEY BAYNARD:  Is it this?

            ATTORNEY MOTLEY:  Yeah.

            ATTORNEY BAYNARD:  I have two of them, if you
    want.

            ATTORNEY MOTLEY:  Sorry.  Thank you.  Well,
    actually, I'm going to let you look at it.  Oh, you got

it.

ATTORNEY BAYNARD:  I didn't know if this was -- if you had an amended one or not.  This is from the 20th.  Is this the one you're --

ATTORNEY MOTLEY:  Yeah, that's the one I'm looking at.

ATTORNEY KNOWLTON:  The 20th of what?

ATTORNEY BAYNARD:  I'm sorry.  July.

ATTORNEY MOTLEY:  July 20.

BY ATTORNEY MOTLEY:

Q    So if you look at No. 9 where we've asked you to turn over any and all reports, notes, e-mails, messages in any form which refer to or are about any forms of force used by any law enforcement against anyone from May 25th, 2020, through October 13th, 2020?

A    I have never seen this document.  It's my first time seeing this document.  So I'm not sure what 'used by any law enforcement' means.  So I don't know how to answer that question.

Q    Okay.  But you have never been asked to turn over No. 9?

A    Number 9, as it's written here, I have never seen this document.

Q    Okay.  Well have you -- thank you.

ATTORNEY MOTLEY:  Do you have any questions?

BY ATTORNEY KNOWLTON:

Q   You said you were not involved in any of the action
    planning for the curfew time period of October 7th?
A   Right.
Q   Were you involved in any other planning for that time?
A   I was involved in station security planning and other
    support functions.
Q   Okay.  Gotcha ya.  Yeah.  And just to be clear in terms
    of Attorney Motley asking about any law enforcement.
            So there were multiple partners, law
    enforcement cooperating agencies in the enforcement of
    the curfew of October 7th through the 13th, correct?
A   Correct.
Q   And would -- would Wauwatosa have been the recipient or
    the administrative keeper of any reports made by any of
    those cooperating agencies in that duration of time?
A   Not necessarily.
Q   Okay.  Could you --
A   If -- if they sent them to us, then we would have them
    otherwise each agency maintains their own reports.
Q   Okay.  So if a protester, as part of the Wauwatosa
    event -- Wauwatosa was commanding the operations,
    correct?
A   Correct.
Q   Okay.  But if a cooperating agency such as West Allis
    picked up a protester or, I guess, given a protester to

transport and they took them to the West Allis Police
Department, would that have been the end of what
Wauwatosa would have received about that arrest?

A   No. Because any arrest that was made was processed by a
Wauwatosa Police Officer.  So we wrote reports.

Q   Okay.

A   What I wouldn't have is if they wrote any ancillary
report or some sort of supporting report, I wouldn't
necessarily have those reports.

Q   Okay.  So Wauwatosa personnel, police officer, was
actually with, if they were taken to a different
location, a Wauwatosa police officer would have been at
that location?

A   Yes.

Q   And done the processing?

A   Yes.

Q   Got it.  So, if there had been any force reports that
would have been captured by Wauwatosa during that
duration?

A   At some point, somebody would have been aware of that.
Yes.

Q   Okay.  And ancillary reports then you are saying if West
Allis wanted to keep their own internal documents that's
up to them and you wouldn't have any knowledge --

A   Correct.

Q    -- or control of that?

A    Correct.  No knowledge or control of that.  No.

Q    Okay.  Would that be typical though?

A    It depends.  I know that sometimes if we support other
     agencies we'll create a short report just documenting
     that on the date and time we supported other agencies.
     It's more of a record-keeping type issue --

Q    Right.  So --

A    -- whether they did or did not I know.

Q    Right.  And that's important and you're the -- you know,
     you're the administrative expert in that.  That's
     important because there's time considerations, right?
     You are expending time and resources in your cooperation
     to another agency.  You want to make a record of, you
     know, officer so and so and so and so spent their, you
     know, six hours of their shift helping this other
     agency, correct?

A    You would think.  I don't know that that's standard
     common practice, but we would --

Q    But you do it?

A    I -- yes, we would.

Q    Okay.  Okay.  You -- sorry.  You said in terms of the
     people that you supervise -- and those are civilians?

A    Yes.

Q    Admin support?

A     Yes.

Q     Okay.  And also dispatch?

A     Yes.

Q     And dispatch has the CIB training, correct?

A     Yes.

Q     Okay.  And so do all of your civilians have CIB
      training?

A     Not all.  It's job specific.

Q     Okay.  Have you ever directly supervised, you might have
      answered this before, Dominick Ratkowski?

A     No.

Q     Okay.  Sorry.  That's all I have.
      BY ATTORNEY MOTLEY:

Q     Let's see.  Does the WPD utilize any malware?

A     Can you rephase it?  I don't understand what you're
      asking.

Q     Does the Wauwatosa Police Department utilize any malware
      program?

A     Such as antivirus program?  I'm sure our city network
      does.

Q     Does the Wauwatosa Police Department use -- utilize any
      malware programs for the purposes of investigating
      protesters in, 2020?

A     I don't know what you're asking me.

Q     Well, I mean is there -- has there been any software

that has been used to survey, target or focus on any people that are protesting in the City of Wauwatosa in, 2020?

A     Again, define software.

Q     Well, I mean like --

A     Because software and malware are two very different things.

Q     Right.

A     So.

Q     Right.  Well, i mean let's just -- let me just ask you straight out.  Is Wauwatosa Police Department surveying or targeting people that were protesting for police reform or on behalf of the three families Alvin Cole, Jay Anderson and Antonio Gonzalez families?

A     No, not to my knowledge.

Q     Okay.  Do you consider this protester list a form of surveillance by the Wauwatosa Police Department?

A     No.

Q     What do you consider this list to be?

A     A list.

Q     When it's given to the FBI, then what does the list become?

A     A list.

Q     A list of what?

A     People involved in incidents.

Q    What incident was I involved in?

A    I saw you one time.  You probably don't remember me, but
     I saw you on the line.  I don't remember the date or the
     time, but you were out there.  You were the first
     person.  You were the front of the line.

Q    Was I protesting?

A    I don't remember what you were doing.

Q    Was I helping?

A    I have no idea.

Q    Were you guys walking back as I was walking forward?

A    I do not recall.

Q    But, again, me being there, does that make it
     appropriate to put me on this list?

A    That's an opinion question.  I have no opinion.

Q    Okay.  So why was this list given to the FBI?

A    I -- I don't know.

Q    Have you ever seen Mayor Dennis McBride protest --
     participate in protests?

A    I have never seen him, no.

Q    Have you ever seen former older woman Heather Kuhl
     participate in protests?

A    I don't believe I have never seen Alderperson Kuhl.

Q    Have you ever seen State Representative Robyn Vining
     participate in protests?

A    I don't believe so.

Q    Have you ever seen Sheriff David Clarke participate in
     protests?

A    I don't believe so.

Q    What do you think about what happened at the failed
     insurrection of the U.S Capitol?  What do you think
     about that?

A    I have no opinion.

Q    You think that was a good thing?

A    I have no opinion.

Q    Were you there?

A    No.

Q    Do you know anyone that was there?

A    Not to the best of my knowledge.

Q    Do you know if anyone within the Wauwatosa Police
     Department was off of work that day?

A    Well, yes there were people off work that day.

Q    Who?

A    I don't know.

Q    Okay.  How do you know for certain?

A    Because we work rotating shifts.  People have days off.

Q    Okay.  But it wasn't anything that raised your eyebrow?

A    No.

Q    Just so people are on, some people are off?

A    Correct.

Q    Okay.  For the curfew between October 7th through the

12th, did you work everyday during that curfew?

A    I did.

Q    What is your normal working hours?

A    Generally, I work 8:00 a.m. to 4:00 p.m. Monday through
     Friday.

Q    So for that week October 7th through the 12th, what was
     your working schedule?

A    As we discussed earlier in this very room, I worked
     4:00 p.m. until we were done.  It varied between
     midnight and 4:00 a.m., is about the latest I recall
     leaving.

Q    As we discussed in this very room, did you start work at
     8:00 a.m. on any of those days?

A    No.

Q    Who told you -- who changed your shift during that time
     period?

A    Captain Vetter.

Q    Okay.  Why?

A    He wanted assistance in the command post.

Q    Okay.  So you're working eight hour shifts during that
     week?

A    No.

Q    How long were your shifts?

A    Well, they varied between eight and 12 hours.

Q    Okay.  So for that week, were you working a 40-hour work

week or you were working more than 40 hours that week?

A    I worked more than 40 hours that week.

Q    Did you get any overtime?

A    No.

Q    Okay.  Why not?

A    Because I'm exempt.

Q    Why?

A    I'm salaried.

Q    Okay.  Interesting.  That sucks.  What I want to show
     you is -- I need this to be marked at, I guess, Exhibit
     3, please.

                 (Random discussion)

            So I'm sorry to have you explain what probably
     are mundane processes for you, but we are trying to
     understand how this works within the Wauwatosa Police
     Department.

            So what I have given to you is what's been
     marked as Exhibit No. 3 which is an incident report
     date of report of November 18th, 2020, regarding the
     arrest of Kathryn Knowlton.

            Do you recall seeing this document before?

A    Yes.

Q    Okay.  And with this document, when someone is
     arrested -- well, let's just say -- let's just use
     Attorney Knowlton as an example.

A    Okay.

Q    Someone gets arrested -- she was arrested and then
     she's -- if a person is -- let's just not her as an
     example.  But if a person is arrested, and then they are
     taken to the Wauwatosa Police Department on a
     noncriminal civil forfeiture and they're there, how does
     that translate to getting on this piece of paper?

A    Okay.  So if we arrest an individual for a municipal
     violation, a noncriminal violation where forfeiture
     would be the penalty, we will -- we have options.  We --
     I assume what you're asking for, based on your
     questions.  We'll take somebody into custody.  We will
     transport them to the Wauwatosa Police Department where
     we will take their handcuffs off, conduct a search
     incident to arrest.  We would then, in our booking room
     area we have some chairs, computer.  The officer making
     the arrest or an officer assisting with the arrest would
     get some -- gather some basic biographical information
     from the arrestee.

Q    Can I just -- what types of biological information would
     they, typically, try to get from the arrestees?

A    Name, date of birth, address, phone number, social
     security number, sometimes a place of work, that kind
     of -- where they were born that kind of biographical
     information.

Q    Okay.  So -- sorry.  I cut you off. Go ahead.

A    So then that officer would enter that information into
     the report management system we talked about.  A --
     generally, a booking photograph is taken, again, through
     the report management system.  At that point, again,
     depending on the crime and the situation, a set of
     fingerprints would be rolled.  They're digital.  There
     is no ink.  The officer would then open up a separate
     software system and create that municipal citation which
     would be printed out, provided to the arrestee,
     explained and then the arrestee would be released from
     the station, provided a ride, allowed to be picked up,
     would be released from custody.

Q    Okay.  Thank you.

A    Then the officer -- and then how it gets to here.

Q    Yes.

A    So then the officer will at some point go back and
     create an incident report, as you can see the top here
     an incident report.  And the officer will -- will put in
     the information and the date and time and the location,
     the complainant, a short summary of what happened and
     then would write what happened.  And the narrative is
     this officer's account of what this officer did, saw,
     observed in this incident.  And this report would get
     submitted to a supervisor who would read, review the

report -- reports.  If the report was complete, it would
be approved.  If it was not, it could be sent back for
more information.  If there were, generally,
typographical errors, that kind of stuff, they could be
corrected.  And then once approved, it stays in our
report management until needed.

Q    Thank you.  So I want to point out certain things.
Okay.  If you look at page one on the bottom it says,
"6438 payroll number," what does that mean?

A    That is the -- that is how we differentiate between
employees.  We have -- our payroll numbers are how we
differentiate between employees.

Q    Okay.  So every employee has a payroll number that --

A    A unique payroll number, correct.

Q    That stays with them throughout their employment?

A    Correct.

Q    If we can please go to Page 3.  So with regards to --
when a person is arrested, do you guys have a weight
scale?

A    No.

Q    Okay.  So is this when officers go into get the DMV
records to get this type of information like height,
weight, hair color, eye color?

A    You can.  Otherwise, if the person is cooperative you
can just ask them, "Hey, how tall are you or how much do

you weigh?"

Q    How easy is it for you to ask a woman how much she
     weighs if she's arrested?

A    You are asking for an opinion there, Attorney Motley.  I
     can tell you it's not easy.  Otherwise, it can come off
     of DOT.  Sure.

Q    Does it, typically, come off of DOT for people that
     aren't willing to answer questions?

A    Yes.

Q    Okay.  And in terms of -- like if someone is
     uncooperative --  well, is not willing to answer
     questions in terms of giving their address or phone
     numbers, is this when you guys would go to the DMV
     records to get this information?

A    Correct.  We would have to do our best to verify the
     information.  But if we were certain about the
     identification of the individual, an officer could enter
     a DOT address, last known address type of thing, yes.

Q    Okay.  And how do you get that booking number?

A    It's auto-generated by the system.

Q    Okay.  And how do you get the incident report number?
     Is that also -- it's the same number -- oh, no, it's
     not.

A    No, it's not.

Q    Sorry.

A   The case number should be the same, you know, it's the
    top left-hand corner you see there 20-018531.  The
    booking number is auto-generated by the report
    management system.  When there is a booking entry
    created the system assigns it a number.  And it shows
    that, in this case.  We're looking at this document from
    when Attorney Knowlton was arrested.  That booking
    number, once her name was entered into the arrest entry
    module, that number was created by the system.  What it
    then shows is that Attorney Knowlton was arrested under
    case -- that same case, 20-018531.  The charge, that's
    the municipal ordinance that was violated, short
    description and Ct is count on the counts.  One count in
    this case.

Q   Okay.  If Dominick Ratkowski had received this document
    and gave this to a journalist not redacting anything,
    would that be appropriate?

A   It would.

Q   Why?

A   Because the City of Wauwatosa operates under the thought
    that -- that a journalists, much like attorneys, get
    un-redacted information.

Q   Even if it's people's home addresses?

A   Correct.

Q   Okay.  Well, why is that a different philosophy compared

to how you redacted the protester list?  You redacted
the home addresses on the protester list and you're
saying that if Dominick gave this document and did not
redact the home address, then that's okay.

A    To members of the, credential members of the media,
because that falls on members of the media to not
release that information.  They have their own ethics
that they need to abide by.  And in the past when I've
gone to Attorney Kesner about that and in this case it
was decided that based on the fact that -- that
information would likely be released that it was best to
redact it.

Q    For the protester list?

A    Correct.

Q    But not for an actual arrest?

A    Correct.

Q    Does that make sense to you?

A    It does.

Q    Why?

A    We don't run secret jails.

Q    What do that have to do with anything?  But you're
releasing information?

A    This is an actual arrest.  This is an arrest report.
This indicates an individual that was arrested for a
violation.  That's one thing.  I don't know where this

information came from --

Q    Right.

A    -- but it's not an arrest.  It's different.

Q    Would it have been appropriate for Dominick Ratkowski to
     have given this information to a member of the public
     that's not a media person in the media un-redacted?

A    A general, just a general inquiry from the public?

Q    Yeah.  Just a citizen.  Just a U.S citizen who asks for
     all the arrest records?

A    If that person was -- arrest records --

Q    Or asked for this incident report?

A    Generally, then private information be redacted.  In
     this case if Attorney Knowlton requested the report
     because -- well, let's -- let's take the fact out for a
     second that you're an attorney.  If Kathryn Knowlton had
     requested this report, we would redact out Dana
     McCormick's information, but leave in her own
     information.  We would ask that she provide IDs so we
     could verify it's her.  We would just redact out all the
     other information.  The same as if Dana McCormick
     requested this Kathryn Knowlton's information would be
     redacted out.  A defense attorney or something like that
     would receive an un-redacted report.  So that's how that
     works.

Q    What is the media credential process for the City of

Wauwatosa?

A    I do not know.

Q    So why is it that you are testifying that Dominick
     Ratkowski could release an un-redacted version of this
     to a credentialed media person, but you have no media
     credentialing process?

A    Correct.

Q    Yeah.

A    I don't know.

Q    So pretty much you just say you are part of the media
     then you guys just give this to them un-redacted.  It's
     fine.

A    I would hope that is not the case, but it has been in
     the past.

Q    But if you're a private citizen, that's not a media
     person and is not an attorney.  As a private citizen
     they are required to come to the Wauwatosa Police
     Department or show you some type of identification to
     verify who they are and then you would give them a
     redacted version of this; is that accurate?

A    Correct.

Q    Okay.  And what would happen if Dominick had given this
     to a private, you know, individual without verifying who
     they were; what's the consequence to that?

A    I don't know.  We'd have to look.

Q    What do you think the consequence should be?

A    You're asking for an opinion and I don't have one.

Q    Okay.

          ATTORNEY KNOWLTON:  Can I ask --

          ATTORNEY MOTLEY:  Go ahead.

          ATTORNEY KNOWLTON:  Well, just because that
     question...

     BY ATTORNEY KNOWLTON:

Q    What do you mean?  Where would you look?  When she's
     asking about consequences, where would you look?

A    We would have to conduct an investigation, determine
     whether a rule or regulation or policy and procedures
     was broken and then refer to the discipline policy to
     see what potential ramifications there might be.

Q    So there are policies and rules about release of
     information for the WPD?

A    Yes.

Q    Your own internal one?

A    Internal.

Q    Okay.  Could we have those?

A    They are online.

Q    Okay.  Perfect.  Great.

A    They are always online.

Q    Okay.

     ATTORNEY MOTLEY:

Q    What are the names of them?

A    We have to look to see.

     BY ATTORNEY KNOWLTON:

Q    Okay.  Are there any other rules that you follow or
     rules that you look to in order to create your rules?

A    I'm not sure how to answer that.  No.  I don't believe
     so.  When we write policies on occasion we will look for
     outside information.  But I know when I have written
     policy I have looked for outside information just to
     make sure the policy is the most up-to-date it can be.

Q    So did you look at other police department's examples?

A    Correct.

Q    Did you look at any of the Wisconsin Statutes?

A    Yes.

Q    Which statutes?

A    There are statutes that define which policies a police
     agency must have.

Q    Right.

A    I don't have the statute in front me.

Q    That's okay.

A    But, yes, we would refer to the statute if the policy --
     if the statute required a policy to be created, we would
     refer to the statute.

Q    So, I guess, I'm looking at this as -- as probably open
     records.  You -- you -- are you aware of open records

statutes?

A    Yes.

Q    Okay.  So did that inform your policy --

A    Yes.

Q    -- creation?

A    Yes.

Q    Okay.  Got it.

A    And all of our policies and procedures are available to
the public on Wauwatosa.net.

Q    So don't make a request is what you're saying?

A    You can.  I'm going to send you the link.

Q    All right.  All right.

A    Some of the ancillary ones we're working on updating.

            ATTORNEY MOTLEY:  You done?

            ATTORNEY KNOWLTON:  Yeah, sorry.

            ATTORNEY MOTLEY:  Okay.

BY ATTORNEY MOTLEY:

Q    SO I'm looking at Wauwatosa.net and I see your open
record's request, Policy No. 20-08 that was the
effective July 7th, 2020.  Is that the policy you're
referring to?

A    That's one of them, yes.

Q    And this was prepared by Lieutenant Gabrish and also
you?

A    Yes.

Q    And are all your policies that you wrote in, 2020, did
     they all have to be approved by Chief Webber?

A    Policies, yes.  We have operating procedures in there as
     well.  Those can be approved by a Captain.

Q    So this particular policy, open-records policy, this
     would have had to been approved by Chief Webber?

A    His signature block should by at the top.  It will say
     who the authority is.

Q    Okay.  So whenever it says "authority," that means that
     that's who approved the policy?

A    Correct.

Q    So here it says, "authority, Chief Barry Webber," so he
     approved this?

A    Correct.

Q    Now, according to this policy, this policy says that
     highly restrictive information needs to be redacted; are
     you aware of that?

A    Yes.

Q    What's "highly restrictive information"?

A    Is there a definition in there.  I'd have to review the
     policy to see what it says.

Q    Sorry.  Personal information or highly restricted
     information obtained from DMV records may not be
     disclosed except when permission by state law?

A    Okay.

Q    Do you know if Dominick Ratkowski had the permission of
     anyone who received a ticket for violating curfew in
     Wauwatosa from October 7th to 12th of 2020, to release
     that record to anybody?

A    I don't know.

Q    Typically, how would the Wauwatosa Police Department get
     permission from people to release records?  How would he
     get -- how would Dominick need to get permission to
     release records to the public?

A    The permission isn't always required to release
     information.  That would be a records clerk or myself or
     my sergeant to determine what can and can't be released.
     We have people that handle that information that, that
     release of information.  I don't know how Dominick
     released anything or why or if he did.

Q    If one of your civilian clerks who is not a law
     enforcement officer released information -- released
     this record without your approval, would that be
     appropriate?

A    If it's within the scope of their duties, yes.

Q    So give me an example of when that would be within the
     scope of their duties?

A    When they get a record's request for the record, it's up
     to them to determine what, if anything, needs to be
     redacted out from those redactions and submit it or

reply with it.

Q    Okay.  And so they would reply directly to the open
     requester?

A    In most cases, yes.

Q    How come I've never received documents directly from
     your civilian?

A    Because documents -- so the civilians handles the front
     of the house, what I describe as the front of the house,
     they handle police reports like this.  They handle
     crashes, they handle that type of routine law
     enforcement matter type documentation.  In more
     complicated longer, more drawn out type things where
     other records, say personnel records or internal
     information are requested that then comes to me or my
     sergeant to do.

Q    So what are the consequences of, for instance, a
     Wauwatosa police officer released un-redacted
     information to a private citizen?

A    Again, we have a progressive discipline policy.  We
     would have to figure out which rule was violated, to
     what extent and then it would be up to the chief of
     police to determine what punishment, if any, was doled
     out.

Q    What would you think the punishment should be?

A    I have no opinion on that.

Q    Okay.  If someone released your home address to the
     public and to media, would that be okay for them to do?
A    Depends on the circumstances.
Q    So if I open record the Wauwatosa Police Department
     today and say, "I want Lieutenant Roy's home address,
     his home phone number, his driver's license number, his
     weight, eye color, date of birth", can I get that
     information un-redacted as an attorney?
A    Not likely.
Q    Why not?
A    Because we -- we withhold that information for the
     safety of our officers.
Q    Okay.  But you don't think it's important to withhold
     that information for the safety of the public?
A    I don't know what you're asking me, Ma'am.
Q    Well, what I am trying to understand --
               ATTORNEY MOTLEY:  Go ahead.
     BY ATTORNEY KNOWLTON:
Q    Yeah, let me try to make this concrete.  So this is
     mine.  Right?
A    Mm-hmm.
Q    We have now acknowledged it's Exhibit whatever number.
               Do you know what I do for a living?
A    I'm going to assume you're an attorney, but that's on
     assumption.

Q    I appreciate -- well, maybe I don't appreciate the
     assumption.

A    I didn't mean anything by it.

Q    No, I know.  I have been an attorney since 2000.  Do you
     know what kind of attorney I am?

A    I read on here that Knowlton Law Group specializes in
     divorce care.

Q    Yeah.  And this actually, the previous deponent actually
     took out there.  I didn't have this on the table.  But
     okay.  But if you look, actually, at the last line on,
     there you could you see what -- what else I specialize
     in?

A    Employees and victims of crime.

Q    Employment and victims of crime.

A    It says, employees.

Q    Yes, employees.  Right.  So yeah, I'm a litigator and
     that's what I do.  And the -- this officer, the
     reporting officer on the bottom, Andrew Floryance.

A    Yes, Ma'am.

Q    Would that have been a person inputting on the computer
     while we were in the booking room?

A    That -- not necessarily.  That was a person that wrote
     and created this report.

Q    Okay.  So the person who was in the booking room making
     the citation that would be a different person?

A    It could or could not be.  I can't tell from this who
     booked you.

Q    Okay.  Oh, that's weird.  You can't tell who booked me?

A    No, Ma'am.

Q    That seems a little bit odd, doesn't it?

A    Not from a report.  If I had my computer, I could pull
     up that booking number and then tell you who booked you.

Q    Oh, okay.  So it's kept somewhere just not on this
     document?

A    Correct.

Q    Okay.  The reason I raise that is when we had a
     conversation this person who was in the booking room,
     and I don't remember his name, but he told me he went to
     Wauwatosa West High School long ago and the kind of work
     that I do, especially, with victims of crime.

          The reason that I bring this up is because
     the police department on that night was informed that
     I was, actually, working on a case with the FBI on a
     human trafficking case where I was representing the
     victims.  And so the defendant in those cases, so
     traffickers who like to kill and be mad at people
     don't like me very much.  Okay.  So -- and your
     officers knew that.  We had an extensive conversation.
     In fact both of -- both of the officers commented on
     that and the FBI agents who were there.  We had a

conversation about FBI agent who I had been working with named Agent Brian Austin.  I'm not sure if you are familiar with him.  But could you see why that would be disconcerting then for me to know that, you know, my home address is -- is available when that's not something I make publicly available?  I'm not on social media at all, exactly, because of the work that I do.

        ATTORNEY BAYNARD:  Objection to the form of the question.  Go ahead, if you can.

BY ATTORNEY KNOWLTON:

Q    So I am -- just from a concrete standpoint do you understand why that would be disconcerting for me?

A    I understand.

Q    Okay.

BY ATTORNEY MOTLEY:

Q    So are police entitled to more protection than the public when you are releasing information?

A    "More protection from the public," could you be more specific?

Q    Are police entitled to more protection from law enforcement officers, than Attorney Knowlton is entitled to as a citizen of the City of Wauwatosa in releasing personal information to the public?

A    Yes.  Police officers' home addresses and biographical

information needs to be protected.  We are doing our
job.  We don't want to be attacked in our homes.  I
wouldn't want anybody attacked at their home, but it
needs to be protected.

Q    So you think Attorney Knowlton wants to be attacked in
her home?

A    Again, I'm going to assume no, she does not want to be
attacked.

Q    So why is your home more important to protect than her
home is to protect?

          ATTORNEY BAYNARD:  Objection to the form of
the question.  Go ahead.

A    I didn't say that.  I don't believe it is.

Q    So when we ask you, as it comes -- as it relates to your
home address that you believe that should be redacted?

A    Correct.

Q    And when it comes to Attorney Knowlton's home address,
you believe that should not be redacted?

A    Attorney Knowlton was arrested for a violation of a
municipal ordinance based on those actions certain
information becomes public information.

Q    Certain information.  Her home information -- her home
address?

A    Generally, a home address.  Again, to the public, we
would not expect it to go to the public.  I would have

expected it to go to her.  As I said, if Ms. McCormick

requested this Attorney Knowlton information would be

redacted out.  Her name would be left.  Female/white

that's what the f/w stands for.  O1, we would take out

the 31 and leave 1972.  Any information beyond that

would be reacted out.

Q    Okay.  So do you think that it was okay for -- strike

that.  You're a public servant, right?

A    I am.

Q    This -- your job as a law enforcement officer is an

important job for the community, correct?

A    I believe so.

Q    Right.  That's something that you voluntarily signed up

for, correct?

A    Correct.

Q    And so with your job, there comes certain risk that you

take as a law enforcement officer, correct?

A    Correct.

Q    Right.  Attorney Knowlton who is a citizen, what risk

are -- come to her as a Wauwatosa citizen?

            I guess my point is this.  You signed up for

your job.

A    Mm-hmm.

Q    Knowing the risk, right?

A    Mm-hmm.

Q    And you are stating that you are entitled to more
     protections than a citizen who did not sign up for your
     employment.  Is that consistent with open records laws
     that people are treated differently?

          ATTORNEY BAYNARD:  Objection to the form of
     the question.  Go ahead.  Also you have to say yes or
     no.  You keep saying mm-hmm.

A    Sorry.  Sorry.  Sorry.  You're going to have to repeat
     that question.

Q    Okay.  Are you as a law enforcement officer entitled,
     for a job you signed up for, why are you entitled to
     more protection from people -- from just your home
     address being disclosed than a private citizen like
     Attorney Knowlton?

A    The difference in this case is that Attorney Knowlton
     was arrested for violating an ordinance.  She broke the
     law.

Q    Did she?

A    She broke the law according to this report.  Now --

Q    Is that what the Court said?

A    That is -- that is not up to -- for me to decide.  She
     was arrested for violating an ordinance.  A citation was
     issued.  That is the Court's job.  However, the police,
     all we can do is act on the ordinances and laws we are
     provided and asked to enforce by people.  We don't write

the law.  We just enforce the law and the ordinances.
Attorney Knowlton was arrested for violating an
ordinance that is the difference.

Q    So if she hasn't been found guilty of it, has she still
violated that ordinance?

A    She was still arrested for that.

Q    Okay.  So your job as a law enforcement officer is to
find whether there is probable cause to support
arresting somebody, correct?

A    Correct.

Q    Finding whether or not there is a probable cause to
arrest somebody is different than that person being
guilty of an offense, correct?

A    Correct.

Q    Have you ever arrested anybody and then they were found
not guilty of the offense for which you arrested them
for?

A    Yes.

Q    So if she is found not guilty, then does that raise the
standard in your book that her personal home address
should not -- should be redacted then?

A    An arrestee -- the issue we have here is that --
Attorney Knowlton, we should have used a different
address for you.  I don't know why.  I wasn't there.  I
wasn't in the booking room.  I don't know what happened.

I don't know how the -- how the -- how the conversation
transpired. I don't have any of that information. But
if you, in fact, informed the officer that we should
have used an alternate address for you. We would -- I
would think that's just common courtesy and decency.

Arrested or not, you're still a human being
and you have a job to do and if that's what happened I
don't know. I wasn't there. But that's the
difference. If somebody is arrested, because an
officer finds there is probable cause then this is
what happens.

Q    What if someone is given a ticket or, you know, charged
criminally with a crime, but not arrested?

A    It's an arrest.

Q    That's still an arrest?  Whether or not you are taken
into custody?

A    Correct.

Q    Okay.  So if Joseph Mensah, if the Court finds there is
probable cause to charge him with an offense can I open
records to get his home address too un-redacted?

A    I don't know.  I don't know the answer to that.

Q    Why?

A    One if we even an address.  If we don't have it, I can't
produce it for you.  He's no longer an employee of the
City of Wauwatosa.  You should be able to get it from

somebody if he is, in fact, arrested or charged with a crime.

Q    Okay.  If you guys had that and I sent an open records to you and said, "I want to open record Joseph Mensah's address because it's been found there is probable cause to charge him with an offense."  Is that something that you would give to me un-redacted?

A    I would.

Q    Great.  Okay.

          ATTORNEY MOTLEY:  How about we take a 15 minute break for ten?

          ATTORNEY BAYNARD:  That's fine.

          (Off the record 3:54 p.m.)

          (On the record 4:08 p.m.)

          ATTORNEY KNOWLTON:  Back on the record.  So it's 4:08 p.m.

          I would just like to say, for the record, I don't think that police officers addresses should be available to the public.  Just making that statement.

BY ATTORNEY MOTLEY:

Q    All righty.  So what I'd like to show you --

          ATTORNEY MOTLEY:  What number are we on?

          COURT REPORTER:  Four.

          ATTORNEY MOTLEY:  Could you mark one 4 and 5?

Q    14 and 15 equally marked Exhibit 4 and 5.  Give you a

minute to look at those?

ATTORNEY BAYNARD:  And just so we know, I'm
assuming that any exhibits that are going to be attached
to the depositions anything that gets e-filed you'll
redact.  Like a home address or -- if it gets attached
to any pleadings.

ATTORNEY KNOWLTON:  Yeah.  I think, what we
forwarded as our proposal for confidential -- that's
what we will practice going forward on our end.  I mean,
we're hoping you do the same.

BY ATTORNEY MOTLEY:

Q    So, Lieutenant Roy, let's look at Exhibit 4 for
     Jacqueline Bogenberger.  Is this what a typical City of
     Wauwatosa municipal citation looks like?

A    Either a court copy or an officer's copy, yes.

Q    Okay.  So let me -- again, I'm sorry.  But I'm really
     trying to understand the process.

A    Sure.

Q    So you've arrested somebody for a municipal citation.
     They are now -- when they are released, do they get this
     piece of paper upon their release or is it something
     else that they get?

A    It's this piece of paper minus the -- where it says
     "Instructions-Read Carefully" at the bottom, below that,
     they don't get the officer's narrative.

Q    Okay.  And so minus that, this is what a person,
     Jacqueline Bogenberger, would have received had she been
     arrested on -- what is it -- October 9th, 2020?

A    Yep.  Correct.  Yes, Ma'am.

Q    Okay.  And once you give somebody this document, do you
     give it to the Wauwatosa Municipal Court or where does
     this document then go?

A    It goes to the court clerks.  Yes, Ma'am.

Q    Okay.  And then what do the court clerks do with it?

A    That's a good question.  I don't know.

Q    Okay.  So once you write this document out and give it
     to the court clerk, is it up to City Attorney George
     Schimmel to decide whether to move forward with the
     charges, or how does that work?

A    To the best of my understanding, yes, that's how it
     works.  The Assistant City Attorney George Schimmel
     makes a prosecutorial decisions.

Q    Okay.  And presumably, he reviews the documents to make
     sure that everything is accurate on the document before
     he moves forward through court?

A    I would assume he does.

Q    Okay.  And, for instance, if you had put, you know,
     Jacqueline Bogenberger was arrested, you know, December
     9th of 2021, if -- if there was that type of error,
     would he then come back to you to ask you rewrite this

ticket or how does that type of error get corrected?

A   I would hope that it wouldn't get to his level.
    Supervisors review them, court clerks review them.  I
    know that errors are made and they get sent back.  And
    the -- the citations are voided and reissued.

Q   Okay.

A   With the corrected information.

Q   Okay.  So, essentially, the citation will be dismissed
    and a new citation would be issued -- reissued?

A   I don't know that dismissed -- I don't know the proper
    legal term for what the municipal court does.  I know
    that we void the citation and then reissue a new
    citation.

Q   Would the new reissued citation in that situation keep
    the same citation number?

A   No.

Q   Okay.  So when you void a citation that means that
    citation is no longer active?

A   Correct.  Gone.

Q   Okay.  And who is the one that determines the deposit
    amount?

A   A supervisor.

Q   A law enforcement supervisor?

A   Yes.

Q   Okay.  And does that deposit amount depict the penalty

that a person can receive based on Wisconsin statute?

A    No.  It's more -- it more pertains to the penalties

assigned to the municipal ordinance than the statute.

Q    Okay.

A    If the -- if the ordinance adopts a statute and reflects

a bail, then that would be used.  Otherwise, that's the

discretion of the supervisor supervising the officer who

is issuing the ticket.

Q    Okay.  And with regards to this ticket Exhibit No. 4,

there is Ms. Bogenberger's home address, right?

A    Mm-hmm.

Q    There's her --

A    Yes.  Sorry.

Q    There's her driver's license identification card number?

A    Yes.

Q    Those two pieces of information are retrieved through a

person's driver's license record, correct?

A    Correct.

Q    Okay.  And that's, typically, something that the

person at the station does after a person is arrested?

A    This system will auto fill the information from the DOT

record.  The two systems -- the two computer systems

talk to each other.  So an officer is going to -- when

they arrest Jacqueline Bogenberger, they are going to

run her driver's file and also check for wants and of

warrants to make sure that Ms. Bogenberger wasn't wanted
for some sort of criminal violation, municipal
violations, something like that.

When they run, and run, that means put them
through the system.  That system we just went through,
that DOT system, when they run them that's -- that
software captures that information and imports it into
this software.  So it's up to the officer to verify
that the information is correct, but it is
auto-filled, if you will, from the DOT.

Q    Okay.  And there is some type of special username and
password you have to have in order to go in this -- that
specific computer system you're discussing?

A    Yes.

Q    Okay.  Is that a different username and password than
you get from the CIB training?

A    I believe so.  I know the city has -- we are moving to
single sign on, it's an IT thing, but it is a different
password.

Q    Okay.  And do you have to go to a special training in
order to use this computer?

A    I don't believe you -- no.  It's on any computer and you
don't go anywhere.  It's in-house training.  It's part
of our field training system.  That kind of a thing, so.

Q    Okay.  And is that field house training, is that

available to non-law enforcement officers?

A    No.  Because only -- only law enforcement officers, I'll

      say that with a caveat, only law enforcement officers

      can issue municipal citations.  There are occasions

      where civilians can issue citations, like in the

      instance of our CSOs, our civilian service officers,

      they can write certain municipal citations.  They are

      trained at the same level then in the use of the system.

Q    Okay.  Thank you.  And then also on this citation has

      birth date, height, weight, hair color, eye color,

      correct?

A    Yes.

Q    And all that information also is something you would get

      through this computer system that would auto-fill it?

A    Yes.

Q    Okay.  Is -- because the Wauwatosa Police Department

      access to the DOT system, are you an agent or they

      agents of the department of transportation?

A    I don't know how that's defined.

Q    Do -- does the Wauwatosa Police Department have a

      special contract with the department of transportation?

A    No.  We have a -- we have a contract with the Criminal

      Information Bureau, CIB, that regulates all of that --

Q    Okay.

A    -- information.

Q    Okay.  So is this for Wauwatosa Police Department
     employees?

A    Yes.  They may encompass some court clerk employees as
     well, but I know for sure it is the Wauwatosa employees.

Q    Would it encompass, like, a city employee like Dennis
     McBride?

A    No.

Q    Okay.  Would it -- would it encompasses, you know, City
     Administrator Archambo?

A    No.

Q    So this -- is this -- I am sorry I'm just really trying
     to understand this.  This computer system that
     auto-fills is this a one computer, stand-alone computer,
     that's located physically at the Wauwatosa Police
     Department?

A    No.

Q    Okay.  Where is it at?

A    It's software.

Q    Oh, software.

A    Yes.  Squad computers, it's on report writing computers,
     it's on any computer that we deem that is necessary to
     have it on, we can put it on.

Q    Okay.  But I couldn't just walk in and start typing in
     names?

A    No.

Q    What happens if someone who does not have -- what if I
     came in and you gave me your username and password,
     didn't go through this training?

A    I would probably be in trouble.

Q    Why?

A    Because that's against the law.

Q    What's against the law?

A    I can't allow you access to that system without training
     and authorization.

Q    Oh, okay.  What happens?  Is that a criminal offense?

A    I -- I don't know.  I'd rather not find out.  So I don't
     do it.  I'm sure that it's not good.  I don't know the
     exact ramifications.

Q    Okay.  Has that -- do you recall if that's ever
     happened?

A    Not that I recall.

     BY ATTORNEY KNOWLTON:

Q    So -- I just want to verify.  So you're saying the part
     where it says "Instructions-Read Carefully," that's not
     on the ticket that's given to the person?

A    Correct.  The -- the -- citation that would be issued to
     the person would, actually, have the instructions of how
     to appear in court, how to pay the citation, what their
     options are.

Q    Oh, okay.  So...

A    So the -- the system creates multiple versions of the
     same tickets.  One would be the, pardon the term, but
     the offender copy, that would be handed to the person
     that is cited.  One would be a court copy.  It may have
     some more boxes on it.  One would be an officer copy.
     This very much looks to me like an officer copy.  It
     could be a court copy, but it looks to me to be an
     officer copy.  The officer enters those notes at the
     bottom and that's then the officer's report that they
     would use in municipal courts or if an incident report
     is written, they could use that as well.  But that's
     just to jog the officer's memory as to why Ms.
     Bogenberger was cited on this date for this violation.

Q    Okay.  And so the assistant city attorney would get this
     one?

A    Yes, Ma'am.

Q    Okay.  Great.  That was -- I get that.  So then up here
     where it says, "Court Use," in the upper right-hand
     corner where it says "DA," did -- did you guys put in
     the N?  Does that mean no?

A    Correct.

Q    Okay.

A    This citation didn't get routed to the district
     attorney's office.

Q    Uh-huh.  Got it.

A    Sometimes City of Wauwatosa citations could get routed
     to the DA's office.  It's mostly like OWI-related law.
     I don't fully understand it.  I couldn't tell you right
     now, all the reasons.  But, usually, it's not -- the
     plaintiff would change to State of Wisconsin.  Say we
     arrested somebody for operating after revocation.  If
     you see in the middle of the page, Plaintiff, there?

Q    Yes.

A    That's a selectable field.  It could be City of
     Wauwatosa, Milwaukee County or State of Wisconsin.  We
     primarily use City of Wauwatosa or State of Wisconsin.
     Say you are arrested for a fourth offense OWI, a
     traffic, this is also a traffic ticket, it would be the
     same thing.  It's the same form.  Say -- but that would
     have to go to the DA's office, then we would route back
     to the DA's office a fourth offense type situation or
     any, you know, offense that would have to be reviewed by
     the DA.

Q    And that would be a little Y and they will still get
     this copy?

A    Correct.

Q    Okay.

          ATTORNEY MOTLEY:  Can you mark this as Exhibit
     6?  So I am sorry.  I only want one copy of this.

     BY ATTORNEY MOTLEY:

Q    I want to show you what's been marked as Exhibit 6.

A    Yes, Ma'am.

Q    This is a ticket for Breon Foster, correct?

A    Yes, Ma'am.

Q    And you just testified that where it says "Court
     Use:DAN" that means this ticket was not referred to the
     district attorney's office?

A    Correct.

Q    Does that also mean that a person is not referred to the
     district attorney's office?

A    No.  It just means that this violation right here this,
     violate emergency order, was not referred to the
     district attorney's office.  This citation was not.

Q    If there were a person who had violated a city ordinance
     and you all believed possibly there is probable cause to
     charge them with a criminal offense, would you also
     refer -- would you refer them to the DA's office and
     also give the DA information like this ticket just so
     that they are aware of this?

A    Generally, no. If somebody is going to be referred down
     to the district attorney's office for a misdemeanor or a
     felony crime, they are not going to issue a municipal
     citation.

               In instances where perhaps a retail theft,
     for example, the retail theft reaches a felony level

and maybe the person ran, but it was not -- it was
just an attempt to get away.  They may get a ticket
for running from the police and then be referred for
the felony retail theft versus a felony resisting or
misdemeanor obstructing.  We still have discretion
when it comes to that.  So generally, you wouldn't get
a retail theft ticket and also a referral.  It
wouldn't work.  It's dissimilar.  You couldn't have it
in two courts.

Q   Okay.  Do you know if anyone was given any criminal
charges of arson as it relates to their behavior from
October 7th through October 12th of, 2020?

A   I don't know.

Q   Okay.  Do you know if anyone was given an arson
municipal ticket in the City of Wauwatosa from, if there
is one, October 7th through 12th of, 2020?

A   The negligent handling of burning material which is not
arson, but could be.  I don't know.

Q   Okay.  Is that a normal charge -- well, is that a charge
that people are given often in the City of Wauwatosa?

A   You would we surprised.  I have written a few of them.

Q   Really?

A   Mm-hmm.

Q   Is it mostly juveniles you're doing that for?  I hope.

A   People laying, you know, pipe -- not pipe bombs, but you

know, little bottle bombs in the street or type stuff or lighting papers on fire causing a disturbance then we can use that citation.

Q    Do you know if anyone was issued that type of citation at all in, 2020, in the City of Wauwatosa?

A    I don't.

Q    Okay.  Now, let's look at Exhibit 5, please, Tiffany Henry.  So I'm not going to go through the whole step by step we just went through.  But if this were given -- if someone's open record requests this ticket, should the address be redacted?

A    Again, depending on the requester, it may be redacted.

Q    Okay.  What about the driver's license number?  Would that be someone you redact?

A    Again, base on the requester, it would be something we would look to redact.

Q    If it was a private person that requested it, would you redact the driver's license number?

A    Other than Ms. Henry herself, yes.

Q    And why?

A    To protect Ms. Henry's identity.

Q    Is that in compliance with the law?

A    Yes.

Q    Okay.  Would you redact her date of birth?

A    Again, we would take the date out.

Q    Would you redact her address if it were a private person
     requesting?

A    Yes.

Q    Would you redact her date of birth if it were a media
     person requesting?

A    No.

Q    Why not?

A    Because it's up then to the media to not release that
     information.  Again, in an effort to be totally and
     completely transparent, we would have provided the
     information to the media in hopes that they do not
     provide it.  They would be responsible for redacting it.

Q    Would you redact her driver's license number to the
     media?

A    No.

Q    Would you redact her driver's license number to an
     attorney not representing her?

A    Generally, no.

Q    Why not?

A    Because attorneys, again, have the ethical, you know,
     responsibility to not release redacted information.

Q    What ethical responsibility is there for that?  Where
     are you citing from?

A    I'm saying from just what I have been told by attorneys
     and the city attorney that attorneys know what they can

and can't release to the public.

Q   Which city attorney told you this?

A   Alan Kesner.

Q   Okay.  With regards to height, weight, hair color, eye color, would you redact that to an attorney not representing Tiffany Henry?

A   No.

Q   Would you redact that information to a member of the public?

A   Yes.

Q   Would you redact that information to a --

A   There's a class coming up in November.  I attended it. I can get you a seat.

Q   That would be great.  With regards to method on this ticket is says "mailed," you see that?

A   I see that.

Q   That -- does that mean that ticket was mailed to her?

A   Yes.

Q   How did you verify that tickets were in fact mailed to people?

A   I don't know there is a verification process in place.

Q   Do you keep a record of -- I don't know envelopes that are produced when you are mailing tickets to somebody?

A   No.

Q   Do you have a log, a written log, that a person writes

in or types in that they mailed it to a person on this
date?

A    The police department does not, no.

Q    So how can I as a citizen, say if I didn't get a ticket
in the mail, how can I prove that you did not mail it to
me if you didn't do it?

A    I don't know.

Q    Okay.  Has there ever been an incident that you are
aware of where some -- where it says a ticket was mailed
when, in fact, it was not mailed to a person?

A    Not that I'm aware of.

Q    Who is the person that handles the mailing of the
ticket?

A    The officer that issues the ticket is responsible to
deliver it.

Q    Okay.  So it's not a clerk that handles it?

A    No, Ma'am.

Q    Okay.  So in this case, Lieutenant Farina would have
been responsible for mailing the ticket to Tiffany
Henry?

A    Yes.

Q    Okay.

                    ATTORNEY MOTLEY:  Do you have any questions?

                    ATTORNEY KNOWLTON:  No, I don't.

                    LIEUTENANT ROY:  Thank you.

BY ATTORNEY MOTLEY:

Q   I'm giving you what has been marked as Exhibit 7, an
    e-mail that you sent on January 7th, 2021, with the
    subject line "open records request response."  Do you
    recall sending this e-mail?

A   I do.

Q   And why did you send this e-mail?

A   To provide documents and videos.

Q   Okay.

            THE COURT REPORTER:  Could you repeat that
    again?

            LIEUTENANT ROY:  And videos, sorry.

            THE COURT REPORTER:  Okay.

BY ATTORNEY MOTLEY:

Q   Okay.  Who is isiah@wisconsinexaminer.com?

A   I don't know but I'm going to imagine that is Isiah
    Holmes, H-o-l-m-e-s.

Q   Who is Lezlie.Johnson@tmj4.com?

A   I don't know.  Again, not to be a jerk, but it sounds
    Lezlie Johnson is an employee of tmj4.

Q   Okay.  Who is peteasparks@gmail.com?

A   I don't know.  Probably Peters Sparks, but I don't know
    that for a fact.

Q   Okay.  But you don't know who that person is?

A   I don't.

Q    Okay.  Who is mthomsen@gtwlawyers.com?

A    I don't know.

Q    Is there anyone that you sent this open records request
     response to that you do know?

A    K. Motley.

Q    That's it?

A    Yes, Ma'am.  Those e-mail addresses come from the
     records requests.  When those individuals request
     records, that's where I get those e-mail addresses from.

Q    And so with open records request, are you required to
     disclose why you're asking for a certain record?

A    No.

Q    So I can just say, I want, you know, all the arrests of
     December 1, 2020, to be provided to me?

A    You could.

Q    I don't have to give a reason or why I'm using this
     information, what I need it for?

A    To the best of my knowledge, that is correct.

Q    Okay.  And do you see in this e-mail the -- right above
     the Dropbox link you wrote, "the documents and videos
     are being provided to you un-redacted"?

A    Correct.

Q    Do you recall what you sent to people?

A    I don't recall offhand.

Q    Do you recall sending to people in this Dropbox link

what's already been marked as Kathryn Knowlton's police
report?

A    I don't recall if it was in there or not.

Q    Do you recall sending un-redacted copies of Exhibit 4, 5
and 6 to everyone on this list, Sir?

A    I do not recall.

Q    Do you recall sending, as part of this open records
request, interrogation video of confidential informant
un-redacted?

A    I don't recall.

Q    Do you recall sending in this open records request
un-redacted video of interrogation of Breon Foster?

A    Again, because this is a verifiable thing, I would ask
to look at the Dropbox to see what's in it before I
answer any of your questions.

Q    Okay.  I'm giving to you what has been marked as Exhibit
8.  Do these folders look familiar to you?

A    They do.

Q    What are these folders?

A    They look like file folders in the Dropbox system.

Q    Okay.  And within this drop box, you didn't redact
anything in any of these folders, did you?

A    I don't recall.  Again, I go through every folder and
every file.  I don't recall whether anything is redacted
or not.

Q    But you acknowledge that everyone on this e-mail you only know one person that you're familiar with?

A    Personally.

Q    Okay. Professionally, who else do you know on this e-mail?

A    The media folks that are on there from tmj4, WISN, Wisconsin Examiner, the ACLU, GTW Lawyers, there's a law firm, again, Wisconsin Examiner.

Q    But Blodestone, B-L-O-D-E-S-T-O-N-E @gmail.com, who is that?

A    I don't know. I can go back and look at the request and find out who it is. But looking at this exhibit right here I cannot tell you.

Q    Okay. So do you know if everyone on this e-mail asked for the same exact open records?

A    I don't know if they did or not.

Q    Why did you send this on the January 7th the day after the U.S Capitol insurrection?

A    I have no idea.

Q    Is that a coincidence?

A    Yes.

Q    Okay. Would you be concerned if anybody that you sent their information out un-redacted if they were physically hurt as a -- as a result of that because insidious third parties found out what their address was

based on your release of open records un-redacted?

A    I wouldn't like to see anybody get hurt for any reason, so.

Q    Do you think it was proper for you to send out, you know, police reports and tickets un-redacted to the public, to people you don't even know if they are in the media or lawyers?

A    I don't know sitting here today.  That doesn't mean that on January 7th I didn't vet this list and that I can't recall.  I can look up the request and let you know who it went to.

Q    Okay.  Are -- were you the main person handling open reports request on January 7th, 2021?

A    Yes.

Q    When you decide to send information out, is there anyone above you that needs to approve that information being released?

A    No.

          ATTORNEY MOTLEY:  Any questions?

          ATTORNEY BAYNARD:  Just a few.

BY ATTORNEY BAYNARD:

Q    So we talked about open records requests a lot.  But you're aware there is a difference between open records request and discovery requests, correct?

A    Yes.

Q    Okay.  And so you're aware that in this case -- or are
     you aware in this case there has been Attorney Motley
     and Attorney Knowlton have made discovery requests?

A    Yes.

Q    Okay.  And do you recall the timeframe when we first --
     well, when did you first recall having a conversation
     with me about the discovery request?

A    Oh boy, it seems like it's been months now.

Q    Okay.

A    I don't -- I don't recall.  We talk routinely.  I don't
     know.

Q    Okay.  And so it would have been -- so, I guess, I'll
     represent you that the discovery request we got in was
     -- I wish I had a copy of it.

            ATTORNEY BAYNARD:  Do you have a copy?

            ATTORNEY MOTLEY:  I know it was January 5th.

     BY ATTORNEY BAYNARD:

Q    Okay.  January 5th.  Do you think that me and you have
     had conversations since about January 5th to the present
     day about those discovery responses?

A    Yes.

Q    Okay.  How many times a week do you think me and you
     talk?

A    A week?

Q    Probably more than you want, but...

A     At least, on average, six to ten.

Q     Okay.  And what's usually -- what are usually
      discussing?

A     How we can best provide the information in the most
      efficient manner and I'm usually explaining to you that
      I am the only one that does this, so.

Q     You would agree that the discovery, the scope of the --
      and there is e-mails -- I'm going to call it an e-mail
      dump because, I think, that's what we have been calling
      it, that in order to get these e-mails if and, I
      guess -- strike that.

              You're aware that there was a request for
      e-mails that hit certain search times for the entire
      @wauwatosa.net server.

A     Yes.

Q     Okay.  And who took those e-mails off the @wauwatosa.net
      server?

A     Our director of IT, Jalal Ali.  Don't ask me how to
      spell that.

Q     Do you recall when about's we got that e-mail export?

A     We've been working on it for at least two months that
      I'm aware of, I believe.

Q     Okay.  And within that process, did you, I guess -- when
      I was done reviewing the e-mails or -- strike that.

              You've reviewed -- do you recall the amount,

the total amount that was in that e-mail dump?  Was it
over 5,000?

A      Which e-mail dump?  We've done -- we've done a couple.
So the last one, the one we are, currently, working on,
is over 5,000.

Q      And, I guess, this is -- would you agree -- I guess, can
you explain the reason why it's taking so long?

A      Yes.  Because based on the search terms if it's a
to/from e-mail with a very broad search term, I get the
e-mail at least twice because I get the to and the from.
And if somebody cc's other people in that and they
reply, I can get the same e-mail six to 12 times.  But I
have to go through each individual e-mail to make sure
that it is, in fact, the same e-mail.  So the search
terms are so broad that we try our best to not waste
your time and provide unresponsive documents.  But it
takes a tremendous amount of time.  I have to read every
single e-mail.  And then I -- if I start at the first
one, I'll read through all the cc'd e-mails, the next
e-mail is all the cc'd e-mails minus the first one.  And
it goes down, down, down, down, down and it takes time.

Q      And did -- recently did your -- did Lieutenant Vetter
reassign your position so you could just focus on these
discovery responses?

A      Yes.  Captain Vetter relieved me of my additional

responsibilities so I could focus on this.

Q   And you're making -- are you making a good faith effort
    to get them done, you know, as quickly as possible?

A   Yes.

Q   And you could understand why Attorney Motley would be
    frustrated with how long she has been waiting to get
    these documents?

A   Certainly.

Q   Okay.

            ATTORNEY BAYNARD:  I don't have anything else.

            ATTORNEY KNOWLTON:  I only have one question.

    BY ATTORNEY KNOWLTON:

Q   Whose the sergeant under you?

A   Sergeant Corey Wex, W-E-X.

Q   Oh, okay.  Yeah.

    BY ATTORNEY MOTLEY:

Q   Okay.  I'm going to ask you two more questions?

A   Yes, ma'am.

Q   And I'm going to apply it to a lot of names.  So I'll
    read the names first and then I'll ask you a question.

A   Okay.

Q   The names I'm asking the question for are in regards to
    Tracy Cole, Taleavia Cole -- let me know if you need me
    to spell anything.  Tahudah Cole; Tristiana Walls;
    Kathryn Knowlton; Dana McCormick; Mary Lockwood; Andrew

Aaron; Kamila Ahmed; Robert Agnew; Isiah Baldwin;
Jacqueline Bogenberger; Lavita Booker; Rebecca Burrell;
Raine, R-A-I-N-E, Cich, C-I-C-H; Steven Conklin; Lauryn
Cross; Nayla Dalarosa; Rachel Dulay; Anne, with an E,
Delessio, DELESSIO-Parson, P-A-R-S-O-N; Erik, with a K,
Fanning; Jessica Fenner, F-E-N-N-E-R; Jill Ferguson;
Breon Foster; Joanna Geisler; Christine Groppi; Darius
Hayes; Joseph Hayes; Percy Hayes; Destiney Jones; Adante
Jordan; Mary Kachelski, K-A-C-H-E-L-S-K-I; Sean Kafer;
Joey Koepp, K-O-E-P-P; John Larry; Alex Larson; Sonora
Larson; Holly Lavora; Lazarito Matheu, M-A-T-H-E-U; Vaun
Mayes, Molly Nilssen; Shawn Page; Carmen Palmer; Leah
Porter; Aidali, A-I-D-A-L-I Rivera; William Rivera;
Hector Rodriguez; Jose Hernandez Ramirez; Oscar
Concepcion Rodriguez; Rosalind Rogers; Nathan Sabel;
William Schroeder; Madelyn Schweitzer,
S-C-H-W-E-I-T-Z-E-R; Mariah Smith; Peter Sparks; Tiffany
Stark; Markasa Tucker; Angel Vega; Christina
Vitolo-Haddad, H-A-D-D-A-D; Gabriella Vitucci; Oscar
Walt on; Britta Welch; Suzanne Wells, Brandon Wilborn;
Trisha Wilson; Katelyn Wojnar, W-O-J-N-A-R; Sonja Worthy
and Khalil Coleman.

        Did any of those people give you permission
to release their personal information publicly?

        ATTORNEY BAYNARD:  I'm just going to object to

form of the question as compound.

A    I didn't need their permission for most that I
     recognize.  I don't know everybody on that list.

Q    Do you recall if anyone gave you permission to release
     their personal information to the public?

A    The information that I released to the public is in
     accordance with the law to the best of my knowledge.

Q    Do you recall receiving anything, their expressed
     consent for you to release any of those people personal
     information?

A    Again, the information I released to the public in
     accordance with the law to the best of my knowledge.

Q    My question is, do you recall receiving any of the
     people that I named their express consent to release
     their personal information to the public?

A    I don't recall asking for their consent.

Q    Thank you.  Do you recall, for any people that I named,
     getting their expressed consent to release any of their
     highly restricted personal information?

A    I didn't release any of their highly restricted
     information.

Q    Right.  So I'm asking you, do you recall if any --

A    So, sometimes isn't necessary.

Q    We'll, my question is, do you recall for any of the
     people that I named receiving their expressed consent to

release any of their highly restricted personal
information?

A    No.

Q    Do you recall -- oh, one other question.  Sorry.

           Is there any circumstance in which a
juvenile's name, address, phone number should be
released to the public by any member of the Wauwatosa
Police Department as it relates to open records
request?

A    I don't know because each request is specific.  It
depends on who.

Q    Okay.  If it were a member of the public that was asking
for -- for the open records request you received on
January 7th with regards to that should any juvenile's
information name, address, phone numbers, date of birth
should that information have been released to a member
of the public, not a journalist, not a lawyer?

A    Depends on who the member of the public is.

Q    And what circumstances can you release information of a
juvenile to a member of the public that is not a
journalist and not a lawyer?

A    Their parents or guardian.

Q    Okay.  So if it's not their parents or guardian, is
there any situation where a juvenile's information,
personal information, should have been released to a

member of the public if they are not a parent or a
guardian of that juvenile?

A    I don't know if there is anyway situation, but juvenile
information is generally highly protected.

Q    Thank you.

BY ATTORNEY KNOWLTON:

Q    Even from a journalist, right?

A    Even from journalists.

BY ATTORNEY MOTLEY:

Q    And from lawyers?

A    Not necessarily lawyers.

BY ATTORNEY KNOWLTON:

Q    Not their own lawyer?

A    Not lawyers.

BY ATTORNEY MOTLEY:

Q    Not lawyers for an open records request?

A    Again, depends on why it's being requested.

Q    Your counsel just talked about the difference between a
discovery request --

A    Sure.

Q    -- versus an open records request?

A    Sure.

Q    So on a discovery request, if I'm the attorney asking
for a juvenile's information, do you -- are you allowed
to release more information under a discovery request

umbrella versus an open records request umbrella to a
lawyer?

A    Of course.

Q    So what information can you -- can you release to a
lawyer under an open records request as it relates to a
juvenile?

A    I would have to look in the guidebook just to be sure.

Q    Okay.  Do you know anything off the top -- could you
release their name?

A    Again, it's situationally dependent and I would refer to
the guidebook just to be sure.

Q    Okay.  Which guidebook are you referring to?

A    The public records guidebook.

Q    Is -- okay.  And that's publicly available?

A    I believe so. Yes, because it was adopted by the Common
Council.

Q    And when is that training again?

A    It's November at the Waukesha County Technical College.

Q    And can a member of the public attain -- go to that
training now?

A    That's a good question.  I don't know.  I believe an
attorney could.  It's taught by an attorney, so.

Q    Are you aware that I used to teach at WCTC Law
Enforcement Officers?

A    I am not.  When did you teach there?  I went to the

academy there.

Q    I taught in their program back in, 2001 through 2003,
     under Brian Duro(phonetic).

A    At WCTC.  Because I was there in, 2001, and I don't
     recall ever meeting you.

Q    Are you aware of how close I came to becoming a law
     enforcement officer myself?

A    I'm not.

Q    Thank you.

               ATTORNEY MOTLEY:  Anything?

               ATTORNEY KNOWLTON:  I don't have anything.

               ATTORNEY BAYNARD:  I don't have anything.

               ATTORNEY MOTLEY:  I think at this time we
     would like to adjourn.

                (Deposition adjourned at 4:49 p.m.)

STATE OF WISCONSIN )

                    )

MILWAUKEE COUNTY    )


        I, MIRIAM BECKFORD, Official Court Reporter,

do hereby certify that I have reported the foregoing

proceedings; that the same is true and correct as

reflected by my original machine shorthand notes taken

at said time and place.



        Dated August 3, 2021



        _____

                Miriam Beckford