**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

**Kathryn KNOWLTON, Dana McCORMICK et al,**

   **Plaintiffs,**

**v.**   **Case No. 20 CV 01660**

**CITY OF WAUWATOSA, et. al,**

**Defendants.**

---

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 257]

---

  Plaintiffs, by and through undersigned counsel, respond to Defendants' Motion for Summary Judgment, [ECF No. 257], and in support thereof, states as follows:

1. **LEGAL STANDARD**

  A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014). In a motion for summary judgment, courts must construe all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). Moreover, it is not the Court's "role to evaluate the weight of the evidence, to judge the credibility of witnesses or to determine the ultimate truth of the matter, but simply to determine whether there exists a genuine issue of triable fact." *South v. Illinois Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818-819 (7th Cir. 2015). Court's may rule in favor of the movant

1

where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Only if there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).

## 2. ARGUMENT

### a. The Curfew Violated Plaintiffs' First Amendment Rights

This case presents a unique and unanswered question to this court: under what circumstances may a city enact a curfew to specifically curtail protest before such protests have begun. Put another way, what guardrails does our Constitution provide to protect those seeking to engage in protest - that most fundamental of political expression - from a law enacted specifically to limit such expression. Here, Defendants possessed no articulable basis for issuing a curfew aimed at protesting other than a generalized and wholly speculative belief that protests of police violence are inherently violent. Plaintiffs contend that short of an imminent and credible threat, the state may not enact laws to curtail political protest. Moreover, there is a dispute of material fact as to each element under the *Ward* standard. Accordingly, Defendants' motion to dismiss Plaintiffs' First Amendment claims should be denied.

### b. Applicable Standard For Public Forum Restrictions

The First Amendment provides that all citizens have a right to hold and express their personal political beliefs. *See Cohen v. California*, 403 U.S. 15, 24 (1971). Organized political protest is a form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988). Indeed, political demonstrations and protests lie at the heart of First Amendment concerns. *See Id.* "[T]he First Amendment safeguards an individual's right to participate in the public debate

through political expression and political association." *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014). This "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," and the Supreme Court has "consistently commented on the central importance of protecting speech on public issues." *Id*. The First Amendment further protects a person's right to peaceably assemble on a public sidewalk. *United States v. Grace*, 461 U.S. 171, 177 (1983). Thus courts must "scrutinize carefully any restrictions on public issue picketing." *McCutcheon*, 572 U.S. at 203.

The Seventh Circuit reviews Free Speech restriction under the *Ward* test. *Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004), *citing Ward v. Rock Against Racism*, 491 U.S. 781 (1989). Under *Ward*, the first question is whether the statute is content-based or content-neutral. Content-based laws - those targeting speech based on its communicative content - are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests - that is, that they satisfy strict scrutiny. *R. A. V.* v. *St. Paul*, 505 U.S. 377, 395 (1992). If a law is determined to be content-neutral, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 79.

### i. The Planned Protests Did Not Represent an Emergency

Defendants' main contention is that they should be entitled to a "particularly yielding reasonableness test" because the curfew in question was "an emergency curfew." ECF #267, p.5. This is quite simply, a misrepresentation of the facts in this case. Nothing about the

3

circumstances that led to the enactment of the curfew were an emergency. Defendant McBride began contemplating the Emergency Proclamation in July of 2020. Ex. 1, p. 27. At that point, he had spoken with Mr. Archambo, Defendant Weber, Captain Vetter, and the Governor's office. *Id*. p. 28. He also spoke with Milwaukee Mayor Barrett about preparing for Chisholm's announcement. *Id*. On August 11, 2020, McBride held a conference call with Maggie Gau, the Governor's chief of staff, and General Knapp of the National Guard in preparation for DA Chisholm's announcement. Ex. 4. On August 27, 2020, Defendant McBride assured a citizen that "[w]e will be notified in advance of the District Attorney's decision, and we have plans in place … to deal with any unrest." Ex. 3. Defendant McBride would hold at least one more meeting with Ms. Gau, General Knapp, as well as Wauwatosa Police officers on September 17, 2020. Ex. 5. These meetings discussed arrangements for mutual aid, protected sites, and the enactment of an Emergency Order. *Id*. On September 10, 2020, Defendant Weber wrote to Defendant McBride suggesting a curfew be ordered. Ex. 6. On September 11, 2020, Luke Vetter emailed Paul Riegel of Milwaukee to inform him that "[w]e have been planning for weeks for the DA Announcement of our Officer Mensah's shooting…We have many commitments of recourse help from neighboring jurisdictions we routinely work with" attaching a Draft Operational Plan. Ex. 7. On September 17, 2020, the City of Wauwatosa began drafting the Emergency Declaration. Ex. 8. On that same date, the WPD revised their Incident Command Structure chart to respond to the "DA Announcement Ops." Ex. 9. Mr. Vetter sent this Command Structure along with the Operational Plan to the National Guard on the same day. Ex. 10. On September 24, 2020, Lieutenant Wrucke had already written and Luke Vetter had already approved Rules of Engagement for Civil Unrest. Ex. 11. On September 30, 2020, Luke Vetter finalized an Operations Activation which was presumably sent to thirty-four (34) mutual aid partners in

4

anticipation of the DA's announcement. Ex. 12. On October 6, 2020, Captain Vetter approved a fifteen-page Operational Plan to respond to potential protests. Ex. 13. That same afternoon, Shane Wrucke sent an email to four individuals with a thirty-three page powerpoint presentation of the City's "Civil Unrest Tactical Brief." Ex. 14. Also on October 6, 2020, the Wauwatosa Director of Public Works sent an email relating to the City's preparation on certain governmental property. Ex. 15. And Ultimately, the Emergency Proclamation enacting the curfew was signed on September 30, 2020, eight (8) days before Attorney Chisholm's announcement. Ex. 16.

For over two and a half months, the City of Wauwatosa, from Mayor to Police Chief, from police officers to public works, prepped and planned for DA Chisholm's decision. They prepared the Emergency Proclamation three (3) weeks before the announcement. The Police developed Operational plans at least a month before the announcement. The city produced at least eight drafts of the Emergency Proclamation. Ex. 8. The police got commitments from neighboring law enforcement agencies for assistance at least a month before the curfew. The curfew was not in response to an emergency, but was instead developed over months. Defendants' suggestion that they should be entitled to a more forgiving standard because "[a]t the dawn of an emergency…public officials may not be able to craft precisely tailored rules" is either disingenuous or seeking to reduce Constitutional protections at the whim of an officer who labels a document as an "emergency response." Defendants know that they spent months preparing, traded drafts of the curfew order with input for many people, and were preparing not for an imminent danger, but instead a speculative concern. Nonetheless, they ask the court to grant them broad latitude. Defendants are not entitled to this.

However, even if the Court were to apply Defendants' requested standard of review, Defendants' actions still fall short. Defendants argue that the curfew should be upheld where the

5

Mayor's actions were taken in good faith and there is some factual basis for the decision that the restrictions were necessary to maintain order. Defendants cannot, and do not, point to a single factual basis for the necessity of this curfew. Throughout discovery, Plaintiffs have requested documentation as to threats. Ex. 18 RFP 6. Defendants have no responsive documents. *Id*. Indeed, Defendant Weber admitted that there was no basis for an assertion that there would be civil unrest. Instead Defendant Weber agreed that the concerns stated in the Proclamation were "speculative" and "guesswork." Ex. 19, 174:21-25. Simple conjecture on possible civil unrest is simply insufficient. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). Accordingly, Defendants' argument that the Court apply a lower standard should be ignored.

### ii. The Curfew Order Was Not Content-Neutral

Defendants enacted the curfew at issue in this case specifically in anticipation of an anti-police brutality protest. It was timed to coincide with the announcement of the Milwaukee District Attorney's announcement on whether to charge a Wauwatosa officer for shooting and killing seventeen year old Alvin Cole. Ex. 16, 17. Moreover, the curfew order was not a law of general applicability, but instead a law instituted with a particular group in mind and to hinder the ability to protest during the very days and in the very location in which such protest was relevant - the city where Alvin Cole was killed in an immediate response to yet another failure to hold police accountable for police killings. It is clear that the purpose of this curfew was to hinder Plaintiffs from engaging in protest against the WPD itself. Accordingly, the Court should find that there is a question of law as to whether Defendants' enactment of the curfew was content-based and therefore subject to strict scrutiny.

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of

6

speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 79. "The government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Id*. While it is clear that a law that restricts speech on its face is content-based, "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based. See *Reed v. Town of Gilbert*, 576 U. S. 155, 164 (2015). The Supreme Court has also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," *Wardm*, 491 U. S. at 791. "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." *Reed*, 576 U.S. at 164.

The record contains substantial evidence that the purpose of this curfew was to stop Plaintiffs' ability to protest. Barry Weber, then Chief of Police, stated that in declaring the October protests an unlawful assembly, he took into account the viewpoint of the protesters. Ex. 19, 135:22-136:2. This is clearly unconstitutional, but at the very least, this creates a question of fact on which a juror could reasonably conclude that the enactment of the curfew was for the purpose of suppressing speech on the basis of Plaintiffs' viewpoints. Viewpoint-based discrimination is presumptively unconstitutional under the First Amendment. *United States v. Playboy Entm't Group*, 529 U.S. 803 (2000).

7

Moreover, Weber was clear that enforcement of the curfew was also aimed at protesters - those he believed should not be out on the streets. Ex. 19, 128:25-129:2 When asked if the curfew affected people's ability to assemble, Defendant Weber responded: "[i]t should have." *Id.* Weber explained that during this curfew, an individual engaged in protest was subject to the curfew, but someone walking his dog, or who had to get their kids somewhere, or someone just generally outside traveling was not. *Id* at 177:6-20 ("if they are out walking their dog or they are coming back from somewhere or wherever, they would not get arrested for a curfew violation"); *Id* at 137, 20-23 ("if you had people coming home from work, or they had to get their kids somewhere or whatever, we certainly would not arrest them for that").

However, these are not simply statements taken out of context. This animus and viewpoint discrimination by Wauwatosa and its leaders against Plaintiffs for their viewpoints is substantiated throughout the record in this case. During the George Floyd protests, the WPD began compiling a list of individuals who protested against police brutality. Ex. 20. This list would later be labeled the "TPR Target List," a reference to The Peoples' Revolution political movement to which this curfew order was aimed. Ex. 21. WPD officer Farina referred to The People's Revolution as a "gang." (PPFOF #19, 24, & 25). A WPD officer later developed a powerpoint presentation which labeled certain individuals, including a Democratic state representative and the Mayor himself, as "higher value targets." Ex. 22. Indeed, in labeling Defendant McBride as a potential target, the WPD directed attention to his connections with Attorney Motley and The People's Revolution. *Id* at 15. Additionally, when individuals were arrested while protesting during the nights of the curfew, the WPD kept track of whether such persons were affiliated with TPR. Ex. 23. On July 16, 2020 Wauwatosa Common Council President, Kathy Causier, announced the appointment of eight persons to the Ad Hoc Committee

to address Policing and Systemic Inequities. Ex. 25. Perhaps most troubling, the WPD through Dominick Ratkowski, put together surveillance files on each of the four citizens chosen for the Wauwatosa's Ad Hoc Committee to address Policing and Systemic Inequities - including Former Court Commissioner Lindsey Draper. Ex. 24. Defendant Ratkowski emailed Defendant Weber and other officers to let them know of each member's association with TPR. *Id* at 1.

The Supreme Court has been clear that municipalities may not enact otherwise facially neutral laws as a pretext to accomplish otherwise unconstitutional content-based or viewpoint based discrimination. *Renton v. Playtime Theatres*, 475 U.S. 41, 62 (1986). As Weber made clear, the curfew was instituted and enforced not on everyday people, but instead specifically against protesters. And this was consistent with the conduct of the WPD throughout the year in targeting TPR, members of color on the Ad Hoc Committee to address Policing, and even the Mayor when he was seen as too sympathetic to TPR. Further, the WPD's targeting of TPR is critical in this analysis even though it was McBride who enacted the curfew. As stated by McBride, the curfew was instituted at the recommendation of Weber and Vetter. Ex. 1 at 66: 5-8 and p.31.

Moreover, it was not only the WPD who could not handle criticism. When McBride himself was confronted by Plaintiff Groppi for his handling of the protests, he retaliated against her by requesting that she be ticketed. Ex. 26. Taken together, there is a significant amount of evidence upon which a juror could rely in finding that the City of Wauwatosa had a problem with criticism and enacted this curfew to suppress political protest aimed at their own police.

However, the context in which this curfew order was announced should not be ignored and is sufficient in and of itself to lead a reasonable juror to infer that this law was enacted on a pretextual basis to restrict Plaintiffs and other TPR members from protesting during this week in October of 2020. Defendants anticipated that individuals would engage in protest in response to

9

District Attorney Chisolm's October 7, 2020 announcement that Wauwatosa Police Officer Joseph Mensah would not be criminally charged for his killing of Alvin Cole. The protests were aimed not at generalized political expression against police brutality, but against a Police Officer who worked and killed in this very City. Defendants enacted this curfew based on speculation rather than an articulable fact. Ex. 19 p.174. Given the nature of this protest and that Defendants are unable to substantiate *any factual basis* for the necessity of a curfew, it is reasonable to infer that Defendants' motives were based on a disagreement with Plaintiffs' political expressions.

### c. The Curfew Was Not Narrowly Tailored to an Important State Interest

### i. Wauwatosa Had No Important State Interest

Defendants cannot satisfy the second prong of the *Ward* test because they have not provided, and indeed do not have, any factual basis to support their need for the curfew order. Without a specific factual basis, a Court is unable to analyze whether the curfew was narrowly tailored to the governmental interest. And mere speculation alone is insufficient to support such an extensive prohibition on protest activity. Moreover, Defendants' restrictions were absolute as to manner and location of permitted protest and the time restriction was so significant as to consign protesters to protest while the streets were empty. For each of these reasons, Defendants have failed to show that there is no dispute of fact upon which a juror could determine that Defendants' curfew was sufficiently tailored to serve a significant public interest.

Seventh Circuit precedent on the interplay between curfew laws and the First Amendment are well established. *See Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004). In *Hodgkins*, the Seventh Circuit evaluated Indiana's juvenile curfew under the First Amendment and found that curfew, even with First Amendment exceptions, was insufficient in protecting the First Amendment rights of juvenile citizens. As provided in *Hodgkins*:

> "[t]he lynchpin questions in this case then are first, whether the curfew law furthers an important or substantial governmental interest and, second, whether the restrictions imposed by the curfew regulation are no greater than are essential to further that interest or in the words of the *Ward* court -- whether the statute is narrowly tailored to serve a significant governmental interest -- and second, whether the curfew law allows for ample alternative channels for expression." *Id*. at 1059 (citations omitted).

"Under the "no more restrictive than necessary" standard, the "government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. at 1060. The Supreme Court has further explained that "the essence of narrow tailoring" is "focusing on the source of the evils the [government] seeks to eliminate . . . and eliminating them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward*, 491 U.S. at 800 n.7

Here, Defendants cannot establish that this law is narrowly tailored for the very reason that Defendants can provide no factual basis for civil unrest. In each of the protest cases cited by Defendants, cities only instituted curfews *in response* to civil unrest several days into the protests. In each one of these cases, the Court specifically noted the factual basis supporting the need for a curfew. *See Rodriguez v. City of Green Bay*, 2022 WL 823948, *6 (E.D. Wis. March 18, 2022) ("[o]n June 1, 2020, the City issued a Proclamation of Emergency *cataloging* the incidents that occurred on May 31, 2020"); 548 F. Supp. 3d 383, 393 (S.D.N.Y 2021) (where in the court noted "contemporaneous news reports — of which the Court cannot and will not pretend to be unaware — reported widespread looting, smashed windows, and other property damage connected to the New York City protests").

Defendants, however, ignore the decision in *NAACP v. City of San Jose*, 562 F. Supp. 3d 382 (N.D. Cal. 2021), where the court confronted a situation much more analogous to the facts presented here. In *NAACP*, the court noted that "[f]or instance, there are no facts in the record

11

about the location and scope of any looting and/or violence, which would inform the court's analysis of whether the curfew order was narrowly tailored to the government interest in preventing property damage. *Id*. at 400. The Court went on to explain that, as here, "Defendants' argument appears to presume that simply by invoking the specter of property damage, a citywide curfew order was automatically warranted as a matter of law. The court cannot rule on the issue of whether the curfew order was narrowly tailored without more facts regarding the nature of the disorder which the curfew sought to prevent." *Id*. at 401. This requirement has also been required by the Supreme Court. In *Turner Broad. Sys., Inc. v. FCC*, the Court held that "when First Amendment rights are implicated," the Court must "assure that, in formulating its judgments, Congress has drawn reasonable inferences *based on substantial evidence*.") *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664, 129 L. Ed. 2d 497 (1994) (emphasis added).

Whereas in the cases upon which Defendants' arguments rely, when the curfew in Wauwatosa was declared, no property destruction nor violence had occurred. Defendants were not responding to a civil unrest, but speculating on the possibility of civil unrest. As confirmed by Weber, the civil unrest referenced in the Emergency Proclamation was "speculative" and "all guesswork." Ex. 19 p 174, *see also* Ex. 19 115:19-22 (describing the curfew as "preventative"). McBride issued this order without reviewing "any documentation of violence" and in fact, never reviewed any intelligence. Ex. 1 pp. 64, 67. This was because there was no intelligence to support credible and serious threats of violence and vandalism. Defendants have never produced a single document to substantiate any threat. Ex. 19 RPD 6. And the record contains evidence that prior protests in the City of Wauwatosa had been peaceful. Ex. 3 (Director of Public Works David Simpson stating that "protests have been peaceful thus far").

Plaintiffs do not contest that a government would have an interest in maintaining public order. However, the analysis does not end with the mere invocation of such interest. As the Supreme Court has made clear, restrictions on Assembly must be supported by imminent threats or a clear and present danger. In *Brandenburg v. Ohio*, the Court stated that in order to curtail protected speech, an assembly must stoke or be threatened by *__imminent__* physical or property damage. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). In *Feiner*, the Court held that speech may be curtailed to prevent immediate danger to speakers and protesters. *Feiner v. New York*, 340 U.S. 315, 321 (1951) (allowing interference with protected expression when "faced with a crisis"). In *Terminiello*, the Court held that protected speech may not be abridged or censored short of "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest". *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949). Defendants provide no evidence, and cannot produce any evidence, that at the time the curfew was instituted, there was a clear and present danger to public order. They could only speculate.

Moreover, this constraint on the state's ability to curtail protest on the basis of speculation is core to the breadth of protection that the First Amendment provides. Should Defendants' argument carry the day - that civil unrest at other protests in other cities empowers that city to substantially curtail protests - there will be no limiting factor to stop cities from banning all future protests. If the invocation of arson in Kenosha is enough to issue a curfew here, without a credible threat of property destruction, then this is the end of free protest in support of the Black Lives Matter movement across the country. If the statement that *these* types of protesters have engaged in violence elsewhere is sufficient to curtail protester rights *here*, then any city may find violence somewhere to prohibit any protest movement in the future. And if a city may proscribe protests solely on the specter of the general unruliness of protests, absent a real threat of violence

13

or destruction, the ability of future protest movements to bring the public's attention to matters of public concern will be so severely limited that effective protest will be effectively prohibited.

### ii.    The Cure Order Is Not Narrowly Tailored

A regulation is not narrowly tailored if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). In enacting this curfew, Defendants engaged in no efforts to narrowly tailor this curfew because the point of the curfew was to limit protest - not to achieve any purpose and certainly not to achieve an identifiable goal. Defendants engaged in no tailoring as to restrictions on either place or manner of speech and only limited tailoring as to the time element. In essence, the curfew stopped all protests in the entire town of Wauwatosa during the hours in which individuals were not at work. Moreover, without any specific concerns to be addressed or conduct that the curfew was enacted to respond to, the Court is deprived of the ability to analyze whether the curfew was narrowly tailored. *See NAACP*, 562 F. Supp. 3d at, 400-401.

Defendants point to *Larson* in support of a city-wide curfew. However, this case points to the necessity of understanding the scope of the city's concern and whether such response was proportional. As the *Larson* court provided, that the fires occurred in nearly forty percent of the City's neighborhoods "show that the scope of Mayor Frey's curfew was proportional to the public-safety risk." *Larson*, 568 F. Supp. 3d at 1010-1011. Here, Defendants can provide no fact to support the proportionality of this curfew. Defendants engaged in no consideration of whether the interests of public safety could be achieved with less expansive restrictions. Indeed, the only interest that could be achieved through a citywide curfew was the total prohibition on protesting.

Defendants also argue that the curfew was only in effect for eleven (11) hours, beginning at 7:00 p.m. and ending at 6:00 a.m. But this timing deprived individuals who work normal work

14

hours from the opportunity to engage in protests against Wauwatosa police killings. For Plaintiffs, protesting during the time of the curfew was the only time they could protest. (PPFOP #1). The *Larson* court acknowledged that the ability for those working a full time-job to participate in protests is an important consideration in whether a time restriction is reasonable. *Id*. at 1011. Here, Defendants' curfew began earlier than any other protest in caselaw - indeed even the curfew in *Hodgkins* aimed at children began at 11:00 p.m. *Hodgkins*, 355 F.3d at 1052. As the Supreme Court has held, adjudicating constitutional issues on the basis of nothing more than "common sense" or "common knowledge" or "intuition" is a dubious proposition. *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 145 L. Ed. 2d 886, 120 S. Ct. 897, 907 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden"). Defendants can offer no explanation supported by any fact or experience for why 7:00 p.m. was narrowly tailored to protect government interests while also protecting First Amendment rights.

However, by failing to seek a narrowly tailored time restriction, Defendants precluded almost all non-work hours during these protests. And this balancing test is not one-sided. Timing of protest matters. The Seventh Circuit has recognized that many expressive activities occur late in the evening. *Hodgkins*, 355 F.3d at 1062.

> To the extent that the curfew prevents a minor from being outside of the home during curfew hours, it does not mean simply that she must shift the exercise of her First Amendment rights to non-curfew hours or to the telephone or internet; it means that she must surrender her right to participate in late-night activities whose context and message are tied to the late hour and the public forum. There is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person, praying in the sanctuary of one's choice side-by-side with other worshipers, feeling the energy of the crowd as a victorious political candidate announces his plans for the new administration, holding hands with other mourners at a candlelight vigil, or standing in front of the seat of state government as a legislative session winds its way into the night. "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it," *Riley v. Nat'l Fed'n*

*of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988), and, we add, when to say it. *Hodgkins*, 355 F.3d at 1061-1062.

Lastly, the manner of protest must include consideration that the timing of a protest matters. A protest against the killing of Alvin Cole by a Wauwatosa police officer is relevant on the day in which the DA decides to let yet another officer walk free after killing his third young male of color. A protest on this issue will not be relevant if conducted days or months later. The ability to protest in the City that employs this police officer who has killed yet another young male of color is the location that this protest is most needed. It is where the citizens who vote and the elected officials who run the police department that employs this officer live. For these individuals to see the protest, it must be in their community.

### d. Defendants Provided No Ample Alternative Channels for Protest

Defendants can point to no alternative channels for protest. Indeed, Farina noted that there was "nowhere" people could protest during the curfew in Wauwatosa. Ex 27, 213:24-214:3. Defendants suggest that Plaintiffs could protest from their living rooms - as if shouting at a TV is an effective form of protest. Defendants suggest that Plaintiffs can protest online, as if rage posting on Facebook is an effective form of protest. If protest is to be effective, then it must have the opportunity to call the public's attention to the topics being discussed. No amount of screaming at home or posting online will reach those you do not know. No amount of indoor protesting will bring your message to the elected officials who have the policy making authority. Although an adequate alternative for expression does not have to be the speaker's best or first choice, it must provide the speaker with sufficiently adequate alternatives. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002). Defendants' flip suggestion that Plaintiffs could protest indoors or online or on private property belies the lack of seriousness with which the City of Wauwatosa considered the needs of protesters to have an opportunity to pursue their message.

16

### e.  **The Curfew Order was a Formal Policy Under Monell**

Plaintiffs' First Amendment claim against the City of Wauwatosa is based on the curfew proclaimed by Defendant McBride. It is quite clear that this curfew order was a formal policy - indeed many protesters were prosecuted for violating it. As Defendants must surely be aware, a municipality may be sued under 1983 for its formal policies such as the curfew order.

### 3.  **Plaintiff Riveria's Title VI Should Not be Dismissed**

"To bring a private action under Title VI the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 418-19 (7th Cir. 1986). Here, Mr. Rivera lived in Wauwatosa on October 9, 2020 when he was arrested. PPFOF #6   In 2020, the City of Wauwatosa, through its police department, recipient of the Department of Transportation Speed Grant, Alcohol Traffic Enforcement Grant "ATEG", and the DOT Click or Ticket Grant. DF Ex. 28, p. 50. Mr. Rivera, therefore, is a beneficiary of the intended grants for the City of Wauwatosa. "Title VI itself directly reache[s] only instances of intentional discrimination. " *Alexander v. Choate*, 469 U.S. 287, 293 (1985). Thus, Title VI includes "an implied private right of action for both injunctive relief and damages" against appropriate entities engaged in intentional discrimination, *Ind. Prot. and Advoc'y Servs. v. Ind. Fam. and Soc. Servs. Admin.*, 603 F.3d 365, 376 (7th Cir. 2010).

Defendants offer no evidence or any argument in this record that the officer who arrested Mr. Rivera is not a City of Wauwatosa employee. On October 9, 2020 Mr. Rivera was told that he was being arrested "because he was black" from a person whom he believed to be a Wauwatosa Police officer. PPFOF #27. This alone creates a dispute of fact and defeats Defendants' motion for summary judgment. After repeatedly telling the arresting Wauwatosa

officer that he was coming from work and driving to his home in Wauwatosa, the officer told him

he was under arrest because, "at this point it doesn't matter because you are black." PPFOF # 28.

The discrimination against Mr. Rivera on October 9, 2020 by the Wauwatosa officer

demonstrates discriminatory intent, which was intentional and continuous. The policy in

Wauwatosa, when Mr. Rivera was arrested on October 9, 2020, was to arrest people of color who

were assumed to be participating in the protests. Because Mr. Rivera is a person of color, he was

intentionally discriminated against and was arrested. PPFOF #6.

### 4. <u>Plaintiffs Were Subjected to Malicious Prosecution</u>

Plaintiffs Isiah Baldwin, Aidali Rivera, and Rosalind Rogers' claims of malicious

prosecution against Defendant Farina must be determined by a jury. Under Wisconsin law, there

are "six essential elements" of a claim for malicious prosecution:

> (1) there must have been a prior institution or continuation of some regular
> judicial proceedings against the plaintiff; (2) such former proceedings must
> have been by, or at the instance of, the defendant; (3) the former proceedings
> must have terminated in favor of the defendant therein, the plaintiff in the action
> for malicious prosecution; (4) there must have been malice in instituting the
> former proceedings; (5) there must have been want of probable cause for the
> institution of the former proceedings; and (6) there must have been injury or
> damage resulting to the plaintiff in the former proceedings.

*Whispering Springs Corp. v. Town of Empire*, 515 N.W.2d 469, 472 (Ct. App. 1994).

#### a. Farina Lacked Probable Cause to Arrest or Prosecute Plaintiffs

Defendants' first argue that Plaintiffs Rogers, Baldwin, and Rivera cannot show that the

institution of proceedings lacked probable cause. This is inaccurate. On September 5, 2020,

Plaintiffs Rosalind Rogers and Isaiah Baldwin were arrested and ticketed by Defendant Farina

for Special Event Permit Required. PPFOF #15. Defendant Farina instituted the judicial

proceedings when he arrested and ticketed Plaintiffs. Wauwatosa Municipal Code 7.50.030 states in relevant part,

> "No person or entity acting as an event organizer shall set up for, hold, or conduct a special event, within the municipal boundaries of the city of Wauwatosa without first obtaining a special event permit."

The record contains no evidence to substantiate the probable cause to believe that Baldwin or Rogers were at a special event. There is also no evidence in the records that Plaintiffs Baldwin and Rogers were "acting as event organizers;" PPFOF #17. There is also no evidence to show that they "set up for, h(e)ld, or conduct(ed) a special event," PPFOF #16. – elements required for probable cause to arrest and ticket them per Wauwatosa Municipal Code 7.50.030.

Defendants next argue that Farina did not act with malice in issuing the citations. The record shows that a jury could reasonably find that Farina and other WPD officers held animus for protesters and that his conduct was in retaliation.

Defendant Farina intentionally arrested Rogers and Baldwin. PPFOF #15. Farina, however, never determined if either Baldwin or Rogers were organizing an event. Farina arrested Baldwin and made the handcuffs extremely tight and grabbed his private area. PPFOF #18 & #20. Farina justified his actions of putting the handcuffs on Baldwin tight, showing that this was no mistake, and said, "maybe you won't do this again." PPFOF #21 Farina also handcuffed Rogers, who also told him Baldwin's handcuffs were too tight. At the time of the arrest, Rogers was wearing a t-shirt with TPR written on it. Farina stated to her that "TPR was a gang". PPFOF #24. Farina arrested, detained, and ticketed Baldwin and Rogers for hours and ultimately gave them a citation for not having a special event permit for an "event" that did not exist. The ticket had court dates of October 28, 2020. Ex. 32, 33. Farina testified that, using Aidali Rivera as an

example, that if she did not show up for a municipal court civil citation, as was given to Baldwin, Rogers, and Rivera that, "She'd fall into default I guess." Ex. 27 pg. 229 line 10.

When asked about his arrest of Baldwin and Rogers on September 6, 2020, Farina admitted to knowing them – but not citing any criminal activity by them – before they were arrested on September 6, 2020:

> "Well, I -- you know, here -- here's the problem with Isaiah and Rosalind, I didn't have one interaction with them.· This wasn't the first time I had interaction with either one of them.· The other name I've never heard before.· So -- so it's · hard when you say, okay, why did Isaiah get arrested.· Well, do you know how many times I've talked to Isaiah and how many protests he was at? Same with Ros, I mean.· Yeah, I can call her Ros, because that's how many times I've had conversation with her, so.· I don't want to give bad information.· And it would be great if I still worked at the police department and I could spend time and read reports, and video, and." (Ex. 27 pg. 311-312 lines 21 – 9)

Although Farina now claims that he does not remember their arrest, his memory failure does not support summary judgment for the Defendants. Baldwin and Rogers certainly remember this horrible experience and the malicious actions of Farina.

### b. The Record Shows that the Defendants Lacked Probable Cause to Institute Proceedings Against Plaintiff Aidali Rivera

Defendants make the same arguments that Aidali Rivera cannot show that there was no probable cause to arrest her and that Farina did not act with malicious intent. This is inaccurate. Defendants incorrectly state that, "there is no dispute that (Aidali Rivera) was in the City of Wauwatosa on a public street after 7:00 p.m. in violation of the curfew when she was arrested." ECF #267 pg. 11, Ex. 39.

Aidali Rivera believes that she was arrested by Defendant Farina, who also ticketed her on October 9, 2020. PPFOF #10. It was because of this arrest and her being ticketed that court proceedings were instituted at the behest of Defendant Farina. She was summoned to appear at judicial proceedings on November 18, 2020. Ex. 37. Aidali Rivera was exempt from the curfew

because she was in Wauwatosa taking her son, a Wauwatosa resident, home from work. Ex. 34 Ex. 19, pg. 177:6-20 . Ms. Rivera complained to Farina that she was taking her son home from work, making her exempt from the curfew per Chief Weber's testimony but she was ignored and arrested anyway. PPFOF #33, Ex. 19 pg. 177:6-20

Like Baldwin and Rogers, Farina intentionally handcuffed Ms. Rivera tightly, exacerbating her pain. . PPFOF #12 Defendant Farina and other officers ignored Ms. Rivera's pleas for help and continued to keep the handcuffs on tight. Ms. Rivera's injuries from this arrest required treatment at a hospital. *Id*. Ex. Defendant Farina had no probable cause to arrest and ticket Ms. Rivera for violation of an emergency order. PPFOF #11.

After no fewer than two court hearings, Ms. Rivera's curfew violation citation was dismissed. PPFOF #14. Aidali Rivera is the *only* Plaintiff whose curfew ticket has been dismissed. Defendant Farina knew there was no probable cause to arrest Ms. Rivera and his actions of arresting, ticketing, and putting the handcuffs on her extremely tightly can support a conclusion that he acted with malice. Contrary to the Defendants' representation, Farina testified only that he did not know Rivera, *not* that he never had contact with her. (Ex. 27 pg. 36 lines 15-16). And Ms. Rivera DID NOT stipulate that she was violating the curfew when arrested.

5. **Defendants Violated Plaintiffs' Privacy Rights Under the DPPA**

Plaintiffs incorporate by reference their arguments in the Partial Motion for Summary Judgment in regards to the DPPA claims against Dominick Ratkowski and Joseph Roy. ECF Nos. 268 and 269. The Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq*., enacted by in 1994, states that, subject to certain limited exceptions, "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information[] from a motor vehicle record." 18 U.S.C. § 2722(a). Congress passed the DPPA in response to safety and privacy concerns stemming from the ready availability of personal information contained in state motor vehicle

21

records. *Lake v. Neal*, 585 F.3d 1059, 1060 (7th Cir. 2009). In order to protect the privacy rights of individuals, the DPPA "creates a private cause of action against "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter." *Lake v. Neal*, 585 F.3d 1059, 1060-1061 (7th Cir. 2009). To state a DPPA claim, a plaintiff must establish: "that the Defendants 1) knowingly 2) obtained, disclosed, or used personal information, 3) from a motor vehicle record, 4) for a purpose not permitted." *Marquardt v. City of Blaine*, 136 F. Supp. 3d 1049, 1056, (D. Minn. 2015).

### a.  Ratkowski Possessed No Legitimate Purpose

Defendant Ratkowski offers only one argument as to Plainitffs' claim against him under the DPPA: that Plaintiffs' claim fails because his purpose was one permitted under the DPPA - specifically that his conduct falls within the law enforcement function exception as provided in the DPPA. 18 U.S.C. § 2721(b)(1). ECF No. 267 p. 14-15 In support of this exception, Defendant Ratkowski argues that he developed this list for the purpose of preparing "for potential violence or future crimes by providing a means for law enforcement to identify witnesses, victims, and possible suspects who might be involved in a specific incident." *Id* at 16. Defendant Ratkowski's argument fails for two reasons: 1) there is a dispute of material fact as to whether this was his actual purpose; and 2) even if the Court were to conclude that there is no dispute of fact as to whether this was his purpose, there is a dispute as to whether this purpose is permitted under the DPPA.

### i.  Ratkowski's Purpose was to Harass

Defendant Ratkowski developed the list, which contains Plaintiffs' personal information from motor vehicle records, for a purpose unrelated to preparing "for potential violence or future crimes by providing a means for law enforcement to identify witnesses, victims, and possible suspects who might be involved in a specific incident." Instead, the record shows that Defendant

Ratkowski acted out of retaliation, discrimination, the purpose of harassment, to assist WPD officers in targeting Plaintiffs' for selective enforcement of laws, to gather intelligence on a political movement for which the WPD unfortunately saw as political opponents, and out of a general animus for individuals protesting police brutality. Defendant Ratkowski's motive were not as argued in his Motion for Summary Judgment, but instead were a troubling abuse of power by a police force reeking of McCarthyism in the Twenty-First Century.

The record is replete with evidence that Defendant Ratkowski's intent was based not on investigating crimes, but in targeting individuals based on their political association. However, his animus towards the People's Revolution is made clear from his conduct that summer. The City of Wauwatosa created an Ad Hoc Committee on Policing and Systemic Inequities to address policing in the City of Wauwatosa. Defendant Ratkowski's response was to prepare intelligence files on four members of color on committee. See Ex. 24 p. 2 - 5. Indeed, in an email to Chief of Police Weber and three other police officers, Ratkowski attached information on these committee members, telling the WPD officers that he was providing such information "in case someone (sic) ask (sic) for proof they are in the People's Revolution." *Id* at 1. Defendant Ratkowski's attachment to such email included the exact same information contained in the TPR Target List, but also included information ranging from citizen's church affiliations, wages, social media, and educational background. *Id* p. 2 - 4.

This list of individuals included Lindsay Draper, a former Milwaukee County Circuit Court Commissioner. *Id* at 5. For each individual, Defendant Ratkowski placed their DOT address. *Id* p. 2 - 4 For each individual, he pulled their DOT photo. *Id*. And all of this was done so that the Wauwatosa Police could track members of a City Commission looking at policy changes in policing. The throughline between this conduct and the TPR target list is that

Defendant Ratkowski was seeking to target individuals on the basis of their political association with the People's Revolution. *Id* p. 1. Clearly, Defendant Ratkowski had no legitimate law enforcement function in accessing these four individuals' DOT records, yet he did so in order to track their association with the People's Revolution. On this basis alone, it is clear that a jury could determine that the purpose of the TPR target list was to target individuals, not to pursue legitimate police functions.

Nonetheless, the record includes further proof that Defendant Ratkowsi's intent was about political affiliation rather than investigations. Indeed, Defendant Ratkowski admitted that the basis for placing an individual on the list was simply based on "mere affiliation with a protest." Ex. 34, p. 83. Indeed, when asked whether a protester need to have been violent, have even potentially committed a crime, Defendant Ratkowski explained that no such conduct was necessary. *Id*. It was based on mere affiliation. *Id*. And an individual need not even attend a protest to warrant inclusion on the list - Defendant Ratkowski also provided that he would have added Plaintiffs' counsel Milo Schwab simply for representing members of the People's Revolution. Ex. 34 p. 123. Indeed, in July of 2020, Defendant Ratkowksi informed thirteen (13) WPD officers that he would "work on Iding all the names at the end of "a letter written by the People's Revolution calling for police accountability. Ex. 35. As Defendant Ratkowski explained, presence at a protest was not even necessary. Simple affiliation with protesters as a political group was enough. Ex. 34, p. 83.

Moreover, the name of the list alone makes clear that the aim is not about investigating *possible future* crimes, but instead about targeting members of the People's Revolution based on their affiliation. The name of the document is the "TPR target list." ECF No. 271 PSPF #1, DF BATES 25052. And a review of arrest records from the curfew shows that only those individuals

24

who the City of Wauwatosa associates with the People's Revolution are included on the list. Ex. 23 DF BATES 22461 - 22470. Even ignoring Defendant Ratkoski's chilling behavior in surveilling individuals on the Committee on Equity in Policing, these acts are independently sufficient to allow a reasonable juror to conclude that the TPR Target List was created for the purpose of harassing and targeting Plaintiffs' on the basis of their political affiliation. Together, this all adds up to a frightening abuse of power and invasion of the privacy of Plaintiffs and others on the basis of their association.

### ii.  Defendant's Proffered Excuse is Not a Legitimate Purpose

Even if the Court determined that there is no dispute of fact that Defendant Ratkowski's motives in creating the TPR target list was to "gather information from DOT records …to prepare for *potential* violence or *future* crimes by providing a means for law enforcement to identify witnesses, victims, and possible suspects who might be involved" in hypothetical future incident, such purpose is nonetheless not a legitimate law enforcement function. ECF No. 267 p. 16. As provided in *Senne v. Vill. of Palatine, Ill.*, a Defendant must show that each use and each disclosure was 'for the purpose of deterring or preventing crime or other legitimate law enforcement functions.'" *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 607-08 (7th Cir. 2012).

Essentially, Defendant Ratkowski argues that it is a legitimate law enforcement function to maintain a list of individuals on the basis of their protest activity or political association in case there is a future need to investigate a crime. Plaintiffs from May 25, 2020 to August 5, 2020 recall an officer reaching out to them as a witness, victim, or suspect involving protests. PPFOF #3. Nowhere in the record is there evidence that this list was created based on past criminal conduct - indeed Defendant Ratkowski's own argument speaks only of *possible future* events. ECF No. 267 p. 16. The same logic would permit a police department to maintain a list of all

25

Black residents in case there is some future crime in the Black community. Indeed, without something more - something akin to a reasonable suspicion - any law enforcement officer could invade the privacy of a private citizen in case that person might one day in the future witness a crime. This would collapse the privacy protections granted by the DPPA - at least as it applies to law enforcement officers. The Seventh Circuit has been clear that not all actions by law enforcement are within the scope of the law enforcement function exception to the DPPA. Tracking and surveilling individuals on the basis of their First Amendment activity in case there is some future need to contact them does not fall within this exception. Accordingly, Defendant Ratkowski's motion for summary judgment fails on this basis as well.

### iii.     Ratkowski Obtained Personal Information From Drivers Records

Defendant Ratkowski makes an additional argument as to three Plaintiffs - that the record does not contain evidence upon which a jury could find that he accessed the personal motor vehicle records of Plaintiffs' Baldwin, Juvenile (male) Palmer, and Juvenile (female) Palmer in placing them on the TPR target list. In support, Defendant cites to his Declaration. However, Defendant Ratkowski's declaration makes no mention of any of these Plaintiffs. Moreover, in the light most favorable to Plaintiffs, a juror could reasonably conclude that given Defendant Ratkowski's use of DOT records, it's reasonable to believe that Plaintiffs' records, including dates of birth, were gathered through motor vehicle records.

### b.  Plaintiffs DPPA Claim Against Roy

### i.     Roy Knew He Was Disclosing Motor Vehicle Records

Defendant Roy's first argument for summary judgment under the DPPA is that Plaintiffs cannot prove that he knowingly disclosed motor vehicle records on the basis that he did not know the origin of the personal information contained in police reports relating to Plaintiffs. This

is clearly incorrect. Defendant Roy plainly stated that Plaintiffs' personal information contained in the released arrest records came from DOT records. When asked where the information in these very records came from, Defendant Roy answered that "[t]his system will auto fill the information from the DOT record." Ex. 36, p. 104. Simply put, Defendant Roy knew that the personal information contained in the records he was disclosing were "auto filled" from DOT records. No less than forty-seven Plaintiffs note that they did not disclose nor do they recall disclosing their personal information of their weight, height, and eye color to officers in Wauwatosa on the dates of the police reports or citations that were released by Roy on January 7, 2021. PPFOF #2 Moreover, no fewer than ten (10) records disclosed by Defendant Roy specifically state that the information was obtained from the DOT. Ex. 38.

### ii. Plaintiffs Did Not Disclose Their Personal Information

Defendant Roy's second argument is that Plaintiffs may not recover under the DPPA if they voluntarily disclosed their own personal information. Defendant Roy's argument fails to even get off the ground. Defendant Roy offers not one piece of information, not his own affidavit, not the affidavit of a single officer, in support of this contention. Without a single piece of evidence, Defendant Roy cannot credibly claim that there is no dispute as to whether Plaintiffs disclosed such information voluntarily. Moreover, as provided in Plaintiffs' affidavits, the personal information obtained from motor vehicle records which Defendant Roy disclosed were not voluntarily disclosed. PPFOF #2. This is sufficient to create a question of material fact. Accordingly, Defendant Roy's second argument fails as well.

### iii. Roy is Attempting to Manufacture a Dispute of Fact

The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims. Rule 56(c)(4) serves this screening function by permitting a

27

party to use an affidavit or declaration to support or oppose a motion for summary judgment only if the affidavit (1) attests to facts of which the affiant has personal knowledge; (2) sets out facts that would be admissible in evidence; and (3) shows that the affiant or declarant is competent to testify on the matters stated. Rule 56(h) permits a judge to sanction a party who presents an affidavit in bad faith or solely for delay. Rule 56 thus requires a judge to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains. *James v. Hale*, 959 F. 3d 307.

In the Seventh Circuit, the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. The court also disregards an affidavit that contradicts a statement made under penalty of perjury, even if the statement was not made in the course of litigation. The sham affidavit rule prohibits litigants from manufacturing issues of fact with affidavits that contradict their prior sworn testimony. *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009).

Here, Roy in his declaration submitted is offering evidence that is different than that which he testified to. In Roy's Deposition when asked specifically about what type of biographical information would WPD officers typically get from those whom they arrested he testified. Ex. 26 p. 77.

In Roy's declaration he states,

"During a Wauwatosa Police Department booking process the booking officer would ask the arrestee for biographical information including name, date of birth, address, height, weight, hair and eye color, and phone number. ECF #259 pt. 10

In another example where Roy tries to rewrite history, in his deposition when he unequivocally testified that information found on Plaintiff Bogenberger's ticket and using her

ticket as an example when asked about home address and driver's license numbers and those being "two pieces of information (that) are retrieved through a driver's license record, correct?" Roy answered, "correct." ECF No. 269 p. 19- 20, Ex. 36 Depo - p. 105).

Conversely, now in Roy's Declaration, he attempts to contradict his own testimony by putting in his declaration that. in para 15, "Information including age, hair color, eye color weight, height, date of birth, address, driver license number, phone number, could come from numerous sources including the report management system, NCIC, officer observations, or open-source information." ECF No. 259 #15. Some judges call these "sham affidavits." Indeed, the Seventh Circuit has noted that "A 'sham affidavit' is an affidavit that is inadmissible because it contradicts the affiant's previous testimony . . . unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse." Cook v. O'Neill, 803 F.3d 296, 298 (7th Cir. 2015). Those are limited exceptions, and if they do not apply and the affidavit testimony conflicts with the deposition testimony, the later affidavit is disregarded and ignored at summary judgment. Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 809, n.1 (7th Cir. 2015). Defense counsel were given an opportunity to cross examine Roy and have offered no explanation as to why his testimony from his deposition to his declaration has changed. As such we ask the court for a ruling to disregard Roy's declaration.

c. **Monetary Damages**

Defendants' last argument is that Plaintiffs must prove actual damages. Notably missing from Defendants' argument is any citation to any DPPA case which makes this finding. Indeed, when Court has been confronted with this question, they have uniformly held that the very nature of the liquidated damages section is to protect against privacy violations when damages are not easily calculable. "If a plaintiff proves that his rights under the Act were violated, but is unable to

show actual damages, he is entitled to receive liquidated damages in the amount of $2,500." Parus v. Kroeplin, 2006 WL 278374, *5 (W.D. Wisc. January 31, 2006); *see also, e.g., Kehoe v. Fidelity Federal Bank & Trust,* 421 F.3d 1209, 1213 (11th Cir. 2005) ("Liquidated damages are a contractual substitute for actual damages and are paid even in the absence of proof of actual damages:"); *Pichler v. UNITE,* 228 F.R.D. 230, 247 (E.D. Pa. 2005) (holding that "a plaintiff may recover liquidated damages of $ 2,500 under the DPPA even if she fails to prove actual damages"). The Court need not delve into treatises on contract law here - the caselaw is clear that Congress created a right to liquidated damages knowing that a violation of the right to privacy may not yield to precise damages, but is nonetheless a deeply damaging act.

### 5. <u>Qualified Immunity</u>

#### a. <u>McBride</u>

Defendant McBridge argues that he is entitled to qualified immunity only on the basis that his conduct did not violate the First Amendment. For the reasons provided in Plaintiffs' First Amendment section, *supra*, Defendant McBride's argument fails.

#### b. <u>Farina</u>

The Doctrine of qualified immunity is inapplicable to Plaintiffs' state law claims. Qualified immunity applies to claims under the constitution or federal law. Plaintiffs' claims for malicious prosecution are state law claims and therefore, qualified immunity is inapplicable.

#### c. <u>Ratkowski</u>

Defendants offer no argument in support of this defense and on that basis alone, Defendant Ratkowski should be denied qualified immunity. However, the claim against Defendant Ratkowksi is not a 1983 action. No 7th Circuit court has ever recognized the defense of qualified immunity in a DPPA action. Lastly, any reasonable person would understand that it

is clearly established that protesters should be free from intentional targeting, harassing, and surveillance of protesters on the basis of their political association.

### d. <u>Roy</u>

Defendants offer no argument in support of this defense and on that basis alone, Defendant Roy should be denied qualified immunity. However, the claim against Defendant Roy is not a 1983 action. No 7th Circuit court has ever recognized the defense of qualified immunity in a DPPA action. Lastly, Defendant Roy's argument is based on his own knowledge. This is not applicable to the clearly established framework and accordingly, such argument fails.

### <u>CONCLUSION</u>

Based on the foregoing, Defendants' motion for summary judgment should be denied in its entirety.

Dated this 1st day of February 2023.

COUNSEL FOR PLAINTIFFS

<u>/s/ E. Milo Schwab</u>
E. Milo Schwab
ASCEND COUNSEL
CO State Bar. No.: 47897
2401 S Downing Street
Denver, CO 80210
Email : milo@ascendcounsel.co

Attorney Kimberley Cy. Motley
MOTLEY LEGAL SERVICES
WI State Bar No.: 1047193
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
Email : kmotley@motleylegal.com
Telephone : (704) 763-5413

Attorney Kathryn Knowlton
KNOWLTON LAW GROUP

7219 West Center Street
Wauwatosa, WI 53210
Email: kate@knowltonlawgroup.com