UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


KATHRYN KNOWLTON, and
DANA McCORMICK, et al,

                                   Case No. 20-CV-01660

    Plaintiffs,

    v.

CITY OF WAUWATOSA, BARRY WEBER,
In his individual capacity as Chief of Police, and
DENNIS MCBRIDE in his individual capacity, et al.

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -



DEPOSITION OF DENNIS MCBRIDE



DATE TAKEN: June 23, 2021

TIME:        9:23 a.m. - 1:31 p.m.
LOCATION:    Knowlton Law Group
             7219 West Center Street
             Wauwatosa, Wisconsin 53210

*Miriam Beckford, Professional Court Reporter*

**<u>APPEARANCES FOR THE PLAINTIFFS</u>**

KIMBERLEY CY MOTLEY, ESQ
MOTLEY LEGAL SERVICES
(704)763-5413
Motleylegal.com

MILO SCHWAB, ESQ,
ASCEND COUNSEL, LLC
3000 Lawrence Street
Denver, Colorado 80205
(303)888-4407

KATHRYN KNOWLTON, ESQ.
KNOWLTON LAW GROUP
7219 West Center Street
Wauwatosa, Wisconsin 53210

**<u>APPEARANCES FOR THE DEFENDANTS</u>**

JASMYNE M. BAYNARD, ESQ.
GUNTA LAW OFFICES, S.C.
9898 West Bluemound Road #2
Wauwatosa, Wisconsin 53226
(414)291-7979

**<u>EXHIBITS</u>**

#1 - Proclamation of Emergency
#2 - E-Mail Confidential: Emergency Declaration
10/06/2020
#3 - Common Council Agenda 10/13/2020
#4 - E-Mail Fw: [External] Protest 10/11/2020
#5 - E-Mail Fw: [External] Clergy request 10/09/2020
#6 - E-Mail Fw: [External] Re: Wauwatosa curfew
10/09/2020
#7 - E-Mail Fw: [External] recent demonstrations
10/12/2020
#8 - Protester List
#9 - E-Mail Fw: [External] Wauwatosa Arrests 10/14/2020

DENNIS RAYMOND MCBRIDE,

a witness herein, having been duly sworn, testified as
follows:

        MAYOR MCBRIDE:  I do.

        ATTORNEY SCHWAB:  Good morning.

        MAYOR MCBRIDE:  Good morning.

        ATTORNEY SCHWAB:  I'm Milo Schwab.  I'm here,
my cocounsel, Kim Motley and Kate Knowlton to conduct
this deposition of Dennis McBride, Mayor of Wauwatosa,
Wisconsin.  Today is Wednesday, June 23rd, 2021.  It is
9:24 a.m. and the case is 20CV1616, a civil action
pending in Federal District Court in the Eastern
District of Wisconsin.  Mr. McBride is here with his
Counsel Jasmyne...

        ATTORNEY BAYNARD:  Baynard.

        ATTORNEY SCHWAB:  Baynard.  And let's see, we
have now asked -- the notary has sworn him in. So we are
ready to commence.

        ATTORNEY MOTLEY:  She has something to say
too.

        THE VIDEOGRAPHER:  Good morning.  This is Disc
No.1 of the Dennis McBride deposition in the matter
before the United States District Court for the Eastern
District of Wisconsin for the case of 20CV1660, *Kathryn
Knowlton, Dana McCormick et. al v. City of Wauwatosa,*

*Dennis McBride and Barry Weber.*  This deposition is being taken on behalf of the Plaintiffs.  It is taking place at Knowlton Law Group at 7219 West Center Street.  The date is April -- no, the date is June 23rd, 2021, and the time is 9:25 a.m.

My name is Madeliene Schweitzer, I'm the videographer.  The Court reporter is Miriam Beckford.

Will, Counsels, please, identify themselves?  And the court reporter will swear in the witness.

ATTORNEY BAYNARD:  Attorney Jasmyne Baynard on behalf of Mayor McBride and all defendants.  And with me as an agent and representative of the City is City Administrator, James Archambo.

ATTORNEY SCHWAB:  All right.  Ready to go?

ATTORNEY MOTLEY:  And Attorney Milo Schwab and Kimberley Motley who are representing all of the Plaintiffs.

BY ATTORNEY SCHWAB:

Q    Mr. McBride, could you please state your full name, for the record?

A    You want my middle name too?

Q    Sure.

A    Dennis Raymond McBride.

Q    All right.  Have you ever been deposed before?

A    No.

Q    No.  Have you ever taken a deposition?

A    I've taken hundreds of depositions.

Q    All right.  So you're experienced with the deposition,
     you understand that all questions --  well, all answers
     will be under oath?

A    Yes.

Q    Okay.  Let's see, there are a few differences between a
     deposition and a typical conversation.  First, the court
     reporter is attempting to transcribe everything we say.
     So when we talk over each other, obviously, that makes
     it more difficult.  Something I was just doing, when we
     speak too fast it makes it a little difficult.  So, to
     the degree we can, let's make sure that we, both, speak
     at a normal clip.

              But also that we don't speak over each other,
     that you don't rush to answer a question before I finish
     asking it.  And in turn I will do my best to not start
     asking a question wait instead until you're done.
     There's another thing; we should stay away from
     uh-huh's, mm-hmm, things like that we should answer yes
     and no.  Additionally, head nods are not going to be
     recorded on the record, so we need to be make sure that
     we answer verbally -- or orally, rather.

A    Just to put it on the record.  Yes, I understand all
     that and I agree with it.

Q    Great.  Is there any reason that you can't -- won't be
     able to give truthful testimony today?

A    No.  None, whatsoever.  I feel great.

Q    Have you been under any stress recently, abnormal
     stress?

A    Nothing more than being Mayor of Wauwatosa.

Q    All right.  Have you taken any drugs or any alcohol this
     morning?

A    No.

Q    Okay.  If you don't understand any question that I or
     Kim ask simply just ask us to restate it or, you know,
     whether it's -- or for more information.  We're happy to
     do so.

A    Right.

Q    Like I said, if you need a clarification, please ask.
     If you have some knowledge, but not full knowledge,
     please state your degree to which you do have knowledge
     of whatever information is being requested and let us
     know that you don't have the complete knowledge.  But,
     again, please provide the knowledge that you do have.
     Sometimes we're going to ask -- we're going to reference
     a document -- actually, I'm not sure...

               All right.  Do you have any questions before
     we begin today?

A    No.

Q    How did you prepare for this deposition?

A    I've been thinking about the deposition for many months.
     I've been eager to sit for this deposition.  I've gone
     over -- we've produced documents and I have looked at
     some of those, sometimes not in detail.  And I worked
     with counsel to produce documents to you in response to
     your requests.  I have met with counsel a few times.

Q    Do you know which documents you reviewed?

A    Well, I produced some texts messages and I know our city
     attorney, excuse me, produced a number of documents by
     looking for e-mails that she requested.

Q    And did you review any of those in the last couple of
     days in preparation, specifically, for today?

A    No, I did not.

Q    Okay.  Did you speak with anyone in preparation for
     today?

A    Yes, I spoke with counsel.

Q    Okay.  Anyone else?

A    Mr. Archambo.

Q    Okay.  When did you speak with Mr. Archambo?

A    Well, this morning and, you know, on an ongoing basis.

Q    Can you tell me the content of those conversations?

A    No.  It's protected by attorney/client privilege.

Q    Mr. Archambo's your attorney?

A    No.  He's an agent, he's city administrator, and he's

within the zone of attorney/client privilege.  On some

legal strategy matters, not all matters.  Some of the

things that are factual, yes, I can tell you.

Q    Can you tell me, between you and Mr. Archambo, who's the

attorney in this attorney/client privilege?

A    Jasmyne Baynard is the attorney.

          ATTORNEY BAYNARD:  So to clarify our

conversation that we had this morning where he was

involved --

          MAYOR MCBRIDE:  Right.

          ATTORNEY BAYNARD:  -- would be protected by

attorney/client privilege.

          MAYOR MCBRIDE:  Right.

          ATTORNEY BAYNARD:  Okay.  I think that's --

          (Interruption)

          THE COURT REPORTER:  I'm sorry, what --

          ATTORNEY BAYNARD:  I said, I think, for the

extent of our conversation this morning I will instruct

him not to answer on the basis of attorney/client

privilege or anything we talked about this morning.

Also, anything that -- any conversations he's had with

Mr. Archambo outside of this morning is not protected by

attorney/client privilege unless Alan Kesner was there

or dealt with legal strategy and other -- in this case.

A    No.  I'm sorry if it wasn't clear.  But anyway, we have

counsel present when we're talking about legal
strategies and I will not answer that.  But if you want
to talk about factual matters, I can do that.

Q    Sure.  So outside of conversations with counsels
present, have you had other conversations with
Mr. Archambo in preparation for today?

A    I don't know if it was in preparation or just
conversations with him that have touched on this.

Q    Okay.  Did you speak with Mr. Weber in preparation for
today?

A    I did not.

Q    When was the last time you spoke with Mr. Weber?

A    Sometime in May before he retired.

Q    Okay.  And aside from Mr. Archambo and counsel, did you
speak with anyone else in preparation for the testimony
you're going to give today?

A    No.

Q    No council members?

A    No.

Q    No commissioners?

A    No. I don't talk to the police and fire commissioners
about city matters.

Q    Okay.

     BY ATTORNEY MOTLEY:

Q    In preparation for today, did you review Chief Weber's

deposition transcripts?

A    No.

Q    Did you look at the video of the deposition?

A    No.

Q    Okay. And you haven't spoken to Chief Weber since May.
What date was that?

A    I don't know.

Q    Okay. So with regards to your conversations with
Mr. Archambo, where your attorney was not present; what
did you discuss in preparation for today?

A    When it was going to be. That he was going to be
present.

Q    And whose idea was that for him to be present today?

       ATTORNEY BAYNARD: I'm going to instruct him
not to answer on the basis of attorney/client privilege.

Q    Why is he here?

       ATTORNEY BAYNARD: Same objection.

Q    Why didn't you show up for the prior deposition?

       ATTORNEY BAYNARD: Same objection.

       ATTORNEY KNOWLTON: And you can object, he
still has to answer the question.

       MAYOR MCBRIDE: You're not a lawyer here.

       (Overlapping Discussion)

       MAYOR MCBRIDE: I don't want questions from
three lawyers at one time. Can you just, please,

confine it to one at a time and I'll be happy to answer
--

ATTORNEY MOTLEY:  This isn't your deposition
and she is an attorney here --

MAYOR MCBRIDE:  That's -- not how you're
supposed to conduct depositions.

(Overlapping discussion)

ATTORNEY BAYNARD:  So I'm not sure what the
last question was.

BY ATTORNEY SCHWAB:

Q    Okay.  Are you claiming attorney/client privilege over
whose idea it was for Mr. Archambo to be present?

ATTORNEY BAYNARD:  Yes.  I'm going to instruct
him not to answer about that topic.  As well as
attorney/client privilege and our legal strategy as to
why he did not appear or why I instructed him not to
appear for his, previously, noticed deposition.  And
what was the last question?

ATTORNEY MOTLEY:  And are you also claiming
attorney/client privilege for the conversations that
he's had with Mr. Archambo when you have not been
present?

ATTORNEY BAYNARD:  No.  And, I think, I mad
that clear.  Any conversation that did not involve me or
the city attorney counsel, there is no attorney/client

privilege.

ATTORNEY MOTLEY:  And let's be clear that your witness is not the judge in this situation.  There are three attorneys here and we will conduct this deposition as we choose to conduct this deposition.

MAYOR MCBRIDE:  And I would also like to make it clear that you're not judge.  So, I would hope that I would get one clear question at a time, so that the court reporter can have a clear transcript.

ATTORNEY MOTLEY:  Absolutely.  And, I think, if there's any problems with how the deposition is conducted we can happily get the judge on the line.

ATTORNEY BAYNARD:  That sounds good.

MAYOR MCBRIDE:  That would be fine.

ATTORNEY MOTLEY:  So going back to the question with regards to Mr. Chambo[sic].

MAYOR MCBRIDE:  It's Archambo.

ATTORNEY MOTLEY.  Mr. Chambo -- Mr. Archambo, sorry.  You're right.  I always think Art Chambo.  It's Mr. Archambo.  And can we spell that, for the record?

MAYOR MCBRIDE:  It's A-r-c-h-a-m-b-o.

BY ATTORNEY MOTLEY:

Q    What is Mr. Archambo's role as the City Administrator with the City of Wauwatosa?

A    He's -- in corporate terms I would say, I'm the chief

executive officer and he's the chief operating officer.

Q    So you -- he reports to you?

A    He reports to me and he also reports to the Common
     Council.

Q    What is Mr. Archambo's role as it relates to being here
     for your deposition?

A    He's the chief operating officer for the City of
     Wauwatosa.

Q    So what is his role?  What is his title?

A    He's the chief operating officer, so he's the agent,
     he's is the -- he is the, in essence, the City.  So he's
     here in that role.

Q    So why didn't Mr. Archambo come for Chief Weber's
     deposition?

A    You have to defer to counsel for that.

          ATTORNEY BAYNARD:  Again, I think, this line
     of questioning I've already objected to.  To the legal
     strategy of having Mr. Archambo here protected by
     attorney/client privilege.  And I'm going to instruct
     him not to answer.

Q    So are you going to show up for Mr. Archambo's
     depositions?

          ATTORNEY BAYNARD:  I'm going to go ahead and
     object on the basis of client/attorney privilege.

          ATTORNEY MOTLEY:  He still needs to answer.

ATTORNEY BAYNARD:  Not if I instruct him not to answer he doesn't have to.  And the legal strategy and whom we have attending depositions whether it's any of the named plaintiffs, whether it's the agent of the city it is a legal strategy protected by attorney/client, so I'm going to instruct him not to answer questions to that end.

Q    So why didn't you show up to the last deposition?

ATTORNEY BAYNARD:  I'm going to go ahead and instruct him not to answer on the basis of attorney/client privilege.  And, I think, this question was asked and answered.  And the legal strategy for why I instructed him and his counsel instructed him not to appear for the last deposition.

ATTORNEY MOTLEY:  Well, I just want to put on the record.  That as counsel you put in writing and you said on the record last time that it was your client that decided not show up for the deposition not you instructed him.  So are you saying you instructed him not to show up to the last deposition.

ATTORNEY BAYNARD:  I'm not sure what record you're referring to, but I instructed Mr. McBride not to appear for the last deposition based off of our conversations back and forth and whatever was filed with the Court in that matter, so.

ATTORNEY MOTLEY:  So you instructed your client to not comply with a legally noticed deposition?

ATTORNEY BAYNARD:  I instructed my client that until we had the issues resolve, which we still really don't have resolved, that he would not be attending the deposition.  And, again, I mean; are you questioning me or are you questioning Mr. McBride?

ATTORNEY MOTLEY:  No.  I'm asking you since you keep testifying.

ATTORNEY BAYNARD:  Okay.  Well, you're asking questions.  I'm instructing him not to answer on the basis of attorney/client privilege.  If you want to have a discussion with me off the record, we can do that.

ATTORNEY MOTLEY:  Well, I'm just wondering because we had a different answer.  So i just a clarification on the record to what it was last time versus what it is now, that's all.

ATTORNEY BAYNARD:  Again, I'm not sure what record you're referring to.

ATTORNEY MOTLEY:  When we spoke to the Judge when your client failed to show up we went on the record in April.

ATTORNEY BAYNARD:  Okay.

ATTORNEY MOTLEY:  And during that conversation you communicated to the judge that your client did not

want to be here, not that you instructed your client not to be here. But that he was refusing to come because he, Mr. McBride, wanted it to be sealed. That's what you said on the record.

ATTORNEY BAYNARD: If you want to show me the part of the record you're referencing. But, again, I'm not here to testify. I'm instructing him not to answer any questions that have to deal with the reasoning for why he did not come. And I'm telling you that it's attorney/client privilege, based on my discussions with my clients, that we would not be producing Mr. McBride for the deposition that was, previously, noticed. And he's here today.

BY ATTORNEY SCHWAB:

Q    Mr. McBride, can you tell me your background?

A    That's a pretty broad question. What do you mean, exactly?

Q    Let's start with your education.

A    Okay. I'm a product of the Wauwatosa schools. I graduated from Wauwatosa East High School. I graduated from UW in Milwaukee with a Bachelor's in Journalism. I received joint degrees from Princeton University and a Master's in Public Administration. And a law degree from New York University.

Q    And tell me about your work experience.

A    I -- well, again, how far back do you want to go?

Q    Let's start after law school.

A    Okay.  During law school I worked for Congress and I
     also worked for law firms.  And then after law school my
     first job was working for United District Judge,
     Terrance Evans who later went to the 7th Circuit.
     Again, worked for two Milwaukee law firms -- and I went
     to Boston worked for six years for a law firm there.
     And I came back and I worked for the EEOC, Equal
     Employment Opportunity Commission for the next 24 years.

Q    And was the EEOC the last place you worked?

A    Other than the City of Wauwatosa, yes.

Q    Okay.  Can you tell me what your practiced before at the
     EEOC?

A    Mostly trial work.  I did a little bit of real estate,
     but not much.  I did antitrust work as well.

Q    Okay.  And trial work was there a, particular, focus or
     was it anything that went to trial?

A    General litigation.  We had a patent -- an antitrust
     case in which we had over a hundred depositions.  There
     were product liability cases that went to trial.  I'm
     trying to remember.  I had cases that were in Fargo,
     North Dakota.  A lot of different kinds of litigation, I
     guess, is what I'm saying.

Q    Did you represent plaintiff, defendants, both?

A    Both.

Q    Predominantly one or the other?

A    Predominantly defendants in the corporate litigation.
     Predominantly -- all plaintiffs in civil litigation.

Q    And tell me about your role at the EEOC?

A    I was a senior trial attorney and for six years a
     supervisory trial attorney. I supervised paralegals,
     lawyers, and what they call clerks which were
     secretaries. I took some cases to trial most of the
     time that settled because it was civil litigation. I
     represented clients in sexual harassment cases, age
     discrimination cases, race discrimination cases,
     disability discrimination cases, the entire gamut.

Q    And did you retire from the EEOC?

A    I did.

Q    When?

A    2015. October 31st, 2015.

Q    Okay. And in that work you said, you did some race
     discrimination?

A    I did, yes.

Q    So would you -- and did you see any up to, 2015?

A    I'm sorry.

Q    I'm going to retract that question. Based on that work,
     would you say that there is still racial discrimination
     in our society?

A    Absolutely.

Q    Is there racism in the City of Wauwatosa?

A    I'm sure there is.

Q    Okay.  Have you ever said that racism or racial
     discrimination in the City is done?

A    Of course, not.

Q    You've never said that?

A    No.

Q    Okay.

     BY ATTORNEY MOTLEY:

Q    Isn't it true that you did say in an article there was
     racism in Wauwatosa.  But it doesn't exist anymore?

A    No.  What I said was that, there was a long history of
     racism in Wauwatosa, but we are a much more welcoming
     community than we used to be.  That doesn't mean that
     there is no racism.  Unfortunately, as long as there are
     human beings there's going to be racism.  That's
     something we have to fight against every day.

Q    What are some examples of racism that you, currently,
     seen in Wauwatosa?

A    I don't, currently, see them, but I'm sure they exist.

Q    You're sure, but you don't know that?

A    No.  Are you denying it?  I'm not.  I'm sure there are
     day-to-day examples of racism in Wauwatosa.  Just like
     any other community in the country.

Q    Do you know of any day-to-day examples of racism in
     Wauwatosa?

A    I do not.

Q    Has anyone ever reported to you that there is racism
     problems in Wauwatosa?

A    There have been a lot of allegations of racism in
     Wauwatosa.  Let me ask you this for clarification,
     please.  When you say the City of Wauwatosa are you
     talking about the city as a corporate entity or are you
     talking about the community?

Q    The City of Wauwatosa.

A    Then I would say, no, to all those questions.

Q    You would say, no, that there's no racism in the city
     entity of Wauwatosa?

A    None that I'm aware of.

Q    Okay.  Are you racist?

A    No.

Q    Have you ever been accused of being a racist?

A    Yes.

Q    By whom?

A    By you.

Q    When?

A    Multiple times in the newspaper.

Q    Give me a date.

                    (Overlapping discussion)

Q    So I have said that you're racist in newspapers?

A    As far as I can recall.

Q    When?

A    I don't know.  I don't have the exact dates.

Q    With which news outlet?

A    There have been an awful lot of articles in the Journal
     Sentinel.

Q    With what journalist?

A    There have been multiple journalists that have written
     about the City of Wauwatosa for the last year.

Q    But when I have accused you of racism?

A    I already said, "I don't know."

Q    So you know I did, but you can't say, specifically, when
     I did that.

A    I believe you did.

Q    You believe I did or I did?

A    I said, "I don't know", several times now.  So I'm going
     to say asked and answered.  How is that?

          ATTORNEY BAYNARD:  I think the issue is you're
     not letting each other finish sentences.  So let's do
     that.

          ATTORNEY MOTLEY:  Okay.  I just want to a very
     clear record of this.

Q    You just testified that I accused you of being racist?

A    I believe you did, but I don't know when that happened.

Q    So you believe I did or I did?

A    I just said -- I just said it.

Q    So you don't know.  Is I believe I did also the same as
     I don't know?

A    I'm not entirely sure.

Q    Okay.  So the same thing.  So who, actually, accused you
     of being racist that you do know for sure?

A    As I recall some people at the July 21st, 2020,
     listening session at Hart Park.

Q    You recall who, specifically?

A    I do not, other than, Father Groppi's daughter.

Q    Christine Groppi?

A    Yes.

Q    Anyone else?

A    I think there were others that night.  I don't think I
     was the only being accused of that.  But, I think, there
     were others that night.  Heather Kuhl, former
     alderperson, accused me of being a racist.

Q    Could you spell Heather Kuhl's name for the record.

A    K-u-h-l.

Q    Anyone else?

A    There might have been some e-mails, I don't remember.

Q    Okay.  So other than Heather Kuhl -- you know, for sure,
     she accused you of being racist?

A    Yes.

Q    Okay.  How did she do that?

A    In an e-mail.

Q    Okay.  And Christine Groppi also accused you of being a
     racist?

A    I believe she did.

Q    How did she do that?

A    It was verbal.  It was at the listening session.

Q    And other than those two, for sure, do you know of
     anyone else?

A    There was a woman at Hart Park in May that accused me of
     being a racist.

Q    Okay.  But you don't know her name?

A    I do not know her name.

Q    Okay.

     BY ATTORNEY SCHWAB:

Q    Are any of the police officers in the City of Wauwatosa
     racist?

A    I don't know.

Q    Do you believe there have been many racial incidents
     with the police officers?

A    What time are you talking about?

Q    In the last -- let's start in the 1980's?

A    Well, if you want to go back that far, yes, there was
     some.

Q    Okay.  How about in the last ten years?

A    I don't know.

Q    Are you familiar with the Martin Luther Parties?

A    Yes.  I don't know what it has to do with this case, but
     I'm familiar with them.

             ATTORNEY MOTLEY:  I have a quick question.

     BY ATTORNEY MOTLEY:

Q    Just to retract; how did you feel when Heather Kuhl
     called you racist?

A    I thought it was outrageous.

Q    How did you feel when you believe Christine Groppi
     called you racist?

A    I thought it was regrettable.  I admired her father
     greatly and I admire her mother.  And, I think, it was
     unfortunate.

     BY ATTORNEY SCHWAB:

Q    So regarding developments -- we're moving back to me
     because, ultimately, I get to ask questions that are --
     in a deposition that are, broadly, construed as relevant
     and the standard is not as narrow as relevance at trial,
     so don't concern yourself with why I'm asking something.

             ATTORNEY BAYNARD:  I'm going to object to the
     form of that statement because it's not a question.

             ATTORNEY MOTLEY:  It's an instruction.

             ATTORNEY BAYNARD:  Okay.

Q    So we can go back to the Martin Luther King parties for

a moment.  Were you a City of Wauwatosa resident when
the information relating to those parties came out?

A    No.

Q    No?

A    I was living in Massachusetts at that point.

Q    Okay.  But you've become of aware of them since?

A    Yes.

Q    Do you know when the last Martin Luther King party was?

A    I believe it was in the 1980's.

Q    Do you know if the officers responsible for that are
still on the force?

A    I have no idea.

Q    Would it trouble you to know that some of those officers
have been promoted?

A    If they were engaged in race discrimination I would be
considered about anybody who was be promoted.

Q    Let me ask you this.  Do you understand those Martin
Luther King parties as racist?

A    It's my understanding.

Q    Do you think that anyone who hosted those is a racist?

A    If based on what I know, which is very little about
those parties, I would say that they were engaged in a
racist act.

Q    And would you support the promotion of someone that
hosted a party to sergeant or lieutenant?

A     No.

Q     Would it trouble you if they were promoted to that after
      their role in a Martin Luther King party came out?

A     Of course.

Q     Do you know if any officers in the Wauwatosa Police
      Department are members of the KKK?

A     No.

Q     Would you demand that they be fired if you were to learn
      that they were?

A     Yes.

Q     Do you know if any members of the Wauwatosa Police
      Department participated in the January 6th insurrection?

A     I do not.

Q     Have you ever wondered if they were?

A     Yes.  And, I think, I asked -- or I'm a little fuzzy on
      that.  I don't think anybody went to that from
      Wauwatosa.

Q     I'm sorry, you said, you asked.  Who did you ask?

A     I believe I asked Captain Vetter.

Q     Okay?

A     But I'm not sure.

Q     Okay.  And you're aware that some police officers around
      the country were involved in that?

A     Yes.  It was outrageous.

      BY ATTORNEY MOTLEY:

Q    When you talked to Captain Vetter about the January 6th
     insurrection did you ask him about it verbally?

A    I think so.

Q    Do you recall if you sent any e-mails about it?

A    I don't think so.

Q    Did you ask anybody else within the Wauwatosa Police
     Department if there were any officers involved in the
     January 6th --

A    I did not.

Q    Did you talk to Chief Weber about it?

A    I did not.

Q    Did you talk to anyone on the Common Council about it?

A    I did not.

Q    Anyone on the police and fire commission about it?

A    I did not.

     BY ATTORNEY SCHWAB:

Q    When did you begin contemplating a curfew for October
     6th?

A    Contemplating, you mean personally?

Q    Yes.

A    You mean talking to people or just my own mind?

Q    Yes.

A    Late July.

Q    And you said, "Talking to people."  Who have you talked
     to about -- who did you talk to from July on?

A    At various times Mr. Archambo, Chief Weber, Captain
     Vetter, Governor's office.  They brought in General
     Knapp from the National Guard and they brought in
     General O'Donahue from the National Guard.

               THE COURT REPORTER:  Can you, please, spell
     those for me?

               MAYOR MCBRIDE:  Knapp is K-n-a-p-p.  And
     O'Donahue is O-'-D-o-n-a-h-u-e.

A    And also there was a woman, I believe, her name was
     Maryanne something, she was also from the State
     government, I think.  I'm trying to remember which
     agency.  She was part of the last call that was in
     September.

Q    And I'm sorry, you said, "They called the National
     Guard."  Whose they?

A    I'm sorry.  I'm not quite sure I remember saying, they.

               ATTORNEY SCHWAB:  Can you go back to the
     beginning of that answer?

               (Court Reporter reads back)

A    It was Maggie Gau, specifically, G-a-u.  She is the
     chief of staff for Governor Evers.  And she was the one
     who had General Knapp on the first call.  And General
     Knapp, General O' Donahue, and a woman whose name I
     can't remember, on the second call.

Q    So is that everyone you spoke to?

A     I believe so.

Q     Did you speak to anyone --

A     Excuse me -- city Attorney Kesner was involved in some
      of the discussions.  K-e-s-n-e-r.

Q     Did you speak to anyone in Milwaukee?

A     In Milwaukee?  Yes, Mayor Barrett.

Q     When did you speak with Mayor Barrett?

A     Late July.

Q     Late July?  Did you speak to him anytime after that?

A     What?  No.

Q     And what did you speak to him about in July?

A     I've known Tom for almost 50 years he and I graduated
      from high school the same.  And we have a lot of common
      friends, in fact, I worked with him in the federal
      court.  He worked for one federal judge across the hall
      and I worked for another.  I called him up and I said,
      "Tom at some point the DA is going to make a decision
      and it's going to affect your community and my
      community.  And we should talk about a strategy with
      dealing with any potential unrest."

Q     And when did you learn of the DA's decision?

A     October 7th, 2020.

Q     Would you have instituted the curfew if the DA had
      decided to charge Officer Mensah?

A     I doubt it.

Q    Why not?

A    I think the people who protested, many of them, there
     are counter protesters and I'm sure we'll be talking
     about that, would have been happy with the decision and
     we probably could have stood down.

Q    Okay.

     BY ATTORNEY MOTLEY:

Q    So you learned about the DA's decision on October 7th,
     2020?

A    Yes.

Q    You never talked to DA John Chisholm prior to October
     7th, 2020, of what his decision was going to be.

A    Absolutely.

Q    Did you talk to Chief Weber about what Chisholm's
     decision was going to be before October 7th?

A    I'm sure I did, but there was no conclusion.  I did not
     know until the afternoon of October 7th that the DA was
     going to render his decision and what his decision was.
     It was when it was announced that I knew it.

Q    You said that you in preparation for the October curfew
     you started preparing at the end of July.  Do you recall
     which date?

A    No.

Q    And on that date how did you start the preparations?

A    By calling Tom Barrett.

Q    You called -- that's the first thing you did?

A    (Non-audible response).

Q    Okay.  Did you follow up that call with an e-mail?

A    No.

Q    Did you talk to Chief Weber at the end of the July about
     the October curfew?

A    No.  We didn't start talking curfew until quite a bit
     later.  We were just talking, generally, what is going
     to happen when the DA makes his decision.

Q    Okay.  Whose idea was it to impose the curfew for
     October?

A    I believe it was the chief's.

Q    Do you recall when he made that -- when you became
     available of his decision to have the curfew in October?

A    Well, it wasn't his decision, it was his recommendation.

Q    Okay.  So who's decision was it, ultimately, to have the
     October curfew?

A    Ultimately, I would say it was between me and the
     governor.

Q    So Governor Evers.  How did the governor make this
     decision?

A    I never spoke to the governor until the curfew period.
     I spoke to him the second day.  He called me.

Q    Hold on just, for the record.  So you mean the second
     day, October 8th, is when you spoke with him?

A    October 8th, yes.

Q    So before October 8th?

A    I did not speak to him, personally.

Q    So who did you speak to in the governor's office with
     regards to the curfew October 8th?

A    Maggie Gau his chief of staff.  So she communicated to
     us, ultimately, that the governor wanted to bring the
     National Guard in and that the curfew would be part of
     that.

Q    So Maggie Gau told you that the governor wanted to bring
     the National Guard in?

A    Not, specifically, in those words.  It's just, you're
     going to get the National Guard.  That was the
     discussion, I believe, it was on September 17th.

Q    So between July, the end of July, and September 17th --
     was September 17th the first time you talked to Maggie
     Gau?

A    No.

Q    When did you first talk to Maggie Gau?

A    I believe it was August 11th when we talked.  I'm a
     little fuzzy on the August date and I'm clear on
     September 17th cause I -- I'm sure that you have the
     document.  I took notes of that conversation.

Q    Okay.  And on that August 11th, was it a call with
     Maggie?

A    It was a conference call.

Q    Okay.  And who else was on that conference call?

A    I believe, it was Mr. Archambo, Chief Weber, I think,
     Captain Vetter I'm not sure, Maggie Gau and General
     Knapp.

Q    And who set up that conference call?

A    Maggie Gau's office.

Q    Why?

A    Because we asked to speak about the situation in
     Wauwatosa.

Q    So what did you, specifically, ask to speak about with
     regards to the situation in Wauwatosa?

A    We wanted to know what the options were.

Q    For what?

A    For any potential unrest.

Q    Why?

A    Because there was potential unrest.

Q    So just potential unrest in general or was it -- like,
     what was the pretext of it?  Was it in conjunction with
     the DA's decision that was coming?  Or you know what
     precipitated this conversation?

A    I would disagree with the word, pretext.  But it was
     because we expected at some point that DA Chisholm would
     render his decision whether to charge or not to charge.

Q    So who reached out to whom with regards to the

conference call?

A    Initially, it was me.  I reached out to the governor's
     office.

Q    And how did you do that?  Was that by e-mail?

A    No, it was telephone.  Tom Barrett gave me Maggie Gau's
     phone number and said, "You should call Maggie and you
     should start the conversation."

Q    And what is your cell phone number?

A    I'm not going to give that to you.

Q    Why not?

A    It's personal information.  If you give me a good
     reason, I will do it.

Q    Well, we have text messages that you have provided to
     us.  So what is the number for those text messages that
     you have provided in our document discovery?

A    Well, I'm going to decline to give you that.  If the
     judge orders it I'll give it to you.

Q    So you're declining to give us the city work number that
     you used as an elected city official?

A    It's my personal cell phone.

     BY ATTORNEY SCHWAB:

Q    Do you use that personal cell phone for city business?

A    I did and I have been told I shouldn't do that.  So I
     won't be doing that anymore.

     BY ATTORNEY MOTLEY:

Q    Did you provide us with all of the text messages in
     relation to what we asked for in the discovery demand?

A    Yes, as I testified earlier today.

Q    Did you provide us with all the e-mails that you have in
     relation to our discovery demand?

A    Yes.

Q    Does that include e-mails from your personal e-mail
     account?

A    I have none that are relevant.

Q    You have no e-mails in your personal e-mail related to
     city business?

A    Sometimes people write to me and I say, "This is my
     personal e-mail account.  You need to write to me on my
     city account."

Q    So for those people that did write to you on your
     personal city account that are relevant to our document
     production did you provide that to your counsel?

A    Yes, but there were none.

Q    There were none?

A    None that I could find.

     BY ATTORNEY SCHWAB:

Q    Okay.  So let's backtrack.  I really want to get into
     the process through which this curfew came into being.
     So you began thinking about some type of response in
     July?

A    Right.

Q    At that point what was the basis on which you thought you need to have some response?

A    There had been a massive amount of unrest across the country and locally not just in Wauwatosa, but in Milwaukee and Madison. So prior to late July and based on what I had seen I anticipated unrest if the DA decided not to charge Officer Mensah.

Q    Can you tell me what, for you, unrest means?

A    Well, that's broad.

Q    That was the word you used.

A    I can tell you what happened and this is what I mean by it. So in Madison, for example, in early June statues were beheaded and torn down at the Capitol, windows were smashed, businesses were forced to closed along State Street. State Senator Tim Carpenter was attacked for filming with videoing with his cell phone as I understand even though he was sympathic to the BLM protesters. That was just Madison. Wauwatosa we had all of kinds of incidents. People were shutting down businesses, pushing people, driving on neighbors lawns, trashing store windows and windows to the police and the fire commissioners. Blocking off intersections outside of my house and across the city. Not allowing traffic to go by. Playing loud music at 12:30 in the morning to

wake up all the neighbors.  At the so-called listening

session on July 21st people were very very angry, which

is understandable, but led me to think that some of that

anger may spill over in some ways that were unlawful.

There were people who were carrying firearms at that

listening session.  They carried firearms into our

Common Council meeting on July 7th, 2020.  That was the

second day.  The first was day was July 2nd, the second

was July 7th were protesters from The People's

Revolution shut down the Cheesecake Factory at Mayfair.

They then came over to city hall and tried to shut down

our Common Council meeting.  Many of them were armed, as

I said.  People -- emotions were running high.  People

were not complying with the law.  And Mr. Archambo and I

met with many protester leaders during in July,

especially, in the hope that we could try to reach some

sort of understanding so people could protest peacefully

without creating problems.  And, unfortunately, those

efforts didn't go very far.

Q    Does people -- do people marching on the street

represent unrest?

A    No.

Q    And if I were to tell you that Chief Weber said that the

simple act of being out marching was an act of civil

unrest.  Would that be problematic?

A    I don't know what Chief Weber said, as I've said, I
     didn't read his transcript.  But I would say, again, the
     ACLU guidelines are the gold standard.  And they talk
     about marching down the street.  And if you occupy one
     lane of the road that's Constitutionally acceptable.
     And as long as you follow the law then, and I said this
     publicly many times during 2020, if you follow the law
     we will protect and defend your right to protest.  And I
     did that to many people during the summer.  A lot of
     Wauwatosans wrote to me and said, "You need to stop
     these protests."  And I said, "The First Amendment
     protects their right to protest.  They get to do that,
     but they have to follow the law."  So what we saw
     sometimes were people following the law and many times
     people not following the law.

Q    Did anyone across all of those protests including the
     October protests been teargassed, shot with pepper
     balls, shot with rubber bullets that were not committing
     illegal acts?

A    I doubt it.

Q    You doubt it?

A    My understanding is that if people -- if those tactics
     were used they were done for a reason.  Not because
     people were protesting, but because they were not
     complying with the law.

Q    And when you say, 'Not complying with the law'; what
     law?

A    When it's an emergency there's a law that I used to sign
     the Emergency Declaration.  And it established a curfew
     and people were not observing the curfew.  Each night
     they were given multiple opportunities to disperse.  The
     police didn't disperse them at 7:00 p.m., they waited.
     And then they made announcements and then another
     announcement and another announcement.  One night I
     remember seeing some drone footage in realtime at the
     corner of Wauwatosa Avenue and North Avenue, I don't
     know, call it a hundred people gathered.  And then a
     line of guardsman and police officers started marching
     east on North Avenue toward the protesters after several
     warnings to disperse.  If there were a hundred people
     were there probably 90 of them took off running down
     North Avenue to the east.  And nobody bothered them they
     just left.  And then, you know, a handful of people
     stayed and some started throwing bottles at the police
     officers and other things.  And it appeared that some
     other tactics were employed.

Q    Okay.  So let's back up again.  In the beginning of July
     you had a, generalized, sense based on the conduct of
     protesters in other towns that there might be some,
     generalized, unrest if the DA announced that he would

not be charging Officer Mensah; is that correct?

A    Yes.  But it just wasn't other towns it was Wauwatosa as
well.

Q    Okay.  And it was based on the conduct of, particularly,
people that are protesting police violence?

A    I don't know what they were protesting in every case.
Some of them were protesting police violence, yes.

Q    Okay.  You mentioned The People's Revolution.

A    Right.

Q    What do they protest?

A    They seem to be protesting a lot of things.  I believe
their posts on Facebook and they are protesting a lot of
different things.  A lot of it is police related and
some of it is not.

Q    Did you have any concerns about groups that, I don't
know, come out to support the police and the civil
unrest they can create?

A    Generally not.  Tosa Together, I participated in a rally
on June 3rd at that same intersection right outside of
city hall.  I had driven my son to Chicago to move into
an apartment.  And I came back for the second hour of a
two-hour rally.  I met with the protestors and marched
along the way and met with people.  That was peaceful.
Tosa Together I think is, usually, always peaceful.

Q    Well, let's go back and discuss -- you mentioned a few

different protests or civil unrest, as you described it.
You mentioned Milwaukee -- I'm sorry. I apologize. You
mentioned Madison; correct?

A    Right.

Q    What were those protests about?

A    I believe it was related to George Floyd's murder.

Q    And in Wauwatosa the protests that you classified as
containing civil unrest, what were those in response to?

A    I believe that was related, primarily, to Alvin Cole's
killing and also to George Floyd.

Q    And outside of Wauwatosa and Madison were there other
towns, specifically, on your mind?

A    Yes.

Q    What towns?

A    Milwaukee for example. There was, I think, it's the 5th
District police station at Martin Luther King Drive and
Locust which was at least, partially, burned. Along
Martin Luther King Drive, that same night, there were
businesses looted and burned. There was a lot of unrest
in Milwaukee. And, of course, at the same time Seattle
was a battleground, Portland was a battleground,
Minneapolis was a battleground, Philadelphia as I recall
at one point incidents occurred, Louisville became a
powder keg because of the Breonna Taylor situation.

Q    Okay. So Louisville was related to Breonna Taylor?

A     Well, generally, what was going on was protesting about
      police violence against black people.

Q     And we'll go back Seattle.  The protests that you have
      in mind those were in relation to George Floyd as well?

A     Yes.

Q     Portland, George Floyd?

A     Yes.

Q     Minneapolis, George Floyd?

A     Especially, Minneapolis.

Q     And Philly, is that related to George Floyd?

A     George Floyd and, I think, there was a situation of two
      where a black man got shot.

Q     Okay.  And so it sounds not like every protest that you
      had in mind, at least, all of them related to police
      killings of black people?

A     Police killings or other violence against black people.

Q     Okay.  So the protests or civil unrest that you had in
      mind was a conduct of people coming out to protest
      police killings of black people?

A     Not entirely.

Q     Can you give me an example of something -- of a protest
      that you saw out there that was not related to the
      police?

A     There were a lot of counter protests at all of these
      events.

Q    Okay.

A    And our primary concern throughout this whole last year
     and into this year has been the protection of human life
     and people are getting hurt.  Counters protesters were
     coming out with guns.  In Kenosha we saw two BLM
     protesters were killed and seriously wounded.  Those are
     the types of things that we are, primarily, worried
     about.  Whatever side you were on, we didn't want people
     to die we didn't want people to get injured.  So our
     concern was people were getting injured in the streets.
     Tim Carpenter got attacked.  We don't want that to
     happen ever.
     BY ATTORNEY MOTLEY:

Q    Who do you mean by 'we'?  Who's included in 'we'?

A    That we talked about earlier; the police, the city
     administrator, the governor's office.

Q    Is the Common Council included in that 'we'?

A    I sure hope so.  I wasn't discussing it with them at
     that time.

Q    You weren't discussing what with them at that point?

A    I had my concerns.  I don't have day-to-day discussions
     with the Common Council.

Q    What's the time period -- you weren't discussing the
     Emergency Proclamation with the Common Council during
     July and October; is that what you mean?

A    I never discussed the Emergency Declaration with the
     Common Council until October 13th, 2020.

Q    Did you ever discuss with the Common Council between
     July and October 13th the need for a curfew?

A    No.

Q    Did you ever discuss with the Common Council between
     August 11th and September -- or excuse me October 13th
     the need for the National Guard to protect, you know,
     property and people in the City of Wauwatosa?

A    No.  And that was -- there's a myth out there that I
     called out the National Guard.  That was the governor.

Q    You requested -- well, this is a question.  Did you
     request of the governor to send the National Guard?

A    No.  We discussed it and it was decided that that would
     be prudent.

Q    You discussed it with Maggie, what's her last name?

A    Gau.

Q    Gau.  That's who you discussed it with at the governor
     was office?

A    All of those people we have already talked about.

Q    Okay.  So did you ever send them an e-mail asking the
     governor's office to send the National Guard?

A    No.

Q    Did Chief Weber or anyone within the Wauwatosa Police
     Department ever send any written communications with the

governor's office requesting that the National Guard be present?

A    I have no idea.

Q    Did you -- did Mr. Archambo or anybody that worked within the people -- that work within the City of Wauwatosa ever request, in writing, that the National Guard be present for the October curfew?

A    Not to my knowledge.

Q    Did you instruct anybody to communicate with the governor's office to request that the National Guard be present?

A    No.

Q    So why was the National Guard present?

A    We discussed this on September 17th and it was clear from the fact that it wasn't just General Knapp, but also General O'Donahue that it was a very serious time. Because this was about the three weeks after the murders in Kenosha and all of the unrest there.  We had earlier discussed, in August, a range of options and we all decided that the National Guard would not be called out.

Q    And when you mean 'we' you mean people you, previously, talked about?

A    Maggie Gua, General Knapp, Mr. Archambo, the chief and I believe Captain Vetter.  I don't know -- I don't think the city attorney was on the call, but in August we

talked about a range of options and we all decided that the National Guard would not be appropriate. After Kenosha that changed.

Q    Was Hanna Kolberg was she also part of these conversations?

A    No.

Q    Hanna Kolberg. Can you spell her name for the record?

A    K-o-l-b-e-r-g. And her first name is Hanna with one H, H-a-n-n-a.

Q    And who is Hanna Kolberg?

A    She's the assistant city attorney.

Q    Just to jump back real quick and then I'm going to jump -- come back to this conversation. You indicated that your MCberry1953@gmail.com that you have, intentionally, not provided us with any documents that maybe in compliance with our request for production of documents because that's your personal e-mail?

A    That's not what I said.

Q    Okay. Could you please explain your rationale for not providing us with those e-mails.

A    I reviewed my personal e-mails and found nothing of relevance as I recall.

Q    Okay. Do you recall providing to your counsel e-mails with regards to our request for production of documents?

A    What happens when there is a request for documents is

that the city attorney has some software that allows him
to do a search. And he searched all of the e-mails and
determined that there were relevant e-mails from my city
account that should be produced to you. That's what we
produced.

Q    Do you recall receiving an e-mail from Kate Knowlton on
October 10th to your personal e-mail in regards to the
curfew?

A    I do and I think I said, "Please don't contact me on my
personal account. Please contact me on my city
account."

Q    But she contacted you with regards to city business;
correct?

A    Right. And I said, "This is not the appropriate e-mail
account."

Q    So other than her e-mail did -- you received other
e-mails to your personal account regarding our request
for production of documents?

A    No.

Q    So you only received her one e-mail?

A    That's the only one I recall.

Q    Because before you said you had not.

A    I told you that if I got, and I was specifically
recalling that one, if I got an e-mail that said, "I
want to talk to you about city business." I said to

Kate, "You need to contact me through my city account."

Q    Okay.  So you only got -- now, you are saying you only got one e-mail to your personal account in relation to our request for production of documents?

A    As far as I know.

Q    Okay.  And you never had this check that you said, you know, with regards to your work e-mail happen with regards to your personal e-mail to see if it complies with our request for production of documents?

A    I don't have that kind of software.  I did it personally through my e-mails for the relevant time period.

Q    Okay.  And are you the one who created the PDF documents of your e-mails?

A    PDF documents...you mean my city e-mails?

Q    Yes.

A    No, I was not.

Q    Who did that?

A    I assume the city attorney.

Q    The city attorney created -- you don't have an IT person that did it?

A    I don't know how he does it.  He just tells me that he has a search function and he can do that.

Q    Who's 'he'?  Sorry.

A    Mr. Kesner.

Q    So Alan Kesner was the one that went through your city

e-mails?

A    Right.

Q    And then created the documents that was given to your
     counsel who then gave it to us?

A    That's my understanding.

Q    Okay.  Do you recall -- so you never double-checked to
     see if there is any extra documents in compliance?

A    As I recall he sent the e-mails to me and had me review
     them.  And they looked like the full range of e-mails
     that I would have received on that topic.

Q    So who's the one that went through your cell phone to
     determine which text messages were appropriate to send
     in relation to our request for production of documents?

A    I did.

Q    Did anyone help you?

A    No.

Q    Okay.  And you're refusing to provide your cell phone?

A    I'm refusing to provide my cell phone number.

Q    Your cell phone number.  Okay.  But you acknowledge your
     cell phone was used in some instances with relation to
     your business?

A    I already testified to that, yes.

Q    Okay.  And you're testifying also -- and with regards to
     your e-mails, did we just get the e-mails that was
     outgoing from your account or -- and did we receive all

of the e-mails from your city account that was also
incoming plus the attachments?

A    My understanding is you received all of them, both
incoming and outgoing.

Q    Incoming and outgoing.  And did we receive also all of
the attachments to your e-mails?

A    I have no idea.

Q    Do you know if you are in full compliance of our request
for production of documents?

A    I believe we are.

Q    But you don't know if we received all of the attachments
to the e-mails?

A    We have a law firm.  And two staff attorneys that do
that work.

            (Off the record 10:21 a.m.)

            (On the record 10:38 a.m.)

BY ATTORNEY SCHWAB:

Q    Okay.  So in the beginning of July you were looking at
all of these other protests out there and seeing civil
unrest and had a concern that this would happen in
Wauwatosa as well?

A    Yes.

Q    Okay.  And, at that point, what were the options you
were thinking about?

A    We were -- I was trying to meet with protest leaders

just to see if we could have them follow the ACLU guidelines and then the protest could continue and there wouldn't be any problems.

Q    Okay.  And so that -- over the summer you tried to meet with people and were you talking with -- you didn't speak with anybody on the Common Council about potential response to future protests?

A    No.

Q    Okay.  Did you speak with anyone in the police department about how to respond to protests?

A    Yes.

Q    Which -- who did you speak with in the police department?

A    Primarily Captain Vetter.

Q    Okay.

A    Also Chief Weber, but primarily Captain Vetter.

Q    Anyone else?

A    We have monthly meetings, the city administrator and I have monthly meetings with the police command staff and also with the fire department command staff -- hold separate meetings those just happen.  And there were other captains present at various meetings when we had had the monthly meetings.  So in July we met on July 6th.  We meet the first Monday of the month, typically.  That was the day before the second cheesecake shut down,

Cheesecake Factory shut down. And, typically, at these meetings it would be the city administrator, and me, and the chief and the captains. So at that time Captain Vetter, Captain Schultz and I believe Captain Morrison.

Q    Did you take notes at these meetings?

A    I do not.

Q    Does anyone take notes at these meetings?

A    I think, but I don't know.

Q    Is there a secretary that would take notes?

A    No. No.

Q    Do you have agendas for these meetings?

A    Not written agendas. The fire chief sends out agendas and the police chief hasn't done that. We just meet and talk about whatever is of concern to us.

Q    And you said July 6th. At that July 6th meeting did you begin the conversation about how to respond to protests arising out of a decision on whether not to charge Officer Mensah?

A    No. I will tell you as well at that July 6th meeting it was unusual because we had Chris Jaeger. I believe it's J-a-e-g-e-r, Christopher. And he's the general manager of Mayfair and also his security chief and I don't recall the security chief's name. But they were there as well because they were concerned about what had happened on July 2nd at Mayfair with the shutdown of the

Cheesecake Factory by TPR.  So we were talking about
that, primarily.

Q    Did you invite Mr. Jaeger?

A    I didn't invite him.  He came.  I don't know who brought
him to the meeting.  I don't know if the police did or
whatever.

Q    Is that common for --

A    No.

Q    -- business owners?

A    No.  But Mayfair was a concern because the protests were
focused on Mayfair at that point.

Q    And is Mayfair Mall a bigger issue or a bigger concern
for you than most other businesses in town?

A    All business are important to us.  Mayfair just happens
to be a very large business.

Q    Okay.  After July 6th -- so in July 6th you didn't speak
about how to respond to Officer Mensah's charging
decision.  Did you talk about protests in general at
this meeting?

A    We were talking about protests at Mayfair.

Q    Okay.  What was your next meeting after that with the
command staff?

A    Whatever the first Monday in August was.

Q    Okay.  And at that meeting did you talk about responding
to the charging decision for Officer Mensah?

A    I don't recall.

Q    Do you know if you ever spoke about a charging decision
     for Officer Mensah at one of these meetings?

A    I assume that we probably did by September.  I mean, at
     that point Kenosha had already happened.  We had a whole
     summer of unrest in Wauwatosa including violence.  And
     we knew that at some point we were going to get a
     decision from the DA.  Every day that went by we assumed
     it would be a day closer.  We didn't know what that day
     was, but it had been dragging on and on and on.  So we
     thought that the decision was coming closer.

Q    Let's see.  Okay.  So that's going on over the summer.
     At what point did you decide to issue a curfew?

A    October 7th.

Q    October 7th?

A    October 7th.  I know what you're going to pull out.
     You're going to pull out the Emergency Declaration which
     I signed on September 30th.  But we would not have
     promulgated that declaration if there had been no reason
     for a curfew.  It was an order in waiting I would
     describe it as.

Q    What date was it signed?

A    September 30th, as I recall.

Q    And this was -- was this in effect when you signed it on
     September 30th?

A    No.

Q    Is there anywhere in this document that it wasn't in
     effect?

A    No.  Not that I'm aware of.

Q    Was there any former proclamation issued to make this
     effective?

A    No.

Q    So was this ever effective?

A    Yes.

Q    And when was it effective?

A    October 7th.

Q    And what made it effective?

A    When we found out that afternoon that the DA had issued
     his decision.

Q    Is there any governing document that makes this
     effective?

A    That document.

Q    So this is effective as of September 30th?

A    No.

Q    Did you make a public declaration?

A    We made it public on October 7th, as I recall.

Q    Did you make some kind of public declaration, I declare
     this Proclamation of Emergency as of effective as of
     today?

A    No.

Q    Okay.

A    I think the police notified people, generally, that
     there was a curfew in place.  And it was well, I recall,
     it was well publicized on all of the local TV stations
     and radio stations.  Let me tell you why I signed it on
     September 30th.  I got a call from Captain Vetter and he
     said that emergency order that we worked on he said,
     "The governor needs it signed."  I said, "Okay.  Why?"
     And he said, "Because he wants to preposition the
     national guard."  That's why I signed it on September
     30th.  I was prepared to sign it whenever the DA issued
     his charging decision.  But it was because the governor
     asked me to sign it that I signed it that day.

Q    When was the first time you thought about having a
     curfew?

A    I guess, mid-September.

Q    Okay.  And before that what were you thinking for a
     response?

A    When we spoke to the governor's office in early August,
     as I said earlier, we went through a range of options.
     The range went from the Wauwatosa Police Department
     managing whatever problem might arise to getting help
     from our mutual aid partners.  We have agreements with
     local police departments.  I don't know -- I'm not a
     signatory.  I don't know how wide that is, but from time

to time we get help from Brookfield.  Sometimes we help
Brookfield.  Sometimes West Allis helps us.  Sometimes
we help West Allis.  So there are various partners in
this mutual aid agreement.  So the next level from the
Wauwatosa Police Department would be the local mutual
aid partners assisting us if need be.  The level above
that would be there is a statewide mutual aid network.
And I can't for the life of me remember there's an
emergency coordinator on the state level who is a former
police chief from somewhere, I think, the middle of
Wisconsin.  But we could then, if things escalated, we
could get help from Green Bay, Beaver Dam, La Crosse,
whoever was willing and able to provide help.  And then
and only then would the National Guard.  So that's how
it progresses.  That's the totem pole for responses.

Q    Okay.  So you said that you began thinking about having
a curfew after Kenosha?

A    Yes.

Q    Why?

A    Because of Kenosha.  Because of what had happened in
Wauwatosa all summer.  Because of what had happened in
Madison, in Philadelphia, in Louisville, in Seattle, in
Portland and other places across the country.  But,
primarily, what we saw was in Wauwatosa and Kenosha this
was local.  And we saw it in Milwaukee and we saw it in

Madison.

Q   But you said, Kenosha.  Can you tell me more about what
    you saw in Kenosha that made you decide that a curfew
    was necessary?

A   Two people got killed, they were BLM protestors.  Kyle
    Rittenhouse came in with a shotgun and killed them.

Q   I'm familiar.  I represent several of those victims.

A   You asked me to testify and so I'm telling you.

Q   I understand.  What I'm asking is; it was Kyle
    Rittenhouse that caused you to...

A   That was one of the biggest reasons, yes.

Q   Okay.

A   He wasn't the only one.  Because in our local protests,
    especially, during the curfew period, we saw
    counter-protesters from other cities who were there.
    And we were warned, especially, after Kenosha that
    outsiders would come into cause trouble.  And so instead
    of just having BLM protesters do whatever they wanted to
    do, we had people come up to start trouble.  And then we
    saw Kyle Rittenhouse kill people.  So we were concerned
    about the loss of life.

Q   You said you were warned.  Can you tell me, who warned
    you?

A   We were getting warned by other police departments,
    particularly, the ones that have participated down in

Kenosha.  We sent our fire department down.  I think our
police department wasn't available because of what was
going on.  But we sent our fire department down to help
out in Kenosha.  There was a lot of mutual aid going on.
And a lot of talk about the -- among the first
responders about who was there and why they were there
and what kind of trouble they were stirring up.

Q    Okay.  So did you ask those people, those mutual aid
partners, what their basis for saying that outside
agitators would come in?

A    Well, we saw it every day.  I read about it and we all
saw it on TV every day.

Q    Okay.  So based on what you read in the newspaper?

A    Some of it, yes.

Q    And what you saw on TV?

A    Yes.

Q    Did you ever see an e-mail saying, people from X town or
X state are planning to come into Tosa or planning to
come into Tosa on this day?

A    Yeah.  We had some of that, I believe.

Q    You had some e-mails that said that?

A    No, I didn't have e-mails.  But I believe the police
were picking up intelligence that's -- in that vein.  I
will also say that I spoke to Mayor Antaramian of
Kenosha and he said there were lot of outside agitators

in Kenosha.  He said those are the primary trouble
makers.

Q    I'm curious -- I'm concerned, not about the people that
came into Kenosha, but the people that you were
concerned would come into Wauwatosa.

A    The same people that came into Kenosha were the ones
that I was concerned about.

Q    And you said -- did you see intelligence saying that
people outside were planning to come into Wauwatosa?

A    I was told about the intelligence.

Q    By who?

A    By the police department.

Q    By who?

A    By Captain Vetter and Chief Weber.

Q    And did they tell you anything more than a, generalized,
we have intelligence?

A    What I understand is that the FBI has a center which
works in partnership with local police departments.  And
I think it's, primarily, for drug things, but during the
protests there was concern about all of this violence.
And they were getting feeds.  And we also had our own
crime analyst who analyzes social media and sees a lot
of things going on too.  So there was a lot of noise out
there and people making threats.

Q    And you guys collect intelligence; is that correct?

A    I don't collect it.

Q    Okay.  The police department.

A    The police department is privy to intelligence from various sources.

Q    Do you know if the police department keeps a list of people affiliated with The People's Revolution?

A    I believe they do.

Q    Do you like that?

A    It depends.

Q    Are you comfortable with a police department keeping a list of a political organization?

A    Is it a political organization?

Q    You tell me.

A    I don't believe it is.

Q    Do you believe it's a terrorist organization?

A    What's your definition of terrorism?

Q    I don't know.  I've seen e-mails within the police department labelling it as a terrorist organization?

A    I haven't.

Q    Would you classify it as a terrorist organization?

A    I don't know.

Q    You don't know?

A    I don't know what they do.  I know some of what they do. I don't know all of what they do.

Q    Okay.

A    To me terrorism is a much bigger deal than protesting in
     Wauwatosa.

Q    Terrorism in Wauwatosa is a bigger deal?

A    That's not what I said.  I said, terrorism is a much
     bigger deal than protesting in Wauwatosa.

Q    Okay.  I'm sorry, I didn't...

A    I mean, terrorism is, you know; Oklahoma City.  It's the
     World Trade Center.

Q    Okay.  And I'll ask again.  Do you believe that the
     members of TPR or TPR as an organization are terrorists?

A    I do not know.

Q    You don't know?

A    I don't know.  I have no basis for that one way or the
     other.

Q    Do you, normally, say that -- so you don't know if
     people are terrorist without being able to confirm that
     they are a terrorist?

A    I don't know if you're a terrorist.  I don't know if
     Jasmyne is a terrorist.  You haven't defined terrorist
     for me, first of all.  What I'm saying is, I know what
     TPR does in Wauwatosa and what it's done in Milwaukee
     and that's all I know.

Q    Okay.  Okay.  So you spoke with the Kenosha Mayor.  You
     were concerned about what you'd seen on TV.  Did you
     ever see any document saying, when the Mensah charging

order comes out we're going to go and smash windows.
We're going to go and do this.  We're going to attack
the police.  We're going to do something?

        ATTORNEY BAYNARD:  Objection to the form of
the question.  Compound.  Go ahead.

A    What I -- I did not see any such document.  What I was
told was that there were multiple threats of arson, for
example.

Q    Okay.  Did you see those threats of arson?

A    I did not.

Q    Who told you that there were threats of arson?

A    The police department and, I believe, our special
prosecutor George Schimmel.

Q    George Schimmel told you that there was threats of
arson?

A    Yes.

Q    Okay.

        BY ATTORNEY MOTLEY:

Q    And who from the police department told you there were
threats of arson?

A    I do not know.

        BY ATTORNEY SCHWAB:

Q    You don't know?

A    I'm sure it was Captain Vetter or Chief Weber.  Whoever
I was speaking with.

Q    And you never asked to see this?

A    I saw what I saw on the streets of Wauwatosa.  I was
     concerned.

Q    On September 30th?

A    All the way -- all summer long there was violence in
     City of Wauwatosa as well as other communities.

Q    Could you define violence for me?

A    Sure.  How about a shotgun at Officer Mensah's
     girlfriend's house, getting shot?  How about Officer
     Mensah getting hit in the head with a bullhorn by a
     protestors.  Three people being charged with felonies as
     a result of that incident.  I saw -- there were people
     assaulting employees at Cheesecake Factory on July 7th.
     I saw people carrying firearms into the city hall on
     July 7th.  I saw people carrying firearms on July 21st.
     And I saw lots of activity that I've already described
     as not peaceful protesting.  So I was very concerned
     about the threat of violence.

Q    Okay.  But, again, you had no -- you reviewed no
     evidence of threats of violence after the charging
     session?

A    I'm not sure I understand your question.

Q    Did you review any documentation on a threat of violence
     in preparation for issuing this curfew?

A    I did not.

Q    This curfew, did it cover -- what area did it cover?

A    Wauwatosa.

Q    The entire city?

A    Yes.

Q    If I wanted to protest in the City of Wauwatosa on
     October 7th, when can I do it?

A    You can do it right up until 7 o'clock.

Q    And why choose 7 o'clock?

A    Because that's when it turns dark in October.

Q    Okay.  And was there a curfew in Kenosha when Kyle
     Rittenhouse killed people?

A    I believe one was imposed, but I'm not a hundred percent
     sure.

Q    Okay.  You didn't inquire?

A    No, I did not inquire.

Q    So you're trying to stop a Kenosha-like incident, but
     you didn't inquire into what Kenosha did that didn't
     work?

              ATTORNEY BAYNARD:  Objection.  Form of the
     question.  Compound.  Go ahead.

A    I know that they had the National Guard there.  I
     believe, they had a curfew.  What I'm saying is I'm not
     a hundred percent sure.  I believe, they had a curfew.
     That was what was recommended to us.

Q    By who?

A    By various partners and sources.

Q    Can you provide those names?

A    I already gave you those names.  I said those through
     the police department.

Q    So Vetter and Weber suggested to you that a curfew
     should be imposed?

A    Yes.  Based on their conversations and their experience
     as police officers.

Q    Did you ever consider saying, "I don't agree?"

A    No, because I agree.

Q    Why?

A    Because of what happened all summer long in Wauwatosa,
     outside of Wauwatosa, in Wisconsin, in Kenosha, outside
     of Wisconsin.  And the violence that had occurred in
     Wauwatosa already.  And the fact that we were very
     concerned about the loss of human life in October.

Q    So if I were to put out, tomorrow, that I was going to
     have an antipolice rally on Friday night and The
     People's Revolution was going to be a part of that;
     would you think it appropriate to say, based on my
     experience The People's Revolution's or anti-police
     protesters are violent so therefore protest is not
     allowed?

A    No.  We never said protests weren't allowed.  What --
     based solely on that sketchy information you just gave

me, there would be no need to impose a curfew.

Q    If I were to do it at 8:00 p.m. and we were going to
     march down Main Street, would you impose a curfew?

A    Not based on what you're giving me now.

Q    What would you need to know?

A    I would need to know whether there was threats of
     violence, whether there was something going on.  But we
     would -- the police would attempt to keep people
     protesting peacefully, they wouldn't deter them from
     protesting.

Q    Okay.  And can you point me to what threats of violence
     there were prior -- as of September 30th when you signed
     this?

A    I told you already.  We were getting intelligence.

                 ATTORNEY BAYNARD:  Asked and answered.  Go
     ahead.

A    Yeah, I already told you that.

Q    Okay.  And you never reviewed the intelligence?

A    I already told you I didn't.

Q    I'm asking again.  Yes or no?

A    I said, no.

Q    No.  You never reviewed intelligence.  Do you often make
     decisions without reviewing documents?

A    I rely on people that work with me and for me.  As mayor
     I have a lot of departments other than the police

department that I also work with and I can't be
reviewing every document that every department is
looking at.  I have to rely on the expertise of people
that I trust.

Q     Was this an important decision?

A     Of course it was.

Q     So you don't review documentation in preparation for
important decisions?

A     Of course I do.

Q     But you didn't in this case?

A     I did review a lot of things in preparation for that.  I
already told you about some of it.

Q     You reviewed newspaper articles?

A     Newspaper articles.  I read three or four newspapers a
day.  I listening to WWM.  I watch the television news.
I talk to experts in our departments.  And I observe
what I observe on the streets.  And I observed a lot
last year.

Q     So would it be fair to say that over the past -- over
the summer you observed that people who show up for
anti-police brutality protests sometimes engage in civil
unrest?

A     How do you define civil unrest?

Q     How do you define civil unrest?

A     Well, if it's civil it's within the bounds of the law.

Q    Okay.  Let me read to you from your order:  Whereas,
     based upon recent experience with protests concerning
     the continued employment of Officer Mensah by the WPD
     and upon community response to decisions and actions
     regarding police officers nationwide, most recently in
     Kenosha, Wisconsin, and Louisville, Kentucky, it is
     anticipated that an emergency will exist in the City of
     Wauwatosa due to conditions which will arise following
     the announcement, including civil unrest throughout
     Wauwatosa that creates concerns for the safety of
     persons and property that will impair transportation,
     health, and police protection and other critical systems
     in Wauwatosa.

A    Okay.

Q    So when you said, civil unrest there; what did you mean
     by that?

A    Well, there I was meaning what I described already with
     all of the violence that occurred in Wauwatosa and
     beyond all summer long.  So we were concerned about
     violence occurring, again, primarily, the loss of human
     life.  That's what we were concerned about.

Q    Okay.  And do you have any threats of -- that would lead
     you to believe that there would be a loss of human life?

A    We had that experience in Kenosha and we had the shotgun
     fired at, during melee at Mensah's girlfriends house on

August 8th, 2020.

Q    But no one said, I'm coming to Wauwatosa to kill
     someone?

A    I don't know.  Maybe our crime analyst is picking that
     up.

Q    Did anyone tell you that this was the case?

A    No.  But after Kenosha I didn't need anything more.

Q    So you went off of just your gut based on what happened
     before?

A    I think I went on a lot more than my gut.

Q    Aside from newspapers articles and what you had read,
     what did you go off of?

A    I've already answered all of that.

Q    Okay.

     BY ATTORNEY MOTLEY:

Q    Okay.  Now, you keep bringing up Kenosha and what
     happened there.  And you acknowledge that what
     precipitated the Kenosha protests was the shooting of
     Jacob Blake; correct?

A    I didn't acknowledge it earlier, but --

Q    -- sorry.

A    Yes.  Okay.  Sure.  What happened on August 23rd, yes.

Q    Okay.  Thank you.  And you referenced the Mensah's house
     melee which happened on August 8th of, 2020; correct?

A    Yes.

Q    All right.  And sorry to have you repeat, but I think
     that this is important.  You mentioned that there were
     other, you know, other violence that was happening in
     Wauwatosa.  There was Mensah's house which happened on
     August 8th of 2020.  Was there any other violence that
     occurred in Wauwatosa that helped you make that helped
     to inform -- make that informed decision to sign an
     Emergency Declaration?

A    There were lower level assaults of employees at the
     Cheesecake Factory on July 7th, 2020.

Q    Okay.  Sorry.  Let me just go after each one.  So from
     July 7th, 2020.

A    July 7th.

Q    July 7th, of 2020, there were assaults at Cheesecake
     Factory?

A    Right.

Q    Was anyone arrested as a result of assaulting other
     people that you're aware of?

A    They received tickets as I understand.

Q    But no one was criminally charged; correct?

A    Depends on what you mean by, criminally charged.

Q    No one was criminally charged by the Milwaukee District
     Attorney's Office or the Waukesha District Attorney's
     Office or any district attorney's office in America;
     correct?

A    Not that I'm aware of.

Q    Okay.  And do you know who was assaulted?

A    I was told that various employees at Cheesecake Factory
     were trying to get the protesters to leave so they could
     continue their business, were pushed.

Q    And who told you this?

A    I was told by the police.

Q    Who?  The name.

A    I don't recall probably Captain Vetter.

Q    Did he call you up and tell you about this?

A    I don't remember when we had the discussion.

Q    So you had a discussion?

A    That's what I'm saying.  Somebody told me.  I believe it
     was Captain Vetter.

Q    Did Chief Weber have a discussion with you about this?

A    I don't recall.

Q    Did you talk to anybody at the Cheesecake Factory with
     regards to the assaults on July 7th?

A    I did not.

Q    Were there any other violent -- instances of violence in
     Wauwatosa aside from Cheesecake Factory and Officer's
     Mensah's that also helped you inform your decision?

A    Yes.  Many of them happened outside of my house.  There
     was one and I don't recall the exact date.  I had over
     30 nights of protests at my house.  And there was a line

of police facing east on Cedar Street and on the west
side of 70th Street.  And people were spitting at the
police, they were screaming at the police, they were
shining floodlights and flashlights in the eyes of the
police officers.  There were some pushing.  People were
blocking the intersection as they always did.  So that
wasn't -- that was not peaceful.  It was on the verge of
violence.

Q    On the verge of violence or it got violent?

A    Some of it got violent, I think, and some of it -- I saw
some videos.  And one of them -- the person I recall,
particularly, was one of your clients, Sonora Larson who
was screaming vulgarities at the police.  And, I
believe, she was pushing police officers.  She later
came to my house with one of your other clients,
Gabriella Vitucci, and screamed into my one doorbell for
five minutes, between 9:10 and 9:15 that night.

Q    And when did this happen?

A    August, I think.  And they were screaming obscenities
into my one doorbell that night.  But August 14th there
was an incident a block north from my house.

     BY ATTORNEY SCHWAB:

Q    Can a police officer -- or do police officers in
Wauwatosa arrest people for screaming vulgarities at
them?

A    I don't believe so.

Q    Is that okay?  Would you support that?

A    Would I support what?

Q    Well, you were just saying that one of her problems was
     that she was screaming vulgarities at an officer.  Am I
     allowed to say, 'fuck you', to a police officer?

A    I think you are.  It doesn't make it right but it's not
     illegal.

Q    Okay.  So you're going through, what I assume was
     illegal conduct and you mentioned she was screaming
     vulgarities, is that just to say you think she's a bad
     person?

A    I was painting the scene.  I said there was some pushing
     going on and shining lights in officers eyes and all of
     that.  On August 13th, Attorney Motley knows a lot about
     this because you were there.  A block north of my house
     on 70th and Aetna which is an intersection just north of
     our road there was a scrum, I would say, between police
     and protesters and you showed up and were facing down
     the police.  That wasn't violent.  But what I'm saying
     is there was some violence going on.  There was some
     pushing and some other things going on at that.  I saw
     the videos.  I could see it from my front window.  I
     could see the scrum, but I couldn't see everything that
     was going on.  I'm basing it on the videos that I've

seen since that time.

Q    So for the August 14th date was anyone criminally
     charged by any -- by the DA's office?

A    I don't know.

Q    Was anyone given a ticket outside of -- with regards to
     August 14th?

A    I believe so, yes.

Q    Did you recommend that people get tickets for the August
     14th protest?

A    It wasn't my call.

Q    Okay.  Have you ever recommended that anyone get tickets
     for protesting?

A    What I have said to people is, if you protest within the
     law, follow the ACLU guidelines the police and the city
     will protect and defend your First Amendment rights to
     the nth degree.  If you break the law then you must
     suffer the consequences whether it's a ticket or
     anything beyond.

Q    So have you ever recommended that anyone be ticketed for
     protesting whether they are breaking the law or not
     breaking the law?

A    Specifically?

Q    Yes.

A    No.

Q    Okay.  Do you recall sending an e-mail to Chief Weber

and Luke Vetter regards to Christine Groppi?

A    I don't recall.

Q    I do want to mark this as an exhibit.  Well, before we
     get into that, sorry.  Me jumping around.  With regards
     to the -- from July 7th through October 13th, did you
     call for a meeting with the Common Council to discuss a
     curfew?

A    No.

Q    Between July 7th and October 13th, did you call for a
     meeting with the Common Council with regards to the
     Emergency Proclamation?

A    No.

Q    Isn't it true according to Wauwatosa's local rules that
     you can call a special meeting with six hours notice?

A    I'm not sure about six hours, but I can certainly call a
     special meeting, yes.

Q    And between -- and you never called a special meeting
     with regards to the curfew or the proclamation from July
     7th through October 12th; is that correct?

A    That's correct.

Q    Who called the special meeting on October 13th?

A    I don't know if it was a special meeting.  I think it
     was just a regular meeting of the Common Council.  If it
     was -- it might have been a committee night and we
     called a special meeting, but I don't recall.  But we

had -- I think what you're driving at, is we had a conversation. The Common Council talked about the Emergency Declaration and, ultimately, decided to take no action.

Q    Right. I'm not driving at anything. I'm just trying to -- that's not what I'm driving at, actually. On October 13th it is advertised as a special meeting on the City of Wauwatosa?

A    Okay.

Q    So who has the power to call special meetings in Wauwatosa?

A    Various people. I can do it. Five members of the Common Council can do it by a petition.

BY ATTORNEY SCHWAB:

Q    So you said you did not call a special meeting between September 30th and October 6th?

A    No. Not that I recall.

Q    Why not?

A    I didn't need to.

Q    And there was a Common Council meeting on October 6th; is that correct?

A    Yes.

Q    And you did not bring up this proclamation; is that correct?

A    That's correct.

Q    Why not?

A    First of all, it wouldn't take effect unless and until
     the DA issued his charging decision and we didn't know
     when that was going to be.  There were a lot of rumors,
     but we didn't know when it was going to be.  Second, as
     the city attorney said in the special meeting on October
     13th in public session, that any discussion of police
     strategy would have to have been discussed in open
     meetings.  Could not be -- there was no exception to the
     open meetings that would have provided for a closed
     session on police strategy with respect to any expected
     unrest.

     BY ATTORNEY MOTLEY:

Q    So you've closed sessions and meetings with regards to
     where police should be placed when there's trick and
     treating in Wauwatosa; correct?

A    I don't know what you're talking about.

Q    In your October 13th meeting, special meeting, one of
     your Common Council members, I believe, it was Joel
     Tilleson, said on the record that the City of Wauwatosa
     has special meetings about where to place police in
     relations to trick and treating in closed sessions.

A    I don't think he was correct, but I don't recall we ever
     had any such discussion.

Q    Okay.  So you didn't know that the DA's decision was

going to be made until October 7th?

A    Right.

Q    And this Emergency Proclamation was not signed -- or
     excuse me was not finalized until -- when was the
     Emergency Proclamation finalized?

A    It was signed on September 30th and it was, for lack of
     a better description, it was, kind of, stuck in my back
     pocket.  It wasn't needed unless and until when the DA
     made a decision and needed to be put in place.  When was
     it finalized?  I would say it was finalized the
     afternoon of October 7th.

Q    Okay.  So it wasn't finalized on October 6th?

A    No.

Q    Okay.  So I'm going to present, I guess, what we're
     going to call 1P.

              ATTORNEY SCHWAB:  Can I jump on this real
     quick?

              ATTORNEY MOTLEY:  Yeah, go ahead.

              ATTORNEY SCHWAB:  Let me get this Exhibit 1.

     BY ATTORNEY SCHWAB:

Q    I'm going to hand you what has been marked as Exhibit 1P
     which is the Emergency Proclamation police -- what was
     the term, police planning, that you didn't want to share
     with the Common Council.  Police operations.  Can you
     tell me in that document where there are police

operations?

A     Well, first of all, there's a lot more that goes into

      police planning and that went into police planning than

      what is in this document.

Q     Okay.  But I'm asking, why you didn't share this

      document on October 6th?

A     Because some of the things involved -- let me give you a

      quick example.  One of the things we were told after

      Kenosha was, make sure that you ban the sale of

      flammable materials during the curfew period.  Because

      in Kenosha eight blocks of Kenosha burned down and they

      had 52 million dollars of property damage.  If in here I

      band the sale of flammable materials during the

      appropriate period, if it had been known that that ban

      was in place people with bad motives might have said,

      I'm going to stock up on flammable materials before we

      go into Wauwatosa.  So that's an example.

Q     So why not omit that and present the rest of the

      document and then add that later?

A     Everything was important in this document that's why we

      put it in there.

Q     Okay.  But --

A     This was informed by what happened -- a lot of this was

      informed by what happened in Kenosha.

      BY ATTORNEY MOTLEY:

Q    So when did you find that the DA was going to make an
     announcement with regards to the Alvin Cole shooting?

A    October 7th.

Q    October 7th.  And also October 7th was when you had the
     final Emergency Declaration?

A    What I knew was that -- what I had learned through the
     grapevine was that you and the Cole family were going to
     meet with the DA on October 7th.

Q    Okay.  I'd like to present what has been marked as 2B.
     Now, on October 6th you sent an e-mail to the Mayor of
     Milwaukee and saying, As promised my emergency
     Declaration is attached.  It will be issued tomorrow
     following the DA's announcement?

A    I did.

Q    So you just testified on October 7th that's when you
     found out the DA was going to make the announcement.

A    Right.

Q    And you also just testified that October 7th is when
     your Emergency Declaration was finalized and out of your
     back pocket?

A    Right.

Q    But yet you sent it to the Mayor of the City of
     Milwaukee the day prior; right?

A    Right.

Q    And also -- you also sent this --

A    Do you want me to explain?

Q    No.  And you also sent this two minutes -- the timestamp
     on this is 5:58 p.m.?

A    Okay.

Q    And you met with the Wauwatosa Common Council on
     6:00 p.m. October 6th; correct?

A    I believe so.

Q    Despite -- so you shared this document with the mayor of
     Milwaukee, but not with your Common Council members;
     right?

A    Yes.

Q    Okay.

A    And the reason for all of that is --

Q    I didn't ask for the reason.  Thank you.

A    So you don't want to know the truth of what's going on,
     but that's fine.

Q    No.  I want you to answer the questions that you're
     asked.  Thank you.

     BY ATTORNEY SCHWAB:

Q    So you mentioned in this executive in the proclamation
     that 32 -- 323.14 gives you the power to issue this
     proclamation of curfew; is that correct?

A    I think that's the right statute.

Q    Did you read that statute before issuing the curfew?

A    I believe I did.

Q    Okay.  And the statute says:  If, because of emergency
     conditions, the governing is unable to meet the chief
     executive officer may issue a proclamation.  What were
     the emergency conditions that required -- that that
     underlie the issuing of the Emergency Proclamation?

A    All of the things that I just talked about for the last
     hour or two hours.

Q    And did any of the those conditions stop the Common
     Council from meeting?

A    No.  We were meeting, virtually, as I recall.

Q    Okay.

     BY ATTORNEY MOTLEY:

Q    All right.  Now, with regards to meetings that are set
     in the City of Wauwatosa, typically, who creates the
     agendas for, for instance, meetings with the Common
     Council?

A    Every Thursday morning we have an agenda meeting.

Q    Sorry.  Who is 'we'?

A    I was just going to explain.  The city administrator,
     for lack of -- I can't remember the exact title, but I
     call her the deputy city administrator Melissa Wiess,
     the department heads and the president of the Common
     Council.  We all meet and we decide what the agenda will
     be for the following Tuesday night.

Q    Okay.  So with regards to the October 13th special

meeting, do you know who called that meeting?

A      I did.  But I can't recall who I talked about the
       meeting with beforehand.  It wasn't -- I don't believe
       it was discussed at the agenda meeting.  I probably
       discussed it with Mr. Archambo.

Q      Okay.  And, typically, once you make the agenda before
       the meeting you post that to the public; correct?

A      We have to do it at least 24 hours in advance under
       state law.

Q      Can you change the agenda to the meeting after the
       meeting happened?

A      No.

Q      So I want to mark Exhibit 3P which is the October --

               ATTORNEY BAYNARD:  Are you saying P or B?

               ATTORNEY SCHWAB:  P as in Paul.

               ATTORNEY KNOWLTON:  P as in Plaintiff.

Q      So I'm showing you what has been mark as Exhibit 3P.
       This is the agenda for the special meeting; correct?

A      Right.  Which is virtual it says at the top.

Q      Okay.  Were you the one that updated this agenda three
       days after the meeting on October 16th?

A      I don't know what you're talk about.

Q      On the bottom it says, updated October 16th, 2020, 11:45
       a.m.

A      I repeat I don't know what you're talking about.  I see

it, but I don't understand it.

Q    Okay.  Let me just walk you through it.  You just testified that a meeting agenda is not to be changed after a meeting occurs; correct?

A    That's my understanding.

Q    Okay.  So for this, particular, meeting agenda, on the bottom, it notes that it was updated October 16th, 2020, which would have been three days after the meeting.

A    I see that.

Q    So who is it -- did you update this?

A    I didn't.  I did not.

Q    Do you know who updated this agenda?

A    I do not.  I can tell you what it says here is what happened on October 13th.  That was the subject of our discussion.  So I don't see any difference in that.

Q    So you know that this is, actually, also the agenda items set on October 13th?

A    I don't know I would have to compare, but it looks like what we talked about on October 13th.

Q    Okay.  But does it look like what the agenda looked like on October 13th, not what you talked about?

A    As far as I know.  Again, you would have to show me the other item so I could compare the two.

Q    Okay.  Now, let's talk about the October curfew.  With regards to October 7th through the 12th during the

curfew let's take each day. Where were you posted
during most of the curfew of October 7th through the
12th?

A    I was in Wauwatosa at an undisclosed location.

Q    What is the undisclosed location?

A    Our emergency Operation Center.

Q    And where is that at?

A    I'm not going to tell you.

Q    And at CVMIC at the Emergency Operation Center, who all
was there?

A    I was at the Emergency Operations Center with
Mr. Archambo -- there were a lot of people. I can give
you as many names as I can remember.

Q    Okay.

A    City attorney, the police chief, Melissa Weiss, Eva
Ennamorato who is our communication's specialist,
Sergeant Abby Pavlik who is the public information
officer for the police department, Jalil Ali our IT
specialist or IT director, there was a representative
from Milwaukee County.

Q    Do you know who that person's name was?

A    I do not recall. There was a representative from
Milwaukee Regional Medical Center, I think, for a while.
And there were a couple of others whose names I don't
recall.

Q    Okay.  Was attorney Gregg Gunta there?

A    Gregg Gunta popped up one moment.  He just came out of
his office and he said to the city attorney and I, "If
you want a soda I'll show you where our refrigerator
is."  And we went out and I got a Diet Coke, as I
recall.  And that was the last I saw of Gregg Gunta.

Q    So your emergency Command center was it on the second
floor of the CVMIC Building?

A    I'm not going to say anything about that.

Q    Why aren't you going to say anything?

A    Because it's the Emergency Operations Center.

Q    Does it still exist as the Wauwatosa Emergency
Operations Center?

A    We have the -- we have an emergency operations plan and
we constitute an Emergency Operation Center as needed.
There is no such thing as the Emergency Operation
Center.

            ATTORNEY SCHWAB:  We need him to answer the
questions.  You know, there is no privilege.  There is
no privilege here.  We can get in front of the judge --

            MAYOR MCBRIDE:  If you seal that portion of
the thing I will answer the questions.

            ATTORNEY SCHWAB:  We aren't going to agree to
seal anything and you have filed no motion for a
sealing, any protection, anything.  So if you would like

to get in front of the judge I'm happy to do so.  I
don't see -- we're not asking state secrets we're
asking --

A    No you're asking city secrets.

              ATTORNEY BAYNARD:  Okay.  So let's go off the
record.

              (Off the record 11:24 a.m.)

              (On the record 11:29 a.m.)

BY ATTORNEY MOTLEY:

Q    So where was the Emergency Command Staff located during
the October curfew?

A    A couple of different locations.

Q    Where is the Emergency Command Staff that you were at
located during the October curfew?

A    That was the Emergency Operation Center we called it and
that was the at CVMIC Building.

Q    Okay.  And what floor?

A    It was on the second floor.

Q    Okay.  And do you know how many drones were in operation
during the October curfew?

A    I don't.

Q    Were there drones in operation on the October curfew?

A    Yes.

Q    How many -- oh, sorry.  How many drones does the
Wauwatosa Police Department have?

A    I do not know.

Q    Okay.  Do you know how many drones that other police
     departments brought to the -- or used during the curfew
     of October?

A    I do not know.

Q    Did you request that drones be used?

A    No.

Q    Okay.  Who requested that drones be used?

A    I don't know.

Q    Were drones used?

A    As far as I know, I saw drone footage in realtime.

Q    So how many drones were you looking at that the
     Emergency Command Center?

A    I don't know.

Q    Was it one?

A    I don't know.

Q    You don't know if you were looking at one drone footage
     at the Emergency Command Center?

A    We had a big screen in front of a horse shoe.  The city
     attorney sat here, the chief sat there, and Mr. Archambo
     sat there.  And other people were around the room.
     Other people were coming by and some others sitting at
     other tables.  We had a big screen and on the screen
     there would be various feeds that we were interested in
     at a given time.  Some of the feeds were from drones

some of them were from people who were walking along with the protesters and some of them -- one was Katie Katie so called from Seattle. She was a young blonde woman.

Q     -- and just answer -- just focus on my question. So you said that there was drones, plural, videos that you were watching at the Emergency Command Center at CVMIC; correct?

A     I don't know if there were drones, plural. I saw drone footage.

Q     You saw a drone footage?

A     I saw drone footage.

Q     At CVMIC?

A     At CVMIC.

Q     Okay. And do you recall -- were you there October 7th?

A     Yes.

Q     You were there October 8th?

A     Yes.

Q     9th?

A     All the way through.

Q     Okay. What times were you there on October 7th?

A     I believe, I arrived at 3:30 or 4:00, maybe a little later.

Q     All right. And how long where you there until?

A     After midnight.

Q    Okay.  Is it pretty much the same hours for all the
     days?

A    As days went on and the unrest diminished it became a
     little later, so maybe 5:00 to 6:00 p.m., but certainly
     no later than 6:00 p.m. And I always stayed until
     midnight, at least.

Q    Okay.  So you were there at CVMIC before the curfew --
     before 7:00 p.m. at least an hour before 7:00 p.m.?

A    Right.

Q    And you were there at least until about midnight or so
     every day?

A    Right.

Q    Okay.  And so on October 7th, do you recall when the
     police started using tear gas, the time?

A    I don't think they used tear gas on October 7th.

Q    Okay.  On October 7th, do you recall when the police
     started using chemical agents or anything like that?

A    I don't recall them doing that on October 7th.

Q    On October 8th, do you recall police using tear gas or
     any chemical agents?

A    There was one night, I believe and I don't recall -- I
     believe it was the 8th or the 9th when there was some
     chemical agents used.

Q    Do you recall what time those chemical agents were used
     by the police?

A    I would say, probably, somewhere around 8:00 p.m.

Q    Okay.  Do you know for sure if they were used around
     8:00 p.m.?

A    Well, they certainly, weren't used right away.

Q    Okay.

A    Each night there was multiple opportunities for
     protesters to disperse.  And we saw that and heard that
     on the footage that we were watching in realtime.
     Somebody, I believe, was using a bullhorn saying there
     was a curfew in place, you must leave.  You'll have an
     opportunity to disperse.  Please leave at this point,
     basically.  And that was done multiple times each night
     and most of the people would leave some of them would
     stay.

Q    Okay.  But you don't recall -- you recall that people
     were told to disperse and at some point there was
     chemical agents or tear gas being used on October 8th
     and 9th?

A    Not 8th and 9th.

Q    8th or 9th?

A    It was one night, I believe.  I think, it was pepper
     balls that were used.

Q    Okay.  So just for your memory October 8th was Thursday.

A    Right.

Q    And October 9th was Friday.

A     I recall.

Q     Okay.  So you don't recall whether it was Thursday or
      Friday?

A     No.

Q     Do you recall tear gas being used on any of the nights
      of the protests?

A     I'm not sure.

Q     Okay.

A     I believe -- again, I'm not sure.  I know there was some
      chemical agents use.

Q     Okay.  But you don't know what time they were used?

A     Again, it would have been after 8:00 p.m. because for
      the first hour every night people were given multiple
      opportunities to leave.  And there was some people
      pushing back against the police line, throwing bottles
      at them and other things.  And that's when the chemical
      agents were used.

Q     And do you know for sure if they were used after
      8:00 p.m.?

A     As I said, my recollection is that, at least, an hour
      would go back by.  So I strongly believe it didn't
      happen before 8:00.

Q     Okay.  And with regards to the emergency curfew did
      you -- you testified earlier that you never asked the
      police to, you know, ticket anyone with regards to

protesting?

A    The police run their operations.  They get instruction from the Common Council and the Mayor, but we do not run their day-to-day operations.

Q    So you never recommended for anyone to get a ticket?

A    Not specifically.  Generally yes.  If people break the law they should get a ticket.  But I never said, "Go give Kimberley Motley a ticket.  Give Jasmyne Baynard a ticket."

Q    Okay.

BY ATTORNEY SCHWAB:

Q    Would it be inappropriate for you to do so?

A    I'm not sure.  I'm not sure under the law.  According to the Wisconsin statutes section 62.09, I don't remember which subsection, it says the Mayor the head of the police department.  Technically, I suppose I could give some instructions to the police, but that would be unwise because the police are the experts and I'm not. I wouldn't direct their day-to-day operations.  I'm not going to ride the white horse into the battle and start acting like the general.  I think that would be inappropriate.

Q    Would it be an abuse of power for you to tell the police to ticket political opponents?

A    Of course.

Q    Does anyone send e-mails on your behalf through your
     e-mail?

A    No.

Q    It's only you?

A    They better not.

          ATTORNEY MOTLEY:  I'd like to present what's
     been what marked as Exhibit 4P.

     BY ATTORNEY MOTLEY:

Q    Now, this was an e-mail that was sent on Sunday, October
     11th --

          ATTORNEY MOTLEY:  Sorry, Jasmyne.  Here you
     go.

Q    -- to Luke Vetter, Barry Weber and James Archambo where
     you are, specifically, saying, "Please send Ms. Groppi a
     ticket for violating a curfew?"

A    Right.  I don't think that ever happened.

Q    Okay.  But you did recommend this abuse of power to the
     police; correct?

A    No.  It wasn't an abuse of power.  She said she was
     there after curfew.

     BY ATTORNEY SCHWAB:

Q    Did she?

A    That's how I read that.

     BY ATTORNEY MOTLEY:

Q    Did you ask her if she was an ACLU Legal Observer?

A    I've never met her.

Q    So you don't know if she qualified as being exempt for the curfew?

A    I have no idea.

Q    But you did recommend that she get a ticket -- or you, actually, directed the police to give her a ticket; right?

A    In this she does not say that she was an ACLU Observer.

Q    But you said, "Please send Ms. Groppi a ticket for violating curfew."

A    No.  My recollection is that she said she was out there after curfew.

Q    Now, you just testified that you have never done this before.  Now, are you sure that you have never done this before?

A    Well, this says what is says.  I don't recall doing it. I do recall sending this e-mail.  I don't recall doing it at any other time.

Q    All right.  I'm going to give you what's been marked also as Exhibit -- so did you recall receiving an e-mail on October 12th from Father Groppi's wife?

A    Yes, I do.  Margaret Rozga.

Q    Correct.  And so on October 11th you sent an e-mail to Mr. Archambo, Lieutenant Luke Vetter -- Captain Vetter and Chief Barry Weber directing them to give Christine

Groppi a curfew ticket.  And then also according to
Exhibit 7P you received an e-mail a little over 24 hours
later from Father Groppi's wife?

A       Right.  Widow, yeah.

Q       Widow.  Sorry.  And did you communicate to Father
Groppi's widow that literally, you know, a day prior you
directed your police department to give her daughter a
ticket for violating curfew?

A       No.

Q       Why not?

A       Why should I?

                ATTORNEY BAYNARD:  Did you say P7?

                ATTORNEY MOTLEY:  7P.

A       Christine Groppi looked like a grown woman to me.  I
have grown children and I let them handle their adult
business.

Q       Okay.

        BY ATTORNEY SCHWAB:

Q       How did you refer her for a ticket?

A       I told you.  I have already testified.

Q       Please restate it.

A       I'll say, again, for the third time that she appeared to
have been out after curfew.

Q       And did you go out looking for who else was out after
curfew?

A    No.  Because I wasn't getting e-mails from other people.

BY ATTORNEY MOTLEY:

Q    You were also out after curfew; right?

A    I was allowed to be according to the Emergency
     Declaration.  The government people doing their
     business.  We also had other exemptions for members of
     the press and people who needed to go to and from work
     got notices or whatever.

Q    And so did you ask Ms. Groppi if she was -- you said
     you've never met her before; correct?

A    I still haven't met her.

Q    So you don't know if she's a journalist; right?

A    She didn't present credentials.

Q    But you don't know if she's a journalist?

A    No.

Q    You don't know if she fall -- fell into one of the
     exemptions?

A    I'm not going to assume that everybody's a journalist.

Q    But despite that you recommended that she get a ticket?

A    What's your point?

Q    It's abuse of power as you acknowledge.  I agree with
     you.

A    No I disagree with your characterization.

BY ATTORNEY SCHWAB:

Q    Did you ever refer someone for a ticket or arrest aside

from this for complaining about your decisions?

A    No.

Q    Okay. Would you in the future?

A    No.

Q    And do you believe --

A    She broke the law that's different.

     BY ATTORNEY MOTLEY:

Q    And she also called you a racist you said; correct?

A    I believe she did. She's white.

Q    Okay.

A    Yeah.

     BY ATTORNEY SCHWAB:

Q    Do you believe the mere act of being outside anywhere in
     the City of Wauwatosa on October 7th, 8th 9th, 10th,
     11th and 12th was an arrestable offense?

A    If you didn't fall into one of the exempt categories,
     yes.

Q    And you have provided no exemptions that would provide
     for protests after 7:00 p.m. in the City of Wauwatosa?

A    That's right. I'll refer back to the order, if you got
     it.

Q    Do you know if any white supremacists, militia members,
     Proud Boys showed up at any of those nights?

A    I don't know about Proud Boys. I don't know about
     militia members. I know there were counter protesters.

And we had a very serious situation occurred where counter protesters and protesters were facing off against each other on Lincoln Avenue across from the West Allis Police Station on one of the night. And General Knapp had to send 25 guardsman to quell the disturbance.

Q    Were any of those counter protesters issued tickets?

A    I do not know.

Q    Would it be upsetting to you -- or would you be concerned if only those who were protesting police and not the counter protesters were issued tickets?

A    It depends on the circumstances. If people were violating the law and they didn't get a ticket and the police could have given them a ticket then they should've gotten a ticket. The police didn't ticket everybody who was out on the streets after the curfew. As you recall, I said multiple times today, that the police gave people who are gathered outside of city hall multiple opportunities each night to leave. So, technically, the police should've given tickets to all of those people, but they didn't want to give tickets to people they wanted people to go home. They wanted the streets to be safe so that there wouldn't be loss of human life.

Q    So how did they select who they gave ticket to? Do you

know who they were?

A    The people who didn't disperse after orders to disperse.
     The people who engaged in violent activity that they
     were able to apprehend.

Q    Do you perceive the counter protesters as people who are
     there to support and defend the police?

A    I think that they are troublemakers if they are out
     there trying to stir up trouble.

Q    Do you think they are there to support the police?

A    I don't know.  I'm not one of them.

Q    Okay.  Have you ever -- have you protested on either
     side?

A    I said, I joined a Tosa Together rally on June 3rd and
     took a knee with everybody else.

     BY ATTORNEY MOTLEY:

Q    Is Tosa Together a terrorist organization?

A    No.  I attended many meetings with Tosa Together and I
     was an active participant.  And one of the things I did
     as a Tosa Together member --

          ATTORNEY MOTLEY:  Okay --

          (Overlapping discussion)

     BY ATTORNEY SCHWAB:

Q    It's an opportunity for us to ask you questions not for
     you to tell us what you want to tell us.

A    Nor for you to tell me what you want me to tell you.

It's a search for the truth. Ask questions and get
answers.

Q    So what was the press credential process for the City of
Wauwatosa in October of 2020 --

            THE COURT REPORTER:  Could you please repeat
that?

Q    What's the press credential process in October of, 2020?

A    My understanding is that if a member of say the
Milwaukee Journal Sentinel had a press card he or she
was allowed in the streets.

Q    What was the City of Wauwatosa's press credentialing
process in October of, 2020?

A    I just told you.

Q    What is the process -- where do they get the press card
from?

A    My parents are both newspaper reporters.  They carry
press cards.

Q    Where do they get the press cards?

A    From the Milwaukee Journal Sentinel.

Q    From the Milwaukee -- so the Milwaukee Journal Sentinel
dictates for the City of Wauwatosa the press
credentials?

A    You're not listening to me.  If you're a reporter for
the Milwaukee Journal Sentinel, the Milwaukee Journal
Sentinel issues you a press card.  If you are a reporter

for Channel 6, Channel 6 issues you credentials. If you
are a reporter with WWM, WWM gives you credentials.

Q    So if you are a reporter that's a freelancer than you
could just register a business and create your own press
card. Does that also qualify in the City of Wauwatosa?

A    We have a problem with that because theoretically the
way you describe it everybody could call themselves or
herself a reporter and then violate the curfew.

Q    So is there -- was there any written press credentialing
process for the City of Wauwatosa in October of, 2020?

A    No.

Q    Is there, currently, any press credentialing in the City
of Wauwatosa?

A    No.

          ATTORNEY MOTLEY:  Did you have a question?

          ATTORNEY KNOWLTON:  I have a couple of
questions.  One that just occurred to me.

BY ATTORNEY KNOWLTON:

Q    The Emergency Proclamation which, I think, is Exhibit 1.
The very first sentence:  The Wauwatosa Police
Department has been informed that on October 7th, 2020,
et cetera, et cetera.  But yes and as you have repeated,
of course, your signature is on this 30th of September
on the second page.  So when did the October 7th, 2020,
get inputted into this document?

A    Well, September 30th, roughly, we were hearing all the
     rumors that everyone else was hearing.  And they were
     coming from Attorney Motley in part.  I saw an article
     October 6th, 2020, for example, where Attorney Motley
     said, tomorrow there is going to be decision by the DA.

Q    Okay.

A    You have to know that I met with the DA in early August
     just as he met with Attorney Motley and the Cole family
     at various points during the summer.  And he told me and
     us, there were others with me that day, that before the
     announcement he would let me know in advance.  He never
     did.  So we were just going on rumors.  And the rumors,
     primarily, were being spread as I recall by the Cole
     family and Attorney Motley.  And there were people --
     businesses on North Avenue that were boarding up,
     because of those rumors.  And people are calling me up
     and saying, "Is it going to happen on such and such a
     day?"  This is all going on through September, by the
     way.  And I kept saying, "No one has told me anything."

Q    Okay.

A    "I don't have that information."  Our best guess was
     October 7th.

Q    Okay.  So just to be clear, when you signed it on the
     30th, the date had already been written in there of
     October 7th?

A    That was our best guess.

Q    Okay.  And okay.  And with all of the concerns that you
     have expressed since July, why didn't you talk to the
     council since July?

A    What did I have to discuss with them?

Q    Well, you've said, repeatedly, and as a citizen I happen
     to agree with you that there was serious safety
     concerns, serious concerns about the tenor of the
     protest or the activities that you had heard about.  And
     the city itself was, you know, in your words, you know,
     potentially a battleground.  You used the word powder
     keg.  Isn't that city business?

A    Of course it's city business, but not all city business
     is done by the Common Council.  Not all city business is
     even done by the Mayor.  Sometimes it's done at the
     department level.  Sometimes it's done at the behest of
     the city administrator.  So everybody was aware of the
     protests.  And there where some discussions in closed
     session with the Common Council about legal matters.
     So, you know, on July 14th, for example, the Common
     Council went into closed sessions to discuss the Joseph
     Mensah situation.  So as needed the Common Council
     discussed what was needed to be discussed.

Q    But you felt that it was more appropriate to talk about
     your fear and your, potential, plans as the leader of

the city with the governor and not with the legislative

body of the city?

A    I wanted to know what our range of options was.

Q    Yes, and I got that.  So you discussed on August 11th

the range of options with the governor's office and

Maggie Gau, Mr. Archambo, Chief Weber, General Knapp,

Captain Vetter, General O'Donahue.  And then you, again,

discussed with that same group or with some members of

that same group, again, on September 17th where it was,

actually, decided that the National Guard would be

brought into the city?

A    General O'Donahue was not part of the August 11th call.

Q    Okay.  And on September 17th, was he part of that

conversation?

A    Yes.  And that was the indication of the heightened

concern by the governor and the National Guard and

that's why an additional general came down as I

understood it.

Q    Okay.  And at that level of concern for the city you

still didn't see fit to invite the council to share your

concerns?

A    If we discussed any of this it would have been an open

meeting.

Q    If you had discussed being concerned about the city?

A    I mean, from time to time we did have discussions with

the Common Council president.

Q   Okay.  When did that happen?

A   Just, generally, there were times when we general
discussions about the State of affairs in Wauwatosa
including the protesting that was going on.  I don't
recall any specific discussions.  But the Common Council
president, as I testified earlier, was present at all of
the agenda meetings, so she's in the loop.

Q   And you had council members that had expressed concerns
directly to you in the summer as well; correct?

        ATTORNEY BAYNARD:  Objection.  Form of the
question.

A   I don't recall.

Q   Okay.  So I still am confused as to why with this level
of concern and your priority as you reiterated being,
actual, life and physical safety of citizens; why isn't
that something that would be an agenda item at a council
meeting?

        ATTORNEY BAYNARD:  Objection.  Form of the
question.  Asked and answered.

A   I've answered this several times now.

Q   Okay.  I'm unclear, so...

A   Well, I'm unclear about your questions.

Q   Why don't you trust the Council?  Why didn't you trust
the Council?

A    I do trust the council.

Q    Why didn't you raise these concerns with them?

A    I testified several times to this now.

Q    You've testified that you didn't want to share the police strategy; is that correct?  Am I getting that correct?

A    Yes.

Q    Okay.  And my cocounsel asked what strategy was elaborated in this emergency order?

A    Right.

Q    And there's none; correct?

A    That's incorrect.  I testified.  I gave an example.

Q    Well, you testified that the flammable materials was an important to include, but there is no indication of any police strategy in Exhibit 1 which is your emergency order; right?

A    And I testified that the discussions would go far beyond the Emergency Declaration.

Q    How do you know that?  What do you mean, the discussions would go far beyond the emergency order?

A    Have you ever been a Mayor?  I discussed a lot of things with a lot of people and they were some pretty serious weighty discussions about what was going on in Wauwatosa, and what might go on, and how we should respond to that, especially, after Kenosha.

Q    There were weighty conversations about that?

A    Of course.

Q    But not with the council?

A    Not with the council.

Q    Were you an alderman?

A    Yes.

Q    Yes.  And how would you feel if your Mayor had decided
     to do an emergency order and never talk to you about the
     concerns that they had before publishing that?

               ATTORNEY BAYNARD:  Objection.  To the form of
     the question.  Calls for speculation.

Q    How would you feel as you have been an alderperson
     yourself?

A    All I can say is a lot of the alders complimented me
     after the fact.

Q    Okay.  But that doesn't answer my question, though.  So
     because you have specifics which is very valuable
     experience as an alder and now in your position as a
     Mayor.  As an alder put yourself in their shoes --

A    Right.

Q    -- which you can.  You can, maybe none of the rest of us
     can.  How would you feel about a Mayor that decided this
     massively important, arguably, as you have characterized
     the most important priority of the community which is
     life and physical safety?  How would you feel as an

alder that they pulled this trigger, pardon the pun,
without discussing it ever with the council?

        ATTORNEY BAYNARD:  Objection.  Form of the
question.  Compound.  Calls for speculation.

A    If the Mayor acted appropriately, I would support the
Mayor.

Q    And so your testimony is, you acted appropriately?

A    Absolutely.

Q    Okay.

BY ATTORNEY SCHWAB:

Q    Let me read you the statute.

        ATTORNEY BAYNARD:  What statute?

Q    323.14.  This is and, I believe -- I believe, this is
what you listed as the main statute that you relied on;
is that correct?

A    If that's the one that gives me the authority to issue
emergency declarations the answer is, yes.

Q    Okay.

A    I referred to section 323.11 and 323.14(4)(b).

Q    All right.  So let's read 323.11 now.  The governing
body of any local unit of government may declare, by
ordinance or resolution, an emergency order existing
within the local unit of government whenever conditions
arise by reason of a riot or civil commotion, a
disaster, or an imminent threat of disaster, that

impairs transportation, food or fuel supplies, medical
care, fire, health or police protection, or other
critical systems of the local unit of government.  The
period of the emergency shall be limited by the
ordinance or resolution to the time during which the
emergency conditions exists or are likely to exist.  Are
you the governing body of the City of Wauwatosa?

A     No.

Q     Okay.  So you didn't have authority under this statute;
is that correct?

A     The governing body clearly has the authority to do it,
if they so desire.

Q     Sure.  So you didn't have authority.  This document did
not provide you authority to declare on the power of the
Mayor --

A     I don't have it in front of me, but if you way -- if the
language refers to the governing body, I'm not the
governing body.

BY ATTORNEY MOTLEY:

Q     The Common Council of Wauwatosa -- the Common Council is
the local governing body of the City of Wauwatosa;
correct?

A     Absolutely.

BY ATTORNEY SCHWAB:

Q     Okay.  So that I just read was 323.  So by your

contention, if what I read is correct and it only
provides for the governing body, then you would've
relied on the second statute?

A   One thing that you're doing here today.  I think, it's
only fair to see --

Q   Sure.  It's highlighted there.

          ATTORNEY MOTLEY:  Why don't you tell him which
statute?

Q   323.11.

A   Right.  I see that, governing body.  Okay.

Q   Does that statute provide you the authority to declare
an emergency?

A   Not unilaterally.

Q   Okay.  At all?

A   The -- well, the Mayor technically is part of the Common
Council.

Q   Okay.

A   I don't know if you know that.

Q   But the power vested in the Mayor as the executive --
the Mayor is the executive of the City of Wauwatosa?

A   As I just testified not unilaterally.

Q   So would it be fair to say that you then relied on
323.14.  Meaning is it fair to say that you did not rely
on 323.11 in issuing this declaration?

A   I relied on both.

Q    What power does 323.11 - -

A    I'm not here as an expert witness.  I'm here as a fact
     witness.

Q    Okay.

A    The city attorney drafted the initial declaration.  I
     modified it to some extent.  I relied on his knowledge
     and expertise in deciding which sections of the
     Wisconsin statutes were appropriate.

Q    Is he your lawyer?

A    Yes.

Q    And you reviewed the statutes to make sure that you had
     the authority?

A    I did, but I relied on his interruption.

Q    Okay.  And what if you didn't have the authority to
     issue the curfew at all unilaterally?

A    Well, I did though.

Q    What if did you didn't?

A    It calls for gross speculation and it's not appropriate.
     I had the authority.

Q    Why don't you read 323.14(4)(b)?

A    And it say, the chief executive officer of the local
     unit of government and that's me.

Q    Okay.  Can you read the first sentence?

A    If, because of the emergency conditions, the governing
     body of the local unit of government is unable to meet

promptly, the chief executive officer or acting chief
executive officer of any local unit of government shall
exercise by proclamation all of the powers conferred
upon the governing body under paragraph (a) or section
323.11, the one we just discussed, that appeared
necessary and expedient.

Q    Okay.  Was the governing body unable to meet promptly?

A    Yes.  Because we did not know until October 7th that the
DA was going to make the decision he did.

Q    And let me read you -- what you just read.  If because
of the emergency conditions the governing body is unable
to meet promptly --

A    Right.

Q    -- did the protests -- did the civil unrest stop the
Common Council from meeting?

A    No.  But the emergency conditions were in place before
we could get the Common Council together.

Q    I'm asking not -- I'm asking, which emergency
conditions, as the statute requires, were the cause of
the Common Council being unable to meet to do their
duties?  Do you understand the statute only grants
the --

A    The Common Council was not able to meet and, therefore,
we did not call the Common Council.  We put the
emergency order in place and soon after we could discuss

it with the Common Council, which was Tuesday October
13th we had that discussion. And the Common Council
took no action.

Q   Why didn't you talk about it on October 6th when you
knew that this was, potentially, and the statute limits
your ability?

A   I just now testified to this at least five times.

Q   Keep testifying.

A   Well, at some point it becomes abusive. I'll testify
one more time on it. I did not know until the afternoon
of October 7th, not October 6th, October 7th which is a
Wednesday. The Common Council meets on Tuesdays. That
DA Chisholm was going to make an announcement and I
didn't know what his announcement would be until he made
it.

BY ATTORNEY MOTLEY:

Q   Did you try to meet with the Common Council on October
7th?

A   No.

Q   Did you try to meet with the Common Council on October
8th?

A   No.

Q   9th?

A   Not until October 13th.

Q   Okay. And according to the special meeting ordinance

you can give six-hour notice to have a meeting with the
Common Council; correct?

A   We can.

Q   Did you attempt to try to meet with the Common Council
from October -- anytime before October 13th?

A   This talks about putting in a proclamation in effect
that was already in effect. Any five members of the
Common Council could call for a special meeting at
anytime and they didn't do that.

Q   But you're the only common council member that signed
this emergency proclamation; correct?

A   Right.

Q   Okay. So and you never attempted to hold a special
meeting during the curfew despite the fact there is a
six-hour notice; correct?

A   I didn't call a special meeting until September -- no,
October 13th.

Q   And you guys could have met remotely during that time
period; correct?

A   We were under an emergency -- we were in an emergency
situation -- I just testified we were there for
six/seven/eight hours a night we were in an Emergency
Operation Center managing a very difficult situation.
We could not have met with the Common Council,
effectively, during that time.

BY ATTORNEY SCHWAB:

Q   You couldn't have met --

BY ATTORNEY MOTLEY:

Q   And you didn't try to meet either.

A   We didn't think the conditions were --

Q   Sorry.  Who's 'we'?

A   All of the people that I have testified about.  We had been dealing with emergency --

Q   You have given a lot of names.  So who is, we, didn't think we'd be able to meet with Common Council?  Who does that, 'we', include?

A   The city administrator, the police chief, the captain, all of the people that were in the emergency center and beyond.  We were dealing with an emergency situation, a very difficult emergency situation.  We were concerned about loss of life and loss of property and we were concerned that there was going to be another Kenosha.

BY ATTORNEY SCHWAB:

Q   Did any of those people that you just mentioned, are any of them elected?

A   No.

Q   So they got to make the decisions and not the Common Council?

A   I make the decisions.

Q   Okay?

A    I'm elected by all of the people in Wauwatosa.

Q    Okay.  Congratulations.

                    (Overlapping discussion)

Q    In reading 323.14, again --  you read this before you
     issued the proclamation?

A    I've already testified to that.

Q    Okay.  It says:  The proclamation shall be subject to
     ratification, alteration, modification or repeal by the
     governing body as soon as that body can meet.  What was
     the earliest they could meet?

A    I don't know.  I do know that we met on October 13th.

Q    Why didn't you try to call at let's say 10:00 a.m. on
     October 8th?

               ATTORNEY BAYNARD:  Objection.  To the form of
     the question.  Asked and answered.

A    Asked and answered many times.  And I'll tell, again, I
     was dealing all day long -- just because I was only in
     the emergency operations center for a period of time
     doesn't mean that I wasn't dealing with it all day long.
     Governors called me at 10:00 in the morning on that
     Thursday the 8th.  I was getting calls from other
     people --

Q    So you had time to speak with the governor and not the
     Common Council?

A    I was dealing with an extraordinary emergency the likes

we haven't seen in Wauwatosa since 1966.

Q    Let me ask you this question.  You said that this was in
     your pocket and not effective, but kind of effective,
     and maybe effective, and it would be effective when you
     decided to make it effective --

A    That's not what I testified.

               ATTORNEY BAYNARD:  Let him finish his
     question.

Q    When did it come effective?  What time of day?

A    It became effective midafternoon on October 7th.

Q    Can you give me a time?

A    No.

Q    Why didn't call a Common Council meeting after it went
     effective?

A    I just testified.

Q    Well, the protests -- this didn't become a curfew until
     7:00 p.m.

A    Right.

Q    There was clearly several hours, potentially, six or
     seven hours?

A    No, it was midafternoon when the DA's announcement
     became public.

Q    How long did it take them to ask to -- and talk about
     with Common Council October 7th?

A    I think Attorney Motley said it would take six hours.

Q    No.  I think, she said that there was six hours between
     the announcement and the beginning of the curfew?

A    No.  I think she said you have to give six hours
     notice --

     BY ATTORNEY MOTLEY:

Q    Well, why don't you clarify for the record.  How many
     hours notice do you or any other Common Council members
     need in order to call a special meeting?

A    And I testified, I don't know.

Q    Okay.  If we said six hours, does that sound right?

A    I don't know.

Q    Did you know in October?

A    We weren't going to call a special meeting until after
     the emergency period.

Q    And who -- and so who called the special meeting on
     October 13th.  Was that also --

A    That was under my authority.

Q    So it was you?

A    Yes, ultimately.

Q    Okay.  So who also decided who was exempt from the
     curfew?  Was that, 'we', decided who should be exempt
     and who shouldn't be exempt?

A    We had a discussion and we determined who the
     appropriate people were to be exempt.

Q    Okay.  Who is, 'we', again?

A   The same group; the city attorney, the city
    administrator and the police.

Q   Okay.  And when was that decided?

A   We had a discussion over -- after September 17th we
    started talking about an emergency declaration and the
    drafting of it.  The city attorney drafted it.  If I
    recall there was a draft on or about September 24th.  I
    looked at it.  I added some things.  I modified a few
    things.  We talked about it some more and then it was
    put on ice.  And then I got a call from Captain Vetter,
    I believe, on September 30th.  And he said the governor
    -- he said, "You need to sign the declaration."  And I
    said, "Why?  We don't know when it's going to go into
    effect, if at all."  And he said, "The governor needs it
    to preposition the National Guard."

Q   Okay.  And did this, 'we', also determine the curfew
    times; correct?

A   The, 'we', recommended.  I made the decision.

Q   So you made the, ultimate, decisions for the exemptions
    and also the time, but you received recommendations from
    other non-elected officials?

A   I'm the chief executive officer of the City of
    Wauwatosa, the buck stops with me.

Q   Right.  And so all of the recommendations that you
    received with regards to the curfew and exemptions came

from unelected officials of the City of Wauwatosa?

A    Just like the pandemic we get recommendations from the health department and the health director --

Q    So all of the recommendations that you received with regards to exemptions and the times for the curfew came from unelected Wauwatosians or unelected people?

A    What Wauwatosans.

Q    Wauwatosans.  Okay.  So were legal observers, were they exempt from the curfew?

A    They weren't, initially, that's something we mistakenly left out.  And once the ACLU said, "Hey, What about legal observers?"  We said, "You're right.  We should have that in there."  So we let ACLU Legal Observers be out during the curfew time.

Q    Did you let any other legal observers be exempt from the curfew during that time?

A    As I recall no one asked at least I wasn't aware of any.

Q    Oh, so you have to ask to be exempt?

A    No.  It was just raised.  And the ACLU said, "Hey, we want legal observers out there, shouldn't they be exempt?"  And the city attorney and I said, "Yes, okay."

Q    Oh, it's just you and the city attorney decided unilaterally that the ACLU Legal Observers should be exempt?

            ATTORNEY BAYNARD:  Objection to the form of

the question.  Mischaracterizing testimony.

Q    He just stated that it was him and the city attorney
     that decided the ACLU Legal Observers were exempt.

A    You have to understand -- you have to understand that if
     you're going to blow holes in the order the curfew is
     meaningless.  We can't have everybody saying, "I'm a
     legal observer.  I'm a journalist."  There have to be
     credentialed people.  So we said, "If you're going to do
     it for the ACLU you have to have one of those blue vests
     and you have to have credentials given to you by the
     ACLU."  And that's what I understand happened.

Q    I'm sorry, what's the number of that exhibit?  It's on
     the top.

A    6P.

Q    So I've given you Exhibit 6P and you said that you have
     to wear the blue vest in order to be credentialed as an
     ACLU Legal Observer; right?

A    Mm-hmm.

Q    According to this e-mail it states, authored by Alan
     Kesner, who you just testified it was you and him who
     made this decision, it states second paragraph:  A blue
     vests will not be sufficient for this exemption to be
     allowed.

A    Then I was misinformed.  But it does say that they need
     to carry ACLU credentials?

Q    So a person who has a law license that has clients out
     there protesting, they would not be exempt from the
     curfew?

A    No. No.

Q    Did you communicate this to the public?

A    I don't recall.

Q    So just you and Alan Kesner and the people on this
     e-mail were aware of this exemption made on October 9th?

A    So you're upset that you weren't given the freedom to
     roam our streets during that time.  Is that what you're
     saying?

Q    So just answer the question.  You don't know if I'm an
     ACLU Observer or not.  So to answer the question just
     you, Alan Kesner and the people Molly Collins, Larry
     Dupuis, Timothy Muth, Vera Eidelman were the only people
     that knew that the ACLU Legal Observers on October 9th
     at 3:32 p.m. were, all of a sudden, exempt from the
     curfew?

A    They are all ACLU people.

Q    Right.  I know that.

A    Excuse me.

               (Overlapping discussion)

Q    This is a yes or no question.  Thank you.  And so to
     continue with regards to the curfew as well; were
     members of the clergy exempt from the curfew?

A    What does the order say?  I haven't even looked at it.

Q    Well, you can always look, it's Exhibit 1.

A    I can.  Do you have a place where you want to direct me?

Q    I realize this is upsetting for you --

A    I'm not upset.  I've been looking forward --

                    (Overlapping discussion)

Q    I'll point to where you need to look.  Page 2, it's the

     third paragraph, hold on -- oh, Page 2, first full

     paragraph.  And just read on down.

A    The exemption is on Paragraph 4 on the first page.

Q    Oh, sorry, I thought you didn't know where it was.

     Okay.  According to the emergency proclamation, were

     clergy also exempt from the curfew?

A    No.  And just so you know I'm not upset by this.  I've

     been looking forward to this deposition for months.

Q    Great.

A    And the opportunity to set the record straight.

Q    Great.  Okay.  Now, I gave you what has been marked as

     Exhibit 5B.  This is an e-mail that was sent to you

     October 9th and where a Brandon J. Brown, who's a pastor

     according to this e-mail, was asking you to consider

     extending the curfew, I believe, exemption for a clergy.

     And your response was, thoughts question mark.  And you

     put James Archambo, Eva Ennamorato E-n-n-a-r-m-o-r-a-t-o

     Alan Kesner and Hanna Kolberg.

A    Hanna Kolberg, yes.

Q    So never exempted the curfew for clergy?

A    No. I don't recall that we did.

Q    Do you recall if any people on this e-mail responded to
     your question of thoughts?

A    I believe, we had a discussion and determined that,
     again, the curfew order would lose it's impact if we
     were starting to let everybody out on the streets.
     Because they had a claim of exemption or that claim.

Q    Okay.  And so, do you recall if the response to this
     e-mail was made with another e-mail by anybody on here?

A    I have no way of knowing.  I don't believe I did.  I
     don't recall.

Q    Okay.  Do you think that the Wauwatosa Police
     Department -- oh, sorry another e-mail.  Now, are you
     aware that people's cell phones were taken from them
     after they were arrested during the curfew?

A    I became aware of that long after the curfew period
     ended.

Q    Do you recall when you became aware of that?

A    Yes.  A couple of neighbors came to my house and said
     that their son's girlfriend had had her cellphone
     confiscated after she got arrested.

Q    Was it the day after the special meeting that your
     neighbors came to your house?

A    I don't recall.

Q    Okay.  Did anyone e-mail you about this?

A    I believe I asked them to send me an e-mail so I would
     have facts to share with the police department.

Q    Okay.  Do you recall who you said -- asked you a e-mail?

A    Yeah.  It was Tom and Joan Olejniczak who lived on Aetna
     Court.

Q    Can you spell the last name for the court reporter?

A    O-l-e-j-n-i-c-z-a-k.

Q    Do you recall if anyone sent you e-mails with regards to
     their phones being taken away?

A    I don't recall.

Q    Okay.  Now, you testified that you are, as Mayor, you're
     in charge of the police among other things with regards
     to the city; correct?

A    Yes.

Q    Like you're the head of the Wauwatosa Common Council;
     right?

A    I'm not head of the Common Council.  I'm the chief
     executive officer of the city and among other things I'm
     head of the police department according to the statutes.

Q    And it's your police to not interfere with Wauwatosa
     Police Department day-to-day operations?

A    Yes.

Q    Okay.  So did you contact the police about your

neighbor's kids phone?

A      Yes.  And I'm sure that you have the e-mail exchange.
And if you would like to share it with me, I'd be happy
to talk with you about it.

Q      Okay.  So what did you say to the police about your
neighbor kid's phone?

A      Can you give me the e-mail and I'll --

Q      We don't have that here.  Just a bunch of papers.

A      Well, I don't recall anything.

Q      So unless people came to your house and asked that their
kids phones or their phones be given back to them that's
what made you contact the police to get people's phones
back?

               ATTORNEY BAYNARD:  Objection to the form of
the question.  Compound.  Go ahead.

A      Asked and answered.  As I testified earlier, I only
became aware of it because my neighbors came to my door.

Q      Okay.

A      So then I immediately, because I was concerned, I
immediately talked to the police department about it.

Q      Okay.  Why were the phones being taken?

A      I don't know.

Q      You didn't ask?

A      Well, my understanding, but I don't know for sure is
that they were looking for possible evidence of criminal

activity.

Q    What made you come to that understanding?

A    I believe that was what I was told.

Q    Who told you this?

A    I think it's Captain Vetter.

Q    When did Captain Vetter tell you this?

A    Whenever I raised it with him.

Q    Did you ask him if he had any search warrants for
     phones?

A    I did not.

Q    Did you ask him who's phones they had in their
     possession?

A    I didn't ask specific names.  I knew that he had --  I
     believe, he told me they had confiscated a number of
     phones.  I don't know what that number was.

Q    Okay.  Did he tell you what they found on the phones
     that they confiscated?

A    No.

Q    Okay.  Do you know how many phones the Wauwatosa Police
     Department took from people?

A    I just said, I don't know.

Q    Okay.  Do you know why they took people's phones?

A    I just said, I think, it was because they were looking
     for evidence of criminal activity.

Q    Do you know if they found any evidence criminal

activity?

A    I don't know.

Q    Were you aware that people, certain females, were
     arrested and were forced to strip naked?  Were you aware
     of that?

A    No.

Q    Did your police -- no one communicated that to you?

A    No.

Q    Do you know why some of the women were forced to strip
     naked that were arrested and given a ticket for curfew
     in Wauwatosa?

            ATTORNEY BAYNARD:  Objection.  Foundation.

A    I just said, I didn't know that it happened.  So how do
     I know what you're asking?

Q    Do you know, generally -- Chief Weber reports to you;
     right?

A    Ultimately.

Q    Okay.

A    Although he doesn't, he's gone.

Q    And you said in October he reported to you; right?

A    Right.

Q    You just said the buck stops with you with the City of
     Wauwatosa?

A    Right.  Right.

Q    Okay.  So did you contact the Wauwatosa Police

Department and tell them to give people their phones back immediately?

A    I believe I sent an e-mail to Captain Vetter forwarding the Olejniczak's e-mail and asked him what happened. And saying that I was concerned about some of the -- some of what had happened. And what I was concerned was not the seizing of the cell phones so much as I was concerned that some young women had been dropped off in places where they didn't have access to a phone. And I wanted to be sure everybody was safe.

BY ATTORNEY SCHWAB:

Q    Did you ever get an answer for why that was happening?

A    The answer I recall getting was that there were a lot of people getting arrested which is why some were being taken to Brookfield, some were being taken to West Allis, I don't know if they were being taken other places. Because the booking, you know, there are only a couple of booking rooms. They were small. They had scores of people getting arrested. And they were -- the people after they were booked were released and I was told they were being released to a central location. So that they could get back to where they came from because people were coming from multiple communities.

Q    And you were -- so you understand they were all being dropped off at the same location?

A   No.  They were being dropped off, I believe, at various
    locations.  But 'central' whatever that means.

Q   Do you know what 'central' means in that case?

A   Well, in the case of Olejniczak's talking about I
    believe it was 35th and Kilbourn, 35th -- I remember
    35th Street.

    BY ATTORNEY MOTLEY:

Q   And do you think that dropping people off at 35th and
    Kilbourn at 2:00 a.m. is -- without a cellphone is a
    safe place to drop off young ladies at night?

A   I told you I had a concern about that.  That's what I
    testified.

Q   But you don't know if it was safe or not?

A   I do not know.  I said, I had a concern about it.  I'm
    concerned about the safety of everyone who interacts
    with the City of Wauwatosa.

    BY ATTORNEY SCHWAB:

Q   Are you satisfied with the answer you received from the
    police that what they did was correct?

A   I have not had the full opportunity to do a debriefing.
    I've wanted to do one, but we've had things going on
    including the retirement of the chief and all of that.
    I still want to make sure that whatever we did was
    appropriate in accordance with 21st century policing
    standards.

Q    So over eight months later you still have not had a
     debrief with the Wauwatosa Police Department with
     regards to what happened in the October curfew?

A    Not with respect to everything.  We've had some
     debriefing, but we have not had a soup-to-nuts
     debriefing.  A lot of it is because we've been
     responding -- the police department's been responding to
     your open records request and your document requests.
     And all of the people that I want to talk to and the
     documents I'd like to look at, are constantly having to
     respond to those things.

Q    Okay.  But you testified that you haven't spoken to the
     Chief of police since May; correct?

A    That's right.

Q    May what?

A    I already told you, I don't recall.

Q    You said you haven't spoke to him since his deposition;
     correct?  Which I believe was May 17th.

          ATTORNEY BAYNARD:  I don't think that's what
     he said.

          ATTORNEY MOTLEY:  He did say that.

A    I didn't say that.

Q    Okay.  So when did you -- did you speak to Chief Weber
     after his deposition on May 17th?

A    I don't recall.

Q    Okay.  Do you recall if you spoke to him May 31st?

A    I don't recall.

Q    That was the day before he retired.  Did you talk to him on his last day?

A    No, I didn't.  We exchanged phone calls that day.

Q    Okay.  Do you talk to him the day before, May 29th?

A    No.

Q    You talked to him on the 28th?

A    No.

Q    27th?

A    Now, you're getting into the, I don't know, territory.

Q    Okay.  But you never asked the police chief, who is the chief policy maker and the chief of police for the City of Wauwatosa for a debrief at all?

A    The chief is not the chief policy maker for the City of Wauwatosa Police Department.  It's the Common Council.

Q    I said Chief Weber in October of, 2020, until I believe he retired June 1st, was the chief policy maker of the Wauwatosa Police Department; correct?

A    And I'm disagreeing with your characterization, he's not the chief policy maker.

Q    Oh, so if he testifies to that he was incorrect?

A    No, he's one of the policy makers, but the Common Council also sets policies.

Q    So who's the chief police maker for the Wauwatosa Police

Department from May -- on May 31st of this year?

A    I'd say it's a combination of the chief and the Common Council.

Q    Okay. And with regards to that, I'm presented to you what's been marked as -- I forget. What number is on there? It's on the bottom?

A    It's 9P.

Q    Exhibit 9P. This is an e-mail that you sent October 14th to Chief Barry Weber and Luke Vetter asking, "Can we return people's phones now?" Do you recall this e-mail?

A    Now, that I see it. I, obviously, sent it so. Apparently, my recollection when I first learned about cell phone was incorrect. I don't know when I, specifically, spoke with the Olejniczak's, but this was October 14th which was a few days after the emergency period ended.

Q    And also in this e-mail there is an attachment of arrest recount.

A    Okay. I don't see any attachment here.

Q    Correct. It just says, attachment arrest recount. Do you see that? PDF.

A    Okay.

Q    Do you know who created that document?

A    I have no idea.

Q    Okay.  Do you recall seeing a document that -- this PDF document arrest recount?

A    I do not.

Q    Is it safe to assume that this -- the arrest recount, PDF, probably came from someone in the Wauwatosa Police Department?

A    I wouldn't make that assumption.

Q    Okay.  Well, what assumption should I make?

A    I don't know because I don't have it in front of me.

Q    Do you think it came from William Schroeder?

A    It could.

Q    A citizen arrest recount PDF?

A    I don't know.

Q    Who's William Schroeder?

A    I have no idea.

Q    Now, with regards to the cellphone, did this cellphone get returned to him?

A    I do not know.

Q    Did Chief Weber or Luke Vetter respond to this e-mail?

A    I do not know.

Q    So you just sent this and just, like, whatever just don't care?

A    No.  My recollection is that I was told by Captain Vetter that all of the phones were returned within a week.

Q    When did he tell you this?

A    When I last spoke to him.

Q    Do you recall when that was?

A    I do not.

Q    Was that October 13th the day of the special meeting?

A    I do not know.

Q    October 14th when he sent this e-mail?

A    Somewhere in that week I assume I had a discussion with him.  I don't know the exact date.

Q    So Luke Vetter, verbally, told you that all of the phones had been returned?

A    He told me, I believe, the following week that things had been returned within a week or so. I don't remember. Maybe it was two weeks.  I don't remember.

Q    So he told you either the week after the curfew that all of the items had been returned to people?

A    That's my recollection.  I could be wrong.

Q    Okay.  So he told you that Tolivia's(phonetic) phone was returned to her?

A    I don't know.

Q    But he said, all the phones?

A    That's my recollection.  But, again, he told me that phones were being returned.  Let me put it that way.

Q    All of the phones were being returned?

A    Or were returned.  I don't know if he said the word,

all.

Q    Okay.  How much do you and Luke Vetter, typically,
      communicate with other?  Mostly calls?

A    I don't talk to him that much, but when I do it's,
      usually, a phone call and we meet at command meetings
      the first Monday of the month.

Q    So at none of these command meetings since October
      curfew you just didn't get bothered to be debriefed
      about the curfew.  Every Monday of the first Monday of
      every single month you meet with the captains and the
      police chiefs and, you know, the fire department.  And
      every single Monday you meet, every month and you
      haven't been debriefed by anybody?

A    You're mischaracterizing my testimony.

Q    Okay --

A    I, specifically, I said I had been debriefed, but not to
      the fullest extent that I would like.

Q    Okay.  So what have you been debriefed on?

A    We've talked about -- a lot of it is responding to your
      open records request and things and how we're going to
      do that.  And what's going to be produced?  And how to
      deal with the lawsuit that was filed within a month
      after -- less than a month after the emergency period.
      And, at some point, I asked did he return the cell
      phones.  And, I believe, he said within a couple of

weeks or a week.  All of those sorts of things.  We

don't -- there is no formal debriefing document, but we

have discussed these things.

Q    You have discussed these things with regards to the

curfew?  Has there been sort of a report, a written

report, about the curfew of October and some of the

things that have happened?  Has anyone created a report

like that?

A    I just said.  I just testified.

Q    Has anyone created a written report --

A    The answer is, no --

            (Overlapping discussion)

Q    Just answer the question.

A    I did answer the question.  I've done it twice now.

Q    I know this is uncomfortable.

            ATTORNEY BAYNARD:  Okay.  Stop.  The back and

forth it is getting abusive.

            ATTORNEY MOTLEY:  Well, please, tell your

client to answer the questions I presented to him.  I

know this is personal for him.

            ATTORNEY BAYNARD:  It's personal for you.  I

can tell from your facial expressions.

            (Overlapping discussion)

            ATTORNEY BAYNARD:  Were you in the middle of a

question?  Were you in the middle of a question because

I'm going to take a break.  Do you think --

(Off the record 12:28 p.m.)

(On the record 12:40 p.m.)

BY ATTORNEY MOTLEY:

Q    So during the break what did you guys talk about?

ATTORNEY BAYNARD:  I'm going to instruct him not to answer on the basis of attorney/client privilege.

Q    During the first break what did you talk about with Mr. Archambo?

ATTORNEY BAYNARD:  I'm going to instruct him not to answer with regards as to any conversation that I was a part of.

Q    Did Mr. Archambo give you advice on how you should move forward to questioning?

ATTORNEY BAYNARD:  I'm going to instruct him not to answer on the basis of attorney/client privilege anything that we discussed while in, that room that I was in to not answer.  If you had conversations when I was not in the room or in the bathroom.

A    And I'm going to follow my attorney's instructions.

Q    Did you have any conversations with Mr. Archambo this morning outside of the presence of your counsel?

A    Yes.  There was one statement Mr. Archambo.

Q    And what did you guys talk about?

A    He said, "When she says it's getting personal it means

it's getting personal to her", meaning you.

Q    Did you talk about anything else?

A    No.

Q    And that includes this morning as well; right?

A    Right.

BY ATTORNEY SCHWAB:

Q    So I'm going to refer back to the proclamation and
     that's going to be the second page of Exhibit 1.  So for
     the whole document you read over this these are, for all
     intents and purposes, your words?

A    Ultimately, yes because I signed it.

Q    You stand by what is in there?

A    Yes.

Q    And you have personal knowledge for everything in this?

A    I don't know what you mean by that.

Q    Who else should I speak to get information and
     background on the document on any contentions anything
     stated in here aside from you?

A    I would say the person that I talked to would be Captain
     Vetter.

Q    Okay.  Did Captain Vetter write this?

A    No.

Q    What would Captain Vetter's role would have been?  What
     information do you have?

A    He knew the conditions on the ground and what was needed

to make sure that we could deal with any potential
unrest.

Q    Did he share those conditions with you?

A    Yes.

Q    You have personal knowledge of all of the conditions as
well?

A    I did not have personal knowledge of all of the
conditions.  I was not a police officer on the ground,
at all times, all summer long.

Q    I'm going to read to you on the second page, the first
paragraph:  Now, therefore, I, Dennis R. McBride, Mayor
of the City of Wauwatosa, under the authority granted by
on due 323.11 and 323.14(4)(b) of the Wisconsin
Statutes, declare that the above conditions would be
likely to give rise and to create -- or to give rise to
and create an imminent threat of riot or civil unrest.
Can you tell me all of the conditions referred to or
referenced in this section?

A    Yeah, I just testified for several hours about them.
All of the things that happened in Wauwatosa and beyond
all summer long.

Q    I understand and I just want to make sure that I
understand and draw a straight line between the
conditions referenced in this paragraph and only those
conditions referenced in this paragraph and those

conditions?

A    I testified about Madison.  I testified about Milwaukee.
     I testified about Seattle, Louisville, Portland,
     Philadelphia, Kenosha and all of things that were going
     on Wauwatosa all summer long.

Q    Okay.  And that was it?  That would be the full list of
     conditions?

A    And, as I said earlier, in other cities, but I just
     don't recall.  All across America in, 2020, people were
     protesting and sometimes things got out of hand and
     sometimes counter protesters got involved and all of
     that.  And there was potential loss of life and
     potential harm.

Q    Okay.  Just want to be sure.  So you were just
     referencing the experiences that you perceived or saw
     across the country at other Black Lives Matter protests?

A    And also what I saw outside my door and what I saw on
     videos some provided by the police some provided by the
     protesters, cause I could see them on Facebook.

Q    I'm sorry.  Can you tell me what video those are?

A    Well, after the shooting at Joseph Mensah girlfriend's
     house on August 8th there were Facebook videos that were
     posted.  And I saw the melee where it looked like a
     hundred people there, you know; chanting, screaming,
     toilet papering and all this and that.  I didn't see a

video of the shotgun going off.  But I saw people who
looked like they were fighting.  And then we learned
about the shooting and the assault on Officer Mensah.

Q    Okay.  And --

A    And there were other videos of other times like the
August 14th incident a block from my house.

Q    Okay.  And we have time, I want to know every video that
you relied on.

A    Those are -- I mean, I don't remember -- I don't
remember every video I saw.  There were lots of videos
this summer.  You know, with a cell phone, as you know,
people take lots of videos.  And some were taken by
protesters and some are taken by counter protesters.
And some people posted those things on Facebook and so I
would see those things.  I don't remember all of the
ones I saw, but it was an ongoing thing.  I remember one
night TPR was marching through Wauwatosa and they were
going to every home of every police and fire
commissioner.  And then they came to my house too
because they always got a two-for because the chairman
of the fire and police commission lives four or five on
the same block from me.  So when they come to my house
they get down to Dominic Leone's house.  And somebody, I
believe, in TPR was part of the whole group and they
were marching, as I recall, when I first started

watching it, this is in realtime and then I'm on a
computer, because someone alerted me to it.  I don't
know who that was.  But they were going down Honey Creek
Parkway in Wauwatosa.  I believe, they had just left
Alderman Franzen's house because he lives on St. Anne
Court which is right off of Honey Creek.  At least, he
saw it.  And then they went to Commissioner Leahy's
house.  Which, I believe, is on Brookside Place which is
across the creek from Honey Creek Parkway.  And then
they continued and I was watching that.  They went into
the Wauwatosa Village area across the Harmonee Bridge
and blocked the intersection at State Street -- well,
State Street and Harmonee Avenue come together.  And
then after a while and they continued down State street
and then they blocked the intersection for about 20
minutes at the intersection of 70th and State Street.
And then they came up 70th Street to my house because I
live at 70th and Cedar.  So I was able to watch all of
this in realtime.  So that was the, sort of, thing that
was going on for a long time.  You could take to any
night of TPR because they were taking their own videos
of what they were doing.

Q     And were you presented with any evidence in the
      documents that showed any of the protesters in the
      Wauwatosa protests had been in Seattle for those

protests?

A    Not that I'm aware of.

Q    In Portland for those protests?

A    Not that I'm aware of.

Q    In Minneapolis for those protests?

A    Not that I'm aware.

Q    In Madison?

A    Again, not that I'm aware of.  It's possible because it
     was only 75 miles away.

Q    Philadelphia?

A    The same.

Q    Louisiana -- sorry, Louisville?

A    The same.

Q    Kenosha?

A    Yes, there were.  I do know, at least, one man,
     particularly, who was in Kenosha.  Because Mr. Archambo
     and I met with two members of Tosa Together, two members
     of Indivisible Tosa, and two member of Tosa Tackling
     Racism one night.  And, again, this was our ongoing
     effort to try to reach out to the community and leaders
     of various protests and people who had concerns.  And
     there was a young man from of Indivisible Tosa.  He was
     the only man in the group, there were five women.  And
     his name is Joseph Kraynick.  And I belive his name is
     spelled, K-r-a-y-n-i-c-k.  And we were talking,

generally, about the situation in Wauwatosa.  And trying to bring peace and trying to respond to community concerns and all of that.  At one point somebody, it might have been me, said something about Kenosha.  And he got very upset, 'I was in Kenosha.  And it was terrible.  And the police were terrible.'  And this and that.  And he was very angry.  He got somewhat calmed down and then later on I mentioned -- I just mentioned the National Guard being in Kenosha.  And he got -- he flew of the handle, and he said, "I can't take this anymore.  I was there and I saw what the National Guard did."  And he left the room.

Q    Okay.  Do you know or believe that every single person in Madison at these protests was in someway violent, destructive or engaged in civil unrest?

A    No.

Q    Same question for Milwaukee?

A    No. I mean some people just come to watch.

Q    So there were peaceful protesters at all protests?

A    I assume there were.  I can only assume.

Q    You could only assume.  Do you believe that -- the ones that you were seeing, the one that came by your house, were any of the members peaceful or where they all engaged in destruction or violence?

A    Some were peaceful and some were not.

Q    Okay.  But your order applied to everyone?

A    How do we decide?  Who do we know who the peaceful ones
     and who the troublemakers are?  I don't know that.  So
     there's no way we could have --  we needed a bright line
     is the bright line was the curfew at 7:00 p.m.

Q    Okay.  And it applied to everyone?

A    It applied to everyone.  Black, white, green, purple,
     clergy, non-clergy.  It applied to everyone.

Q    Would you agree that the effect of the curfew was to
     make protesting in the City of Wauwatosa unlawful after
     7:00 p.m.?

A    It made gatherings unlawful.  It made people leaving
     their home, if they didn't have specified exempt
     business, unlawful.

Q    If me and ten friends had wanted to gather in Wauwatosa
     on October 7th at 8:00 p.m. to protest police violence
     outside, would that have been in illegal?

A    Yes.  Because the Supreme Court allows time, place, and
     manner restriction appropriate.  And it was a time,
     place, manner restriction.

Q    Okay.  And -- and it wouldn't matter if we were being
     peaceful or not?

A    That's right because you were violating the law if you
     were out after curfew.

Q    And it was -- and it was because of previous protests

that you declared -- this was not because there were
just people out milling out around too late or children
engaging in problems.  This curfew was set in
anticipation of protests; is that correct?

A     It was not set in anticipation of protests it was set in
anticipation of possible violence.

Q     And was that violence going to be related to protests?

A     It might have been and might not have been.  What we had
seen and what the police will tell you and Mayor
Antaramian told me in Kenosha is that, and you see this
around the country sometimes, you know, when the
Cleveland Cavaliers won the NBA title there were a lot
of happy people out there.  Probably 99 percent of the
people are happy, but some people always choose the
opportunity to cause trouble.  So we had to plan for
that eventuality.

Q     Was a curfew set in Cleveland?

A     No.

Q     Have you ever seen a curfew after a football game?

A     No.

Q     Have you ever considered setting a curfew after a high
school football game?

A     No.  But the point is sometimes bad things happen even
in good moments.

Q     Okay.  And this was the one instance you wanted to make

sure that none of those good or bad moments could happen?

A    No.  We, actually, had -- I signed a emergency declaration earlier in the year too.

Q    Oh, you did.  When?

A    May 30th.

Q    Did you issue that out unilaterally as well?

A    Yes.

Q    You did?

A    Mm-hmm.

Q    When did you get the Common Council to agree with it?

A    The Common Council.  This was a Saturday night at 8:30.  And the chief said, "We need a curfew because we have people driving a hundred miles an hour on Mayfair Road and on Burleigh Street.  And trying to go into Mayfair and causing trouble.  They're driving the wrong way on Mayfair Road et. cetera, et. cetera.  And he asked me for a curfew and I -- by 9 o'clock that night we had a curfew in place.  The city attorney --

Q    And that night did the civil unrest stop the Common Council from meeting as well?

A    No.  We talked about it with the Common Council, I believe, the following Tuesday.

Q    And so your belief is you can declare a state of emergency whenever it's more convenient for you to do so

than the Common Council?

A    No.  That's not at all what I just said.

Q    Okay.  The statute seems to suggests is it has to be a emergency condition to which you are responding which must stop the Common Council from meeting.  Can you tell me when you understand you are legally enabled to declare an emergency?

A    I'm not here as an expert witness I'm here as a fact witness.  And I don't agree with your characterization of 323.11.

Q    Okay.

A    What happened on May 30th there was an emergency in realtime.  This wasn't something that we were guessing that maybe on October 7th something might happen.  This was going on right then and there.  In fact, the day before there had been some unrest.  And I was talking to the chief and I said, "Are you going to need a curfew or anything?"  And he said, "No, we don't need a curfew?"  And then he called me Saturday night and he said, "We need a curfew."  He said, "All hell is breaking loose of Mayfair Road."  Not his exact words, but...  And then we talked to the city attorney and by 9 o'clock we had a declaration in place.  The Common Council could not have addressed that emergency situation.

Q    Okay.

A    In that short of time we needed to get some peace on the
     streets because people were driving like crazy people
     and people could die.

Q    Was that the case on October 6th that you didn't have
     the ability to talk to Common Council?

A    We have been through this so many times already today.

Q    Would you agree that you just didn't want to tell the
     Common Council?

A    No.  That's not true.  That's not what I testified.

Q    Okay.  Are you happy with the performance of the
     Wauwatosa Police Department?  Were there any other
     problems with how they performed over the week of
     October 7th to the 14th?

A    I don't have any reason to think that they did anything
     unlawful.

Q    They performed, exactly, how you wanted them to?

A    I don't know.  I wasn't there.  I'm not at all a
     captain.  I wasn't on the streets at all times.  I
     wasn't in all places at all times.  There wasn't just
     one spot were the police were dealing with things they
     were all over the city dealing with things.  And some of
     the things that, I believe, have been attributed to
     Wauwatosa Police were, actually, done by police from
     other departments.  So you would have to sort that out.

Q    Okay.  But, again, knowing what you know now, are you

happy with the performance?

A    Happy is not the right word.  I believe that they acted
     appropriately.

Q    Okay.  And there was no inappropriate conduct?

A    I just testified.  I said, "I believe they acted
     appropriately."

     BY ATTORNEY KNOWLTON:

Q    Do you believe they acted appropriately in everything
     they did?

          ATTORNEY BAYNARD:  Objection to the form of

     the question.  During the time period of the curfew?

          ATTORNEY KNOWLTON:  During the time period of

     the curfew.

          ATTORNEY BAYNARD:  Then objection.  Asked and

     answered.

A    Yes.  I believe I have already answered that.

Q    No.  You said, you believe they acted appropriately.
     And then you said, you don't know everything that they
     did.

A    Right.

Q    Are you learning about things that you aren't happy
     about?

A    No.

Q    No.  So you can testify, then, that you are happy with
     everything they did?

A    That's not what I said.

Q    Sorry.  That you believe they were appropriate in
     everything they did?

A    I don't know everything that they did every minute of
     every day.  What I do know, I believe, they acted
     appropriately.

Q    And you also testified that you don't know everything
     because you haven't had a debriefing?

A    I don't know everything because I wasn't there.

Q    Okay.  And you testified that you didn't, in realtime,
     watch from the entirety -- I'm sorry, you left usually
     around midnight.  So, at least, when the curfew was
     enacted each evening starting at 7:00 until either
     things calmed down, you know again, or midnight.  You
     were watching in realtime from the CVMIC Building;
     correct?

A    I wasn't watching everything because we were getting
     different feeds at different times.  And you know
     they're breaking windows at Swan Boulevard and North
     Avenue.  So we watched the windows being broken.  We got
     feed from somebody, I believe, it was some conservative
     pseudo journalist walking around, taking video and we
     saw the windows being smashed out.  So we were watching
     that because that's what was going on.  And then we
     learned about a melee at Menomonee Parkway right after

that where people were throwing bricks and bottles and rocks at the police. So we were trying to watch that. Other times we were watching what was going on Wauwatosa and North Avenue. Another night there was a situation at about 67th and Villard. Protests were marching around and the National Guard stopped them, and I can't remember for what. And the group split and one went off into Milwaukee and there was looting going on. And the Milwaukee Police were dealing with that. And then another group started heading towards my house. They said, "We're going to the Mayor's house."

(Interruption)

The group split off and they were headed to my house. And there we got a feed there was a drone feed of the overhead of my house. And we could see the protest coming to my house.

Q   Okay. So to be clear you didn't see the windows getting broken you went to that feed after that was reported to you?

A   No. I saw the windows being broken in realtime.

Q   Oh, you did. Okay. With multiple cameras and all of that business. Did you see on Saturday night the city hall lawn? What were you watching on Saturday night, do you remember?

A   Again, we watched different things. Sometimes we were

watching Katie Katie.  Sometimes we were watching a MAGA
guy who was a Kyle Rittenhouse supporter driving around,
I think, he said he was from Texas.  So we watched his
feed for a while to see if he was up to no good.  We
were watching Katie Katie she would march with the
protesters and she was from Seattle.  So at any given
time we might be watching something else.  But we did
see -- I mean, I don't recall night after night,
specifically, everything at a given time.  But we had a
lot of feeds from city hall.  The drones that were
there, I think, it was drone footage.  We saw the
protesters in the middle of the intersection.  We saw
people sometimes on the grass.  Sometimes there were
people at the BMO Harris parking lot.  Sometimes they
were just on Wauwatosa Avenue.  One night, I believe, it
was the first night, some of the protesters evaded the
police line on North Avenue by going on -- they drove on
the lawn at Longfellow.  Some drove around Longfellow
and the police had to reestablish the line, I think on
81st. Street.  So we saw some of things going on in
realtime.

Q    Okay.  On Exhibit 1 just, the emergency order.

A    Okay.

Q    Just to be clear, your intention was to ensure that
     first responders and anyone with a legitimate purpose

that -- were able to travel in the streets?

A    Right. Absolutely.

Q    And so the restriction was if they were pedestrian or vehicle traffic in the streets; is that right?

A    It says: It will be necessary to remove traffic and pedestrians from Wauwatosa streets.

Q    Okay. And the intention there was because you want to make sure that, again, that city business and first responders were able to have a clear access of entry; is that right?

A    That was part of the answer.

Q    That's part of the answer. Can you give me the other part?

A    The rest is, when you have a curfew you have to know who the people are so that you can deal with the emergencies. And so if those few people who had press credentials, or those few people who are nurses going to the medical center or something needed to do that, they could be stopped. And they would say, "I'm a nurse going to the medical center." Okay. You can go ahead. Or, "I'm a reporter for the Journal Sentinel. Here's my card." Okay. You can be here. But the purpose was to clear the streets of pedestrians and traffic so that the police could manage what could be a danger to human life as well as to property.

Q     In the streets?

A     Streets and sidewalks and everything else.

Q     It doesn't say sidewalks and everything else, does it?

A     The streets include the sidewalks.

Q     Do they?

A     Yes, they do.

Q     Do the streets include the lawns?

A     Yes.

Q     Why?

A     You are not allowed to be out after 7:00 p.m.

Q     So on my own property I'm not allowed to be out?

A     You can be in your own yard.

Q     Okay.  And whose yard is city hall?

A     It's not your yard.

Q     Okay.  Okay.  Thank you, well...

A     It's everybody's yard and you're not entitled to be
      there.  You violated the curfew that night by sitting on
      the lawn.  You didn't get an exemption.  You didn't get
      a lawn exemption.  You didn't get a sidewalk exemption.
      The protesters often march on the sidewalks as well as
      the streets.  You don't an exemption.  You don't get a
      grass exemption.

              ATTORNEY MOTLEY:  You done?

              ATTORNEY KNOWLTON:  Sure.

      BY ATTORNEY MOTLEY:

Q    I want to go back a little bit to the two neighbors that
     came to your house Tom and John, I believe?

A    Joan.

Q    Joan.  Okay.  And they said their child was arrested and
     their phone taken away?

A    Their son's girlfriend.

Q    Their son's girlfriend.  What's her name?

A    I don't recall.  I do recall who she was because the
     night that they're talking about she and another young
     woman had a banner that they stretched across the
     eastbound lane on North Avenue right at the intersection
     of Wauwatosa Avenue and North Avenue.  They blocked
     traffic with the banner and I saw that in realtime.  And
     they got -- they were told to stop and they refused to
     stop and that's when they got a ticket.

Q    Okay.  So it was the girlfriend of the son did get a
     ticket?

A    That's my understanding.

Q    Are you positive that's what happened or you believe
     that happened?

A    What I was told by Tom and Joan is that she was
     arrested, taken to, I believe, the Wauwatosa Police
     Station.  Again, there were multiple police stations
     involved.  And she was booked on some level, ticketed, I
     don't know.  And then, ultimately, her cellphone was

taken. And then she and some other people including a young woman like her were put at 35th and Kilbourn.

Q      So you said she was booked on some level and you don't know if she was ticketed?

A      No, I don't know specifically.

Q      Did you also send an e-mail to Luke Vetter and Chief Weber to make sure she was ticketed just like you did with Christine Groppi?

A      I wanted to know what the situation was because what I had been told by Tom and Joan, I believe, they said she had been ticketed.

Q      But you did not send an e-mail to Vetter or Weber to make sure that she got a ticket like you did with Christine Groppi?

A      She was taken to the police station.

Q      But you did not send an e-mail to Vetter or Weber to make sure that she was ticketed like Christine Groppi?

A      I did not need to. I did not need to do that because she violated the curfew and she was out there and she got arrested. So I did not need to do that.

Q      Okay. But you're not sure if she got a ticket?

A      I don't know the names of the people that got tickets. There was seventy or something like that.

Q      Okay. Now, getting -- I want to understand, sort of, meetings in Wauwatosa. When there is a regular Common

Council meeting and things are put on the agenda how soon -- when's the last time period things can be put on the agenda?

A   If it's a 7:30 meeting on a Tuesday night the last opportunity, I believe, is 7:29 p.m. on Monday the night before.

Q   Okay.

A   You have to give 24 hours notice, typically, we post agendas like 5:00 p.m. the previous Friday. Once in a while there is a change in the agenda something is taken off and something is put on. And it's usually done on that Monday during the day.

Q   And who approves the agenda items that are put on this?

A   I told you earlier its people at the agenda meeting.

Q   Okay. So with regards to the May 30th through June 2nd curfew, you said the Common Council was not made aware of it until the meeting on June 2nd?

A   No. I believe -- what happens in a situation like that, typically -- I don't know if I did it or the police did it, typically, it's the police. But sometimes I'll say, we just did something. The Common Council, for good reason, is very jealous for knowing everything it needs to know. Typically, what happens we have an emergency situation and we just establish a curfew. And so, I believe, that night as soon as possible, excuse me, we

sent out an e-mail to the Common Council saying, "This

just happened.  And heres a copy of the curfew and the

emergency declaration."

Q   So when did you send the emergency declaration to the

Common Council that occurred on May 30th?

A   I think I said that night, I believe.

Q   The night of May 30th?

A   I believe so.

Q   You sent them a copy of it?

A   I don't know if I did it or somebody did in the police

department.  That's, typically, what we do.  Can I say,

as I sit here right now.  I didn't prepare for that.  I

didn't go and check, so I don't recall specifically.

Q   Okay.  But if the police department did sent it to them

it's because you told them to do it or would they just

do that on their own?

A   They would just do it.  You know, if there is a shooting

for example or -- what was the most recent thing?  There

was something, every public information officer is the

one that, typically, does it.  But there was a just a

shooting it was 113th and Center or something and just

so you know and we'll give you more information when we

get it.  But the Common Council is, typically, alerted

as soon as possible when there is an important matter

like that.  So, typically, they should have gotten a

notice that night of the emergency declaration.

Q    Okay.  So who alerted the Common Council of the
     Emergency Declaration on October 7th?

A    I'm not sure probably, Abby Pavlik.

Q    But somebody did?

A    I assume that they did.

Q    And they would have done that by e-mail?

A    Yes, they should have.

Q    Okay.  So for the curfew of May 30th through June 2nd,
     did you also have -- go to the command post at CVMIC?

A    I don't think it was June 2nd.

Q    Or June 1st.

A    I think, it was May 30 and 31st and maybe it ended the
     morning June 1st.

Q    So, again, May 30th through June 1st?

A    Right.

Q    Did you go to the emergency command center at CVMIC?

A    No.

Q    Was anything set up at Segment for that curfew?

A    No.

Q    With regards to the curfew of October at Segment for the
     streams that you were looking at, were all of those
     videos being recorded?

A    I don't believe they were, I think, they were just being
     shown.

Q    Okay.  You indicated that you saw videos of protesters
     on Facebook.  Whose Facebook's posts -- whose Facebook
     video did you look at?

A    I can't recall.  I think some of them were TPR.

Q    Names?

A    I dont know the names.

Q    You don't know any of the names of the videos that you
     saw on Facebook live?

A    No, I don't recall.

Q    Okay.  Do you think it's appropriate the Wauwatosa
     Police Department to target and surveil citizens?

A    No.

                ATTORNEY BAYNARD:  Objection to the form of
     the question.

A    You're using the term, target.

Q    I'll rephrase.  Do you think it's appropriate for the
     Wauwatosa Police Department to target and surveil people
     that are protesting for police reform?

A    I think, it's appropriate for the Wauwatosa Police
     Department to be monitoring potential threats to the
     community.

Q    Okay.  Do you think that it's appropriate for the
     Wauwatosa Police Department to monitor journalists?

A    Not if they are not a threat to the community.  I take
     that very seriously.  My parents were reporters and I'm

a journalism graduate.

       ATTORNEY BAYNARD:  Can we go off the record,
briefly?

       (Off the record 1:11 p.m.)

       (On the record 1:11 p.m.)

BY ATTORNEY MOTLEY:

Q    Are you familiar with this document, Mayor McBride?

A    No.

Q    Would you be surprised if this was a document created by
the Wauwatosa Police Department?

A    I don't have a reason to be surprised or not surprised.
I don't know what it is.

Q    It's, essentially, the protester list document?

       ATTORNEY KNOWLTON:  Is there a title on it?

       ATTORNEY MOTLEY:  No there is no title on it.

BY ATTORNEY SCHWAB:

Q    So this is the first time you're seeing this document?

A    Yes.

Q    Pretty extensive; right?

A    I don't know, it's a lot of pages.  I don't know how
many pages.  There's no numbering on it.

Q    Unfortunately, I gave it to you as we received it.
There's not title.

A    There appears to be about, I don't know, 20 pages to
this thing maybe.

Q    So do you think it is appropriate for the Wauwatosa
     Police Department to surveil elected officials?

A    If the elected officials are violating the law I would
     say, yes, otherwise, no.

Q    Have you ever violated the law in Wauwatosa for the last
     year?

A    No.

Q    Was it appropriate to target and surveil you?

A    No. Because I haven't done anything wrong.

     BY ATTORNEY SCHWAB:

Q    Do you believe that David Bowen is a criminal?

A    I have not reason to believe he's a criminal.

     BY ATTORNEY MOTLEY:

Q    Do you believe Jonathan Brostoff, Page 3.

A    Brostoff.  I know Jonathan.

Q    Do you believe he's a criminal?

A    No.  I have no reason to believe that.

Q    Do you believe I'm a criminal?

A    I have no reason to believe that.

Q    Do you believe Isiah Holmes Page 6, journalist, is a
     criminal?

A    I have no reason to believe that.

Q    Do you believe Page 7 that Tracy Cole, the mother to
     Alvin Cole, is a criminal?

A    Listen I don't have pages, page numbers.  I don't have

any reason to believe that -- who did you say?  Tracy
Cole?

Q    Tracy Cole, Page 7.

A    I don't know anything about Tracy Cole other than she is
Alvin Cole's mother.

Q    What about Attorney Deja Vishny, do you have any reason
to believe that she's a criminal?

A    I don't know anything about her.

Q    Okay.

     BY ATTORNEY SCHWAB:

Q    Do you know if there is -- have you ever heard of the
police surveilling people in general?  Are you kept
abreast of that?

A    As I testified earlier, I know that there is police work
collaborated with the FBI and other departments in the
area and they monitor potential concerns.  That's all I
know.

Q    Okay.  Were you familiar that there was a protester list
relating to these individuals?

A    I knew that there was -- what I read after the August
8th incident at Officer Mensah's girlfriend's is that
the police were monitoring certain people because they
were thought to have engaged in violence at that
incident.

Q    Did that give you a reason that they were monitoring,

surveilling, developing a list?  Did they tell you why
they were doing so?

A    With respect to that incident?

Q    Just generally.

A    They didn't tell me about generally.  But I do know that
they were trying to monitor the protest situation to
make sure that there weren't incidents that were likely
to occur that they couldn't handle.

Q    Do you know if there are any other protester list or
surveillance list outside of this one that is related, I
suppose, related to black lives Matter?

A    I don't know what this is so I can't compare it to
anything else.

BY ATTORNEY MOTLEY:

Q    Do you believe it's appropriate for the Wauwatosa Police
Department to create a list like this of people who may
not be involved in criminal activity?

          ATTORNEY BAYNARD:  Objection to the form of
the question.  Lacks foundation.  Go ahead.

A    Yeah.  Again, I don't know what this list is or who
created it.

BY ATTORNEY SCHWAB:

Q    Would you find it appropriate for the police to develop
a list of all known protesters on the basis of their
political beliefs?

A    No.  You shouldn't by targeted for political beliefs.
     It should be observed if people are, potentially,
     involved in criminal activity.

Q    And do you believe that every single -- if the police
     developed this list that every single one of those
     people must have -- there must be a basis for believing
     they're engaging in criminal conduct?

              ATTORNEY BAYNARD:  Objection to the form of
     the question.  Lacks foundation.

A    I can't answer with respect to this.  I don't know what
     this document is.

Q    Do you know if there is another list outside of this
     one?

A    No.

Q    Do you know if -- you mentioned before that Proud Boys
     are counter protesters, white supremacists have shown
     up; correct?

A    Yes.

Q    Do you know if there is a list of them?

A    I do not know.

Q    Or an effort to identify those people?

A    I do not know -- yes.  I take that last answer back.
     Yes, they do monitor people who are counter protesters
     whether they are Proud Boys or whatever.  I don't know
     what the labels are going do be.  But they are

monitoring for people who might cause trouble in
Wauwatosa.  So, for example, in November, I'm trying to
remember the date, it was November 19th, I believe, it
was a Friday.  It was the day that we had the
mass-shooting at Mayfair.  We had eight people shot.

         The following day MAGA protesters led by David
Clarke and Vicki McKenna who is a talk show host, a
right-wing talk show host wanted to hold a rally at the
corner of Mayfair and North.  And I called the -- and
said, "Can you get these people to stop?  Please, this
is not a time for a rally like this."  And he said that
he spoke to them and they refused to back down.  And
they held the rally.  Somebody was arrested at that
rally, a MAGA, protester.  The following week there was
a Tosa Together and a TPR rally on the same corner and
nobody was arrested.

         So people said to me, "Well, how dare you let
the MAGA protesters protest?"  I said, "Well, the 1st
Amendment covers the MAGA protesters too.  I don't like
the MAGA protesters, but it covers them too."  And one
of them got arrested and the Tosa Together people didn't
get arrested at the same corner a week later.  So the
police are monitoring.  They did know about that rally.
They were concerned about it.  And I know that they are
looking regardless of race, creed, color or political

belief they are trying to observe whether there is going
do be some trouble in Wauwatosa.

BY ATTORNEY MOTLEY:

Q    Do you think the Wauwatosa Police Department monitoring
     me is appropriate use of city resources?

A    I don't know if they do that.

Q    You recognize I'm on this list; correct?

A    Again, I don't know what this list is.  I don't know who
     created it.

Q    If you find out that this is a list of protesters who
     Wauwatosa Police Department has labeled as protesters
     that they monitor, if it is determined that is what this
     document is, do you think that's an appropriate use of
     City of Wauwatosa resources?

             ATTORNEY BAYNARD:  Objection to the form of
     the question.  Improper hypothetical.  Go ahead.

A    Yeah, I can't answer that question.

Q    Do you believe that monitoring you was an appropriate
     use of Wauwatosa city resources?

A    No, because I know my situation.  And I know what was
     going on and I found out what happened and it was
     completely inappropriate.  And by the way they weren't
     monitoring me as I understand it.  They just threw that
     in there because somebody had a gripe.

Q    And that Lieutenant Lewandowski, L-e-w-a-n-d-o-w-s-k-i

he was the one that created that power point with high
value target; correct?

A    He's not a lieutenant, but it was Detective Lewandowski
at that point in time, so.

Q    Okay. And he's been promoted in April of this year;
correct?

A    Right.

Q    Was he reprimanded at all for putting you even it was a
gripe and labelling you as a high value?

A    Yes. He was given a written reprimand, as I understand.

Q    And that was the only reason that you were targeted that
you're aware of with the Wauwatosa Police Department?

A    Yes, it's my understanding.

BY ATTORNEY SCHWAB:

Q    You said that he did this based on the gripe?

A    That's my understanding. That's my guess.

Q    Can you explain the understanding of why he would have
done that?

A    Well, the police union didn't like what the Common
Council and I did in July of, 2020, which was pass a
resolution instructing Mr. Archambo city administrator
and Chief Weber to and this is a quote "Facilitate the
transfer of officer Mensah from the police department."
That was passed by the Common Council almost,
unanimously -- - and the following week the police union

issued a vote of no confidence with me and the Common
Council.  So when I say it's a gripe, I think, it is
based on that.  I think they have never gotten over that
resolution.

Q    Does it worry you that the police or certain officers
may take actions with the force of the State based on
their personal feelings and their political beliefs?

A    You're not understanding.  It was not an action it was a
draft and a supervisor told him to take it out and it
just stayed in draft so no action was taken.

BY ATTORNEY MOTLEY:

Q    Let me jump back real quick.  With regards to the
emergency command center was Dominic Leone or any member
of the police and fire commissioner also present?

A    No.

Q    Do you think it's appropriate for -- were you involved
in the incident that happened at Joseph Mensah's house,
I believe, it was August 8th of this year?

A    Involved in what way?

Q    In any way.

A    No, of course not.

Q    Of course not.  And you mentioned that three people were
arrested with regards to that incident; correct?

A    I believe more were arrested, but three were charged by
the district attorney with felonies for that incident.

Q    Okay.  And was one of the three Niles McKee?

A    I'm trying to remember the names.  I think one was Niles
     McKee, there was a Bell -- Bell and then there was a
     third guy.  I don't know who it was.  I don't know if
     I'm getting the names right.

Q    And do you think that it was appropriate for Joseph
     Lewandowski to question Niles McKee about you when he
     was conducting his interrogation about what happened at
     Joseph Mensah's house?

A    No, because I was not involved in the incident.

Q    Were you aware that in his official police report there
     is a whole paragraph of questionable conduct of
     Wauwatosa Mayor Dennis McBride.  That's in his report
     given to the DA's office?

A    I became aware of that -- I saw a snippet of the video
     where he was talking about me.

Q    Excuse me.  And I understand why it's confusing that
     video was of Brianna Foster(phonetic) a different
     person.  This is Niles McKee.

A    No.  I think, I saw something else, but I did become
     aware of that.  I'm not sure if I saw that, particular,
     document.  I, certainly, became aware of it and I heard
     what he said.  So how I became aware of it, I can't
     recall.

              ATTORNEY SCHWAB:  We need to wrap up.

BY ATTORNEY SCHWAB:

Q  I'm still curious if the conduct of the police, at
   least, this police officer is based in part on the
   furtherance of the police department's own needs or
   desires or goals?

A  Is that a question?

Q  Sure.  You know.  Lewandowski, said, additionally, Mayor
   Dennis McBride extended a welcome to The People's
   Revolution protests any time.  I asked McKee what made
   him think that he's said, "That he's for us."  And then
   I asked what he thought when Mayor McBride stopped doing
   exactly what The People's Revolution wanted.  He said,"
   He's against us."  It seems to be that they're using
   police resources to pursue police goals whether it's
   police union goals or the protection of the police as an
   entity against people who are seeking to restrict the
   power of the police.  Is that a legitimate use of police
   force?

          ATTORNEY BAYNARD:  Objection to the form of
   the question.  Calls for speculation.  And also it's an
   improper hypothetical and compound.  Go ahead.

A  I don't know what was in Officer Lewandowski's head at
   that point.  I will tell you this he called me earlier
   this year and apologized.

Q  Does it worry you -- did it make you wonder if at any of

other time other conduct against any other people was influence by his personal feelings like he did against you?

A   As a citizen and as an elected official I'm always concerned that the police make sure that they get just -- the government needs to turn square corners with its citizens. I make sure whatever the police do and whatever any other employee of the City of Wauwatosa is appropriate under the law and under our civil -- that people are treated fairly.

Q   I understand that's what you want, but do you have any concerns that the police at points are bias or partial?

A   I was, certainly, concerned when they lifted the draft listed me as a high value target. So that led me to question whether they were doing appropriate things.

Q   But did it lead you to question whether they were being appropriate in listing Representative Bowen as a high value target?

A   My understanding is that Representative Bowen was at the incident on August 8th. There was some concern -- my understanding is that the matter was, actually, presented to the district attorney to look at whether Representative Bowen acted improperly or illegally that night. So if there is a concern that he acted illegally then I would think it was appropriate.

Q    So it's only you.  You are the only person they acted
     improperly against and nobody else?

A    I'm sorry?

               ATTORNEY BAYNARD:  Objection to the form of
     the question.

A    No.  I didn't say that.  I just said that, if people are
     believed to have acted illegally -- here's what I
     understand --

Q    I know.  What I'm saying you're on the list with other
     people.  Why do you believe that you are special on that
     list?  You know, if that list is problematic because it
     included you, why is it not problematic based on -- or
     as its inclusions to other people?

A    If the other people were just targeted politically that
     would be inappropriate, I already testified.  But, as I
     said, Representative Bowen there was a belief that he
     acted illegally the night of August 8th when he was at
     the incident on Officer Mensah's girlfriend's house.  So
     if they had a legitimate law enforcement concern about
     him or anybody else, including me, if I had been there
     and I had beaten Officer Mensah with a bullhorn then I
     would think that somebody should have arrested me or
     ticketed me or done whatever.

Q    Representative Bowen hit Officer Mensah with a bullhorn?

A    I didn't say Representative --

ATTORNEY MOTLEY:  Sorry.  Finish.

A   Officer Mensah was struck in the head with a bullhorn that night.

Q   Sure your implication was that Representative Bowen --

A   No, I did not say that.

Q   Okay.  Because you're saying, "If I was the one," in talking about why Bowen was on the list.  You said, "If I was would have struck --

A   If Representative Bowen -- I'll repeat my answer.  If Representative Bowen acted illegally that night than he should be ticketed or charged or whatever is appropriate.  If I had been there, even as Mayor, and I acted inappropriately or illegally I should be charged.  Somebody hit him, I don't who that somebody was.  But the police have a belief, but it wasn't Representative Bowen, hit Officer Mensah in the head with a bullhorn that night.

Q   If the police are targeting Representative Bowen on the basis of his political beliefs that would be a serious problem?

A   It would be a problem, yes.  But that's not what they were doing as I understand.

Q   Was Tiffany Henry ever referred to the DA's office for criminal charges?

A   I'm not sure.  I believe she was, but I'm not sure.

Q    Was Tiffany Henry acting inappropriately or did she hit
     Officer Mensah with the bullhorn at his house?

A    I don't believe she was the person that they thought did
     that.

Q    So she also was on that list; correct?  And she works
     for Senator Baldwin.

A    That list.  Which list?

Q    The high value target list?

A    Yes, she was on that list.

Q    So did you launch an investigation also as to why
     Tiffany Henry was on this list too?

A    No, I did not.

Q    You just did it for yourself?

A    I leave the police to do their work and the city
     attorney to make sure what they're doing is legal.  And
     if there are problems I want to hear about it.

Q    So if you determine that there are people on this list
     that, you know, never committed a crime.  You know,
     aren't really being surveilled for any legal purposes
     are you also going to launch and investigation against
     the Wauwatosa Police Department for this list?

              ATTORNEY BAYNARD:  Objection to the form of
     the question.  Lacks foundation.  Calls for speculation.

A    If I found out that somebody has been targeted solely
     for political reasons then I would want an

investigation. If they are alleged to have engaged in criminal conduct then it's appropriate for the police to follow them and make sure that they are not engaging in that conduct.

BY ATTORNEY SCHWAB:

Q   Have you investigated to be sure of which people are being targeted solely based on political or do you believe that it was only you that is being targeted for political conduct?

A   I'm aware of multiple people who have been served and many of them have been convicted of crimes or are alleged to have engaged in criminal behavior --

Q   I understand --

A   -- so I consider it appropriate for them to be followed.

Q   I understand. You're saying that you would take serious issue and to ask for an investigation of anyone who is being targeted political conduct. And I assume that you were referencing yourself -- including yourself in that. And I'm asking, how can you be sure whether or how do you inquire whether any of these people, any of them, are being targeted for their political beliefs?

        ATTORNEY BAYNARD: Objection to the form of the question. Lacks foundation. You're pointing to this list or that power point?

        ATTORNEY SCHWAB: The high value list.

A    My understanding is that each one of those people is
     alleged to have engaged in criminal conduct.  In the
     case of Representative Bowen the DA determined there was
     not enough evidence to pursue that.
     BY ATTORNEY MOTLEY:
Q    What about Tiffany Henry?
A    I believe that is also true of her.
Q    What alleged criminal conduct?
A    I don't know.  But I do recall she was present on August
     8th and there was an allegation that maybe she had
     engaged in some criminal conduct.
     BY ATTORNEY SCHWAB:
Q    -- as a pretext.  That they did that the police did not
     alleged criminal conduct as a pretext to target on a
     political basis?
A    Yes, I'm confident of that.
Q    On what basis?
A    Based on my conversations with the police and I've asked
     tough questions and I've gotten answers.
Q    What tough question?
               ATTORNEY SCHWAB:  I apologize.
               ATTORNEY MOTLEY:  One quick question.
     BY ATTORNEY MOTLEY:
Q    Who did you talk to at the police department with
     regards to the high value target?

A    I talked to the chief and I talked to the Captain,
     Captain Vetter.

Q    Okay.  And Lewandowski?

A    Lewandowski called me later to apologize.

             ATTORNEY MOTLEY:  All right.

             (Off the record at 1:31 p.m.)

STATE OF WISCONSIN )

                             )

MILWAUKEE COUNTY   )


       I, MIRIAM BECKFORD, Official Court Reporter, do hereby certify that I have reported the foregoing proceedings; that the same is true and correct as reflected by my original machine shorthand notes taken at said time and place.



              Dated July 8, 2021



              _____

                 Miriam Beckford