# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KATHRYN KNOWLTON, et al.,

    **Plaintiffs,**

    v.                                **Case No. 20-CV-1660**

CITY OF WAUWATOSA, et al.,

    **Defendants.**

## DECISION AND ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, THE PARTIES' MOTIONS TO STRIKE, AND PLAINTIFFS' MOTIONS FOR SANCTIONS

Plaintiffs represent a group of approximately sixty-four individuals, as well as a single unincorporated entity, engaged in a variety of actions throughout 2020, particularly in the City of Wauwatosa (the "City"), aimed at opposing police violence. The plaintiffs sue the City and its Mayor, Dennis McBride, under 42 U.S.C. § 1983 for allegedly violating their rights under the First Amendment by enacting an emergency curfew order in October 2020. Plaintiffs sue Wauwatosa Police Department ("WPD") employee Dominick Ratkowski and WPD Lieutenant Joseph Roy for allegedly violating their rights under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721. Plaintiff William Rivera sues the City for allegedly violating his rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Finally, plaintiffs Isaiah Baldwin, Aidali Rivera, and Rosalind Rogers sue WPD Officer Jeffrey Farina for malicious prosecution under Wisconsin common law. (Fourth Am. Compl., Docket # 155.)

Plaintiffs move for partial summary judgment in their favor as to their DPPA causes of action against Ratkowski and Roy. (Docket # 268.) The defendants move for summary judgment in their favor as to all of the plaintiffs' claims. (Docket # 257.) In addition to the cross motions for summary judgment, both parties also move to strike various pleadings (Docket # 279; Docket # 308; Docket # 323), and the plaintiffs bring two motions for sanctions (Docket # 246; Docket # 326).

 For the reasons further explained below, the plaintiffs' motion for partial summary judgment (Docket # 268) is denied. The defendants' motion for summary judgment (Docket # 257) is granted in part and denied in part. The parties' motions to strike are denied. The plaintiffs' motions for sanctions are denied.

## BACKGROUND

In 2020, the United States was immersed in what Plaintiffs describe as "the largest social justice movement in history" in response to "anti-Black racism, white supremacy, police violence, mass criminalization, and mass incarceration." (Fourth Am. Compl. ¶ 4, Docket # 155.) In particular, protests erupted around the country in response to the deaths of Black citizens at the hands of law enforcement, such as Breonna Taylor on March 13, 2020 and George Floyd on May 25, 2020. (*Id.* ¶¶ 2, 6.) In Wisconsin, on February 2, 2020, WPD Officer Joseph Mensah shot and killed Alvin Cole, a Black teenager, at the Mayfair Mall in Wauwatosa. (*Id.* ¶ 129.) Throughout the summer of 2020, Plaintiffs, along with others, were engaged in a wide variety of actions including rallies, marches, and other creative protests opposing police violence and demanding police accountability within the criminal justice system. (*Id.* ¶ 5.) One political protest movement emerged in Wisconsin after Floyd's murder called The People's Revolution ("TPR"). (*Id.* ¶ 6.)

2

Defendant Ratkowski works for the WPD as a crime analyst. (Declaration of Kimberley Motley ("Motley Decl.") ¶ 8, Ex. 6, June 23, 2021 Deposition of Dominick Ratkowski ("June Ratkowski Dep.") at 8, Docket # 272-4.) Ratkowski testified that part of his role in the WPD is to help detectives solve crimes quicker. (*Id.* at 84.) Ratkowski testified that he decided to create a "protestor list" around approximately June 5, 2020, to plan for potential violence and to identify witnesses, victims, and suspects of any potential violence that came out of a protest. (*Id.* at 82, 93.) Ratkowski testified that what led to an individual's inclusion on this list was being observed and tagged in photographs at a protest. (*Id.* at 83.) The protestor list included certain identifying information such as a person's name, date of birth, address, and photograph. (Motley Decl. ¶¶ 5, 23, Ex. 1, Target List, Docket # 272-1, 272-16.) Ratkowski obtained at least some of this information from Department of Transportation ("DOT") records. (Motley Decl. ¶ 11, Ex. 9, July 26, 2021 Deposition of Dominick Ratkowski ("July Ratkowski Dep.") at 47–48, 51, Docket # 272-7.) Ratkowski distributed the list to individuals within several law enforcement agencies. (Plaintiffs' Proposed Findings of Fact in Supp. of Partial Summ. J. ("Pls.' PFOF") ¶ 11, Docket # 271.) Plaintiffs contend that in January 2021, Defendant Roy also disclosed this personal information from motor vehicle records to members of the public. (*Id.* ¶¶ 25–26.)

In August 2020, in Kenosha, Wisconsin, Jacob Blake, a Black man, was shot and seriously injured by a Kenosha police officer. (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 8, Docket # 287.) In the week following this shooting, during protests in Kenosha, two protestors were killed, one was seriously injured, and widespread property damage occurred. (*Id.* ¶¶ 8–9.)

On September 5, 2020, an event was held in Wauwatosa to celebrate one hundred consecutive days of protesting for police reform and against police brutality. (Fourth Am. Compl. ¶ 205.) The event included a protest march in the evening, and plaintiffs Isaiah Baldwin and Rosalind Rogers were part of the protest march. (*Id.* ¶ 210.) Baldwin and Rogers were arrested in Wauwatosa by WPD Officer Farina on September 5, 2020 and received tickets for allegedly holding or conducting a special event in Wauwatosa without a permit. (Plaintiffs' Proposed Findings of Fact in Opp. to Defs.' Summ. J., ("PPFOF in Opp.") ¶¶ 15–23, Docket # 297.) Baldwin and Rogers allege that Officer Farina arrested them and gave them tickets because he believed they were members of TPR, a group Farina allegedly described as a "gang." (*Id.* ¶¶ 19, 24.) Both Baldwin's and Rogers' tickets were eventually dismissed. (*Id.* ¶¶ 29, 33.)

In anticipation that the Milwaukee County District Attorney might soon issue a decision on whether to charge Officer Mensah in Alvin Cole's shooting death, Mayor McBride issued a "Proclamation of Emergency" on September 30, 2020. (Declaration of Dennis R. McBride ("McBride Decl.") ¶ 2, Ex. A, Docket # 262.) The Proclamation stated that the WPD was informed that Mensah's charging decision would be released on October 7, 2020. (*Id.*) It further stated that:

> [B]ased upon recent experience with protests concerning the continued employment of Officer Mensah by the WPD and upon community response to decisions and actions regarding police officers nationwide, most recently in Kenosha, Wisconsin, and Louisville, Kentucky, it is anticipated that an emergency will exist in the City of Wauwatosa due to conditions which will arise following that announcement, including civil unrest throughout Wauwatosa which creates concerns for the safety of persons and property and will impair transportation, health, and police protection and other critical systems in Wauwatosa.

4

(*Id.*) The Proclamation stated that it "is in the City of Wauwatosa's best interest to enact a curfew by which pedestrian and vehicular traffic on Wauwatosa streets—except for persons who are going to or from work and government officials, social service workers, and credentialed members of the press acting in their official capacities—is prohibited between the hours of 7:00 p.m. and 6:00 a.m. each night beginning at 7:00 p.m. on October 7, 2020, and ending at 6:00 a.m. on October 12, 2020." (*Id.*) Approximately twenty-seven of the named plaintiffs (those challenging the Proclamation under the First Amendment), were arrested and/or ticketed for protesting or for being present during protests in Wauwatosa from October 7 through October 12, 2020. (Fourth Am. Compl. ¶¶ 272–73.)

Plaintiff Aidali Rivera alleges that she was arrested on October 9, 2020 by a WPD Officer who she believes to be Officer Farina for allegedly protesting in violation of the curfew order. (PPFOF in Opp. ¶¶ 10–13.) Rivera states that she told Officer Farina that she was not protesting and that she was taking her son, William Rivera, home from work. (*Id.* ¶ 33.) Although Rivera received a ticket for violating the emergency order, the ticket was later dismissed. (*Id.* ¶¶ 13–14.) Plaintiff William Rivera alleges that he was returning home from work in Wauwatosa on October 9, 2020 when he was arrested for violating the curfew. (*Id.* ¶¶ 29, 33.) Rivera avers that he was unaware of the curfew at the time of his arrest. (*Id.* ¶ 29.) Rivera states that the arresting officer, who he believes worked for the City, told him that he was being arrested "because at this point it does not matter because you are Black." (*Id.* ¶ 28.)

## SUMMARY JUDGMENT STANDARD

While Defendants move for summary judgment as to Plaintiffs' First Amendment, Title VI, and malicious prosecution claims, both parties move for summary judgment in their favor on Plaintiffs' DPPA claims. Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary

5

judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

When both parties move for summary judgment in their favor on the same issue, "the court must consider the evidence through two different lenses." *Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 877, 890 (S.D. Ind. 2009). Specifically, "[w]hen considering defendants'

motion[ ], the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences. When considering plaintiffs' motion[ ], defendants receive those benefits." *Id.*

## ANALYSIS

As stated above, Defendants move for summary judgment in their favor on Plaintiffs' 42 U.S.C. §1983, Title VI, and state law claims. Both parties move for summary judgment in their favor on Plaintiffs' DPPA claims. I will address each claim in turn.

*1. Section 1983 Claim*

Approximately twenty-seven of the named plaintiffs sue the City and Mayor McBride under § 1983, alleging that the emergency curfew order deprived them of their First Amendment rights of free speech and assembly. (Fourth Am. Compl. ¶¶ 904–29.) The parties agree on the applicable legal framework. Specifically, while political demonstrations and protests are forms of expression protected by the First Amendment, the protections are not absolute. (Docket # 267 at 2; Docket # 286 at 2–3.) And courts review First Amendment restrictions under the framework articulated by the Supreme Court in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). In *Ward*, the Supreme Court stated that "[o]ur cases make clear . . . that even in a public forum[,] the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id.* at 791 (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984)). The plaintiffs argue, however, that defendants cannot show they are entitled to judgment as a matter of law as to each *Ward* element.

7

### 1.1 Was the Law Content-Neutral?

The first question under the *Ward* framework is whether the law is content-based or content-neutral. In *Ward*, the Supreme Court stated that: "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* The Supreme Court held that: "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (internal citation omitted).

Plaintiffs argue that the curfew order was not content-neutral because it was enacted "specifically in anticipation of an anti-police brutality protest." (Docket # 286 at 6.) They argue that the curfew was not a law of general applicability, but was a law instituted with a particular group in mind and to hinder the ability to protest against the WPD itself. (*Id.*)

The same arguments were made in challenging this exact curfew in *Radke v. City of Wauwatosa*, Case No. 21-CV-247 (E.D. Wis. Aug. 24, 2022). In *Radke*, Judge Lynn Adelman found that the Wauwatosa curfew order is content neutral on its face. Specifically, Judge Adelman cited to the justification in the Proclamation for the emergency order, which stated that given recent experience, it was "anticipated that an emergency will exist in the City of Wauwatosa due to conditions which will arise following [the announcement of the charging decision], including civil unrest throughout Wauwatosa which creates concerns for the safety of persons and property and will impair transportation, health, and police protection and other critical systems in Wauwatosa." Judge Adelman reasoned that this justification for the

8

curfew did not reference the content of any speech. Instead, it focuses on the safety concerns that could have arisen if conditions like those that had been experienced in municipalities such as Kenosha materialized in Wauwatosa. Additionally, Judge Adelman acknowledged that while the protests referenced in the Proclamation involved a specific viewpoint, the stated justification for the curfew was public safety rather than anything related to the subject matter of the protests.

Plaintiffs argue, however, that the Supreme Court has recognized an additional category of laws that while facially content-neutral, are still considered content-based regulations of speech, specifically, "laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Ward*, 491 U.S. at 791.)

Plaintiffs argue that the record contains ample evidence that the true purpose of this curfew was to stop the plaintiffs' ability to protest. (Docket # 286 at 7.) The "substantial" evidence Plaintiffs point to is the deposition testimony of Barry Weber, then Chief of Police for the WPD. (*Id.* at 7–8.) Specifically, Plaintiffs argue that Weber testified that he took into account the viewpoint of the protestors in "declaring the October protests an unlawful assembly." (*Id.* at 7.) But Weber's specific testimony is as follows. Weber was asked who would determine if an assembly had become unlawful, to which Weber responded that the supervisor on the scene would make the determination. (Declaration of Milo Schwab ("Schwab Decl.") ¶ 20, Ex. 19, Deposition of Barry Weber ("Weber Dep.") at 135, Docket # 291-3.) When asked what facts would go into the decision, Weber testified they would look at the statutes and ordinances and "what exactly is the behavior they're experiencing." (*Id.*)

9

Weber was then asked whether the officer takes into account who is protesting when declaring an assembly unlawful, to which Weber responded that he did not understand the question. (*Id.*) Weber was then asked whether an officer would declare an assembly unlawful because it was the KKK assembling, to which Weber responded that the "city would probably go to court over that to begin with, I don't know." (*Id.*) The next question Weber was asked was, "Did you take into account that the people that would be protesting in October would be protesting police when declaring that assembly unlawful?" to which Weber responded, "Yes." (*Id.*) Weber was again asked, "Did you take into account their viewpoint?," to which Weber responded, "The protesting police, yes." (*Id.* at 136.)

Plaintiffs cite to this testimony as irrefutable evidence that the curfew order was content based. And Plaintiffs argue that because the curfew was enacted at Weber's suggestion, this proves the curfew order was not content-neutral. But Plaintiffs overstate Weber's role in both the enactment of the curfew order and in its enforcement. Weber clearly had input into Mayor McBride's initial decision to implement the curfew. McBride testified that both Weber and Captain Vetter suggested imposing a curfew. (Schwab Decl. ¶ 2, Ex. 1, Deposition of Dennis McBride ("McBride Dep.") at 66, Docket # 288-1.) Weber testified that he was concerned about "civil unrest," referring specifically to the recent unrest in Kenosha resulting in violence and destruction of property. (Weber Dep. at 118–19, 121, 127–28, 132–33, 136–38.) And while McBride testified that Weber made recommendations, it was ultimately McBride's decision whether to implement a curfew. (McBride Dep. at 31.) Weber testified that after his initial recommendations, he made two suggestions for the Proclamation—prohibiting gasoline sales in cans after the curfew (based on the events in

10

Kenosha), and having the curfew start at 7:00 p.m., when the sun goes down. (Weber Dep. at 136–37.)

Furthermore, Plaintiffs produce no evidence that Weber instructed his officers to arrest protestors because they were protesting against police brutality. Rather, Weber testified that whether an individual was arrested was decided not by him, but by the supervisor on the scene who would take into account the relevant ordinance and the behavior occurring. (*Id.* at 135, 176.) The balance of the plaintiffs' asserted evidence that the curfew order was in fact enacted because the government disagreed with the content of the plaintiffs' speech is speculation that "Wauwatosa and its leaders" harbored "animus and viewpoint discrimination" against the plaintiffs. (Docket # 286 at 8.) But Plaintiffs point to no evidence connecting this alleged animus to the enactment of the October 2020 curfew. For these reasons, Plaintiffs have not demonstrated that the October 2020 curfew was not content-neutral.

       1.2    Was the Curfew Narrowly Tailored to Serve a Significant Governmental Interest?

The next question under *Ward* is whether the law was narrowly tailored to serve a significant governmental interest. Plaintiffs argue that the curfew order was neither narrowly tailored nor did it serve a significant governmental interest. (Docket # 286 at 10–16.) While the Supreme Court has specifically "recognized the legitimacy of the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights," *McCullen v. Coakley*, 573 U.S. 464, 486–87 (2014) (internal quotation and citation omitted), Plaintiffs argue that any threat of civil unrest in Wauwatosa was merely speculative and thus no curfew was warranted. (Docket # 286 at 11.) This same argument was also raised, and rejected, in *Radke*. In *Radke*, the plaintiff argued that the curfew did not actually serve a significant governmental interest because it was not enacted in

response to an actual emergency, riot, or disaster. (Docket # 44 at 7 in Case No. 21-CV-247.) In rejecting this argument, Judge Adelman found that plaintiff cited no legal authority that a municipality must wait for a riot or disaster to materialize before taking action to protect public safety. (*Id.*)

The plaintiffs in this case cite to three Supreme Court decisions that they contend stand for the proposition that restrictions on assembly must be supported by imminent threats or a clear and present danger—*Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Feiner v. New York*, 340 U.S. 315, 321 (1951); and *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949). (Docket # 286 at 13.) But none of these cases stand for the broad proposition Plaintiffs assert. In *Brandenburg*, the Court was addressing the Ohio Criminal Syndicalism Statute. Such statutes criminalized the actions of individuals or groups who advocated for radical political and economic changes by criminal or violent means. *See* 395 U.S. at 447. The *Bradenburg* Court reiterated that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.*

Both *Feiner* and *Terminiello* addressed convictions for disorderly conduct and considered whether the statutes violated the defendant's First Amendment rights. In *Feiner*, the Supreme Court upheld the defendant's conviction for disorderly conduct stating that "[i]t is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, [it is] another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace." 340 U.S. at 321. Whereas in *Terminiello*, the Court found that the

defendant's conviction for disorderly conduct was unconstitutional because "[i]t permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest." 337 U.S. at 5. But none of these cases stand for the proposition that a municipality cannot enact a curfew order unless and until a crisis has occurred.

Furthermore, Plaintiffs understate the relevance of the Kenosha protests in evaluating the Wauwatosa officials' actions. Plaintiffs argue:

> Should Defendants' argument carry the day—that civil unrest at other protests in other cities empowers that city to substantially curtail protests—there will be no limiting factor to stop cities from banning all future protests. If the invocation of arson in Kenosha is enough to issue a curfew here, without a credible threat of property destruction, then this is the end of free protest in support of the Black Lives Matter movement across the country.

(Docket # 286 at 13.) But Plaintiffs fail to grapple with the extent of the events in Kenosha, or the proximity of the events in both time and location to the events in Wauwatosa. The demonstrations in Kenosha were prompted by the shooting of a Black man, Jacob Blake, in Kenosha, Wisconsin on August 23, 2020 by a white police officer. (Docket # 44 at 1 in Case No. 21-CV-247.) As Judge Adelman noted in *Radke*, the "violence that occurred during the Kenosha protests was particularly severe. Many buildings were burned to the ground and two protestors were shot and killed, while a third was seriously injured." (*Id.* at 1–2.) Thus, the demonstrations in Kenosha did not simply involve arson as stated by Plaintiffs, but the deaths of two protestors.

And the demonstrations in Kenosha occurred mere weeks before Officer Mensah's charging decision, in a city approximately 45-miles away from Wauwatosa, after similar circumstances, i.e., a law enforcement officer shooting a Black man. Given the proximity in both time and location of the Kenosha protests to the events in Wauwatosa, it is unsurprising that these events informed the actions of Wauwatosa officials. Mayor McBride avers that the

13

curfew's purpose was to protect the people and property of Wauwatosa, "especially after the violence that had occurred in other cities in similar situations," specifically noting the deaths of two protestors during the Kenosha demonstrations. (McBride Decl. ¶ 5.) Mayor McBride avers that he wanted to protect protestors in Wauwatosa from facing similar harm as those protestors who were killed in Kenosha. (*Id.*) On this record, I find that the curfew served a significant governmental interest.

The plaintiffs further argue that the curfew was not narrowly tailored. The curfew was in effect from 7:00 p.m. until 6:00 a.m. for five nights, from Wednesday, October 7, 2020 until Monday, October 12, 2020. (McBride Decl., Ex. A.) The curfew provided exceptions for those going to or from work and government officials, social service workers, and credentialed members of the press acting in their official capacities. (*Id.*) Plaintiffs argue that the curfew was not narrowly tailored because it was enacted city-wide, during non-working hours, and on the day of the charging decision. (Docket # 286 at 14–16.)

The requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Restrictions on the time, place, or manner of protected speech are "not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Id.* at 797 (quoting *Albertini*, 472 U.S. at 689). And the restrictions need not be the least restrictive or least intrusive means of doing so. *Id.* at 798.

As to the time limitations, Plaintiffs argue that the curfew "stopped all protests in the entire town of Wauwatosa during the hours in which individuals were not at work." (Docket # 286 at 14.) Plaintiffs argue that for each of the twenty-seven plaintiffs asserting a First

14

Amendment claim, protesting during the time of the curfew was the only time they could protest. (*Id.* at 15.) Assuming, however, that "normal" work hours are from 9:00 a.m. until 5:00 p.m. on Monday through Friday, Plaintiffs do not explain why they could not protest during the day on the two weekend days of the curfew—Saturday, October 10, 2020 and Sunday, October 11, 2020. *See Radke*, Docket # 44 at 9 ("[T]he plaintiff does not explain why protesting during the day on the weekend would not have been an adequate alternative for those who worked 9–5."). In *Radke*, the court took judicial notice of the fact that during early October in Milwaukee County, the sun sets at about 6:30 p.m. and rises at about 7:00 a.m. (*Id.* at 8 n.3.) Weber testified that he suggested beginning the curfew at 7:00 p.m. because it was around sunset and that it "seemed like most of the issues that cities would face would happen after dark." (Weber Dep. at 137.) *See Radke*, Docket # 44 at 8 ("The plaintiff does not explain why daytime protests would not have been adequate alternatives to protests at night, when criminal activity is harder to prevent.").

Plaintiffs further argue that by enacting the curfew on the same day in which the DA "decides to let yet another officer walk free after killing his third young male of color" lessens the impact of the protest. (Docket # 286 at 15–16.) Plaintiffs argue that a "protest on this issue will not be relevant if conducted days or months later." (*Id.* at 16.) But Plaintiffs fail to explain why a protest conducted less than a week after the charging decision, for example, on Tuesday, October 13, 2020, would no longer be relevant. Whereas implementing the curfew on the day of the charging decision when emotions are running particularly high serves the important state interest in protecting the safety of its citizens.

Finally, Plaintiffs argue that enacting the curfew city-wide was unnecessary and that Defendants "engaged in no consideration of whether the interests of public safety could be

achieved with less expansive restrictions." (Docket # 286 at 14.) But again, restrictions on the time, place, or manner of protected speech need not be the least restrictive means. *Ward*, 491 U.S. at 797–98. The city-wide regulation promotes the substantial government interest of protecting its citizens. For these reasons, I find that the curfew was narrowly tailored to serve a significant governmental interest.

### 1.3    Alternative Channels for Protest

The final *Ward* requirement is that the regulation leave open "ample alternative channels of communication." 491 U.S. at 802. Plaintiffs argue that because the curfew was enacted city-wide, it left nowhere in the City of Wauwatosa where people could protest during the curfew. (Docket # 286 at 16.) Plaintiffs argue that Defendants' suggested alternatives of protesting indoors or on private property are ineffective to call the public's attention to the topics being discussed. (*Id.*) But "shouting at a TV" or "rage posting on Facebook," as plaintiffs suggest, are not the only alternative channels for protest as Plaintiffs contend. (*Id.*) Again, the curfew did not prevent protesting during the daytime hours and the curfew included two weekend days that would accommodate those who work 9:00 a.m. to 5:00 p.m. on Monday through Friday. Even if these alternatives were not preferred by the plaintiffs, they have not shown that these alternative channels for protest are inadequate. For these reasons, I find that the final *Ward* requirement for a valid time, place, and manner restriction is met. For these reasons, the defendants are entitled to summary judgment on the plaintiffs' First Amendment challenge to the curfew order.

### 2.    *Title VI Claim*

Plaintiff William Rivera sues the City under Title VI. The City moves for summary judgment in its favor as to this claim. Title VI is a statute that prohibits race discrimination

16

and applies in all programs receiving federal funds. *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 917 (7th Cir. 2012). Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. Title VI was enacted "pursuant to Congress' spending power and operate[s] in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds." *Parker*, 667 F.3d at 917. For an individual to bring a private action under Title VI, "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe on Behalf of Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 418–19 (7th Cir. 1986), *overruled on other grounds by Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996).

Rivera avers that he was arrested by an officer who he believes works for the City and that the officer told him that he was being arrested because he is Black. (PPFOF in Opp. ¶¶ 27–28.) Rivera argues that because the City receives certain federal funds through its police department, such as the Department of Transportation Speed Grant, the Alcohol Traffic Enforcement Grant "ATEG," and the DOT Click or Ticket Grant, the City is a "federally funded program or activity" for purposes of Title VI and that as a resident of Wauwatosa, he was the intended recipient of the federal funds. (Docket # 286 at 17.)

Title VI defines "program or activity," in relevant part, as:

all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government

17

entity) to which the assistance is extended, in the case of assistance to a State or local government;

42 U.S.C. § 2000d-4a. Multiple courts in this district have found that a city does not fall within the scope of Title VI's coverage because a city is:

> [N]ot an "operation" of "a department, agency, special purpose district, or other instrumentality of a State or of a local government," or of "the entity of such State or local government that distributes such assistance," or of any of the other entities enumerated in § 2000d–4a. Rather, the City is a municipality and, as such, it does not fit within the definition of "program or activity" for purposes of Title VI.

*Hodges by Hodges v. Pub. Bldg. Comm'n of Chicago*, 864 F. Supp. 1493, 1505 (N.D. Ill. 1994); *see also Smith v. City of Chicago*, 143 F. Supp. 3d 741, 758 (N.D. Ill. 2015) (finding City of Chicago did not fall under the scope of Title VI); *House v. City of Milwaukee*, No. 21-CV-0866-BHL, 2022 WL 16715835, at *6 (E.D. Wis. Nov. 4, 2022) (finding that the "City of Milwaukee is exempt because it does not fall within Title VI's definition of a 'program' or 'activity;' it is a full-blown municipality"). I agree under the plain language of the statute, a city cannot be a "a department, agency, special purpose district, or other instrumentality" of itself, nor can it be an "entity" of itself. *See* 42 U.S.C. § 2000d-4a. Thus, the City of Wauwatosa does not fall under the scope of Title VI. For these reasons, Rivera's claim against the City under Title VI fails. Summary judgment is granted in the defendants' favor on this claim.

3. *Driver's Privacy Protection Act Claims*

Forty-eight of the plaintiffs[1] allege that defendant Ratkowski and forty-nine of the plaintiffs[2] allege that defendant Roy violated the Driver's Privacy Protection Act by allegedly disclosing personal information as defined by the statute for an impermissible purpose. Under the DPPA, it is "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use" not permitted by the DPPA. 18 U.S.C. § 2722(a). "Personal information" is defined by the statute to include: "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(3). A "motor vehicle record" means "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). An individual whose personal information has been obtained or disclosed in violation of the DPPA may bring a civil action for damages in federal court. 18 U.S.C. § 2724. The DPPA provides, however, for certain permissible uses of personal information,

---

[1] Andrew Aaron, Robert Agnew, Kamila Ahamed, Isaiah Baldwin, Jacqueline Bogenberger, Lavita Booker, Rebecca Burrell, Raine Cich, Khalil Coleman, Tahudah Cole, Taleavia Cole, Tracy Cole, Steven Conklin, Lauryn Cross, Erik Fanning, Jessica Fenner, Breon Foster, Christine Groppi, Gaige Grosskreutz, Joseph Hayes, Adante Jordan, Mary Kachelski, Sean Kafer, Joseph Koepp, John Larry, Alex Larson, Sonora Larson, Vaun Mayes, Molly Nilssen, Shawn Page, Carmen Palmer, C.P., D.P., Oscar Concepcion Rodriguez, Rosalind Rogers, Madeleine Schweitzer, Mariah Smith, Peter Sparks, Tiffany Stark, Angel Vega, Gabriella Vitucci, Tristiana Walls, Oscar Walton, Jayden Welch, Briitta Welch, Brandon Wilborn, Trisha Wilson, and Katelyn Wojnar. (Docket # 302 at 3 n.1.)

[2] Andrew Aaron, Kamila Ahmed, Robert Agnew, Isiah Baldwin, Jacqueline Bogenberger, Rebecca Burrell, Raine Cich, Khalil Coleman, Taleavia Cole, Steven Conklin, Anne Delessio-Parson, Rachel Dulay, Erik Fanning, Jill Ferguson, Breon Foster, Joanna Geisler, Joseph Hayes, Destiney Jones, Adante Jordan, Mary Kachelski, Sean Kafer, Katheryn Knowlton, Joseph Koepp, John Larry, Alex Larson, Sonora Larson, Lazarito Mathieu, Vaun Mayes, Dana McCormick, Molly Nilssen, Carmen Palmer, C.P., D.P., Leah Porter, Jose Hernandez Ramirez, William Rivera, Hector Rodriguez, Rosalind Rogers, Nathan Sabel, William Schroeder, Mariah Smith, Peter Sparks, Angel Vega, Christina Vitolo-Haddad, Gabriella Vitucci, Jayden Welch, Suzanne Wells, Brandon Wilborn, Katelyn Wojnar, and Sonja Worthy. (Fourth Am. Compl., Claim 14.)

19

including "use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b).

To establish a DPPA violation, Plaintiffs must prove that Defendants: (1) knowingly, (2) obtained, disclosed, or used personal information, (3) from a motor vehicle record, (4) for a purpose not permitted. *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015). Both parties move for summary judgment in their favor on Plaintiffs' DPPA claims. I will address the claims against each defendant in turn.

### 3.1 DPPA Claim Against Ratkowski

As stated earlier, forty-eight plaintiffs sue Ratkowski under the DPPA for his alleged creation and distribution of the protestor list or "Target List." Ratkowski does not challenge, for purposes of summary judgment, that he knowingly obtained or disclosed personal information. (Docket # 267 at 14–16; Docket # 283 at 3–5.) Rather, he argues the plaintiffs cannot show that he obtained this personal information from a motor vehicle record for an impermissible purpose.

#### 3.1.1 Did the Information Come from a Motor Vehicle Record?

With the exception of plaintiff Mariah Smith, Defendants argue that the plaintiffs failed to establish any evidence that Ratkowski obtained the information contained in the protestor list from motor vehicle records. (Docket # 283 at 3–4.) The protestor list contains such information as the individual's name, address, photograph, date of birth, race, and sex. (Docket # 272-16.) Ratkowski testified that he obtained people's home addresses through various sources, including "criminal histories, programs like Rate Me," and the "Milwaukee

County Land Management Systems." (June Ratkowski Dep. at 98.) Ratkowski also testified as follows when asked about how he obtained plaintiff Smith's address:

> Question:    Okay. Now, with regards to this list, let's go back to
>              it. I know I keep jumping around. Let's focus on
>              Mariah Smith, page one. Now, you mentioned before that
>              you used the DOT computers to get people's driver's DMV
>              records, correct?
>
> Answer:     Correct.
>
> Question:    Okay. And within that system is that how you get people's addresses?
>
> Answer:     Correct.
>
> Question:    Is that how you got Mariah's address on this document?
>
> Answer:     Yes.

(July Ratkowski Dep. at 42.) Ratkowski testified that in addition to the DOT records, he also obtained addresses and phone numbers from a subscription database called "TLO." (*Id.* at 53, 56.) However, on the protestor list itself, for thirty-seven of the individuals, the entry contains the notation "DOT" by the address. (Docket # 272-16.)

The defendants argue that the plaintiffs misconstrue Ratkowski's testimony that he obtained addresses from DOT records, arguing that Ratkowski was only discussing plaintiff Smith's address, no one else's. (Docket # 283 at 4.) Admittedly, counsel's questions to Ratkowski are not clear. While counsel tells Ratkowski he is to focus on Mariah Smith, counsel then asks whether Ratkowski obtained "people's addresses" from DMV records. (July Ratkowski Dep. at 42.) Based on the way the question was framed and Ratkowski's answer, a reasonable jury could believe that Ratkowski testified that he obtained multiple plaintiffs' addresses from the DOT, not just Smith's, especially given the "DOT" notation by the addresses of thirty-seven of the plaintiffs.

Furthermore, for the individuals included on the protestor list with photographs, the photographs on the left appear to be more formal headshots of the individuals, whereas the photographs on the right appear to be less formal "action" shots of the individual, taken, for example, at a protest or a meeting. (Docket # 272-16.) When asked where Ratkowski obtained the photographs of plaintiff Smith, he testified that the photograph on the left was a DOT photo; whereas the photograph on the right was from social media. (July Ratkowski Dep. at 48.) As to the other plaintiffs, however, it does not appear Ratkowski was directly asked where the photographs on the left were obtained. Despite this gap in questioning, when asked whether Roy ever asked him where he obtained the photographs on the left, Ratkowski testified that Roy "asked me maybe about one - - one or two people on here just to verify that those photos came from the DOT. Because I believe he recognize - - he likely recognized the DOT, what a DOT photo looks like." (*Id.* at 54–55.) Given Ratkowski's testimony and the appearance of the photographs on the protest list itself, a reasonable jury could conclude that the photographs were taken from the DOT.

Thus, given that for forty-six of the plaintiffs, their addresses and/or photographs could have reasonably come from DOT records, a question of fact exists as to whether these plaintiffs can meet this element of their claim.

For plaintiffs D.P. and C.P., however, I find the undisputed facts show that Ratkowski did not obtain the information from DOT records. D.P. and C.P. are both juveniles, who appear on the protestor list with their mother, Carmen Palmer. (Docket # 272-16 at 19, 25.) For all three, the list states their address was obtained from their arrests on October 8, 2020. (*Id.*) Unlike for Carmen Palmer, there are no "formal" photographs to the left of the names of the two juveniles that could have come from DOT records. (*Id.*) Plaintiffs argue that a

reasonable jury could conclude that because Ratkowski obtained information from the DOT for other plaintiffs, he likely also obtained C.P.'s and D.P.'s information from the DOT. (Docket # 286 at 26.) I disagree. The protestor list states that the addresses of the juveniles and their mother was obtained from their arrests. (Docket # 272-16 at 19, 25.) Thus, there is no record evidence that Ratkowski obtained any of the information regarding the two juvenile plaintiffs from DOT records. For these reasons, I find that defendants' motion for summary judgment is granted as to C.P.'s and D.P.'s claims under the DPPA.

### 3.1.2   Whether the Information was Used for a Permissible Purpose

Defendants further argue that Plaintiffs' DPPA claim against Ratkowski fails because Ratkowski used the list for a permissible purpose under the statute. The DPPA permits law enforcement to use information obtained under the DPPA "in carrying out its functions." 18 U.S.C. §2721(b)(1). In *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597 (7th Cir. 2012), the Seventh Circuit noted that the DPPA was passed predominantly as a public safety measure and "[n]ot surprisingly, the Act's expanded authority for law enforcement was an important part of the same narrative." *Id.* at 607. The court further noted, however, that in the Congressional records, Senator Harkin qualified that the exception for law enforcement use "is not a gaping loophole in this law." *Id.* (quoting 139 Cong. Rec. S15,962 (daily ed. Nov. 17, 1993) (statement of Sen. Harkin)). Rather, the exception "'provides law enforcement agencies with latitude in receiving and disseminating this personal information,' when it is done '*for the purpose of deterring or preventing crime or other legitimate law enforcement functions*.'" *Id.* at 608 (quoting 139 Cong. Rec. S15,962 (daily ed. Nov. 17, 1993) (statement of Sen. Harkin)) (emphasis in original). Thus, "[g]iven the concern of Congress for these safety and security

23

issues, the disclosed information actually must be used for the purpose stated in the exception." *Id.* at 609. The court further stated that the language of § 2721(b)(1) means that:

> [T]he actual information disclosed—i.e., the disclosure as it existed in fact—must be information that is used for the identified purpose. When a particular piece of disclosed information is not used to effectuate that purpose in any way, the exception provides no protection for the disclosing party. In short, an authorized recipient, faced with a general prohibition against further disclosure, can disclose the information only in a manner that does not exceed the scope of the authorized statutory exception. The disclosure actually made under the exception must be compatible with the purpose of the exception. Otherwise, the statute's purpose of safeguarding information for security and safety reasons, contained in the general prohibition against disclosure, is frustrated.

*Id.* at 606.

Ratkowski avers that his purpose in creating the protestor list was "to prepare for crime or potential violence by providing a means to identify witnesses, victims and suspects of any potential violence or crime that may came [sic] out of a protest." (Ratkowski Decl. ¶ 4, Docket # 258.) However, Ratkowski also testified, that the criteria for being added to the list was merely attending a protest—the individual need not have engaged in violence or have committed a crime to be included on the list. (June Ratkowski Dep. at 83.) Furthermore, there is other evidence that suggests the list was not specifically focused on identifying potential witnesses, victims, and/or suspects of protest-related crimes. For example, Ratkowski testified that he would place plaintiffs' counsel on the list due to his involvement in the lawsuit, even though he had not attended a protest in Milwaukee. (June Ratkowski Dep. at 123.) Also, when members of TPR sent a letter dated July 9, 2020 to Mayor McBride and the Wauwatosa Common Council, Ratkowski informed members of the WPD that he would "work on IDing all the names at the end of the letter." (Schwab Decl. ¶ 36, Ex. 35, Docket # 294-6.) Finally, Ratkowski emailed the protester list to Brian Conte in Milwaukee County

noting that it was a list of "TPR members he has been working on" and that Conte should feel free to pass it along to anyone who would find it useful. (Motley Decl. ¶ 12, Ex. 10, Docket # 272-8.)

The Seventh Circuit in *Senne* rejected the argument that "as long as [the Village] can identify a subsection of the law under which *some* disclosure is permitted, *any* disclosure of information otherwise protected by the statute is exempt, whether it serves an identified purpose or not." 695 F.3d at 605 (emphasis in original). Rather, the *Senne* court makes clear that if the disclosed information is not used to effectuate a law enforcement purpose in any way, "the exception provides no protection for the disclosing party." 695 F.3d at 606. At the very least, Ratkowski's distribution of the list to Conte with the blessing to "feel free to pass it along" to anyone who might find it useful creates a question of fact as to whether the disclosed information was actually being used for the purpose stated in the statutory exception. For these reasons, with the exception of the two juvenile plaintiffs' claims as explained above, a reasonable jury could conclude Ratkowski violated the DPPA.

### 3.2    DPPA Claim Against Roy

As to Roy, the plaintiffs argue that on January 7, 2021, Roy shared a Dropbox link that contained unredacted documents, which included over 500 pages of police reports, 66 citations, and hours of videos, including that of confidential informants. (Docket # 269 at 18.) Plaintiffs argue that within "that mountain of information Roy disclosed were 49 Plaintiffs' personal information found on the hundreds of pages of police reports and in the 66 pages of WPD citations for Plaintiffs which contained information from their motor vehicle records in violation of the DPPA." (*Id.*) Defendants argue that the plaintiffs cannot establish that Roy knowingly disclosed personal information obtained from motor vehicle records. (Docket #

25

267 at 17–18.) Defendants do not argue whether Plaintiffs can meet the other elements of the DPPA claim (*id.* at 17–19); thus, I will focus on the knowledge element.

For personal information found on the municipal citations, while Roy testified that information regarding an individual's home address and driver's license number generally auto fills from their DOT record (Motley Decl. ¶ 6, Ex. 2, Deposition of Joseph Roy ("Roy Dep.") at 104–105, Docket # 272-2), he avers that as to twenty-four of the plaintiffs,[3] he would not have known whether the officer generating the citations checked the DOT records to autofill the citation or whether the officer imported the personal information from another source (Declaration of Joseph Roy ("Roy Decl.") ¶ 18, Docket # 259). Roy acknowledges, however, that for these twenty-four individuals, the citations *could* contain information from DOT records. (*Id.*)  However, for the citations issued for five of the plaintiffs—Jacqueline Bogenberger, Peter Sparks, Jill Ferguson, Sonora Larson, and Molly Nilseen—Roy avers that the citation itself states that the individual was identified through their Wisconsin picture identification, and thus the information was not gathered from a motor vehicle record. (*Id.* ¶ 17.) Despite the statement on those five citations that the individual was identified through their Wisconsin identification, I find a question of material fact exists as to whether the personal information printed on the citations came from DOT records and whether Roy was aware of that fact. Roy acknowledges that information such as home address and driver's license number generally populates automatically on the citation form from information found in DOT records. Given Roy's testimony as to this process, a reasonable jury could find

---

[3] Andrew Aaron, Kamila Ahmed, Jacqueline Bogenberger, Khalil Coleman, Anne Delessio-Parson, Rachel Dulay, Erik Fanning, Breon Foster, Joanna Geisler, Joseph Hayes, Destiney Jones, Adante Jordan, Joseph Koepp, Alex Larson, Sonora Larson, Carmen Palmer, Leah Porter, Hector Rodriguez, Nathan Sabel, Christina Vitolo-Haddad, Gabriella Vitucci, Suzanne Wells, Brandon Wilborn, and Sonja Worthy.

26

that Roy knew the information printed on the citations that he later disclosed was protected information under the DPPA.

Plaintiffs assert that in addition to the individuals Roy lists, plaintiffs Isaiah Baldwin, Mary Kachelski, and Lazarito Matheu also were issued citations containing personal information from their DOT records that was disclosed by Roy. (Docket # 302 at 11 n.4.) For the same reason a question of fact exists for the plaintiffs above, a question of fact remains as to these three plaintiffs as well.

As to the personal information obtained from the police reports, Roy similarly avers that there is no way for him to know the source of the personal information, as it could have come from a variety of sources. (Roy Decl. ¶ 16.) However, as Plaintiffs argue, for ten of the plaintiffs,[4] the police report specifically states that the identifying information was taken from a DOT record. (Docket # 302 at 9–10.) Focusing on the records for John Larry, Jayden Welch, and Sean Kafer (as the other seven plaintiffs' DPPA claims against Roy already survive as explained above), for each of these individuals, the police report specifically states that the individual's "DOT record shows" and then lists the person's height, weight, eye color, and hair color. (Roy Decl. ¶ 4, Ex. A, Docket # 259-2 at 21, 23.) The Seventh Circuit has found that such information as height, weight, hair color, and eye color is considered "personal information" under the DPPA. *See Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 943 (7th Cir. 2015). Thus, although Roy avers that he had no way of knowing the source of the information found in the reports, because the reports themselves state that this

---

[4] Specifically, John Larry, Joseph Hayes, Jayden Welch, Sean Kafer, Khalil Coleman, Alex Larson, Kamila Ahamed, Gabriella Vitucci, Brandon Wilborn, and Adante Jordan.

information came from DOT records, a reasonable jury could find that Roy violated the DPPA.[5]

### 3.3 Damages

Defendants assert that Plaintiffs' DPPA claims also fail because they have not suffered any cognizable injury from the alleged DPPA violation. (Docket # 267 at 21–24.) The DPPA provides the following remedies for a violation of the statute: "(1) actual damages, but not less than liquidated damages in the amount of $2,500; (2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate." 18 U.S.C.A. § 2724(b).

Plaintiffs do not dispute that they have no proof of actual damages. (Docket # 286 at 29; Docket # 269 at 28–30.) They argue, however, that they are entitled to statutory liquidated damages. (*Id.*) Defendants argue that Plaintiffs are not entitled to statutory liquidated damages without proof of any actual damages. (Docket # 267 at 21–22.) Although neither party presents any authority from the Seventh Circuit on this issue, other circuits have found that a "plaintiff need not prove a measure of actual damages to recover liquidated damages under the DPPA, and certainly need not prove actual damages to recover the other types of remedies listed in § 2724(b)." *Kehoe v. Fid. Fed. Bank & Tr.*, 421 F.3d 1209, 1212 (11th Cir. 2005); *see also Pichler v. UNITE*, 542 F.3d 380, 400 (3d Cir. 2008) ("The plain language of the

---

[5] Plaintiffs do not address whether the following plaintiffs' personal information under the DPPA was disclosed by Roy: Robert Agnew, Rebecca Burrell, Raine Cich, Talevia Cole, Steven Conklin, Katheryn Knowlton, Vaun Mayes, Dana McCormack, Juvenile Palmer 1 and 2, Jose Hernandez Ramirez, William Rivera, Rosalind Rogers, William Schroeder, Mariah Smith, Angel Vega, and Katelyn Wojnar. As such, these plaintiffs' DPPA claims against Roy are dismissed.

DPPA, Supreme Court and other precedent, and the common law of privacy all support construing § 2724(b) so as not to require actual damages to recover liquidated damages.").

I agree with the circuits that have found that § 2724(b) does not require a finding of actual damages in order to award statutory damages. The plain language of § 2724(b)(1) indicates the liquidated damages serve as a damages floor—a plaintiff can receive his or her actual damages but should not receive damages less than $2,500. Furthermore, § 2724(b) lists other damages a plaintiff can recover, separate from actual or liquidated damages as stated in § 2724(b)(1). Defendants do not assert that plaintiffs in this case cannot prove any other form of damages under § 2724(b). Thus, Plaintiffs' DPPA claims will not be dismissed due to lack of damages.

### 3.4    Qualified Immunity

Defendants argue that even if Ratkowski and Roy are liable under the DPPA, they are entitled to qualified immunity. (Docket # 267 at 26.) Plaintiffs counter that no Seventh Circuit court has ever recognized the defense of qualified immunity in a DPPA action. (Docket # 286 at 30–31.) As an initial matter, the defendants' qualified immunity argument is wholly underdeveloped. This is reason enough to reject the argument. *See Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999) (finding arguments raised in a conclusory or underdeveloped manner are waived). The paucity of analysis notwithstanding, I do not find qualified immunity applies to the DPPA claims.

Several circuit courts have addressed the issue of qualified immunity in the DPPA context; however, in those cases, the plaintiff had sued under both the DPPA *and* under 42 U.S.C. § 1983. For example, in *Collier v. Dickinson*, 477 F.3d 1306 (11th Cir. 2007), the Eleventh Circuit found that an aggrieved individual can separately sue for a DPPA violation

29

under the DPPA itself, but also under § 1983. *Id.* at 1311. The *Collier* court then considered the issue of qualified immunity, but only after having "found that the statutory rights created by the DPPA are enforceable both directly and under Section 1983." *Id.* The *Collier* court concluded, however, that the statutory right to privacy in motor vehicle record information was clearly established at the time of the defendants' alleged conduct, giving them fair notice that their alleged conduct violated federal law, and thus not entitling them to qualified immunity. *Id.* at 1312. Similarly, the Sixth Circuit in *Roth v. Guzman*, 650 F.3d 603 (6th Cir. 2011) also considered the issue of qualified immunity in the context of a DPPA violation brought under the DPPA and § 1983.

Interestingly, the only case in this circuit seemingly addressing this issue ultimately disagreed with the *Collier* court's analysis. *Kraege v. Busalacchi*, 687 F. Supp. 2d 834, 839–40 (W.D. Wis. 2009). After acknowledging that the Seventh Circuit has not considered whether plaintiffs may use § 1983 to enforce their rights under the DPPA, the *Kraege* court found that because the DPPA "has a more restrictive private remedy[,] . . . plaintiffs' § 1983 claim to enforce their rights under the Act is barred." *Id.* Thus, assuming qualified immunity is available in the context of the DPPA, it appears to only be a defense when one's DPPA rights are enforced through § 1983. And it is unclear whether such a cause of action is even permitted in this circuit. Either way, plaintiffs in this case did not sue under § 1983, but directly under the DPPA. As such, Plaintiffs' DPPA claims are not barred by qualified immunity.

Because a reasonable jury could conclude that Ratkowski and Roy violated the DPPA, and because Defendants have not shown Plaintiffs are unable to prove damages or that qualified immunity bars the suit, both parties' motions for summary judgment as to the DPPA claims are denied and the claims will proceed to trial.

30

4. *Malicious Prosecution Claims*

Finally, plaintiffs Isaiah Baldwin, Aidali Rivera, and Rosalind Rogers sue Officer Farina for malicious prosecution under Wisconsin state law. Plaintiffs allege that Farina, while acting within the scope of his employment (Fourth Am. Compl. ¶ 92), ticketed the plaintiffs without probable cause, leading to the initiation of judicial proceedings against them that caused them damages (*id.* ¶¶ 1093–1102).

There are "six essential elements" of a claim for malicious prosecution under Wisconsin law:

> (1) [T]here must have been a prior institution or continuation of some regular judicial proceedings against the plaintiff; (2) such former proceedings must have been by, or at the instance of, the defendant; (3) the former proceedings must have terminated in favor of the defendant therein, the plaintiff in the action for malicious prosecution; (4) there must have been malice in instituting the former proceedings; (5) there must have been want of probable cause for the institution of the former proceedings; and (6) there must have been injury or damage resulting to the plaintiff in the former proceedings.

*Whispering Springs Corp. v. Town of Empire*, 183 Wis. 2d 396, 404, 515 N.W.2d 469, 472 (Ct. App. 1994). If the plaintiff fails to establish any one of these elements, the defendant prevails. *Tower Special Facilities, Inc. v. Investment Club, Inc.*, 104 Wis. 2d 221, 227, 311 N.W.2d 225 (Ct. App. 1981). Defendants argue that Plaintiffs' malicious prosecution claims fail because Plaintiffs cannot show a want of probable cause for issuing the citations, nor can the plaintiffs show Farina acted with malice. (Docket # 267 at 10–11.)

For the element requiring a "want of probable cause for the institution" of the proceedings:

> "It is generally held that whether a defendant sued for malicious prosecution acted on probable cause is a mixed question of law and fact. Where the facts are in dispute, the jury determines the facts under proper instruction of the trial court, and the court determines the question of probable cause from such facts.

31

Where the facts are undisputed, the question of probable cause is solely for the court.

*Pollock v. Vilter Mfg. Corp.*, 23 Wis. 2d 29, 41, 126 N.W.2d 602, 609 (1964) (internal citation omitted). And "in the context of a malicious prosecution suit, 'probable cause' shall mean that quantum of evidence which would lead a reasonable layman in the same circumstances to honestly suspect that another person had committed a crime." *Id.* at 42, 126 N.W.2d at 609.

### 4.1    Citations Issued to Baldwin and Rogers

On September 6, 2020, both Baldwin and Rogers were issued municipal citations by Farina for allegedly violating Wauwatosa Ordinance 7.50.030, Special Event Permit Required. (Roy Decl. ¶ 4, Ex. A, Docket # 259-1 at 5; Declaration of Rosalind Rogers ¶¶ 4–6, 13, Docket # 296-53.) Wauwatosa Ordinance 7.50.030 states, in relevant part, that:

> No person or entity acting as an event organizer shall set up for, hold, or conduct a special event, within the municipal boundaries of the city of Wauwatosa without first obtaining a special event permit. The city administrator, or his designee, shall have the exclusive authority to determine whether or not a permit is required for any particular event.

> A "special event" is defined as a:

> [T]emporary gathering of people on public or private property and involving at least one of the circumstances listed below. . . 1. Will involve the closing and exclusive use of a public street, alley, or public right of way; 2. Over 250 people at any one time attending the event on private property, except those situations where a constitutional right is being expressed—marches and public assemblies; 3. City ordinances and rules require public safety support by city employees; 4. Will require extraordinary services by any city department; 5. Hours of the event extend beyond those otherwise adopted in city ordinances; or 6. Alcohol, beverages, food, and/or merchandise will be offered for purchase.

Wauwatosa Ordinance 7.50.020.

On Baldwin's citation, the narrative states that Baldwin was part of a protest group assembled at North 65th Street and Milwaukee Avenue and that the individuals in the group were blocking all lanes of traffic, not allowing vehicular traffic to pass through. (Roy Decl. ¶ 4, Ex. A, Docket # 259-1 at 5.) Farina testified that Baldwin and Rogers were given citations because they were blocking the road, "almost like a block party. If you're gonna have a block party, you need a permit to block off that road. And they were just doing it to do it." (Declaration of Kiley Zellner ¶ 5, Ex. C, Deposition of Jeffrey Farina ("Farina Dep.") at 301–302, Docket # 265-3.)

While both Baldwin and Rogers aver that neither were acting as an "event organizer" and neither were conducting or holding a "special event" (Rogers Decl. ¶¶ 5–6; Declaration of Isaiah Baldwin ¶¶ 5–6, Docket # 296-40), whether they are actually guilty of the offense is not the standard for probable cause. Again, the Wisconsin Supreme Court has said that in the context of a malicious prosecution suit, probable cause means enough evidence which would lead a reasonable lay person in those same circumstances to honestly suspect the person had committed a crime. *See Pollock*, 23 Wis. 2d at 42, 126 N.W.2d at 609. Beyond asserting that they were not, in fact, violating the ordinance, Plaintiffs do not establish that Farina lacked probable cause in issuing the citations. Because Plaintiffs fail to establish all of the elements of their claim, Baldwin's and Rogers' malicious prosecution claims against Farina are dismissed.

### 4.2    Citation Issued to Aidali Rivera

Rivera avers that she was arrested on October 9, 2020 and issued a ticket for violating the curfew order. (Declaration of Aidali Rivera ¶¶ 2–6, Docket # 296-51.) Plaintiffs argue that Rivera was exempt under the curfew order as she was driving her son home from work; thus,

Farina lacked probable cause to issue her a citation. (Docket # 286 at 20–21.) As an initial matter, Rivera avers that she "believes" she was arrested by Farina. (Rivera Decl. ¶ 2.) In other words, she is uncertain whether it was, in fact, Farina who arrested her. Farina, for his part, testified that he did not arrest her. (Farina Dep. at 234.) Even assuming that it was Farina who arrested her, Rivera does not deny being out during the curfew hours. (Docket # 286 at 20.) Additionally, even accepting that Rivera told Farina that she was exempt from the curfew because she was driving her son home from work, Farina was not required to credit her statement in assessing probable cause. Recall that probable cause does not require proof of guilt beyond a reasonable doubt. Thus, even though Rivera's citation was dismissed, Rivera cannot establish that Farina lacked probable cause in issuing her a citation for violating the curfew order. Because Rivera fails to establish all of the elements of her claim, Rivera's malicious prosecution claim against Farina is dismissed.

> 5. *The Parties' Motions to Strike*

Both parties have filed motions to strike portions of the other's summary judgment pleadings. First, Plaintiffs move to strike Ratkowski's February 6, 2023 declaration. (Docket # 308.) Defendants originally filed Ratkowski's declaration on December 19, 2022 (Docket # 258); however, the declaration was missing page two, paragraphs five through thirteen. (*Id.*) Defendants filed the corrected version of Ratkowski's declaration on February 6, 2023, after Plaintiffs filed their brief in support of partial summary judgment on December 19, 2022. (Docket # 269.) Plaintiffs allege that the late filing of Ratkowski's corrected declaration irreparably prejudiced them. (Docket # 308 at ¶ 12.) I disagree. As an initial matter, the previously omitted statements in Ratkowski's declaration are not new information—his statements can be found in his two depositions conducted in 2021. Furthermore, the corrected

declaration was submitted prior to Plaintiffs' February 8, 2023 filing of their reply brief in support of their partial summary judgment motion. (Docket # 302.) Given these were not new facts, it is unclear what prejudice Plaintiffs faced. And clearly the updated declaration had no bearing on the DPPA claims against Ratkowski, since they survive summary judgment. As such, Plaintiffs' motion to strike Ratkowski's declaration (Docket # 308) is denied.

Next, Plaintiffs move to strike the declaration of Matthew Martell (Docket # 264), arguing that he was never disclosed as a fact witness. (Docket # 323.) Martell's declaration addresses placing Baldwin and Rogers under arrest and includes his supplemental police report. (Docket # 264.) Defendants argue that Martell is named solely to impeach Plaintiffs' claims that Farina arrested them and thus supplemental disclosure was not required under Fed. R. Civ. P. 26(a)(1). (Docket # 329.) Even so, Defendants argue Plaintiffs were aware of Martell as a witness as he was identified in the Fourth Amended Complaint and in subsequent discovery. (*Id.*) Given that Martell's declaration was unnecessary for deciding the summary judgment motion, and because Defendants named Martell solely for impeachment purposes, the motion to strike (Docket # 323) is denied.

The defendants move to strike Attorney Motley's declaration filed in support of Plaintiffs' motion for partial summary judgment (Docket # 269-1), arguing that substantial portions of her declaration are improper under Fed. R. Civ. P. 56(c)(4), (Docket # 279). Rule 56(c)(4) provides that a declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Defendants argue that

35

paragraphs two through seventeen and nineteen through twenty-three of the declaration are not based on personal knowledge. (Docket # 280.)

Plaintiffs contend that Defendants are engaging in gamesmanship, hoping that they "could prevail through strict proceduralism." (Docket # 301 at 1.) Plaintiffs argue that as attorney of record in this case, Attorney Motley "clearly has knowledge of the documents produced, *by Defendants*, in this case." (*Id.* at 2.) The rules of evidence and civil procedure should not so casually be cast aside as mere adherence to "strict proceduralism." These rules are fundamental and necessary to the practice of law. And Plaintiffs seem to misunderstand how documents are properly authenticated. One does not gain the ability to properly authenticate a document merely because she is an attorney in a case. Nor does a party producing a document in discovery automatically authenticate the document. As the Seventh Circuit explained:

> *The mere act of producing a document in response to a discovery request based on the content of the document does not amount to an admission of the document's authenticity.* A party's duty to produce documents under Federal Rule of Civil Procedure 34(a) applies to responsive documents in its "possession, custody, or control." They must be produced regardless of their authenticity, accuracy, or reliability, so the act of production does not say anything about authenticity, accuracy, or reliability. Those are matters for follow-up requests for admissions or other discovery tools.

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578–79 (7th Cir. 2015) (emphasis in original). That being said, while the defendants' arguments are well-taken, the defendants do not mount any specific arguments challenging the authenticity of the cited documents, and in fact rely on such evidence as the cited depositions in their own pleadings. *See Woods v. City of Chicago*, 234 F.3d 979, 989 (7th Cir. 2000) (finding that under the specific circumstances of that case, requiring authenticating affidavits would be an "empty formality" because the opposing party had effectively conceded the accuracy by relying on the documents themselves). For these

36

reasons, Defendants' motion to strike Attorney Motley's declaration (Docket # 279) is denied.

### 6. *Plaintiffs' Motions for Sanctions*

Plaintiffs filed two motions for sanctions against Defendants. I will address each in turn.

#### 6.1 Motion for Rule 11 Sanctions (Docket # 326)

To begin, Plaintiffs move for sanctions against Defendants on the grounds that several factual allegations in Defendants' proposed findings of fact (Docket # 266) are allegedly knowingly and deliberately misleading. (Docket # 327.) The crux of Plaintiffs' claims are that the defendants engaged in "verbiage manipulation" of facts in their proposed findings of fact. (*Id.* at 5–7.) For example, Plaintiffs fault the defendants for drafting a proposed finding of fact stating that "Ratkowski only provided the list to other law enforcement agencies . . ." when he actually avers that "I provided the list to the following law enforcement agencies . . ."; plaintiffs argue this somehow indicates that Ratkowski actually provided the list to entities beyond law enforcement agencies. (*Id.* at 3.) I am unclear how Ratkowski's declaration "drastically and substantively change[d] the meaning of the statement," (*id.*) nor does it alter my analysis of these summary judgment motions. Plaintiffs also allege that the defendants set out to deliberately mislead the court by proposing a fact stating that there is no dispute that Aidali Rivera was on the streets of Wauwatosa *in violation of the curfew* when she was arrested when in actuality, Rivera only admitted to being on the street after 7:00 p.m. (i.e., not in violation of the curfew) (*Id.* at 327.) The Court is well aware that although Rivera was out past curfew, she denies violating the curfew order. I was certainly not misled by this statement.

37

At bottom, what Plaintiffs truly contest is the defendants' proposed findings of fact slipping into argument. Although the plaintiffs' point is well-taken, the Court is well versed in parsing argument from "fact" within parties' proposed findings of fact and reviewing the underlying evidence to do so. Sanctions are not warranted on this basis. The plaintiffs' motion (Docket # 326) is denied.

### 6.2    Motion for Rule 37 Sanctions (Docket # 246)

Finally, the plaintiffs argue that the defendants willfully destroyed electronic evidence vital to the resolution of this case. (Docket # 246.) Plaintiffs argue that various members of the WPD deleted texts and/or emails containing images, videos, or other electronic information during the curfew enforcement operation dates, or otherwise related to the lawsuit. (Docket # 247.) The plaintiffs argue that the defendants were put on notice to preserve electronic discovery as early as October 11, 2020. (Docket # 247 at 6.) Plaintiffs assert that regardless of this notice, Defendants and their counsel knowingly and deliberately failed to preserve electronically stored information ("ESI") with the intent to deprive Plaintiffs of the evidence. (*Id.*) Regarding failure to take reasonable steps to preserve the ESI, Plaintiffs contend that Defendants received no training and established no routine for preservation of ESI and that communications made only electronically, such as text messages and data and communication applications downloaded to phones and used during the curfew order, were deliberately deleted. (*Id.* at 7.)

Specifically, Plaintiffs allege that Chief Weber testified that he deleted emails related to this lawsuit after forwarding them to the Wauwatosa City Attorney and that since he "probably" communicated with Mayor McBride via text regarding the curfew, it is "reasonable to presume that Weber deleted those texts as well." (*Id.* at 8.) While Weber

38

believed the texts were stored in the City's server, the City's IT Director, Jalal Ali, testified that texts are not preserved on the City's server. (*Id.* at 9.) Thus, Plaintiffs argue that "innumerable texts and potentially other electronically stored information was intentionally deleted by Mr. Weber and others that would be relevant to this lawsuit. They are now gone forever." (*Id.*)

Plaintiffs further argue that Ratkowski testified that officers would take pictures on their phones of people attending a protest and then forward the images to him. (*Id.*) Plaintiffs argue that Ratkowski "has not provided referenced ESI, such as texts, pictures, videos and other ESI from his phone throughout the duration of this lawsuit." (*Id.* at 10.) Plaintiffs argue that Roy testified that he had the ability to text during the curfew enforcement operations, and when asked if he sent or received text messages regarding protesting or curfews from his fellow officers, Roy testified "not directly that I can recall about curfew." (*Id.*) Plaintiffs argue that Wauwatosa Detective Martin Keck testified that he would use his personal phone to communicate with other operational personnel in a professional capacity via text message and email and that his phone only stores texts for 30 days. (*Id.* at 10–11.) While he testified he texted co-workers, he stated he was never advised to keep texts and thus "they are deleted forever." (*Id.* at 11.)

Plaintiffs assert that WPD Captain Shane Wrucke testified that he would use his cell phone to communicate with other operational personnel in a professional capacity via text message and email; however, the text messages were not kept very long, and he was not advised to keep them. (*Id.*) Officer Gee of the WPD testified that she and her WPD colleagues were instructed to download an application to their phones to capture and forward information electronically for anyone arrested and/or transported by officers during the

39

curfew. (*Id.* at 12.) Plaintiffs argue that in this case, "the evidence that is now not available to the Plaintiffs is absolutely more than 'minimal,' and has a direct impact on the ability of the Plaintiffs to prosecute some of their claims, as well as having a direct impact on the administration of justice." (*Id.* at 16.)

> Fed. R. Civ. P. 37(e) provides that:
>
> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Rule 37(e)'s requirement that ESI "cannot be restored or replaced through additional discovery" refers to digital backups and the likelihood that electronic documents have multiple versions. *Freidig v. Target Corp.*, 329 F.R.D. 199, 208 (W.D. Wis. 2018). As to text messages, while Plaintiffs assert that IT Director Ali testified that text messages and application used by law enforcement were not archived by his department (Docket # 247 at 7), the excerpt from his deposition does not contain this testimony (Ex. 6, Docket # 247-6). And Chief Weber testified that he forwarded any emails regarding the protest and curfew to the City Attorney before deleting them (Weber Dep. at 108–109) and that emails are preserved

on the server for seven years (*id.* at 110). Thus, it is not clear to me that the allegedly deleted ESI could not have been restored or replaced through additional means.

Even assuming, however, that Plaintiffs could establish that the City failed to take reasonable steps to preserve ESI and that no back-up copies exist, Plaintiffs have not shown that they are prejudiced from the alleged loss of the information. Plaintiffs contend that the lost evidence has a "direct impact" on their ability to prosecute "some of their claims," without articulating what those claims are or how they are impacted. As to the First Amendment claim, the photographs of the protests or emails exchanged during the time of the curfew order in October would not impact the Court's analysis under *Ward* as to whether the order was a reasonable time, place, and manner restriction. Nor would it impact disposition of Rivera's Title VI claim, which turned on a statutory construction issue of whether the City falls within the scope of Title VI's coverage. Nor is it clear how these alleged documents would affect the malicious prosecution claims against Farina. Finally, as to the DPPA claims that survive summary judgment, Plaintiffs do not demonstrate how Ratkowski's receipt of photographs from the protest or Roy's October 2020 text messages, sent prior to his alleged January 2021 disclosure, would assist Plaintiffs' prosecution of these claims. For these reasons, Plaintiffs' motion for sanctions (Docket # 246) is denied.

## CONCLUSION

The plaintiffs sue the defendants under 42 U.S.C. § 1983, Title VI, state law, and the DPPA. The parties filed cross-motions for summary judgment as to the plaintiffs' DPPA claims, and the defendants moved for summary judgment as to the plaintiffs' remaining claims. For the reasons explained above, the plaintiffs' motion for partial summary judgment

is denied and the defendants' motion for summary judgment is granted in part and denied in part.

Summary judgment is granted in favor of the defendants as to the plaintiffs' First Amendment claim pursuant to § 1983. Claim One of the Fourth Amended Complaint is dismissed.

Summary judgment is granted in favor of the defendants as to plaintiff Rivera's Title VI claim. Claim Eleven of the Fourth Amended Complaint is dismissed.

Summary judgment is granted in favor of the defendants as to the plaintiffs' state law claim of malicious prosecution. Claim Thirteen of the Fourth Amended Complaint is dismissed.

Plaintiffs' motion for partial summary judgment as to their DPPA claims against Ratkowski and Roy is denied. Defendants' motion for summary judgment as to the plaintiffs' DPPA claims is granted in part and denied in part. As to plaintiffs D.P.'s and C.P.'s claims against Ratkowski, the defendants' motion for summary judgment is granted. However, the remaining plaintiffs' claims against Ratkowski remain.

Defendants' motion for summary judgment is granted as to the following plaintiffs' claims against Roy: Robert Agnew, Rebecca Burrell, Raine Cich, Talevia Cole, Steven Conklin, Katheryn Knowlton, Vaun Mayes, Dana McCormack, D.P., C.P., Jose Hernandez Ramirez, William Rivera, Rosalind Rogers, William Schroeder, Mariah Smith, Angel Vega, and Katelyn Wojnar, However, the remaining plaintiffs' claims against Roy remain.

With no remaining claims, the following plaintiffs are dismissed from the case: C.P., D.P., Katheryn Knowlton, Dana McCormack, Jose Hernandez Ramirez, William Rivera, William Schroeder, and TPR.

With no remaining claims against them, the following defendants are dismissed from the case: The City of Wauwatosa, Dennis McBride, and Jeffrey Farina.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the plaintiffs' motion for partial summary judgment (Docket # 268) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket # 257) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the parties' motions to strike (Docket # 279, Docket # 308, Docket # 323) are **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiffs' motions for sanctions (Docket # 246, Docket # 326) are **DENIED**.

**IT IS FURTHER ORDERED** that the following sealing motions are **GRANTED**: (Docket # 260, Docket # 270, Docket # 276, Docket # 300, Docket # 304, Docket # 307, Docket # 313.)

**FINALLY, IT IS ORDERED** that the defendants' motion for extension of time (Docket # 317) is **MOOT**.

**FINALLY, IT IS ORDERED** that in preparing their final pretrial reports, the parties are instructed to address *only* the remaining claims and parties. They are not to address dismissed claims and parties.

Dated at Milwaukee, Wisconsin this 13th day of March, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge