UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

------------------------------------------------------------
                                  )
ANDREW AARON, et al.,             )
                                  )  Case No. 20-CV-1660
                  Plaintiffs,     )
                                  )  Milwaukee, Wisconsin
     vs.                          )
                                  )
DOMINICK RATKOWSKI and JOSEPH ROY,)  May 1, 2023
                                  )  8:42 a.m.
                  Defendants.     )
                                  )  **Volume 1**
------------------------------------------------------------

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE NANCY JOSEPH

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff          Motley Legal Services
                           By:  MS. KIMBERLEY MOTLEY
                           P.O. Box 1433
                           Matthews, North Carolina 28106
                           Ph:  704-765-4887
                           kcymotley@gmail.com

                           Ascend Counsel, LLC
                           By:  MR. EDWARD MILO SCHWAB
                           2401 South Downing
                           Denver, Colorado 80210
                           Ph:  303-888-4407
                           milo@ascendcounsel.com

                           Knowlton Law Group, LLC
                           By:  MS. KATHRYN L. KNOWLTON
                           7219 West Center Street
                           Milwaukee, Wisconsin 53210
                           Ph:  414-202-2444
                           kate@knowltonlawgroup.com

For the Defendant          Wirth & Baynard
                           By:  MR. JOSEPH M. WIRTH

1

```
 1                         and MS. JASMYNE M. BAYNARD
                           9898 West Bluemound Road
 2                         Suite 2
                           Wauwatosa, Wisconsin 53226
 3                         Ph:  414-291-7979
                           jmw@wbattys.com
 4                         jmb@wbattys.com

 5

 6                         I N D E X

 7                                                        PAGE
```

```
 8    PRE-TRIAL DISCUSSION                                  4

 9    VOIR DIRE                                            17

10    DISCUSSION - STRIKES FOR CAUSE                       70

11    JURY SELECTION                                       91

12    PRELIMINARY JURY INSTRUCTIONS                        93

13
      OPENING STATEMENTS
14
      By Ms. Motley                                       101
15
      By Mr. Wirth                                        115
16

17    PATRICK KNIGHT VIA TELEPHONE                        133

18
      WITNESS                  EXAMINATION                PAGE
19
      MADELEINE SCHWEITZER      Direct by Mr. Schwab       145
20
                               Cross by Mr. Wirth         151
21
                               Redirect by Mr. Schwab     156
22

23    TIFFANY STARK            Direct by Mr. Schwab       158

24                             Cross by Mr. Wirth         162

25                             Redirect by Mr. Schwab     165
```

                                                          2

1   LAURYN CROSS          Direct by Ms. Motley        166

2                         Cross by Ms. Baynard        170

3                         Redirect by Ms. Motley      177

4
    SONORA LARSON         Direct by Mr. Schwab        183
5
                          Cross by Mr. Wirth          189
6
                          Redirect by Mr. Schwab      193
7
                          Recross by Mr. Wirth        195
8
                          Redirect by Mr. Schwab      196
9
10  LUKE VETTER           Direct by Ms. Motley        213

11

12                        E X H I B I T S

13
    EXHIBIT NO.        DESCRIPTION                    REC'D
14
    215 (Page 16 - last entry only)                  247
15
    217                                              236
16

17

18

19

20

21

22

23  U.S. Official Court Reporter:  THOMAS A. MALKIEWICZ, RMR, CRR
    Proceedings recorded by computerized stenography, transcript
24  produced by computer aided transcription.

25

TRANSCRIPT OF PROCEEDINGS

1

2          THE CLERK:  Judge Joseph is on the bench calling case

3 20-CV-1660, Andrew Aaron, et al., versus Dominick Ratkowski,

4 et al., scheduled for a jury trial.

08:42  5      Appearances, please, starting with the plaintiff.

6          MS. MOTLEY:  Attorney Kimberley Motley appearing in

7 person with attorneys Milo Schwab and Kathryn Knowlton.

8          THE COURT:  Good morning, Miss Motley and Mr. Schwab

9 and Miss Knowlton.  And good morning to the plaintiffs who are

08:42 10 present in court as well.

11          MS. BAYNARD:  Good morning, Your Honor.  Attorney

12 Jasmyne Baynard and attorney Joe Wirth appearing on behalf of

13 defendants, Dominick Ratkowski and Joseph Roy.

14          THE COURT:  Good morning, Miss Baynard, Mr. Wirth,

08:43 15 Mr. Ratkowski, and Mr. Roy.  Good morning one and all.

16      We are here for a jury trial this morning.  I understand

17 that the jury is in the building, they are currently in

18 orientation and getting settled in, and they'll be ready for us

19 very soon.

08:43 20      So I just have a couple of matters before we bring them up

21 to the courtroom.  In regards to voir dire, I had E-mailed to

22 the parties my voir dire questions.  Starting with the

23 plaintiff, Miss Motley.  Do you have any feedback or anything

24 on the voir dire questions?

08:43 25          MS. MOTLEY:  Your Honor, I don't have anything with

4

08:43  1    regard to the voir dire questions.  I don't know if my

2    colleagues have anything to add.

3                    MR. SCHWAB:  No.

4                    MS. KNOWLTON:  No, Your Honor.

08:43  5            THE COURT:  All right.  You may have noted in regards

6    to the voir dire at a point in the voir dire questioning, I

7    will ask, number one, to give -- I'll give each side an

8    opportunity to introduce themselves to the jury, and then later

9    in the voir dire questions, I will be asking that you read the

08:44 10    names of the potential witnesses and plaintiffs to the jury to

11    make -- to ask whether or not they know or are related to

12    anyone.

13          Miss Motley, will I be calling on you?

14                    MS. MOTLEY:  Yes, Your Honor.

08:44 15            THE COURT:  All right.  And for the defense, same to

16    you, as to the voir dire questions, any feedback or -- or any

17    issues with voir dire questions?

18                    MS. BAYNARD:  Nothing, Your Honor.

19            THE COURT:  And as to calling on a person to read the

08:44 20    name of witnesses and introduce themselves to the jury, who

21    I'll be calling on?

22                    MS. BAYNARD:  That would be me, Your Honor.

23            THE COURT:  Okay.  Thank you.  Moving along, the plan

24    is that as soon as we impanel the jury to move into opening

08:45 25    statements, so be ready to do that this morning.  It may occur

5

08:45  1   as early as before lunch, so I don't know how fast we're going

2   to move, but be ready if it does happen before lunch that

3   you're ready to do that.

4        And for opening for the plaintiffs who will I be calling

08:45  5   on?

6        MS. MOTLEY:  Me, Your Honor.

7        THE COURT:  And for the defense who will I be calling

8   on?

9        MS. BAYNARD:  Attorney Wirth.

08:45  10       THE COURT:  All right.  And then right after opening

11   statement, opening statement we'll be moving into the

12   plaintiffs' presentation of their case in chief.  Miss Motley,

13   please give me the name of the witnesses that you're calling

14   immediately to open your case.  And it's helpful to me if you

08:45  15   give them in the order that you'll be calling them.

16       MR. SCHWAB:  Your Honor, this is actually a -- we

17   just learned this morning of an issue here.  We had served

18   Barry Weber less than a week ago.  We've just been informed --

19   He was anticipated to be our first witness.  We just learned

08:46  20   that he apparently is in Israel now, but we served him fewer

21   than seven days ago.  Nobody has ever informed us from

22   Mr. Weber to defense counsel who apparently does know his

23   whereabouts now and made that representation but only this

24   morning.  It's created an issue for us, so we're still working

08:46  25   that out, but we have a concern that he may actually just be

08:46   1   avoiding testimony and not actually out of the country.

2               THE COURT:  All right.  Mr. Schwab, refresh my memory

3       Mr. Weber, is he the mayor?

4               MR. SCHWAB:  He is the former chief of police.

08:46   5               THE COURT:  Chief of police.

6               MR. SCHWAB:  He can speak to many issues regarding

7       policy, procedures, organization.  There were some important

8       things we were going to get through him, and like I said, he

9       was served five days ago, four days ago, personally at his

08:47  10       home.  We spent over a thousand dollars trying to get him

11      served, and we were surprised this morning that apparently he

12      somehow is now out of the country.

13              THE COURT:  Mr. Schwab, and again to be clear, you

14      anticipate calling him regarding policy and structure, again as

08:47  15       to the DPPA?

16              MR. SCHWAB:  Well, as to the organizational

17      structure, training, things like that, which relate not --

18      relate to these officers and their knowledge about, for

19      example, open public records and how these policies are

08:47  20       drafted, what it takes to be --

21          You know, we have a lot of questions that we wanted to get

22      through him, and they were relevant and foundational to a lot

23      of the testimony we're going to get in later.  He's also the

24      witness that would allow us to introduce certain exhibits.

08:47  25              THE COURT:  Okay.  As to how policies are drafted?

7

08:47　1　　　　　　MR. SCHWAB:  No.  No, no.  No, no.  But as to

　　　2　policies, he's the final policy maker.  He is the one that

　　　3　adopts them.  He would be a relevant person to admit policies

　　　4　here.

08:48　5　　　　　　THE COURT:  Okay.  I understand what you're saying,

　　　6　I'm just trying to get a very specific answer.

　　　7　　　　　　MR. SCHWAB:  Sure.

　　　8　　　　　　THE COURT:  Are we talking about DPPA policy?

　　　9　Because, again, I'll be asking throughout the trial that, you

08:48　10　know, the evidence is connected to the DPPA, so --

　　　11　　　　　　MR. SCHWAB:  So the DPPA policy would be one, the

　　　12　open public records, which is the second claim, that relates

　　　13　deeply to that, training for employees and officer of the

　　　14　police department that goes to knowledge --

08:48　15　　　　　　THE COURT:  Yeah.  Training in regard to the DPPA?

　　　16　　　　　　MR. SCHWAB:  Training as regards to how they would

　　　17　know whether something is a driver's record.

　　　18　　　　　　THE COURT:  Okay.  So that to me that connects to the

　　　19　DPPA.

08:48　20　　　　　　MR. SCHWAB:  Yes, of course.  It connects to the

　　　21　knowledge component of the DPPA.  Yes, Your Honor.

　　　22　　　　　　THE COURT:  Thank you, Mr. Schwab.

　　　23　　　　　　MR. SCHWAB:  And that's not it.  I'd have to review

　　　24　my notes, but we anticipated -- we anticipated a few other

08:48　25　things as well.  You know, it's -- it's troubling that we only

8

08:49   1   were informed of this this morning.

        2           THE COURT:  Thank you, Mr. Schwab.  I will give the

        3   defense an opportunity to be heard on the Weber subpoena

        4   situation, but I don't know if you're addressing this or

08:49   5   Miss Motley is addressing this.  I need the name of the

        6   witnesses who are being called today.

        7           MR. SCHWAB:  We're still --  We're scrambling.  We

        8   would like to call -- I think we'd like to call Captain Vetter

        9   first, and then we anticipate calling several plaintiffs.

08:49  10   Tiffany --  Tiffany Stark; is that correct?

       11           THE COURT:  Mr. Schwab?

       12           MR. SCHWAB:  Yes.

       13           THE COURT:  Scrambling as to witnesses is not

       14   something a judge wants to hear on the day of trial.

08:49  15           MR. SCHWAB:  I understand.

       16           THE COURT:  We are talking who are you going to call?

       17   So I heard Mr. Vetter?

       18           MR. SCHWAB:  And I apologize, I know, but we also

       19   expect that someone won't dodge a subpoena.

08:49  20           THE COURT:  Yeah.  We're going to get back to the

       21   subpoena.  Right now I'm just taking notes.

       22           MR. SCHWAB:  He was going to be our first witness.

       23   He was actually going to take a substantial part of today, so

       24   now we're trying to figure out how we can fill this space after

08:50  25   someone who was properly subpoenaed has chosen not to appear

08:50  1    and did not give us that warning.  Tiffany Stark, Sonora

2    Larson, Rebecca --

3                THE COURT:  Okay.  Just slow down for me because I'm

4    actually writing their names and also -- and I'm asking because

08:50  5    also the staff is -- needs to know and the court reporter needs

6    to know as well.

7                MR. SCHWAB:  Yeah.

8                THE COURT:  So your first will be?

9                MR. SCHWAB:  Rebecca Wigley.

08:50  10               THE COURT:  Next?

11               MR. SCHWAB:  Tiffany Stark.  Sonora Larson.  If you

12   need me to spell that, I can.

13               THE COURT:  I got it.  Thank you.

14               MR. SCHWAB:  Madeleine Schweitzer.  And that's who we

08:50  15   would anticipate calling.  Hopefully that will take us close to

16   the end of the day, Your Honor.

17               THE COURT:  Okay.  Thank you, Mr. Schwab.  And just

18   be ready throughout the trial, I'll be checking in on the plan,

19   what are we doing?  So if it's the morning, I'll be asking

08:51  20   who's being called in the morning, the afternoon when we close

21   in the evening, I'll also ask to expect the next morning.  Also

22   that allows the defense to be ready so we have no, again, no

23   dead time to respect your time, to respect the jury's time.

24               MR. SCHWAB:  Yes, Your Honor.

08:51  25               THE COURT:  Okay.  Thank you.  All right.  So

10

08:51 1  Ms. Baynard or Mr. Wirth, first on the Weber subpoena

2  situation.

3          MR. WIRTH:  Judge, Barry Weber was a party to this

4  lawsuit, he was dismissed as a party to this lawsuit, so in

08:51 5  that sense he became a witness.  There was some conversations

6  between defense counsel and plaintiffs' counsel on whether we

7  would accept service on behalf of any Wauwatosa employee past

8  or present, and we said no, we can't.  We will --  We will

9  arrange to have the parties present, they are, and if you have

08:52 10  active members of the police force that you want to call as

11  witnesses such as Captain Vetter, just let us know and we'll

12  make arrangements to have him here.

13      We were never advised that Barry Weber was served.  What

14  we were --  What we did, and let's be honest, Judge, it was

08:52 15  four or five days before the start of trial, and Mr. Weber

16  was -- we were advised by his attorney that Mr. Weber was on

17  his way out to the Middle East on a church trip, so I don't --

18  the -- the appearance of Mr. Weber was not facilitated through

19  our office.

08:52 20      Mr. Weber is no longer a party, and attempting to serve

21  someone four or five days before a trial that's been scheduled

22  for months, sometimes this stuff happens.  We didn't facilitate

23  his absence from the courtroom and any suggestion to the

24  contrary is absurd.

08:52 25          THE COURT:  Mr. Schwab, do you wish to be heard?

11

08:52  1          MR. SCHWAB:  Yeah, that is exactly the problem.  They

2      did not facilitate.  We tried to work with them and they

3      refused.

4          MR. WIRTH:  No.

08:53  5          MR. SCHWAB:  We asked if they would accept service,

6      and they said no.  So we spent over a thousand dollars spending

7      weeks trying to serve him.  He avoided service successfully

8      until the final week, which is in advance of the deadline.

9      Forty-eight hours, I believe that's what the federal rules say.

08:53  10     We served him early enough and in advance enough.  His attorney

11     apparently never reached out to us to let us know.

12         I don't know if he's actually out of town, but it's

13     problematic and it is disrespectful to the authority of the

14     court for someone to be served with a subpoena and beliedly

08:53  15     [sic] ignore it.

16         And let's be clear.  This is not just a random witness,

17     this is the individual who was a defendant in this case, who

18     has been represented by these attorneys, is the former chief of

19     police for this -- and the former boss for these two

08:53  20     individuals.  He has important information, and to not even do

21     us the courtesy of reaching out to us, I think that's worthy of

22     contempt of court.

23         THE COURT:  All right.  I'm pausing here.  I --  I

24     can't compel defendants' counsel to facilitate the receipt of

08:54  25     the subpoena.  While it would've facilitated and made things

12

08:54 1  easier, but I'm not sure I have the authority to compel them to

2  do so.

3        MR. SCHWAB:  I'm not saying that you have the

4  authority to compel them to do so, but I'm saying that the idea

08:54 5  that -- that they were not informed or they had no -- that's --

6  that's patently false.  I would ask perhaps that the Court send

7  a marshal over to Mr. Weber's house and see if he actually is

8  in Israel.

9        Again, the Court's authority here is in question.  Can

08:54 10  someone, subpoenaed lawfully by this court and by officers of

11  this court, ignore it for a trial?  That's an important

12  question.  And that goes to your discretion and your authority

13  here, Your Honor.  He ignored that.

14        If he had reached out, he never filed anything.  He

08:55 15  apparently has an attorney who could've filed a third-party

16  objection to inform the Court.  They could've reached out to us

17  to let us know he would not be available this day and perhaps

18  would be available another day.  All of that was ignored.  This

19  is really troubling behavior.

08:55 20        THE COURT:  Mr. Schwab, do you have the attorney's

21  name?

22        MR. SCHWAB:  I do not because, again, they didn't

23  reach out to me.  They apparently only reached out to defense

24  counsel who also did not inform us even though we've been

08:55 25  communicating essentially daily.  We were --  We only learned

13

08:55 1  of this this morning, and it feels like we have been

2  sandbagged, Your Honor.

3  THE COURT: Thank you, Mr. Schwab. Mr. Wirth, who is

4  representing Mr. Weber to your knowledge? Or Miss Baynard?

08:55 5  MR. WIRTH: I think it's Pat Knight.

6  MS. BAYNARD: Just to be clear, the attorney reached

7  out to us because their process server was trying to serve

8  Mr. Weber, reached out to us and said, you're the attorneys of

9  record on this. I got a call from the process server saying

08:56 10  they're trying to serve Barry Weber, giving you a heads-up, and

11  I believe we discussed it briefly at the second final pre-trial

12  conference, and it was brought up that that was the first time

13  we were aware till the Sunday we had the pre-trial conference

14  on Monday that Barry Weber was served.

08:56 15  So I don't think that this attorney represents him, I

16  believe he represented him in the John Doe state hearings, and

17  that's why the process servicer -- process server reached out

18  to Mr. Weber. And I think having the -- You know, I just want

19  to make it very clear and the Court is aware of the

08:56 20  communications between the parties over the past week, I would

21  not say that we've communicated, we're not sure of the 110

22  witnesses that they've listed who they intend to call, so to

23  represent to the Court that we've been in constant

24  communication giving curtesies about who's being called, what

08:57 25  information they have, that just hasn't occurred. And, I mean,

14

08:57   1    you've been witness to some of that.

        2        So I don't --  Back to your question, I don't know if Pat

        3    Knight necessarily represents him, but that's who the process

        4    server reached out to.

08:57   5            THE COURT:  All right.  Anything further, Mr. Schwab?

        6            MR. SCHWAB:  Yeah.  Just also to remind the Court, we

        7    are anticipating doing remote testimony.  If we had been aware

        8    of this we could've arranged that, but we've been denied even

        9    that opportunity here.  But he was properly served.  Thank you,

08:57   10   Your Honor.

        11           THE COURT:  Thank you, Mr. Schwab.  Mr. Miller, what

        12   is the status on the jury?

        13           THE CLERK:  They're ready.

        14           THE COURT:  They're ready.  Okay.  So I will take up

08:57   15   this matter during a break to allow us to get started with the

        16   voir dire questions.  I remind the parties that all witnesses

        17   are sequestered, so please properly advise your witnesses and

        18   also remind witnesses to have their phones off and not visible

        19   while they are on the stand.  And I believe that's all I need

08:58   20   for now.

        21       As to voir dire, let's bring the jury in.

        22           (There was discussion off the record.)

        23           THE COURT:  Miss Motley, what's -- confirm the number

        24   of plaintiffs?  Because I do want to tell the jury.

09:00   25           MS. MOTLEY:  57.

                                                                      15

09:00    1              THE COURT:  57.  Thank you.

         2              (There was discussion off the record.)

         3              THE COURT:  The jury's coming from another floor, so

         4    you may be seated until we hear them coming.

09:02    5              MR. SCHWAB:  Your Honor, would now be an appropriate

         6    time?  I'm sorry, I should've asked, for an order sequestering

         7    witnesses?

         8              THE COURT:  I've already entered that.  It was

         9    entered during the final pre-trial.

09:03   10              MR. SCHWAB:  I apologize.  I forgot it.

        11              THE COURT:  There's a lot going on.  I understand.

        12              MR. SCHWAB:  Thank you, Your Honor.

        13              THE COURT:  I'm sorry.  One second.  We have to get

        14    the court reporter give us a signal that he's back on.

09:03   15         All right.  Miss Motley, you wish to be heard?

        16              MS. MOTLEY:  Your Honor, I don't think parties have

        17    settled on -- or we're not aware of which redacted target lists

        18    we should use.  There was one filed by us, there was one filed

        19    by them.  I don't know if that's something that we want to

09:04   20    speak about now or later.

        21              THE COURT:  We'll talk about it later, unless you

        22    think it's needed for voir dire.  I don't think it is.

        23              MS. MOTLEY:  I do think it's needed before openings,

        24    but not for voir dire.

09:04   25              THE COURT:  Okay.  Let's take it up before opening,

09:04  1   but while we're waiting, the redacted version that I approved

2   only redacts the unnamed plaintiffs, so everyone who's not

3   named, or named plaintiff, should be redacted, and that's the

4   only information that I ordered redacted, no other redactions.

09:04  5            MR. WIRTH:  I think that would be our Exhibit 1000.

6            MS. MOTLEY:  Well, Your Honor, there's -- I don't

7   know if you want to get into the arguments now or later.  We

8   have some issues with the defendants' redactions.

9            THE COURT:  All right.  So let's take it up before

09:05  10  opening.

11           MS. MOTLEY:  Thank you.

12           THE COURT:  Thank you.

13           (There was discussion off the record.)

14           THE CLERK:  Andrew Aaron, et al., versus Dominick

09:16  15  Ratkowski and Joseph Roy, scheduled for a jury trial.

16  Appearances, starting with the plaintiff?

17           THE COURT:  Please be seated first, everyone.

18           MR. SCHWAB:  Good morning, Your Honor.  Milo Schwab,

19  Kimberley Motley, and Kathryn Knowlton on behalf of plaintiffs.

09:16  20           THE COURT:  Good morning to you all.

21           MS. BAYNARD:  Good morning.  Attorney Jasmyne Baynard

22  and attorney Joe Wirth on behalf of defendants.

23           THE COURT:  Good morning to you as well.  All right.

24  Are we all set?  All right.  Good morning, everyone.  We are

09:17  25  very grateful to have you here this morning.  Serving as jurors

17

09:17    1    is right up there with the right to vote as the privileges that

2    we have as citizens, so welcome and thank you.

3         And you may already know that civil jury trial, trial by

4    jury is one of the features of our legal system, so it's a real

09:18    5    privilege that you get to participate in that capacity.

6         To get us started before I start running my mouth and

7    talking about all the civic virtues of serving as jurors, I

8    have to put you under oath.  If you all please stand and raise

9    your right hands.

09:18   10                (The jurors were sworn.)

11                ALL JURORS:  I do.

12                THE CLERK:  Thank you.

13                THE COURT:  Please be seated.  So you heard the case

14    called, but let's do some introductions to orient you as to who

09:18   15    we are and what's going to go on here.  I'm Judge Joseph, I'm

16    one of the magistrate judges here in this district.  And I'm

17    going to introduce the court staff that I have with me.

18         Mr. Miller, with who you heard call the case, he is my

19    courtroom deputy who will be with me during this trial, and

09:19   20    there's another courtroom deputy, Evan Romel, who you may also

21    see.  And next to him in front of me is Miss Cronin.  She is my

22    law clerk.  And then in the corner is Mr. Eder, court security

23    officer, or bailiff, who will be with us during this trial.

24    And another individual, Mr. Kurzynski, who's in the back, our

09:19   25    other CSO, will be in -- helping us throughout the trial here.

18

09:19 1          And then, actually the most important person in this

2    courtroom is our court reporter.  He's the most important

3    person because he's the court historian.  So he's taking down

4    every word that is being said, every um-hum, huh-uh, say it

09:19 5    again, and he will be joined this week by another court

6    reporter, Susan Armbruster.  So that's who we are, that's the

7    court team.  As you can tell from the team working together, it

8    takes a lot of players, it takes a village to pull off a trial.

9          Did any of you know any of the names that I just

09:20 10   introduced?  If you do, please raise your hand.  Juror number

11   12, who do you know?

12          A JUROR:  I'm familiar with you; I was a court

13   reporter for 41 years in Milwaukee.

14          THE COURT:  Tell me your name.

09:20 15          A JUROR:  I know Tom and I know Frank.

16          THE COURT:  All right.  Well, thank you.  Now, I will

17   ask you this.  Does the fact that you are familiar with me,

18   that you know the court reporter, and I think you mentioned the

19   CSO, will that get in the way of you being a fair and impartial

09:20 20   juror to both sides of this case?

21          A JUROR:  No.

22          THE COURT:  Okay.  Anyone else knows anyone I already

23   introduced?

24          (No response.)

09:21 25          THE COURT:  All right.  I don't see any other hands

19

09:21   1    up.  Let me allow plaintiffs' counsel to introduce themselves,

        2    and I'll ask you the same question about them.  Miss Motley?

        3            MS. MOTLEY:  Good morning, Your Honor.  Good morning.

        4    My name is attorney Kimberley Motley, and I'm here with

09:21   5    attorney Milo Schwab, attorney Kathryn Knowlton.

        6            THE COURT:  Thank you, Miss Motley.  Anyone on the

        7    panel know Ms. Motley, Mr. Schwab, or Miss Knowlton, have done

        8    business with them or their firm or being represented by them

        9    or know them in any way?  If so, please raise your hand.  All

09:21  10    right.  Juror number one.

       11            A JUROR:  Yes, I'm familiar with Kimberley Motley as

       12    a -- attorney as she's affiliated with UW-Milwaukee in some

       13    ways, and I worked there for 12 years.

       14            THE COURT:  Okay.  Thank you, juror number one.  Now,

09:21  15    does the fact that you know Ms. Motley through a professional

       16    capacity, will that get in the way of you being a fair and

       17    impartial juror in this case to both sides?

       18            A JUROR:  No.

       19            THE COURT:  Thank you.  Let me just ask the defense

09:22  20    counsel to please introduce themselves to you.

       21            MS. BAYNARD:  Attorney Jasmyne Baynard, attorney Joe

       22    Wirth, and we're with -- and we represent the defendants.

       23            THE COURT:  Thank you, Miss Baynard.  Anyone in the

       24    panel know Ms. Baynard or Mr. Wirth?  Please raise your hand.

09:22  25            (No response.)

20

09:22 1        THE COURT:  I do not see any hands.  All right.  So I

2 have some additional questions for you, and the purpose of the

3 questions is for voir dire, for jury selection, and voir dire

4 is a very fancy French legal talk to mean to tell the truth.

09:22 5 And the purpose of the questions are not to embarrass you, not

6 to put you in the spot or to be nosey and get in your business,

7 but as you can tell already, the purpose of the questions is to

8 assess whether you can be fair and impartial jurors to both

9 sides of the case.  So that's where I am going when I'm asking

09:23 10 you these questions.

11        In answering the questions, I have some questions for you

12 on the placard that you'll be answering to introduce yourselves

13 to us.  Please speak loudly so that we all can hear you, we all

14 can take notes if we want to take notes, and most importantly

09:23 15 we want to help the court reporter catch every word that you

16 are saying, and also please speak slowly as well.

17        So on the placard, you will see that we ask you to, and

18 for those of you in the back, we'll start with the jury box and

19 then we'll turn it to the back so you'll be able to see.  Just

09:24 20 one second here.  So the placard asks for your name, your age,

21 your address, and when I say address, just a city and state,

22 Milwaukee, Milwaukee County, not street address.  Your marital

23 status, whether you have any children, and since we're talking

24 about children, go ahead and brag about those grandchildren too

09:24 25 if you have any.  If you want to brag about a pet, go ahead, we

21

09:24   1   won't hold it against you either.  The extent of your formal
        2   education, your occupation, or if you're retired, tell us what
        3   you did before you retired.  Your spouse's occupation or your
        4   spouse's former occupation, and although not on the placard,
09:24   5   but since this is the only time during the trial you'll get to
        6   talk to us, tell us a fun fact about you.  And if you don't
        7   want to do that, just say, Judge, I'm not fun.  And that's
        8   okay.  All right?

        9       So let's get started.  Juror number one, you're going to
09:25  10   kick us off nice and loudly and slowly, please.

       11           A JUROR:  Thank you.  My name is XXXXX XXXXX, and I'm
       12   66 years old.  I live in Wauwatosa.  I'm married for 35 years
       13   this year, and I think that's a very fun fact.  I have a
       14   daughter who's getting married this summer, she's 30.  I have a
09:25  15   master's degree from UW-Milwaukee where I worked for the past
       16   12 years.  I'm currently retired, and I was a fundraiser for
       17   the university.  My husband is a professor at Alverno College,
       18   and he's still employed.  Thank you.

       19           THE COURT:  Thank you, juror number one.  And
09:25  20   congratulations, that long marriage and the upcoming wedding as
       21   well.  Juror number two?

       22           A JUROR:  Hi.  My name is XXXXX XXXXXXX-XXXXXX.  I
       23   was born in 1955, so not always sure of the age, but you can do
       24   the math from that.

09:26  25           THE COURT:  Are you asking lawyers to do math?

09:26  1          A JUROR:  Yes, I am.  In November of 1955.  I'm from

2     Milwaukee, live in the Bay View area, and I've been married

3     since 1996.  I have no children.  As far as education, I have

4     two years at a liberal arts college with art and English Lit as

09:26  5     my majors.  I'm retired, and before retirement -- I retired

6     when my mother developed Alzheimer's and my sister took a leave

7     from her job, so it was a little earlier than I would've wanted

8     to.  I was a receptionist secretary at a tax firm.  Before that

9     I was a hairdresser for many years, and my husband, he works at

09:27 10     Verizon, he's an engineer installer, and not quite sure what,

11     he's been working at home since COVID, and it's really turned

12     into a working at home job with just occasional trips out.  And

13     not going to have any fun facts.  I have two cats, one bit me

14     this morning, so I'm swelling up right now.

09:27 15          THE COURT:  Oh, no.  Oh, no.  Hope you're okay.

16     Thank you, juror number two.

17          A JUROR:  Hi.  My name is XXXX XXXXXXXX.  I'm juror

18     number three.  I'm 29 years old.  I live in the City of

19     Whitewater.  I am married for four years and have one child.  I

09:27 20     received a bachelor's degree and I'm working at the Whitewater

21     Unified School District as a data analyst, and my wife is a

22     part-time social media marketer for a small bakery called Wood

23     Street Bakery.  No fun facts about me.

24          THE COURT:  You're not fun, juror number three.

09:28 25     Okay.  That's fine.

23

09:28   1          A JUROR:  Juror number four, XXXXX XXXXXXX.

        2   Fifty-three, from New Berlin.  Been married for 33 years.  I

        3   have three daughters and four grandchildren.  I have an

        4   associate's degree in -- with a finance background on that.

09:28   5   And I currently work for Global Payments, it's a credit card

        6   processor, I do apsis development management.  My husband works

        7   for True Value, and he's a field specialist at -- helps stores

        8   that want to expand and remodel.  Fun fact, going on my first

        9   cruise next year.

09:28  10          THE COURT:  Thank you.

       11          A JUROR:  I'm juror number five.  My name is XXXXXXXX

       12   XXXXXXX.  I am 23 years old.  I'm from Mayville.  I am single.

       13   No kids, but two dogs.  I went to culinary school for about a

       14   year, I work at Kwik Trip as the food service leader, and

09:29  15   that's about it.

       16          THE COURT:  Thank you.

       17          A JUROR:  I'm juror number six.  My name is XXXXX

       18   XXXXXXXXXX.  I am 39 years old.  I live in Milwaukee.  I'm

       19   married.  I have two pugs, no children.  I have a bachelor's

09:29  20   degree.  I work for Clarios, formerly Johnson Controls, and I

       21   and I'm a commodity manager.  My husband is an accountant.  And

       22   he worked for Northwestern Mutual.  I do have to tell you that

       23   I have a trip planned for Friday, and I'll be gone Friday and

       24   Monday this week.

09:29  25          THE COURT:  Thank you.  Juror number seven?

24

09:30  1          A JUROR:  Hi.  My name is XXXXXXX XXXXXXXXXX.  I am

2      60 years old.  I live in Cudahy.  Recently widowed, no

3      children, and a high school education, graduate.  And currently

4      work at McAdams Graphics as a machine operator.

09:30  5          THE COURT:  Thank you.

6          A JUROR:  I am juror number 14.  I am 43 years old.

7      I currently live in Waukesha.  I am married, I have two

8      children and a dog.  I have, let's see, education, I have some

9      college, never finished.  I am a senior customer care

09:30  10     representative and collector for an oil distributing company.

11     My husband works in I.T., and fun fact, my entire family loves

12     to be outside.

13         THE COURT:  I didn't catch the last word.  Your

14     entire family?

09:31  15         A JUROR:  Loves to be outside.

16         THE COURT:  That is wonderful.  Hopefully we get some

17     nice weather for that.

18         A JUROR:  Yeah.  Yeah.

19         A JUROR:  Good morning.  I'm juror number 13.  I'm

09:31  20     35.  Live in Sussex.  Married with two children.  Have a

21     bachelor degree.  I am a senior project lead with Milwaukee

22     Tool.  My wife stays at home with the two children.

23         THE COURT:  You holding back on that fun fact about

24     you?

09:31  25         A JUROR:  I can't think of anything.

09:31   1          THE COURT:  All right.  Thank you.

        2          A JUROR:  Juror number 12.  XXXXX XXXXXXXX.

        3   Sixty-four years of age.  I live in Delafield.  In a long-term

        4   relationship.  I have one child, two grandchildren.

09:31   5   Associate's degree from Concordia.  I was a court reporter for

        6   41 years.  My partner's occupation was in sales, and I love to

        7   travel.

        8          THE COURT:  Wonderful.  Thank you.

        9          A JUROR:  I am juror number 11.  I'm age 64.  I'm --

09:32  10   I live in the City of -- the County of Milwaukee.  I am single.

       11   I have no children.  I have a bachelor's degree.  I am retired

       12   from the state of -- the state as a revenue auditor, and I

       13   don't have any fun facts.

       14          THE COURT:  Thank you.

09:32  15          A JUROR:  Juror number 10, name's XXXX XXXXXXX.  I

       16   live in New Berlin.  Married, empty nester.  Two grown boys out

       17   on their own, two grandchildren.  Education, the last class to

       18   graduate from Boys' Technical High School before they changed

       19   the name.  Occupation, I'm a heavy equipment mechanic for Payne

09:32  20   and Dolan, and my wife is retired.  She was in the offices for

       21   Roundy's.  No fun facts.

       22          THE COURT:  Well, congratulations on that empty nest

       23   thing.  That's big.

       24          A JUROR:  Juror number nine.  XXXXX XXXXXXXX.

09:33  25   Forty-six years old.  Live in Delafield.  Married, three kids,

09:33   1   master's degree.  Currently lead market development for

2   Forefront Dermatology, wife is a teacher in Waukesha.  And I'm

3   the least attractive person in my house.

4           THE COURT:  Thank you for sharing that.

09:33   5           A JUROR:  XXXXX XXXXX.  Juror number eight.  I'm 63

6   years old.  I live in Greenfield, Whitnall area.  Married.  One

7   child and two grandchildren.  I have a bachelor's degree.  I

8   work at Milwaukee County, I'm at the airport.  I'm the

9   accounting manager, and my wife's a homemaker.

09:34  10           THE COURT:  Thank you, juror number eight.  And now

11   we'll turn the placard toward the back and get the microphone

12   rotating in the back to hear from our colleagues in the back.

13   Are you able to see that?  Should we move the placard closer

14   to --

09:34  15           A JUROR:  I'm fine, thank you.

16           THE COURT:  Thank you.

17           A JUROR:  I'm juror number 15.  I'm 50 years old.  I

18   live in West Allis.  I'm single.  No children.  Some college.

19   I work as a -- in food service.  And one of my favorites things

09:34  20   to do is to play golf.

21           THE COURT:  Thank you, juror number 15.

22           A JUROR:  My name is XXXXXXX XXXXXX, juror number 16.

23   I am 23 years old.  I live in Milwaukee.  I'm single.  My only

24   children are my three cats.  I just got my bachelor's degree,

09:35  25   and I'm going back for my master's in fall.  I currently work

27

09:35  1  at JusticePoint and pre-trial services as a screening

2  supervisor at the Milwaukee County Jail.  And I guess my fun

3  fact is I play ultimate Frisbee competitively.

4         THE COURT:  Thank you.

09:35  5         A JUROR:  Good morning.  My name is XXXXXXXX XXXX,

6  juror number 17.  I am 38 years old, I live in St. Francis.  I

7  am married and have two kids and three dogs.  I have two

8  master's degrees.  I am a research administrator at UWM, my

9  husband is a butcher, and prior to working at UWM as a public

09:35  10  school teacher for eight years I taught French and Spanish.

11         THE COURT:  Thank you.

12         A JUROR:  Hi.  Jurors number 18.  XXXXXXXXX

13  XXXXXXXXXX.  I'm 57 years old.  Live in Franksville.  I'm

14  happily divorced.  I have three grown children.  I have my

09:36  15  master's degree.  I'm vice president of sales for a

16  manufacturing company in Kenosha.  Fun fact is our company is

17  one of the number one manufacturers of correctional lighting.

18         THE COURT:  Thank you.

19         A JUROR:  I'm juror number 19.  My name is XXXXX

09:36  20  XXXXXXXXXX.  I'm 43 years old.  I live in Menomonee Falls.

21  I've been married for 18 years with two children.  I have a

22  master's degree.  I am a high school teacher at Nicolet High

23  School, and my husband is in risk management for BMO Harris.

24  Fun fact is I like to run.

09:36  25         THE COURT:  Thank you, juror number 19.

28

09:36  1        A JUROR:  Hello.  Number 20.  XXXX XXXXXX.

2    Thirty-four years old.  Live in Saukville.  I'm married, have

3    two kids.  I got a master's degree, I'm a accountant for a

4    manufacturing company, and my wife currently stays home with

09:37  5    our kids.  And not a lot of fun.

6        THE COURT:  Thank you.

7        A JUROR:  Hello.  I am juror number 21.  My name's

8    XXXX XXXXX.  I live in Bayside, Wisconsin.  I'm currently going

9    through a divorce process, so that's almost finalized, who-hoo.

09:37  10   No kids.  I have one dog, cavalier King Charles spaniel.  His

11   name is Thomas; he's the best.  I have a bachelor's degree in

12   supply chain and operations management from UW-Milwaukee, also

13   went to Nicolet.  Nice.  That being said, I work for a

14   manufacturing company.  We make gutter guards and gutter

09:37  15   hangers.  That's, again, very fun.  My spouse, who's my

16   girlfriend now, is a PT.  And one little fun fact about me, I

17   love Mazda Miatas, and I actually did my due diligence prior to

18   this court case, and had a 99 percent, I should say, chance of

19   having this court case today, I found out on Google, so I did

09:38  20   my due diligence and did a little research, so I already know a

21   little bit more about this case than probably most.

22       THE COURT:  All right.  Thank you, juror number 19

23   [sic].

24       A JUROR:  21.

09:38  25       A JUROR:  I'm juror number 22.  My name is XXXXXX

09:38   1   XXXXXX.  I am 46.  I live in Greendale.  I'm married with one

        2   15-year-old son.  I have an associate's degree in science, and

        3   I'm a branch manager at Educators Credit Union.  And my husband

        4   is an I.T. for the City of Muskego.

09:38   5           THE COURT:  Thank you, juror number 22.

        6           A JUROR:  Good morning.  My name is XXXX XXXX.  I am

        7   57 years old.  I live in the City of Greenfield in Milwaukee

        8   County.  I've been married for 27 years.  I have a 25-year-old

        9   son.  I completed a five-year apprenticeship program.  I'm a

09:39  10   master electrician and do a lot of automation work.  My wife is

       11   actually a pastor at Evangelical and Reform United Church of

       12   Christ in Waukesha, and my fun fact is I'm a drag-racer.

       13           THE COURT:  Thank you.

       14           A JUROR:  Good morning.  Juror number 25.  I am XXXX

09:39  15   XXXXXXX.  I'm 24 years old.  I'm from Milwaukee.  I'm not

       16   married, no children, even though my niece and my nephews, they

       17   are my children.  I am currently working on my associate's

       18   degree in respiratory therapy.  I work as a banker at

       19   Huntington Bank, formerly known as TCF, and my fun fact, I

09:39  20   lived in Colorado for three years.

       21           THE COURT:  Thank you, juror number 25 --  Is that

       22   25?

       23           A JUROR:  Yes.

       24           THE COURT:  Thank you, juror number 25.

09:39  25           A JUROR:  Hi there.  This is juror number 24.  Name

09:39  1   is XXXX XXXXX.  Sixty-seven years old from Lake Geneva,

2   Walworth County.  Married for 24 years.  We have three

3   children, two dogs.  Associate's degree in engineering.

4   Occupation, I work at Nordco in Oak Creek.  We make the magnets

09:40  5   equipment for the railroad.  My wife is a nurse at Children's

6   Hospital.  And I do absolutely nothing fun.

7                THE COURT:  Thank you, juror number 24.

8                A JUROR:  I'm juror number 23.  Name is XXXXXX

9   XXXXXXXX.  Age is 31.  I'm from Hartford, Wisconsin.  Marital

09:40  10  status, been married for about six months.  No kids, but we

11  just got a puppy, so just as good.  Education, I have a

12  bachelor's degree and I am an accountant at Northwestern

13  Mutual, and my spouse is a -- works in copyright at Northwest

14  Publishing House.  And I do nothing fun.

09:40  15               THE COURT:  Thank you, juror number 23.

16               A JUROR:  I'm juror 27.  My name's XXXXX XXXXX.  I

17  live in Milwaukee.  I've been married for seven years; we have

18  two small children.  I have a master's degree in architecture,

19  I'm an architect, and my wife is a digital marketing manager,

09:41  20  and I've been to all 30 major league baseball parks.

21               THE COURT:  Thank you, juror number 27.

22               A JUROR:  Good morning.  I'm juror number 28.  My

23  name is XXX XXXXXX.  I'm 57 years old.  I live in Mukwonago,

24  it's in Waukesha County.  I'm currently married for 33 years.

09:41  25  I have three children, three dogs, a cat, two horses, and a

09:41  1   snake.  I have a bachelor's degree in engineering, I work

2   part-time as an engineer, my spouse is retired as a doctor of

3   audiology, and I'm currently wearing socks with dinosaurs

4   riding skateboards.

09:41  5          THE COURT:  Best fun fact.  Thank you, number 28.

6          A JUROR:  I'm juror number 29, my name is XXXXXX.

7   I'm 36 years old.  I live in Greendale.  Been married almost

8   four years now, but I've been with him since I don't know how

9   long.  I got one kid, he's almost a teenager, and I got two

09:42 10   cats.  Graduated Nicolet High School.  I currently work as a

11   pharmacy technician.  My husband works in photography.  And a

12   fun fact is next month I go for my pharmacy certification test.

13          THE COURT:  Wonderful and good luck to you.

14          A JUROR:  Hello.  I'm juror number 30.  My name is

09:42 15   XXXXXX XXXXXXXXXXX.  I'm 54 years old from Kenosha.  Not

16   married, no children.  High school education.  I'm in the food

17   service industry, and I'm a caregiver for my mother.  That's

18   sometimes fun.

19          THE COURT:  Thank you.

09:42 20          A JUROR:  Hi.  I'm juror number 32.  My name is

21   XXXXXXX XXXXXX.  I am 44 from Sussex.  I'm married, I have two

22   grown stepchildren and two geriatric cats.  High school

23   graduate.  I'm a kind of jack-of-all-trades for a home

24   remodeling company.  My spouse works in I.T., and my fun fact

09:43 25   is I am a prolific sleep talker.

32

09:43    1          THE COURT:  Thank you, juror number 30 --  Was that

         2    32?

         3          A JUROR:  Yes.

         4          THE COURT:  Thank you, juror number 32.

09:43    5          A JUROR:  I'm juror number 31.  My name is XXXX

         6    XXXXX.  I'm 43 years old.  I live in Waterford.  I am married

         7    with two children.  I have a bachelor's degree.  I'm currently

         8    a private wealth adviser at U.S. Bank, my wife is a teacher.

         9    And fun fact, we're taking our honeymoon 18 years late to

09:43   10    Hawaii in June.

        11          THE COURT:  Wonderful.  It's never too late for a

        12    honeymoon.  Thank you all for answering those questions for --

        13    for us.

        14       As you listened to each other, do you know anyone on the

09:44   15    panel with you?  Did you recognize any name, faces on -- of

        16    each other on the panel?

        17          (No response.)

        18          THE COURT:  All right.  I do not see any hands.  I do

        19    have some additional questions for you.  Mr. Kurzynski, is it

09:44   20    possible to get rid of the placard now so I'm able to see the

        21    back clearly?  Anyone have difficulty hearing or had difficulty

        22    hearing us this morning so far?  Anyone --  Yes, juror --

        23          A JUROR:  Here and there, need for people to speak

        24    up.

09:44   25          THE COURT:  All right.  So we will be mindful to

09:44  1    always speak into the microphone.  Thank you.

2          Anyone have any vision problems that may make it difficult

3    for you to see the exhibits, to see the --  We're going to use

4    the screen at times.  Any vision difficulty that may be --

09:45  5    maybe make it difficult for you to participate in the trial?

6                    (No response.)

7              THE COURT:  Anyone have any other disability,

8    including use of medication, which might make it difficult or

9    impossible for you to serve as a member of the jury?  Juror

09:45  10   number two?,

11             A JUROR:  I have --  I'm on medication for

12   narcolepsy, but sometimes, rarely, it does break through.

13             THE COURT:  Thank you for sharing that with us.  Now,

14   I believe it was juror number 19 mentioned that he had Googled

09:45  15   about the case before --

16             A JUROR:  Sorry.

17             THE COURT:  I'm sorry.

18             A JUROR:  Twenty-one.

19             THE COURT:  Twenty-one.  Thank you.  Juror number 21,

09:45  20   who had mentioned Googling about the case.  Anyone else Google

21   about the case before coming in this morning?  Any other hands?

22                    (No response.)

23             THE COURT:  Anyone else heard or read anything about

24   the case before coming in this morning?  I have a hand up in

09:46  25   the back.  Tell me your number, please.

34

09:46  1          A JUROR:  Twenty-nine.

       2          THE COURT:  Twenty-nine.

       3          A JUROR:  I just saw the name on the -- on the court

       4   calendar, and I tried to do some Google, but I got nowhere, so

09:46  5   I just like heard the name.  I don't know if that counts.

       6          THE COURT:  All right.  Thank you for sharing that

       7   with us.  The reason I ask that question is that you will be

       8   instructed if selected as jurors to decide the case based on

       9   the evidence that you hear in this courtroom, that is presented

09:46 10   to you rather than anything else you may have learned from

      11   outside of the courtroom.  Anyone will have difficulty

      12   following that instruction, please raise your hand.

      13          (No response.)

      14          THE COURT:  Juror number 21, you had mentioned

09:47 15   Googling the case and learning a little bit of -- learning

      16   about the case before coming in here.  Would you have

      17   difficulty putting out of your mind what you researched and

      18   deciding this case based on the evidence presented to you here

      19   in the courtroom?

09:47 20          A JUROR:  I would have no problem whatsoever.

      21          THE COURT:  And related to that question, throughout

      22   the trial I will instruct you not to Google the case, not to

      23   research the case during the trial, not to research the

      24   parties, the plaintiffs, the defendants, the attorneys, anyone

09:47 25   in court.  Anyone would have difficulty following that

35

09:47 1    instruction?

2            (No response.)

3            THE COURT:  Here's a harder one.  During the trial I

4    will instruct you not to post any information on social media

09:48 5    regarding the case, regarding the plaintiff, the defendants,

6    the attorneys, the witnesses, issues related to the case.  Any

7    of you will suffer withdrawal if I instruct you not to post

8    anything about the case while you are participating in the

9    case?  Anyone?

09:48 10           (No response.)

11           THE COURT:  I see no hands on that question either.

12   I will now ask plaintiffs' counsel to read for you the names of

13   the plaintiffs in this case.  There are 57 individual

14   plaintiffs in this case, so please listen closely, because then

09:48 15   I will ask you whether you know of any of the names, whether

16   you are related to them or familiar with them.  Miss Motley?

17           MS. MOTLEY:  Your Honor, before I read the names, I

18   don't know if the court reporter would like to get all the

19   names first before I read them.

09:49 20           THE COURT:  Court reporter is okay.  Thank you.  The

21   only thing I would ask, Miss Motley, if you would pause at

22   different intervals, that way I'll check with a group and then

23   you continue, please.

24           MS. MOTLEY:  Sure.  No problem.  The names of the

09:49 25   plaintiffs are Andrew Aaron, Robert Agnew, Kamila Ahamad,

36

09:49  1  Jacqueline Bogenberger, Lavita Booker, Rebecca Wigley, Raine

2  Cich, Tahudah Cole, Taleavia Cole, Tracy Cole, Khalil Coleman,

3  Steven Conklin, Lauryn Cross, Erik Fanning, Jessica Fenner,

4  Christine Groppi, Gaige Grosskreutz, Joseph Hayes, Adante

09:50  5  Jordan, Mary Kachelski, Sean Kafer, Joseph Koepp, John Larry.

6  THE COURT:  Let me ask Miss Motley to pause right

7  there.  So far any of the names familiar to you or are you

8  related to anyone on the list?  Juror number 16, you have your

9  hand up.

09:50  10  A JUROR:  My boyfriend was a student of Sean Kafer's.

11  THE COURT:  Okay.  Thank you.  And Ms. -- juror

12  number 16, was -- would this be an issue that would prevent you

13  or make it difficult for you to be fair and impartial?

14  A JUROR:  No, I don't know him myself at all.

09:50  15  THE COURT:  Okay.  Thank you.  Miss Motley, please

16  continue.

17  MS. MOTLEY:  Thank you.  Alex Larson, Sonora Larson,

18  Van Mayes, Molly Nielsen, Shawn Page, Carmen Palmer, Oscar

19  Concepcion Rodriguez, Rosalind Rogers, Madeleine Schweitzer,

09:51  20  Mariah Smith, Peter Sparks, Tiffany Stark, Angel Vega, Gabriela

21  Vitucci, Tristiana Walls, Oscar Walton, Briitta Welch, Jayden

22  Welch, Brandon Wilborn, Trisha Wilson, Katelyn Wojnar, Jill

23  Ferguson, Joanna Geisler, Christina Vitolo-Haddad, Destiney

24  Jones.

09:51  25  THE COURT:  Let me pause right there to give you a

37

09:51 1    chance to let me know whether you recognize anyone from that

2    group of names?  Anyone?  Any of the names familiar to you?

3    Anyone you're related to?

4              (No response.)

09:52 5              THE COURT:  All right.  Thank you, Miss Motley.  You

6    may continue.

7              MS. MOTLEY:  Lazarito Matheu, Anne Delessio-Pason,

8    Leah Porter, Hector Rodriguez, Suzanne Wells, Sonja Worthy,

9    Nathan Sabel, Isiah Baldwin, and Rachel Dulay.

09:52 10             THE COURT:  Any recognition of the names of the

11   plaintiffs that Miss Motley just read?  Anyone familiar with

12   the names, related to anyone on the list?

13             (No response.)

14             THE COURT:  All right.  I do not see any hands up.

09:52 15   I'll ask the defendant --  I'll ask the defense to read off the

16   names of the defendants, and if you could do it slowly and I'll

17   ask the panel the same questions.

18             MS. BAYNARD:  The two defendants are Dominick

19   Ratkowski and Joseph Roy.

09:53 20             THE COURT:  Members of the panel, do you know either

21   of the defendants or familiar with their names, related to them

22   in any way?

23             (No response.)

24             THE COURT:  I do not see any hands up.  Now that

09:53 25   you've heard who the parties are, both the plaintiff and the

09:53  1    defendants, it's a good time for me to give you a short cap of

2    what this case is about.  You've heard the case introduced as

3    Andrew Aaron, et al., versus defendants Ratkowski and Roy.

4    This is a civil case.  For those of you who watch a lot of TV,

09:53  5    or maybe you're already familiar, you know the plaintiffs are

6    the side of the case that's bringing the lawsuit and the

7    defendants are the parties being sued.

8        In this case the claim is brought -- the claims are

9    brought under federal law called the Driver's Privacy

09:54  10   Protection Act, or you may hear us call it the DPPA for short,

11   Driver's Privacy Protection Act.  The Driver's Privacy

12   Protection Act, or the DPPA, makes it unlawful for any person

13   to knowingly obtain, disclose, or use personal information from

14   a motor vehicle record for a purpose not permitted by the DPPA.

09:54  15       In this case each of the 57 plaintiffs allege that

16   defendant Ratkowski violated the DPPA by knowingly obtaining,

17   disclosing, or using personal information taken from their

18   motor vehicle records for a purpose not permitted under the

19   DPPA.

09:55  20       Each plaintiff alleges as to defendant Roy that he

21   knowingly disclosed personal information taken from their motor

22   vehicles for a purpose not permitted under the DPPA.  Both

23   defendants Ratkowski and Roy deny violating the DPPA.  So

24   that's who the parties are and a brief elevator pitch of what

09:55  25   the case is about.

09:55    1    I will now invite Miss Motley to read off the names of the

2    potential witnesses in this case.

3    MS. MOTLEY: The potential witnesses in this case are

4    Molly Collins, James Gutenberg, Erik Schneider, Luke Vetter,

09:56    5    Dana McCormick, Matthew Stippich, Heather Kuhl, Brian Conte,

6    James Birschbach, Jodi Borchardt, Adam Behnke, Daniel --

7    Daniel, excuse me, Carranco, Jeremy Fadness, Andrew Kwaterski,

8    Diane Nelson, John Lucas, Chris Marks, Rachael Sells, Pablo

9    Torres, John Wilke, Andrew Willis, Brian Conte, William

09:56    10    Schroeder, Katie Schuh, Sean Peterson, and Scott Wales.

11    THE COURT: Do you recognize, know, or are related or

12    familiar with any of the names that Miss Motley just read?

13    Juror number 12.

14    A JUROR: Scott Wales is an attorney; I am familiar

09:57    15    with him.

16    THE COURT: Thank you, juror number 12. I will now

17    ask the -- any other hands on the list of witnesses?

18    (No response.)

19    THE COURT: All right. And if I'm -- have my head

09:57    20    down for a second writing notes and you have an answer to a

21    question, just wave me down so that I can make sure to catch

22    you.

23    And for the defense, Ms. Baynard, can you please read the

24    name of your potential witnesses?

09:57    25    MS. BAYNARD: Yes. We just have, besides the

40

09:57    1    defendants it will be Luke Vetter and Shane Wrucke.

2          THE COURT:  Thank you.  Members of the jury, do you

3    recognize or know any of the names of these potential

4    witnesses?

09:58    5          (No response.)

6          THE COURT:  I don't see any hands.  During the trial

7    you may hear the name Joseph Mensah.  Anyone on the panel

8    familiar, related, know the name Joseph Mensah?  Juror number

9    one.

09:58   10          A JUROR:  I believe he's a -- was a police officer

11    for the City of Wauwatosa.

12          THE COURT:  And are you familiar with him in any

13    other way besides this information you shared with us?

14          A JUROR:  Well, I -- he was a party to or accused of

09:58   15    another -- of a crime.  Do you want me to elaborate on any --

16          THE COURT:  I want to know --  I'm sorry.  Do you

17    know him personally?

18          A JUROR:  No, I do not know him.

19          THE COURT:  And how do you know this information?

09:58   20          A JUROR:  Through reading the newspaper.

21          THE COURT:  Okay.  So you're familiar with the name

22    from reading the newspaper?

23          A JUROR:  Correct.

24          THE COURT:  All right.  Does the fact that you have

09:59   25    read of the name, Joseph Mensah, and read of -- you said of

09:59 1 things that he had been accused of, would that you -- would

2 that make you have difficulty deciding this case based on the

3 information, the evidence presented to you in this case?

4 A JUROR: No.

09:59 5 THE COURT: Will it make you -- difficult for you to

6 be fair and impartial to both sides of the case?

7 A JUROR: No.

8 THE COURT: All right. Anyone else heard, read,

9 know, familiar, related to the name Joseph Mensah? Juror

09:59 10 number 11.

11 A JUROR: I too have heard him on, like, the

12 television, in the newspaper.

13 THE COURT: Okay. So you are not related to him, you

14 do not know him personally, but you have heard the name on the

10:00 15 news; is that what you're saying?

16 A JUROR: That is correct.

17 THE COURT: So I have the exact same questions for

18 you that I asked juror number one.

19 A JUROR: Sure.

10:00 20 THE COURT: Does that fact make it difficult for you

21 to listen to the evidence and instruction in this case and

22 decide this case based on the evidence presented to you here in

23 this courtroom?

24 A JUROR: No.

10:00 25 THE COURT: All right. Thank you, juror number 11.

10:00   1   Anyone else?  Did I miss anyone?

         2           (No response.)

         3           THE COURT:  Have you or any members of your family

         4   work for the City of Wauwatosa?

10:00   5           (No response.)

         6           THE COURT:  I don't see any hands.  Anyone in here

         7   work for the Wauwatosa City Attorney's Office?

         8           (No response.)

         9           THE COURT:  Have you or any members of your family

10:00  10   ever been involved in a claim or lawsuit against a police

        11   agency or police officers?

        12            (No response.)

        13            THE COURT:  Have you or members of your family worked

        14   for the Wauwatosa Police Department in any capacity?

10:01  15           (No response.)

        16            THE COURT:  Have you or members of your family worked

        17   for any other law enforcement agency or law enforcement

        18   officers in any capacity?  Juror number four.

        19            A JUROR:  My daughter's father-in-law is a Milwaukee

10:01  20   detective, homicide.

        21            THE COURT:  Your daughter's father-in-law?

        22            A JUROR:  Yes.

        23            THE COURT:  Is a detective.

        24            A JUROR:  Yes.

10:01  25           THE COURT:  Having that family relationship, would

10:01  1  that make it difficult for you to be fair and impartial to both

2  sides of this lawsuit?

3          A JUROR:  No.

4          THE COURT:  Thank you.  I also saw a hand in the

10:02  5  back.

6          A JUROR:  I have in-laws that currently work for the

7  Milwaukee County Sheriff's Department and have worked for the

8  Milwaukee Police Department.

9          THE COURT:  And that's juror number 19.

10:02  10         A JUROR:  Yes.

11         THE COURT:  Juror number 19, having that family

12  relationship, would it make it difficult for you to be fair and

13  impartial to both sides of the lawsuit?

14         A JUROR:  No.

10:02  15        THE COURT:  Anyone else in the back had their hands

16  up?  We'll finish in the back and we'll come back again to the

17  jury box.  Juror number 23.

18         A JUROR:  I have a couple of close friends that are

19  police officers and I also have one family member who is a

10:02  20  detective.

21         THE COURT:  Okay.  And who's the family members,

22  brother, sister?

23         A JUROR:  Cousin.  Close cousin.

24         THE COURT:  So you have a close cousin and some close

10:02  25  friends.  Juror number 23, does the fact that you have those

44

10:03　1　relationships would make it difficult for you to be fair and

2　impartial to both sides of this lawsuit?

3　　　　　　A JUROR:  No, Your Honor.

4　　　　　　THE COURT:  In other words are you able to decide

10:03　5　this case based on the evidence presented here to you in this

6　courtroom?

7　　　　　　A JUROR:  Yes, Your Honor.

8　　　　　　THE COURT:  All right.  Please be seated.  Thank you.

9　Anyone else in the back?

10:03　10　　　　　A JUROR:  My father-in-law is a reserve police

11　officer in Des Plaines, Illinois.

12　　　　　THE COURT:  And juror number 31 --

13　　　　　A JUROR:  Correct.

14　　　　　THE COURT:  -- does that relationship make it

10:03　15　difficult for you to be fair and impartial to both sides of

16　this lawsuit?

17　　　　　A JUROR:  No, it does not.

18　　　　　THE COURT:  Thank you.  Anyone else in the back?  Did

19　I miss anyone in the back?  Juror number 16, we're coming back

10:03　20　to you.

21　　　　　A JUROR:  One of my cousins is a drug enforcement

22　detective or something like that in Kenosha.

23　　　　　THE COURT:  And juror number 16, as I've asked the

24　other panelists, would that relationship make it difficult for

10:04　25　you to be fair and impartial to both sides of this lawsuit?

45

10:04  1          A JUROR:  No.

2          THE COURT:  Thank you.  Did I miss any hands in the

3    back?

4          (No response.)

10:04  5          THE COURT:  All right.  So I'll return back to the

6    jury box.  Did I miss any hands in the jury box?  Juror number

7    one.

8          A JUROR:  Yes.  Thank you.  My brother-in-law is a

9    retired police officer from City of Menomonee Falls.

10:04  10          THE COURT:  And same as I've been asking, would that

11   relationship get in the way of you being fair and impartial to

12   both sides of this lawsuit?

13          A JUROR:  No.

14          THE COURT:  Thank you.

10:04  15          A JUROR:  I don't know if this is appropriate now, I

16   don't have any friends or relatives who are in law enforcement,

17   I'm wondering the officer you mentioned before, I think it was

18   Mensah, something like that, is he a current -- is he still an

19   officer?

10:04  20          THE COURT:  Do you know the name, juror number two?

21          A JUROR:  No, I don't.

22          THE COURT:  Okay.  And you ask that because you

23   believe you know the name?

24          A JUROR:  No, I'm going on information that I've

10:05  25   learned today.

10:05    1        THE COURT: Okay. Yeah, so my question's only if you

2    know him.

3        A JUROR: No.

4        THE COURT: All right then. You've answered the

10:05    5    question. Thank you. Someone else had their hand up.

6        A JUROR: You didn't answer it.

7        THE COURT: Because I have to ask you questions, so I

8    think you sufficiently answered the questions, juror number

9    two.

10:05    10        A JUROR: Okay.

11        A JUROR: My son's a police officer for the City of

12    Sheboygan.

13        THE COURT: And that's juror number 10. And juror

14    number 10, does the fact that your son is currently a police

10:05    15    officer, would that make it difficult for you to be fair and

16    impartial to both sides of the lawsuit here?

17        A JUROR: No.

18        THE COURT: Thank you. Any other hands in the jury

19    box?

10:05    20        (No response.)

21        THE COURT: Okay. We'll move on. Have you or any

22    members of your family worked for the Department of

23    Transportation, D.O.T.? Anyone in here work for D.O.T.?

24    Number eight.

10:06    25        A JUROR: It's Milwaukee County D.O.T. at the

10:06    1    airport.  I'm the accounting manager there.

         2              THE COURT:  Okay.  Thank you.  So you're the

         3    accountant manager for D.O.T.

         4              A JUROR:  Milwaukee.

10:06    5              THE COURT:  Okay.  Milwaukee.  Thank you.  And how

         6    about DMV, anyone here work for the Department of Motor

         7    Vehicles or have family members who work or have worked?

         8              (No response.)

         9              THE COURT:  All right.  I don't see any hands.  So

10:06   10    I've been asking about work experience.  I'm going to switch to

        11    ask you about your prior trial experience.  Any of you have

        12    served before as jurors in a case, either civil or criminal?

        13    If you --  If so, raise your hand and we'll come to you.  We'll

        14    start first in the jury box, and then we'll make our way to the

10:07   15    back of the courtroom.  Juror number one, have you prior jury

        16    experience?

        17              A JUROR:  Yes, I served on a Milwaukee County court,

        18    a criminal case involving drugs.

        19              THE COURT:  And can you tell me how long ago that

10:07   20    was?

        21              A JUROR:  It was at least four years ago.  If not

        22    more.

        23              THE COURT:  And were you the foreperson in that case?

        24              A JUROR:  No, I was not.

10:07   25              THE COURT:  And this jury reach a verdict?

10:07   1           A JUROR:  No, it did not.

2           THE COURT:  So you mentioned a criminal case.  This

3  is a civil case, and in a civil case the standards are

4  different.  In a civil case the burden of proof will be

10:07   5  preponderance of the evidence, which I will talk about more,

6  and in a criminal case it's actually the highest standard we

7  have in law, which is beyond a reasonable doubt.  I just wanted

8  to point that out now that you've mentioned that you served on

9  a criminal case.

10:07  10     Anyone else have prior jury experience?  Well, I forgot to

11  ask you, juror number one, if you could give her the microphone

12  again.  The fact that you've served on a jury before, would

13  that influence whether you are able to be a fair and impartial

14  juror in this case?

10:08  15         A JUROR:  It wouldn't influence me.  In other

16  words --  I'm sorry, go ahead.

17           THE COURT:  Did you have, I don't know, an experience

18  such that it left a bad taste about jury service in your mouth

19  that you could not be fair and impartial to both sides of this

10:08  20  lawsuit?

21          A JUROR:  No.  It was an interesting experience.

22          THE COURT:  Thank you.  The next person in the jury

23  box to have prior jury experience?

24         A JUROR:  Yes.  Juror experience about 20 years ago,

10:08  25  and it was a criminal case with Milwaukee County.

10:08   1          THE COURT:  Okay.  And were you the foreperson in

        2   that case?

        3          A JUROR:  No.

        4          THE COURT:  And was the jury able to reach a verdict?

10:08   5          A JUROR:  Yes.

        6          THE COURT:  And same question I asked your colleague,

        7   number one, would the experience having served before, has it

        8   left a bad taste in your mouth such that it would make it

        9   difficult for you to be fair and impartial to both sides of

10:09  10   this lawsuit?

       11          A JUROR:  No, it was very interesting.  I enjoyed it.

       12          THE COURT:  Thank you.  I believe, juror number six,

       13   you have your hand up?

       14          A JUROR:  I was a juror on a criminal case in

10:09  15   Milwaukee County, I believe it was 2019.

       16          THE COURT:  And were you the foreperson in that case?

       17          A JUROR:  No.

       18          THE COURT:  And did the jury reach a verdict?

       19          A JUROR:  Yes.

10:09  20          THE COURT:  And same, anything from that experience

       21   would make it difficult for you to be fair and impartial to

       22   both sides of this lawsuit?

       23          A JUROR:  No.

       24          THE COURT:  Okay.  Thank you, juror number six.

10:09  25   Juror number 12?

10:09 1          A JUROR:  Yes.  I was on a jury about 30 years ago,
      2  criminal case, yes, I was the foreperson, we reached a verdict,
      3  and I can be fair and impartial.

      4          THE COURT:  Thank you, juror number 12.  Anyone else
10:09 5  in the jury box with prior jury experience?

      6          (No response.)

      7          THE COURT:  Okay.  We'll move to the back now.

      8          A JUROR:  I was just on a court case two weeks ago.

      9          THE COURT:  And juror number twenty --

10:10 10          A JUROR:  Two.

      11          THE COURT:  22.  Thank you.  Especially in the back,
      12  it's helpful to us if you tell me what number you are so I can
      13  take my notes.  Okay.  So that was just two weeks ago.  Was it
      14  a criminal trial or civil trial?

10:10 15          A JUROR:  It was a child abuse trial.

      16          THE COURT:  I'm sorry, it was a?

      17          A JUROR:  Child abuse trial.

      18          THE COURT:  A criminal trial?

      19          A JUROR:  Yes.

10:10 20          THE COURT:  Okay.  And were you the foreperson?

      21          A JUROR:  No.

      22          THE COURT:  Okay.  Anything from that very recent
      23  experience would make it difficult for you to be fair and
      24  impartial to both sides of this lawsuit?

10:10 25          A JUROR:  No.

10:10   1              THE COURT:  Thank you.  Other hands in the back?

        2              A JUROR:  I was on a criminal trial for the jury for

        3   a criminal trial about 14 years ago in Milwaukee County.

        4              THE COURT:  And that is juror number 19?

10:11   5              A JUROR:  Nineteen.  Sorry.

        6              THE COURT:  Juror number 19.  And I'm sorry, how many

        7   years ago?

        8              A JUROR:  Fourteen.

        9              THE COURT:  Okay.  And was it -- you said it was a

10:11  10   criminal case?

       11              A JUROR:  Yup.

       12              THE COURT:  And did -- were you the foreperson?

       13              A JUROR:  I was not.

       14              THE COURT:  Did your jury reach a verdict?

10:11  15              THE CLERK:  Yup.

       16              THE COURT:  Anything from that experience would make

       17   it difficult for you to be fair and impartial to both sides of

       18   this lawsuit?

       19              A JUROR:  Nope.

10:11  20              THE COURT:  Thank you.  Anyone else in the back here

       21   with prior jury experience?

       22              A JUROR:  Juror number 30.  I was on a case about 20

       23   years ago in Kenosha.  On the jury.

       24              THE COURT:  And was it a civil --

10:11  25              A JUROR:  Criminal case.

10:11   1              THE COURT:  Okay.  And were you the foreperson?

        2              A JUROR:  No, I was not.

        3              THE COURT:  And was your juror -- jury able to reach

        4     a verdict?

10:11   5              A JUROR:  Yes.

        6              THE COURT:  And anything from that experience would

        7     make it difficult for you to be fair and impartial to both

        8     sides of this lawsuit?

        9              A JUROR:  No, not at all.

10:12  10              THE COURT:  Okay.  Thank you.  Any other hands on

       11     this question in the back of the courtroom?

       12              (No response.)

       13              THE COURT:  All right.  My next question is about

       14     lawsuits.  Have any of you or your immediate family members

10:12  15     participated in a lawsuit in any capacity, whether you were the

       16     party, person being sued, or whether you were -- whether you

       17     were suing or being sued, whether you were a witness, an

       18     expert, participated in any kind of capacity in a prior

       19     lawsuit?  Please raise your hand.

10:12  20              A JUROR:  My brother-in-law was, now deceased, was an

       21     expert witness on a, what's it called, it was some kind of

       22     chemical agent that was harmful to workers.  It wasn't

       23     asbestos, but it was something where he had to be all the

       24     time --

10:12  25              THE COURT:  Sure.  Juror number two, how long ago

53

10:12  1  that was?  Approximately.

2  A JUROR:  I don't know, I would say at least three,

3  if not longer.

4  THE COURT:  Okay.  Did you learn anything from your

10:13  5  brother's experience that would make it difficult for you to be

6  fair and impartial -- fair and impartial to both sides of this

7  lawsuit?

8  A JUROR:  I don't think so.

9  THE COURT:  Okay.  Thank you.  Anyone else in the box

10:13  10  with prior lawsuit experience in any capacity?

11  (No response.)

12  THE COURT:  All right.  I --  Let's go to the back.

13  And please identify by number, please.

14  A JUROR:  Number 20.  My dad's company was sued

10:13  15  civilly for a injury that occurred with some of the equipment

16  they make probably 25 years ago.

17  THE COURT:  Anything you learned from that

18  experience, juror number 25, that would make it difficult for

19  you to be fair and impartial to both sides of this lawsuit?

10:13  20  A JUROR:  I was juror 20.  No.  I don't think so.

21  THE COURT:  That is juror number 20?

22  A JUROR:  Correct.

23  THE COURT:  Okay.  Thank you for the correction.

24  Anyone else in the back?

10:14  25  A JUROR:  Number 19.  My husband sued a former

54

10:14   1   employer for payment.

2           THE COURT:  Approximately how long ago that was?

3           A JUROR:  Fifteen years.

4           THE COURT:  Okay.  And anything from that experience

10:14   5   would make it difficult for you to be fair and impartial to

6   both sides of the lawsuit?

7           A JUROR:  No.

8           THE COURT:  Okay.  Anyone else in the back?

9           A JUROR:  Number 26, Your Honor.  I was sued in small

10:14   10  claims court in 1996, and that was for a auto accident.  The

11  guy in the other part of the accident was suing his own

12  insurance company, which was mine.

13          THE COURT:  Thank you, juror number 26.  Anything

14  from that experience would make it difficult for you to be fair

10:14   15  and impartial to both sides of this lawsuit?

16          A JUROR:  No.

17          THE COURT:  Okay.  Thank you.  Any other hands in the

18  back there?  I see one more hand.

19          A JUROR:  Juror number 31.  I was a witness

10:15   20  representative for a former company of mine who was being sued

21  by a former employee.  This was about eight years ago.

22          THE COURT:  Did you learn anything from that

23  experience, from that participation that would make it

24  difficult for you to be fair and impartial in this lawsuit?

10:15   25          A JUROR:  No, I did not.

10:15   1            THE COURT:  Okay.  All right.  Did I miss anyone on

2       this question?

3                    (No response.)

4            THE COURT:  I do not see any hands.  My next question

10:15   5       is, you will hear during the trial that the plaintiffs were

6       demonstrating against or protesting police misconduct and/or

7       violence.  Do you hold any negative views of citizens who

8       protest police misconduct and/or violence?  Anyone in the panel

9       have any negative views of individuals who demonstrate or

10:15   10      protest against police misconduct or violence?

11                   (No response.)

12           THE COURT:  Have you or any close members of your

13      family or friends participated in demonstrations or protests

14      regarding police issues, either in support of or against police

10:16   15      conduct?  Anyone participated themselves?  We'll start in the

16      jury box, and then we'll come to you in the back.

17           A JUROR:  I don't know if --  This is something where

18      I could be there or make a donation toward?

19           THE COURT:  Yes, let's include donations as well.

10:16   20      That's --  Okay.

21           A JUROR:  Yeah.  I --

22           THE COURT:  Okay.  And you made a donation toward?

23           A JUROR:  Towards Black Lives Matter.

24           THE COURT:  Okay.  Thank you.  Anyone else?  Again,

10:16   25      participated or donated.

10:16   1                 A JUROR:  My sister's participated in the Black Lives

        2   Matter's march.  Juror number five.

        3                 THE COURT:  Thank you.

        4                 A JUROR:  I participated in a Black Lives Matter

10:17   5   march here in Milwaukee.

        6                 THE COURT:  Thank you.  That's juror number six.

        7                 A JUROR:  Juror number 14.  I had the right -- the

        8   Black Lives riots in Waukesha go past my house, and I had

        9   property damage from it.

10:17  10                 THE COURT:  Thank you.  So before I go to the back, I

       11   do have questions for those of you who raised your hand in the

       12   jury box.  As you will hear, you anticipated my next questions,

       13   like you're reading my list here.  A couple of you mentioned

       14   Black Lives Matter movement or protests.  Now, does any of you,

10:17  15   the facts that you've mentioned that would it prevent you from

       16   being fair and impartial to both sides of the lawsuit if people

       17   were either participating, in favor, or against Black Lives

       18   Matter?

       19                 A JUROR:  No.

10:18  20                 THE COURT:  First number two, who had raised your

       21   hand?

       22                 A JUROR:  Yeah, I think that it's instinct for a lot

       23   of people to automatically believe the law enforcement

       24   position -- the situation, and I would just -- trying to be

10:18  25   weary on both sides.

                                                                        57

10:18    1              THE COURT:  Okay.  And so what you're saying is that

         2    you would keep an open mind to both sides of the evidence; is

         3    that what you're saying?

         4              A JUROR:  Yeah.

10:18    5              THE COURT:  Okay.  Thank you.  And juror number five?

         6              A JUROR:  No.

         7              THE COURT:  Okay.

         8              A JUROR:  I would be impartial.

         9              THE COURT:  So what you -- you're saying is the fact

10:18   10    that I believe you said you participated; is that correct?

        11              A JUROR:  Yes.

        12              THE COURT:  Would not prevent you from being fair and

        13    impartial to both sides of the lawsuit?

        14              A JUROR:  Correct.

10:18   15              THE COURT:  And thank you.  Juror number six, same

        16    question --

        17              A JUROR:  Yes.

        18              THE COURT:  -- for you.

        19              A JUROR:  I would be okay with that.  It would not

10:19   20    prevent me.

        21              THE COURT:  It would not prevent you from being fair

        22    and impartial to both sides of the lawsuit?

        23              A JUROR:  Yes.

        24              THE COURT:  And juror number 14, you had shared that

10:19   25    property damage and some protests near you residence, again, as

10:19 1    I indicated, that some of the plaintiffs or the plaintiffs were

2    protesters.  Would that fact of -- that experience you had

3    personally prevent you from being fair and impartial to both

4    sides hearing the evidence in this case?

10:19 5            A JUROR:  I would say it could, just because it

6    personally affected my family.

7            THE COURT:  All right.  Thank you for answering the

8    question.

9        So let's move to the back and the same question, and the

10:19 10   question was, any of you or close members, family or friends

11   participated in protests either in support of or against

12   police-related issues?  And that includes donations as well.

13   Number 16.

14           A JUROR:  I have personally participated in multiple

10:20 15   protests in Milwaukee, and my boyfriend, he also filmed a

16   majority of some of the protests that took place in Milwaukee

17   County.

18           THE COURT:  Thank you.  And let me ask you this.

19   Having yourself participated and you have a boyfriend who

10:20 20   filmed, would you be able to set aside your personal

21   experiences to decide this case based on evidence presented to

22   you and the law as I instructed you?

23           A JUROR:  Yeah, I would definitely be able to put my

24   personal opinions aside.

10:20 25           THE COURT:  Thank you.  Still in the back on this

59

10:20   1    question.  Number 19.

        2              A JUROR:  I've participated in pro BLM rallies in

        3    Waukesha and Milwaukee County.

        4              THE COURT:  And same as I've been asking your

10:21   5    colleagues, the fact of your participation, would that get in

        6    the way of you listening to the evidence as presented to you in

        7    this courtroom and being fair to both sides of the lawsuit?

        8              A JUROR:  No, I don't think so.

        9              THE COURT:  Any other hands up on the question?

10:21  10              A JUROR:  Number 20.  My company's made various small

       11    donations to local police and fire around by us.

       12              THE COURT:  Thank you, number 20.  Same as I've asked

       13    the other -- your other colleagues.

       14              A JUROR:  No, it wouldn't.

10:21  15              THE COURT:  The fact that you've made these

       16    donations, would it prevent you from listening to the evidence

       17    in the courtroom and deciding the case based on the evidence?

       18              A JUROR:  No, it wouldn't affect my judgment.

       19              THE COURT:  Thank you.  Any other hands in the back?

10:21  20    Participated, donated?  Did I miss anyone?

       21              (No response.)

       22              THE COURT:  I don't think so.  I'll move on.

       23         Anyone on the panel experience a situation where you

       24    believe that your personal information was improperly obtained,

10:22  25    used, or disclosed?  Anyone have had experience with personal

60

10:22   1    information being improperly obtained, used, or disclosed?

        2    Juror number two, juror number eight.

        3              A JUROR:  I'm wondering is that like identity theft?

        4              THE COURT:  It could be.  However way you want to

10:22   5    answer that.

        6              A JUROR:  Yeah, I've been involved with two years of

        7    our federal tax return, we haven't gotten a refund yet, and

        8    there was something with Social Security number somebody else

        9    used and filed.  It's the biggest mess and I spent hours and

10:22   10   hours just waiting to get somebody to talk to, and still in the

        11   process.

        12             THE COURT:  Well, I'm sorry you've had this

        13   experience.

        14             A JUROR:  Not about the money, just the --

10:23   15             THE COURT:  Yes.

        16             A JUROR:  So I'm hoping they are a little bit higher

        17   than the people, that -- that -- that would be great.

        18             THE COURT:  Well, as I had mentioned in the very

        19   short introduction about the case, this case is about personal

10:23   20   information, so with you having had this experience, would that

        21   prevent you from being fair and impartial to both sides of the

        22   lawsuit?

        23             A JUROR:  Well, I don't really understand what the

        24   two sides are --  Because is it a corporation?

10:23   25             THE COURT:  Well, you will hear more once the

61

10:23   1    attorneys introduce the case, but you have the short version

2    that I just gave you, and -- and you raise a -- you know, a

3    good question, you don't know yet, right, and so my question to

4    all of you, are you willing to have an open mind to hear the

10:24   5    evidence on both sides and make a decision based on the

6    evidence presented to you?

7             A JUROR: Yes, ma'am.

8             THE COURT: All right. I believe, number eight, you

9    had your hand up, and, again, to refresh, the question we're

10:24   10    talking about, experience with having your personal information

11    improperly obtained, used, or disclosed.

12             A JUROR: Yes, I've had a couple times my credit card

13    was used, once was like over $10,000 to buy All Star tickets to

14    the NBA All Star Game. Another time it was just at a local

10:24   15    store.

16             THE COURT: Okay. And, again, would having that not

17    so good experience, will it make it difficult for you to be

18    fair and impartial to both sides of this lawsuit?

19             A JUROR: No, it wouldn't be difficult. No.

10:24   20             THE COURT: Thank you. Anyone else in the jury box

21    regarding the personal information question?

22             A JUROR: Hi. I don't know if it's relevant. My

23    sister recently was scammed and had some personal information

24    and some money issues because of it.

10:25   25             THE COURT: All right. And would that experience,

10:25  1    from what you learned from your sister, unpleasant experience,

2    would that make it difficult for you to be fair and impartial

3    to both sides of the lawsuit?

4           A JUROR:  No.

10:25  5           THE COURT:  Okay.  Thank you.

6           A JUROR:  Number 13.  I also had credit card

7    information leaked and was misused.

8           THE COURT:  Okay.  I'm also sorry for that experience

9    for you.  Would that personal experience make it difficult for

10:25 10    you to be fair and impartial to both sides of the lawsuit?

11           A JUROR:  No.

12           THE COURT:  All right.  Did I miss any hands?

13           A JUROR:  Juror number 14.  My mother-in-law was

14    scammed, and unfortunately ended up causing her to declare

10:25 15    bankruptcy, and our bank account during that same time was

16    cleaned out.

17           THE COURT:  Oh, I'm sorry about that experience.  You

18    know my follow-up question, that's a terrible thing to happen

19    to you and your mother-in-law, but would that experience make

10:26 20    it difficult for you to be fair and impartial to both sides of

21    the lawsuit in this case?

22           A JUROR:  No.

23           THE COURT:  Thank you.  Going to the back now on this

24    question.  Any hands in the back on this question?  Personal

10:26 25    information question?

10:26  1          (No response.)

2          THE COURT:  All right.  If I didn't miss anyone, I

3    will move on to the next question.  I had mentioned earlier

4    that during the trial I will instruct you not to do research,

10:26  5    but I also want to highlight for you that during the trial I

6    will instruct you not to go investigate on your own the issues

7    or the attorneys, the parties, the witnesses.  Anyone would

8    have difficulty with that question -- with that instruction?

9          (No response.)

10:27  10          THE COURT:  No hands up on that.  Now, during the

11    trial, this goes back to conversation I had earlier about

12    keeping an open mind, during the trial I will be instructing

13    you not to talk to each other about the case, and the reason

14    for that is that we want you to wait to have all the evidence

10:27  15    and all the instructions and to formally turn the baby over to

16    you before you can start deliberating on the case.  Anyone

17    would have difficulty holding off, talking about the case even

18    with each other until you've received all the evidence, all the

19    instruction?  Anyone would have problem with that?

10:27  20          (No response.)

21          THE COURT:  Anyone on the panel who because of any

22    particular feelings about the judicial system, including about

23    judges and lawyers, would not be able to serve as impartial and

24    fair jurors in this case?  Any feelings you have about the

10:28  25    legal system that would get in the way of you being fair to

64

10:28   1    both sides?

2            (No response.)

3            THE COURT:  As jurors your job will be the judges of

4    the facts, that is, you will determine the facts in this case.

10:28   5    Is there any member of the jury, if selected, would not be able

6    to render a verdict solely on the evidence consisting of the

7    testimony and exhibits presented to you during the trial?

8            (No response.)

9            THE COURT:  Again, as judges of the facts, you may

10:28  10    have to make credibility determinations.  Is there any one of

11    you who believe that a police officer or law enforcement

12    witness should automatically be believed over a lay witness or

13    non-police witness?

14           (No response.)

10:29  15           THE COURT:  The flip side of that question, any one

16    of you serving as judges of the facts would believe that police

17    officers are generally untruthful?

18           (No response.)

19           THE COURT:  Is there any one of you who would not

10:29  20    follow the instructions that I will give you during the trial

21    and at the conclusion of the trial, whether you agreed, so I

22    might give you an instruction, you're like, oh, I don't like

23    that one, but you would have to follow it anyway.  Anyone would

24    have a problem doing that?

10:29  25           (No response.)

65

10:29    1              THE COURT:  Any of you have a problem accepting the

         2      law as I give it to you regardless of your opinion or any

         3      notions that you had about the law prior to coming into the

         4      courtroom?

10:29    5              (No response.)

         6              THE COURT:  We're wrapping up now.  Has any of you

         7      experienced anything in life that you believe, and only you

         8      know this, that you believe would affect your ability to serve

         9      as a fair and impartial juror to both sides of this lawsuit?

10:30   10              (No response.)

        11              THE COURT:  Any member of the panel hold any

        12      religious, philosophical, or moral beliefs which would make it

        13      difficult or preclude any of -- preclude your ability to serve

        14      as a fair and impartial juror in this case?

10:30   15              (No response.)

        16              THE COURT:  Any one of you have any pressing personal

        17      or business matters on your mind that would make it difficult

        18      for you to give this case your 100 percent attention?

        19              (No response.)

10:31   20              THE COURT:  Okay.  Last call.  Okay.  Any of you know

        21      any reason whatsoever that I did not touch upon that would make

        22      it difficult for you to sit and decide the case again fairly

        23      and impartially to both sides?  Juror number two.

        24              A JUROR:  Question.  What if we have lost our faith

10:31   25      in the Supreme Court?

10:31 1          THE COURT:  Well, this is not the Supreme Court, as

2    you know, so maybe that answers the question.  As I opened voir

3    dire introduction this morning, you know, serving as jurors is

4    one of the privileges that we have as citizens, and having you,

10:31 5    members of our community, come in and you get to be judges of

6    the facts, during the duration of the trial, that's an

7    important privilege as a citizen and important to our legal

8    system.

9          All right.  So I want to take a quick break to check in

10:32 10   with the lawyers.  While I'm doing that, you have been sitting

11   and listening to me for awhile now, so get up, stretch, do your

12   yoga pose in your seat while I check in with the lawyers.

13        Counsel, if you'll please approach.

14             (The following discussion was held at sidebar.)

10:33 15        MS. BAYNARD:  One of the questions I have, and -- was

16   the question that says this trial's going to take five days.

17   Is there anybody who --

18             THE COURT:  I forgot that.  Yes.  Thank you.

19             MS. BAYNARD:  It --

10:33 20             THE COURT:  Yes.  That's the purpose of holding --

21   Have I missed anything?  Anything else?  Get us started?

22             MS. BAYNARD:  Not that I can think of.

23             THE COURT:  Anything from you that was missed?

24             MR. SCHWAB:  I would say one thing that I want to ask

10:34 25   about is the police officers, the Police Association that is --

67

10:34  1  kind of came out through one, there was an ask, you know, the

2  question about if you participated in the protest expanded to

3  if you donated to this movement, if somebody was at the -- to

4  see if anyone else has Police Athletic Association cards,

10:34  5  anything like --

6         THE COURT:  About cards?

7         MR. SCHWAB:  Donated to police benevolent

8  associations, things like that.

9         THE COURT:  Open up the question about --

10:34  10         MR. SCHWAB:  If I don't know if it was clear on the

11  donation side relating to police departments.

12         THE COURT:  Okay.

13         MR. SCHWAB:  Things like fund-raisers, like things

14  like that.  I wasn't expecting the woman, number two said

10:34  15  something about donating to BLM.  I don't know that that time

16  crossed that donations in general in support would be part of

17  that.

18         THE COURT:  Okay.  Anything else?

19         MS. BAYNARD:  Can I just use the --

10:35  20         (The sidebar discussion ended.)

21         THE COURT:  All right.  We are back on the record.

22  Just checking that our court reporter is ready for me.

23      All right.  We are back on the record, and checking my

24  notes, I have two additional questions for you.  One, I believe

10:36  25  someone in the back, juror number 20, mentioned donating to the

68

10:36    1    police, and I did not ask if anyone else made any donations to

         2    any police organizations?  Police or law enforcement

         3    organizations or related to law enforcement organizations.

         4         (No response.)

10:36    5         THE COURT:  All right.  I do not see any hands up.

         6    And then my final question that I forgot to ask you is that

         7    this case will take five days, I know I think, juror number

         8    six, you mentioned a vacation.  This case will take five days

         9    to be presented to you, so this work week.  Does that fact make

10:36   10    it difficult for anyone to serve as fair and impartial jurors

        11    in this case?  Anyone will have a problem with the five-day

        12    commitment?

        13         (No response.)

        14         THE COURT:  All right.

10:37   15         MR. WIRTH:  Do not see any hands on that.  All right.

        16    This is a good --  Yes, juror number 15?

        17         A JUROR:  Yes, I -- will we be done by Friday?

        18         THE COURT:  Five days, Friday.

        19         A JUROR:  Friday.

10:37   20         THE COURT:  Yes, five days.

        21         A JUROR:  Be complete before this weekend?

        22         THE COURT:  Yes, five days is the timeline for the

        23    trial.  All right.  That's for the presentation to you.

        24         A JUROR:  Okay.

10:37   25         THE COURT:  All right.  Any other hands on that?  All

69

10:37   1   right.  So you have been sitting well, so this is a good time,

2   let's take a -- I'm going to give you a quick morning break of

3   about 10 minutes, and I need to address with the lawyers, and

4   then we'll get back on the record.

10:37   5           THE BAILIFF:  All rise for the jury.

6           (The jury was excused.)

7           THE COURT:  All right.  Please be seated.  I want to

8   quickly address any --  I want to quickly address any requests

9   to strike for cause.  From the plaintiffs?

10:39   10           MR. SCHWAB:  Yes, Your Honor.  We have two.  Number

11   14, she indicated that she didn't know if she could be

12   impartial based on her own experiences.  I think that given her

13   own personal experiences, I mean, I know I personally would --

14   it would be difficult for me to set that aside.

10:39   15           THE COURT:  Okay.  Say no more, Mr. Schwab.  I agree

16   that number -- juror number 14 did say she would have a

17   difficult time being fair and impartial in this case, so I will

18   strike her for cause.

19           MR. SCHWAB:  And number 10.  He indicated that his

10:39   20   son is a police officer, I'm not saying that any relationship

21   to a police officer, there are many people obviously who have

22   cousins, who have in-laws, who have brother-in-law's,

23   father-in-law, childs [sic], spouses, parents.  I'm not saying

24   that any connection to police officers, but a son, that kind of

10:40   25   direct family relation, that's very close and I have some

70

10:40   1    serious concerns about the ability for that juror to be

2    impartial as well.

3           THE COURT:  Okay.  Thank you.  Regarding number 10, I

4    do wish to -- I will hear from the other side on that.

10:40   5           MS. BAYNARD:  I guess, Your Honor, what I think the

6    issue would -- if it's the fact that he has a son that is in

7    law enforcement, I mean, he was asked the same question, would

8    you be able to decide the case fairly, he said yes.  I think

9    kind of the flip side of that is also the individuals who all

10:40  10    said participated.  It's not just I don't have negative

11    feelings towards Black Lives Matter movement, it's I've

12    actively participated in this, so I guess I would ask if we're

13    striking number 10 because his son is a police officer that we

14    would also, the Court would consider striking any of the

10:41  15    individuals who not only just participated in these protests.

16           THE COURT:  All right.  So let me first address

17    number 10.  Let me just reserve on number 10 after I address

18    the -- any other strikes and see what we have left here.  I

19    don't think just having a relative is -- police officer, even a

10:41  20    son, is for cause, cause ground here.  Clearly, like the person

21    had said, hey, I can't be fair and impartial, we want her out

22    of here, but just having a son who's a police officer I don't

23    think -- I'm not sure that's grounds.

24           MR. SCHWAB:  And I would only ask that you conduct

10:41  25    some further voir dire on that one issue.  I agree that it's

10:41    1    more of a I don't know yet, and I wanted to call that

2    attention. I think that that is a relationship that requires a

3    little more, and I would not say it's analogous to people who

4    participated or support a political movement, this is, my son

10:42    5    is similarly situated to a defendant, and I think that's a

6    little different, my son is, you know --

7       So I'm not -- I would ask at least that you conduct a

8    little further voir dire on the question of whether he can put

9    those feelings aside. A simple yes is, I think, maybe

10:42    10    superficial.

11       THE COURT: Okay. Thank you. I thought I had asked

12    follow-up with the people who had relationships. Did I miss

13    number 10, Mr. Schwab?

14       MR. SCHWAB: I'm just -- I would ask for a further

10:42    15    in-depth, not just, you know, beyond can you be impartial, you

16    know, but I -- I'll defer to the Court.

17       THE COURT: Okay. Thank you. All right. So these

18    were the two for -- from the plaintiff. Number 14 is stricken

19    for cause. From the defense, any motions for strikes?

10:43    20       MS. BAYNARD: I guess with two points of

21    clarification before I use a strike.

22       THE COURT: Excuse me. I didn't mean for strike, for

23    cause. We're still in cause.

24       MS. BAYNARD: Oh, okay, for cause.

10:43    25       THE COURT: You don't have to share your strikes with

72

10:43  1   me.

2   MS. BAYNARD:  I'm thinking that number two with her

3   testimony regarding the hearing issue and the narcolepsy, and

4   just some of her answers in general, might be a reason why she

10:43  5   should not be participating on the jury.

6   THE COURT:  All right.  The plaintiff wish to be

7   heard?

8   MR. SCHWAB:  I didn't hear anything about hearing,

9   and she was awake and alert and said that she's on medication.

10:43  10  I think that's a disability issue.  If we're going to strike

11  people because of disabilities, you know, I -- she said that

12  she takes medication for it, to address that issue, and she

13  never made any indication that she couldn't be impartial.  She

14  has political beliefs, everyone has political beliefs.  As long

10:43  15  as they can set those aside and be fair and impartial and she,

16  in fact, volunteered that she -- that she would really do --

17  make a good effort and she believes that both sides should be

18  heard, so I think that based on her extensive description of

19  her own state of mind, she proved to be a capable juror.  But

10:44  20  again, from the medication standpoint, she said she takes this

21  medication, and she was very forthright about it, didn't say

22  that she falls asleep frequently, and like I said, she's been

23  alert this whole time.

24  THE COURT:  Thank you.  With the hearing, she did say

10:44  25  difficulty, but it was -- I think it was a microphone and

73

10:44 1   speaking up issue, so once we started speaking up, she did not

2   show any difficulty hearing us.

3       On the medication issue, however, she did say she does

4   take medication, but she said something that sometimes there

10:44 5   are breakthroughs, I forgot the exact word, but she did say

6   breakthrough.  This is a five-day trial, and it's going to be a

7   hectic schedule, so as a matter of precaution, not risking

8   medication issues, I will strike her for cause.

9       Any others?

10:45 10      MS. BAYNARD:  And I just want the record to be very,

11   very clear that nothing to do with attorney Schwab's kind of

12   backhand comment we're striking people for their disabilities.

13   That has absolutely nothing to do with it.

14      THE COURT:  I'm not striking her for her

10:45 15   disabilities.  People on medication can serve, as long as it

16   does not interfere with any, you know, possibility of not being

17   able to hear.  So if she said, you know, I take medication,

18   it's under control, but she did pause and say there are some

19   breakthroughs.  It's the breakthroughs that I'm concerned

10:45 20   about.

21      MR. SCHWAB:  And I understand, and it wasn't intended

22   as a backhanded anything.  It was just a recognition that

23   disease is a disability.

24          THE COURT:  Yes.

10:45 25      MR. SCHWAB:  Narcolepsy would be properly understood

74

10:45   1   as a disability and at least should be acknowledged in that

2   context, but it wasn't a backhanded.  I understand.  Thank you,

3   Your Honor.

4           THE COURT:  I understand.  Any other motion for

10:46   5   cause?

6           MS. BAYNARD:  I wasn't sure with number six.  She

7   said she had a vacation, she was going to be gone Friday and

8   Monday?  And then when you asked the follow-up I heard about

9   number six, is anybody going to be gone, I don't know if she

10:46  10  meant, well, you've already acknowledged that, number six, I

11  would be out on Friday through Monday?  But that was my only

12  other kind of note.

13          THE COURT:  Okay.  So we will need her on Friday, so

14  I understood that her trip starts on Friday, so I will strike

10:46  15  her for cause just in case she needs to get going on her trip

16  on Friday.

17          MR. SCHWAB:  Your Honor, before we go there, I'd ask

18  that we question her about it.  She was asked specifically and

19  she said she had no reason.  We don't know what time she leaves

10:46  20  on Friday; perhaps she leaves on Friday at 10:00 p.m.  So at

21  least before we strike her I think we should inquire further

22  into it because she was asked if she could make the schedule,

23  and she didn't -- and she didn't raise her hand and say I can't

24  do that.

10:46  25          THE COURT:  Okay.  So because we have plenty, we're

75

10:47  1    not starving for jurors, I'm just going to go ahead and strike

2    her for cause, because she did, even before I got to the end,

3    anyone have -- five days, she had volunteered it very early on.

4    I think she stated, I want you to know that I have this trip

10:47  5    planned, so it seems to be something on her mind, so I will

6    release her from service.

7           Anyone else?  Any other requests for strikes?

8           MS. BAYNARD:  Your Honor, one more, and I don't even

9    know if we'll get to this point because he's so far into the

10:47  10   alternates, but the individual who said he Googled the case, he

11   tried to learn about it before coming here today, I believe

12   that was number 21.  I think there was another female even

13   farther back who probably also wouldn't make it into the box,

14   but number 29 said she saw the name on the court calendar and

10:47  15   tried to Google it but couldn't find anything.  So I think that

16   could be -- he seemed proud of the fact that he did research

17   about the case before coming here, so I think that would be a

18   reason for him not to sit in the jury box.

19          THE COURT:  The plaintiffs wish to be heard on that

10:48  20   concern?

21          MR. SCHWAB:  He was asked if he could be impartial,

22   and he said yes.  I --  I don't think that he's violated any

23   rules, he said he would not, but I think he agreed that he

24   wouldn't research further if he makes his way to the panel.  I

10:48  25   think it is probably not a likely concern, and we can put it

76

10:48  1   off to the side, but he said he could be impartial, and, you

2   know, I was told that an officer -- the father of a police

3   officer who says he could be impartial, we'll trust that, so I

4   think we can trust him as well.

10:48  5          THE COURT:  As to the officer, I said I didn't

6   comment whether we could trust him or not, my concern was

7   whether just the fact of having a son or a spouse or someone.

8          MR. SCHWAB:  And I apologize.  I didn't mean trust,

9   but just merely that the follow-up inquiry was, can you be

10:48  10  impartial?  If he says yes, then we're okay.  I would say, you

11  know, same applies to Mr. -- to number 21.

12         THE COURT:  Okay.  Thank you.  All right.  So

13  Googling or doing investigation on the case is a concern of the

14  Court as reflected in a number of questions and ways that I

10:49  15  asked about Googling social media.  We want people who are just

16  focusing on the evidence presented in this courtroom to them.

17  Given that we are not again starving for jurors, we have a big

18  panel, I will go ahead and strike number 21.  Anyone else?  Any

19  other requests for cause?

10:49  20         MS. BAYNARD:  Nothing from the defense, Your Honor.

21         MR. SCHWAB:  One moment --  One moment, Your Honor.

22  May I review my notes?

23         THE COURT:  Yes.

24         (There was discussion off the record.)

10:50  25         MR. SCHWAB:  You know, it wouldn't --  I don't know

77

10:50  1   that it would be appropriate at this time, but I will say just

2   watching number nine, he didn't seem to be engaged in -- in the

3   process, and I have some concerns about his willingness to

4   remain engaged, inability -- or maybe ability, maybe just

10:50  5   willingness.  I don't know if you want to hear that for cause,

6   but number nine was -- seemed to be disengaged from the

7   process.

8        THE COURT:  Mr. Schwab, when you say disengaged, you

9   didn't see him falling asleep or anything, because I was

10:51  10   watching for that.

11        MR. SCHWAB:  No.  No, just, I don't know if I -- to

12   me it appeared that he was either distracted or not listening

13   at various times.

14        THE COURT:  Okay.  Thank you.  I hear you, I'm always

10:51  15   on the watch for people who are falling asleep, and because we

16   definitely don't want that.  I trust your observations,

17   Mr. Schwab, but I don't know that's a basis to strike him for

18   cause.  He answered all the questions, so it's not that he was

19   not paying attention to questions being answered.

10:51  20        MR. SCHWAB:  Okay.  Thank you.

21        THE COURT:  But thank you for raising that.  If the

22   parties don't have anyone else, the person I want to raise is

23   juror number one, who says that she knows Miss Knowlton

24   through --

10:52  25        MS. KNOWLTON:  Miss Motley.

10:52  1          MS. MOTLEY:  She didn't say she knows me.

2          THE COURT:  No, Knowlton I said.  I'm sorry.

3     Knowlton, yes, she said she knew Miss Knowlton.

4          MS. BAYNARD:  She said Motley.

10:52  5          THE COURT:  She said Motley?

6          MS. MOTLEY:  She didn't say she knows me, she said

7     had heard about me.

8          THE COURT:  Okay.  Something --  I thought she

9     mentioned something too about, knows your reputation from

10:52 10    university system is what I noted.  And some professional

11    capacity.  I don't mean that she knows you from the news or --

12          MS. MOTLEY:  Right.

13          THE COURT:  I thought she had indicated professional

14    capacity.

10:52 15          MS. MOTLEY:  Your Honor, the way that I understood

16    what she was saying is I'm an alumni of UW-Milwaukee, so, you

17    know, that's out there.  That's the school I graduated from.

18          THE COURT:  Got it.

19          MS. MOTLEY:  And that is what I understood.

10:52 20          THE COURT:  Got it.  I wanted to make sure it wasn't

21    a professional relationship through something or another.

22          MS. BAYNARD:  Your Honor, I just want it to be clear

23    she referred to attorney Motley as a renowned lawyer who she

24    knew of because they worked at -- and I'm not saying they

10:53 25    worked together, but it wasn't just, I read about her in the

79

10:53    1    news, so --

2             THE COURT:  Okay.

3             MS. BAYNARD:  Not sure if the court reporter can

4    search the term.

10:53    5             THE COURT:  Yeah, I did make a note of wanting to

6    know about the professional relationship, because she made it

7    sound it was a professional -- not personal, but somehow

8    professionally she knew you.

9             MR. SCHWAB:  And I understood it to be just I've

10:53   10    heard of her.  You know, renowned wouldn't be like my friend is

11    a renowned person, renowned would be I've heard of through the

12    news or something, and that's not personal, that's not

13    professional, and like Miss Motley said, that's the educational

14    component, that's just where she went to school.

10:53   15             THE COURT:  Okay.  Thank you.  All right.

16             MS. BAYNARD:  I guess, Your Honor, not to the point

17    that you're making about the relationship, my concern is the --

18    it seemed that she's already kind of created a opinion on

19    Officer Mensah, and we know that this case isn't about Officer

10:54   20    Mensah, but I'm -- I think the parties both anticipate and

21    obviously with the question that it's going to be invoked.

22             I'm anticipating the plaintiff, and I was actually

23    surprised how many people hadn't heard of him, but having a

24    juror with -- on top of some of the things that you've noted --

10:54   25    that having a juror who has read about it, seemed to have

80

10:54  1  formed an opinion, and she said that he was criminally charged

2  or made the comment that he was associated him with a crime,

3  and there's been no adjudication of any crime as relates to

4  Officer Mensah.

10:54  5      THE COURT:  Okay.  She was not the only one who

6  raised her hand on the Mensah question.  I also thought that

7  juror number 11 also raised her hand, that she had -- and I

8  took both of them as having heard stuff on the news.

9      MS. BAYNARD:  I think the difference of 11 was she

10:55  10  said I had heard about the name on the news, and juror one

11  indicated that she had read that he was criminally charged

12  or -- again, I don't remember the exact wording of her, but I

13  guess if I'm distinguishing juror one to juror 11, juror 11

14  made it sound like it was more of a heard about Officer Mensah

10:55  15  in the news as opposed to I've read that he was criminally

16  charged for -- kind of any type of event.

17      THE COURT:  All right.  Anything else, Mr. Schwab, on

18  that?

19      MR. SCHWAB:  Sure.  I don't know that she said that

10:55  20  she [sic] was criminally charged.  I think we should be wary of

21  selecting a jury that doesn't read the news.  You know, that's

22  what she indicated, that she read it in the news.  And when she

23  was asked if she'd be fair and impartial, she said yes.  I

24  don't know --  I don't know how we can, you know, if we're

10:56  25  going to disbelieve her on that, but she only indicated that

81

10:56    1    she had read it in the news, and I think that that's a normal

2    thing.

3         I agree I'm surprised that only two people, I think we get

4    into our own bubbles here and assume that everyone is familiar

10:56    5    with the things that we're familiar with.  Clearly it was not

6    a -- something that raised or crossed the news, but she happens

7    to have read the news that day, I don't think that's a reason

8    to strike her for cause.

9         THE COURT:  All right.  I don't think I have reason

10:56   10    to strike her for cause on that.  As I mentioned, she was not

11    the only person who had raised her hand on that question.

12    Furthermore, the parties are reminded to the extent, you know,

13    Joseph Mensah's name is for a limited purpose, to the extent

14    it's for, on the plaintiffs' side, explaining that plaintiffs

10:57   15    were demonstrating against police misconduct, that's the extent

16    of it.  We're not going to have a side trial on Mr. Mensah.  On

17    the defense side to the extent that it's to explain why the

18    defendants took particular actions, it's permitted, so we're

19    not going to get in a side trial regarding Mr. Mensah.

10:57   20         MS. BAYNARD:  I had one last for cause that I wanted

21    to address with the Court.  I believe it's number 16.

22    Initially indicated her boyfriend was a student of Sean Kafer.

23    That wasn't necessarily the part that kind of flagged it for

24    me.  She said she could put that aside.  It was the actively

10:57   25    participating, and then her boyfriend was, I don't know if she

82

10:57  1  said was a videographer or a photographer for the protest.

2  I guess one of the individuals, or more than one of the

3  individuals who are plaintiffs were also considered

4  videographers or photographers for the protest. I think that I

10:58  5  agree that she said that she could be impartial, but I think

6  that actively -- taking actively participating role to the

7  extent where you are not only at the protest but you are

8  filming on their behalf, taking videos is a little bit of a

9  concern for the defendants.

10:58  10  THE COURT: Okay. Plaintiffs wish to be heard?

11  MR. SCHWAB: Well, first of all, she wasn't the one

12  doing it. I assume she can set her -- a close personal family

13  relative's opinions aside and be impartial, but she said she

14  could. We also don't know what that role is. They were --

10:58  15  Maybe we never inquired into that, we don't know if that person

16  was simply out there in a news role, like a journalist. I

17  don't think we have any information that would support that

18  strike, but again it wasn't that individual. It was her -- a

19  family member. But, you know, I think as we discussed, family

10:58  20  members are not those people, and if they said they can set

21  that opinion aside, then we can -- we can -- we can believe 'em

22  on that.

23  THE COURT: All right. Thank you. So I hear your

24  reason for striking for cause, I do think the distinction that

10:59  25  she was not the person who was doing the filming, if that is

83

10:59   1  the concern, makes it a little more attenuated concern, so I

2  don't think that's a basis for cause to strike her.

3       All right.  So we don't want to keep the jury waiting

4  further, so, Mr. Miller, is the cleaned up form ready for --

10:59   5  Oh.

6       And then, lastly, Mr. Miller reminded me that I had set

7  juror number 10 aside, and I'm not going to strike him for

8  cause, again, just on the basis of the police officer-son

9  relationship.

11:00  10       Okay.  So with that --

11            MR. WIRTH:  Judge, just I apologize for interrupting.

12  Can we just -- 14 struck for cause, two struck for cause, six

13  struck for cause, 21 struck for cause, correct?  Okay.

14            THE CLERK:  That's what I have.

11:00  15            THE COURT:  So I -- going through my list, as I say,

16  two, six, 14, 21.

17            MS. KNOWLTON:  Yes.

18            MR. WIRTH:  Okay.

19            THE COURT:  All right.  So with having given the jury

11:00  20  a break while we discussed the case, we're going to bring them

21  in for -- while you do your preemptory strikes, and then once

22  we are done with that and we put them under oath, we're going

23  to move straight to our opening statements.

24            MS. BAYNARD:  Your Honor, then could the parties take

11:01  25  a quick break then if --

11:01  1                THE COURT:  You need a break?

       2                MS. BAYNARD:  Right.  Yeah.  I thought they might

       3     need one.  I'm worried about them, not me.

       4                THE COURT:  No, no, no.  I'm joking, Miss Baynard.

11:01  5     So how much of a break do the parties wish?  Real quickly.

       6                MS. BAYNARD:  There's a lot of people sitting here,

       7     so I wanted to make sure everyone gets to like use the

       8     bathroom, get water before the opening statements.

       9                THE COURT:  All right.  So I don't want to Ping-Pong

11:01  10    the jury, bring 'em in, bring 'em out, so what I will -- I'll

       11    give you a quick five minutes to go to the restroom, then we'll

       12    bring them in.

       13               MR. SCHWAB:  And, Your Honor, just from a

       14    housekeeping standpoint, given the time, a few minutes, we'll

11:02  15    bring them back in, we'll do peremptories.  Do you think we're

       16    going to do openings after lunch?

       17               THE COURT:  No, we're going to do openings when we

       18    bring them back in.  We're going to select the jury and proceed

       19    to opening statements.

11:02  20               MR. SCHWAB:  Okay.

       21               MS. MOTLEY:  Your Honor, could we address the issue

       22    with regards to the target list, the redactions, before we do

       23    the openings?

       24               THE COURT:  Yes.  Why don't we -- I'm trying not to

11:02  25    steal from your break time, but we can do that.  Go ahead.

                                                                          85

11:02  1    Yes.

2    MS. MOTLEY:  Okay.  Your Honor, for docket number

3    385, plaintiffs filed at the instruction of the Court a new

4    redacted version of the targets list.  We'd ask that that be

11:02  5    adopted by the Court.  We followed the instructions with

6    regards to what needs to be redacted, and so we'd ask, and we

7    base that off of the Court's order of the specific other items

8    that needed to be redacted from our most recent filing, and we

9    think that that's, you know, sufficient in terms of, you know,

11:03  10   protecting the privacy rights of those that are not plaintiffs

11   in this matter, and we ask the Court to adopt that, and we --

12   that the parties adopt that version of the redacted target

13   list.

14          THE COURT:  Give the number again, three --

11:03  15         MS. MOTLEY:  I believe it's 380 -- I'm sorry, 385.

16          THE COURT:  Okay.  I do have that.  All right.  As to

17   385?

18          MR. WIRTH:  Judge, the defendants object to 385

19   because that's the one that got redacted to include redactions

11:03  20   of the plaintiffs' information.  So what we did is file Exhibit

21   No. 387, which redacts only information for non-parties.

22          THE COURT:  All right.  So as I stated this morning,

23   what was authorized was redaction of non-plaintiffs, so redact

24   as to non-plaintiff, as to plaintiffs do not redact.

11:03  25         MS. MOTLEY:  Your Honor, that's what we did.  We

86

11:04  1    redact -- We only put in the plaintiffs. The issue is is that
       2    with the redactions that the defendants filed on Friday with
       3    the Court, there's, first of all, there's certain notations on
       4    here, like for instance that Ratkowski wrote, like for instance
11:04  5    referring to Khalil Coleman as a likely Gangster Disciple. You
       6    know, we redacted that. Above his name it says the people who
       7    the group is renting a loft at Welford Sanders Center. I
       8    redacted that because I thought that went to the non-plaintiff
       9    above. Because the way that this thing is written, it goes
11:04  10   name, and then there's a dot, so that's why I redacted that.
       11   You know, we redacted notations for arrests, you know, the
       12   redactions were for prejudicial purposes.
       13       THE COURT: But that -- the Court has to decide that,
       14   Miss Motley, you can't take it on your own to redact
11:05  15   information.
       16       MS. MOTLEY: Your Honor, sorry. And, Your Honor, I
       17   understand that, and that's why I thought when I filed the
       18   first redaction of the target list and then we received the
       19   Court's order, I filed the Court's order and redacted the
11:05  20   additional things. So it wasn't as though with the Court's
       21   order I went outside of that, but I -- with the first
       22   redaction, these things were also redacted.
       23       And so it wasn't that I went beyond what the Court asked
       24   for, and, you know, as I understood it, you know, we're not to
11:05  25   bring in things related to criminal, you know, insinuations or

| | | |
|---|---|---|
| 11:05 | 1 | titles or things like that.  And this, for instance, this |
| | 2 | specific note that this person is a likely Gangster Disciple |
| | 3 | is, and this is just based on defendant Ratkowski's assessment, |
| | 4 | however he assessed it looking on Google or whatever, but, you |
| 11:05 | 5 | know, I believe that that's extraordinarily prejudicial. |
| | 6 | And I do want to note that my first filing when I redacted |
| | 7 | the target list I tried to keep it consistent with the way that |
| | 8 | defendant Roy redacted the target list when he released it in |
| | 9 | open records.  So that's why I kept -- and actually I redacted |
| 11:06 | 10 | it even more. |
| | 11 | THE COURT:  Let me ask for Ms. -- Miss Motley.  For |
| | 12 | your --  The jury's out, I want to bring them back in.  For the |
| | 13 | opening statements, what do you need from the --  Do you need |
| | 14 | the entirety of the -- of the list in question? |
| 11:06 | 15 | MS. MOTLEY:  No, Your Honor. |
| | 16 | THE COURT:  Okay.  So the page, if you're showing a |
| | 17 | page of it during opening, is it possible to show a |
| | 18 | non-contested page so that we can take -- address this later |
| | 19 | and not have the jury waiting? |
| 11:06 | 20 | MS. MOTLEY:  Yes, Your Honor. |
| | 21 | THE COURT:  All right.  Let's proceed that way, and |
| | 22 | then we'll return to the details of where it's contested.  Take |
| | 23 | five, and let's bring the jury in. |
| | 24 | MR. WIRTH:  Thank you, Your Honor. |
| 11:16 | 25 | (A recess was taken.) |

88

11:19  1          THE COURT:  One second, please.

2          THE BAILIFF:  You may be seated.

3          THE COURT:  All right.  Mr. Miller, we are back on

4     the record with the same attorney appearances as earlier this

11:19  5     morning.  Mr. Miller, had the parties received the revised jury

6     lists?

7          THE CLERK:  I have to give it to them right now.

8          THE COURT:  All right.  So let's bring the jury in.

9          (The jury is in the box.)

11:21 10          THE COURT:  Members of the panel, thank you for your

11    patience.  I am sorry to have to lock you up in a windowless

12    room.  I think I don't know if there are windows in there, but

13    I assure you that while you were waiting, we were hard at work.

14         We have reached a part of the trial where the attorneys

11:21 15    will exercise their strikes and then we will select a jury.

16    So, Officer, if you'd please distribute the lists.

17         All right.  Members of the panel, while the attorneys are

18    quickly doing their work, some judges usually have jokes to

19    entertain you.  I'm afraid to tell you I am not one of those

11:22 20    judges; I don't have any jokes at the ready for you while you

21    are waiting.  But I can tell you a little bit about the

22    building while you are waiting.

23         If it is your first time here at the federal courthouse,

24    this is really, I think, one of the most beautiful courthouses

11:22 25    in the country.  If memory served me well, the courthouse was

11:22   1   built originally in 1898 and then the 1930's we added a new

2   part of the building.

3   This courtroom that you sit in has been remodeled in this

4   new decade, so it has some bells and whistles, but if you ever

11:22   5   have the opportunity to see the other courtrooms in the

6   building, please do take it.

7   Anyone here have participated or heard of Doors Open?  No?

8   Okay.  Two people, all the way in the back.  Well, Doors Open

9   is a day usually early fall where buildings downtown are open

11:22  10   for touring.  So it's a nice opportunity to get to see the rest

11   of the courthouse, if you have not already done so.  Bring your

12   families, bring kids, because it's really beautiful.  And some

13   other buildings in the downtown area are also open for viewing

14   as well.  I'm a courthouse fan, so when I travel, I usually try

11:23  15   to see other federal courthouses because really for the most

16   part really, really beautiful, and ours is one of the -- as I

17   already mentioned, not only one of the most beautiful, but also

18   one -- one of the oldest.

19   I can't remember now as we speak if I was in, I want to

11:23  20   say Denver maybe not 100 percent sure, but I was in another

21   city, and I had asked to see their courthouse.  It was a lovely

22   courthouse, lovely enough, and the judge was giving me the tour

23   was bragging about their ceremonial courtroom.  Our ceremonial

24   courtroom is on the third floor.  It's the first courtroom in

11:24  25   this building, and it's really, really remarkable.  This is a

90

11:24  1    pretty courtroom, but that courtroom is really stunning, and

2    it's the original first courtroom built.

3        And so this other judge was bragging, so, yeah, it's a

4    really old courtroom, it's really beautiful.  It was built in

11:24  5    the 1970's.  Now, and I'm like, oh, yeah, really old.  Mine was

6    built in 1890's.  So do -- do take advantage of it.

7        All right.  Members of the panel, this is the time where

8    we play a little musical chairs.  If you are in the jury box

9    and your number is called, please remain seated in the jury

11:26  10    box.  If you are in the jury box and your number is not called,

11    please kindly go sit in the back.

12        If you are sitting in the back and your number is called,

13    please move up to the jury box, and if you're sitting in the

14    back and your number is not called, just remain seated, please.

11:27  15    At this time I will ask the clerk to publish those

16    selected.

17        THE CLERK:  The selected jurors are juror number

18    three, juror number four, juror number eight, juror number 11,

19    juror number 12, juror number 13, juror number 15, and juror

11:27  20    number 17.

21        THE COURT:  All right.  The musical chairs.

22        THE BAILIFF:  Come on back, make sure you bring all

23    your personal belongings.  Thank you.

24        THE COURT:  Just please have a seat, please, if

11:28  25    you're moving to the back.

| | |
|---|---|
| 11:28 | 1 |

    All right.  Mr. Miller, if you'll please call the names of those selected again, and if you're in the box, just to confirm that we have the correct numbers in the box, just raise your hand for me, please, when your number is called.

11:28    5        THE CLERK:  Juror number three.  Juror number four. Juror number eight.  Juror number 11.  Juror number 12.  Juror number 13.  Juror number 15.

        THE COURT:  That's why we do this.

        THE CLERK:  Juror number 17.

11:29  10        THE COURT:  All right.  Thank you.  At this time I would ask that you join me in giving a big round of applause to members of the panel who are not selected.  We could not have gotten this far in the process without your participation and contribution to the administration of justice, so thank you so 11:29 much and have a wonderful rest of your day.

        (The additional jurors were excused.)

        THE COURT:  All right.  Mr. Miller, if you will please administer the oath to the now selected jury.

        THE CLERK:  All rise, raise your right hand.  Do you 11:30 each solemnly affirm that you will well and truly try this case between Andrew Aaron, et al., plaintiffs, and Dominick Ratkowski and Joseph Roy, defendants, and give a true verdict according to the evidence?  If so, please answer I do.

        ALL JURORS:  I do.

11:30  25        THE COURT:  Please be seated, members of the jury.

11:30  1      Members of the jury, now that you have been sworn in,

2      we're going to move into opening statements from the lawyers,

3      but before I invite them to give their opening statements, I do

4      have some preliminary instructions for you, which I believe

11:31  5      will assist you in your participation in the case.

6      To begin, as a reminder, this is a cause of action brought

7      under the DPPA, the Driver's Privacy Protection Act.  Under

8      that act, under that law, to establish that the defendants

9      violated the DPPA, plaintiffs must prove three propositions:

11:31  10      One, the plaintiffs must prove that the defendants

11      knowingly obtained, disclosed, or used personal information;

12      two, that this personal information came from motor vehicle

13      records; and, three, it was for a purpose not permitted by the

14      DPPA.

11:31  15      I will have more instructions for you at the end of the

16      trial regarding the DPPA, but I just wanted to get you started

17      to help orient you here.  Additionally, I have some other

18      instructions, just again orient you to your participation as we

19      begin.

11:32  20      First, your duty as jurors.  It will be your duty to

21      decide from the evidence to be presented what the facts are.

22      You and you alone are the judges of the facts.  You are to

23      determine the facts from the testimony you hear and the

24      evidence received during the trial.  It is for you to determine

11:32  25      the inferences which you feel may be properly drawn from such

93

11:32  1    evidence.

2           Nothing I may say or do during the course of the trial is

3    intended to indicate or should be taken by you as indicating

4    what your verdict should be.  No statement, ruling, remark, or

11:33  5    comment which I may make during the course of trial is intended

6    to indicate my opinion as to how you should decide the case or

7    to influence you in any way in your determination of the facts.

8           During the course of the trial, I may occasionally ask

9    questions of a witness in order to bring out facts not then

11:33 10    fully covered in the testimony.  Please do not assume that I

11    hold any opinion on the matters to which I may ask questions.

12    Remember, again, that you as the jurors are at liberty to

13    disregard all comments of the Court in arriving at your own

14    findings as to the facts.

11:33 15           I may also find it necessary to admonish counsel, and if I

16    do, you should not show any prejudice towards counsel because I

17    have found it necessary to issue such an admonishment.

18           From time to time during the trial it may become necessary

19    for me to discuss matters with the lawyers out of the hearing

11:34 20    of you, the jury, either by having a conference at the bench,

21    when the jury's present in the courtroom, or by calling a

22    recess.  Please understand that while you are waiting we are at

23    work.  The purpose of this conference is not to keep relevant

24    information from you, but, rather, to decide how certain

11:34 25    evidence is to be treated under the rules of evidence to avoid

94

11:34   1   confusion and error.  We will, of course, do what we can to

2   keep the number and length of these conferences to a minimum.

3        I may not always grant an attorney's request for a

4   conference.  Do not consider my granting or denying a request

11:34   5   for conference as any indication of my opinion of the case or

6   what your verdict should be.

7        Evidence.  The evidence from which you will find the facts

8   will consist of the testimony of witnesses, documents, and

9   other things received into the record as exhibits and any facts

11:35  10   the lawyers agree to or stipulate to or any fact that I may

11   instruct you to find as a matter of law.

12        Certain things are not evidence and must not be considered

13   by you.  Such matters include statements, arguments, and

14   questions by the lawyers are not evidence.  Objections to

11:35  15   questions are not evidence.  Lawyers have an obligation to

16   their clients to make an objection when they believe evidence

17   being offered is improper under the rules of evidence.  You

18   should be --  You should not be influenced by an objection or

19   by my ruling on any objection.  If the objection is sustained,

11:36  20   ignore the question.  If it is overruled, treat the answer like

21   any other.

22        If you are instructed that some item of evidence is

23   received for a limited purpose only, you must follow that

24   instruction.  Testimony that the Court has excluded or told you

11:36  25   to disregard is not evidence and must not be considered by you.

95

11:36  1   Anything you may have seen or heard outside the courtroom is

2   not evidence and must be disregarded.  You are to decide the

3   case solely on the evidence presented here in the courtroom.

4        There are two kinds of evidence, direct and

11:36  5   circumstantial.  Direct evidence is direct proof of a fact,

6   such as the testimony of an eyewitness.  Circumstantial

7   evidence is proof of facts from which you may infer and

8   conclude that other facts exist.  I will give you further

9   instructions on these as well as other matters at the end of

11:37 10   the case.

11        But I want you to have in mind that you may consider both

12   kinds of evidence.  It will be up to you to decide which

13   witnesses to believe, which witnesses not to believe, and how

14   much of any witness's testimony to accept or reject.

11:37 15        In considering the weight and value of the testimony of

16   any witness, you may take into consideration the following:

17   The witness's ability to see or hear or know the things about

18   which the witness testifies; the appearance, attitude, and

19   behavior of the witness; the quality of the witness's memory;

11:38 20   whether the witness has an interest in the outcome of the case

21   or any motive, bias, or prejudice; the inclination of the

22   witness to speak truthfully or not along with the probability

23   or improbability of the witness's statements; whether the

24   witness' testimony was contradicted by anything the witness

11:38 25   said previously or by the testimony of other witnesses or

96

11:38    1    evidence received in this trial.  Thus, you may give the

2    testimony of any witness just such weight and value as you

3    believe the testimony is entitled to receive.

4        Burden of proof:  Again, as I mentioned this morning, this
11:38    5    is a civil case.  The plaintiff, or plaintiffs, are the party

6    making the claim, has the burden of establishing their case by

7    what is called a preponderance of the evidence.  To establish

8    by a preponderance of the evidence means to prove that

9    something is more likely so than not so, in other words the
11:39   10    preponderance of the evidence in the case means such evidence

11    as when considered and compared with that opposed to it has

12    more convincing force and produces in your minds belief that

13    what is sought to be proved is more likely true than not true.

14        To put it differently, if you were to put plaintiffs' and
11:39   15    defendants' evidence on opposite sides of the case, plaintiffs

16    would have to make the scales tip somewhat on their side.  If

17    the plaintiff fails to meet this burden, your verdict must be

18    for the defendants.

19        Those of you who have sat on a criminal case will have
11:40   20    heard of proof beyond a reasonable doubt.  I mentioned that

21    earlier this morning.  That requirement does not apply to a

22    civil case, and you should therefore put it out of your mind.

23        Now, I have a few words for you about your conduct as

24    jurors.  First, you've heard this already this morning.  Do not
11:40   25    talk to one another about this case until the end of the case

97

11:40    1    when you retire to the jury room to decide your verdict.

         2         Second, do not talk to anyone else about this case or

         3    about anyone who has anything to do with it until the trial has

         4    ended and you have been discharged as jurors.  Anyone else

11:40    5    includes members of your family and friends.  You may tell them

         6    that you are a juror in a civil case, but do not tell them

         7    anything else about it until after you are discharged from your

         8    duties.

         9         Third, do not let anyone else talk to you about the case

11:41   10    or about anyone who has anything to do with the case.  If

        11    someone should try to talk to you, you must report it to me

        12    immediately.

        13         Fourth, do not read any news stories or articles or listen

        14    to any radio, television, social media, any other kind of media

11:41   15    about the case or about anyone else who has anything to do with

        16    the case.

        17         Fifth, do not do any research, do not Google, do not make

        18    any independent investigation concerning the case.

        19         Sixth, do not post on social media about the case, the

11:41   20    parties, the lawyers, especially the judge.  Do not post

        21    anything on social media about the case.

        22         Finally, do not form an opinion until all the evidence is

        23    in and the case has been submitted to you.  Keep an open mind

        24    until you start your deliberations at the end of the case.

11:42   25         After the case is submitted to you, you must discuss it --

11:42  1   you must discuss it only with your fellow jurors in the jury
       2   room.  It is extremely important that you keep an open mind not
       3   to decide any matter raised during the trial until the entire
       4   case has been submitted to you pursuant to the instructions
11:42  5   that I will give you at the end of the case.

       6       At the end of the trial, you will have to make your
       7   decisions based upon what you recall the testimony and evidence
       8   to be.  You will not have a transcript of the witnesses'
       9   testimony with which to consult.  Furthermore, it is difficult
11:43 10   and time consuming for the court reporter to read back lengthy
      11   testimony.  Accordingly, it is of extreme importance that you
      12   give this case, including the testimony and evidence received
      13   during the trial, your utmost and undivided 100 percent
      14   attention.

11:43 15       All right.  With that background we are about to begin the
      16   trial.  Plaintiffs' counsel will be invited to make their
      17   opening statement, which is an outline or overview of what
      18   plaintiffs expect to prove in their case so that you could have
      19   a way, a form of following their case.  Next, the defense will
11:43 20   be invited to make an opening statement if they wish to do.
      21   Again, opening statements are not evidence, but they are there
      22   to give you an outline and a framework.

      23       After opening statements, you will hear from the
      24   witnesses, and that will be after lunch.  We'll take a break
11:44 25   after openings to have lunch and come back and start hearing

11:44  1  from witnesses.

2      So after opening statements this afternoon, you -- the

3  plaintiffs will present their case in chief, and then after the

4  plaintiffs are done with their case in chief, the defendants

11:44  5  have the opportunity to present their case if they so choose,

6  and after hearing from all of the witnesses, I will give you

7  the instructions, that is, the law that is applicable to the

8  case, and then the lawyers will give their closing arguments,

9  and after closing arguments, you'll get some final words from

11:44  10  me, and then we'll turn the baby over to you.

11      Some logistics that may be on your mind.  I'll be asking

12  that you report at 8:30 in the morning, and then we'll do a

13  roll call about 8:40, 8:45, make sure everyone's here and

14  settled, and we'll get you in the courtroom by no later than

11:45  15  9:00 a.m.  Please be prompt so that we could start and we could

16  end on time.

17      You should expect a morning break halfway through the

18  morning, 15-minute break so you could shake a leg, do some

19  yoga, give the court reporter's fingers a break, and then

11:45  20  one-hour lunch.  And then the afternoon, again, 15-minute shake

21  a leg break in the afternoon, and you should plan on ending

22  your day at five o'clock with us.  So that's the general

23  schedule that you will -- we will follow in the case.

24      Throughout the trial this week, I'll be checking in with

11:45  25  the lawyers and giving you updates on how we're doing so you

11:45  1    could follow our schedule.

2          So those are the logistics, so with that, I will invite

3    plaintiffs' counsel, Miss Motley, to please -- please make your

4    opening statement.

11:46  5          MS. MOTLEY:  Thank you, Your Honor.  Getting our tech

6    together.  Just one second.  Thank you, Your Honor.

7          Good morning, and thank you all for being here today.  My

8    name is attorney Kimberley Motley, and along with attorney Milo

9    Schwab and attorney Kathryn Knowlton, we represent the

11:47  10   plaintiffs in this matter.

11         Now, 33 years ago there was a show called Mork & Mindy,

12   that was really popular in the '70's, and it was starring Robin

13   Williams and Mindy, who was the love interest in the show who

14   Mork, who was an alien, had a baby sister in the show.  And the

11:47  15   baby sister who played for Mindy, her name was Rebecca

16   Schaeffer.

17         And so Rebecca Schaeffer was a popular actress, and there

18   was a fan that was obsessed with her.  And so he started

19   stalking her.  And then ultimately he hired a private

11:47  20   investigator for $250, because he wanted to know where she

21   lived.  And so this private investigator went to the Department

22   of Motor Vehicles, and he was able to get her address.  And

23   then once this fan got her address, he went to Miss Schaeffer's

24   house and he shot and killed her.  She was 21 years old.

11:48  25         It was because of this murder that was -- it became the

11:48   1   catalyst for why we have the Driver's Privacy Protection Act.

   2   And so Congress thought that it didn't make sense that a person

   3   could go to the DMV to get someone's address or their personal

   4   information because we all know that when we get things like

11:48   5   our driver's licenses or our state ID, we have no choice but to

   6   give the Government our personal information, such as our

   7   address, our date of birth, our height, our weight, those types

   8   of things.

   9   So what the DPPA says, and we're going to refer to it a

11:48   10   lot as the DPPA, but it's essentially the Driver's Privacy

   11   Protection Act, and what it says is that a person who knowingly

   12   obtains, uses, or discloses personal information from a motor

   13   vehicle record for a purpose not permitted under the DPPA shall

   14   be liable to the individual to whom the information pertains.

11:49   15   And this is why you're here today.  You're here because

   16   the evidence will show that defendant, Dominick Ratkowski,

   17   who's sitting in the suit in the corner right there, and

   18   defendant Lieutenant Joseph Roy, who's sitting in his uniform,

   19   both violated the DPPA against our plaintiffs.

11:49   20   Now, when you think about the DPPA, it's important to know

   21   that our privacy is important, our personal information is

   22   very, very important.  And it belongs to us.  And we give it to

   23   the Government, they have a duty to protect that information.

   24   And so when you talk about what are the actions?  So the

11:49   25   way that the law is written there's three actions, okay,

11:49   1   there's obtaining, so it's like a credit card.  A person who

        2   gets a credit card in the mail, you're obtaining that credit

        3   card.

        4       And then if you knowingly use that credit card, you go to

11:50   5   the grocery store, you swipe it, that's a use.  Or maybe you

        6   have a recurring, you know, monthly charge that comes to your

        7   credit card.  You're not swiping it, but that's still a use

        8   because it's hitting your credit card.  So if anyone uses that

        9   information, that also is a violation of the DPPA.

11:50  10       And then the last point, if a defendant knowingly attains,

       11   uses, or discloses that personal information.  So if you show

       12   your credit card to someone or you make it available to them,

       13   or you give it to a person, that's disclosing it to a person.

       14   So those are all three violations of the DPPA.  And if you do

11:50  15   any one of those three things, obtain, use, or disclose

       16   personal information that came from a motor vehicle record for

       17   a purpose not permitted, then you're violating the law.

       18       And so when you listen to the evidence, what needs to be

       19   shown is that for every time that either defendant obtains,

11:51  20   used, or disclosed information from the DMV, they need to show

       21   why they did it every time for every single plaintiff

       22   specifically.

       23       Now, Dominick Ratkowski and Lieutenant Joseph Roy, they're

       24   both employees of the City of Wauwatosa.  And you'll hear

11:51  25   defendant Ratkowski argue that the reason why he did it is

11:51    1    because it was a legitimate law enforcement purpose. Now,

       2    there are exceptions to how you can get this information, use

       3    this information from the DMV. But even those legitimate law

       4    enforcement purposes have limits. Because the DPPA is meant to

11:51    5    protect all of us, it's meant to protect all of our privacy,

       6    all of our data, all of our personal information that we don't

       7    have a choice but to give to the DMV if we want a driver's

       8    license. And, ladies and gentlemen, it is never, never a

       9    legitimate law enforcement purpose to target or to try to

11:52   10    silence people who are engaged in constitutionally protected

     11    activity.

     12       And you'll hear a little bit about sort of, we know what

     13    our rights are, right, we have the First Amendment rights and

     14    our First Amendment is something that's -- we all have the

11:52   15    benefit of. And it reads: "That Congress shall make no law

     16    respecting an establishment of religion or prohibiting the free

     17    exercise thereof or abridging the freedom of speech or of the

     18    press or the right of people to peaceably assemble and to

     19    petition the Government for a redress of grievances."

11:52   20       This First Amendment is foundational to our country. It's

     21    so foundational that our forefathers made it number one. It's

     22    number one. It's our first amendment, and the evidence will

     23    show that defendant Ratkowski targeted plaintiffs because they

     24    are invoking their constitutional right to speech. The

11:53   25    evidence will show that he targeted these plaintiffs because

11:53    1    they are doing things to which our First Amendment allows, such

2    as petitioning government and things like that, and we will

3    talk about that.

4    Now, as the judge said that we have the burden as the

11:53    5    plaintiffs, which means that our burden is a preponderance of

6    the evidence. So if you sort of think about a scale, we have

7    to show by a little over 50 percent that we are proving our

8    case. What the evidence will show is that we're most -- we're

9    more likely than not showing that there were violations of DPPA

11:53    10    by these two defendants, and it's important to note that

11    when -- if Dominick Ratkowski brings up that he did it for a

12    legitimate law enforcement purpose, if he ever obtained, used,

13    or disclosed personal information, it must be used for that

14    purpose.

11:54    15    So defendant Ratkowski can't get on the stand and just

16    say, legitimate law enforcement function, legitimate law

17    enforcement function. He must show you how it was used in that

18    way. And he's the only one that can do that.

19    Now, on June 5th of 2020, which is where a lot of this

11:54    20    case is sort of happening, there was a lot going on in our

21    country. We were in the midst of COVID, if you remember, there

22    was a lot of protests going on. George Floyd had just been

23    killed. There were George Floyd protests happening. There

24    were Blue Lives Matter protests happening, Black Lives Matter

11:54    25    protests happening. It was election year. There was a lot

11:55  1    going on.

2          And while people were taking to the streets, specifically

3    in Wisconsin, there were many communities coming together,

4    like-minded individuals, they were creating Facebooks, they

11:55  5    were marching in the streets, they were doing all these things,

6    and there was a community of people that came together that is

7    essentially referred to as The People's Revolution, or TPR.

8          And if I were to define sort of who they were, because

9    there's no real definition, is they're a Facebook group, and

11:55  10   also they're just a bunch of community members who came

11   together after the killing of George Floyd.  And these

12   community members consisted of parents, teachers, pet lovers,

13   all different types of people that came together who were

14   trying to invoke change.

11:55  15         And they tried to invoke change in several ways.  They --

16   They marched in the streets, they tried to invoke change by

17   petitioning the Government, they wrote letters to their local

18   leaders, they met with the police, they showed up at meetings,

19   they did things that our First Amendment says that we can do as

11:56  20   citizens.  They did those things.

21         And so while many citizens around this country were doing

22   that, Dominick Ratkowski, who was a civilian crime analyst for

23   the City of Wauwatosa, was looking at people online.  The

24   evidence will show that Dominick Ratkowski created fake social

11:56  25   media accounts, and he started stalking people on Facebook,

11:56  1    Twitter.  He created -- looked at people's dating accounts.

2          Now, defendant Ratkowski, he is not a police officer.  He

3    is a civilian crime analyst for the City of Wauwatosa.  And on

4    June 5th, 2020, he created a list.  And after he was done

11:57  5    looking through social media, he decided to go into people whom

6    he believed were affiliated with TPR into their D.O.T. records,

7    and the evidence will show that it wasn't because they

8    committed a crime or because they were violent, it was because

9    they were protesting.  And he did this on June 5th, 2020.

11:57  10         And then after that, he didn't just get any D.O.T.

11   records, he got all 44 plaintiffs' driver's license

12   photographs.  He obtained their photograph.  He typed his user

13   name, his password to have access to this information.  You're

14   going to hear what it takes to access this information.  I

11:57  15   don't have access to it.  You have to --  The Government has to

16   allow you to have access to it, you have to get -- go through a

17   training, you have to take a test, and you get a user name and

18   password in order to have access to this information.

19         So defendant Ratkowski on his own, on his own went in

11:58  20   there and got peoples' driver's license photographs.  And then

21   after he obtained that information, he did that also without

22   their consent.  And you'll hear a little bit about there's two

23   different types of information with the DMV, there's personal

24   information and there's highly restricted information.  So

11:58  25   personal information is like, you know, your date of birth,

11:58  1    your height, your weight, your eye color.  Those are things

2    that you need to give in order to get your driver's license.

3        But highly restricted information are things like your

4    social security number, or your DMV photograph, because when

11:58  5    you go to the DMV, when you -- when they take that picture of

6    you, that photograph doesn't belong to you.  It's not like when

7    they give you your driver's license, they give you your

8    driver's license, your head shot.  They keep the picture,

9    right?  And that picture ends up on your -- on your driver's

11:59 10    license.

11        So he went in there on his own because people were

12    protesting and got their highly restricted information without

13    their consent.  And only he can explain why he did that.  But

14    the evidence will show that's why he did it.  Because TPR, or

11:59 15    people whom he believed were affiliated with TPR, were

16    protesting in the streets.

17        Now, the interesting thing is is that we're going to prove

18    that, number one, defendant Ratkowski did knowingly obtain,

19    disclose, or use personal information.  And so when you see

12:00 20    "did", these are agreed upon facts.  These are facts that --

21    that they've agreed with and we've agreed.

22        Number one, Dominick Ratkowski, he did go in peoples'

23    D.O.T. records.

24        Number two, Dominick Ratkowski did obtain peoples' -- the

12:00 25    plaintiffs' driver's license photograph.

12:00  1      Number three, Dominick Ratkowski did use those photographs

2      and he put them on a list, a list that he calls and he referred

3      to as a TPR target list.  His words.  And then after putting

4      them on this list, he then disclosed it to over 100 people,

12:00  5      peoples' private personal information.  Now, too, he got it

6      from the DMV.

7      Number three [sic], he's going to argue that he did it for

8      a permissible legitimate law enforcement purpose, and again,

9      and I'm going to repeat this because I think it's really

12:01 10      important.  That no law enforcement activity can infringe on

11      the First Amendment rights, ladies and gentlemen.  It's never a

12      legitimate law enforcement purpose to target or to try to

13      silence people who are -- who are lawfully engaged in

14      constitutionally protected activity.  And that's what he did.

12:01 15      And he did it repeatedly and he did it willfully and

16      recklessly.

17      Now, you're going to see the target list, but this

18      document is so -- there's so much sensitive information that

19      this is what you're going to get.  However, for the plaintiffs,

12:02 20      you're going to be able to see what their entry is.

21      Now, on this list that he created, it's a 29-page

22      document, there are over 200 people on this document with

23      information that was obtained from the DMV records.

24          MR. WIRTH:  Judge, this is going into the pre-trial

12:02 25      motion.

12:02    1              MS. MOTLEY:  Your Honor, these are all stipulations.

         2              MR. WIRTH:  No, they're not.

         3              MS. MOTLEY:  Yes, they are.

         4              THE COURT:  Excuse me.  Miss Motley, you may continue

12:02    5     with the opening.  Focus on our plaintiffs, please.

         6              MS. MOTLEY:  Thank you.  So for our plaintiffs, there

         7     are 44 plaintiffs that he put on this document that are

         8     like-minded to the other people on this document.  And for our

         9     44 plaintiffs, he put their pictures, their addresses, their

12:02   10     dates of birth, he put their vehicle information, and he did

        11     this all by watching people -- or people being tagged on social

        12     media.  The evidence will show that he never went to a protest,

        13     the evidence will show that he never verified that any of these

        14     people were actually there, and he created this target list.

12:03   15         Now, the second defendant, Lieutenant Joseph Roy, on

        16     January 7th of 2021, he released unredacted documents, which

        17     contained police reports, citations, et cetera.  And those

        18     police reports, citations, and documents that he released,

        19     which contained over 500 pages of documents, he didn't redact

12:03   20     it.  And those documents had plaintiffs' personal information

        21     also obtained from the D.O.T.

        22         The evidence will show that the information that

        23     Lieutenant Roy released contained plaintiffs' addresses,

        24     phone -- or, excuse me -- addresses, dates of birth, height,

12:04   25     weight, driver's license numbers, and he released this to 16

                                                                          110

12:04    1    people by way of a Dropbox link, and the 16 people he released

2    it to were lawyers, journalists, you know, just regular people

3    in the community who wouldn't have access to this information.

4    And he violated their privacy rights as well.

12:04    5        Now, for Joseph Roy, he's going to allege that when he

6    released this information, he did not know that this

7    information came from the DMV.  And the evidence will show that

8    not only did Lieutenant Roy release this information, but that

9    he also released this information knowing that it came from the

12:05   10    Department of Motor Vehicles and that he also, when he

11    disclosed this information to 16 people, also violated the

12    DPPA.

13        Number two, it's indisputable evidence that some of the

14    information that Lieutenant Roy released came from the Motor

12:05   15    Vehicle records.

16        And, three, it's indisputable that he released this

17    information for a purpose not permitted by the DPPA.  He's only

18    going to come in and argue that he didn't know that this

19    information came there.  And we ask that you listen to the

12:05   20    evidence and come to a conclusion otherwise.

21        Now, this case is not about politics.  This is about

22    privacy.  It's about our plaintiffs' right to privacy, our

23    plaintiffs' right to have their information protected by the

24    D.O.T.  It's their right to go out there and lawfully protest,

12:06   25    and that's what they did.

12:06 1    And they have the right to that privacy, they have a right

2    to not having their information misused in the ways that

3    defendant Ratkowski and defendant Roy misused their

4    information.  What happened to the defendants -- or, excuse

12:06 5    me -- the plaintiffs is exactly the type of behavior that the

6    DPPA is meant to protect against.

7    Now, I want to talk to you about my plaintiffs.  There's

8    57 plaintiffs on this case.  And we've come to an agreement,

9    you're not going to hear from all 57 of them.  You're not going

12:06 10   to hear from 57 people that how they feel about this happening

11   to them.  But these are real people.  These are parents,

12   teachers, our children that were put on this target list;

13   parents, teachers, and children who had their personal

14   information disclosed to over a hundred people simply because

12:07 15   defendant Ratkowski was watching them or seeing them tagged on

16   social media.

17   And I'd like my plaintiffs to please stand.  Thank you.

18   You may be seated.

19   And I want you to know that they're going to -- you know,

12:07 20   not all plaintiffs will testify and we're not going to do that

21   to you, but they're real people, they're real people just like

22   everyone else who deserves their privacy to be protected.

23   They're real people like everybody else who also are afforded

24   the right to not have their data and their information being

12:08 25   given out and put on a list, a target list just because.

12:08   1          Now, at the conclusion of this trial, you're going to get
        2   the names of the plaintiffs.  For defendant Dominick Ratkowski,
        3   there are 44 plaintiffs that are on this target list.  For
        4   defendant Joseph Roy there are 32 plaintiffs who are alleging
12:08   5   that he violated the DPPA with them.

        6          And at the conclusion of this case, you're going to get
        7   two questions:  Number one, you need to decide did the
        8   defendants knowingly violate the DPPA when they obtained, used,
        9   or disclosed plaintiffs' information from their motor vehicle
12:08  10   records?  And so we know, for instance, with Ratkowski, it's
       11   just like a credit card, when you get it, just like he got
       12   their DMV records, their photographs, that's one.  That's an
       13   obtainment.

       14          When Dominick Ratkowski put that information on the target
12:09  15   list, that's a use.  And every time he went to this document,
       16   that's a swipe, another swipe on your credit card, that's
       17   another use, that's another use, that's another use, and you'll
       18   hear how many times he used it.  The evidence will show that he
       19   used it dozens and dozens of times.  And every time he used
12:09  20   this information once he gave it to somebody, made it available
       21   to them, every single person that he made it available to, that
       22   is a disclosure.

       23          And so when you're thinking about this case and the
       24   defendant Ratkowski, it's not about a list, it's about every
12:10  25   single person's data.  So every time he obtained their

12:10 1  information, he needs to justify why he did it for that

2  specific plaintiff. Every time he went to the list and used

3  it, swiped that credit card and used this list, he needs to

4  justify why he used that specific plaintiff's information, and

12:10 5  for every single person that he disclosed this document to, he

6  needs to justify why he disclosed that specific plaintiff's

7  personal protected driver's information.

8      Now, this is an extremely important case, and we really

9  appreciate you guys being here. We don't just say that. This

12:10 10  is about privacy, and this case is about the misuse of the

11  private information by two persons who worked for the

12  Government. Our privacy is important. Our privacy matters.

13  And this situation is exactly the situation that the DPPA meant

14  to protect us against.

12:11 15      And so at the conclusion of this case we will come to you

16  and we will tell you that our plaintiffs, they deserve privacy

17  just like everybody else. And only you have the power to judge

18  whether or not defendant Ratkowski and defendant Roy violated

19  the DPPA. You have the power to make these two defendants

12:11 20  accountable for what they did against these 57 plaintiffs. It

21  is outrageous what happened.

22      And so at the conclusion of this case, we are going to ask

23  for you to find for the plaintiffs and to find that the

24  defendants obviously violated the DPPA numerous times, and not

12:12 25  only did they violate the DPPA numerous times, but they did so

12:12   1   in a willful and reckless manner.  Please hold these two

2   defendants accountable.  Thank you.

3   THE COURT:  Thank you, Miss Motley.  While defense

4   counsel is setting up to approach the bench, please feel free

12:12   5   to stand and stretch yourselves for a hot minute.

6   MR. WIRTH:  May it please the Court.

7   THE COURT:  Mr. Wirth, you may proceed.

8   MR. WIRTH:  Thank you.  One of the things you're

9   going to find out in this case is how important it is to listen

12:13   10   to both sides before you start making a decision.  Generally

11   speaking, the defense will go second throughout the course of

12   this trial.  And as you're about to learn, when you hear the

13   other side of the case, when you hear the explanation, you will

14   realize that it is completely different from what you've just

12:14   15   been told.

16   One of the important things that we do in opening

17   statements is sometimes we have to establish what the evidence

18   will not show, what this case is not about.  There is no

19   argument from any plaintiff in this case that in any fashion

12:14   20   were they prevented from protesting or exercising their First

21   Amendment rights.  Not one.  That is not a question you will be

22   asked in this case.

23   There are no damages in this case.  This is a case

24   involving a federal act, a federal code section.  No one was

12:14   25   silenced.  The concept of the list will be explained to you.

115

12:15   1       The environment in which this case unfolds is as has been

2       described to you, a very tumultuous time in the city's history.

3       The beginning of 2020, there was a police shooting, and Mayfair

4       Mall became between February --

12:15   5               MS. MOTLEY:  Objection, Your Honor.  This is

6       something that actually was the subject of our pre-trial

7       motion.

8               MR. WIRTH:  Judge, just a little latitude.

9               THE COURT:  Miss Motley had described the setting for

12:15  10       this, so with very narrow latitude, without details and

11       focusing on our case, you may set the setting as well.

12               MR. WIRTH:  One hundred percent.  Thank you, Judge.

13       The Mayfair Mall had become a gathering spot, it had

14       become between the February and May time period a spot where

12:16  15       gatherings, demonstrations, protests had become focused to the

16       point where command level people in the Wauwatosa Police

17       Department, now captain, then lieutenant, Luke Vetter, and now

18       captain, then lieutenant, Shane Wrucke, had decided at the

19       command level, we have to kind of keep an eye on what's going

12:16  20       on.

21       What happened in late May is that the City of Milwaukee

22       contacted Wauwatosa with a list of people it had been involved

23       in the Milwaukee incident four or five --

24               MS. MOTLEY:  Objection.  He's arguing particulars

12:16  25       that aren't in evidence, Your Honor.

12:16  1              MR. WIRTH:  Oh, they are.

       2              MS. MOTLEY:  We're here for the DPPA.

       3              MR. WIRTH:  Right.

       4              THE COURT:  Thank you.  We are here for the DPPA,

12:17  5    this is opening statement as I instructed the jury, and will

       6    instruct you, the lawyers' opening statements are not evidence.

       7    This is what they anticipate the evidence to show.

       8              MR. WIRTH:  Correct.  Thank you, Judge.

       9         And that request went to Dominick Ratkowski.  So Dominick

12:17 10    Ratkowski began a list to investigate or to find out if he

      11    could determine information for the names that had been

      12    referred to him.  In the course of that investigation, there

      13    was a recording that said that mentioned trouble ahead for

      14    Mayfair Mall.

12:17 15         At that point Lieutenant Vetter, Lieutenant Wrucke told

      16    Dominick Ratkowski, who is a civilian crime analyst employed by

      17    the City of Wauwatosa Police Department, do we have

      18    anticipatory information, anticipatory identification for what

      19    happens if trouble comes to Mayfair?  At about that time the

12:18 20    George Floyd shooting occurred, as you've heard, and the level

      21    of protests, the frequency of protests and the expansion of the

      22    protests occurred.

      23         At that point Mr. Ratkowski began to do things like

      24    monitor social media to see where these protests were being

12:18 25    announced, where these protests were being gathered, where

12:18   1   these protests were being scheduled, and where they would take

         2   place.

         3          You'll hear the testimony from Mr. Ratkowski, from

         4   officers Vetter and Wrucke, that one of the reasons they did

12:19   5   that is to anticipate, so that they could close down roads, so

         6   that they could make sure they have their personnel, and so

         7   that they should -- and in some instances to protect the

         8   protesters themselves, to facilitate the idea that people are

         9   allowed to gather, people are allowed to protest, but they are

12:19  10   not allowed to destroy property, to do those kinds -- to commit

        11   acts of destruction.

        12          So what the list became is an identification, oftentimes

        13   by the protesters themselves by what they would post on their

        14   Facebook pages, on their social media, but just as often by

12:19  15   virtue of what friends and colleagues would post and then tag

        16   them is people who were frequently involved in the protests so

        17   that the police department could anticipate how big a gathering

        18   it may be, what the modus operandi may be for the protest

        19   itself, to identify people who were leaders.  And you'll hear

12:20  20   Lieutenant Vetter tell you that they -- a number of the people

        21   on this list were identified because they were leaders.

        22          Now, this wasn't a uniform kind of march or uniform

        23   demonstration, they professed to want to do 100 in a hundred

        24   days.  So a lot of times this pod was there, but that pod

12:20  25   wasn't.  This gathering had both pods.  These had these people.

12:20   1   What they -- the Wauwatosa Police Department wanted to find out

        2   is who are the leaders?  If this starts to go sideways, who can

        3   we contact and say, hey, get your people together, okay.  We

        4   don't want there to be destruction, injury, those kinds of

12:20   5   things.  This is what law enforcement does.  It plans to

        6   deescalate these kinds of things, it plans to keep them active

        7   and -- and going forward, but within the bounds of the law.

        8       So what you will find out is that the list itself becomes

        9   a series of sometimes Facebook URL's, snapshots from social

12:21  10   media posts, snapshots from, in some fashion, body camera,

       11   because the police do then respond to these, but there's no

       12   identification.

       13       So what Dominick Ratkowski did is he went and once they

       14   were tagged, once he figured he had 'em identified, once he

12:21  15   thought he may need that person, he would go to the driver's

       16   license and pull up their photo.  So the sensitive information

       17   that's on the list is their driver's license photos.  There are

       18   addresses, there are names, but as often as not those came from

       19   the -- the names and addresses came from other types of

12:22  20   records.

       21       We do not dispute that the pictures that go down the left

       22   side of this list are from the Department of Motor Vehicles.

       23   Those are the motor vehicle records.  The list begins to expand

       24   because the protests begin to expand, the demonstrations begin

12:22  25   to expand, so now there are people included on the list that

119

12:22  1    are videographers, photographers, they're not targets of

2    anything.  Target was a word used in an E-mail one time.

3    They're not targets of anything.  They're videographers,

4    they're memorialists, they're the ones who are taking the

12:22  5    photographs, taking videography, taking the kinds of recordings

6    that the police, they want to know where they can go if it's

7    time -- if something bad happens and they can go and look and

8    see that person generally records what's going on and we will

9    be able to see and see if anybody's tagged and see who the

12:23  10   people are and see who the recurrent permits are in this thing.

11          So what happens as the time frame is the hundred days, if

12   you will, continues is there is in July, there's an incident at

13   Mayfair Mall.  There's a lot of social media and a lot of

14   photographic postings, and I'm not real savvy in social media,

12:23  15   tweets and Twitters and those kinds of things, in which people

16   are identified.

17          So, yes, that data is mined.  It's no news to anybody that

18   police departments monitor social media nowadays, and people

19   whose -- who become witnesses, memorialists, those who record

12:23  20   these things may be -- they are -- they include sometimes

21   people who appear to have broken ordinances, so that they can

22   get their citations, what we call tickets, so they can get

23   their citations mailed to them because in that environment you

24   will hear the police officers tell you that in that environment

12:24  25   it isn't always the smartest thing, it isn't always the safest

120

12:24   1    thing to write citations for property destruction during the

2    demonstration.  Rather, go back, take a look at the

3    memorialists, identify who was committing the ordinance

4    violations, and mail them their tickets.  That's why their

12:24   5    addresses are on there, that's why their pictures are on there

6    so that they can be identified as witnesses, as memorialists,

7    as possible violators, as leaders, as people who -- who we can

8    rely on to tell us things, okay.

9        The list then expands in August.  You've heard reference

12:24   10   to Officer Mensah.  There's a demonstration at Officer Mensah's

11   fiancee's house, and there's again, there's some -- there's

12   some trouble.  And so, again, they go to the list, they review

13   the social postings, they review the videography, they review

14   the photographs, and they identify people who are going to get

12:25   15   citations or who are witnesses who can help sort out what

16   happened.

17       In August of '14 -- August 14th of 2020, there is a -- a

18   large caravan, vehicles, and in some instances there are

19   individuals who are repeatedly seen at these demonstrations who

12:25   20   are armed.  They go on the list.

21       So now the list is witnesses, memorialists, potential

22   violators, potential informants, potential armed people, and

23   what it's doing is it's allowing the police department to try

24   to manage the situation, to anticipate where these are going to

12:26   25   happen, to shut off roads, to tell the people, stop blocking

121

12:26  1   ambulances, and these kind of things are the purpose, the law
       2   enforcement purpose because what you were told is only
       3   partially correct.

       4        With respect to the DPPA, what it protects is that
12:26  5   officers shall not knowingly disclose personal information from
       6   within a motor vehicle record except as provided.  What's
       7   provided?  There's a state statute that says upon the request
       8   of any law enforcement agency, it's 66.0313, it's what's known
       9   as the mutual assistance, sometimes referred to as the mutual
12:26  10  aid statute, upon the request of any law enforcement agency,
       11  the law enforcement personnel of any other law enforcement
       12  agency may assist the requesting agency.

       13       What's going on now is that this is not confined to
       14  Wauwatosa, there are neighboring communities, neighboring
12:27  15  police agencies, neighboring crime analysts who want the
       16  information that's in this list.  Those are the people with
       17  whom we shared the lists.  They weren't disclosed to a thousand
       18  or a hundred people, whatever it was, just at random.  They
       19  were disclosed to other law enforcement agencies.

12:27  20       What are the permissible purposes for the list, if you
       21  will, for the gathering of the Department of Transportation
       22  records that comprise the list?  The DPPA permissible purposes
       23  are any law enforcement agency in carrying out its functions,
       24  any private person, Dominick Ratkowski, acting on behalf of a
12:28  25  local agency in carrying out its functions.

122

12:28  1          The DPPA actually permits law enforcement to carry out

2     their function, not just to arrest people.  They can also be

3     used for any other use specifically authorized under the law of

4     the state for public safety.  In other words it is permissible

12:28  5     to exchange this information with other law enforcement

6     agencies.  It is permissible to give them a heads-up of what

7     we've gathered when they anticipate there may be trouble in

8     their community.

9          What happens next in September of 2020 is that there's a

12:28  10     disturbance at the mayor's house.  Once again, social media

11     pictures, body camera footage, license plates are gathered at

12     the scene to determine who and what happened and where

13     citations might be issued.  These are by definition law

14     enforcement, law agency functions.  They are permissible.

12:29  15          What --  By the time, and then to kind of end this line of

16     thought, the mayor puts in a curfew in October.  It kind of

17     coincides with when the hundred days are winding down, so there

18     aren't a lot of additional citations issued after that, but

19     when they are, they're issued for curfew violations and once

12:29  20     again they're identified using usually body camera or dash

21     camera for people who are out after curfew, the curfew ends,

22     the hundred days ends, and the list ends.  The list was done by

23     November of 2020.

24          So throughout its five-month existence, the list was used

12:30  25     by a law enforcement agency to identify witnesses, potential

12:30  1   leaders, to obtain cooperation, to ensure safety.  It

2   identified those who frequently appeared because there was an

3   indication that if this group shows up, it's going to be

4   bigger, it's going to be more expansive, it may even be more

12:30  5   dangerous.

6       It's going to frequently post on social media, and that we

7   need to know so that we can go look and see who we have to

8   identify.  It is not being shared with the world.  It's being

9   shared with other law enforcement agencies who are experiencing

12:30  10  the same kind of social unrest.

11      Folks, we are not here, this trial is not about whether or

12  not the protests, the First Amendment rights of protesters was

13  an adequate vehicle for social justice versus the other side of

14  the argument, oh, they're just opportunists.  That's not what

12:31  15  this is about.  What you are here in trial to be a jury for is

16  the DPPA.  Was the information from the Department of Motor

17  Vehicles, keep in mind it's only the information limited to the

18  Department of Motor Vehicles, with respect to the list by and

19  large that's the photographs, were those photographs that

12:31  20  helped the police identify who they had discerned being present

21  at these things by social media, body cam, tags and videos,

22  YouTube, some people live-streamed it while they were there,

23  and they were able to identify people, was that a law

24  enforcement function?  There's no catch.  Of course it was.

12:31  25      In addition, there were memorialists, you will hear that

12:31   1    there were photographers and videographers on the list because

2    we needed to know whose website we could go to and see the

3    videos, or whose social media we could go to and see the

4    videos.  There were ordinance violators.  Quite often it was

12:32   5    bad karma to try to issue tickets during the protests, during

6    the demonstration.  Those were issued afterwards, and we had to

7    know where to send 'em.

8        And, finally, the idea that the photographs were what I

9    would call primary source material, but in some fashion there

12:32  10    was a protester hit list, so we went through and like pulled up

11    a bunch of random driver's license photographs because that's

12    who we were looking for, it's the complete opposite.  What

13    happened is the protests happened, the demonstrations happened.

14    Whatever the outcome was happened.  And then we looked at what

12:32  15    we call public source materials to identify who we needed to

16    start categorizing as the leader.  We can go to that person and

17    say, hey, guys, this is getting out of hand.  Can you control

18    your people?  We can go to that person and say, hey, can we see

19    your video?  Or go to their publicly posted site and see their

12:33  20    video.

21        So these are the kinds of law enforcement, law agency

22    functions that that list served.  You're probably sitting there

23    thinking, well, yeah, of course that's what law agency does.

24    Of course they want to anticipate this.  Of course they want to

12:33  25    identify what it will take to keep things safe, what it will

125

12:33  1   take to keep things as organized as it could be.  What's the

2   catch?  There is no catch.  That's it.  That's what the list is

3   for.

4       There's a quirk, and the quirk is the special verdict

12:33  5   form.  You will be asked in the special verdict form to answer

6   a question based upon what's -- you've heard called the burden

7   of proof.  Generally speaking, that burden of proof rests with

8   the plaintiffs.  So the idea is that the question has to be

9   worded so that the burden of proof is in the question.  They

12:34 10   weren't finalized yet, but you're going to be asked a question

11   something like this:  With respect to Dominick Ratkowski, did

12   he knowingly obtain, use, or disclose such plaintiffs' personal

13   information from a motor vehicle record for a purpose not

14   permitted by the DPPA?  So the question is did he, basically,

12:34 15   violate the DPPA?

16       So when it comes to question number one, you will actually

17   answer that question no, because the evidence is going to show

18   you, was there a law enforcement function for the list and the

19   names on the list?  Of course there was.  But the answer isn't

12:34 20   yes when it comes time to answer the question, the answer is no

21   because the question asks you was there no law enforcement, no

22   law agency reason for that list?

23       So when the time comes for you to answer the special

24   verdict, we will ask that you answer for each plaintiff no,

12:35 25   this list was not a violation of the DPPA.

126

12:35  1      As you've heard, there are two questions that you will be
2      asked to answer in this question.  The second question involves
3      Lieutenant Joseph Roy.  Lieutenant Roy works in the -- in a
4      division of the Wauwatosa Police Department that responds to
12:35  5      open records requests.  You will hear that Wisconsin is what's
6      called a sunshine state, we are very pro open records.  So when
7      the request comes in, the exception is to redact anything
8      that's being asked for.  The rule is to produce it.

9      The open records requests that came in following the
12:35  10     conclusion of the fall and the beginning of January was
11     responded to on January 7th, 2021.  What Joseph Roy did is he
12     sent an E-mail to, I think there were 16 addressees, 14 of --
13     some of whom were attorneys for the plaintiffs that asked for
14     everything they got, some of whom were the plaintiffs -- they
12:36  15     got more than they asked for -- but plaintiffs themselves were
16     asking, attorneys for the plaintiffs were asking, and news
17     agencies were asking.

18     And what Joseph Roy did is he gathered the information,
19     the information that was released by a Dropbox link was
12:36  20     citations that you and I call tickets, incident reports, which
21     are the reports of why -- why and to whom the tickets will be
22     issued, body camera video, dash camera video, other kinds of
23     memorializations.

24     So really the only area where motor vehicle records could
12:37  25     have been released in that is when the concept of what's in the

127

12:37   1    release came from the motor vehicle record.  It's not just that

2    Joseph Roy is going to tell you, no, I didn't know, what he's

3    actually going to tell you is you can't know.  He couldn't

4    know.

12:37   5        What happened is while it's true that the citations that

6    were in that open records disclosure, Joseph Roy is just the --

7    essentially the custodian of the record, the guy who produces

8    it.  He didn't write the citations.  He didn't write the

9    incident reports.  He didn't put the data in those.

12:37   10        So you start from the premise that Joseph Roy doesn't know

11    where the data is in the citations and the incident reports

12    came from, he didn't author them.  They were certainly created,

13    they were certainly distributed, but the DPPA requires that he

14    know he's districting motor vehicle records.

12:38   15        What you are going to learn is that with respect to the

16    citation, and by and large what's in a ticket is your name and

17    your address, your date of birth, sometimes your driver's

18    license number, but by and large it's -- there's no pictures,

19    we're no longer talking about pictures.  It's name, address,

12:38   20    date of birth.

21        With respect to the citations, the information that's in

22    the citation, and Mr. -- Lieutenant Roy will tell you the

23    information that's in the citation can come from

24    self-reporting.  You ask someone what their name and address

12:38   25    is, they give it to you.  That's not a motor vehicle record,

12:38  1    although the name and address will be in the citation.

2            It can also come, certainly can come from the Department

3    of Transportation, it could be that it came from a motor

4    vehicle record.  That is one of the choices.  It also could

12:39  5    come from the NCIC, the National Crime Information Center, for

6    any plaintiffs who had prior contact with law enforcement.

7            That information, name, address, date of birth can also

8    come from the Crime Information Bureau, the CIB, which is the

9    state version of a database for people who've had contact with

12:39  10   law enforcement.  And it could be contact that was three months

11   earlier and now it resulted in a -- another contact that

12   produced this citation.  Self-reporting could very well be.

13   Could it be a D.O.T. record?  Could it be a motor vehicle

14   record?  Certainly could be.  Could it be a record from the

12:39  15   NCIC?  Absolutely could be.  Could that information have come

16   from the CIB, the Crime Information Bureau?  Absolutely it

17   could.

18           And there's a huge database called TLO that was adopted by

19   private citizens, and it is a massive database in our country,

12:40  20   and the owners and operators of that database offer it free to

21   law enforcement.

22           So if you're -- if you're following along here, the

23   information that's in the citation could've come from the

24   person themselves, the Department of Transportation, the NCIC,

12:40  25   the CIB, or the TLO.  Five different ways that that name,

129

12:40   1   address, date of birth, even the driver's license number could

2   be in that citation.

3       There is no way for Joe Roy, who did not author that

4   citation, to know how that information got in there, to know

12:40   5   that he is disclosing motor vehicle records.

6       With respect to the incident reports, it's even harder,

7   it's even more difficult because the incident reports are

8   specifically, those are typed up by the reporting of the

9   responding officer.  Those are created back at the station, so

12:41  10   to speak, and they're created in the police department's record

11   system called Phoenix.

12       And the reports are generated in a sub program called

13   NAMES, it's an acronym for something, but it's NAMES.  And

14   NAMES has its own database.  So the information that goes into

12:41  15   the incident reports now could've come from the NAMES database,

16   could've come from the people who received the citation, could

17   certainly have come from the Department of Transportation,

18   CIB --

19           MR. SCHWAB:  Your Honor, there's a lot of evidence

12:41  20   that's being introduced here.  I don't know if this is argument

21   as opposed to evidence you're seeking to be introduced.

22           THE COURT:  Thank you for the objection.  Mr. Wirth,

23   you may continue with the at line of what you anticipate the

24   evidence to show.

12:42  25           MR. WIRTH:  Thank you.  And Lieutenant Roy will tell

12:42  1    you names, database, self-reporting, D.O.T., NCIC, CIB, TLO.

2    He will also tell you that nothing in the report tells him

3    where that information came from or where it was entered or who

4    entered it.  He isn't the author of either the citation or the

12:42  5    report.  So when Joseph Roy tells you that he doesn't -- he

6    didn't knowingly disclose motor vehicle information, that's

7    why.  He can't know.  It's not -- It doesn't -- It's not

8    self-evident.

9        So the last question you'll be asked in this case is,

12:42  10   again, that kind of flip question where you're not being asked

11   the affirmative, did Joseph Roy not know.  You're being asked,

12   did Joseph Roy knowingly disclose motor vehicle information in

13   the E-mail of January 7th, 2021?  Once again, we will ask that

14   for each of the 32 plaintiffs who are plaintiffs for the Roy

12:43  15   disclosure, you answer all of those questions no.

16       The idea, hopefully, that we go second has now been

17   impressed upon you for why it's important to hear all of the

18   information.  We intend to call or question, if he's called by

19   others, Luke Vetter, we intend to call Shane Wrucke, we intend

12:43  20   to call Dominick Ratkowski, and we intend to call Joseph Roy.

21       What I just told you to expect from their testimony, you

22   will hear from them as they sit as witnesses.  When the

23   evidence is in, you're going to be asked two questions:  Did

24   Dominick Ratkowski create and distribute the list for no law

12:44  25   enforcement purpose?  The answer is going to be no.

12:44  1     You're going to be asked, did Joseph Roy in his open

2     records -- in his position as the open records distributor

3     knowingly distribute motor vehicle records?  Again, we're going

4     to ask you to answer those questions no.

12:44  5     That is --  That concludes my presentation, but the

6     emotion that attends that time period in the city's history

7     shouldn't distract you from the questions you'll be asked to

8     answer.  We trust that you will answer them truthfully, and we

9     ask that your verdict speak that truth, whatever the truth may

12:44 10    be.  Thank you.

11         THE COURT:  Thank you, Mr. Wirth.  Members of the

12    panel, you have now heard the parties' opening statements.

13    You've all earned A. plus today, I know you started your day

14    early to join us early, and you've been paying attention, and

12:45 15    you have more than deserved an hour lunch.  It is now 12:45.

16    You are on your own for lunch.  Please report back at 1:45.

17    The CSO will show you how to get back in the jury room.  Thank

18    you.  Have a good lunch.

19         Again, please do not talk about the case and do not

12:45 20    research the case, and keep an open mind.  You have not heard

21    any --  You have not heard evidence yet.  Thank you.

22         THE BAILIFF:  All rise for the jury.

23         (The jury was excused.)

24         THE COURT:  Please be seated, everyone.  All right.

12:46 25    I want to make sure that you get a lunch, because you too have

12:46  1    put in hard work today already.  A couple of things.  First, I
       2    did note some reaction from the room as -- as opening
       3    statements were being made.  I remind everyone, it's, of
       4    course, very human to react to things that you hear that you
12:46  5    agree or disagree with, but it's really very important that we
       6    do not do anything during the trial to distract the jury from
       7    the important work that they have to do.  So please contain our
       8    reactions throughout the trial.
       9          Secondly, Mr. Schwab, this morning you raised the issue
12:47  10   with Mr. Weber, and I contacted Mr. Knight and he's been
       11   waiting since noon to talk to me on the record regarding what
       12   he knows so that he can make a record.  So Mr., I don't know if
       13   it's Mr. Miller or who's going to get Mr. Knight on the phone?
       14          THE CLERK:  I'm going to try through here.
12:47  15          THE COURT:  Yes, thank you.
       16          THE CLERK:  To do a two-way.  Can we just go back and
       17   I'll call him on there to make sure he's ready, I think I can
       18   call him on there.  One second, please.  All right.  Give this
       19   a try.
12:49  20          MR. PATRICK KNIGHT:  Hello, it's Pat Knight.
       21          THE COURT:  Good afternoon, Mr. Knight.  This is
       22   Judge Joseph.
       23          MR. PATRICK KNIGHT:  Good afternoon, Judge.
       24          THE COURT:  Thank you for making time.  I apologize,
12:49  25   we ran a little bit over what we anticipated, but I'm sure you

12:49  1    understand.

2          MR. PATRICK KNIGHT:  Not a problem, Judge.

3          THE COURT:  We are on the record in jury trial for

4    case 20-CV-1660, Andrew Aaron, et al. versus Ratkowski and Roy,

12:49  5    and the reason I'm calling you is regarding witness Weber, the

6    former chief of police who was subpoenaed for the trial that

7    was scheduled to begin this morning at 8:30.  Mr. Knight, do

8    you currently represent Mr. Weber?

9          MR. PATRICK KNIGHT:  No, I do not, Your Honor.

12:50  10          THE COURT:  Did you previously represent Mr. Weber?

11          MR. PATRICK KNIGHT:  Yes.  If you'd like, I can

12    recite on that.  In July of 2020 I was engaged to represent

13    Mr. Weber, and at that time it was an internal investigation

14    being conducted by the Wauwatosa Fire and Police Commission.

12:50  15    That --  And I completed that, then I was engaged by the City

16    of Wauwatosa to represent Chief Weber in February, I believe,

17    of '21, and that was with regard to the John Doe proceedings

18    that were being conducted in Milwaukee County Circuit Court.

19    And I did represent him throughout there, and those matters

12:51  20    concluded in the course of that.

21          So I have not represented former Chief Weber in any other

22    matters.  I've been engaged in both those instances by the City

23    of Wauwatosa to represent the chief and in any subsequent

24    matters not.

12:51  25          With regard to this matter, Judge, I was contacted, oh, I

134

12:51  1    think within the last couple weeks by Tom Fisher, who I know

2    who's an investigator, and I believe he was working for

3    Miss Motley, and he asked me about Chief Weber and mentioned

4    that there was some difficulty with service, and I said, I'll

12:51  5    look into it.

6         I was unaware of this case, so I did check this case and

7    saw that he was a party to it and saw that he had been

8    dismissed out of it, and also saw that while it was pending,

9    who his attorneys were.

12:52  10        So I -- I concluded a long time ago at the end of the John

11   Doe, so I had not had any contact with Mr. Weber since his

12   retirement, and I -- I passed along the note to -- or sent an

13   E-mail off to Miss Baynard just to let her know that Mr. Fisher

14   had reached out to me.

12:52  15        But I obviously, I don't have any authority to accept the

16   subpoena or to represent him in the matter in which presumably

17   he had counsel during the time it was pending.  So that's why I

18   did not reach out to the chief, and I haven't received anything

19   in writing from any of the parties, but that's the extent of my

12:53  20   contact so far.

21             THE COURT:  Thank you, Mr. Knight.  If you could

22   stand by for a second, please.

23             MR. PATRICK KNIGHT:  Sure.

24             THE COURT:  Miss Motley, any further questions for me

12:53  25   or Mr. Schwab from attorney Knight?

12:53    1              MR. SCHWAB:  So my understanding is that he, in fact,

         2    that this individual, this attorney was not contacted by

         3    Mr. Weber but was, in fact, contacted by Mr. Fisher who was

         4    contacted by Mr. Weber?

12:53    5              MR. PATRICK KNIGHT:  I was contacted by Mr. Fisher.

         6    I'm unaware of any communications or contact with Mr. Weber

         7    other than Mr. Fisher advising me that they had encountered

         8    some difficulty in service, and I don't know about that, and

         9    that's -- that's simply information that I received in a phone

12:53   10    call from Mr. Fisher.

        11              MR. SCHWAB:  You know, Your Honor, my understanding

        12    was that this individual was the one that passed on that

        13    Mr. Weber was in Israel.  Maybe I misunderstood that.  I'm not

        14    sure where this information that he's out of the country came

12:54   15    from, if it was directly to defense counsel or -- but it

        16    doesn't sound like it was to this attorney.

        17              MR. PATRICK KNIGHT:  No.  I'm unaware of his

        18    location, if he's in country or out of country right now.

        19              THE COURT:  Thank you.  Mr. Wirth, Miss Baynard, any

12:54   20    question for Mr. Knight?

        21              MR. WIRTH:  No, Judge.

        22              MS. BAYNARD:  No.

        23              THE COURT:  All right.  Mr. -- Anything further,

        24    Mr. Schwab?

12:54   25              MR. SCHWAB:  No, Your Honor.

12:54     1          THE COURT:  All right.  Mr. Knight, thank you so much

         2     for making time for us.  Please enjoy the rest of your day.

         3          MR. PATRICK KNIGHT:  Okay.  Not a problem, Judge.

         4     Thank you.

12:54     5          THE COURT:  Thank you.

         6          MR. PATRICK KNIGHT:  Bye now.

         7          MR. SCHWAB:  Still confused where the providence of

         8     Mr. Weber being out of country comes from.  My understanding

         9     from this morning is that it was from this guy.

12:54    10          THE COURT:  That's why I called Mr. Knight, and you

        11     heard -- I did not speak to --

        12          MR. SCHWAB:  I --

        13          THE COURT:  Excuse me.  I did not speak to him prior

        14     to coming on the record, so you're hearing what I'm hearing at

12:55    15     the same time as well.

        16          MR. SCHWAB:  Thank you.

        17          THE COURT:  All right.  You also have deserved a

        18     lunch, so if you could take an hour for lunch as well, and very

        19     quickly when we come back for lunch, before the first witness,

12:55    20     witness Wigley take the stand, we can take up the exhibit list

        21     issues that we started this morning.

        22          MS. MOTLEY:  Thank you, Your Honor.

        23          MR. SCHWAB:  Your Honor, if I may just make one

        24     request that you send the marshals over to Mr. Weber's house to

12:55    25     see if he's home?

12:55  1          THE COURT:  Okay.

2          MR. SCHWAB:  We were told by defense counsel that

3  this attorney had reached out to them.  That apparently is not

4  the case.  I don't know if he actually is in Israel.  We, like

12:55  5  I said, we had weeks of efforts to -- we spent significant sums

6  to try to serve him, he appears to be dodging service at times.

7  We don't know if he truly is in Israel or in the Middle East or

8  just sitting in his living room determined not to come here.

9          THE COURT:  Do you know at this time whether

12:56  10  Mr. Weber's currently represented by other counsel?  Mr. Knight

11  said he did not -- he doesn't no longer represent him.

12          MR. SCHWAB:  I do not know.  All I can say is that we

13  served him, we made efforts, and this was telegraphed for weeks

14  and weeks.  We discussed with opposing counsel about this.

12:56  15  This was not a secret that we were attempting to serve him.  We

16  did affect service upon him, he didn't show, he never filed

17  anything, he never apparently retained an attorney to file

18  anything.  He should be held in contempt of court right now,

19  and we should send a marshal out to go get him.

12:56  20          THE COURT:  And, Mr. Wirth or Miss Baynard, do you

21  know if someone other than Mr. Knight is representing

22  Mr. Weber?

23          MS. BAYNARD:  No, Your Honor.  And I would say that

24  for the purpose of this case, when we became aware, so this

12:56  25  E-mail that I'm looking at from Pat Knight when we became aware

12:56　1　of it on Sunday we addressed it at the pre-trial conference on

2　Monday, we didn't get a heads-up that he was being served, so

3　we couldn't coordinate it.  So it wasn't like, hey, we're

4　trying to serve Barry.  All right.  Let me E-mail him and say,

12:57　5　hey, you're going to be out of town?  Are you back on Thursday?

6　Are you back -- excuse me -- back on Friday?

7　　　So, I mean, for the purpose of he is going to be a witness

8　in this case, I don't think he would have personal service,

9　I'm -- I don't think he would have personal representation.

12:57　10　I'm not aware of any attorney that represents him, but Pat

11　Knight just represented him, I think that's why Tom Fisher

12　reached out.

13　　　So we will make efforts to --  We can try to contact him,

14　but I don't want to be kind of like held up or, you know, if we

12:57　15　can't get him today or tomorrow, or I guess whenever.

16　　　　　THE COURT:  All right.  If defense counsel can reach

17　out to see what's the latest information regarding Mr. Weber's

18　location, and we'll take it from there.

19　　　　　MR. WIRTH:  Very good.

12:58　20　　　　　THE COURT:  Okay.  Thank you.

21　　　　　THE BAILIFF:  All rise.

22　　　　　(A lunch recess was taken.)

23　　　　　THE CLERK:  Judge Joseph is on the bench.  Calling

24　case 20-CV-1660, Andrew Aaron, et al., versus Dominick

13:59　25　Ratkowski and Joseph Roy, continuation of the jury trial.

139

13:59  1   Appearances, please, beginning --

2          THE COURT:  Good afternoon.  Given that we have the

3   same appearances as this morning, I'll just enter in the record

4   that we have the same appearances.

14:00  5      Ms. Motley, regarding the exhibit list, do the contested

6   areas concern any of the witnesses that we will hear from this

7   afternoon?

8          MS. MOTLEY:  Your Honor, I do -- would like to

9   address the redacted target list that we all know what we can

14:00  10  and cannot use.

11         THE COURT:  Okay.  Yes, but does it concern any of

12  the witnesses we're going to see right away?

13         MS. MOTLEY:  It may.

14         THE COURT:  It may.  Okay.  All right.

14:00  15         MS. MOTLEY:  And it may with one witness.  It may.

16  Sorry.

17         THE COURT:  So I have 385 in front of me, and I also

18  have 387.  So I believe 385 came from the plaintiff and 387

19  came from the defense.  So on the first page, the difference I

14:00  20  see between these two is that on the defense, there is the

21  line, The People's Movement group note, and I read that similar

22  to the plaintiff, that line refers to the person above?  It --

23      Mr. Wirth, you -- because the way it's written it's a

24  person's name and then notation.  So you're shaking your head

14:01  25  no, so go ahead, please be heard.

14:01   1          MR. WIRTH:  Judge, the testimony will be that Khalil
2      Coleman was one of the leaders of The People's Movement group,
3      and so that notation actually goes down with him.  He's on the
4      list as one of the leaders.

14:01   5          THE COURT:  I understand that, so am I reading the
6      chart incorrectly, that name and notes in reference to this --
7      to the individuals?

8          MR. WIRTH:  It's that --  It's not uniform, you are
9      correctly reading it for most of the entries, but it -- because
14:01  10      it was added to and from, it got disjointed in places.

11          THE COURT:  All right.  Ms. Motley?

12          MS. MOTLEY:  Your Honor, you know, it just -- I mean,
13      I'll take attorney Wirth's word for it, it's just that we -- we
14      did talk on Friday, he did tell me that on Friday, that was the
14:02  15      first time, you know, I'd heard of that, but it just didn't
16      make sense with the way that it is in the -- in the target
17      list, so --

18          THE COURT:  Okay.  Well, I was reading it the same
19      way as the plaintiffs' counsel was reading it, but if
14:02  20      Mr. Wirth's presentation to the Court is that Mr. Ratkowski
21      will testify that this relates to the person immediately below,
22      then it will not be redacted.

23          The next difference I see is with plaintiff redacted G.D.
24      and the defense did not.  Mr. Wirth?

14:02  25          MR. WIRTH:  Right, it just says G.D.  I know that

141

14:02  1   attorney Motley suggested that that's an abbreviation for

2   Gangster Disciples, and it very well may be, but that's not

3   what it says.

4                   THE COURT:  Okay.

14:02  5                   MR. WIRTH:  We don't intend to suggest that

6   Mr. Coleman is on this list because he's a Gangster Disciple.

7                   THE COURT:  All right.  Well, if we're not going to

8   get into that just at a matter of prudence, let's redact that

9   G.D.

14:03 10       And then the next -- unless I'm missing it, but the next

11  page I see differences are -- is on page 29.

12                  MR. WIRTH:  There's a couple other ones before that.

13                  THE COURT:  There's a couple other ones before that.

14  All right.  Take me to the next page of differences.

14:03 15                  MR. WIRTH:  I'll have to call up the ones that have

16  the red stripes on 'em.

17                  THE COURT:  And while Mr. Wirth is calling that up,

18  Miss Motley, part of the reason I wanted to take this up later

19  and we are not rushing is because we do have the jury waiting,

14:03 20  so if it really does not concern the witnesses that we are

21  expecting, because it does require us going entry by entry, but

22  if it does not, I'd like to save them for later when we're not

23  rushing through them.

24                  MS. MOTLEY:  Your Honor, I can understand that, and

14:04 25  that's fine.  I would like --  I would like for us --  The

14:04   1   issue is is that now Captain Vetter's going to testify, and so

2   this list may come in, and frankly our perspective is I'm not

3   trying to be disrespectful to the Court, but their whole

4   defense is permissible purpose, permissible purpose, so why is

14:04   5   anything being redacted?  If this whole document is a law

6   enforcement permissible purpose that is not a violation of

7   DPPA, then I don't -- the redactions -- this is the problem,

8   Your Honor, from a practical standpoint.

9       We have this list redacted.  Then we have Joseph Roy, he

14:04   10  redacted the list also.  And on that redaction of the list, the

11  names of non-parties are not redacted.  So are we going to

12  redact that?  And then there's different versions of this list.

13  There's like 25 versions of this list.

14      So it's, you know, it's a bigger sort of issue, I think,

14:05   15  and I just wanted to put that on the record at least so that

16  the Court is aware.  I'll definitely, you know, with -- with

17  Vetter I'm happy to -- I don't want to waste the Court's time.

18  I agree with --

19          THE COURT:  Well, it's not my time, but we do have

14:05   20  the jury waiting, and if it's something that I would need to go

21  entry by entry into, it's going to take longer.

22          MS. MOTLEY:  I just ask the Court to allow me to use

23  docket 285 today.  That's the path of least resistance.  I'm

24  not going to ask Vetter like, okay, let's look at page 25, you

14:05   25  know, what does this entry say?  But I may use it.

143

14:05    1          THE COURT:  You may use the exhibit, but not portions

2     that are contested that I have not ruled on.

3          MS. MOTLEY:  Thank you, Your Honor.

4          THE COURT:  Okay.  And in regards to the continuing

14:05    5     objection about the list being redacted, again, it is redacted,

6     the global redactment is for non-plaintiffs, and the reason for

7     that as I explained previously I think is supported by the four

8     corners of the statute, that is that DPPA is an individual

9     rights kind of statute, so the individuals have to assert their

14:06   10     violation of the DPPA.

11          To allow plaintiff -- names who are not plaintiffs to be

12     submitted to the jury, or to be questioned to then the defense

13     would have the right to explain why those others are on the

14     list and they're not parties to the case.  So that is the

14:06   15     reason.  We'll focus on the plaintiffs, that's what you have

16     the burden of showing, and that's what they have the

17     opportunity to respond to.  Let's bring our jury out.

18          (The jury is in the box.)

19          THE COURT:  You may be seated.  Good afternoon,

14:09   20     members of the jury.  We are continuing as to where we left off

21     this morning.  Prior to lunch you had the opportunity to hear

22     the parties' opening statements, and now we begin the evidence

23     part of the case with the plaintiffs presenting their case.

24     Miss Motley?

14:09   25          MR. SCHWAB:  Your Honor, plaintiffs call for their

14:09  1  first witness Madeleine Schweitzer.  And, Your Honor, may I

2  work from the lectern?

3          THE COURT:  Yes, you may.  Just be careful not to

4  block the jury.

14:09  5          MR. SCHWAB:  Sure thing.

6          THE CLERK:  Raise your right hand.

7          MADELEINE SCHWEITZER, called as a witness herein,

8  after having been first duly sworn, was examined and testified

9  as follows:

14:10  10          THE WITNESS:  I do.

11          THE CLERK:  You can have a seat, please.  State and

12  spell your first and last names.

13          THE WITNESS:  Madeleine, M-A-D-E-L-E-I-N-E,

14  Schweitzer, S-C-H-W-E-I-T-Z-E-R.

14:10  15                    DIRECT EXAMINATION

16  BY MR. SCHWAB:

17  Q.    Good afternoon, Miss Schweitzer.

18  A.    Hi.

19  Q.    Miss Schweitzer, where do you currently live?

14:10  20  A.    I live in Milwaukee, Wisconsin.

21  Q.    Okay.  And where did you grow up?

22  A.    I grew up in Whitefish Bay, Wisconsin.

23  Q.    Okay.  Tell me a little bit about your background.

24  A.    I, like I said, grew up in Whitefish Bay, went to college

14:10  25  at MIAD at the Milwaukee Institute of Art & Design, worked as a

14:11  1    gathering manager at an art gallery in town for 10 years, and

2    now I am the general manager of a restaurant.

3    Q.   Okay.  And during the period in question, the summer of

4    2020, what was your profession?

14:11  5    A.   I was a gallery manager and I was doing a little part-time

6    managing work at a restaurant.

7    Q.   Okay.  And did you have any -- any hobbies you were

8    engaged in at that time as well, anything that was important in

9    your life?

14:11  10   A.   Yeah, I'm a painter, so painting, photography, artwork,

11   all -- all that stuff.

12   Q.   Okay.  Now, at some point you became involved in a set of

13   marches; is that correct?

14   A.   Yes.

14:12  15   Q.   When about did you become engaged?

16   A.   I became engaged, I think it was very late May, 2020, and

17   a large protest was going by my house, and I felt moved and I

18   joined in.  My family, a source of pride in my family is the

19   fact that my grandparents marched with Father James Groppi, who

14:12  20   is a influential civil rights leader in town, and when I saw

21   all the different communities coming together, I joined in.

22   Q.   Okay.  And at some point the movement or -- or these

23   marches formed, I guess, into a kind of a loose coalition that

24   we've heard described as TPR.  Are you familiar with that?

14:13  25   A.   Yes.

146

14:13   1    Q.   Where --   Were you part of those marches?

         2    A.   I was.  Yes.  My husband and I, who is a -- the director

         3    of the documentary department at UWM, we decided we were going

         4    to film every march of TPR as they tried to reach 100 marches

14:13   5    and even beyond those 100 marches, so, yeah, it was still --

         6    still working on the documentary.

         7    Q.   You said a hundred marches.  Was this a hundred marches

         8    scattered across any amount of time?

         9    A.   Consecutively, so 100 -- 100 days of consecutive marching.

14:13  10    Q.   Okay.  So a hundred days.  How many of those days did

        11    you -- did you show up?

        12    A.   I think I only missed a couple of days, so -- but like I

        13    said, the marches went beyond 100 days.  I was there for

        14    probably 80 percent, 85 percent of the different marches.

14:14  15    Q.   And what would 85 percent of the total marches look like

        16    in a numerical sense?

        17    A.   Ooh, I went to art school.  So I think there was a whole

        18    year of action, so 375, 325, something similar --   A lot of

        19    days.

14:14  20    Q.   Maybe over 300?

        21    A.   Yes.

        22    Q.   Okay.  And how big were these marches, you know, what was

        23    the size range?

        24    A.   In the very beginning they were very large, and there were

14:15  25    multiple different groups, not just TPR, ooh, thousands of

147

14:15   1   people in the very early days, but the numbers dwindled as time

2   went on, and I'd say a good day I'd have 40 people.

3   Q.   Okay. So you talked about these hundred days. Moving

4   past the first couple weeks with a lot of energy, 40 average

14:15   5   people per day?

6   A.   It really depended on the day.

7   Q.   Sure.

8   A.   Sometimes less.

9   Q.   And what was -- what was the -- how long were these

14:15   10   marches? How long would they go for?

11   A.   Hours.

12   Q.   Hours?

13   A.   It really depended on the day, of course, but there were

14   nights where we wouldn't get home until like pretty late,

14:16   15   11:00 p.m., so, ooh, we would march five to six hours some

16   days, again, depended on the day. Some days were shorter, some

17   days were longer. But, yeah, there's a lot of -- lot of miles

18   put on.

19   Q.   And you were filming most of this, right?

14:16   20   A.   Yes.

21   Q.   Okay. What -- Can you describe for me what these marches

22   on a day-to-day basis looked like?

23   A.   Yeah. So we would all gather in one place, we would find

24   out the location from a Facebook page and meet up, have a

14:17   25   little pre-march circle. They were always quite joyous. We

14:17  1  were -- There's a song that was sung stating what -- what the

2  day was, what number we'd reached, and then there would be a

3  impactful speech about why the group is there and what -- what

4  goals they had.

14:17  5  Q.   Okay.  Now, we heard in the opening statement how the

6  police needed this list because everyone was blocking

7  ambulances, and I can't even -- I apologize, I didn't catch the

8  parade of horribles that were listed, but did you ever see

9  anyone blocking ambulances while you were out there in these

14:18  10  day after day after day, 300 days?

11  A.   I never saw that, no.  It was --  The group I saw was full

12  of teachers and sometimes children and parents, and that was

13  never anything that occurred that I saw.

14  Q.   Were people chanting?

14:18  15  A.   Yes.

16  Q.   People holding signs?

17  A.   Yes.

18  Q.   And at times marching in the street?

19  A.   Correct.  Yeah.

14:18  20  Q.   Okay.  Now, you found yourself on this target list; isn't

21  that correct?

22  A.   Yes.

23  Q.   Okay.  Did you ever commit a crime?

24  A.   No.

14:18  25  Q.   Any police ever reach out to you to investigate you for a

14:18  1    crime?

       2    A.    No.

       3    Q.    Are you aware of any conduct you engaged in that could

       4    constitute a crime?

14:18  5    A.    No.

       6    Q.    Okay.  Any police ever reach out to you to ask you

       7    questions about possible other investigations of crimes?

       8    A.    No.

       9    Q.    Blocking of ambulances?

14:19 10    A.    No.

      11    Q.    Nobody ever knocked on your door?

      12    A.    No.

      13    Q.    Okay.  And, in fact, you said you filmed day after day

      14    after day, right?

14:19 15    A.    Yes.

      16    Q.    So you had hundreds of hours of film?

      17    A.    Yes.

      18    Q.    Any police ever reach out to you to ask if they could

      19    review your film?

14:19 20    A.    No.

      21    Q.    So how did it feel when you learned that you had been

      22    placed onto this list?

      23    A.    Really violating.  Yeah, felt like my personal privacy was

      24    put out there to people that I didn't know, and I have had

14:20 25    experiences with a stalking situation in the past, and so that

14:20  1    was concerning to me as a -- as a young woman.

2    Q.   And, again, you've reviewed that target list, right?

3    A.   Yes.

4    Q.   And you saw your picture on there?

14:20  5    A.   Yes.

6    Q.   And you recognize where your picture came from?

7    A.   Yes.

8    Q.   Where was that?

9    A.   My driver's license.

14:20 10    Q.   Okay.  You ever consent to the use or disclosure of your

11   driver's license picture?

12   A.   No.

13   Q.   Your birthday?

14   A.   No.

14:20 15    Q.   Your --  The address that was on file with the Department

16   of Transportation?

17   A.   No.

18            MR. SCHWAB:  No further questions.

19            THE COURT:  Thank you, Mr. Schwab.  Mr. Wirth?

14:20 20            MR. WIRTH:  Very briefly.

21                    CROSS-EXAMINATION

22   BY MR. WIRTH:

23   Q.   Miss Schweitzer, when did you learn about the list?

24   A.   Well --

14:21 25    Q.   Well into the lawsuit, right?

151

14:21    1    A.    January, 20 --  What year?

         2    Q.    Okay.  And I don't --  I wasn't trying to trick you at

         3    all.  It was well after the protests were over?

         4    A.    Well, this -- that's hard because I've heard accounts of

14:21    5    other people who would --

         6              THE COURT:  Okay.

         7    BY MR. WIRTH:

         8    Q.    I'm asking you.  You were unaware of this list until well

         9    after the protests were over, correct?

14:21   10    A.    No.

        11    Q.    What's incorrect about that?

        12    A.    I knew there was a list, either in police vehicles or at

        13    the station.  I'd heard accounts of people seeing their photos.

        14    Q.    Where would you post the film that you would take during

14:22   15    these 300 marches?

        16    A.    On social media and --

        17    Q.    I don't know what social media is.  What medium?

        18    A.    Facebook and Instagram, and I believe we have some on our

        19    website.

14:22   20    Q.    You also have a website with the films?

        21    A.    Yes.  Yes.

        22    Q.    Within those 300 marches that you filmed, what would be

        23    the subject of your filming?  What were you there to film?

        24    A.    The people that made up The People's Revolution, the

14:22   25    different relationships.

14:23    1    Q.   The singing and the chanting and the sign holding, that

2    kind of thing?

3    A.   Yes.

4    Q.   Did you go to all of the protests, the marches, I think

14:23    5    we're calling them, that your schedule permitted?

6    A.   Yes.

7    Q.   You were never prohibited by the police from attending a

8    march, correct?

9    A.   Correct.

14:23    10    Q.   And you were there for 80 to 85 percent of them?

11    A.   Yes.

12    Q.   And you were permitted to film those 80 to 85 percent you

13    attended?

14    A.   Yes.

14:23    15    Q.   Is it your testimony that during your attendance you never

16    saw property destruction?

17    A.   I -- No.

18    Q.   You never filmed property destruction?

19    A.   No. Oh, yes. No. No.

14:24    20    Q.   What -- What hung you up there?

21    A.   I just forgot how you phrased that.

22    Q.   Okay.

23    A.   My fault.

24    Q.   And I -- if I do that, it's a bad question, just tell me

14:24    25    to ask it a different way, okay?

153

14:24    1    A.    Okay.  Sorry.

         2    Q.    Were you there in your 80 to 85 percent in the presence of

         3    any confrontations between protesters and police?

         4    A.    Can you ask that again?

14:24    5    Q.    Sure.  Any shouting matches, any nose to nose, any

         6    physical confrontations, anything like that?

         7    A.    Yes.

         8    Q.    Did you film those?

         9    A.    Yes.

14:24   10    Q.    Were those also then posted on Facebook, Instagram, and

        11    your website?

        12    A.    Yes.

        13    Q.    Those would be filmed witness of confrontation between

        14    protesters and police, correct?

14:25   15    A.    Yes.

        16    Q.    The groups that you traveled with you said were kind of

        17    friends and neighbors, teachers, those kinds of things?

        18    A.    Yes.

        19    Q.    But the protests themselves, especially on the days when

14:25   20    there were a thousand people, were made up of multiple

        21    different groups, correct?

        22    A.    Yes.

        23    Q.    So your perspective and your filmography in that

        24    perspective was kind of in and amongst your group and your

14:25   25    orbit, if you will?

14:25    1    A.    Yes.

         2    Q.    Okay.  But you would agree with me that in those protests

         3    there were different groups and different orbits that you may

         4    be completely unaware of?

14:25    5    A.    Yes.

         6    Q.    Why Wauwatosa?  Why were you there?

         7    A.    We had learned of a police officer who had killed three

         8    young men of color in a five-year span who was at that time

         9    still on the force.

14:26   10    Q.    Were you also in other municipalities?

        11    A.    Yes.

        12    Q.    What other municipalities were you in?

        13    A.    Whitefish Bay, Milwaukee, West Allis, Shorewood.

        14    Q.    Multiple north shore neighborhoods?

14:26   15    A.    Yeah.  Yes.

        16    Q.    And in those multiple north shore neighborhoods did you

        17    also film the marches?

        18    A.    Yes.

        19    Q.    In those multiple other north shore neighborhoods did you

14:26   20    ever film property destruction?

        21    A.    No.  I don't believe I did.

        22    Q.    So your experience --  And was that also dozens, hundreds

        23    of marches in the other north shore suburbs?

        24    A.    Dozens.

14:27   25    Q.    So maybe 400 marches total?

14:27  1  A.   Yeah.

2  Q.   And in 400 marches, you never saw property destruction?

3  A.   Not in these suburbs.

4  Q.   All you were --  All you recall filming in terms of other

14:27  5  than the singing and chanting and sign holding would be

6  confrontations between marchers and police?

7  A.   Amongst.

8        MR. WIRTH:  Then I guess that's all I have.  Thank

9  you.

14:27  10       THE WITNESS:  Okay.

11       THE COURT:  Anything further, Mr. Schwab?

12                 REDIRECT EXAMINATION

13  BY MR. SCHWAB:

14  Q.   These confrontations with police officers, were they

14:27  15  physical?

16  A.   Sometimes.

17  Q.   Protesters would throw punches at police officers?

18  A.   No.

19  Q.   Okay.  The protester conduct, was it verbal or physical?

14:28  20  A.   The protesters were often hurt by police officers.

21  Q.   Okay.  And we talked about the -- those marches with

22  thousands?

23  A.   Yes.

24  Q.   Were those the marches through Wauwatosa throughout the

14:28  25  summary?

14:28   1   A.   No.

2   Q.   Okay.  And, you know, you heard that the police didn't

3   make an effort, you know, that --  Or you were asked if the

4   police tried to stop you from filming, correct?

14:28   5   A.   Correct.

6   Q.   How does knowing that you're on this list impact your

7   likelihood to film future protests?

8   A.   It gives me pause.  I feel worried, and knowing my

9   information is out there, I don't feel as comfortable as I once

14:29  10   did.

11          MR. SCHWAB:  Thank you.  No further questions.

12          THE COURT:  Thank you, Mr. Schwab.  Thank you.  You

13   may step down.

14          THE WITNESS:  Thank you.

14:29  15          THE COURT:  Your next witness, Mr. Schwab?

16          MR. SCHWAB:  Yes, Your Honor.  I'm going to call --

17   Plaintiffs call Tiffany Stark.

18          THE BAILIFF:  Watch your step.

19          TIFFANY STARK, called as a witness herein, after

14:29  20   having been first duly sworn, was examined and testified as

21   follows:

22          THE WITNESS:  I do.

23          THE CLERK:  Okay.  You can have a seat, and then

24   please state and spell your first and last name.

14:29  25          THE WITNESS:  My name is Tiffany Stark.  Tiffany,

14:29 1    T-I-F-F-A-N-Y, Stark, S-T-A-R-K.

2                 DIRECT EXAMINATION

3    BY MR. SCHWAB:

4    Q.   Good afternoon, Miss Stark.

14:30 5    A.   Good afternoon.

6    Q.   Can you tell me where you currently live?

7    A.   I live in West Allis, Wisconsin.

8    Q.   Okay.  And where did you grow up?

9    A.   In West Allis, Wisconsin.

14:30 10    Q.   Okay.  Born and raised?

11    A.   Yes.

12    Q.   Can you tell me a little bit about your background, your

13    experiences?

14    A.   I have a bachelor's degree from Mount Mary College in

14:30 15    social work and then I have a graduate master's degree from

16    UW-Milwaukee.  I graduated in 2009.  I'm a mental health social

17    worker; I work with addictions and mental health.

18    Q.   And where do you -- where do you provide those services?

19    A.   I work at the VA Medical Center on the inpatient psych

14:30 20    unit.

21    Q.   Okay.  How did you come to be involved with -- with the

22    marches in the summer of 2020?

23    A.   I saw a post from an MPS teacher that was organizing a

24    protest or a community event with family and kids just to get

14:31 25    some information and get to know other people that were

158

14:31    1    concerned with the things that were happening in our country

2    and our -- in our own city.

3    Q.    Okay.  And do you remember when that was, approximately?

4    A.    It was in June of 2020.

14:31    5    Q.    Okay.  And at some point you became -- you at least were,

6    is it fair to say that you were involved with multiple marches

7    in Wauwatosa as well?

8    A.    I would say yes and no.  It's hard to tell.  I mean, I

9    would say I wasn't out there a lot.  I would probably say I did

14:31    10   'em maybe altogether maybe like 30 protests.

11    Q.    Sounds like a lot to me.

12    A.    Not like everybody --  You know, there was a lot more

13    people out there, but with my time constrictions, that's what,

14    you know, I would try to come when I could, but depending on my

14:32    15   schedule.

16    Q.    Okay.

17    A.    And they were in different places, so Tosa was some of

18    them, but not all of them.

19    Q.    Okay.  And what was your experience at these -- these 30

14:32    20   or so marches?

21    A.    It was a great energy, it was a lot of different people

22    from different backgrounds.  There was people that were older,

23    younger, in the middle, people that were -- that were part of

24    groups in Tosa, like Tosa moms or, you know, there's just a lot

14:32    25   of different organizations.  And it was exciting to see people

14:32   1    come together and, you know, try to, you know, encourage each

2    other and trying to figure out what we can do to make our

3    community and country better.

4    Q.    Okay. And did you see kids out there?

14:32   5    A.    Yes.

6    Q.    Did you see people holding signs?

7    A.    Yes.

8    Q.    Did you ever see anyone blocking an ambulance?

9    A.    No.

14:33   10    Q.    Did you ever see anyone committing property destruction?

11    A.    No.

12    Q.    Breaking windows?

13    A.    No.

14    Q.    Graffitiing anything?

14:33   15    A.    No.

16    Q.    Violence? Did you ever see a protester engaged in

17    violence?

18    A.    No.

19    Q.    Okay. And you hesitated. You know, and so at some point

14:33   20    you -- it turns out you were placed onto this target list;

21    isn't that your understanding?

22    A.    Yes.

23    Q.    And you've seen the -- your entry for the target list?

24    A.    Yes.

14:33   25    Q.    Okay. Do you recognize the photo?

14:33    1    A.    Yes.

         2    Q.    And where is that from?

         3    A.    That's from the protests I mentioned that the MPS teacher

         4    had organized.

14:33    5    Q.    Okay.

         6    A.    Which was family friendly children.

         7    Q.    Did you ever commit any crimes while you were out there?

         8    A.    No.

         9    Q.    And did the police ever reach out to you?

14:33   10    A.    No.

        11    Q.    Ever stop by your door?

        12    A.    Nope.  No, sorry.  No.

        13    Q.    Nobody ever reached out to you to investigate any crimes?

        14    A.    No.

14:34   15    Q.    Okay.  Well, then tell me what -- how did it feel when you

        16    did see that you were -- your name and your address and your

        17    other personal information had been placed onto this target

        18    list.

        19    A.    I was in shock.  Because I was never pulled over, never

14:34   20    ticketed, never arrested.  I just couldn't believe that I was

        21    on the list.  Like I said, I maybe went to 30 marches, and

        22    there's other people that have been out there more frequently,

        23    and I just was -- other people were shocked.  I was shocked.

        24    Q.    Okay.  And you said you work in healthcare?

14:34   25    A.    Yes.

14:34   1    Q.   Are you in your own professional capacity subject to any

2    privacy laws?

3    A.   Yes.

4    Q.   Tell me about those.

14:34   5    A.   There's a law called HIPA, which means you cannot release

6    anybody's medical personal information without a release of

7    information or you would be fired.

8    Q.   And in your job you take that seriously?

9    A.   Yes.

14:35  10    Q.   Lastly, did anyone ever reach out to you to ask if they

11    could put your name on this list?

12    A.   No.

13    Q.   Anyone ever reach out to you to see if they could access

14    your D.O.T. records?

14:35  15    A.   No.

16    Q.   And anyone ever reach out to you to see if they could

17    share your personal contact information around?

18    A.   No.

19    Q.   Okay.

14:35  20            MR. SCHWAB:  No further questions.

21            THE COURT:  Thank you, Mr. Schwab.  Mr. Wirth?

22                         CROSS-EXAMINATION

23    BY MR. WIRTH:

24    Q.   Miss Stark, very briefly.  You indicated that you attended

14:35  25    about 30 of the protest marches; is that correct?

162

14:35   1    A.   Yes.

2    Q.   How many of those took place in Wauwatosa?

3    A.   Maybe five or six.

4    Q.   How many times were you part of the protests that were at

14:35   5    the mayor's house?

6    A.   Zero.

7    Q.   How many times were you in the protests that took place on

8    or near Mayfair Mall?

9    A.   Maybe two.

14:36   10   Q.   With respect to your inclusion on the list, were you ever

11   stopped by Wauwatosa from participating in any of the marches

12   that your schedule permitted you to attend?

13   A.   No.

14   Q.   With respect to your presence on the list, were you ever

14:36   15   contacted by any other police department to stop you from

16   attending a protest that your schedule permitted?

17   A.   No.

18   Q.   You don't specifically know where the list --  You don't

19   personally know where the list of the contents of the list may

14:36   20   have been distributed, correct?  Other than what you may have

21   heard today in court.

22   A.   I only know when I learned about it, but I don't know

23   where exactly it was distributed, but I did hear that it was

24   given to other municipalities and other police entities and all

14:37   25   of that.

163

14:37  1    Q.   But none of those police entities stopped you from

       2    protesting or marching or attending either, did they?

       3    A.   No.

       4    Q.   Which of the protests in Wauwatosa do you remember?

14:37  5    A.   I remember some of the protests with the family of Jay

       6    Anderson, I remember the October march after the -- the

       7    Coles -- after D.A. Chisholm decided not to charge Joseph

       8    Mensah in the murder -- well, the murder of Alvin Cole.

       9    Q.   And that's -- that's kind of how you feel, correct?

14:37 10    A.   Yes.

      11    Q.   And that October one was one of the big ones, correct?

      12    A.   Yes.

      13    Q.   Hundreds of people, correct?

      14    A.   Yes.

14:38 15    Q.   And did you circulate among those hundreds of people, or

      16    did you stay kind of in your group?

      17    A.   I stayed in my group.

      18    Q.   And who was your group?

      19    A.   Some of my friends.

14:38 20    Q.   So with respect to the hundreds of marchers, you don't

      21    know what others may have been doing?

      22    A.   Correct.

      23              MR. WIRTH:  That's all I have, Judge.

      24              THE COURT:  Thank you.  Anything further, Mr. Schwab?

14:38 25              MR. SCHWAB:  Yes, Your Honor.

                                                                   164

14:38    1                THE COURT:  Anything further?

         2                MR. SCHWAB:  Yes, Your Honor.

         3                THE COURT:  Oh.

         4                        REDIRECT EXAMINATION

14:38    5    BY MR. SCHWAB:

         6    Q.    Knowing that your personal information has been disclosed

         7    like this, does that impact your feelings about protesting in

         8    the future?

         9    A.    I don't know, I have to be careful because I work for the

14:38   10    federal government, I have security clearance, and I have to

        11    get a PIV card renewed, and that doesn't -- hasn't been renewed

        12    since all of this has happened, and it's not going to be

        13    renewed --

        14                MR. WIRTH:  I don't mean to interrupt the witness,

14:39   15    but we're going into material that was prohibited by motions in

        16    limine.

        17                THE COURT:  If we could tie into that by --

        18                MR. SCHWAB:  I'm only asking the question in response

        19    to his question about whether it stopped her from protesting.

14:39   20                THE COURT:  Okay.  If you could just answer the

        21    question directly, please.

        22                THE WITNESS:  Yes.

        23                MR. SCHWAB:  No further questions.

        24                THE COURT:  All right.  Thank you so much.

14:39   25    Mr. Schwab, your next witness?

14:39 1          MR. SCHWAB:  Ms. Motley is going to -- is --

2  Plaintiffs will call Lauryn Cross to the stand.  Miss Motley

3  will conduct direct.

4          THE COURT:  Thank you.

14:39 5          LAURYN CROSS, called as a witness herein, after

6  having been first duly sworn, was examined and testified as

7  follows:

8          THE WITNESS:  I do.

9          THE CLERK:  Thank you.  You can have a seat, and

14:40 10  please state and spell your first and last name.

11          THE WITNESS:  Lauryn, L-A-U-R-Y-N, Cross, C-R-O-S-S.

12                    DIRECT EXAMINATION

13  BY MS. MOTLEY:

14  Q.   Good afternoon, Miss Cross.

14:40 15  A.   Hello.

16  Q.   Please note with questions, answers to questions, you have

17  to use words so the court reporter can take everything down.

18  So yes, you have to say the words.

19  A.   Yes.

14:40 20  Q.   Thank you.  So, Miss Cross, June 5th of 2020, what were

21  you doing that day?

22  A.   I know that I was at a protest, it was a couple days

23  before my birthday.  I had been on about 90 percent of the

24  protests that summer.

14:40 25  Q.   Okay.  And while you were at the protests, did you -- have

14:40   1   you ever been charged with a crime for being at a protest on

2   June 5th of 2020?

3   A.   No.

4   Q.   Have you been charged with a crime for being at a protest

14:41   5   in 2020 at all?

6   A.   No.

7   Q.   Okay.  Have you ever been ticketed by any Wauwatosa

8   officers for being at a protest?

9   A.   No.

14:41  10   Q.   You see where defense counsel table is, correct?

11   A.   Yes.

12   Q.   Okay.  So the man behind him with the tie is Dominick

13   Ratkowski.  Have you ever met Dominick Ratkowski before?

14   A.   No.

14:41  15   Q.   Okay.  And the man sitting next to him is defendant

16   Lieutenant Roy.  Have you ever met him before?

17   A.   No.

18   Q.   Okay.  Have you ever been contacted by anyone from the

19   City of Wauwatosa on June 5th of 2020 or at any time in 2020?

14:41  20   A.   No.

21   Q.   And when you were at a protest, did you ever block any

22   ambulances?

23   A.   No.

24   Q.   When you were at a protest, did you ever, you know, tell

14:42  25   officers what your date of birth is?

14:42    1    A.    No.

2    Q.    When you were at a protest did you ever tell officers what

3    your address is?

4    A.    No.

14:42    5    Q.    Okay. And you're aware that you're on the target list,

6    correct?

7    A.    Yes.

8    Q.    Okay. And how does it make you feel to be on the target

9    list?

14:42    10    A.    I think it's kind of intimidating to continue doing

11    protests. Yeah, I see it as like something that kind of like

12    criminalizes me for taking part in something like that.

13    Q.    Okay. And when did you first learn that you were on this

14    target list?

14:42    15    A.    I think during the open records request for the target

16    list through --

17    Q.    And just to refresh your memory, would that have been

18    around January -- or, sorry -- around July of 2021?

19    A.    Yes.

14:43    20    Q.    Okay. So you heard that -- June 5th of 2020 you said you

21    were protesting, right?

22    A.    Yes.

23    Q.    You've heard that on June 5th of 2020 it was agreed that

24    defendant Ratkowski created a list, correct?

14:43    25    A.    Yes.

168

14:43  1    Q.   Okay.  So from June 5th of 2020 until July of 2021 you

2    didn't know you were on this list?

3    A.   Yes.

4    Q.   Okay.  And based off of that, has it affected you from

14:43  5    going out and engaging?  Protesting?

6    A.   I think it makes me feel like I have to be a little bit

7    more careful.  I think I, like, resonate well with, like, the

8    stalking portion of it.  That's what I feel like when I'm --

9    when I'm protesting is like I'm being stalked.

14:43  10   Q.   I'm sorry.  I didn't mean to upset you.

11   A.   That's okay.

12   Q.   Did you engage in any other sort of activity, like did you

13   ever write any letters to the Government?

14   A.   Yes, I did petitions with community members, you know,

14:44  15   like police crime issues, I --  Was that the question?  Yeah,

16   I'll answer it.

17   Q.   Did you ever attend any meetings?

18   A.   With police?

19   Q.   With --  With anyone in the Government.

14:44  20   A.   Yes.

21   Q.   Okay.

22        MS. MOTLEY:  I have nothing further.  Thank you.

23        THE COURT:  Thank you, Miss Motley.  Miss Baynard, am

24   I calling on you?

14:44  25        MS. BAYNARD:  Yes, briefly.

169

14:44    1                      CROSS-EXAMINATION

2    BY MS. BAYNARD:

3    Q.    Miss Cross, do you live in Wauwatosa?

4    A.    No.

14:44    5    Q.    Okay.  Did you ever attend protests in Wauwatosa?

6    A.    Yes.

7    Q.    Okay.  Did you attend a protest in Wauwatosa on July 7th

8    of 2020?

9    A.    I probably did.

14:44   10    Q.    Okay.  Did any --  Did you ever attend a protest at the

11    Mayfair Mall?

12    A.    Yes.

13    Q.    How many do you think?  In the summer of, let's use summer

14    of 2020, so we'll go from May to October.

14:45   15    A.    At least four.

16    Q.    Okay.  Did you ever attend a protest that -- in Wauwatosa

17    at The Cheesecake Factory?

18    A.    Yes.

19    Q.    Okay.  Were you ever a part of a group that shut down The

14:45   20    Cheesecake Factory during a protest?

21    A.    Yes.

22    Q.    Okay.  And what was -- I guess do you recall what date

23    that occurred on?

24    A.    No.

14:45   25    Q.    Okay.  So if -- Can you give me a time frame of when you

14:45 1  were protesting?  We'll go to Mayfair Mall first.

2  A.   A time frame?  Anywhere from like the beginning of July

3  till like mid July, I think.  I'm not sure.

4  Q.   Okay.  But you said -- I believe you said you were

14:45 5  involved in a protest that shut down The Cheesecake Factory,

6  correct?

7  A.   Yes.

8  Q.   And you're not sure when that would've occurred?

9  A.   Yes.

14:45 10  Q.   And what was --  I guess what was your participation in

11  the protests that shut down The Cheesecake Factory?

12  A.   I was an emcee, so I introduced like speakers for the

13  event.  I was with the Cole family at the time who was speaking

14  at The Cheesecake Factory, and that's it.

14:46 15  Q.   Okay.  Are you aware that The Cheesecake Factory is

16  private property?

17  A.   Yes.

18  Q.   Okay.  And are you aware that Mayfair Mall is private

19  property?

14:46 20  A.   Yes.

21  Q.   Okay.  And when you were involved in the protests that

22  shut down The Cheesecake Factory, you said your role was to be

23  an emcee.  I guess can you just explain kind of what your --

24  explain what the emcee role would have -- what it would have

14:46 25  entailed?

14:46   1   A.   Yeah.  So like at an event, it would be to introduce the

2   speakers, the program for the event, why people are there.  If

3   any -- If  there needed to be like a relationship between, you

4   know, like people that had the venue for that event, so I did

14:46   5   talk to like the gentleman -- the manager of Cheesecake Factory

6   before we went into The Cheesecake Factory to have the event.

7   I talked to participating organizations in the event, and then

8   I also was with one of the families that had spoken at the

9   event, so just keeping in communication with people who were

14:47   10   speaking or people that were there.

11   Q.   Okay.  Were you ever a part of the group that attempted to

12   extort The Cheesecake Factory for a mural of Alvin Cole?

13   A.   Extort The Cheesecake Factory?  What do you mean by that?

14   Q.   Were you ever part --

14:47   15          MS. MOTLEY:  Your Honor, completely improper

16   questioning.  She's trying to throw in insinuation.  The

17   question doesn't even make sense, unintelligible.

18          THE COURT:  All right.  Miss Baynard, the witness did

19   not answer the question.  You may rephrase it, please.

14:47   20          MS. BAYNARD:  Do you want me to ask the question?

21          THE COURT:  You may rephrase it.

22   BY MS. BAYNARD:

23   Q.   Okay.  At your --  At the event where you assisted -- the

24   protest where you were at that shut down The Cheesecake

14:48   25   Factory, were you there reading off demands to -- over a

14:48  1  microphone?

2  A.   Yes.

3  Q.   Okay.  And was one of those demands that if The Cheesecake

4  Factory did not create a mural that you would -- the protesters

14:48  5  would continue to shut The Cheesecake Factory down until they

6  did so?

7  A.   No, that was not the demand.

8  Q.   Okay.  Were one of the --  I guess is one of the

9  statements that you made there, do you recall making a

14:48  10  statement that to the effect of you knew The Cheesecake Factory

11  made $20,000 a day or some amount of money a day and that you

12  were -- you and the group were going to continue to show up

13  until they met your demands?

14  A.   I did not make that statement.

14:48  15  Q.   Okay.  And beyond the 7/7 Cheesecake Factory protest, you

16  said you were at some -- at the Mayfair Mall.  Where else did

17  you participate in protests at?

18  A.   Where else did I participate in protests, like in 2020?

19  Q.   Well, let's do the -- we'll do the summer of 2020.

14:49  20  A.   I participated in protests on the east side of Milwaukee,

21  there's like a chalk and walk thing for the school board.  I

22  participated in protests at I think it was Wauwatosa Police

23  Department.  I'm not sure which, like the streets or which --

24  yeah.

14:49  25  Q.   At the Wauwatosa Police Department?

14:49   1   A.   Um-hum.

        2   Q.   Okay.

        3   A.   I participated in protests at like most parts of Wauwatosa

        4   or like most parts of the City of Milwaukee.

14:49   5   Q.   Okay.  Why was --  I guess what was the purpose of

        6   shutting down The Cheesecake Factory on 7/7 then?

        7   A.   That was the place where Alvin Cole was killed, which this

        8   is also in relation to the ongoing campaign against Joseph

        9   Mensah, who took part or was accused in taking part of the

14:50  10   murder of Alvin Cole.

       11   Q.   What would shutting The Cheesecake Factory down, I guess,

       12   have to do with protesting for that -- for the cause that you

       13   said you were protesting?

       14   A.   I think the movement at that time was -- or and the

14:50  15   release of footage, and it was belief that The Cheesecake

       16   Factory had access to CCTV footage during the time of Alvin

       17   Cole's murder.

       18   Q.   Okay.  And what was the purpose of I guess you said you

       19   protested at Mayfair Mall.  How many times -- I'm sorry if I

14:50  20   asked this question -- how many times do you think you

       21   protested at Mayfair Mall?

       22   A.   Not that many.  I think like under four definitely at

       23   Mayfair Mall.

       24   Q.   Yeah.

14:50  25   A.   Yeah.

14:50  1   Q.   You said under four?

        2   A.   For me personally, yes.

        3   Q.   And are you aware that Mayfair Mall was a, for lack of a

        4   better word, a consistent spot for these protests to occur?

14:51  5              MR. SCHWAB:  Objection, Your Honor.  Foundation.

        6              THE COURT:  Overruled.  She may answer if she knows.

        7   The witness may answer if she agrees.

        8              THE WITNESS:  I'm sorry?  What was the question

        9   again?

14:51  10   BY MS. BAYNARD:

       11   Q.   I said --  I believe my question was whether you were

       12   ever -- oh, were you aware that Mayfair Mall was a spot of --

       13   where consistent protesting was occurring?

       14   A.   I'm aware that some protests occurred there.

14:51  15   Q.   Okay.  Are you aware if Mayfair Mall was ever shut down

       16   because of the protesting?

       17   A.   I'm aware.

       18   Q.   You're aware that it was?

       19   A.   Um-hum.

14:51  20   Q.   Okay.  And I believe you said that you -- you continued to

       21   protest?

       22   A.   Yes.

       23   Q.   Do you still continue to protest?

       24   A.   Yes.

14:51  25   Q.   Okay.  And that's not withstanding your knowledge of this

14:51   1   list?

2   A.   Can you rephrase the question?  I'm sorry.

3   Q.   You continued to protest --

4   A.   Yes.

14:52   5   Q.   -- even though you have knowledge of a list that exists?

6   A.   Yes.

7   Q.   Okay.

8   A.   Differently, but yes.

9   Q.   Okay.  Have you seen --  Have you seen the list?

14:52  10   A.   Yes.

11   Q.   Okay.  Where did you see it?

12   A.   There was an article put out by the Wisconsin Examiner

13   detailing the list.  I found out through like the official list

14   and whether or not I was on it through the press.

14:52  15   Q.   Okay.  So the Wisconsin Examiner posted the list, that's

16   how you found out about it?

17   A.   No.  I --  I knew about the list's existence through the

18   open records request, but like details as to what was on the

19   list I learned through the press.

14:52  20   Q.   Okay.  So have you seen --  I'm trying to --  I'm sorry if

21   my questions aren't good.  You've seen it --  You've seen a

22   copy of the list, and I believe on your direct you said you

23   recognize your driver's license photo?  Did you --  You said

24   you saw the list and you recognized the photo on it to be your

14:53  25   driver's license photo.

Case 2:20-cv-01660-NJ    Filed 06/05/23    Page 176 of 267    Document 420

14:53   1   A.   Yes.

2   Q.   Okay.  Did you recognize the other photo of you on the

3   list to be you at the 7/7 -- the date The Cheesecake Factory

4   was shut down on 7/7?

14:53   5   A.   Yes.

6        MS. BAYNARD:  Okay.  I have nothing further.  Thank

7   you.

8        THE COURT:  Anything further, Miss Motley?

9        MS. MOTLEY:  Yes, Your Honor.

14:53   10              REDIRECT EXAMINATION

11   BY MS. MOTLEY:

12   Q.   So, Miss Cross, what do you do for a living?

13   A.   I'm a liaison for the Milwaukee Area Labor Council.

14   Q.   And what do you do there?  What is your job duties?

14:53   15   A.   I just get new members to go out and volunteer in the

16   community.

17   Q.   And how long have you had that job?

18   A.   Couple months, and then I also do home care.  I take care

19   of my old coworker's daughter.

14:53   20   Q.   Okay.  And do you have any relatives that live in

21   Wauwatosa?

22   A.   No.

23   Q.   Okay.  And do you have --  With your job is it your duty

24   to, you know, study protests in the City of Wauwatosa?

14:54   25   A.   No.

14:54   1   Q.   Okay.  So you heard attorney Baynard ask you about all

2   these specific protests.  That's not your job at all, correct?

3   A.   No.

4   Q.   And for many of the protests that she mentioned you

14:54   5   weren't there or don't even know anything about them, correct?

6   A.   Yes.

7   Q.   Okay.  Now, we talked about the Cheesecake Factory.  Now,

8   that happened a month in July, a month after this list was

9   created in July, 2020, correct?

14:54   10          MS. BAYNARD:  Objection.  Foundation.

11          THE COURT:  Sustained.

12          MS. MOTLEY:  Your Honor, may I --

13          THE COURT:  You may rephrase the question.

14          MS. MOTLEY:  Okay.  Thank you.

14:54   15          THE COURT:  Please rephrase.

16   BY MS. MOTLEY:

17   Q.   So you heard in the opening statements that one of the

18   facts that has been agreed to by both parties is that on

19   June 5th of 2020 defendant Dominick Ratkowski created a list.

14:55   20          MS. BAYNARD:  Going to object to foundation, and I

21   think it misstates the -- I don't think that's an undisputed or

22   a fact that we've stipulated to in this case.

23          MS. MOTLEY:  Your Honor, it is a fact that we

24   stipulated in this case.  It's specific that on June 5th of

14:55   25   2020 civilian list -- defendant Dominick Ratkowski created a

178

14:55  1   list.  That is the stipulation.

2   MS. BAYNARD:  Your Honor, the list is fluid, and it

3   changed and it grew, and so I think asking her whether or not

4   she -- about the list as it was on June 5th when there's been

14:55  5   no evidence other than opening statement which isn't evidence

6   about the date the list started is improper, and this witness

7   doesn't have foundation to answer that question.

8   MS. MOTLEY:  Your Honor, if I may respond.  Her

9   objection was that's not a stipulation.  That was a specific

14:55  10   stipulation that on or about --

11   THE COURT:  Miss Motley, go ahead, please rephrase

12   the question, and let's see what the witness knows.

13   MS. MOTLEY:  Okay.  Thank you.

14   BY MS. MOTLEY:

14:56  15   Q.  On June 5th of 2020 were you also aware that Dominick

16   Ratkowski created a list?

17   A.  No.

18   Q.  Okay.  When did you become aware of that?

19   A.  During the open records requests --  Or there was news

14:56  20   about in the open records request.

21   Q.  Okay.  Well, let's go back to the open records request.

22   You mentioned that you first heard or came to know that you

23   were on this target list through the Wisconsin Examiner; is

24   that accurate?

14:56  25   A.  Yes.

14:56  1   Q.   Okay.  And is that when you found out that you were on the

       2   list?

       3   A.   I'm not sure.  It was some time during the period after

       4   that the Wisconsin Examiner found out about the list.

14:56  5   Q.   Okay.  And do you recall when that was that you found out?

       6          MS. BAYNARD:  Objection.  Asked and answered.

       7          MS. MOTLEY:  I never asked that question.

       8          THE COURT:  You may answer the question.

       9   BY MS. MOTLEY:

14:57 10   Q.   Do you recall when you found out that you were on this

      11   target list?

      12   A.   Some time before the end of 2020.

      13   Q.   Okay.  And are you concerned about being on this list?

      14   A.   Yes.

14:57 15   Q.   Are you concerned about your information that's on this

      16   list?

      17   A.   Yes.

      18   Q.   Okay.  With regards to the questions that attorney Baynard

      19   talked to you about, The Cheesecake Factory protests in July of

14:57 20   2020, you indicated that you were there, correct?

      21   A.   Yes.

      22   Q.   Okay.  And you were on the microphone at some point during

      23   these protests?

      24   A.   Yes.

14:57 25   Q.   Okay.  And you weren't arrested that -- for those

14:57  1    participating in those protests, correct?

2    A.   No.

3    Q.   Were you ever ticketed?

4    A.   No.

14:57  5    Q.   Were you ever questioned?

6    A.   No.

7    Q.   Were you ever contacted by any law enforcement officers?

8    A.   No.

9    Q.   Were you ever contacted by any law enforcement agencies?

14:57  10   A.   No.

11   Q.   Okay.

12            MS. MOTLEY:  I have nothing further.  Thank you.

13            THE COURT:  Thank you.  You may step down.  Thank

14   you.  Next witness, please?

14:58  15            MS. MOTLEY:  Your Honor, plaintiffs would like to

16   call Luke Vetter, please.

17            MS. BAYNARD:  Your Honor, could we have a sidebar?

18            THE COURT:  Can we wait until after Mr. Vetter

19   testifies?

14:59  20            MS. MOTLEY:  I think it's regarding the list and what

21   we can and cannot show.

22            THE COURT:  All right.  We could have a sidebar,

23   please.

24            (The following discussion was held at sidebar.)

14:59  25            MS. BAYNARD:  I think we're both kind of in a -- I

181

14:59  1   think we're both kind of in agreement that the -- I guess the

2   version of the list should probably be decided before we get

3   into kind of like substantive, especially law enforcement

4   witnesses because our hope is that we call Vetter one time and

15:00  5   not -- and I know I think you want it to be decided, I -- for

6   us, I mean, that's kind of what I'm trying to avoid as to --

7           MR. SCHWAB:  We're at that point.

8           MS. BAYNARD:  It's unfortunately --  I don't want to

9   waste the Court's time any more either.  I don't know if you

15:00  10   have plaintiffs that can go and like -- or there's a good

11   stopping point or --

12           MR. SCHWAB:  We can't stop --  It's going to be a

13   sidebar at some point, right?

14           MS. MOTLEY:  I guess maybe what we can come to is an

15:00  15   agreement that, okay, page one is okay, I don't think we're

16   going to have him paging through it, so I think there's certain

17   pages where we're okay with.  So for me, page one I don't like

18   the G.D. thing or the --

19           THE COURT:  If I may interrupt you, Miss Motley.  I

15:00  20   had intended to give the jury their afternoon break at 3:30.

21   We can use that time to go through the list.  Is there a short

22   witness we could have that will take us until 3:30 break?

23           MS. MOTLEY:  Sure.

24           MR. SCHWAB:  I don't know if this will take 30

15:01  25   minutes, though.

15:01   1                THE COURT:  Might get it close?

        2                MR. SCHWAB:  I expect it's going to be consistent --

        3                THE COURT:  Do a witness, take a break, and then get

        4       into this list.  Okay.

15:01   5                (The sidebar discussion ended.)

        6                MR. SCHWAB:  Ready to proceed, Your Honor?

        7                THE COURT:  Yes, I'm ready to proceed.  Mr. Schwab or

        8       Ms. Motley, is it Mr. Schwab I'm calling on?

        9                MR. SCHWAB:  Schwab.  Plaintiffs will next call

15:02  10       Sonora Larson.

       11                THE CLERK:  Please raise your right hand.

       12                SONORA LARSON, called as a witness herein, after

       13       having been first duly sworn, was examined and testified as

       14       follows:

15:02  15                THE WITNESS:  I do.

       16                THE CLERK:  Please have a seat and spell your first

       17       and last names.

       18                THE WITNESS:  Sonora, S-O-N-O-R-A, Larson,

       19       L-A-R-S-O-N.

15:02  20                           DIRECT EXAMINATION

       21       BY MR. SCHWAB:

       22       Q.   Good afternoon, Miss Larson.

       23       A.   Hi.

       24       Q.   If you'd like, you can raise the microphone, maybe scoot

15:02  25       up to it just to make sure we're --

15:02  1    A.    Oh, yeah.

       2    Q.    -- speaking into the microphone so everyone can hear and

       3    the court reporter can --

       4    A.    How's this?

15:03  5    Q.    I think that's good.  If you'd like to, like I said, you

       6    can raise it if it would make you more comfortable instead of

       7    leaning forward.

       8          Ms. Larson, where do you currently live?

       9    A.    Boston, Massachusetts.

15:03  10   Q.    And what is your job?

       11   A.    I am a baker.

       12   Q.    What type of baker?

       13   A.    Pastry.

       14   Q.    Okay.  And has that been your profession for a little

15:03  15   while now?

       16   A.    Yes, either pastry cook or line cook for the past seven

       17   years.

       18   Q.    Okay.  And prior to moving to Boston, where did you live?

       19   A.    Riverwest in Milwaukee, Wisconsin.

15:03  20   Q.    Okay.  And where did you grow up?

       21   A.    Wauwatosa, Wisconsin.

       22   Q.    Okay.  Do you have any relatives that live there?

       23   A.    Yes.  My dad lives there still.

       24   Q.    Okay.  And where did you graduate from high school?

15:03  25   A.    Wauwatosa East High School.

15:03  1    Q.   Okay.  I want to turn your attention to the summer of

2    2020.  Do you remember how you became first involved in, you

3    know, how you came to attend your first protest, your first

4    march, first demonstration?

15:04  5    A.   Yes.  After witnessing a demonstration occurring outside

6    my house after the killing of George Floyd.

7    Q.   And was that here in Wisconsin?

8    A.   Yes, that was in --

9    Q.   Or, I apologize, here in Milwaukee?

15:04 10   A.   Yes, Milwaukee, Wisconsin.

11   Q.   Okay.  So you participated in some of the early

12   demonstrations in Milwaukee?

13   A.   Yes, I did.

14   Q.   Okay.  And at some point you found yourself also

15:04 15   participating in some of the TPR protests; is that correct?

16   A.   Yes.

17   Q.   How many would you say you participated in?

18   A.   Approximately 80.

19   Q.   Ah.  Was that most days?

15:04 20   A.   When I could, yes.

21   Q.   And what did those protests, those marches look like?

22   A.   Like others have described, large and then more small, but

23   regardless of size, I would say there is a community feel to

24   it, there were often families out there, and generally -- and

15:05 25   uplifting spirit.

15:05   1    Q.   Okay.   How long would you march when you marched with

        2    the -- with these groups?

        3    A.   Up to seven hours.

        4    Q.   Covering miles?

15:05   5    A.   Yes, covering miles.

        6    Q.   Did you ever carry a sign?

        7    A.   Yeah.

        8    Q.   Frequently?

        9    A.   Yeah.

15:05   10   Q.   Did you chant?

        11   A.   Yeah.

        12   Q.   Did you ever commit a crime?

        13   A.   Not to my knowledge, no.

        14   Q.   Did you ever break a window?

15:06   15   A.   No.

        16   Q.   Did you ever graffiti a building?

        17   A.   No.

        18   Q.   Did you ever commit any violence?

        19   A.   No.

15:06   20   Q.   Okay.   Did you ever see an ambulance stopped by a protest

        21   movement?

        22   A.   No, the opposite.

        23   Q.   Okay.   Were these well organized?

        24   A.   As well as you can organize.

15:06   25   Q.   People would go up and stop traffic?

186

15:06    1    A.   Oh, absolutely.  In terms of traffic flow, yes.  Very well

         2    organized.

         3    Q.   Okay.  So the goal wasn't to obstruct traffic, right?

         4    A.   No.

15:06    5    Q.   And, for example, if there had been an ambulance, there

         6    were people that would've been assigned to make room for that,

         7    right?

         8    A.   Absolutely.  Yes.

         9    Q.   And you said there were like up to seven hours?

15:06   10    A.   Yes.

        11    Q.   Were there some vehicles that had supplies?

        12    A.   Oh, yes.

        13    Q.   What types of supplies?

        14    A.   Water, Band-Aids, you know, like the big chip -- the boxes

15:07   15    with all the different kinds of little chip bags, those kind of

        16    things.  Yeah.

        17    Q.   Okay.  And like I said, you were -- you were out

        18    protesting in your own hometown, right?

        19    A.   Yes.

15:07   20    Q.   Did that play a role in your involvement?

        21    A.   One hundred percent.

        22    Q.   Okay.  Did any police officers ever reach out to you?

        23    A.   No.

        24    Q.   Anyone show up at your door to ask any questions?

15:07   25    A.   No.

187

15:07 1    Q.   Anyone ever reach out to you over your Facebook account to
2    ask you questions?
3    A.   No.
4    Q.   No police ever --  No police officer ever called you to
15:07 5    conduct an investigation?
6    A.   No.
7    Q.   An interview?
8    A.   No.
9    Q.   Okay.  But at some point you did learn that you had been
15:07 10   placed on this target list, right?
11   A.   That I did.
12   Q.   Okay.  And what did that mean to you?
13   A.   To me that meant that what -- while I was doing what I
14   felt was right, others were villanizing me for it.
15:08 15   Q.   Did it scare you?
16   A.   Yes.
17   Q.   Does it scare you?
18   A.   Yes.
19   Q.   Did you ever shout at part of a protest, here's my
15:08 20   address?
21   A.   No.
22   Q.   Did you ever chant your birth -- your date of birth?
23   A.   No.
24   Q.   Did you ever consent to giving a police officer your --
15:08 25   your home address?

188

15:08  1   A.   No.

       2   Q.   You ever give a police officer your driver's license

       3   picture?

       4   A.   No.

15:08  5   Q.   Okay.  And anyone ever reach out to you, ask you if it was

       6   okay to use that private information?

       7   A.   Nobody ever did that.

       8   Q.   And did anyone ever reach out to see if it was okay to

       9   disclose your private information?

15:08  10  A.   No.

       11             MR. SCHWAB:  No further questions.

       12             THE COURT:  Thank you, Mr. Schwab.  Mr. Wirth?

       13             MR. WIRTH:  Briefly.

       14                      CROSS-EXAMINATION

15:09  15  BY MR. WIRTH:

       16  Q.   You were at roughly 80 protests; is that correct?

       17  A.   Yes.

       18  Q.   And how many of those were in Wauwatosa?

       19  A.   30 to 40.

15:09  20  Q.   So you were a fairly regular attendee at the Tosa

       21  protests?

       22  A.   Yes.

       23  Q.   You were asked whether or not you had ever committed a

       24  crime, and you said not to my knowledge, correct?

15:09  25  A.   Correct.

15:09  1   Q.   You were, however --  You did, however, receive ordinance

       2   citations from the City of Wauwatosa, true?

       3   A.   True.

       4   Q.   One of them was in August for operating your vehicle

15:09  5   without its lights on?

       6   A.   Yes.

       7   Q.   Why were you driving on August 27th, 2020, with your

       8   lights off?

       9   A.   I had just started my car and had not yet turned them on.

15:10  10  Q.   You weren't already on the street in a moving vehicle?

       11  A.   Not that I recall.

       12  Q.   If the officer cited you for moving -- a moving vehicle

       13  with your lights off, would you disagree that's what you were

       14  doing?

15:10  15  A.   I did disagree, yes.

       16  Q.   Were there protests in which the protesters were driving

       17  in the street on the route with their lights off?

       18  A.   Not to my knowledge.

       19  Q.   You indicated that there was, however, occasions where the

15:10  20  protesters would stop traffic; is that correct?

       21  A.   Yes.

       22  Q.   Kind of at the tail end of the pretests you were also one

       23  of the attendees who were cited for being out during the

       24  curfew, correct?

15:10  25  A.   Yes.

15:10  1  Q.  You received a citation for that, correct?

2  A.  Yes.

3  Q.  With respect to the first citation for driving without a

4  license -- without your lights properly operated, was that

15:11  5  handed to you or mailed to you?

6  A.  I believe --  I don't recall.

7  Q.  With respect to the citation for being out after curfew,

8  was that handed to you or mailed to you?

9  A.  I do not recall.

15:11  10  Q.  On 9/2/22 you were at the mayor's residence for a protest,

11  correct?

12  A.  I --  I cannot confirm that date.

13  Q.  During one of your protests, irrespective of the date,

14  during one of your protests you actually Facebook Live videoed

15:11  15  your participation, correct?

16  A.  I believe so.

17  Q.  And that is on your public Facebook page?

18  A.  I am unaware of what is on my public Facebook page at the

19  moment.

15:11  20  Q.  What is a live --  What is a Facebook Live video?

21  A.  A Facebook Live video is when you stream to the internet

22  simultaneously as something is happening.

23  Q.  And what were you filming when you were streaming to the

24  internet simultaneously to the protests at the mayor's home?

15:12  25          MR. SCHWAB:  Objection, Your Honor.  Foundation.

15:12   1          THE COURT:  It's sustained as to the location of this

2    protest.

3    BY MR. WIRTH:

4    Q.   Well, you were at the mayor's home, correct?

15:12   5    A.   I have attended a protest at the mayor's home.

6    Q.   Your uncertainty was whether it was the 9/2/22 date?

7    A.   Correct.

8    Q.   Okay.  So while you were at the mayor's home, what were

9    you Facebook Live streaming?

15:12  10    A.   From what I recall as to live streaming at the mayor's

11   home I remember a confrontation -- a verbal confrontation

12   between a young man and a police officer who had showed up to

13   our protests at the mayor's home, and I recall live streaming

14   that confrontation as well as the pepper spraying that occurred

15:13  15   of the young man.

16   Q.   You were a witness to that, correct?

17   A.   I was a witness to that.

18   Q.   And with respect to your protest at the mayor's house, did

19   it go past midnight?

15:13  20   A.   I could not tell you that, but it doesn't sound --  I was

21   very rarely in Wauwatosa after midnight.

22   Q.   Were there times where you were protesting at the mayor's

23   house until 2:00 in the morning?

24   A.   Not to my knowledge, no.

15:13  25   Q.   But Facebook Live is a contemporaneous representation,

192

15:13   1   correct?

2   A.   In the --

3   Q.   For instance, if you're filming at 2:00 in the morning, or

4   if the stream is at 2:00 in the morning, that's when you're

15:14   5   filming, correct?

6   A.   Potentially.

7   Q.   And is that also something that could then thereafter be

8   saved on your Facebook page?

9   A.   Yes, it could be saved on my Facebook page.  Also if

15:14   10   something is published at 2:00 a.m., then it's very different

11   than it being streamed at 2:00 a.m.

12   Q.   No argument with you there.  But with respect to what you

13   were Facebook Live streaming, you were a witness to some form

14   of physical confrontation between a protester and a police

15:14   15   officer, correct?

16   A.   I was.

17               MR. WIRTH:  Then I don't have anything further.

18               THE COURT:  Thank you.  Anything further?

19                    REDIRECT EXAMINATION

15:14   20   BY MR. SCHWAB:

21   Q.   You saw a physical confrontation at this event?

22   A.   At this event, yes.

23   Q.   Did the protestor use physical violence against the police

24   officer?

15:14   25   A.   No.

15:14   1   Q.   Did the police officer use physical violence against the

        2   protester?

        3   A.   In that he dispersed pepper spray into this protester as

        4   well as my face, yes.

15:15   5   Q.   And you actually filed a complaint?

        6   A.   Yes, I did file a complaint.

        7   Q.   Did the police respond to that complaint?

        8   A.   I recall receiving a letter that -- I don't know the

        9   proper terminology, but it said that my complaint was

15:15  10   essentially null and that it did not matter.

       11   Q.   So you have video of the police using pepper spray on

       12   someone and the police did not investigate this?

       13   A.   Yes.

       14   Q.   Okay.  Even though you told them to?

15:15  15   A.   I -- Yes.

       16   Q.   And you were willing to provide them the video?

       17   A.   I was, yes.

       18   Q.   Okay.  When you were at the mayor's house did you break

       19   any of his windows?

15:15  20   A.   No.

       21   Q.   Did you commit, you know, any crimes?

       22   A.   No.

       23   Q.   And that protest ticket we talked about, do you remember

       24   when the protests started, the curfew started?

15:15  25   A.   7:00 p.m.

15:15  1    Q.   So it was still light out?

       2    A.   Yes.

       3    Q.   Okay.  And these two tickets they mentioned --

       4    A.   Yes.

15:16  5    Q.   -- was jail time ever on the table?

       6    A.   No, as far as I'm concerned they were municipal tickets.

       7    Q.   They were just monetary citations, right?

       8    A.   Yes.

       9    Q.   Okay.  So not criminal conduct?

15:16  10   A.   No.

       11              MR. SCHWAB:  No further questions, Your Honor.

       12              THE COURT:  Thank you, Mr. Schwab.  Thank you.

       13              MR. WIRTH:  May I just do one?

       14              THE COURT:  Very quickly.

15:16  15              MR. WIRTH:  Recross very quickly.

       16              THE COURT:  Very quickly.

       17                        RECROSS-EXAMINATION

       18   BY MR. WIRTH:

       19   Q.   You attended the morning session with the openings,

15:16  20   correct?

       21   A.   I did not.

       22   Q.   Oh, you were not here for the opening statements?

       23   A.   No.

       24   Q.   If one of the categories mentioned by the attorneys was

15:16  25   witnesses with respect to this incident, you were a witness?

195

15:16 1   A.   Was that a question?

2   Q.   Yes.

3   A.   Could you rephrase it?

4   Q.   I'll put a question mark on the end of it.  Yeah, I'll

15:16 5 rephrase it.

6      You were a witness to what occurred on the night that

7 there was a protest at the mayor's house, correct?

8   A.   If I was there, I witnessed it, yes.

9   Q.   And you filmed it?

15:16 10   A.   Yes.

11   Q.   Okay.

12         MR. WIRTH:  That's all.  Nothing further.  Thank you.

13         MR. SCHWAB:  Your Honor, briefly one re-redirect?

14         THE COURT:  Last one.

15:17 15                  REDIRECT EXAMINATION

16 BY MR. SCHWAB:

17   Q.   Did anyone from the police department ever reach out to

18 you to ask any questions including follow-up on your complaint

19 about this incident?

15:17 20   A.   No.

21         THE COURT:  Okay.  Thank you.  You may step down now.

22 Ladies and gentlemen of the jury, I think we have earned our

23 afternoon break, so you could use a facilities and stretch and

24 refresh.  Let's take 15 minutes, please.

15:17 25         THE BAILIFF:  All rise.

15:17   1          (The jury was excused.)

        2          THE BAILIFF:  You may be seated.  All right.

        3   Returning to the list, I have document 385 and 387 in front of

        4   me.  When we last talked, we had gone over the objection on

15:18   5   page one.  I believe there were no further objections on page

        6   one; is that correct?  Is that correct, Miss Motley?

        7          MS. MOTLEY:  Your Honor, I just wanted to be clear.

        8   For the sentence above Julio Coleman's name, it -- I'm sorry,

        9   we don't have a problem with that, but we do have a issue with

15:18  10   the likely a G.D.

       11          THE COURT:  I already ruled on that.

       12          MS. MOTLEY:  I'm sorry.

       13          THE COURT:  Yeah, it's been a long day, I already

       14   ruled that since it's not part of the expected justification

15:18  15   that it would be redacted.

       16          MS. MOTLEY:  Okay.  Thank you.

       17          THE COURT:  All right.  So nothing further on page

       18   one.  What's the next page, and again I'm using that 29-page

       19   document, if you tell me what page -- what is the next

15:19  20   objection?

       21          MR. WIRTH:  Judge, the next one that I can see, I

       22   don't have my paper open in front of me, but the next one that

       23   I can see is Gaige Grosskreutz.

       24          THE COURT:  Can you please give me a page number?

15:19  25   Because I have the documents, they have page numbers.

15:19  1          MR. WIRTH:  Apparently it's on page six.

2          THE COURT:  Yes.  Page six, Gaige Grosskreutz.

3          MR. WIRTH:  Grosskreutz.

4          THE COURT:  Grosskreutz.

15:19  5          MR. WIRTH:  The --  The difficulty with the redaction

6     there is that what's been redacted is the very -- or one of the

7     very reasons he's on the list.  Mr. --  Mr. Grosskreutz -- I'm

8     German, I should understand this -- acts as armed security on

9     the perimeter of the group.  The police need to know that.

15:19  10    That's one of the reasons he's on the list.

11         THE COURT:  Miss Motley, do you wish to be heard?

12         MR. SCHWAB:  Your Honor, this was made, a statement

13    made by an individual at crime analyst who we actually don't

14    have any real intelligence on this.  This is speculation on his

15:20  15    part.  Additionally, there's -- we've redacted this hit list

16    heavily, and there's a particular --

17         MS. BAYNARD:  Yeah, let's stop calling it a hit list.

18         MR. SCHWAB:  I didn't call it a hit list.

19         MS. BAYNARD:  You just said hit list.

15:20  20         MR. WIRTH:  You just did.

21         MS. BAYNARD:  You said a hit list.

22         MR. SCHWAB:  I said this list.  I'm sorry, I

23    enunciated poorly.  I've never called it the hit -- a hit list.

24    I apologize if I did.

15:20  25         There is an additional sensitivity to Mr. Grosskreutz,

15:20   1   especially if we're talking about this being made public or

2   displayed in open court.  Mr. Grosskreutz was one of the

3   Rittenhouse victims, so I think it -- the extra degree of

4   sensitivity, especially to wild accusations that he is an armed

15:21   5   security guard without any additional, you know, information

6   that it's just incredibly concerning, especially if we're

7   redacting this list for all these other protective purposes.

8           THE COURT:  We're not redacting for other protective

9   purposes.  Again, we are redacting from non-plaintiffs.  On the

15:21   10   first page the reference to the G.D. was redacted because it

11   does not connect to the expected explanation as to why it's on

12   the list.  So we're not just wildly redacting for all other

13   purposes.

14       All right.  As to the notation next to Mr. Grosskreutz's

15:21   15   name, if the anticipated testimony is that this is relevant as

16   to why he's on the list, it will remain.  The next one?

17           MR. WIRTH:  I'm going down the list.  We are now down

18   to, it appears to be page 19.

19           THE COURT:  Just give me a moment to get there,

15:22   20   please.  All right.  I am on page 19.

21           MR. WIRTH:  You'll see that there are at least, with

22   respect to Exhibit 385, there are one, two, three, four -- four

23   plaintiffs, and I'm trying to call up the -- four plaintiffs

24   who have redacted -- information redacted.  I'm trying to call

15:22   25   up the --  Oh, it mentions their arrests.  They're --  They've

15:22    1    redacted out the fact that these people are on -- because they

2    were arrested.

3            THE COURT:  All right.  I am on page 19.  I actually

4    have three versions in front of me.  Plaintiff, defendant, and

15:22    5    the unredacted, and it appears to have those dates.  So,

6    Ms. Motley, are you addressing this or Mr. Schwab addressing

7    this?

8            MS. MOTLEY:  I am, Your Honor.

9            THE COURT:  As to the first entry which relates to

15:22   10   Mr. Fanning?

11           MS. MOTLEY:  Yes, Your Honor.  If it's okay with the

12   Court, I can tell you the thinking for all four, because it's

13   the same sort of explanation.

14           THE COURT:  Yes, please.

15:23   15           MS. MOTLEY:  So it was my understanding that anything

16   with regards to potential, you know, criminal implications or,

17   you know, any sort of crime implications was not to come in,

18   and so that's why I redacted this.

19       With regards to these particular -- these four plaintiffs,

15:23   20   they were all arrested for a noncriminal ticket, and, you know,

21   frankly, I'm hearing something different from the defense

22   counsel, I -- which, you know, the story keeps changing that I

23   thought this was an investigatory tool and essentially a phone

24   book, but now, oh, that was put on there because he was

15:23   25   arrested.

15:23   1          You know, so we -- we redacted that because it's

2       prejudicial, and I'm concerned that it will give it a criminal

3       element to which, you know, it's a citation, that's why those

4       four particular plaintiffs were arrested, and actually those

15:24   5       four plaintiffs are also on the claim involving Joseph Roy, and

6       I believe those four citations are in the dump, the Dropbox

7       link dump which shows that it's a citation.

8              THE COURT:  All right.  Thank you.  Mr. Wirth or

9       Miss Baynard?

15:24   10             MR. WIRTH:  Miss Baynard can handle this one.

11             MS. BAYNARD:  I guess going to the criminality, we

12      agreed that we were not going to refer to the plaintiffs as

13      criminals because not all of them had committed crimes, but

14      that has -- I guess my understanding was not that we would be

15:24   15      redacting Dominick Ratkowski's notations on this list because

16      it indicates that somebody was arrested, or their arrest date

17      or has a booking photo.

18          So I think that it's improper to redact information from

19      the list, and if he testifies that, oh, it had nothing to do

15:25   20      with why I added them, well, that's one thing.  I don't

21      anticipate the testimony to be that.  It's relevant to why

22      people are included on this list, and I don't think we referred

23      to all the plaintiffs as criminals, and we don't intend to.

24             THE COURT:  Well, you're not allowed to.

15:25   25             MS. BAYNARD:  Exactly.  We don't intend to.

15:25   1          THE COURT:  Okay.  So as I made clear at the

        2   pre-trial conference, no one will be categorically referred to

        3   as criminals, so we had already settled that.

        4          As to the arrest date, if it relates to the justification

15:25   5   as to why an individual plaintiff is on the list, it remains on

        6   the list, however, the parties should clarify that we're

        7   talking about the -- when it says arrest, either in direct or

        8   cross-exam point out that the arrest in question is regarding

        9   citations or ordinance and not criminal conduct.

15:26  10          MS. MOTLEY:  Your Honor, may I add to that?

       11          THE COURT:  Yes.

       12          MS. MOTLEY:  I just simply add that if this

       13   particular page is shown, that it's, you know, in the way the

       14   Court is saying, it should be unredacted, it only be shown once

15:26  15   that evidence does come out.  Like I'm concerned that we have,

       16   you know, Luke Vetter testifying, and then we show every page.

       17   We don't have to show every page with every witness.

       18          THE COURT:  I think I mentioned this too at one of

       19   the final pre-trial conferences.  Nothing should be and will be

15:26  20   allowed to be published to the Court until the evidence is in

       21   and the exhibit has been admitted, so we're not just randomly

       22   flashing things before the jury.

       23          MS. MOTLEY:  Thank you.

       24          THE COURT:  So I think your question and comment goes

15:26  25   to foundation, relevant with a particular witness.

15:26    1            MS. MOTLEY: Thank you.

          2            THE COURT: So that's page 19. Next page?

          3            MR. WIRTH: I think most of it wraps up on 19. Yeah,

          4 because there are -- there's four curfew violations are on 19.

15:27    5 Let me just make sure. Yeah, then we just get to Facebook

          6 URL's and -- and vehicles which are all --

          7            THE COURT: If you please be specific as to what page

          8 I should be looking at.

          9            MR. WIRTH: Right. We're -- When we get down to

15:27   10 page 27, we start with just vehicle identification and there

        11 are no more plaintiff redactions after that, so -- so I think

        12 that once we -- I think that 19 wraps up the pages on which

        13 plaintiffs' materials had been redacted.

        14            THE COURT: All right. So what I'm hearing is there

15:27   15 are no further objections on this document that I need to

        16 address.

        17            MR. WIRTH: Yes, I believe that's correct. My only

        18 hesitation is I haven't compared the vehicle, the unredacted

        19 vehicle to the redacted vehicles. I have no -- I have no

15:28   20 doubt that plaintiffs couldn't redact from his vehicle, so I

        21 think we're -- I think we're set as to page 19.

        22            THE COURT: Miss Motley, is there any additional

        23 objection to address regarding this exhibit?

        24            MS. MOTLEY: Just one, Your Honor. I just want to be

15:28   25 clear for page one.

15:28  1            THE COURT:  Yes.

      2            MS. MOTLEY:  Am I allowed to show what we filed as

      3   docket 285 where we redacted out the likely G.D. and we also

      4   redacted the sentence above that?  Is this okay to show that?

15:28  5            THE COURT:  385, the sentence above remains for the

      6   reasons we discussed earlier, but your redaction of the G.D. is

      7   appropriate.  So we need a version that has the line visible

      8   and the G.D. blocked.

      9            MS. MOTLEY:  Thank you, Your Honor.  I'm happy to

15:29 10   do -- for plaintiffs' to do that, it just takes a minute to

     11   redact, because you have to redact everything, so I'm

     12   concerned --

     13            MR. WIRTH:  Judge, with respect to 387, the defense,

     14   all we would have to do is redact likely a G.D., and then it

15:29 15   would be done.

     16            MS. MOTLEY:  Your Honor, the issue with their exhibit

     17   is they're blacking out whole pages when we know that they are

     18   individual entries that it's really important.

     19            MS. BAYNARD:  I mean, I guess, you know, we've

15:29 20   already gone through opening statements and we've argued about

     21   this a lot and we said, look, we're not talking about

     22   plaintiffs that are not -- people that are not plaintiffs and

     23   we're not talking about claims.  The jury can see the full,

     24   that's 29 pages, and I think there's even testimony in the

15:29 25   opening that there's 400 people on here.

15:29  1        MS. MOTLEY:  200.

       2        MS. BAYNARD:  I heard 400 that all have their highly

       3   restricted information, and the Court already ruled that we

       4   were not going to be discussing parties that did not have

15:30  5   claims and individuals -- including individuals who are no

       6   longer plaintiffs and then showing the list that has -- and

       7   saying there's 200 people on this.  I mean, that is extremely

       8   unfairly prejudicial.

       9        THE COURT:  All right.  I believe I also addressed

15:30 10   this at the final pre-trial conference, that is because there

      11   was a discussion about whether there could be an exhibit that

      12   just shrank it down to just the remaining plaintiffs, and I had

      13   ruled that the full exhibit so that the jury, although not

      14   having a view of the non-plaintiffs, see what the exhibit

15:30 15   looked like, and that's the 29 pages and with the entries

      16   blocked out.

      17        So I believe the way the plaintiffs have it is

      18   appropriate, that it blocks out individual non-plaintiffs.  So

      19   that's consistent with my ruling on that.  But now we are

15:31 20   almost at the point of splitting hairs here on this exhibit.

      21        MS. MOTLEY:  And, Your Honor, if I can just correct

      22   the record?  That's correct, that's how -- as I remember the

      23   ruling, and I don't -- which is why I was surprised during

      24   opening, I recall the Court saying we could talk about there

15:31 25   being 200 people on this list.  I mean, the list is the list.

15:31   1   They're just trying to reimagine this document that was

2   created.  What we couldn't do is say, you know, this person and

3   this -- like talk about non-plaintiffs in that which is not --

4   that's what I understood it to be, we could talk generally

15:31   5   about it, but not specific to non-plaintiffs.

6           THE COURT:  You could talk generally about the scope

7   of the list, you cannot talk about non-plaintiffs nor can you

8   infer that the non-plaintiffs also have DPPA -- DPPA

9   violations.  They're not present, and current plaintiffs cannot

15:32  10   assert standing in the place of the non-plaintiffs, so a

11   reference can't be made, everybody -- it's 200 violations,

12   every individual in here has been violated.  What is before

13   this jury is the identified plaintiffs who are in court for

14   trial for, the 57.

15:32  15           MS. BAYNARD:  That's what came --

16           MS. MOTLEY:  -- how my rights were violated, I'm

17   happy with my -- it should be unredacted.

18           THE COURT:  You are not --  You cannot be both a

19   party of interest, a witness, and attorney in the case as you

15:32  20   well know, Ms. Motley.

21           MR. SCHWAB:  Your Honor, before we move on, and I'm

22   not, you know, not expecting argumentation, just for the

23   purpose of the preservation, we want to just once again state

24   that we believe the information contained in this document

15:32  25   unredacted is relevant, and that is our preference.  I'm not

15:33  1    trying to get into it right now, just for the purposes of

2    appeal, wanted to put that on the record.

3           THE COURT:  Thank you, Mr. Schwab.  The record is

4    made.  Anything else on this list before we move on?

15:33  5           MR. WIRTH:  Just one more thing, or to kind of wrap

6    up and see where we ended here.  If -- Before this thing can

7    get redacted, if we have like Vetter testify, which list can he

8    be handed?  Because some of what he's going to testify is

9    what's been redacted and won't show up on the red list versus

15:33  10   the blacked out list.

11          MS. MOTLEY:  Your Honor, may I respond to that?

12          THE COURT:  Yes.

13          MS. MOTLEY:  I believe for the specific entries, I

14   mean, I understand that Dominick Ratkowski made this list, that

15:33  15  he's the one to be -- talk about the specific entries, he did

16   this.  I don't have any testimony that Vetter added anything to

17   this list.

18          THE COURT:  So I'm understanding that response that

19   this exhibit will not be used with witness Vetter, am I correct

15:34  20  in my understanding?

21          MS. MOTLEY:  No.  I -- I don't know, Your Honor.  I

22   just don't know what's going to be said by him.  That's the

23   problem.  You know, people testify in depositions one way, then

24   they say, you know, it just hasn't been consistent, so --

15:34  25          THE COURT:  All right.  I understand that.  So long

15:34   1    that nothing -- nothing is published to the jury that has not

2    been approved. And no questions to the -- no questions in

3    front of the jury to witness Vetter inconsistent with the

4    ruling regarding the list.

15:34   5             MS. MOTLEY: Thank you.

6             MR. WIRTH: And what if one of the questions that we

7    don't know what's going to be asked, the only way Vetter can

8    answer it is if he sees the unredacted material for the

9    plaintiff? If you -- If we hand him something that has a

15:34   10    material redacted and say, why or what or when, and he looks at

11    it and says, I -- I don't know from this, but if that redaction

12    were gone, he would know from this.

13             THE COURT: All right. So as -- redaction as to

14    whom?

15:35   15             MR. WIRTH: The -- I thought the -- I thought the

16    conversation was going to end with, right, we're not going to

17    hand the list in any form to somebody like Luke Vetter, that's

18    the Ratkowski list. But why would we hand the list to Luke

19    Vetter?

15:35   20             THE COURT: I don't know. And I'm hearing plaintiff

21    does not know because they don't know what Mr. Vetter will

22    testify to, so witnesses have to testify about information

23    within their firsthand knowledge, so that -- I hope that guides

24    the examination, it has to be within -- within their firsthand

15:35   25    knowledge, and we'll take it from there if we must.

15:35   1          MS. MOTLEY:  Thank you.

        2          THE COURT:  All right.  Lastly, I want to return back

        3   again to Mr. Weber before we take our break.  I believe,

        4   Ms. Baynard, you were reaching out?

15:36   5          MS. BAYNARD:  Yeah, I did.  I did not --  I just got

        6   a voice mail, and I looked through the -- so he called and it

        7   got forwarded to our -- I mean, our after hours, so that's

        8   where the information came that he's gone.  I think he might be

        9   back tomorrow, or whatever day the 3rd is.  He said late on the

15:36  10   2nd.  I don't know if he's flying into Chicago.  I don't know

       11   if he's flying into -- or --  I don't know if he's actually not

       12   there, but that's the information that I have.

       13          And to the point of --  And I asked attorney Motley to

       14   send us a copy of the subpoena, because we never received it,

15:36  15   but if we want to readdress the issue of Weber and the policies

       16   that I guess he was purportedly going to speak about, and

       17   again, I don't want to take up time when the jury's here, but I

       18   have taken a look at the two policies and I believe plaintiffs'

       19   Exhibit 3 that they were going to have Barry Weber purportedly

15:37  20   speak on, it was not the policy that was in place on the time

       21   of the violation, that policy had been rescinded and there was

       22   a different open records policy in effect on -- starting

       23   July 27th, 2020, so that would've been at the time of

       24   Ratkowski's disclosure.

15:37  25          So my thought was if we were going to have Luke Vetter

209

15:37 1    testify about it, he could testify just to -- to that, and then

2    we can see if we hear back from Barry Weber on Wednesday, but

3    like I said, I don't have a copy of the subpoena yet, I'm going

4    to get a copy from Kim, and --

15:37 5         THE COURT:  Miss Motley?

6         MS. BAYNARD:  Miss Motley.  Sorry.  And then we

7    will -- I'll try to get ahold of him when he gets back.

8         MR. WIRTH:  I think it's possible we might be able to

9    secure his appearance on the 4th.

15:38 10        THE COURT:  All right.  Miss Motley?

11        MS. MOTLEY:  Your Honor, I think, and I hate to do

12   this, it's possible that, you know, as this trial goes on maybe

13   we won't need him, but we would like to secure his appearance,

14   that would be great.

15:38 15      With regards to the policy, we disagree with that, you

16   know, that was the DPPA policy, you know, that's why we're

17   having him testify, so --

18        MS. BAYNARD:  I mean, that's what -- if that's why

19   he's coming, I guess I was trying to make it easier for

15:38 20   everybody that it wasn't the policy that's in place.  I have

21   the policy that was effective and it says this policy rescinds

22   16-00, Driver Protection Act.  That's what I was trying to --

23   If that's what we were having him testify to go around all

24   this, I was going to say, if that clears anything up.

15:38 25        MS. MOTLEY:  Your Honor, the -- I know I looked last

210

15:38    1    week, but the current DPPA policy, which is our exhibit, is at

2    least thought last week when -- I think it's still on the

3    Wauwatosa Police Department's -- No, I have these. But thank

4    you.

15:39    5         MS. BAYNARD: No, those are -- Yeah. Yeah, yours is

6    three, it's on the top.

7         MR. WIRTH: But to address --

8         MS. MOTLEY: These are open records request policies.

9    We're talking about the DPPA policy. And so that's the issue.

15:39   10    The Driver's Privacy Protection Act. It's still on their

11    website, it still is the policy, I believe. It's currently on

12    their website right now. That's what we're talking about. And

13    this isn't a case about open records, this is a case about the

14    DPPA.

15:39   15         THE COURT: All right. We're eating into your little

16    break time. With respect to Mr. Weber, I encourage the parties

17    to keep -- have conversations to see whether this can be done

18    through cooperation, and if the parties -- plaintiffs need me

19    to take action, I will need the server to testify and make a

15:40   20    record about his -- his or her, I think it's a he, to serve

21    Mr. Weber so we can have a record on this issue.

22         MS. MOTLEY: Thank you.

23         MR. WIRTH: And like I said, Judge, I think it's

24    after midnight now where he is, but we will -- we will

15:40   25    facilitate his appearance on the 4th if that's what we want to

15:40  1  do.

2  THE COURT:  All right.

3  MS. BAYNARD:  I don't mean to --

4  MR. WIRTH:  I shouldn't promise anything.  Yeah.

15:40  5  THE COURT:  All right.  So the parties will keep

6  talking and working on that.  Okay.  You get maybe 10.  You

7  used up some of your time, so you can take 10, give our court

8  reporter a break.  Thank you.

9  THE BAILIFF:  All rise.

15:40  10  (A recess was taken.)

11  (The jury is in the box.)

12  THE COURT:  All right.  Good afternoon again, ladies

13  and gentlemen of the jury, we are now getting to our last hour

14  before the end of our first day.  Plaintiffs ready to proceed?

15:56  15  MS. MOTLEY:  Yes, Your Honor.  We'd like to call Luke

16  Vetter, and I believe attorney Wirth is going to get him.

17  THE COURT:  Thank you.

18  MS. MOTLEY:  May I --

19  THE COURT:  Yes, yes.

15:57  20  THE CLERK:  Raise your right land.

21  LUKE VETTER, called as a witness herein, after having

22  been first duly sworn, was examined and testified as follows:

23  THE WITNESS:  I do.

24  THE CLERK:  You can have a seat.  And state and spell

15:57  25  your first and last name.

212

15:58   1          THE WITNESS:  First name is Luke, L-U-K-E, last name

        2   is Vetter, V., as in Victor, E-T-T-E-R.

        3                      DIRECT EXAMINATION

        4   BY MS. MOTLEY:

15:58   5   Q.    Good afternoon.  I believe it's Captain Vetter?

        6   A.    Correct.  Good afternoon.

        7   Q.    Thank you.  Captain Vetter, thank you for being here today

        8   on short notice.  I wanted to talk to you a little bit about

        9   what it takes to become a Wauwatosa police officer.  Could you

15:58  10   please explain to us the process by which someone can become a

       11   Wauwatosa police officer?

       12   A.    There's a lot of steps in there, but generally speaking

       13   they apply, they have to have certain level of college credit,

       14   they need to go through a physical agility test, interviews,

15:58  15   background investigation, medical tests, then they have to go

       16   to a police academy for about four or five months and pass

       17   that.  And then they go through extensive training at the

       18   police department for about a year before they are -- truly

       19   become a full-fledged officer.

15:59  20   Q.    Okay.  So, okay, so you apply for the job, right?  And

       21   then you get a call for an interview; is that what I'm

       22   understanding?

       23   A.    I don't know if an interview is the first step.

       24   Q.    Okay.  Sorry.  What is the first step?

15:59  25   A.    The hiring process is not specifically in my bureau.  Once

15:59  1   those applicants get to a point where they are going to be

2   hired, background investigations, that's when I'm brought in,

3   so the first step probably is an application.

4   Q.   Okay.  So I guess this is a better question, I'm sorry.

15:59  5   So from application to hire, approximately how long does that

6   take?

7   A.   It depends.  It could take anywhere from three months to

8   six months to occur.

9   Q.   Okay.  And then once you're hired as a Wauwatosa police

16:00  10  officer, are you automatically let on the streets?  Is there a

11  probationary period?  Hew does that work?

12  A.   It depends if you're a certified officer or not when

13  you're brought on.

14  Q.   Okay.  So explain that.

16:00  15  A.   A certified officer is someone that has been a police

16  officer at a different agency.  They can be brought on

17  immediately and then they start training on the streets, but

18  again, they are not a full-fledged solo officer for about a

19  year after that point.

16:00  20  Q.   Okay.  So am I hearing correctly that if you come in and

21  have prior law enforcement experience and -- or if you come in

22  as a new officer, it takes at least a year to become a

23  full-fledged Wauwatosa police officer; is that accurate?

24  A.   Correct.

16:00  25  Q.   Okay.  Thank you.  And for that year's time period, are

16:00   1    you -- Do you shadow another officer? How does -- for a

2    new -- Let's just stick to new officers. Do they get -- Is

3    there a field training officer that they have to follow?

4    A.   So there's a lot of questions there, but they do have a

16:01   5    field training officer that they train with for about three

6    months, they have -- then they have a solo period where they're

7    on their own and are shadowed randomly and have biweekly or

8    monthly check-ins and evaluations until they get to that one

9    month -- or, excuse me -- that one year service mark.

16:01  10    Q.   Okay. Thank you. And is it fair to say there's a lot of

11   training that's involved for a Wauwatosa police officer?

12   A.   Yes.

13   Q.   Okay. And how long have you been with the Wauwatosa

14   Police Department?

16:01  15    A.   I'm in my 22nd year.

16   Q.   Okay. Wow. And so how -- could you please explain sort

17   of the, I guess, the organize chart of, you know, the Wauwatosa

18   Police Department?

19   A.   The organizational chart -- chart starts with the chief of

16:01  20   police. Underneath the chief are three captains, and each

21   captain runs a separate and distinct bureau. Those bureaus are

22   the patrol bureau, the administrative bureau, and the support

23   services bureau.

24       Underneath each of those bureaus there are various numbers

16:02  25   of lieutenants that supervise different units within the

215

16:02  1   bureau, and then underneath those lieutenants are sergeants

2   that usually run each of those units.  Underneath those

3   sergeants are then detectives and/or officers.

4   Q.   Okay.  And so are detectives and officers, are they at the

16:02  5   same level or are officers sort of below detectives?

6   A.   It depends on the situation.

7   Q.   Okay.  But generally speaking are officers below

8   detectives?

9   A.   It depends on the situation.

16:02  10   Q.   Okay.  So is there anyone under detectives and officers?

11   A.   On the sworn side, no.

12   Q.   Okay.  So we have the chief is top, and then under him are

13   three captains and you're one of the three captains, correct?

14   A.   Correct.

16:03  15   Q.   And then under the captains are lieutenants and then

16   sergeants and then detectives and police officers depending on

17   the situation?

18   A.   Correct.

19   Q.   Okay.  Thank you.  And as part of the police academy or

16:03  20   training, are officers required to, you know, know how to look

21   peoples' private information up in the D.O.T. system?

22   A.   As part of which training?  I missed the --

23   Q.   Their training.

24   A.   It is part of their training, yes.

16:03  25   Q.   Have you ever looked anybody up in the time system?

16:03   1   A.   Yes.

        2   Q.   Okay.  Is there any officer with the Wauwatosa Police

        3   Department that does not have the ability or the access to look

        4   somebody up in the time system?

16:04   5   A.   All sworn staff will have access.

        6   Q.   Okay.  And is that sort of basic training that everyone

        7   has to -- that sworn officers have to know how to look people

        8   up in the time system?

        9   A.   Correct.

16:04  10   Q.   Okay.  And what does that training consist of?

       11   A.   It's training that they receive at the academy, they

       12   receive on-the-job training, and then there's, I believe it's

       13   maybe biannual training that's required through the State of

       14   Wisconsin as well.

16:04  15   Q.   Okay.  And a person that goes through the academy, is that

       16   before they're hired as an officer of Wauwatosa?

       17   A.   No, usually they're hired and then they are sent to the

       18   academy.

       19   Q.   Okay.  So they're hired and then they go to the academy

16:04  20   and that's about four months?

       21   A.   Correct.

       22   Q.   Okay.  And are they allowed to go on the street and arrest

       23   people and do sort of law enforcement tasks while they're at

       24   the academy?

16:05  25   A.   No.

16:05  1   Q.   Okay.  But they get that D.O.T. training at the academy?

       2   A.   They may.

       3   Q.   They may.

       4   A.   Correct.

16:05  5   Q.   Okay.  If they don't get it at the academy, when do they

       6   get it?

       7   A.   They get that when they come to the police department and

       8   have their active field training.

       9   Q.   Okay.  And that active field training is within the first

16:05  10  year of them being with the Wauwatosa Police Department,

       11  correct?

       12  A.   Correct.

       13  Q.   Okay.  Thank you.  And as part of that training, you're

       14  taught about the Driver's Privacy Protection Act; is that

16:05  15  accurate?

       16  A.   Correct.

       17  Q.   Could you please describe to us what that training,

       18  specific to the DPPA, what that consists of in order to pass

       19  it?

16:05  20  A.   I don't know what the specific training is for that

       21  specific policy.

       22  Q.   Okay.  But you said you've been an officer for 27 years?

       23  A.   Twenty-two.

       24  Q.   Sorry, 22 years.  And you said that that training happens

16:06  25  how often?

16:06  1    A.    It depends if it's a departmental training or if it's a

2    state recertification.

3    Q.    Okay.  So let's say if it's a department training, how

4    often does Wauwatosa Police Department have its officers

16:06  5    participate in the DPPA training?

6    A.    So I don't know if we have a specific policy that's

7    entitled DPPA.  There's a combination of open records requests

8    along with the DPPA that deals with both of those topics.  And

9    just like all our or policy and procedure, they're reviewed

16:06  10   every couple years for any updates and then rolled back out or

11   down to the staff for, could be roll call trainings, could be

12   group trainings once those policies come out.  So about every

13   couple years there is informal training.

14   Q.    Okay.  So what I'm talking about, I'm talking about

16:07  15   training, not policies, because the DPPA training is conducted

16   by the DOJ, correct?

17   A.    I don't know.

18   Q.    Okay.  But you have access to the time system?

19   A.    I do.

16:07  20   Q.    Okay.  And in order to have access to the time system, can

21   you just go on any computer and have access?

22   A.    I don't believe so.

23   Q.    Okay.  So what does it require for you to access someone's

24   D.O.T. records?  What do you have to do?

16:07  25   A.    You're able to access those through squad computers once

16:07  1  logged on, once your credentials are verified, meaning that the

2  system identifies you as a valid user.

3  Q.   Okay.  So I'm sorry, I'm really trying to understand this.

4  So I'm going to make a presumption.  So when someone is pulled

16:07  5  over and an officer goes back and conducts the checks in their

6  squads, are they -- is that when they're going into the D.O.T.

7  system to look people up?

8  A.   Correct.

9  Q.   Okay.  And that's in --  And they can do that from their

16:08  10  squad vehicle?

11  A.   They can.

12  Q.   Okay.  And then in order to look people up, for instance,

13  at the Wauwatosa Police Department, is it just like an open

14  source computer that anyone can look someone up, or do you have

16:08  15  to put a specific user name and password?  How does that work?

16  A.   Every computer you must log into with your own specific

17  user name.

18  Q.   Okay.

19  A.   There are not just like open computers at the police

16:08  20  department for that type of information.

21  Q.   I see.  Okay.  And so can a Wauwatosa -- you know, can

22  someone at Wauwatosa give their passport -- excuse me -- their

23  user name and password to someone that does not have access to

24  the D.O.T.?  Is that okay for them to do if they haven't gone

16:08  25  through the training themselves?

16:08    1    A.   So you asked two questions.  Can they give it to someone?

2    Sure.  Should they give it to someone?  No.  It's a violation

3    of policy.

4    Q.   Okay.  Thank you for correcting me.  So a person should

16:09    5    not give their user name and password to someone that has not

6    gone through the DPPA training; is that accurate?

7    A.   It depends on what they're accessing.  We do have generic

8    passwords as well that we access different things through as

9    well.

16:09   10    Q.   Okay.  But if you're a person that does not have -- has

11    not gone through the training with the DOJ and has not been

12    credentialed to have access to the DPPA, even with those extra

13    user names and passwords, are they allowed to access that

14    system?

16:09   15    A.   Could you restate that question exactly?

16    Q.   Okay.  Let me give you an example.  I want your user name

17    and password.  I haven't gone through the training.  I work at

18    the City of Wauwatosa, haven't gone through the training.  Can

19    you give me your user name and password so I can look someone

16:10   20    up?

21    A.   I could give it to you, yes.

22    Q.   Okay.  Should you give me your user name and password if I

23    haven't gone through the training myself?

24    A.   Probably not.

16:10   25    Q.   Okay.  And why is that?

221

16:10    1    A.    Because the access to that information generally is for

         2    law enforcement sensitive only, and that's who -- excuse me,

         3    that's how we restrict who has access to that by giving those

         4    credentials and that ability to.

16:10    5    Q.    Okay.  Now, as part --  Why does law enforcement need

         6    access to this information?

         7    A.    To which information?

         8    Q.    To information --  Well, let me just take a step back.  So

         9    when a law enforcement officer accesses someone's information,

16:10   10    does it just go into the D.O.T. records?

        11           MS. BAYNARD:  Objection to form of the question.  I

        12    think it's ambiguous and foundation.

        13           MS. MOTLEY:  I'll rephrase.

        14           THE COURT:  Thank you, Miss Motley.

16:11   15           MS. MOTLEY:  Thank you.

        16    BY MS. MOTLEY:

        17    Q.    So let's take it a real life example.  Okay.  Someone's

        18    being pulled over, okay, and they have their squad camera -- or

        19    squad computer in the car.  When they go and do their checks

16:11   20    and they type in the information, does the system specifically

        21    go to only the D.O.T. record, or does it go to a bunch of

        22    different databases?

        23    A.    It, I believe, it checks several databases.

        24    Q.    Okay.  Do you know what databases it checks?

16:11   25    A.    I believe when you do a single name check, it's possible,

16:11   1   or a plate check or a serial number on some type of piece of

2   property, it'll check Department of Transportation, it'll check

3   time, it'll check a national crime information.  Property,

4   databases.  There's all sorts of things that it checks at the

16:12   5   same time.

6   Q.   Okay.  But as the user, you have to -- do you have to

7   check a box to make sure it checks D.O.T. or NCIC, or does it

8   automatically check all those different databases at the same

9   time?

16:12  10   A.   I don't know if it checks all of them at once.

11   Q.   Okay.  Do you know what databases it does check

12   automatically?

13   A.   I do not.

14   Q.   Okay.  Thank you.  But you said you can do those searches

16:12  15   with the -- a name check, you mentioned.

16   A.   You can.  Yes.

17   Q.   Okay.  Thank you.  Now, per the Wauwatosa Police

18   Department policy, what are some of the information that's

19   supposed to be protected by the police department?

16:13  20            MS. BAYNARD:  Objection.  Foundation.

21   BY MS. MOTLEY:

22   Q.   Based on your training and experience --

23            MS. BAYNARD:  I'll withdraw.

24            THE COURT:  Go ahead, Miss Motley.  I heard you

16:13  25   starting to rephrase the question.

223

16:13   1              MS. MOTLEY:  Yes.

        2              THE COURT:  You may proceed.

        3              MS. MOTLEY:  Thank you.

        4     BY MS. MOTLEY:

16:13   5     Q.   Based on your training and experience, what are some of

        6     the personal information that Wauwatosa police officers are

        7     supposed to protect?

        8     A.   We are supposed to protect all personal information.

        9     Q.   Okay.  If a person is arrested, does that make it okay for

16:13  10     their address to be, you know, shared, disclosed to people

       11     outside the Wauwatosa Police Department?

       12              MS. BAYNARD:  Objection to form of the question.

       13     Compound.

       14              MS. MOTLEY:  I'll --

16:13  15              THE COURT:  Sustained.  You may rephrase and simplify

       16     it, Miss Motley.  Thank you.

       17              MS. MOTLEY:  Thank you.

       18     BY MS. MOTLEY:

       19     Q.   Based on your training and experience, if someone is

16:14  20     arrested for a noncriminal ticket, is it the policy of the

       21     Wauwatosa Police Department that their address can be disclosed

       22     publicly?

       23              MS. BAYNARD:  Going to object to relevance too.  I

       24     don't think that this --  I guess I don't think this question

16:14  25     is eliciting a response that would be relevant to any of the

16:14 1  claims at issue, specifically the DPPA claim.

2        MS. MOTLEY:  Your Honor, actually this is relevant to

3  the DPPA claim.  We have two defendants here, goes to claim

4  two.

16:14 5        THE COURT:  Overruled.  You may answer the question,

6  Captain Vetter.

7        THE WITNESS:  My experience is that addresses often

8  are redacted.

9  BY MS. MOTLEY:

16:14 10  Q.   Now, based on your training and experience, is it the

11  policy of Wauwatosa Police Department to disclose a person's

12  driver's license number publicly?

13  A.   No.

14  Q.   Based on your training and experience, is it the policy of

16:15 15  the Wauwatosa Police Department to disclose a person's height,

16  weight, eye color, hair color publicly?

17  A.   No.

18  Q.   Based on your training and experience, is it the policy of

19  the Wauwatosa Police Department to disclose a person's home

16:15 20  address publicly?

21  A.   No.

22  Q.   Thank you.  Now, I want to talk a little bit about police

23  citizen complaints.  How does one --  Do you have a police

24  citizen complaint policy?

16:15 25        MS. BAYNARD:  Going to object on the basis of

16:15  1    foundation, relevancy.  This --  I can't imagine how the

2    complaint policy would have anything to do with the DPPA claim.

3                THE COURT:  Relevance?

4                MS. MOTLEY:  Your Honor, it goes to the willful

16:15  5    reckless with regards to the target list.  We've already had

6    testimony from Miss Sonora Larson that she put in a police

7    citizen complaint and she ended up on the target list.

8                THE COURT:  May I please have -- see the attorneys at

9    sidebar?

16:16  10               (The following discussion was held at sidebar.)

11               THE COURT:  What's the relevance relating to

12   procedure or policy?

13               MS. MOTLEY:  No problem.  So we believe that there

14   are some people that are added to this target list simply

16:16  15   because they put in a police citizen complaint, and, you know,

16   Sonora Larson testified that she was a person that put in a

17   police citizen complaint, so it goes to willful reckless.

18               THE COURT:  Okay.  I guess are you going to tie it to

19   these defendants?

16:16  20               MS. MOTLEY:  Yes.

21               THE COURT:  The two defendants?

22               MS. MOTLEY:  Absolutely.

23               THE COURT:  As we had discussed, the willful conduct

24   has to be on the part of the defendants.

16:17  25               MS. MOTLEY:  Correct.

226

16:17 1          MS. BAYNARD:  I don't think it's been established who

2    she put the complaint in to, and she's not -- I mean --

3          MS. MOTLEY:  She testified --

4          MS. BAYNARD:  Yeah, but she didn't say I put in the

16:17 5    complaint to Ratkowski and this is what happened, or I put in a

6    complaint to whatever --

7          MS. MOTLEY:  Vetter.  But he was the number two.  So

8    if she put in a complaint to the police department --

9          MS. BAYNARD:  You're just assuming that then Vetter

16:17 10   would have the complaint.

11         MS. MOTLEY:  Well, I'm not asking about her specific

12   complaint, I'm asking about the complaint policy.

13         THE COURT:  I'll allow limited questions on the

14   procedure, but I don't think we need to walk through all of the

16:17 15   procedure of a citizen complaint because it's not relevant

16   here, and I'll allow you to connect it to the two defendants.

17         MS. MOTLEY:  Okay.  And, Your Honor, I apologize.

18   What I'm trying to do is --

19         MS. BAYNARD:  I get it.

16:17 20         MS. MOTLEY:  That's what I'm asking him.  Those are

21   questions for Weber, so I'm trying to avoid that.

22         MS. BAYNARD:  Yeah.  I mean --

23         MS. MOTLEY:  I don't really have many more questions

24   on that, so --

16:18 25         THE COURT:  All right.  Thank you.

16:18   1              MS. MOTLEY:  Thank you.

        2              (The sidebar discussion ended.)

        3              THE COURT:  Thank you.  Miss Motley, you may

        4    continue.

16:18   5              MS. MOTLEY:  Thank you, Your Honor.

        6    BY MS. MOTLEY:

        7    Q.    Captain Vetter, I guess I want to take a quick step back

        8    and I want to focus on June 5th of 2020.  So on June 5th of

        9    2020, do you recall what your title was with the Wauwatosa

16:19  10    Police Department?

       11    A.    Captain of patrol bureau.

       12    Q.    Okay.  So you were second in the chain of command amongst

       13    two other captains; is that accurate?

       14    A.    I am equal to two other captains.  So I wouldn't say I'm

16:19  15    second.

       16    Q.    I'm sorry.  Okay.  But the chief, only the chief is above

       17    you?

       18    A.    Correct.

       19    Q.    Okay.  Thank you.  And taking a step back, as part of the

16:19  20    training and -- of officers with the Wauwatosa Police

       21    Department, are they required to follow the U.S. Constitution?

       22    A.    Yes.

       23              MS. BAYNARD:  Objection to form of the question.  I

       24    mean, relevance.  He already answered.

16:19  25              THE COURT:  Overruled.  You may continue.

228

16:19  1                    MS. MOTLEY:  Thank you.

       2    BY MS. MOTLEY:

       3    Q.   Now, we talked a little bit about police citizen

       4    complaints, and I understand that's not your area completely,

16:19  5    but do you recall receiving any police citizen complaints in

       6    2020?

       7    A.   Yes.

       8    Q.   Okay.  Do you recall receiving any police citizen

       9    complaints in 2021?

16:20 10    A.   Yes.

      11    Q.   Okay.  Do you recall receiving a police citizen complaint

      12    from me regarding plaintiff John Larry?

      13    A.   Vaguely.

      14    Q.   Okay.

16:20 15                    MS. MOTLEY:  Your Honor, may I approach?

      16                    THE COURT:  You may.

      17                    MS. MOTLEY:  I'd like to present to him Exhibit 217.

      18                    THE COURT:  You may.  And is there an objection to

      19    this exhibit?

16:20 20                    MR. WIRTH:  We're going to --  What is 217?  May I

      21    see it?  Thank you.

      22                    MS. BAYNARD:  I guess we'll see where the questions

      23    go.  I have an objection to the relevance of this document to

      24    the DPPA claims, but --

16:21 25                    THE COURT:  You may approach.

16:21   1   BY MS. MOTLEY:

        2   Q.   I want to present you with Exhibit 217 to refresh your

        3   memory.

        4           THE COURT:   Hasn't been published yet.

16:22   5   BY MS. MOTLEY:

        6   Q.   Now, are you familiar with Exhibit 217?

        7   A.   Yes.

        8   Q.   How are you familiar with this document?

        9   A.   This was a complaint or list of demands sent by your

16:23  10   office or yourself about a citation that David Bowen (phonetic)

       11   and John Larry received back in 2020.

       12           MS. MOTLEY:   Your Honor, I move to admit Exhibit 217.

       13           THE COURT:   Any objection?

       14           MS. BAYNARD:   Yes, Your Honor.   One, I'm not --

16:23  15   object to the relevance of this document.   It definitely does

       16   not go to either of the remaining claims, just by the date

       17   alone I can tell that, and then there is also information that

       18   relates to someone who is not a party to this action at all.

       19           MS. MOTLEY:   Your Honor, it goes to willful reckless

16:24  20   damages, and the document that we are referring to, at least

       21   one of the documents referring to specifically plaintiff John

       22   Larry, so it goes to his specific claim and his specific

       23   damages.

       24           MS. BAYNARD:   Your Honor, I disagree and if we want

16:24  25   to have a sidebar and take a look at the exhibit together, we

16:24 1    can.

2              THE COURT:  It is helpful if I have the exhibit that

3    you all are arguing about.

4              MS. MOTLEY:  I thought --  Sorry.

16:25 5              (The following discussion was held at sidebar.)

6              THE COURT:  Do you have the document?

7              MS. MOTLEY:  Yes.  Okay.

8              THE COURT:  I think you can --

9              MS. MOTLEY:  Your Honor, this --  Sorry.  I think

16:25 10   this particular exhibit is regarding John Larry, who's the

11   plaintiff.  I sent, but have 2021 --  So the document is

12   disclosed by this defendant, and basically this document goes

13   to what are the documents that Joseph Roy disclosed and

14   released on January 7th, 2021, and so this specifically goes to

16:25 15   him only going to get into John Larry, and it goes to his --

16   the willful conduct of Joseph Roy as it relates to John Larry

17   in the document that was released publicly.

18             MS. BAYNARD:  Well, Your Honor --

19             MS. MOTLEY:  And here's a letter and Luke Vetter, he

16:26 20   wrote a letter back to me on February 15th of 2021, which he

21   just admitted to in the --

22             MR. SCHWAB:  These relate to specific documents,

23   another document part of that release which includes Mr. Larry

24   and 10 other plaintiffs' personal identifying information and

16:26 25   their explanation for how that information and the providence

231

16:26 1  of that information at from --

2       MR. WIRTH:  One, Judge --

3       THE COURT:  All right.  So let me understand, you

4  want to do what on the witness stand with this document?  You

16:26 5  want to --  Is it to talk to him about his letter?

6       MS. MOTLEY:  That's correct.  And --

7       THE COURT:  Only specifically about --

8       MS. MOTLEY:  -- John Larry.

9       THE COURT:  -- Mr. Larry?

16:26 10      MS. MOTLEY:  Correct.

11      MS. BAYNARD:  But, Your Honor, one, I have an issue

12  with if we're talking about the -- this only guess to Roy's

13  disclosure, that was on January 1st, 2021.  Vetter's response

14  to whatever, I guess, whatever complaint was filed or sent or

16:27 15  letter sent has nothing to do with the specific -- with the

16  specific claims against Captain Vetter or Lieutenant Vetter.

17  Also this has --

18      THE COURT:  There's no claim against Vetter.

19      MS. BAYNARD:  Yes.  Sorry, sorry.  Against Roy.  This

16:27 20  letter has nothing to do with the claims against Roy.  It's a

21  letter that attorney Motley and also David Bowen is not a

22  plaintiff.

23      MS. MOTLEY:  You done?  Sorry.  And just --

24      MS. BAYNARD:  I guess my objection would be is on the

16:27 25  basis of relevance.  I don't think that this document has any

16:27    1    bearing on the facts of consequence certainly to my

2    understanding that is only going to be used for Roy.

3                THE COURT:  So this --

4                MS. MOTLEY:  Your Honor --

16:27    5                THE COURT:  Excuse me, please.  Mr. -- Captain

6    Vetter's response is, I mean, is all about Bowen.  Is there

7    another page that --

8                MS. MOTLEY:  Yeah, there is another page after that

9    goes to John Larry.

16:28   10                THE COURT:  All right.

11                MR. SCHWAB:  Excuse me, please.

12                THE COURT:  Excuse me, please.  You may ask only

13    regarding Mr. Larry and only his response that he commit --

14    Your letter has other information?

16:28   15                MS. MOTLEY:  No, it doesn't.  This is specifically to

16    John Larry.  I didn't name one other person in this letter but

17    John Larry.

18                MS. BAYNARD:  I mean, I guess additionally what I'm

19    anticipating that what it's going to be used for is these --

16:28   20    the whole -- this is a nonrelated issue of there being false

21    arrests.  There was another complaint attorney Motley filed,

22    sent, saying there's these false arrest records.  There's an

23    arrest person that he wasn't arrested.  Is that where you're

24    going with this line of questioning?

16:28   25                MS. MOTLEY:  Well, the point is these documents that

16:28 1    were released were released by Roy on January 7th, 2021.  This

2    specific document, specific to John Larry, was released

3    publicly to 16 people, and so, you know, that goes to willful

4    reckless, and he -- and this goes to his exact claims to the

16:29 5    claim involving Joseph Roy.

6         MS. BAYNARD:  But this isn't the document that was

7    released.  His intimate report I agree was released, and if you

8    were saying -- if you were asking about that but this is a

9    letter you sent afterwards talking about the issue of these --

16:29 10   the supplemental report seen him as arrested, and just because

11   in our communications I'm assuming that you're going to talk

12   about the false arrests, and it's going to go to, I guess,

13   damages of that sort.

14        THE COURT:  Okay.  So, Miss Motley, so this incident

16:29 15   report concerns what?

16        MS. MOTLEY:  This incident report specifically --

17        THE COURT:  Was disclosed by Mr. Roy; is that

18   correct?

19        MS. MOTLEY:  That's correct.

16:29 20        THE COURT:  So you may ask only regarding the

21   incident report disclosed by Mr. Roy and only as it relates to

22   plaintiff Larry.  You may not get into false arrest

23   allegations, which was dismissed as part of other claims in

24   this lawsuit.  So the incident report, if you want to talk

16:30 25   about that, that was disclosed by Roy.

16:30    1              MS. MOTLEY:  Thank you.

         2              MR. SCHWAB:  The term "false arrest" here is --

         3              MS. BAYNARD:  Yeah, I don't mean --

         4              MR. SCHWAB:  -- with the Fourth Amendment thing.  In

16:30    5      fact, there were records that says -- that we understand to be

         6      procedure as to tickets, but they were disclosed as this person

         7      was arrested and whether they, in fact, weren't, and that's

         8      what this is going to.  To arrest is not a --

         9              THE COURT:  I was thinking about the false -- the

16:30   10      false -- the claim, Mr. Schwab, so -- correct, I was thinking

        11      about that.  If it relates specifically to the incident report

        12      that was disclosed --

        13              MR. SCHWAB:  Yes.

        14              THE COURT:  -- by there -- allegedly by Mr. Roy, and

16:30   15      only as to Mr. Larry, and I think we can do this in an

        16      efficient way.

        17              MS. MOTLEY:  All right.  Thank you.

        18              THE COURT:  All right.  Thank you.  So we have to

        19      complete the record for the court reporter, sorry, so --

16:31   20              MS. BAYNARD:  We'll have a redacted version.

        21              THE COURT:  So the objection is overruled, so will

        22      focus, Miss Nealson (phonetic), if you could stay here to hear

        23      this.  I'm sorry, Miss Motley.  To finish the record, the

        24      objection is overruled in part and granted in part.  You will

16:31   25      be allowed to go as to the incident report as to Mr. Larry and

16:31  1  what will be published only the page that concerns Mr. Larry,

2  the incident report.

3         MS. MOTLEY:  Thank you.

4         THE COURT:  Thank you.

16:31  5         (The sidebar discussion ended.)

6         MS. MOTLEY:  Your Honor, I just want to clarify for

7  the record that Exhibit 217 has been published?

8         THE COURT:  The Exhibit 217 has been admitted into

9  evidence and may be published as discussed.

16:32  10        MS. MOTLEY:  Thank you.

11        (Exhibit No. 217 was received into evidence.)

12        MS. MOTLEY:  Sorry, I was just setting up my --

13        MS. BAYNARD:  Your Honor, I just want to get clear

14  what gets published, because the entirety of the exhibit as we

16:32  15  discussed does not relate to the claims.

16        THE COURT:  No.  I thought I was already clear as to

17  what can be published.

18        MS. MOTLEY:  Yes, Your Honor.

19        THE COURT:  And if I'm counting pages, it's just, I'm

16:32  20  looking at a letter dated February 15, 2021, from Mr. Vetter,

21  R-E, a Mr. John Larry.

22        MS. MOTLEY:  Thank you, Your Honor.  I'm just getting

23  my computer ready.  I don't want to show the wrong thing.

24        MS. BAYNARD:  Wait, Your Honor, it's my understanding

16:33  25  only the last page of that --

236

16:33    1                    THE COURT:  That's correct.  Page --  The letter from

         2    Mr. Vetter to -- regarding this incident will be published.

         3                    MS. BAYNARD:  So I would ask that --

         4                    THE COURT:  If you want to ask foundation questions,

16:33    5    but --

         6                    MS. MOTLEY:  Okay.  Your Honor, I'm sorry.  Can we

         7    have another sidebar?

         8                    THE COURT:  Okay.

         9                    (The following discussion was held at sidebar.)

16:34   10                    MS. MOTLEY:  Sorry.  So my letter regarding John

        11    Larry is that okay?  I put --

        12                    MR. SCHWAB:  Letter and his response specifically --

        13                    THE COURT:  Plaintiffs' response, and --

        14                    MS. BAYNARD:  I have a problem with this.

16:34   15                    MS. MOTLEY:  It's just John Larry.  There's nothing

        16    else in here.

        17                    MS. BAYNARD:  I know, but what I have an issue with

        18    is this -- what I have an issue is the suggestion in this

        19    letter that people are being, again, not a false Fourth

16:34   20    Amendment, but the notation on the reports used to indicate on

        21    incident reports arrested person.

        22                    MS. MOTLEY:  We're just talking about this report.

        23    This report specific to John Larry is a report that John Joseph

        24    Roy released.  That's a fact.  He released this as part on

16:34   25    January --

16:34  1                    MS. BAYNARD:  This is a month after.

2                    MS. MOTLEY:  What does it matter?  What does the date

3         matter?

4                    MS. BAYNARD:  I'm saying we're talking about the

16:35  5         releasing records on January, 2021, so attorney Motley's letter

6         a month later, I don't understand the relevance.  I have an

7         issue with the last page, but the Court said that it relates

8         specifically to John Larry so that she can ask about it.

9                    MS. MOTLEY:  This case is about data that was

16:35 10         released.

11                    THE COURT:  Okay.  Yes, so this case is about data

12         that was released, and it's also about the knowledge of the two

13         defendants and their state of mind at the time they did

14         whatever they did, claim to use.  So your letter is

16:35 15         February 10, so how does it go to reckless disregard on

16         whatever date that they disclosed?

17                    MS. BAYNARD:  January 1.  Or January 7 --

18                    THE COURT:  So I had arrived -- I had allowed his

19         letter to come in, since he -- he's the one who wrote it in

16:35 20         response even though it came forward, but your letter

21         afterwards and his letter specific as to the incident report,

22         so if you want to ask foundation questions and get to his

23         letter that he wrote, go ahead and do that, but you don't need

24         to publish to the jury your letter that comes after the fact.

16:36 25         It doesn't show their state of mind.

16:36 1          MS. MOTLEY:  Well, it does, it goes to Roy's

2     knowledge of the documents that he was releasing publicly

3     because part of the document --

4          THE COURT:  Does your letter show his knowledge?

16:36 5          MS. MOTLEY:  Well, it goes to willful reckless.  It

6     shows constructive knowledge.  His --  His argument is because

7     I didn't write the document, therefore I cannot be, you know,

8     held like for the --

9          THE COURT:  How does your letter show his state of

16:36 10    mind at the time of the disclosure?  Your letter's putting him

11    on notice after the fact and calling him out after the fact.

12          MS. MOTLEY:  But how is --

13          MS. BAYNARD:  You should read the letter too.

14          MS. MOTLEY:  The document was released January 7th,

16:36 15    2021.  So because I didn't read 500 pages on January 7, 2021,

16    I've got the document --

17          THE COURT:  I'm not faulting you about reading or not

18    reading, I'm just going back to the elements of the claim,

19    Miss Motley, which requires you to show their state of mind at

16:37 20    the time of the action that they took.

21          MS. MOTLEY:  That's right.

22          THE COURT:  Okay.  So you made --

23          MS. BAYNARD:  But this is -- relates to we've also

24    identified dozens of other false arrests and booking

16:37 25    information made by many Wauwatosa police officers released to

16:37 1  the public.  It's interesting that many of the citizens, I

2  mean --

3          MS. MOTLEY:  You said it goes to people.  It's

4  like --

16:37 5          THE COURT:  I'm sorry, we're going to move along.  I

6  have a jury waiting.  You may not publish your letter on -- may

7  publish Mr. Vetter's letter since he wrote it and specifically

8  as to the incident specifically as to plaintiff Larry.

9          MS. MOTLEY:  Okay.  No problem.  Thank you.

16:38 10          (The sidebar discussion ended.)

11          MS. MOTLEY:  Your Honor, may I proceed?

12          THE COURT:  Yes, you may.  Thank you.

13          MS. MOTLEY:  Thank you.

14  BY MS. MOTLEY:

16:38 15  Q.    Now, Captain Vetter, do you recall receiving on

16  Exhibit 217, I believe it's the last page, do you recall

17  actually writing a letter on February 15th of 2021 to me?

18  A.    Yes.

19  Q.    And do you recall why you wrote this letter?

16:38 20  A.    This was in response to your claims for violation or a

21  complaint.

22  Q.    And do you recall what that complaint was, with regards to

23  John Larry specifically?

24  A.    I think the main concern was that his name when we issued

16:38 25  a citation showed up in -- in the back side of an incident

240

16:38  1  report with the classification -- with the administrative

2  classification of arrested.

3  Q.  Okay.  And based on your letter to me on February 15th of

4  2021, let's see, so let's go to paragraph number two.

16:39  5  Actually --  Sorry.  I'm trying to make this big for the jury.

6  So in this letter, I'll go paragraph by paragraph.  First

7  paragraph, you acknowledge receipt of my certified letter with

8  regards to John Larry, correct?

9  A.  Yes.

16:39  10  MS. BAYNARD:  Objection, Your Honor.  I'm going to

11  object to hearsay.  This is asking the question about a

12  document that has not been admitted into evidence, and if we're

13  going to use the page that was admitted to talk about the pages

14  that were not admitted, I want to make sure the record is clear

16:39  15  on that.

16  MS. MOTLEY:  Your Honor, if I may respond.  I'm

17  asking Captain Vetter about this specific letter which was just

18  admitted to the Court.

19  THE COURT:  Okay.  The objection is overruled.  The

16:39  20  question is setting up the reason for this Mr. -- Captain

21  Vetter's letter.  So you may continue as to his letter.

22  MS. MOTLEY:  Thank you.

23  BY MS. MOTLEY:

24  Q.  And, Captain Vetter, on paragraph one your letter was in

16:40  25  response to a police incident involving plaintiff John Larry

16:40  1    that occurred on August 14th of 2020; is that correct?

2    A.    Correct.

3    Q.    Okay.  And in your letter you noted what happened to John

4    Larry August 14th of 2020, correct?

16:40  5    A.    Correct.

6    Q.    Okay.  Could you please explain to the jury, you know, why

7    you wrote this letter?

8    A.    So people file complaints with the police department all

9    the time.  It's pretty routine for police work.  We do a lot of

16:40  10   work that upsets people and they don't like some of the work we

11   do, especially when they are arrested, so they file complaints.

12   It's pretty normal.

13        So in this circumstance there was an allegation that we

14   were spreading information of a false arrest and that a -- an

16:41  15   apology was demanded by the police department -- from the

16   police department because of that.

17   Q.    Okay.  Captain Vetter, was John Larry arrested on

18   August 14th of 2020?

19   A.    He was cited on August 14th of 2020.

16:41  20   Q.    Okay.  Was John Larry arrested on August 14th of 2020?

21   A.    I believe I just answered that.  He was cited on

22   August 14th of 2020.

23   Q.    You told me what --  My question specific is, was John

24   Larry arrested on August 14th of 2020 --

16:41  25              MS. BAYNARD:  Objection.

242

16:41   1   BY MS. MOTLEY:

        2   Q.   -- not was he cited?

        3            MS. BAYNARD:  Object to the form of the question.

        4   Argumentative.

16:41   5   BY MS. MOTLEY:

        6   Q.   Arrested on August 14th of 2020?

        7            THE COURT:  When there's an objection on the floor,

        8   please pause.  Okay.

        9            MS. BAYNARD:  Objection to the form of the question,

16:42  10   argumentative and relies on an undefined term, arrest.

       11            THE COURT:  All right.  The objection is sustained,

       12   and just maybe rephrase.  There was a question asked about

       13   citation, that is a question, asked about arrest.  Miss Motley,

       14   if you could clarify the question about arrest and we could

16:42  15   move on.

       16            MS. MOTLEY:  Okay.

       17   BY MS. MOTLEY:

       18   Q.   Captain Vetter, based on your knowledge, was John Larry

       19   arrested by a Wauwatosa police officer on August 14th of 2020?

16:42  20   A.   It really depends what the definition of the word

       21   "arrested" is.

       22   Q.   Okay.  Well, you're an officer of 22 years, correct?

       23   A.   Yes.

       24   Q.   So you don't know what the definition of arrest is?

16:42  25            MS. BAYNARD:  Object to the form of the question.

16:42   1              THE COURT:  Overruled.  You may answer.

        2              THE WITNESS:  Could you ask the question again?

        3    BY MS. MOTLEY:

        4    Q.   You're an officer of 22 years.  You don't know the

16:42   5    definition of arrest?

        6    A.   I do.

        7    Q.   Okay.  So what is the definition of arrest?

        8    A.   It varies.  I can arrest someone without putting handcuffs

        9    on them and issue them a citation.  That technically is an

16:43  10    arrest.

       11    Q.   Okay.

       12    A.   I can also put handcuffs on them, I could use force to

       13    arrest them.  It's not a single answer, ma'am.

       14    Q.   Okay.  So in August 14th of 2020, based on your definition

16:43  15    of arrest, was John Larry arrested?

       16    A.   He was not booked or processed or handcuffed.

       17    Q.   Can you arrest someone virtually?

       18    A.   No.

       19              THE COURT:  Exhibit 217, Miss Motley, if you're done

16:43  20    with your questions, may be taken down.

       21              MS. MOTLEY:  Oh.  Sorry.  I do have --

       22    BY MS. MOTLEY:

       23    Q.   With regards to -- to this exhibit, you noted on paragraph

       24    three that there was an arrest entry for John Larry; is that

16:44  25    accurate?

16:44  1    A.   Correct.

       2    Q.   Thank you.  I want to --  Do you recall --  Sorry.  Do you

       3    recall what incident 2-0152959 was referencing with regard to

       4    John Larry as you put in that letter?

16:44  5    A.   I do not.

       6    Q.   Okay.  Would it refresh your memory if I present the

       7    document to you?

       8    A.   Yes.

       9          MS. MOTLEY:  Your Honor, may I approach?

16:44  10         THE COURT:  You may.  What exhibit is that?

      11          MS. MOTLEY:  Oh, I'm sorry.

      12          (There was discussion off the record.)

      13    BY MS. MOTLEY:

      14    Q.   You've had a chance to review Exhibit 215?

16:45  15    A.   No, there's 20 pages here.  If it is a specific question

      16    at a specific time in here, I'll focus on that to be efficient.

      17    Q.   I'm sorry?

      18    A.   Respectful of the jury's time.

      19    Q.   No problem.  So with regards to this specific document, we

16:45  20    are focused on John Larry, okay?

      21    A.   Okay.

      22    Q.   So could you please review this document, only focusing on

      23    John Larry?

      24          MS. BAYNARD:  What page --

16:45  25         (There was discussion off the record.)

16:47    1              THE WITNESS:  It looks like I'll focus on pages four

         2    and then pages 16 and 17.

         3    BY MS. MOTLEY:

         4    Q.   Okay.  So with regards to pages -- focus on pages 16 and

16:47    5    17 and John Larry.

         6         Now, this document notes that John Larry was arrested on

         7    August 14th of 2020, correct?

         8    A.   So there's a name, classification that must be attached to

         9    every single person in a police report, and the only

16:48   10    classification that's available for this circumstance, when

        11    someone is cited, is arrested.

        12    Q.   Okay.  So what else do you see in this document as it

        13    relates to John Larry?

        14    A.   I see his name, his age, his address, physical

16:48   15    descriptors, and charge -- the ordinance violation for this

        16    incident.

        17    Q.   Are you aware that this specific incident report was part

        18    of the documents that Joseph Roy released publicly to 16 people

        19    on January 7th of 2021?

16:48   20    A.   I am not aware of that.

        21    Q.   Okay.

        22              MS. MOTLEY:  Your Honor, I ask that I be allowed to

        23    admit Exhibit 215.

        24              THE COURT:  Any objection to 215?

16:49   25              MS. BAYNARD:  I guess my only objection would be that

16:49    1    I believe the one we're looking at is 335 pages.  I'm not sure

2    and it's unredacted.  So that's my only concern.

3           THE COURT:  So as to Exhibit 215, page 16, the last

4    entry with reference to plaintiff John Larry's admitted into

16:49    5    evidence.

6           MS. MOTLEY:  Thank you.

7           (Exhibit No. 215, page 16, was received into

8    evidence.)

9           THE COURT:  And it may not be published unless

16:49    10    redacted for other individuals who appear on this list.  But as

11    to Mr. Larry, it may.

12           MS. MOTLEY:  Thank you, Your Honor.  I'd like to

13    share my screen if that's okay.  I can show just his entry.

14           THE COURT:  Yes.

16:50    15    BY MS. MOTLEY:

16    Q.   Okay.  So we're just --  Captain Vetter, we're just going

17    to look at arrested 10, where it says John Larry.  Do you see

18    that?

19    A.   Yes.

16:50    20    Q.   Okay.  And on this -- this document, is 20 pages, correct?

21    A.   Yes.

22    Q.   Thank you.  And on this document you see John Larry's, you

23    know, address, correct?

24    A.   Yes.

16:50    25    Q.   His date of birth?

16:50   1   A.   Yes.

        2   Q.   His height, his weight, hair color, eye color?

        3   A.   Yes.

        4   Q.   Okay.  And it notes that he's arrested, but that's not

16:50   5   accurate, correct?

        6   A.   At the time it was accurate, yes.

        7   Q.   Okay.  You just mentioned that he wasn't handcuffed on

        8   August 14th of 2020, right?

        9   A.   I don't believe he was.

16:50  10   Q.   Okay.  You just mentioned you can't arrest somebody

       11   virtually, correct?

       12   A.   Correct.

       13   Q.   Okay.  And was John Larry physically taken into custody on

       14   August 14th of 2020?

16:51  15            MS. BAYNARD:  Asked and answered.

       16            THE COURT:  Captain Vetter did previously answer this

       17   question, but in the interest of moving on, you may answer it.

       18            THE WITNESS:  Could you repeat it?

       19   BY MS. MOTLEY:

16:51  20   Q.   Was John Larry actually arrested --  Your answer has

       21   changed now?

       22            MS. BAYNARD:  Objection.  Argumentative.

       23            THE COURT:  Just please ask the questions,

       24   Miss Motley.

       25

BY MS. MOTLEY:

Q. Explain how John Larry was arrested on August 14th of 2020.

A. He was cited, so underneath this category of arrest, that is a category that you cannot see because it's just an internal record that shows cited or summoned versus a physical custodial arrest.

Q. So --

A. So underneath arrested there's a category of cited, so that's what we've been going back and forth about. It doesn't show it on the screen -- or, excuse me, on the report because there's only one category that at that time police could select for someone, like victim or offender or -- or witness or vehicle owner. The only thing available to the officers at that time was the term "arrested", and then underneath that which does not show up is the subcategory of cited so that's what we keep going back and forth about. I tell you he was cited and then it pops up as arrested.

Q. Okay. So let's -- I'm going to scroll down one more so we see that, and this is still with John Larry, that he was -- So you're saying that he was given a ticket on August 14th of 2020?

A. I don't know if he was given the tickets on that date. He may have -- Tickets may have been written or generated on that date.

16:52   1   Q.   Okay.   So it was a noncriminal ticket that may have been

2   perhaps generated on August 14th of 2020?

3   A.   Correct.   I see an ordinance violation there.

4   Q.   Okay.   It's an ordinance violation.   So if someone gets a

16:53   5   parking ticket in Wauwatosa, that's considered an arrest also?

6   A.   No.

7   Q.   Okay.   So would a Wauwatosa officer looking at this

8   document, would they know that this was not an actual arrest of

9   John Larry put in handcuffs and taken to the Wauwatosa Police

16:53   10   Department?   Would they know that looking at this document?

11           MS. BAYNARD:   Objection.

12           THE WITNESS:   No.

13           MS. BAYNARD:   Relevance.

14           THE WITNESS:   They would not know.

16:53   15           THE COURT:   Captain Vetter, when you hear an

16   objection, please do not answer until I've had the opportunity

17   to rule.

18       All right.   The objection is overruled.   Captain Vetter

19   may answer.

16:53   20           THE WITNESS:   So, no, someone looking just at this

21   paper wouldn't be able to tell that.

22   BY MS. MOTLEY:

23   Q.   Okay.

24   A.   Again, this is an administrative system that doesn't show

16:53   25   every action in a -- in a case on a defendant.

16:54  1   Q.   So even a Wauwatosa officer looking at this would not know

2   that this arrest of John Larry going to handcuffs actually did

3   not happen?

4   A.   No.

16:54  5   Q.   Okay.

6          MS. MOTLEY:  Thank you.  I have nothing further.

7          THE COURT:  Thank you, Miss Motley.

8          MR. WIRTH:  Judge, we had discussed going ahead with

9   the direct examination of each witness so that we didn't have

16:54  10  to keep calling them back.  Obviously we wouldn't get that done

11  by 5:00.

12         THE COURT:  All right.  Ladies and gentlemen of the

13  jury, it's five minutes before 5:00, and you all have been so

14  excellent today, so I don't want to keep you overtime on the

16:54  15  first day.  You've put in the hours today.  So we are going to

16  stop tonight, even though it's five minute before because we

17  can't accomplish the work in the remaining five minutes.

18  Please report back at 8:30 tomorrow.

19         Before you leave, take a second, write your juror number

16:55  20  on the outside of the cover of your notebook, because that will

21  be your notebook for the duration of the trial; and you will

22  leave the notebook on your seat when you leave here, it will be

23  safe, we'll keep it in custody for you, and you'll have it back

24  again tomorrow.

16:55  25         Again, do not discuss the case with anyone.  I'm sure your

251

16:55  1   family will be very excited to hear what you did today, you

2   could blame it on me that I said don't talk about it quite yet

3   until all the evidence is in and the case has been turned over

4   to you.  And not talking about the case includes not talking to

16:55  5   members of the media about the case, and the Court will not

6   release your names to the media, so you do not talk to anyone,

7   and again do not post and do not do any research on the case.

8       Again, on behalf of both parties we thank you so much for

9   your full attention.  Please have a restful evening.

16:55  10        THE BAILIFF:  All rise for the jury.

11        (The jury was excused.)

12        THE BAILIFF:  You may be seated.

13        THE COURT:  Captain Vetter, you may step down.  We'll

14   have you return tomorrow morning, and, Captain Vetter --

16:56  15        MS. BAYNARD:  She's talking to you, Captain.

16        THE COURT:  Captain Vetter, also you are not to

17   discuss your testimony with anyone because your testimony will

18   continue tomorrow.

19        THE WITNESS:  Yes, ma'am.

16:56  20        THE COURT:  Thank you.  Please have a good evening.

21        MS. BAYNARD:  Thank you.

22        THE COURT:  All right.  Is there any business for us

23   this evening?  First from you, Miss Motley?

24        MS. MOTLEY:  No, Your Honor.

16:57  25        THE COURT:  Okay.  Mr. Wirth?

16:57  1          MR. WIRTH:  From the defense perspective, Judge, if
2      we can get an idea of who the witnesses tomorrow will be, to
3      the extent that our cooperative efforts is necessary to have
4      them here, we'll do that.

16:57  5          THE COURT:  All right.  And also --
6          MR. WIRTH:  We're going to keep working on Barry
7      Weber.  Just in case.

8          THE COURT:  Thank you.  And I also need that, as I
9      mentioned, throughout the trial I'll be checking in with you
16:57  10     what the game plan is as we move along.

11          So, Miss Motley, who can I expect to see tomorrow morning
12     after we are done with Captain Vetter?

13          MS. MOTLEY:  Your Honor, you can expect defendant
14     Dominick Ratkowski, Katie Schuh, Matthew Stippich.  Do you want
16:57  15     the whole --

16          THE COURT:  Yeah, we have -- tomorrow is our first
17     full day.

18          MS. MOTLEY:  I apologize.  Heather Kuhl.  I have to
19     check on --  But John Larry.  Sorry.  Mary Kachelski, Lavita
16:58  20     Booker, and I think that's -- I think that's --

21          THE COURT:  Okay.  All right.  Anything further,
22     Miss Baynard?

23          MS. BAYNARD:  Yes, Your Honor.  Before we, I guess,
24     have specific witnesses who attorney Motley has just indicated
16:58  25     would be testifying tomorrow, we've already included this in

253

16:58  1   our original kind of objection to the witness list, but Heather

2   Kuhl, Matt -- and Matt Stippich have no information relevant to

3   the DPPA claims, they are alderpersons -- or former

4   alderpersons, they were both deposed in this case, and neither

16:59  5   of the depositions related to the DPPA claim.  So I'm not sure

6   what testimony they would have relevant to any of the claims

7   here.

8          THE COURT:  Okay.  Miss Motley, as to Matthew

9   Stippich, may I have a proffer of proof of what he will testify

16:59 10   about in regards to the DPPA as to the two defendants here?

11          MR. SCHWAB:  Your Honor, these two individuals, first

12   of all, were at protests and they're not on this list.  But

13   there is additional evidence that Mr. Ratkowski developed

14   another list and this one instead was of ad hoc committee's

16:59 15   operation inclusion, several -- plaintiff was on that list.

16   But Mr. Stippich and Miss Kuhl were the leaders of that

17   organization, and Mr. Ratkowski looked into their D.O.T.

18   records, looked into their church records, looked into their

19   jobs.  This is a pattern and practice, it goes to what his

17:00 20   purpose is, and, in fact, he has an E-mail that says in case

21   anyone's wondering, here's the proof that these people are

22   associated with TPR.

23          THE COURT:  All right.  So your answer as to Matthew

24   Stippich is that he will testify regarding another list?

17:00 25          MR. SCHWAB:  He will testify as to his experience on

254

17:00  1  this ad hoc committee, which was another subject of targeting.

2  　　　　　THE COURT:  All right.

3  　　　　　MR. SCHWAB:  That is relevant to show the actual

4  purpose.  But John Larry was also on that list, on that

17:00  5  committee.  Heather Kuhl was on that committee.

6  　　　　　THE COURT:  All right.  Well, as to any other lists,

7  again, this is the DPPA violation, and the list I've been

8  hearing about is this list that we spent a lot of time

9  discussing already.  So I'm hearing about another list.  Go

17:01  10  ahead, Mr. Schwab.

11  　　　　　MR. SCHWAB:  Sure.  We're not making additional

12  claims on the basis of this list, but this list is in support

13  of the idea that there were alternative purposes, that there

14  was a targeting of these people on the basis of their political

17:01  15  activity, and I will tell you these E-mails are very direct;

16  are very direct.  They include people who could not be

17  considered to be violent like Lindsay Draper (phonetic), who

18  was -- whose D.O.T. records were also looked up based on his

19  perceived association with TPR.  This is --  This goes directly

17:01  20  to what his purpose was.

21  　　　　　MS. BAYNARD:  Your Honor, I mean, I'm hearing -- I

22  don't even know who Lindsay Draper is, that would be the first

23  time hearing that name.  There is absolutely no relevant

24  information that Matt Stippich, Heather Kuhl, or any

17:01  25  alderperson who's not on this list has, and the only purpose is

17:02    1    going to be to be unnecessarily duplicative, irrelevant, and

2    prejudice the defendant.

3        If they have these E-mails that show something that's

4    relevant to the DPPA claim against Dominick Ratkowski and to

17:02    5    show his state of mind and his reckless alleged behavior, then

6    they can cross-examine him on it and we don't need to bring in

7    alderpersons who are -- have no information relevant to this

8    claim.  They're both deposed and neither of them -- neither of

9    them said any of the information I'm hearing now.

17:02    10            THE COURT:  All right.  Miss Motley, I saw you

11    raising your hand?

12            MS. MOTLEY:  Your Honor, I know the insinuation keeps

13    being they were deposed and they didn't bring this up.  Well,

14    we didn't find out about this list until we were well into this

17:02    15    lawsuit, so even for Chief Weber, we didn't even know the list

16    existed until well after that deposition.  And so that's, I

17    don't think that's a --  I think it's kind of a disingenuous

18    argument.

19        With regards to Matt Stippich and Heather Kuhl, their

17:03    20    testimony goes specific again to John Larry whose information

21    was looked up by Dominick Ratkowski.  On the list itself

22    defendant Dominick Ratkowski specifically put John Larry, ad

23    hoc committee.  The E-mails that we received were -- where it

24    shows it demonstrates that he looked 'em up, we received from

17:03    25    the defendants, so it goes to willful reckless.

17:03  1          And, you know, they will be quick witnesses.  We are happy

2    to, you know, compromise and calling one as opposed to two, but

3    they certainly go to specific claims as it relates to defendant

4    Ratkowski's purpose and especially as it relates to his purpose

17:03  5    with regard to John Larry.

6          THE COURT:  Thank you.  Just give me a second here.

7    As you all know, and you've addressed this in your opening

8    statements, I'll direct you again to the language of 18 U.S.C.

9    2724, so a person who knowingly obtains, discloses -- and I'm

17:04 10    warning you this is going to be a broken record in this

11    trial -- or uses personal information from a motor vehicle

12    record for a purpose not permitted in this chapter shall be

13    liable to the individual to whom -- so speaking of the

14    individual to whom the information pertains.

17:04 15          So the information that I've been hearing that this

16    trial's about is about this particular list, so witnesses are

17    not going to be allowed to testify about other lists that may

18    have violated the DPPA, so it's not about this list, if it's

19    not about these plaintiffs, if it's not about these defendants,

17:05 20    they will not be allowed.

21          Another lawsuit regarding that list, another lawsuit

22    regarding other plaintiffs, another lawsuit regarding other

23    defendants that these witnesses are relevant to may testify.

24    I've told the jury that this is going to be a five-day trial,

17:05 25    it is, because of the nature of the claim:  Personal

17:05 1    information of the named plaintiffs against these two

2    defendants.

3         MS. MOTLEY:  Thank you, Your Honor.  Again, just to

4    not, you know, beat a dead horse, but again, we just wanted --

17:05 5    specifically this goes specific to John Larry.  The information

6    obtained is specific to John Larry.  It's information that's on

7    the list, it shows it came from the D.O.T., it shows why he got

8    it from the D.O.T., because he was on this committee.  It goes

9    to the claim, and frankly, I believe it goes to willful -- his

17:06 10   willful reckless behavior.  It's also on the list that he puts

11   why he was there because he's on this ad hoc committee that is

12   supposed to try to, you know, work with the police to try to

13   invoke positive change, and they didn't like it, frankly.

14        MS. BAYNARD:  I mean, that is literally your opinion,

17:06 15   and that has nothing to do with why Heather Kuhl or Matt

16   Stippich should be testifying.  If John Larry wants to testify

17   or you want to have Dominick on the stand and say, why did you

18   make the notation ad hoc committee?  And you have all these

19   E-mails that you're discussing things, that is fine, but there

17:06 20   is no way that Heather Kuhl or Matt Stippich have any relevant

21   information to why Dominick Ratkowski accessed information or

22   the information that was accessed.  There's none.

23        MS. MOTLEY:  Your Honor, with that theory, if that's

24   the case then why are we bringing up other protests?  Why are

17:07 25   we bringing up this date and this date?  You know, it does go

17:07   1   to his state of mind.  There's certain people that he was laser

2   focused on targeting, and that goes to his state of mind.

3       And we have a common council member or former common

4   council member who was also protesting in Wauwatosa multiple

17:07   5   times who was not put on this list.  Or was on this ad hoc

6   committee with John Larry to whom he then once again accessed

7   his D.O.T. records for a purpose not permitted.  And so it goes

8   to willful reckless, it goes to his state of mind.

9           MS. BAYNARD:  No.

17:07  10           MS. MOTLEY:  If this is a theory, then why are we

11   bringing up any other protests and any other place?  That also

12   is completely irrelevant.  And that's, you know, frankly I

13   think that's the brush that has been sort of painted that

14   there's protesting in America, that some of it was violent, so

17:07  15   therefore that's a justification for these plaintiffs to be on

16   this list.  You know --

17           THE COURT:  Explain what is Stippich going to say,

18   and I apologize if I'm mispronouncing his name, and Kuhl are

19   going to say.  And you have narrowed it to Mr. Larry and you --

17:08  20   that means that you have narrowed it to defendant Roy regarding

21   the disclosure.  What will they say about why Mr. Roy put

22   Mr. -- disclosed Mr. Larry's information on the list?

23           MR. SCHWAB:  He can speak --  He can speak to both

24   Mr. Larry's involvement with this committee but he can speak

17:08  25   more broadly to the role of this committee, and I -- this is

17:08  1    deeply relevant, Your Honor.  I apologize, but this is -- this

2    goes to the heart of his purpose, and that's -- they're arguing

3    that he had legitimate purpose and for us to be able to offer

4    evidence to rebut that, to say actually here's another

17:08  5    potential purpose, that is at the heart of our case.  At the

6    heart of our case.  I understand that we are focused on these

7    individuals, and that is correct.

8         THE COURT:  And that's -- because that's the lawsuit

9    you brought.

17:09 10         MR. SCHWAB:  I understand.  But he gets to then say

11    here's my legitimate law enforcement purpose, and if it turns

12    out he had an illegitimate law enforcement purpose or an

13    illegitimate purpose in general, and we have proof that can

14    rebut that he was doing this in some preventive way, and

17:09 15    instead was doing this in a retaliatory manner, then that is

16    directly relevant to his purpose, and when he says I was only

17    doing this for law enforcement purposes but then goes and

18    targets other people because they might have some say in how

19    policing has changed in this town, that is something the jury

17:09 20    needs to know.  That is something the jury needs to be able --

21    and plaintiffs deserve to be able to offer because that goes to

22    the heart of what his purpose is.

23         MS. BAYNARD:  If they have evidence to show that --

24         MR. SCHWAB:  And we have evidence --

17:09 25         THE COURT:  Please let Mr. Schwab speak.  One person

260

17:09   1   at a time.

2           MR. SCHWAB:  And we have evidence that we received

3   from defendants months ago that has been on our witness list --

4   or, rather, our exhibit list from the start when we -- which we

17:10   5   complied with, got in in time, have never moved, have never

6   changed.  In fact, you can go look at the exhibit list.  It

7   says ad hoc E-mail.  We have not been hiding the ball on this.

8   But this goes to his purpose.

9           THE COURT:  I am not seeing this as an issue whether

17:10  10   you did not disclose, and that's not the way I'm asking my

11   question.

12           MR. SCHWAB:  Sure.

13           THE COURT:  My questions go to relevancy as to the

14   defendant's purposes, their mens rea, so will I expect the

17:10  15   witness to say why or how or when or what Ratkowski or Roy did?

16           MR. SCHWAB:  No, but he's going to provide context

17   for what he did.  He's going to provide context for what this

18   committee was, how often they met, what their purposes were,

19   the work that they did.  That is relevant to some -- to

17:11  20   Mr. Ratkowski targeting them retaliation -- or with

21   retaliation.  But setting that context for this committee, so

22   that then when we bring this -- this list of D.O.T. records and

23   acts -- and it looks exactly the same as the -- as the target

24   list, except they're broader and they're just aimed at the four

17:11  25   people who have been appointed to this committee, that gives us

261

17:11  1    the ability to then explain to the jury this was not a protest

2    group, this was not a group that was involved in -- in -- in

3    violence, this was not a group that could possibly be being

4    investigated.

17:11  5        What is the through line between these two?  They were

6    perceived to be, you know, related to TPR and they were

7    perceived to be about police reform, and that provides the

8    context so that we can then understand these E-mails by

9    Mr. Ratkowski in their full -- in their full context and allow

17:11  10   us, the plaintiffs, to put forward an argument to counter his

11   argument that he had a legitimate purpose.  So that we can

12   suggest a different purpose.

13        THE COURT:  All right.  So it appears to me that the

14   conversation regarding Mr. Stippich and Miss Kuhl should be

17:12  15   tabled after Mr. Ratkowski testifies, as you say he will

16   testify in your case in chief.

17        MR. SCHWAB:  That is correct and that was our

18   intention.

19        THE COURT:  And we will then revisit whether what

17:12  20   you're proffering is relevant to his testimony.  Any --  So

21   please have other witnesses ready to go in case those two

22   witnesses do not have anything relevant to offer.

23        MS. MOTLEY:  Thank you.

24        MR. WIRTH:  Judge, we're -- we're now put in a

17:12  25   position of preparing for a mini trial on why that list was

17:12  1   created and why that list was -- why those four people were,

2   quote, targeted, why --  This is exactly what the Court

3   cautioned against.

4        So obviously I understand the Court's ruling that we'll

17:13  5   revisit this issue after Ratkowski testifies, but he's going to

6   testify that they had a legitimate legal purpose for doing

7   these things.  We all know that.

8        THE COURT:  But I think I heard, sorry to interrupt

9   you, that the proffer being made that we're not going to talk

17:13 10   about another list.  I've heard that there's testimony about

11   this list in question, this disclosure in question.  Again,

12   we're not having a second trial within a trial.  I am not

13   interested in witnesses coming to talk about other lists

14   because it's not relevant to the list in question, what we will

17:13 15   revisit if they have anything specific to testify to regarding

16   the list that we've all been talking about.

17        MS. MOTLEY:  That's correct, Your Honor.  And, you

18   know, just to be clear, we are not suggesting that, we're being

19   very specific, this is with regard to plaintiff John Larry, who

17:14 20   is on both claims.  He's on the claim for Roy and on for

21   Ratkowski.  And so as you saw with Captain Vetter, you know, a

22   large part of his testimony was specific to him and the claim

23   involving defendant Roy.

24        And so with regards to, you know, this ad hoc committee, I

17:14 25   mean, we keep saying list, I know that is the language we've

263

17:14  1    been used to, but this case is about data and the information

2    that was obtained from the D.O.T. and the list was just a

3    vehicle by which that data was, you know, was -- was disclosed.

4         So I just want to be clear, we understand we're not coming

17:14  5    here with another list tomorrow, we're not talking with someone

6    that isn't a plaintiff, we're talking about our specific

7    plaintiff, John Larry.

8         THE COURT:  And in regards to your -- the specific

9    claim, not some other claim too that has to be part of it too.

17:14  10        MS. MOTLEY:  That's right.

11        THE COURT:  Okay.

12        MS. MOTLEY:  With regards --  Yes.

13        MR. WIRTH:  Okay.  But I -- I understand the Court's

14    ruling, obviously we will abide by it, but there's no reason

17:15  15    that Stippich and Kuhl should testify about their experiences

16    why they were on the list, why, you know, why they think the

17    modus operandi was.

18        THE COURT:  No.  I --  I am not allowing them to talk

19    about why they were on a list or the list.  Again, that's

17:15  20    consistent with my ruling.  They're not plaintiffs here.  What

21    I'm hearing and what will revisit if they have information

22    specific as to what -- why Mr. Larry's information was

23    disclosed is what I'm leaving the door open to.  Does he

24    have --  Do they have stuff about Mr. Larry relevant to

17:15  25    Mr. Larry's DPPA claim as it relates to the data or the list

264

17:15    1    that we have been talking about?

2           MS. MOTLEY: Yes, Your Honor, they do. I mean, it

3    goes to why. Why did Ratkowski choose to get John Larry's

4    information? So it is relevant. It goes to willful reckless.

17:15    5    This is not -- You know, I think there's been some

6    misspeaking. Heather Kuhl and Matthew Stippich are not on any

7    list. I want to be very clear about that. That we know about.

8    That's -- We understand what we're here for, we certainly more

9    than understand that this trial's going to be done on Friday

17:16    10    for sure. So they're quick witnesses. They will go specific

11    to the DPPA claim as it relates to John Larry.

12           THE COURT: All right. I will -- We will revisit.

13    I want to hear what they're going to say as to the DPPA

14    regarding Mr. Larry specifically.

17:16    15           MS. BAYNARD: And, Your Honor, can we revisit it

16    outside of the -- I guess when -- outside of the presence?

17    Like what I don't want to have is them get on the stand and

18    then do a bunch of objections and come off as, oh, there's a

19    reason we didn't want to --

17:16    20           THE COURT: We will revisit -- We will -- I'll make

21    a ruling whether they can take the stand at all if they have

22    relevant information after we hear from Mr. Ratkowski and the

23    plaintiffs still want to have them, how does it relate to his

24    testimony.

17:17    25           MS. MOTLEY: Thank you.

17:17   1            MS. BAYNARD:  Very good.

        2            THE COURT:  Okay.  Thank you.  Have a good evening,

        3   everyone.  Please be here at 8:30 tomorrow morning, we'll take

        4   the call -- call in the jury as soon as they get here.

17:17   5            MR. SCHWAB:  Thank you.

        6            THE BAILIFF:  All rise.

        7            (At 5:17 p.m. the hearing ended.)

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

17:17    1                    C E R T I F I C A T E

         2

         3              I, THOMAS A. MALKIEWICZ, RPR, RMR,

         4     CRR, an Official Court Reporter for the United States

17:17    5     District Court for the Eastern District of Wisconsin, do hereby

         6     certify that the foregoing is a true and correct transcript

         7     of all the proceedings had and testimony taken in

         8     the above-entitled matter as the same are contained

         9     in my original machine shorthand notes on the said

17:17   10     trial or proceeding.

        11

        12
               Dated this 5th day of June, 2023.
        13
               Milwaukee, Wisconsin.
        14

17:17   15

        16                    Thomas A. Malkiewicz, RPR, RMR, CRR
                              United States Official Court Reporter
        17                    517 East Wisconsin Avenue, Room 236
                                     Milwaukee, WI 53202
        18

        19                    Thomas_Malkiewicz@wied.uscourts.gov

17:17   20

        21

        22
               ELECTRONICALLY SIGNED BY THOMAS A. MALKIEWICZ
        23     Official U.S. Reporter, RPR, RMR, CRR
               _____
        24

        25