UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

ANDREW AARON, et al,                    )
                                        )
                    Plaintiffs,         )        Case No. 20-CV-166
                                        )        Milwaukee, Wisconsin
        vs.                             )
                                        )        May 2, 2023
DOMINICK RATKOWSKI & JOSEPH ROY,        )        8:47 a.m.
                                        )
                    Defendants.         )        **VOLUME 2**
                                        )
----------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE NANCY JOSEPH
UNITED STATES MAGISTRATE JUDGE, and a jury.

APPEARANCES:

For the Plaintiff
ANDREW AARON, et al:            Motley Legal Services
                                By: Ms. Kimberly Motley
                                PO Box 1433
                                Matthews, North Carolina 28106
                                Ph: 704-765-4887
                                kcmotley@gmail.com

                                Ascend Counsel, LLC
                                By: Mr. Edward Milo Schwab
                                2401 South Downing
                                Denver, Colorado 80210
                                Ph: 303-888-4407
                                Milo@ascendcounsel.com

                                Knowlton Law Group, LLC
                                By: Ms. Katheryn L. Knowlton
                                7219 West Center Street
                                Milwaukee, WI  53210
                                Ph: 414-202-2444
                                Kate@knowltonlawgroup.com

268

CONTINUED APPEARANCES:

For the Defendants
DOMINICK RATKOWSKI &
JOSEPH ROY:                    Wirth & Baynard
                               By: Mr. Joseph M Wirth &
                               Ms. Jasmyne M Baynard
                               9898 West Bluemound Road - Ste 2
                               Wauwatosa, WI  53226
                               Ph: 414-291-7979
                               jmw@battys.com
                               jmb@battys.com

 U.S. Official Reporter:        SUSAN ARMBRUSTER, RPR, RMR,
 Transcript Orders:             Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

269

```
 1                    T-R-A-N-S-C-R-I-P-T   I-N-D-E-X

 2
                                                      Page
 3                        WITNESSES CALLED

 4   Captain Vetter

 5     Cross Examination by Ms. Baynard:          271 - 308
       Redirect Examination by Ms. Motley:        308 - 330
 6     Recross Examination by Ms. Baynard:        330 - 332

 7   Dominic Ratkowski

 8     Direct Examination by Ms. Motley:          333 - 439

 9   Katie Schuh

10     Direct Examination by Ms. Motley:          439 - 453
       Cross Examination by Mr. Wirth:            453 - 455
11     Redirect Examination by Ms. Motley:        456 - 458

12   John Larry

13     Direct Examination by Mr. Schwab:          459 - 472
       Cross Examination by Ms. Baynard:          472 - 475
14
     Mary Kachelski
15
       Direct Examination by Ms. Motley:          475 - 482
16     Cross Examination by Ms. Baynard:          482 - 482
       Redirect Examination by Ms. Motley:        483 - 483
17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  Calling Case No. 20-CV-1660, Andrew Aaron, et al v. Dominick Ratkowski and Joseph Roy for continuation of a jury trial.  Appearances starting with the plaintiffs.

MS. MOTLEY:  Attorney Kimberly Motley appearing in person with Attorneys Milo Schwab and Kathryn Knowlton.  Good morning.

THE COURT:  Good morning, Ms. Motley, Mr. Schwab and Ms. Knowlton.

MS. BAYNARD:  Attorney Jasmyn Baynard here with Mr. Wirth.

(Jury enters.)

THE COURT:  And good morning to you, Members of the Jury.  I hope you had a restful evening and ready to work today.  Before we continue to whereas to where we left off last night, just a quick preview.  This morning expect a break between 10:15 and 10:30 and then expect lunch right about noon for an hour, so that's the morning lined up.  It does feel a bit warm in here to me.  I don't know if it feels warm to you.  We are working on adjusting the temperature.  All right.  With that, Mr. Vetter is on the witness stand.  Mr. Vetter, I remind you that you are still under oath.  With that, we can pick up where we left off last night.

**CROSS EXAMINATION BY MS. BAYNARD:**

Q.  Captain Vetter, you were asked yesterday before the close of

271

1    the trial whether the Wauwatosa Police Department has a policy
2    releasing people's private information.  Do you remember that
3    question?
4    A.   Yes.
5    Q.   And your answer was no.  Do you remember answering no?
6    A.   Yes.
7    Q.   Okay.  And that was a pretty broad question, wasn't it?
8    A.   It was.
9    Q.   The Wauwatosa Police Department is obviously bound by the
10   laws of the State of Wisconsin, true?
11   A.   Absolutely.
12   Q.   And notwithstanding the fact that Wauwatosa doesn't have a
13   blanket policy requiring release of private information, are
14   there state statutes that require the disclosure of such
15   information?
16   A.   Absolutely.
17   Q.   And I guess could you kind of expand on what those state
18   statutes are?
19   A.   Sure.  So we have a policy that deals with all the keeping
20   of records that we take care of at the police department, and I
21   believe it's under -- I believe it is entitled the Opens Record
22   Policy.  That is in tandem with the Wisconsin Opens Record Law
23   along with DPPA.
24   Q.   So would you agree Wisconsin has open records laws that
25   often require the release of private citizen's information?

272

1    A.  Yes, absolutely.

2    Q.  And is there a difference between open records law and the

3    DPPA?

4            MS. MOTLEY:  Objection, Your Honor.  Captain Vetter is

5    not an expert on the different laws.  I don't believe he's an

6    attorney as well.  It is beyond the scope of what he should be

7    allowed to testify to.

8            THE COURT:  Ms. Baynard, do you recall the question he

9    was asked on the very last policy on direct, so he can be cross

10   examined as to his knowledge on them on cross examination, but

11   you could recross.

12           MS. MOTLEY:  Your Honor, if I may.  He was asked about

13   the policies.  She's asked questions about the laws.

14           THE COURT:  You may rephrase, Ms. Baynard.

15   Q.  Captain Vetter, is there a difference between the open

16   records policy and the Wauwatosa Police Department with regards

17   to the DPPA?

18   A.  Yes.

19   Q.  And what is the --  Can you explain the difference?

20   A.  Yes.  So the Wisconsin Open Records Law is kind of actually

21   a competing interest to the DPPA.  Wisconsin open laws --

22           MS. MOTLEY:  Objection, Your Honor.  He's again

23   talking about the law.  And the question was with regards to the

24   policy of the Wauwatosa Police Department.

25           THE COURT:  I'll allow you to redirect on that.  In

273

1  this case, the policy is very much intertwined with the law.  If

2  the witness could phrase it in terms of the policies is

3  consistent with the conversation we're having.

4        THE WITNESS:  Okay.  So our policy, that is in tandem

5  with the law, requires that the government and therefore police

6  do not act in secret, so we must release all sorts of records to

7  the public especially when they are requested of us.

8        And those records sometimes include names, dates of

9  birth, addresses, what someone is arrested for.  On the one end

10 of the spectrum, we must release that information according to

11 policy.  But on the other end of the spectrum within the policy

12 reference of the DPPA, it guards private information.  So

13 there's sometimes competing release of information because we

14 must not act in secret but also guard certain information.

15       So it's constantly a balancing act as to what should

16 we release and what should we hold back.  And Wisconsin has a

17 very, very strong open records law meaning the government cannot

18 hold much back.  We must release a lot of information amongst my

19 experience in information amongst other states.  That's a very

20 powerful open records law compared to many other states.

21 Q.  That's open records law.  What about the -- What does the

22 DPPA protect?  What's your understanding of what the DPPA

23 protects?

24       MS. MOTLEY:  Again, Your Honor, objection.  He's not

25 an expert on the DPPA.  We do have someone from the DOJ coming.

274

1    Perhaps that would be the appropriate person to ask those

2    questions to, but he's not an expert on what it's meant to

3    protect.

4         THE COURT:  You may rephrase your question in terms of

5    the policy that was asked in terms of the witness on direct.

6    Q.  Based on your -- Based on your experience with the Wauwatosa

7    Police Department and information in open records information in

8    the policy that you've described, what does the DPPA protect?

9    A.  So within our open records policy, there's also DPPA

10   information that guides us, and the DPPA protects --  It's very

11   narrow.  It's very specific.  It just has to do with information

12   from the state driver's files.

13   Q.  And based off your experience and the policy that we've

14   talked about, are there situations where opens records

15   protections will legally release names, addresses, dates of

16   birth or information that would otherwise be protected by the

17   DPPA?

18        MS. MOTLEY:  Objection, calls for a legal conclusion.

19        THE COURT:  I'll sustain the objection and give

20   Ms. Baynard the opportunity to rephrase the question.

21   Q.  Okay.  Captain Vetter, based on the policies that you

22   discussed yesterday, are there situations that you're aware of

23   where open records production -- you can release the

24   information, a name, address, date of birth, license number

25   where it otherwise might be protected by the DPPA?

275

1       MS. MOTLEY:  Objection, Your Honor.  It goes outside

2  the scope of what he's allowed to testify to.  He's not the open

3  records custodian for the Wauwatosa Police Department.  She's

4  asking for information with regards to his expertise in the area

5  that he doesn't work in.

6       MS. BAYNARD:  May I respond?

7       MS. MOTLEY:  It calls for a legal conclusion.

8       THE COURT:  Thank you.  I will allow the witness to

9  answer the question based on the questions that were asked of

10  him during the opening -- excuse me -- not during opening,

11  during direct examination.  He was asked about these topics.  So

12  he may be cross examined or questioned by the other side on it

13  because he was questioned by I believe you Ms. Motley regarding

14  that.

15  Q.  Would you like me to restate the question?

16  A.  Please.

17  Q.  Okay.  So based on the discussion yesterday, are there

18  situations where open records production can legally release the

19  names, addresses, dates of birth, license plate number that

20  would otherwise be protected by the DPPA?

21       MS. MOTLEY:  Objection, Your Honor, again calls for a

22  legal conclusion.  Her question is can this information be

23  legally released?  And again, it calls for a legal conclusion to

24  talk about the legal policy, not legal concussions.

25       THE COURT:  Okay.  Mr. Vetter, can you answer the

276

1    question in terms of the policy and practice under the DPPA?

2            THE WITNESS:  There are situations where that type of

3    information, names, addresses, dates of birth could be released

4    under the open records portion of the policy that come from the

5    DPPA portion or the driver's file portion if we're verifying

6    information with other sources like C-Cap, which anybody in the

7    public can use, or whitepages.com or paid subscriptions that

8    even private detectives use to find information on people.

9            So if we're verifying information from those DOT

10   files, my understanding our practice is, according to our

11   policy, that's when again we have those records and the open

12   regards law requires that we release often more information than

13   we want to because it does --  It does infringe on people's

14   privacy.  It does cause them embarrassment if a name is released

15   if it says arrested behind their name or says a charge.  We

16   understand that's personally embarrassing, but the state law

17   says we must.

18   Q.  I guess going off of that question, do you have an

19   example -- You said for verification purposes, do you have an

20   example in this case?

21   A.  Yes.  I know during this entire summer of events that we're

22   discussing, we were -- I should say we had the investigative

23   division was scouring social media or open sources.  Often times

24   some of the individuals were putting their own videos, their own

25   pictures on Facebook, social media.  And we review those while

277

1    we were investigating incidents, and then we would verify often

2    times those names or those photos or those pictures against

3    potentially a DOT file, potentially a DOT picture, potentially a

4    jail photo.  We used it to verify.  Before we just irresponsibly

5    assumed that it would be the same individual, we have to do a

6    thorough investigation to build to probable cause.

7    Q.  Okay.  Yesterday I guess we kind of talked about when we're

8    talking about policies, and I believe we discussed the policy

9    that the Wauwatosa Police Department had.  And I believe it's

10   Plaintiffs' Exhibit -- you have a couple of binders behind

11   you -- 7.  Plaintiffs' Exhibit 3.

12             Okay.  When you were speaking yesterday about the

13   policy that was at the Wauwatosa Police Department that was

14   later rescinded, is the policy in front of you, the DPPA policy

15   that you were speaking of?

16   A.  Correct.  Well, this policy actually shows an effective date

17   of 2016, and then it needed to be reviewed in 2018.  So it

18   strikes me because of the dates since we were in 2020 and 2021,

19   there was probably a refreshed policy --

20   Q.  Okay.

21   A.  -- that we were acting under.

22   Q.  Okay.  If there is a refreshed policy that had the effective

23   date of July 7, 2020, would that have been the policy in effect

24   at during the summer of 2020?

25   A.  From July forward in 2020, yes.

278

1    Q.   Okay.

2    A.   This one seems dated.

3    Q.   Now, you kind of started getting into some of my other

4    questions, but I want to talk about where sources of information

5    that law enforcement officers have access to.  I believe you

6    said C-Cap; is that correct?

7    A.   Correct.  C-Cap is the Wisconsin Certified Court records.

8    So anyone that gets charged with a crime, their record will be

9    open to the public and can be searched quite easily, Wisconsin

10   Court website just by a name.  That's it, and you can find out

11   the record.

12   Q.   Okay.  Are you -- What other I guess police databases are

13   you familiar with that Wauwatosa uses?

14          MS. MOTLEY:  Objection.  He's not an expert on police

15   databases.

16          THE COURT:  If the witness has knowledge of the

17   information being requested, he may answer it.

18          THE WITNESS:  So I have personally used and know that

19   our Investigative Division and Patrol Division, Patrol Bureau,

20   uses all sorts of different databases to find information and

21   build cases to probable cause.

22   Q.   I believe one of the ones you mentioned yesterday was the

23   Names System.

24   A.   Yes.

25   Q.   Okay.  Can you explain what the Names System is?

279

1    A.   So the Names System is the internal police database.  So

2    every person that we have contact with, their name will be

3    entered into that database, and it's forever held in there.  It

4    could be five, ten, 20, 30 years old.

5              And as we have new contacts with individuals, we will

6    check that information.  We will update it, refresh it.  People

7    move, people's weight changes, people's hair color changes, et

8    cetera.

9    Q.   And does the Names database, does that communicate with the

10   DOT records?

11             MS. MOTLEY:  Objection, Your Honor.  Again, he's not

12   an expert on what databases communicate with the Department of

13   Transportation.

14             MS. BAYNARD:  Your Honor, may I be heard?

15             THE COURT:  You may be heard.

16             MS. BAYNARD:  Yesterday Attorney Motley asked Captain

17   Vetter about the Names System and if that information would

18   contain motor vehicle records.  I'm expanding -- I am expounding

19   on that, and I can rephrase to include mother motor records.

20   And I believe he also testified or was asked when you open up

21   the Names Database, is there a list of checked boxes you can

22   check to get NCIC tracks, different databases where someone's

23   information can come from that would not be the DOT?  That's the

24   information I'm trying to expand or elicit from Captain Vetter.

25             MS. MOTLEY:  Your Honor, may I respond?

1          THE COURT:  Yes.

2          MS. MOTLEY:  This is the first time I heard of the

3    Names Database.  This was not discussed yesterday at all.  I

4    don't know if she's -- I think maybe -- Are you talking about

5    the TIME Database?

6          MS. BAYNARD:  He said Names Database.

7          MS. MOTLEY:  We do have the DOJ person who actually is

8    the person that knows about the TIME Database.  He's not an

9    expert on this.  We had many Motions in Limine about testimony

10   that's outside the scope of their expertise or their knowledge.

11         THE COURT:  Thank you.  As I had previously ruled,

12   there are no expert witnesses in this case.  But witnesses can

13   testify within matters within their own personal knowledge.

14         Yesterday, there was testimony elicited regarding

15   systems used by Wauwatosa.  This line of question is in line

16   with that, so he'll be allowed to answer the question.

17         THE WITNESS:  Could you restate the question?

18   Q.  Yes.  Okay.  So yesterday you talked about the Names

19   Database, and can you explain what the Names Database is?

20   A.  So the Names Database has nothing to do with a DOJ file.  It

21   is a specific Wauwatosa Police Department file.  That's where we

22   input names, addresses, incidents, police reports in that Names

23   Database.  You may hear referred to at future testimony here as

24   the Phoenix Report Management System.  Phoenix Report

25   Management.  It's just a brand name.  It is not the city.  Most

1  if not all police agencies in this county and area use it, and

2  information can be put in there based on something verbal.

3       If an individual tells me this is how, this is how I

4  know it to be used and I used myself.  If someone tells me their

5  address, I can put it in there.  If DOT gives us an address, it

6  can go in there.  If white pages find information on someone's

7  phone number, that can go in there.  So it is a clearing house

8  where one clearing house for all our police data on individuals

9  goes from numerous different sources.  It all gets centralized

10  in that Names RMS System.

11  Q.  Captain Vetter, I want to shift your attention a little bit.

12  When were you hired with the Wauwatosa Police Department?

13  A.  June of 2001.

14  Q.  Okay.  And your current rank is captain; is that correct?

15  A.  Correct.

16  Q.  In the summer of 2020, who is Dominick Ratkowski's direct

17  supervisor?

18  A.  I believe his direct supervisor at that time was the

19  Investigative Division Lieutenant who would have been Detective

20  Shane Wrucke.

21  Q.  And are you familiar with I guess -- Strike that.  What is

22  Dominick Ratkowski to your knowledge, what is his role in the

23  police department?

24  A.  His specific role and title is crime analyst.

25  Q.  In which division is Dominick Ratkowski within the police

282

1  department?

2  A.  He's assigned to the Support Services Bureau.  And then

3  underneath that is the Investigative Division.

4  Q.  And what is Dominick Ratkowski -- To your understanding,

5  what is his -- What is his job with the Detective Investigation

6  Bureau?

7          MS. MOTLEY:  Objection, Your Honor.  This is something

8  that Mr. Ratkowski will testify to.  This is beyond the scope of

9  his testimony to what DPPA duties are.

10         MS. BAYNARD:  May I be heard?

11         THE COURT:  Go ahead.

12         MS. BAYNARD:  Yesterday testimony was elicited from

13 Captain Vetter about his position in the police department, how

14 he was essentially number two.  I'm simply asking him -- We

15 talked about the chain of command.  I'm asking him about an

16 employee who was within that chain of command.  And just because

17 Dominick Ratkowski can also testify to that, I don't think that

18 precludes Captain Vetter from providing this testimony as well.

19         MS. MOTLEY:  Your Honor, if I may.

20         THE COURT:  Yes.

21         MS. MOTLEY:  With regards to Captain Vetter's

22 testimony yesterday, he did give the chain of command.  In his

23 chain of command, he did not mention Dominick Ratkowski in that

24 chain of command.  And also what we questioned Captain Vetter on

25 was his specific, you know, job, what his specific duties are,

1   so I do like to have my objection stand.

2           THE COURT:  All right.  I understand that Mr. Vetter

3   is being called one time so he's not being called later on

4   again.  So on that basis, I will allow his testimony.  But

5   Ms. Motley's correct, if Mr. Ratkowski will testify, you can get

6   from him what he does, what he doesn't do, what his

7   responsibilities are.  It can get cumulative.  Get to the point,

8   please.

9           MS. BAYNARD:  I will.

10  Q.  Same question.  I will rephrase.  Based on your position at

11  the police department, what is your understanding of what

12  Dominick Ratkowski's I guess his role in the Detective

13  Investigation Division?

14  A.  So I think what I'll clarify this for everyone is while

15  Dominick Ratkowski a crime analyst within the Investigative

16  Division through support services.  He helps every bureau at the

17  police department.  There must be a chain of command.  He must

18  report to one person.  That is how it works.  However, he's

19  constantly helping my bureau with intel, with alerts, officer

20  safety alerts, finding suspect information for us.  He could

21  just easily be assigned under me.  It just happens he's assigned

22  under the Investigative Division.

23  Q.  I believe you said Dominick Ratkowski, he assists

24  investigations by monitoring intel.  Is that your testimony?

25  A.  Correct.  That is one of his that I know of one of his

284

1    routine daily tasks.

2    Q.  And are you aware if -- I guess, where does this I guess

3    intel come from?  Where is some of the sources of the intel?

4            MS. MOTLEY:  Objection, vague.

5            THE COURT:  Sustained.

6    Q.  Okay.  I want to talk about this list.  Are you familiar

7    with a list that was created by Analyst Ratkowski?

8    A.  Yes.

9    Q.  And how are you aware of this list?

10           MS. MOTLEY:  Objection, vague.

11           THE COURT:  Vague as to?

12           MS. MOTLEY:  Her question is -- I believe her

13   questioning needs to be more specific.

14           THE COURT:  The question is how are you aware of this

15   list?  Maybe is this the list prepared by Mr. Ratkowski that

16   you're referring to?

17           MS. BAYNARD:  Yes, that's what we're here about.

18           THE COURT:  Yes, okay.  If you phrase it in that

19   context, then Captain Vetter can answer it.

20   Q.  Okay.  Captain Vetter, are you aware of the list that was

21   created by Dominick Ratkowski some time in the summer of 2020?

22   A.  I am.

23   Q.  Okay.  And how are you -- When I say the list, you're aware

24   that I'm speaking of a list created by Analyst Ratkowski,

25   correct?

285

1    A.   Correct.

2    Q.   And how did you become -- How are you aware of this list?

3    A.   So this list was something that all supervisors during the

4    summer of 2020 began talking about, how do we start to keep

5    track of what we saw as numerous ordinance violations, sometimes

6    crimes that were occurring in order to properly investigate

7    those?  And the list became a living, breathing document

8    constantly changing, constantly being updated.

9         There were over 90 some protests in the City of

10   Wauwatosa during that six, seven month period, and there were

11   numerous ordinance violations, sometimes crimes were committed

12   which because the police were vastly outnumbered, often times we

13   couldn't immediately act on or it wasn't appropriate or safe to

14   immediately act on.  So this list helped us investigate those

15   violations and then take enforcement action when it was

16   appropriate.

17   Q.   Okay.  Did you tell Dominick Ratkowski to create this list?

18   A.   I don't think I specifically told him to create this list.

19   Again, it was a general discussion amongst most of the

20   supervision that we needed to do something to try and maintain

21   order with all the disruption that was being caused at

22   businesses and streets all over the city during that summer.

23   Q.   Okay.  And your having --  I want to be clear.  You said

24   there was conversations between supervision.  Supervision I

25   guess in which division, if any?

1    A.   It would have been all divisions.

2    Q.   Okay.  What did you --  Do you have a timeframe of -- When

3    did you first become aware that a list was created?  I believe

4    you said sometime in the summer of 2020?

5    A.   Correct.  So post George Floyd issues, which is the end of

6    May of 2020, that swept the nation, right.  Everybody remembers

7    that.  It started in Minneapolis and started to sweep the nation

8    including causing problems right here in the metro area,

9    specifically to Milwaukee and the City of Wauwatosa.

10            So as protests and demonstrations continued and

11   continued and continued, there began to be basically the thought

12   that order wasn't being maintained, that there were lots of

13   violations, that it was disrupting people, and there began to be

14   an urge to actually try and maintain order in the city.

15   Q.   And I want to be very clear.  You're not saying that -- I

16   think you testified there was 90 some protests in the summer.

17   You're not saying that everybody involved in the protests was

18   disruptive?

19   A.   No.

20   Q.   Okay.  Now, I believe you said early late May, early June

21   during some of these protests, did crimes occur?

22   A.   Yes.

23   Q.   And when you're in these discussions with the list or the

24   first time you see it I guess, what's your understanding of what

25   the purpose of this list was?

MS. MOTLEY: Objection, Your Honor. This is beyond the scope of his testimony. Only Dominick Ratkowski can testify to what the purpose of this list was that he created.

MS. BAYNARD: Your Honor, can we sidebar on this one?

THE COURT: You may.

(Sidebar discussion.)

MS. BAYNARD: Your Honor, I agree that the person who is talking about the -- exactly why people are put on the list going into specifics of the list is Dominick Ratkowski, but we have heard -- I mean, basically the plaintiffs' position is that it was a political hit list in retaliation for -- You made a noise. That is why I was looking at you. So Captain Vetter is aware of the list.

Testimony from Dominick Ratkowski is going to be the first time the list starts to include pictures. It expands from what it is to what it became is when the Cheesecake Factory, that is when they start ID'g a ton of people.

I think that Captain Vetter's testimony can go to his understanding of the purpose of what the list is. There's been a ton of testimony from people who I mean even the plaintiff saying the list I thought I felt like I was being stalked, I felt like I was being watched. Really besides Dominick Ratkowski, the only person that can testify to that is people -- investigators who used the list, and Captain Vetter who was in the chain of command that oversaw and gave the instructions to

1    the detective bureau, we need to start being able to identify

2    people.

3              And the testimony from Dominick Ratkowski will be he

4    took that as the easiest way for me to do that is creating a

5    list.

6              MS. MOTLEY:  The only person that can testify to the

7    purpose of this list is Dominick Ratkowski.  As this Court has

8    noted, the DPPA is an individual violation, individual to each

9    person, and that's why we have the document redacted.  We're

10   protecting people's privacy.

11             As Attorney Baynard said, we did have the plaintiffs

12   testify, and they use the pronoun I, I, I.  They didn't say

13   they.  If she's allowed to ask Vetter for what Dominick

14   Ratkowski's purpose is, it is opening the door for us to get

15   into the entire list.  If she wants to ask why did he do this

16   specific plaintiff --

17             MS. BAYNARD:  I would not.

18             MS. MOTLEY:  She's opening the door.  It is already

19   open.

20             MS. BAYNARD:  The door was opened in the opening

21   really when you said this has hundreds of people's highly

22   confidential --

23             MS. MOTLEY:  That's a fact.  I didn't say plaintiffs.

24   I said hundreds of people.

25             MS. BAYNARD:  That's what I'm saying.

1          THE COURT:  So the court reporter can hear me, let's

2    focus on the issue.  The question is, can Captain Vetter who did

3    not prepare the list testify to what the purpose of the list is?

4    That's the question on the floor for him.

5          MS. BAYNARD:  I understand.

6          THE COURT:  This issue regarding opening the door is a

7    side distraction.  It is not related to this issue at all.  As

8    to whether Captain Vetter can testify as to Ratkowki's purpose,

9    I'm sustaining the objection.  Okay.  Again, the focus is

10   Ratkowski is alleged to have violated the DPPA, and what was his

11   purpose in terms of permissible use?

12         Now, so far what Captain Vetter has testified to is

13   permitted in terms of the lead up, their discussions in the

14   department.  That's all allowable.  But now we're getting into

15   Ratkowki's mind frame.  He can't testify to that.

16         MS. BAYNARD:  I understand.  I want to be clear, and I

17   wasn't planning on using the list.  He wouldn't know, I guess,

18   specifics on anybody.  But again, we don't intend to recall him.

19   And maybe Dominick Ratkowski first would have made more sense to

20   have Vetter afterwards, but the list grows as there are events

21   occurring in Wauwatosa.  That's the testimony that's going to

22   come out.

23         You know, he was asked about an incident report with

24   John Larry yesterday.  That incident, sorry, on 8-14 was an

25   incident that they were investigating.  The incident at the

1    Cheesecake Factory was an incident that they were investigating.

2         So when he's asked, I need you to ID people or what's

3    the follow up on have we got these people ID'd, I think that

4    does go to the law enforcement purpose.  And if we're going to

5    narrow it to the only person whose mens rea matters is Dominick

6    Ratkowski, then we should -- should be nobody on the witness

7    says and Roy has his claim.  That's my position on the testimony

8    coming in.  The testimony of the witnesses on the list, not the

9    list, plaintiffs' witness list.

10        THE COURT:  Still focusing on witness Vetter.  Again,

11   what you just did, Ms. Baynard, in terms of questioning Captain

12   Vetter about specific incidents that he already testified about

13   yesterday.  The letter about the incident report, permissible.

14   He testified about that.  He can testify the circumstances as

15   you testified that the list changed.  But the key distinction

16   I'm making, purpose of the list, goes to intent, and intent at

17   issue are the defendants' intent, and that's where I'm making

18   the distinction and drawing the line.

19        Earlier you had said that it was in part you were

20   asking the question in response to plaintiffs' argument that the

21   purpose was politically motivated.  And both Ms. Motley and

22   Mr. Schwab who was at sidebar with us, they both reacted and

23   said as if that was not the argument being made.

24        MS. MOTLEY:  Correct.

25        THE COURT:  And I think that's not supported by the

291

1    record, Ms. Motley.  At opening, your opening statement was the

2    impermissible use.  I'm paraphrasing, the impermissible use was

3    to chill First Amendment activity, and that is politically

4    motivated to chill First Amendment activity.  The inference

5    being they, the police or the defendants, specifically did not

6    like the subject matter of the protests; that is, protesting

7    police misconduct.  That was your opening statement, and that

8    was also part of some of the questions of the plaintiffs.

9          MS. MOTLEY:  Your Honor, to that point, I mean my

10   plaintiffs testified to both reckless and in my opening

11   statement my opening was specifically related to explaining what

12   a law enforcement purpose is and its relationship to the

13   constitution and to the DPPA.

14         So, you know, it is not a First Amendment retaliation

15   case.  I circled it all to the DPPA.  So I understand that I did

16   bring up, you know, why people are protesting, but I didn't --

17   I don't believe any way that I said that, you know, he did it

18   because, you know, there's clear testimony that Dominick

19   Ratkowski targeted members of the TPR, and it is clear because

20   he put it in writing.  This isn't me just saying it.  There's

21   clear testimony that he was calling this a protester list.

22   That's where we got this information.  This is his words and

23   only he can speak to that, so that's been based off of two

24   depositions and plenty of emails that we received from

25   Ratkowski.  That's what he's referring to.  It's not something I

292

1    am just throwing out there as an inference. That is something

2    he said.

3            MS. BAYNARD: I think the sidebar -- I do think we're

4    getting into defending the people. Specifically asked she said

5    I petitioned the government, then I am put on this list. And

6    we're talking about I made a complaint. I guess you have to

7    show there wasn't a law enforcement purpose, but we really are

8    getting into where I'm trying to show this was not a first --

9            I feel like this is a First Amendment retaliation

10   case. That's where it's getting and some of the testimony that

11   I think we probably wouldn't need. I'm trying to respond to

12   some of the stuff that came out yesterday. That's what I'm

13   trying to do really.

14           THE COURT: And in response to both of what your

15   statements are, my summarizing your position that the

16   impermissible purpose was to chill First Amendment

17   constitutional expression. In saying that, I was not saying

18   that you did not tie it to what you anticipate the evidence to

19   show. That is not what I'm saying.

20           What I'm saying is in saying that, you're saying that

21   is the impermissible purpose which is not allowed under DPPA.

22   So what they are now trying to say is that, no, it was not for

23   that. It was, in fact, for law enforcement, and they will be

24   allowed to address that.

25           Circling back again to Captain Vetter specifically.

293

1   The distinction I'm drawing that he cannot get in the head of

2   Ratkowski and Roy.  I think he's mostly as to Ratkowski as to

3   what Ratkowki's purpose is.  If you want to ask him specific

4   incident that was he testified to yesterday, specific facts, go

5   ahead.  But I think it is improper when you say what was the law

6   enforcement purpose of the list, you can do that with Ratkowski.

7        MS. BAYNARD:  So can I ask him more on the basis of

8   what the goals and the use departmentally of the list were?  I

9   want to tell him for a second if I ask a certain question to

10  avoid --  to avoid I guess testifying to anything that would

11  be -- It is not always my question.  Sometimes it is the answer

12  that's given.  Is he allowed to testify to as he testified to

13  before, I had conversations with supervision, we needed to start

14  identifying people for potential enforcement action, et cetera?

15  Is that -- That's what he's testified to.  And so am I allowed

16  to ask him about departmentally what they were using?  I guess

17  --  I guess you're saying he can't testify to what the purpose

18  of the list was.

19       MS. MOTLEY:  I think anything with regards to the list

20  in terms of obtaining, using or disclosing this information,

21  only Ratkowski can testify to that.  Again, he's the only

22  defendant on that particular, you know, issue.  It only goes

23  again like you said, he can't go in Ratkowki's head.

24       In terms of why he answers -- to answer for why he

25  obtained it, why he used it.  Again, it is not about the list.

294

1    It is about the 44 individual plaintiffs' personal information,
2    you know, and it sounds like he's already testified outside the
3    scope.

4         He's made mention of we were trying to detect people
5    for crimes and things like that. Not one single plaintiff was
6    criminally charged, criminally questioned or anything like that.
7    Based on any insinuation out there, there are people on the list
8    charged with crimes, but they are not our plaintiffs so that's
9    our problem. Only Ratkowski can testify to that.

10        THE COURT: Okay. As to your question whether you may
11   ask him how the list was used in the department, the witness has
12   already testified that this list was -- many supervisors were
13   talking about the need for this list, and that's how Ratkowski
14   came to create this list.

15        There's argument on the other side that this list was
16   being used improperly to target individuals based on either
17   affiliation, viewpoint, et cetera. So he may answer if he knows
18   specifically not goals but if he knows how it was used in light
19   of prior testimony and the line of argument. That's permissible
20   testimony. Anything else with Mr. Vetter while we are on the
21   sidebar because --

22        MS. BAYNARD: I don't have anything else with regards
23   to Vetter.

24        MS. MOTLEY: I don't either, Your Honor. I do want to
25   say for the record I already told we don't need Barry Weber, so

1    you're aware.

2           THE COURT:  Let's get back on the record and continue

3    this trial, and we'll go on the record to take up other matters.

4           MS. BAYNARD:  Would you like me to instruct him to not

5    --  I'm not going to ask questions elicited.  You can ask him

6    the response he gave.  Would you like me to instruct him to --

7           MS. MOTLEY:  I don't have an objection.

8           THE COURT:  Ms. Motley does not object, so you may

9    instruct him.

10       (Back on the record.)

11          THE COURT:  Members of the Jury, thank you for your

12   patience.  We'll continue.  Ms. Baynard.

13   **CONTINUED CROSS EXAMINATION BY MS. BAYNARD:**

14   Q.  So I believe before we took a brief -- It wasn't brief.

15   Before the sidebar, we were discussing the list.

16   Departmentally, what was -- In your experience, what was the

17   list used for?

18   A.  So my bureau, the Patrol Bureau, was basically responsible

19   for dealing with all of the protests, some of which were

20   disruptive, some of which were ordinance violations, some of

21   which there were crimes occurring, and I wanted this list to be

22   able to investigate and potentially charge or arrest individuals

23   who violated those ordinances and laws.

24   Q.  Okay.  I think before you said that the list was a living

25   and breathing document.  Are there --  Can you give specific

1    instances where the list I guess in your understanding grew,

2    specific events where the list grew?

3            MS. MOTLEY:  Objection, outside the scope of his

4    testimony of what we just discussed at sidebar.

5            THE COURT:  Overruled as to specific incidences.

6            THE WITNESS:  So there were numerous incidents that

7    occurred in Wauwatosa, in the county, in Southeastern Wisconsin

8    and the United States where our concern for public safety was

9    worsening.  And there were protests, for example, at the City of

10   Wauwatosa mayor's home in the middle of the night shining lights

11   and lasers at 2:00 in the morning into his house to be

12   disruptive, intimidate him, disrupt the neighborhood.  That's

13   not protesting.  That's disorderly conduct.  That's disruptive.

14           We are a police department.  We have an obligation to

15   maintain order for our community.  There's another incident

16   where a former officer of ours had a protest at his house where

17   his house was vandalized, windows were broken, and he was shot

18   at with a shotgun, and people were criminally and felony charged

19   with attempted homicide.

20           MS. MOTLEY:  Objection, Your Honor.

21           THE COURT:  Sustained.

22           MS. MOTLEY:  I ask the jury be instructed that none of

23   our plaintiffs were criminally charged or anything with regards

24   to this incident he just named.

25           THE COURT:  Ms. Baynard.

1              MS. BAYNARD:  So stipulated.

2              THE COURT:  It is stipulated between the parties that

3     the incident that Captain Vetter just mentioned regarding

4     shooting, firing, does not concern any of the plaintiffs in this

5     lawsuit.

6     Q.  And Captain Vetter, when you were investigating these -- You

7     gave two examples.  Did you use the list to identify individuals

8     who were at these events?

9     A.  Yes, that was the primary function of the list.

10    Q.  And I believe when you were talking about, you know, the

11    understanding of what the actual use of the list was, you said

12    public safety.  Can you explain what you meant by public safety?

13    A.  Public safety is a very broad term, and it also is a

14    balancing test.  We have to allow people to move about freely

15    during their day and use their First Amendment right to protest

16    and demonstrate but also balancing that against keeping a

17    peaceful and orderly community.

18              So we're constantly balancing those two things in

19    order to maintain order so businesses can stay running, so they

20    can do their business, make their money.  People can continue

21    going to work, driving on streets without being blocked, et

22    cetera.

23    Q.  We talked about -- I guess you talked about what your

24    understanding of the, I guess, what you personally knew the list

25    to be used for.  Did you -- Do you recall or did you ever

1    instruct Shane Wrucke to utilize the list in any type of

2    investigation at the mall or the Cheese Cake Factory?

3    A.   Absolutely.

4    Q.   I'm going to hand you what's been marked as Defendant's

5    Exhibit 1010.  I don't plan on publishing it to the jury.

6    Captain Vetter, do you recall sending this email to Shane

7    Wrucke?

8    A.   I do.

9    Q.   What is this email in relation to?

10   A.   So again, the Patrol Bureau, my personnel at that time are

11   responsible for dealing with these incidents that occur.  There

12   was a disorderly conduct protest event near the Mayfair Mall

13   that closed down numerous businesses.  They were loud and

14   disruptive, and we had numerous complainants and victims that

15   were there that we were investigating for the violation, excuse

16   me, that we were interviewing for the violation.  And it is

17   commonplace for the Patrol Bureau to then pass those

18   investigations onto the Investigative Division where Lieutenant

19   Shane Wrucke was in charge of to continue doing further

20   followup.

21           It often takes days and weeks to investigate

22   ordinances or crimes to even see if there is a violation that we

23   can charge.

24   Q.   Specifically, this document hasn't been redacted in any

25   form, but can you read your -- I guess your e-mail to Shane

299

1    Wrucke.  It is on the bottom.

2    A.  Yes.  So it is dated July 14, 2020.  About 9:54 a.m..  It

3    says, "Shane, please provide me with an update on the status of

4    the mall disorderly conduct protest cases, and I list three case

5    numbers here, three incidents and any others including the

6    number of suspects that have been developed that you plan on

7    citing or referring also.  I need this by 1:00 p.m. for a

8    meeting today.  Thanks."

9    Q.  And if you look a little bit further, and I don't want you

10   to talk about any of the people if a name shows up in there.  Do

11   you see next to incident report there's a number, that case

12   20-13276?

13   A.  Yes.

14              MS. MOTLEY:  Objection, hearsay.

15              THE COURT:  Is this an email prepared by the witness?

16              MS. MOTLEY:  No.

17              MS. BAYNARD:  The first part is prepared by him.  The

18   second part is a response.  By this witness, no.  It was by

19   Shane Wrucke.  If you like, I can address it with Shane Wrucke.

20              THE COURT:  Address it with Mr. Wrucke if he's going

21   to testify.

22   Q.  So Captain Vetter, this correspondence that we just talked

23   about, you're looking for an update on the mall.  I believe the

24   email says, include the number of suspects that have been

25   developed and whether or not you plan on citing or also

1    referring.  How big were some of these protests?

2    A.  We always kept track of the number of individuals that were

3    at the protests just so we could respond to them operationally

4    to make sure we had the proper number of staff to monitor, and

5    some of these would be 30, 40, 50 people.  Some of them would be

6    100, 125.  And typically a patrol shift that I have available to

7    deal with that is between eight and ten cops.

8    Q.  Okay.  I want to talk about one of the specific events that

9    you were asked about yesterday, and I believe that was in

10   plaintiffs' exhibit -- Plaintiffs' Exhibit 15.

11   A.  Let me switch books here.  I am not sure how this is

12   organized.

13           MS. KNOWLTON:  Your Honor, may I assist?

14           THE COURT:  You may, Ms. Knowlton.

15   Q.  It is actually Plaintiffs' Exhibit 15 and the number is

16   28840.

17           THE COURT:  Ms. Baynard, I am lost.  Is it 215 or 15?

18           MS. BAYNARD:  Plaintiffs' Exhibit 215, and it is

19   28840.

20   Q.  I will just move on from this.  Captain Vetter, did you ever

21   have communication with any of the protestors?

22   A.  I would say protest leadership, yes, and protestors

23   themselves, yes.

24   Q.  I guess who did you have --  Strike that.  Captain Vetter,

25   yesterday you were asked about an incident that happened on

1  8-14.  I believe it was on N. 70th Street.  Do you recall a

2  portion of that incident report?

3  A.  Was that reference the John Larry --

4  Q.  Yes.

5  A.  -- line of questioning?  Yes.

6  Q.  Okay.  Do you recall that protesting event?

7  A.  Yes.

8  Q.  What do you recall from that event specifically?

9  A.  I was not on duty at the time, but I was notified by the

10  shift lieutenant of the emergent situation and that a county --

11  entire county-wide emergency mutual assist for our law

12  enforcement agency was put out in order to get more help there

13  for our officers.

14  Q.  And were there arrests made at that event?

15  A.  I believe a couple arrests were made at the event, yes.

16  Q.  I'd like to show you -- When you talk about public safety, I

17  guess we got a little sidetracked from that.  What did public

18  safety entail with regards to these events?

19         MS. MOTLEY:  Objection, vague.

20  Q.  The specific protest events that you've spoken of, I believe

21  one was at the mayor's house.  You talked about the mall, the

22  officer's home, and then the 8-14 incident?

23         MS. MOTLEY:  Objection, still vague.

24         THE COURT:  Objection overruled.

25         THE WITNESS:  So public safety is very broad and

302

1   police are put in the position of having to maintain order at

2   protest events.  Whether we agree or disagree with what's being

3   protested, our job is just to maintain order so that the

4   protestors can maintain their First Amendment rights while not

5   disrupting the other public that they are in and around, and

6   that is a fine, difficult balancing act.

7           We're trying to maintain rights, but we don't want

8   these rights to impress impart too much on the public as well.

9   So where one person's rights end, another person's rights begin,

10  and we're constantly trying to balance that.

11          And I've been at protests all my 22 years right smack

12  in the middle of two heated parties, and our job is just to be

13  there and try to be a calming force and allow both those parties

14  to exist hopefully peacefully.

15  Q.  Were there ever instances at these protests where I guess is

16  another factor of public safety blocking traffic?

17  A.  Many of the routine concerns and problems that we had where

18  order was not maintained in this summer is traffic being

19  blocked, ambulances being blocked on the way to Froedert, squad

20  cars being blocked as they were trying to leave Froedert,

21  people's lawns being driven on to get around the police, small

22  amount of damage to property.

23          I know a situation where a resident of Wauwatosa was

24  attacked by some protestors.  I don't recall if we were able to

25  ever identify them.

303

1          MS. MOTLEY:  Excuse me.  Objection, Your Honor.

2          THE COURT:  Captain Vetter, when you hear an objection

3     if you please pause to give them a chance to address the

4     objection.  The objection, Ms. Baynard, do you wish to be heard

5     on the objection?

6          MS. MOTLEY:  Objection, Your Honor.  It is beyond the

7     scope.  He's talking about protests in general had bad things

8     happen.  I thought we were here for the 44 specific plaintiffs.

9          MS. BAYNARD:  I will instruct to tie it to the

10    specific events that we've talked about.

11    Q.  Captain Vetter, I believe we've talked about -- Okay, so I

12    think we were talking about whether or not any of the -- if

13    there was ever situations where these large groups blocked --

14    were blocking roads.  Do you recall me asking that?

15    A.  Yes.

16    Q.  And did you ever have -- I believe you said there was an

17    incident where potentially there was an ambulance that was

18    blocked?

19    A.  That's correct.

20    Q.  I'm going to refer you to Plaintiffs' Exhibit 233.

21          MS. KNOWLTON:  If I may, Your Honor.

22          THE COURT:  Yes.  Thank you.

23    Q.  Captain Vetter, I believe you indicated that you had

24    communications with some of the leadership of the demonstration

25    group.  Why did you have communication with the demonstration

1   leaders?

2   A.  I always try to have communication with demonstration and

3   protest leaders, the group, the leadership to ensure them the

4   police are there just to monitor, to also go over if you will

5   the ground rules or the laws of protesting so that they again

6   can use their First Amendment right but also so that if follows

7   within the law.

8           Things like do not walk in the roadway, obstruct

9   traffic, use sidewalks, you cannot demonstrate on someone's

10  private property.  So it is routine for me to contact

11  demonstration leadership to go over those ground rules again so

12  that it is peaceful and that we balance protestors' rights with

13  the communities rights and the community safety.

14  Q.  I guess were there any of the protest leaders on the list

15  that Dominick Ratkowski created?

16  A.  I believe so.

17  Q.  Okay.  And did you ever --  I am going to refer you to the

18  bottom part of the Exhibit 233, Plaintiffs' Exhibit 233, just

19  your e-mail.

20  A.  Okay.

21  Q.  So this is -- I guess, do you recognize this email, just the

22  bottom portion?

23  A.  The third paragraph?

24  Q.  Yes, just the part you put in there.

25  A.  Yes.

305

1    Q.   Can you describe the communication we're looking at?

2    A.   It is an email that I sent in May, May 27th of 2021 to

3    Lieutenant Beckman who was supervising the second shift patrol

4    personnel.

5              MS. BAYNARD:  Your Honor, I would like permission to

6    publish just the portion that contains Mr. Vetter's

7    communications to the jury.

8              THE COURT:  First, are you moving 233 into evidence

9    for that limited purpose?

10             MS. BAYNARD:  Yes, Your Honor.  I ask it be moved into

11   evidence.

12             THE COURT:  Any objection?

13             MS. MOTLEY:  No, Your Honor.

14             THE COURT:  233 you can see for the purpose and may be

15   published as requested.

16   Q.   Okay.  Captain Vetter, does this email refresh your

17   recollection of an event where the protest blocked -- I think

18   you have a version in front of you if it is easier, but blocked

19   an ambulance?

20   A.   Yes.

21   Q.   And I believe -- What was the purpose of sending this email

22   to Dominick and Lieutenant Beckman?

23   A.   The intent of this was to try and have Lieutenant Beckman,

24   the second shift supervisor, contact, meet the protest

25   leadership whether before a protest, after, during, didn't

1    matter what he did, to reestablish the ground rules so that the

2    protestors could do their thing but not disrupt public safety or

3    disrupt the community or in this circumstance and that evening

4    or prior evening actually blocking an ambulance in an emergency

5    to a trauma center, Froedert.

6    Q.  If you look at the very last portion of the email.  I

7    believe you just said you just spoke about the -- what the

8    ground rule was.  You're also asking if anybody can be ID'd from

9    last night they should be cited.  When you sent that email to

10   Dominick and Lieutenant Beckman, was it your intent that people

11   would be ID'd from this list that Dominick created?

12   A.  Identified and cited, correct.

13   Q.  Captain Vetter, I believe we've spoken a lot about what the

14   kind of department's understanding of the list, and I believe

15   you said for potential ID'g people at the events, to know

16   leadership, et cetera.

17            When we're talking about the enforcement of citation

18   aspect, was everybody who I guess --  Was the list used to issue

19   citations?

20   A.  Yes.

21   Q.  Was everybody who participated in the protest cited?

22   A.  No.

23   Q.  Were citations --  Were citations mailed sometimes?

24   A.  Yes.

25   Q.  Were citations mailed after gathering because you have

307

1  information from the list to identify people?

2  A.  Yes.

3          MS. BAYNARD:  Just one second, Your Honor.  I have

4  nothing further.

5          THE COURT:  Ms. Motley, anything further?

6          MS. MOTLEY:  Yes, please, Your Honor.

7  **REDIRECT EXAMINATION BY MS. MOTLEY:**

8  Q.  Good morning, Captain Vetter.

9  A.  Good morning.

10  Q.  I just wanted to ask a few questions to clarify some things.

11  Do you mind pulling up Exhibit 233, again?

12          MS. BAYNARD:  It is up.

13  Q.  So what I'm pulling up is Exhibit 233, which you just spoke

14  about with Attorney Baynard.  The date on this email is May 23,

15  2021, correct?

16  A.  On my email, correct.

17  Q.  And defendant Dominick Ratkowski had created this list

18  June 5th of 2020, correct?

19  A.  That could be.

20  Q.  So this email is a year after this list has been -- the 44

21  plaintiffs' information had been put on this list, correct?

22  A.  I don't know who alls information was on the list in May of

23  2020 versus or June of 2020 versus May of 2021.

24  Q.  Okay.  Thank you.  But had the list been out for at least a

25  year or a little under a year at the time you sent this specific

308

1  email, correct?

2  A.  I think that's fair.

3  Q.  Okay.  And do you know how many people this plaintiffs'

4  private information was sent to within that year?

5  A.  I do not.

6        MS. BAYNARD:  Objection to the form of the question.

7  Which people?

8        MS. MOTLEY:  Any of the plaintiffs.

9        THE COURT:  Go ahead.  I think --  The question is do

10  you know how many people the list was sent out to is that

11  correct, Ms. Motley?

12        MS. MOTLEY:  Correct.

13        THE COURT:  Is your answer the same, Captain Vetter?

14        THE WITNESS:  It is the same.  I do not know how many

15  people that list was sent to.

16  Q.  Do you know how many times the list was used within that

17  year?

18  A.  I do not know the number of times.

19  Q.  Do you know if every single person --  Well, do you know how

20  many people received the list that had the 44 plaintiffs'

21  private information from the DOT?

22        MS. BAYNARD:  Objection to the form of the question,

23  argumentative, assumes facts not in evidence.

24        MS. MOTLEY:  This is already stipulated to.  Every

25  plaintiff had a driver's license photo on the list.

309

1          THE COURT:  You may answer the question, Captain

2     Vetter.

3          THE WITNESS:  I do not know how many people it was

4     sent to.

5     Q.  Do you know if all the people that received these 44

6     plaintiffs' DOT information, if they all were law enforcement

7     officers?

8     A.  I recall that we were sharing information with other law

9     enforcement agencies while also trying to comply with open

10    records requests at the same time, so it could have been a

11    combination of law enforcement and whomever.  Again, that

12    Wisconsin Open Records Law, we must comply with that.

13    Q.  Okay.  But do you know if this list with the 44 plaintiffs'

14    private information only went to law enforcement officers?

15    A.  I don't believe it only went to law enforcement, no.

16    Q.  And so it's your testimony that the 44 plaintiffs' private

17    information was released publically?

18         MS. BAYNARD:  Object to the form of the question.  I

19    think it is vague to what we're talking about the list release

20    and open records and the list distributed by the police

21    department.  Those are two separate things.

22         THE COURT:  So the objection is sustained.  It may be

23    revised, Ms. Motley, to be specific and also not compound.

24    Q.  Sorry to give you a confusing question.  So with regards to

25    this list, the list that was created by defendant Ratkowski.

1  Was it released based on an open records request?

2          MS. BAYNARD:  Objection to the question, irrelevant.

3          THE COURT:  Overruled.  The objection is overruled.

4  He may answer.

5          THE WITNESS:  I'm sorry, can you ask one more time?

6  Q.  Sorry.  With regards to this list that was created by

7  defendant Ratkowski, do you know if it was released publically?

8  A.  I think there's a difference between releasing it publically

9  and releasing it upon request via open records request.

10 Q.  Thank you.  Do you know if this list was released based on

11 an open records request?

12 A.  I believe so.

13 Q.  And do you know if this list was released based on an open

14 records request not redacted like not blacked out to the public?

15 A.  I recall that occurring, yes.

16 Q.  I'm sorry you recall?

17 A.  I recall the unredacted version being released, yes.

18         MS. BAYNARD:  Your Honor, can we have a sidebar?

19         THE COURT:  Very brief.

20    (Sidebar discussion.)

21         MS. BAYNARD:  The list released in open records that's

22 all blacked out, that's not one of your -- That's not one of

23 your disclosures.  So my concern is now we're confusing the jury

24 that when the list was released after in open records very

25 heavily, heavily redacted, no DOT information.  I think your

311

1   picture was on there.  There were some people's booking photos

2   that were not plaintiffs.  That is not part of this lawsuit.

3   And if they want to with Dominick Ratkowski go through, you have

4   all the emails where it was sent out and say why did you send it

5   to this specific person?  That's permissible.

6           But the way the questioning is going, it makes it

7   sound like the list unredacted with the plaintiffs' information

8   was released in open records requests, and that is absolutely

9   not correct.

10           MS. MOTLEY:  Your Honor, she opened the door.

11  Attorney Baynard is the one that opened the door and talked

12  about this list being released publically through an open

13  records request.  I am following up on the questions.  This is

14  his testimony.  This is what he's saying.  It is not what she's

15  testifying to.  He just testified that this list was released

16  publically based on an open record request unredacted.  We

17  didn't get every open records request, and Attorney Baynard

18  opened the door to this questioning.

19           THE COURT:  Okay.

20           MS. BAYNARD:  This is not one of the claims that is in

21  this.  I don't think it was opening the door when he talks about

22  the difference between the DPPA information and verification and

23  when releasing information that was going to release disclosure

24  of citations, incident reports.  But the suggestion that and the

25  jury has heard the suggestion that this list was released

1  unredacted pursuant to an open record request is absolutely

2  untrue.  And it sounds way worse and more inflammatory that it

3  was released between law enforcement.

4        I have no problem with Attorney Motley asking if it

5  was released to people other than law enforcement.  But now the

6  jury has heard that the list was released publically, and it

7  wasn't, the version that she's talking about.  I am more than

8  happy to email it to the Court.  I don't think any of the

9  plaintiffs' information is on there.  I would like to share

10 that.  I would like to send it to you because that is -- I mean

11 again, that's not where the disclosures we're talking about

12 today.

13       THE COURT:  Okay.  The question -- Let's return the

14 question back to the list at issue in this case.  That's the

15 first thing.  Number two, although Captain Vetter is aware of

16 things, is he the person doing this releasing, this disclosing?

17       MS. MOTLEY:  No.  That's the whole point.  He's not

18 the open records custodian.  I don't know why he's allowed to go

19 down that record.  Attorney Baynard has opened that door.  And

20 the problem is is that I clarified with him I said, so the

21 unredacted list was released to the public?  He said, yes.  She

22 doesn't like the answer, but that's his answer.  He's lying

23 under oath.

24       MS. BAYNARD:  I think he's getting confused by whether

25 we're talking about the specific --  that list that is not part

1    of the case.  If it was released unredacted which it wasn't

2    publically.  The only person who got it completely unredacted

3    was you.  So even if --  I think that is --  That is not one of

4    the claims here now.  They're going to be thinking it was

5    released.  The Wauwatosa Police Department gave it unredacted to

6    an open records request.  That's not the case at all.  It is

7    heavily redacted.

8              THE COURT:  You, Ms. Baynard, can ask your follow-up

9    questions on the distinction that you're making now.

10             MS. MOTLEY:  Can we show --

11             THE COURT:  No, we're getting into a side issue.  If

12   you wish to clarify that Captain Vetter, the public release he

13   was talking about, is not the list involving these plaintiffs,

14   you may ask that, but we're going to keep this brief because

15   we're going to take our morning break.

16             Ms. Motley, you need to wrap up and get back to the

17   list, the question and things within Vetter's own knowledge and

18   actions.

19             MS. MOTLEY:  Your Honor, I want to be very clear the

20   list -- It is regarding this list.  There is no -- So to suggest

21   it is a completely different list is completely untrue.  It is

22   this specific target list that he is talking about.  This is the

23   list that she's saying was redacted.  It is this list.  I'm not

24   bringing up any other list.  And frankly every time this list

25   was disclosed to another person, it goes back to the defendant

1   Ratkowski.  You opened the door.

2          MS. BAYNARD:  You know how it looked when it got sent

3   out.

4          MS. MOTLEY:  You are saying your client just lied

5   under oath.

6          MS. BAYNARD:  I think he is confused.  One lawyer, one

7   witness.

8          MS. MOTLEY:  That's why I wanted to clarify.  That is

9   why I asked.

10          THE COURT:  That is why I'm allowing you, Ms. Baynard,

11   if you want to do a very short examination to clarify what you

12   think he got confused about, you may do so, but we're not

13   getting --  Focus.  This witness should be done already as far

14   as I'm concerned.  If you please focus as to what this witness

15   know and this list and let's wrap it up.

16      (Back on the record.)

17          THE COURT:  Ms. Motley, you may continue.

18          MS. MOTLEY:  Thank you, Your Honor.

19   (**By Ms. Motley.**)

20   Q.  So is it the policy of the Wauwatosa Police Department to

21   use, obtain or disclose people's personal information from their

22   motor vehicle records?

23          MS. BAYNARD:  Object to the form of the question.

24          THE COURT:  She wasn't done yet.  Finish your question

25   so I can appreciate the objection.  Go ahead, finish your

315

1  question.

2  Q.  Thank you.  Is it the policy of the Wauwatosa Police

3  Department who --  Is it a policy of the Wauwatosa Police

4  Department to publically release personal information from

5  people that is obtained from motor vehicle records if someone

6  requests it through an open records request?

7         MS. BAYNARD:  Object to the form of the question,

8  compound.

9         THE COURT:  The objection is overruled.  The witness

10  may answer if he knows.

11         THE WITNESS:  That's a complicated question.  So it

12  really goes back to balancing again the open records request,

13  which the government says -- excuse me -- which the law and

14  policy says we've got to release information but yet against the

15  DPPA, which says don't release too much.  So we're always trying

16  to balance that appropriate amount of information that should be

17  released.

18  Q.  So the Wauwatosa Police Department does release DOT personal

19  information from people as part of its policy?

20  A.  I guess it depends how that information is acquired because

21  it could be acquired through open sources.  It could be acquired

22  through other databases.

23  Q.  So specifically talking about DOT records, okay.  Just that.

24  That information.  Is it the policy of the Wauwatosa Police

25  Department to release personal information that is obtained from

316

1   citizens' DOT records?

2   A.  To release that DOT record, no.  That is not --  That is not

3   within our policy.

4   Q.  Is it the policy of the Wauwatosa Police Department to

5   release personal information that is found on a person's DOT

6   record such as their, you know, address, date of birth, height,

7   weight, those types of things?

8   A.  Again if it is an open records request versus just asking

9   for DOT files, open records request, we might be able to find

10  height, weight, dates of birth.  That is not in a DOT file, so

11  then I would say it potentially could be released if not

12  redacted by the record's division.

13  Q.  Okay.  So the open records division of the Wauwatosa Police

14  Department determines what information is redacted and goes to

15  the public?

16  A.  That is correct.

17  Q.  And you are not in charge of the Open Records Division,

18  correct?

19  A.  It is not within my bureau.

20  Q.  And is defendant Joseph Roy on June of 2020 to January 7th

21  of 2021, was the person that was in charge of the Open Records

22  Division with the Wauwatosa Police Department?

23  A.  I believe Joseph Roy was a sergeant at that time, so I'll go

24  with if he was a sergeant at that time, there's been a lot of

25  movement within units.  There actually would have been a

1    lieutenant and a captain above him also specifically for

2    records.

3    Q.   And I just want to clarify.  You mentioned there's a lot of

4    databases that are available to persons that work at the

5    Wauwatosa Police Department, correct?

6    A.   Yes.

7    Q.   Okay.  And you mention that the Wisconsin Circuit Court

8    Access Database which is open to the public, that's one of the

9    databases that you all use in your line of work?

10   A.   Yes.

11   Q.   And you would agree that in the C-Cap, the Wisconsin Circuit

12   Court Access Program, I guess I don't know what the P stands

13   for.  That a person's, you know, complete date of birth is not

14   available to the public in that database?

15   A.   I don't recall if their date of birth is in that database or

16   not.

17   Q.   Do you recall -- I wish I could pull it up, but I can't.

18   But do you recall if a person's -- You would agree that a

19   person's height, weight, eye color, hair color is not

20   information that you can get from C-Cap, correct?

21   A.   I don't know if that information is within C-Cap.

22   Q.   But it was your testimony earlier we were mistaken that you

23   knew that you're saying that you don't know that.  You don't

24   know if a person's, you know, complete date of birth is in

25   C-Cap.  You don't know if a person's height, weight, hair color,

1    eye color can be found on C-Cap; is that correct?

2    A.   Within that specific database, I'm not sure if that lists

3    all that information.  I know when you query individuals, you

4    can put a date of birth.  I don't know if it then conversely

5    shows you a date of birth.

6    Q.   Okay.  Thank you.  Are you aware of a citizen complaint that

7    was filed by Tracy Cole on July 13th of 2020?

8    A.   I don't recall that specific complaint.

9    Q.   Okay.  Do you recall any citizen complaints that were given

10   to the Wauwatosa Police Department from June 5th of 2020 until

11   let's just say January 7th of 2021?

12           MS. BAYNARD:  Object to the form of the question,

13   foundation.  If we want to tie it to the individuals that are

14   here, not just in general.

15           THE COURT:  Sustained as to broadness.

16   Q.   Are you aware that Tracy Cole did file a citizen complaint

17   with the Wauwatosa Police Department?

18   A.   Numerous complaints were filed with the police department,

19   with the Police and Fire Commission over those years there.  I

20   just --  I would have to see the specific complaint to recall

21   the details.

22           MS. MOTLEY:  Your Honor, is it okay if I refresh his

23   memory with the complaint?

24           THE COURT:  You may approach the witness.

25           MS. MOTLEY:  I'm sorry.  If you could please pull up

319

1    Exhibit 241.

2              MS. BAYNARD:  You said 241?

3              MS. MOTLEY:  Yes.

4    Q.  So does that refresh your memory?

5    A.  Yes.

6    Q.  Now, what does that complaint -- What is this complaint

7    about?

8              MR. WIRTH:  Just for -- Just a second, can we see

9    what's being referred to?

10   Q.  Now, we're going to focus on the July 13, 2020 letter

11   regarding Tracy Cole who is a plaintiff in this matter.  Could

12   you please explain what this complaint is about?

13             MS. BAYNARD:  Objection, Your Honor, calls for

14   hearsay.

15             THE COURT:  It is 10:17.  I promised the jury a

16   morning break.  Let's take our 15-minute morning break now,

17   please.

18             BAILIFF:  All rise for the jury.

19      (Jury excused.)

20             THE COURT:  We'll keep this brief.  I also need to

21   give the court reporter and the staff a morning break as well.

22   There's an objection on the floor.

23             MS. BAYNARD:  Yes, Your Honor.  Do you have the

24   exhibit?

25             THE COURT:  I do.

320

1           MS. BAYNARD:  I believe the page we're referencing is

2     a page of the exhibit.  It is a complaint regarding Officer

3     Mensah on behalf of Antonia Gonzales.  I believe we're looking

4     at the same document.

5           MS. MOTLEY:  Page 3.

6           THE COURT:  I thought I heard the question regarding a

7     July 13, 2020 letter; is that correct?

8           MS. MOTLEY:  Yes.

9           MR. WIRTH:  Judge, can Captain Vetter use the men's

10    room.

11          THE COURT:  Yes.

12          MS. BAYNARD:  I guess, one, having Captain Vetter talk

13    about what this incident report is and, two, the unfairly

14    prejudicial nature of -- This is a complaint that Attorney

15    Motley submitted to the Wauwatosa Police and Fire Commission

16    which Captain Vetter is not a member of.  And in here it talks

17    about he fired his weapon at Alvin Cole killing him five times.

18    I mean, this is extremely prejudicial, and I don't think that

19    Captain Vetter can talk about what's inside of this complaint.

20          THE COURT:  Ms. Motley, where are you going with this?

21    I thought we were close to wrapping up with Vetter.

22          MS. MOTLEY:  The problem is there were so many doors

23    open with the cross with Luke Vetter including the felonies that

24    came as a result of a gun being shot at Mensah's house.

25          THE COURT:  So we addressed that by clearly on time by

1    instructing the jury that this does not concern any of the

2    plaintiffs in this case.  So where are we going with this

3    letter?

4            MS. MOTLEY:  Your Honor, it is Captain Vetter's

5    testimony that this target list had a legitimate law enforcement

6    purpose when it was, you know, disclosed and used by Wauwatosa

7    Police Officers.  We believe the evidence will show that Tracy

8    Cole specifically -- Part of the reason why she was, perhaps,

9    you know her information was disclosed was because of her

10   citizen complaint.  You know, we have evidence of the target

11   list being distributed on the same date and the date after with

12   her information and that of her family.

13           So it goes specific to the charges -- excuse me -- the

14   claim regarding defendant Ratkowski.  It goes specific to

15   willful reckless, so that's why we want to bring this in.

16           THE COURT:  All right.  I will now allow it.  You may

17   ask Ratkowski when you have him on the stand why he disclosed

18   Ms. Cole's information, whether the disclosure was in

19   retaliation response or in connection with any citizen complaint

20   that she made.  What else do we have left with this witness?

21           MS. MOTLEY:  I'm hoping to wrap it up soon.  I thought

22   it would be quicker than this.  I am hoping not more than

23   15 minutes.

24           THE COURT:  Fifteen.  That sounds like a lot,

25   Ms. Motley.  What else is there to do with him?

322

1          MS. MOTLEY:  We want to discuss Exhibit 215 very

2     briefly which is something that was admitted yesterday regarding

3     John Larry's arrest.

4          THE COURT:  Which means you already questioned him

5     about that yesterday.

6          MS. MOTLEY:  Right.  We have ten other plaintiffs that

7     are also on that document.

8          THE COURT:  So it is not just about John Larry.  That

9     is who you had discussed it with him yesterday.  You are now

10    going to discuss it with him regarding other plaintiffs.

11         MS. MOTLEY:  And one question regarding John Larry.

12         THE COURT:  All right.  Ms. Baynard, anything else you

13    have?

14         MS. BAYNARD:  I guess depending on what the 215

15    discussion entails, there could potentially be follow up, and

16    then maybe I might have a few questions.  I guess with the 215,

17    the exhibit, I believe we only admitted the page with John

18    Larry's name.

19         THE COURT:  That is correct.  I had it redacted only

20    to John Larry.  That is who the witness had testified about.

21    All right.  Let's have a morning break, too.

22         BAILIFF:  All rise.

23     (Brief recess taken.)

24     (Back on the record.)

25         THE COURT:  Back on the record.  Two quick things

323

1   before we bring the jury out.  I just received a question from

2   the jury.  The question read, "Can you please refresh my memory

3   regarding open records and its purpose."

4           It is my intent to instruct the jury that they have to

5   wait to hear all the evidence as previously instructed on that

6   question.  Either side wish to be heard very quickly?

7           MS. MOTLEY:  No, Your Honor.

8           MR. WIRTH:  I think that's appropriate, Judge.

9           THE COURT:  All right.  The second issue is a reminder

10  to everyone in the courtroom to mind their demeanor during

11  testimony.  As I stated yesterday, it's very human to react to

12  things that we like or do not like or agree or do not agree

13  with, but this is a court of law.  A jury has a very important

14  job to do to both sides, and we do not want to distract them

15  from the work that they must do.

16          If I have to give this reminder again, people who are

17  not following it are at risk of being ejected from the

18  courtroom.  All right.  My understanding now with this Captain

19  Vetter is that it will be brief and efficient.  I need the

20  attorneys to be very mindful of our sidebars unless for this

21  remaining witness unless it is really urgent, I am likely not to

22  grant a sidebar so we can wrap this up.  All right.  Please

23  bring the jury out.

24      (Jury enters.)

25          THE COURT:  Good morning.  I received a question from

1    the jury.  I'll just remind the jury in response to the question

2    as I had instructed you yesterday, just keep an open mind.  You

3    have not received all the evidence yet.  You may have a question

4    now that may be answered later by other witnesses or later

5    during the presentation so keep an open mind to all the

6    evidence.  With that, you may continue.

7            MS. MOTLEY:  Thank you, Your Honor.

8            THE COURT:  You may continue, Ms. Motley.

9    (**By Ms. Motley**.)

10   Q.  Captain Vetter, you are aware of the Driver's Privacy

11   Protection Act, right?

12   A.  Yes.

13   Q.  You've taken training with regards to accessing DOT records,

14   correct?

15   A.  Yes.

16   Q.  You would agree that the Wauwatosa Police Department you

17   know anyone who works there or any City of Wauwatosa employee

18   has to follow the Driver's Privacy Protection Act, correct?

19   A.  Yes.

20   Q.  So we talked a little bit about open records, but you

21   recognize that, you know, this is the federal law that you all

22   have to follow?

23   A.  Yes.

24   Q.  Sometimes I understand it is difficult that the open

25   records -- The state open records law may come in.  You know,

325

1  there may be issues with sort of the interpretation with the

2  federal law.  But irregardless of that, you are still required

3  to follow that law, correct?

4  A.  Yes.

5  Q.  Now, we're almost done.  Now, Captain Vetter, you would

6  agree that it is not a legitimate law enforcement purpose to

7  obtain someone's DOT records because they write a citizen

8  complaint against an officer?

9       MS. BAYNARD:  Objection to the form of the question,

10  foundation.

11       THE COURT:  Overruled.  He may answer if he knows.

12       THE WITNESS:  Can you ask the question one more time?

13  Q.  Sure, I'll rephrase.  Is it a legitimate law enforcement

14  function to access someone's DOT records if they write a citizen

15  complaint against a Wauwatosa officer?

16  A.  I think that that would probably not be necessary.

17  Q.  Okay.  Is it a legitimate law enforcement function to

18  violate the DPPA if you know people attend a meeting at the City

19  of Wauwatosa?

20  A.  We should not be violating the DPPA.

21  Q.  Okay.  I'd like to --  Do you know if Dominick Ratkowski

22  ever violated the DPPA by looking up people who attended

23  meetings at Wauwatosa?

24  A.  I do not know if he conducted that type of intelligence

25  work.

326

1    Q.  And you and Mr. Ratkowski, you never sat down and he never

2    explained, you know, each 44 plaintiffs' entry and where he got

3    the information and why he got the information; is that correct?

4    A.  Correct.

5    Q.  I'd like to refresh your memory with Exhibit 189.

6            MS. MOTLEY:  Your Honor, if I may approach him?

7            THE COURT:  You may.

8    Q.  Now, what I'm showing you is Exhibit 189.  Are you familiar

9    with this email that you received from Mr. Ratkowski on July 9th

10   of 2020?

11   A.  Are we referring to several?

12   Q.  Just the first page.

13   A.  Just based on the first page, I don't know what this email

14   is referring to.  It looks like there's ten pages of document

15   here.

16   Q.  Okay.  Would you agree that the first page says that --

17   Would you agree that this email has an attachment of a letter

18   being sent to the mayor and the Wauwatosa Common Council?

19   A.  Yes.

20   Q.  Would you agree that this email was sent by Dominick

21   Ratkowski July 9, 2022 to you?

22   A.  Me amongst several others, yes.

23   Q.  Would you agree that this letter --

24           MS. MOTLEY:  Your Honor, may I publish the letter?

25           MS. BAYNARD:  I have an objection.

327

1          THE COURT:  You may be heard.

2          MS. BAYNARD:  I am going to object on the basis of

3     hearsay.  This is not an email that was created by Captain

4     Vetter nor is the attachment, a document created by Captain

5     Vetter.  It is an email that was drafted by Dominick Ratkowski.

6     And if plaintiff wants to address it with Dominick Ratkowski,

7     they can do that.

8          MS. MOTLEY:  Your Honor, Captain Vetter has already

9     testified that this is an email that he received.  This is in

10    the course of his work as a captain at the Wauwatosa Police

11    Department.  I'm only going to get to page 1.  I'm not going to

12    disclose any of the other persons' name on this letter.  I'm

13    just looking at specific to page 1 of the document.

14         MS. BAYNARD:  I amend my objection to include the

15    first page of the document doesn't indicate the name of a named

16    plaintiff.

17         THE COURT:  All right.  The objection is sustained.

18    You may ask questions regarding the witness receiving this

19    letter, but you may not publish it.

20         MS. MOTLEY:  Thank you.

21    Q.  So you would agree that you received this email on July 9th

22    of 2020, and you would agree, correct?

23    A.  Yes.

24    Q.  You would agree in this document Dominick Ratkowski says --

25         MS. BAYNARD:  Objection, hearsay.

328

1          THE COURT:  Sustained.

2    Q.  You would agree that this document attachment contains the

3    names of some of the plaintiffs?

4          MS. BAYNARD:  Objection.  Hearsay, foundation.  We're

5    talking about the attachment.  That again is not written by

6    Captain Vetter.  It is written by some of the plaintiffs.  It is

7    a hearsay statement.

8          MS. MOTLEY:  Your Honor, it goes to party opponent.

9    Again, I will not publish the letter to this Court; however, it

10   goes to, you know, his testimony that he has given in terms of

11   that it is not the policy of the Wauwatosa Police Department --

12   excuse me -- that it is not a legitimate law enforcement

13   function for the DPPA to be violated and people write letters to

14   the common council.

15         THE COURT:  This is really simple.  The author of this

16   email and attachment is going to testify in the trial.  You may

17   ask him about it then.

18         MS. MOTLEY:  Thank you.

19         THE COURT:  The witness acknowledged receipt of it and

20   that's his role in it.  He received it.  The person who wrote it

21   has information for the jury.

22         MS. MOTLEY:  Thank you, Your Honor.

23   Q.  Now, in 2020 in November of 2020, there were also David

24   Clark also had a protest in the City of Wauwatosa; is that

25   correct?

329

1    A.   Yes.

2    Q.   And was he added to the target list?

3    A.   I don't know.

4              MS. MOTLEY:   I have nothing further.   Thank you.

5              THE COURT:   Thank you, Ms. Motley.   Very brief,

6    Ms. Baynard.

7    **RECROSS EXAMINATION BY MS. BAYNARD:**

8    Q.   Captain Vetter, Attorney Motley asked you about some

9    specific -- if it is a law enforcement purpose to do certain

10   activities, and she put up the DPPA definition.   Do you recall

11   that?

12   A.   Yes.

13   Q.   Is it a law --  Is it a legitimate law enforcement purpose

14   to investigate crimes?

15   A.   Absolutely.

16   Q.   Is it a legitimate law enforcement purpose to share

17   information with mutual aid partners?

18   A.   Yes.

19   Q.   Is it a legitimate law enforcement purpose to attempt to

20   prevent crimes?

21   A.   Yes, it is a legitimate law enforcement to prevent crime.

22   Q.   Is it a legitimate law enforcement purpose to plan for

23   public safety?

24   A.   Yes.

25   Q.   Is it a legitimate law enforcement purpose to gather intel

330

1    of people who may be witnesses, suspects, or persons of interest

2    in ongoing investigations?

3    A.   Absolutely.

4    Q.   You were asked and questioned by Attorney Motley about

5    whether the list was ever distributed pursuant to an open

6    records request in an unredacted form.  Do you recall that

7    question?

8    A.   Yes.

9    Q.   And you answered yes?

10   A.   Correct.

11   Q.   Okay.  When you answered that question, did you have a

12   person -- I guess, did you have a person in mind to whom you

13   believe it was released to unredacted?

14   A.   This is an instance I recall some unredacted information

15   going out.  I think it went on the news and appropriately yes.

16   Q.   But do you know who -- Did the Wauwatosa Police Department

17   release it in an unredacted version to the news?

18   A.   We did not release it to the news, no.

19   Q.   Is it your understanding it was released in discovery to

20   plaintiffs' counsels?

21   A.   That was my recollection of that unredacted release,

22   correct.

23   Q.   And it was released pursuant to the exchange of discovery

24   not pursuant to open records law?

25   A.   Yeah.  My recollection is that it was related to yes,

1    discovery from a different lawsuit.

2    Q.   I guess in your experience as a police officer, have you

3    been involved in the discovery process in suits before?

4              MS. MOTLEY:  Objection, Your Honor, irrelevant.

5              THE COURT:  What is the relevance?

6              MS. BAYNARD:  I want in response to the open records

7    kind of questioning the distinction between a release of open

8    records and providing discovery, and I think it goes to the

9    communication we had and the distinction I'm trying to make we

10   had in our sidebar.

11             MS. MOTLEY:  We're not here for open records.  We're

12   here for DPPA.  That is what this case is about.  It is not open

13   records.

14             THE COURT:  Let's move on from this line of

15   questioning, Ms. Baynard, as to discovery.

16             MS. BAYNARD:  Okay.  Then, I have nothing further.

17             THE COURT:  All right.  Captain Vetter.  You may step

18   down.  Have a good day.

19      (Witness excused.)

20             THE COURT:  Next witness, please.

21             MS. MOTLEY:  I'd like to call Dominick Ratkowski.

22             Dominick Ratkowski, being first duly sworn to tell the

23   truth, the whole truth, and nothing but the truth, testified as

24   follows:

25             THE CLERK:  Please state and spell your first and last

332

1    names.

2            THE WITNESS:  Dominick Ratkowski, D-o-m-i-n-i-c-k,

3    R-a-t-k-o-w-s-k-i.

4    **DIRECT EXAMINATION BY MS. MOTLEY:**

5    Q.  Good morning, Mr. Ratkowski.

6    A.  Good morning.

7    Q.  So let's talk about June 5th of 2020.  So you created a list

8    on June 5th of 2020, correct?

9    A.  Correct.

10   Q.  And you obtained 44 plaintiffs' DOT driver's license photos?

11   A.  Not on that day.

12   Q.  Okay.  So you obtained --  So how did you start this list?

13   A.  I was asked by some MPD investigators, officers, to try to

14   identify people around June 5th, early June late May, to try to

15   identify some people who were making threats to Mayfair Mall.

16   And because there was large scale unrest throughout the city and

17   throughout the county, I was working with Fusion Center analysts

18   and investigators to try to identify people who were potential

19   threats during the unrest, and so they reached out to me to make

20   me aware there were other people threatening property damage,

21   looting, whatever at Mayfair Mall, so I started monitoring,

22   gathering social media URLs and user names as a reference guide

23   to continue kind of monitoring the situation.

24   Q.  Okay.  So you created fake Facebook accounts, correct?

25   A.  Correct.

1    Q.   You created fake dating accounts?

2    A.   Correct.

3    Q.   And you started this document based on you looking at

4    people's social media; is that accurate?

5    A.   Can you repeat the question?

6    Q.   Sorry, sure.  You started this document based on you looking

7    at social media?

8             MS. BAYNARD:  Objection.  Vague as to which document

9    we're referring to.

10   Q.   The target list.  So you created the target list based on

11   you looking at social media?

12   A.   The information was started through social media, social

13   media gathering, and I was asked to identify people.  And the

14   easiest way to do that was through social media.

15   Q.   No one instructed to you create the target list; is that

16   correct?

17            MS. BAYNARD:  Objection, form of the question or I

18   guess calling this a target list.  It is not.  This is

19   inflammatory and prejudicial and not sustained by the evidence

20   that has come out yet.

21            THE COURT:  Ms. Motley, do you wish to be heard?

22            MS. MOTLEY:  Sure.  Your Honor, I will submit an

23   exhibit to the witness that will establish that, you know, we're

24   calling it what he called it.

25            THE COURT:  All right.  Until we get to that piece of

334

1    evidence, let's just call it his list since he prepared it, and

2    you can get that into evidence, Ms. Motley.

3            MS. MOTLEY:  Thank you, Your Honor.  May I go to my

4    computer to get that exhibit?

5            THE COURT:  Yes.

6    Q.  Do you recall sending the list you created to Christin

7    Berges on October 6th of 2020?

8    A.  Yes.

9    Q.  Do you recall sending the email to Christin Berges where you

10   identify this document as a TPR target list?

11   A.  Yes.

12   Q.  So you called it the TPR target list?

13   A.  Yes, and that was a mistake on my part.  It was a

14   mischaracterization in that one email.

15   Q.  Did you ever tell Christin Berges that that was a mistake

16   that you referred to this TPR as a target list?

17   A.  No.

18   Q.  Okay.  So when we talk about the list, we're talking about

19   the target list.  That's the document we're talking about.  Do

20   you understand?

21   A.  Yes.

22   Q.  Thank you.  So you testified that you were never tasked to

23   create the target list; is that correct?

24           MS. BAYNARD:  I will make the same objection to it

25   being inflammatory.  He said I called it something incorrectly

335

1  in one email.  And for the plaintiffs' attorney to suggest that

2  that is what the document should be called and that Dominick

3  Ratkowski refers to it generally as that or anybody else is

4  extremely inflammatory, and it is not based on the evidence that

5  is in this case.

6          THE COURT:  Thank you, Ms. Baynard.  Right now I see

7  that Ms. Motley is just using this witness' word even though it

8  is that one email.  You will have the opportunity to cross

9  examine and ask him questions on that.

10 Q.  Thank you.  So you indicated that you were never tasked to

11 create the target list; is that correct?

12 A.  A specific list, no.

13 Q.  Do you recall being -- With regards to this case, do you

14 recall that you were deposed on June 23rd of 2021?

15 A.  I recall the deposition.  I don't remember the date.

16 Q.  In that deposition, you were given sworn testimony to us,

17 correct?

18 A.  Correct.

19 Q.  Okay.  And on June 23, 2021, you were not a defendant in

20 this matter, correct?

21 A.  I don't believe so.

22 Q.  Do you recall in that deposition you testified that you were

23 never tasked to create the target list.  Do you recall that?

24 A.  Correct.

25          MS. BAYNARD:  Objection, hearsay.

1          THE COURT:  Overruled.

2          THE WITNESS:  Correct.

3    Q.  Do you recall that in that deposition your attorney asked

4    you if you were tasked to create the target list and you said

5    you weren't.  Do you recall that?

6    A.  Correct.

7    Q.  But your testimony is today different and you're saying

8    that?

9          MS. BAYNARD:  Objection.  This is improper

10   impeachment.

11         THE COURT:  Set the foundation first regarding today's

12   testimony before we get to what you say is the contradictory,

13   please.

14         MS. MOTLEY:  Sure, no problem.

15   Q.  Let's go back to June 5th of 2020.  Did anyone ever tell you

16   to go into peoples' DOT records and to get their driver's

17   licenses photos?

18   A.  No.

19   Q.  Did anyone tell you to go into peoples' DOT records and to

20   get their addresses?

21   A.  No.

22   Q.  Did anyone tell you to go into peoples' DOT records and get

23   their dates of birth?

24   A.  No.

25   Q.  What I'd like to show you is a redacted target list.

337

1          MS. MOTLEY:  Is it okay for me to approach the

2     witness?

3          THE COURT:  Does the exhibit have a number?  You may

4     approach, Ms. Motley.  Does the exhibit have a number?

5          MS. MOTLEY:  Yes, Exhibit 311.

6          THE COURT:  You may approach.

7          MS. BAYNARD:  This is not correctly redacted.

8          THE COURT:  As to this recent list is Document 405,

9     Ms. Motley.  Are we talking about the same document?

10          MS. MOTLEY:  That is correct.

11          MS. BAYNARD:  Your Honor, we can approach and show

12     you?

13          MS. MOTLEY:  Your Honor, may we approach the bench?

14          THE COURT:  You may.

15       (Sidebar discussion.)

16          MS. MOTLEY:  The issue with the target list is that

17     this is my fault.  This picture is not redacted.  What I can do

18     is quickly redact it, and then that page or just not show this

19     first page.  What I'm really concerned about is if we admit

20     this, are we allowed to put it up there or not?

21          THE COURT:  Yes.  Once foundation is made it is

22     accepted into evidence, yes, it can go up there.

23          MS. MOTLEY:  Okay.

24          THE COURT:  Is this what I have Document 405 that was

25     filed last night?

338

1          MS. MOTLEY:  Yes.

2          THE COURT:  This is it?

3          MS. MOTLEY:  Yes.

4          THE COURT:  It cannot be published with a picture.

5     That should be redacted on it.

6          MS. MOTLEY:  Can I use a different page?  I don't

7     think there's any other page.

8          MS. BAYNARD:  I should have taken a better look this

9     morning.  I just noticed the guy on the first page.  I just

10    noticed it because I saw there is a booking photo in there.

11         MS. MOTLEY:  He's not a plaintiff anymore.  He was --

12         THE COURT:  Counsel, we shouldn't be taking up jury

13    time to do this kind of work.

14         MS. MOTLEY:  We cannot use page 1.

15         THE COURT:  Any other objections on this exhibit?  Do

16    you have other questions you can keep working on?

17         MS. MOTLEY:  Sure, no problem.

18        (Back on the record.)

19    (**By Ms. Motley.**)

20    Q.  Now, also with regard to this target list, no one instructed

21    you to create this target list, correct?

22    A.  No one specific, no.

23    Q.  This specific one?

24    A.  I was asked to identify people.  And the only way -- The

25    most efficient way of doing it is to create a list of people I

1    already identified.

2    Q.  So you have another list other than this document?

3    A.  No.  This is the only list relating to a protest.

4    Q.  Okay.  Sorry, I didn't hear the last part.

5    A.  Relating to this protest.

6    Q.  Relating to this protest?

7    A.  This case.

8    Q.  This case, sorry.  Thank you.

9         THE COURT:  Ms. Motley let, me interject.  It would be

10   helpful if you move the microphone over a bit closer to you.

11   Thank you.

12   Q.  And you never met any of the 44 plaintiffs, correct?

13   A.  Correct.

14   Q.  And you creating this list, this document was based solely

15   off of you looking at social media; is that accurate?

16   A.  That was my primary purpose for this, yes.

17   Q.  And you created this list on your own, correct?

18   A.  Correct.

19   Q.  And no one told you to go into peoples' DOT records and cut

20   and paste their photographs onto any document, correct?

21   A.  Correct.

22   Q.  You did that on your own?

23   A.  Correct.

24   Q.  And the people that are on this document, it's --  Who are

25   they?

1    A.  People who were consistently involved in protests throughout

2    Wauwatosa.  I believe we had over between 50 and 60 maybe 70, I

3    am not sure of the exact amount.  But the people constantly

4    showed up to events, protests and they identified themselves as

5    being constantly involved.  Some of them are leaders of the

6    group that was constantly there.  They planned a lot of the

7    events.  A lot of them were potential witnesses to incidences

8    that occurred throughout the summer and into the fall, and they

9    all basically self identified through Facebook, social media,

10   Instagram, YouTube, web pages of being present at the unrest.

11   Q.  You never physically attended one of the events yourself,

12   correct?

13   A.  Correct.

14   Q.  You never verified that the people that you put on the list

15   were actually at those events, correct?

16   A.  Apart from them -- Apart from these individuals indicating

17   they were at a protest, I do not verify it.

18   Q.  So when did Tracy Cole identify that she was at a protest?

19   A.  I was looking through Facebook video of an incident that

20   occurred at the Cheese Cake Factory where the Cheese Cake

21   Factory was shut down, and I identified her as being present and

22   a witness.

23   Q.  And the Cheese Cake Factory was on July 7th of 2020,

24   correct?

25   A.  Correct.

341

1    Q.   You had created this list a month prior on July 5, 2020,
2    right?
3    A.   No.
4    Q.   When --
5    A.   I created this version of the list once Captain Vetter asked
6    for identifications.
7    Q.   Okay.  So when did Captain Vetter ask for identifications?
8    A.   I believe it was after the July 7th Cheese Cake Factory
9    incident.
10   Q.   Okay.  So you agree that June 5th of 2020, you created the
11   list, right?
12   A.   Correct.
13   Q.   And you agree that that list contained DOT information,
14   correct?
15   A.   No.
16   Q.   Okay.  What information did this come from because this is
17   new.
18            MS. BAYNARD:  Objection to the question,
19   argumentative.
20            THE COURT:  Sustained.
21            THE WITNESS:  That information was Facebook URL and
22   user names as a reference guide for me to continuously monitor
23   the situations throughout Milwaukee County.
24   Q.   And you are aware that this matter has been going on for
25   over two years, correct?

1    A.   Correct.

2    Q.   And this list that you're bringing up, do you recall giving

3    it to your lawyers or giving it to us?

4    A.   No.

5    Q.   So this discoverable document of this new list, you never

6    gave to your attorneys?

7    A.   It was discarded after it became irrelevant and this current

8    version was started.

9    Q.   So you destroyed evidence?

10            MS. BAYNARD:  Objection, argumentative.

11            THE COURT:  Sustained.

12            MR. WIRTH:  No, you don't have to answer.

13   Q.   So you had a list but it no longer exists; is that accurate?

14   A.   Correct.

15   Q.   Where is that list at?

16   A.   I believe I stated that it was deleted after it became

17   irrelevant to monitoring the situation and shifted more towards

18   incidents that were occurring in Wauwatosa.

19   Q.   Did you tell your attorneys that you deleted this document?

20   A.   I don't recall.

21   Q.   Did you tell us that you deleted this document?

22   A.   I don't remember.

23   Q.   Do you recall being deposed twice in this matter on

24   June 23rd of 2021 and on July 27th of 2021?

25   A.   Yes.

1   Q.  Do you recall not testifying that you had another document

2   that you deleted?

3           MS. BAYNARD:  Objection, form of the question.  Again,

4   it is improper impeachment.  If she wants to show him the

5   testimony where that question was specifically asked and

6   answered in a contrary way, she can do that.

7           MS. MOTLEY:  Your Honor, this is a very serious --

8           THE COURT:  Okay.  The objection is overruled.

9   However, Ms. Motley, if you wish to impeach Mr. Ratkowski,

10  please lay the foundation as to current testimony and then prior

11  testimony.

12          MS. MOTLEY:  Okay.  Thank you.

13  Q.  So with regards to this other document that was deleted, who

14  was on that document?

15  A.  I don't remember.  It was Facebook URLs that constantly were

16  posting information on where and when protests were occurring.

17  Again, it was a reference guide for myself.

18  Q.  Okay.  So it was -- It sounds like there were just words on

19  that document; is that accurate?

20  A.  Yes.

21  Q.  Okay.  It sounds like they were just Facebook URLs and

22  potentially Facebook names; is that accurate?

23  A.  Yes.

24  Q.  There weren't any pictures on that document?

25  A.  No.

344

1    Q.  So let's get back to this document that you created.  How

2    many people did you send this document to?

3    A.  I don't know the exact number off hand, but it was other law

4    enforcement personnel.

5    Q.  Was it 20 people?

6    A.  Again, I don't know the exact number.  I would say a little

7    more than 20.  I'm not 100 percent sure of the number.

8    Q.  Didn't everyone at the Wauwatosa Police Department receive

9    this document?

10   A.  Potentially yes.

11   Q.  That is over 100 people?

12   A.  Correct.

13   Q.  So the question is how many people received this document?

14          MS. BAYNARD:  Objection.  Asked and answered,

15   argumentative.

16          THE COURT:  Sustained.  It was answered.

17          MS. MOTLEY:  Your Honor, actually I would disagree it

18   was.  What I asked him prior was how many people did he give to

19   this document.  Now, the question is how many people received

20   this document, period.

21          THE COURT:  Okay.  I'll allow that distinction.  If

22   the witness knows how many people received it as compared to how

23   many people he sent it to.

24          THE WITNESS:  I don't know the exact number.

25   Q.  Since June of 2020 until now, this document is still out

345

1   there, correct?

2           MS. BAYNARD:  Objection form.  Can we have a sidebar?

3           THE COURT:  No.  The objection is overruled.  If the

4   witness knows, he may answer the question.

5           MS. MOTLEY:  Can you repeat the question?

6       (Question read by reporter.)

7   A.  I believe so.  I'm not sure at all.

8   Q.  And you don't know or do you know the titles of every single

9   person that received this document?

10  A.  If I'm able to see the names, I should be able to identify

11  who they are.

12  Q.  Okay.  Do you recall on July -- July 26th of 2021 responding

13  to written, sworn interrogatories?

14  A.  Yes.

15  Q.  Do you recall that one of the questions was asking you how

16  many or -- Excuse me.  I have the name, job title, address,

17  email, address, phone number, badge or ID number of all

18  individuals who had access or who had received the protestor

19  list and all the updates as created by Mr. Ratkowski from

20  June 1st of 2020 to June 24th of 2021.  Do you recall answering

21  that question?

22  A.  I believe so.

23  Q.  Do you recall in your answer to that question that you

24  indicated that defendants attempted to indicate the current

25  title or position of all individuals below however cannot

1   confirm the accuracy.  Do you remember that?

2   A.  Yes.

3   Q.  So do you recall that in this interrogatory, you identified

4   at least 15 plus people that you yourself gave this target list

5   to.  Do you recall that?

6   A.  If I could see the document, yes.

7           MS. MOTLEY:  Your Honor, may I approach?

8           THE COURT:  You may.

9           THE WITNESS:  I'm sorry, I don't know how this is

10  organized.  Seven.

11  Q.  Yes.  Okay.  Do you recall --  How many people did you admit

12  to sending this target list to?

13  A.  I believe I counted 34.

14  Q.  And these 34 individuals do not work for the Wauwatosa

15  Police Department, correct?

16  A.  Correct.

17  Q.  Okay.  And you in your interrogatories, you stated that you

18  don't know the job titles of these --  You can't confirm the

19  accuracy of all these individuals, correct?

20  A.  At the time that I responded to this, correct.  Some may

21  have been promoted.

22  Q.  But for some people -- You would agree that some people you

23  don't have any job title, correct?

24  A.  Correct, there are a few.

25  Q.  Okay.  So there's 34 people on this list, right?

347

1    A.   Correct.

2    Q.   Okay.  And there's -- For instance, do you know if every

3    single person of this 34 people have access to DOT records?

4    A.   I don't know personally.  I assume they would.  They are all

5    law enforcement.

6    Q.   So Ryan Rasmussen where it says crime law enforcement

7    officer?

8    A.   He is a crime analyst with the Intelligence Fusion

9    Department at the Milwaukee Police Department.

10   Q.   You just testified that these are law enforcement officers.

11   That is not true, right?

12             MS. BAYNARD:  Objection, argumentative.

13             THE COURT:  Sustained.

14   Q.   Are you a law enforcement officer?

15   A.   No.

16   Q.   Okay.  Is Ryan Rasmussen a law enforcement officer?

17   A.   Sworn, no.

18   Q.   Is he an un-sworn law enforcement officer?

19   A.   He is a crime analyst.

20   Q.   Okay.  So he's not a law enforcement officer, correct?

21   A.   Correct.

22   Q.   And you don't know if he has access to DOT records, correct?

23   A.   I don't know.

24   Q.   Ryan Orlovsky.  On June of 2021 when you signed this

25   document, do you know if he was a law enforcement officer?

348

1    A.   Again, he was a crime analyst, so no.

2    Q.   Okay.  Do you know if he had access to the TIME System?

3    A.   I don't know.

4    Q.   Christin Berges July 2021, do you know if she's a law

5    enforcement officer?

6    A.   She is a crime analyst as well.

7    Q.   Do you know if she's a law enforcement officer?

8    A.   She is not.

9    Q.   She's not.  Do you know if she had access to the DOT

10   records?

11   A.   I don't know.

12   Q.   And I don't want to go over each one, but you do recognize

13   there's several people on this document of 34 that are

14   identified as crime analysts, correct?

15   A.   Correct.

16   Q.   And all the people --  How many people are identified as

17   crime analysts on this document?

18   A.   I count seven.

19   Q.   Seven.  So seven crime analysts.  And when we're talking

20   about this, we're talking about the target list?

21   A.   Correct.

22          MS. MOTLEY:  Your Honor, I'd like to publish the list

23   if possible but from page 2 onward.

24          THE COURT:  Any objection?

25          MS. BAYNARD:  No objection.

349

1           THE COURT:  It may be published.

2           MS. MOTLEY:  Thank you.  Your Honor, may we approach?

3   I'm sorry, I'm seeing what I filed with the Court is the correct

4   one.  I don't understand why -- Is there a way to make sure?  We

5   don't want to share anybody else's sensitive information.

6           Your Honor, is there a way that we can confirm?  What

7   I'm seeing was filed is the correct one.  The one I sent them is

8   not.  We can't pull it up on Pacer because it is a sealed

9   document.

10          THE COURT:  All right.  Members of the Jury, we are

11  running into technical difficulties as you're seeing.  Why don't

12  we just take our lunch break now, and we'll come back this

13  afternoon and have resolved the technical hiccups and proceed.

14  Please have a good lunch.

15          I remind you as I reminded you --  I am on the record.

16  I remind you as I reminded you yesterday, please do not discuss

17  the case with each other or with anyone else.  Have a good

18  lunch.  It is 11:30.  Let's be back at 12:30, please.

19          BAILIFF:  All rise for the jury.

20      (Jury excused.)

21          THE COURT:  Mr. Ratkowski, you may step down from the

22  witness box as well.

23      (Witness excused.)

24          THE COURT:  All right.  Ms. Motley.

25          MS. MOTLEY:  I apologize for that, the confusion.  I

350

1    filed the correct one with the person that was supposed to be

2    redacted.  So we're trying to pull it up on Pacer to see if it

3    matched.  And for some reason, it doesn't pull up.  We're just

4    looking at the first page for those two photographs too.  I

5    didn't want to publish it unless it was 100 percent verified.

6    What I emailed has the pictures.  I want to make sure.

7            THE COURT:  We'll also break for lunch at this time.

8    Ms. Motley, use can this time to confirm, and Ms. Baynard, you

9    as well can confirm that it is the exhibit that has been

10   approved that will be published before the jury.  I am letting

11   the parties know that I will instruct the jury because once it

12   is published, they will be able to see that the red redactions

13   indicate individuals who have been redacted because they are not

14   plaintiffs in this case.  With that, please be back at 12:30 to

15   be ready to rock and roll.

16       (Lunch recess taken.)

17       (Back on the record.)

18           THE CLERK:  Court calls Case No. 20-CV-1660, Andrew

19   Aaron, et al v. Dominick Ratkowski, et al.  Appearances remain

20   the same.

21           THE COURT:  Thank you.  Before the jury comes out

22   Ms. Motley, are you ready to proceed?

23           MS. MOTLEY:  Yes, Your Honor.  On Pacer we have the

24   correct properly redacted list so the Court is aware.

25           THE COURT:  That's the one, the Document 405, I

1    referenced this morning?

2              MS. MOTLEY:  I put in a new one on 406 now.

3              THE COURT:  Any other matters before we bring the jury

4    out?

5              MR. SCHWAB:  Yes, Your Honor.  To make this a little

6    more efficient, I'll take a moment here.  I just confirmed with

7    defense counsel about a stipulation, the admission of a variety

8    of Mr. Ratkowski's emails, so we don't have to go through one by

9    one by one, so it will take a moment just to confirm.

10             THE COURT:  All right.  Is there a stipulation as to

11   specific exhibits?

12             MR. WIRTH:  Judge, I think what we're talking about is

13   the fill in the blank 15, 16, 34 emails whatever it is rather

14   than have him say did you send this on this date, send this on

15   this date.  We'll stipulate to that.

16             THE COURT:  Mr. Schwab, are you the one putting the

17   exhibit numbers on record where there's a stipulation regarding

18   admission?

19             MR. SCHWAB:  Yes, Your Honor.

20             THE COURT:  Are you ready?

21             MR. SCHWAB:  I want to make sure they'll agree to

22   stipulate.  Like I said, this will probably save 20 minutes of

23   the jury's time.

24             THE COURT:  I just need to put on the record.

25   Mr. Ratkowski, you may take the witness stand.  Ms. Motley, as

1    to ECF Document 406, what trial exhibit numbers are these being

2    referenced as?

3              MS. MOTLEY:  Exhibit 311.

4              THE COURT:  Thank you.

5              MS. MOTLEY:  Your Honor, I just have a housekeeping --

6    Is it okay to bring water to the podium?

7              THE COURT:  Yes.

8              MR. WIRTH:  Judge, while we have the down time, I

9    think in the defense questioning of Mr. Ratkowski, Attorney

10   Baynard intends to use essentially demonstrative exhibits, a

11   picture of this person will pop up with lines.  And next to it

12   taken from that list and just say what you contend is the law

13   enforcement purpose for this person on the list.

14             THE COURT:  Is there an objection?  This is a pull out

15   from 311 is what I'm hearing.

16             MR. WIRTH:  Rather than right on the board.

17             MS. BAYNARD:  I redacted the likely --

18             THE COURT:  Is there an objection?

19             MS. MOTLEY:  There may be, Your Honor.  I don't know.

20   I understand it is just a picture.  Is it a picture from the

21   list?

22             MS. BAYNARD:  It is literally the list.

23             MR. WIRTH:  It is the picture cut out of yours.

24             MS. MOTLEY:  I have no objection.

25             THE COURT:  Mr. Schwab, are you ready to make that

353

1    record?

2         MR. SCHWAB:  I want to make sure they have enough

3    time.  What happened is I just gave her a bunch of exhibits.

4    Every single one at least in the book as of now or maybe not

5    every single one do have some iteration of the protest target

6    list.  My belief is we pull those, and it is just the email.  It

7    is a series of emails where they send out that list.

8         There are a couple additional documents that were part

9    of their exhibit list, so I just sent them the bates number.  It

10   is one exhibit, but it is a 300-page document, so I sent them

11   the bates numbers so they can verify.  It will be a limited

12   number.  You know how it is looking at bates numbers.  I

13   apologize, I should have brought this up before we went to

14   lunch.

15        THE COURT:  We're going to go ahead and get started as

16   to the exhibits that are stipulated to.  They may be used as

17   admission already stipulated to.  Later on we will put each of

18   them on the record to preserve the record.

19        MR. WIRTH:  I was going to say the only caveat is it

20   was suggested to just be the first page.  The witness may say I

21   can't answer that unless I see the attachment, so we may have to

22   show them the attachment.

23        MS. BAYNARD:  I guess that's what I am thinking when I

24   go through.  I agree unless we're going to redact every single

25   one.  There's not, like, a great way to do that.  I guess if you

                                                        354

1  give him a version and say here is the front page and it says

2  I've ID'd 30 people, are you going ask and follow up which 30?

3          MS. MOTLEY:  This is sort of the issue, right.

4  There's so many lists and --

5          THE COURT:  The list we're talking about now is Docket

6  Number 311.

7          MS. MOTLEY:  No, Judge.  She's talking about another

8  list.

9          MS. BAYNARD:  I am talking to how it would be added

10 to.  This is from July 13, 2020.  And it says I've ID'd -- A

11 better example, plaintiffs' exhibit I believe this is 48.  It's

12 from July 14, 2020.  It says here's the updated list.  There are

13 around 40 people I fully ID'd and has the people that have been

14 ID'd.

15         I guess my concern would be with the number being

16 published to the jury with the number 40 when there's only 40

17 plaintiffs.  So if the next version is I've ID'd another 30

18 people.  And with the exhibit, there is a version of the list

19 attached to it.  That's kind of what I was trying to figure out

20 how we can not waste the jury's time but also come to some

21 agreement.

22         MS. MOTLEY:  Your Honor --

23         THE COURT:  I think the parties need to be reminded

24 that we had not one but two pretrial conferences to address

25 matters that we would not be holding the jury hostage in a hot

1   room.  The first one I think was an hour and-a-half.  The second

2   one was almost three hours if you look at the docket.  So we

3   have taken up a lot of pretrial time to try to manage all of

4   this.

5            MS. MOTLEY:  Your Honor, the way that I understood it

6   is that there's one list and one list only that was approved by

7   this Court and that the emails I guess are coming in.  So that's

8   sort of the issue is that, you know, as I understood it, I mean

9   we've known and we've noted our objection on the record with the

10  redactions.  This is sort of the issue.  We were prepared for

11  pretrial.  We were perfectly fine with the list to come in.  As

12  I understand it, it is the final list and that's it.

13           THE COURT:  But I'm not hearing this conversation with

14  you about the list.  I'm hearing conversations about emails

15  right now.

16           MS. MOTLEY:  The problem is the list kept growing.  So

17  you know the first list had 30 people.  Then, we have 40.  Then,

18  they got 60.  So each email this document kept growing until

19  it's Exhibit 311.  So we're talking about the same document that

20  just kept having different iterations.

21           THE COURT:  What's the question?

22           MS. BAYNARD:  The question, Your Honor, is we are fine

23  with the emails being used to I guess for the witness to say

24  okay, it was sent on this date.  The issue is the attachment to

25  the list or the attachment to those emails.  They are not

356

redacted and they include non-plaintiff information, so some of them I think there's really no indication of here is the list with addresses whatever. But some of the versions of it say I've been able to ID between 40 and 60 people if that makes sense. I guess that can be -- that can be resolved with the Court again saying you've already told the jury we are only talking about these individuals.

So if an email says that it was -- If the email says there's 40 people but some of the plaintiffs are not on like this, for example, this July 8th stops. A lot of the plaintiffs aren't on this one. You know like we're saying, it was a growing, living document so event added, event added.

THE COURT: You can address that during your question of particular emails do not address particular plaintiffs, and you can also address it with instructions. Let's bring this jury out.

(Jury enters.)

THE COURT: Ladies and Gentlemen of the Jury, thank you for your patience. Let's take up where we left off this morning. Ms. Motley.

MS. MOTLEY: Thank you, Your Honor.

**CONTINUED DIRECT EXAMINATION BY MS. MOTLEY:**

Q. Good afternoon, Mr. Ratkowski. Now, you testified that you did refer to this list as a TPR target list, correct?

A. In one email, yes.

1    Q.  And could we please pull up --

2           MS. MOTLEY:  Your Honor, I ask that I be allowed to

3    pull up exhibit number I believe it is 201, the email -- the

4    October 6, 2020 email from defendant Ratkowski to Christin

5    Berges.

6           THE COURT:  You may proceed.

7    Q.  While he's looking that up, now you created this target list

8    on June 5th of 2020, correct?

9           MS. BAYNARD:  Objection, asked and answered.

10          THE COURT:  Sustained.  The objection is sustained.

11   Next question.

12   Q.  I'd like to refer to Mr. Ratkowski's deposition.  If you can

13   go to the June 23, 2021 deposition, page 93.

14          THE COURT:  Is there a question?

15          MS. MOTLEY:  Yes.  The deposition directly contradicts

16   that answer.

17          THE COURT:  There was no answer.  I sustained the

18   objection.

19          MS. MOTLEY:  He answered that question before, Your

20   Honor, before lunch.

21          THE COURT:  Okay.  Maybe we need to rewind.  I did not

22   pick that up.  We're picking up a question that was asked

23   earlier.  So what is the question?

24   Q.  Before lunch you testified that on June 5th of 2020, you did

25   not create this list, correct?

1    A.   Correct.

2    Q.   Could we now pull up defendant's deposition from June 23,

3    2021, page 93.

4              THE COURT:   So to make sure I understand so today

5    Mr. Ratkowski's testifying that he did not create this June 5,

6    2020; is that correct?

7              MS. MOTLEY:   That's correct.

8              THE COURT:   You may proceed.  Before the witness gets

9    questioned about a deposition, he should have the opportunity to

10   review it and then ask questions about it.

11             MS. MOTLEY:   Thank you, Your Honor.  I'm sorry.  Your

12   Honor, may I approach the witness?

13             THE COURT:   Yes.  The witness has the opportunity to

14   review it, and you may proceed to ask questions.

15             MS. BAYNARD:   I believe if it is 93, he have the

16   transcript to look at the pages before and after.

17   Q.   That's page 93 in your hand.  Let me know when you're ready,

18   Mr. Ratkowski.  We're just looking at page 93.

19             THE COURT:   Ms. Motley, if you please direct the

20   witness to the lines that you want to question him on, that will

21   get us there faster.

22   Q.   Mr. Ratkowski, we're going to the line where you were

23   questioned, "Okay --

24             THE COURT:   Just the line number.

25             MS. MOTLEY:   This is not numbered.

1    Q.  Okay.  So June 5th around, you started this list.  Do you

2    see that question?

3    A.  Yes.

4    Q.  Okay.  Your Honor, may I publish to the Court?

5            THE COURT:  You may.

6    Q.  So on June 23, 2021, you were in a deposition, correct?

7    A.  Correct.

8    Q.  And this is your sworn testimony on that date, correct?

9    A.  Correct.

10   Q.  On June 5th of --  June 23rd of 2021, you were asked so

11   around June 5th -- "So June 5th around you started this list."

12   And your answer was, "Correct".  Do you see that?

13   A.  Yes.

14   Q.  Okay.  So you did start the target list around June 5th of

15   2020, correct?

16           MS. BAYNARD:  Objection, asked and answered.

17           THE COURT:  Overruled.

18           THE WITNESS:  I believe my answer just above that is I

19   have no idea the exact date.  The deposition was about a year

20   later, and I could not remember the exact date that this list

21   that we're talking about today was started.

22   Q.  Okay.  So in your answer though you did say you agree that

23   you --  you didn't know the exact date, but you did say you

24   created around June 5th of 2020, correct?

25   A.  Correct.

360

1    Q.   Okay.  So that's when you created this list, correct?

2    A.   I created the list around that date.  I don't remember the

3    exact date, I'm sorry.

4    Q.   Just like your testimony?

5    A.   Correct.

6    Q.   Great.

7            MS. BAYNARD:  Objection, argumentative.

8            MS. MOTLEY:  How is that argumentative?  She is

9    objecting to the way I talk.  I don't know what to do.  Am I

10   allowed to speak?

11           THE COURT:  Just ask questions with witnesses and no

12   commentary with it afterwards.  Just questions, please.

13           MS. MOTLEY:  Thank you.

14           THE COURT:  Thank you.

15   Q.   So this target list, this is the only protestor list that

16   you have created since you've been a crime analyst with the City

17   of Wauwatosa, correct?

18   A.   With peoples' information, yes.

19   Q.   And this list that you created is based off of people -- In

20   order for them to get on this list, it did not require that they

21   had committed a crime, correct?

22   A.   Correct.

23   Q.   And in order for people to get on this list, it didn't

24   require that they were violent, correct?

25   A.   Correct.

1   Q.  It was just the mere affiliation with the protest is why you

2   put them on this list, correct?

3   A.  Correct.

4   Q.  And you didn't create a list of counter protestors, correct?

5   A.  Specifically counter protestors, no.

6   Q.  Again.  No one ever tasked you to create this list, correct?

7   A.  Correct.

8   Q.  And no one ever instructed you to create this list, correct?

9   A.  I was asked to identify people.  And again the easiest way

10  to do that is to create a document where people who have already

11  previously been identified are on there so I don't have to

12  re-identify them every single incident.

13  Q.  But no one instructed you to go in peoples' DOT records and

14  to get their private information and to put them on this

15  document, correct?

16  A.  Correct.

17  Q.  Okay.

18          MS. MOTLEY:  Could we please pull up the Exhibit 311,

19  the target list.

20          THE COURT:  Before the Exhibit 311 is published,

21  Members of the Jury, Exhibit 311 you're going to see -- You'll

22  see that it is redacted in red.  And for your information, the

23  redactions are for non-plaintiffs so the non-plaintiffs' names

24  appears on that list.  It has been redacted.

25  Q.  So this is Exhibit 311.  So what I'm showing you that's in

1    front of you actually is this a document that you created?

2    A.  Yes.

3    Q.  Could you please pull it up.

4          THE COURT:  It may be published.

5    Q.  Okay.  So this is the target list.  And if we could scroll

6    up a little bit.  So on this list, you have -- 44 plaintiffs are

7    on this document, correct?

8    A.  Correct.

9    Q.  All right.  How many pages is this document?

10   A.  I count 29.

11   Q.  This document is 29 pages.  How many people are on this

12   document?

13         MS. BAYNARD:  Objection, relevance.

14         THE COURT:  He may answer the question.

15         THE WITNESS:  I don't know off the top of my head how

16   many people are on here.

17   Q.  Is it fair to say there's over 200 people on this document?

18         MS. BAYNARD:  Objection, relevance.

19         THE COURT:  He's already answered the question that he

20   does not know how many people are on it.

21         MS. MOTLEY:  Thank you.

22   Q.  Is it true that all the pictures that are on the left-hand

23   side of this document at least for the plaintiffs, those are all

24   their driver's licenses photos, correct?

25   A.  I believe so, yes.

363

1    Q.   Thank you.  And I'd like to -- Let's just scroll through the
2    document.  Is this the document in its most recent form in its
3    entirety?
4    A.   I believe so.
5    Q.   If you want to take a minute to look to make sure.
6    A.   Yes.  It looks like it, yes.
7    Q.   Thank you.  On this document -- So why did you obtain Robert
8    Agnew's DOT picture?
9    A.   Specifically Mr. Agnew, I believe, he was involved in a
10   protest that between -- that occurred on 8-14 around that date.
11   I'm sorry, I don't know the exact date, that encompassed some
12   reckless driving incidences.  For specifically him, I believe he
13   was added on or around that date as part of the investigation
14   into the reckless driving and the incident that occurred on that
15   date.
16   Q.   Okay.  So that was August 14th of 2020 we're talking about,
17   right?
18   A.   I believe so, yes.
19   Q.   Okay.  And you had created this document June 5th of 2020,
20   right?
21          MS. BAYNARD:  Objection, Your Honor.  He has testified
22   multiple times that the document, as it is being shown in its
23   completeness, is not the document as it was at the beginning of
24   the summer.
25          MS. MOTLEY:  Your Honor, he is the only one that can

364

1    testify as to why he obtained, used or disclosed these

2    particular plaintiffs' information.  This is why we're all here.

3                 THE COURT:  The witness can answer the question.  You

4    may continue.

5                 THE WITNESS:  Can you repeat the question?

6    Q.  So this document was created June 5th of 2020, and you're

7    talking about with regards to Robert Agnew, that was two months

8    later on August 14th of 2020 why you're testifying you obtained

9    his information?

10   A.  This information was a living document.  It constantly

11   changed.  As investigations moved on, more people kept being

12   identified.  As more incidents occurred, more people kept

13   getting identified as we moved on in the investigation.  The

14   document that was created on or around the time of June 5th was

15   a starting point.  It was not the finalized document.

16   Q.  Okay.  So with regards to Mr. Agnew, you obtained his

17   information from the DOT, right?

18   A.  Correct.

19   Q.  June 5, 2020?

20   A.  Incorrect.

21   Q.  When did you do it?  What is the specific date?

22   A.  I can't tell you the date.

23   Q.  Okay.  Was it June 6th of 2020?

24   A.  I can't tell you the date.  I have no way to know or

25   remember back three years when I ran a specific person.

365

1   Q.   You testified you've taken the DOT TIME training, correct?

2   A.   Yes.

3   Q.   How long have you been a crime analyst with the Wauwatosa

4   Police Department?

5   A.   Five years.

6   Q.   And we're talking about June of 2020, how long had you been

7   with the or the City of Wauwatosa at that point in time?

8   A.   I believe it was two years.

9   Q.   Okay.  So you'd been working there for two years and had you

10  taken the training by then?

11  A.   Most likely.

12  Q.   And we're talking about the DOT training.  You had taken

13  that by June 5th of 2020?

14  A.   The eTIME training, the TIME System, yes.

15  Q.   As part of that training, you're required to --  Could you

16  please explain what that training consists of.

17  A.   It consists of learning the database, learning the TIME

18  System Database, what information is obtained, what information

19  we can obtain, whether it is property information, gun

20  information, trailer information, vehicle information, personal

21  information from NCIC, DOT, a database called NLETS, which is a

22  national database, and it walks you through what information is

23  imported by other agencies, when to input stuff, when to take

24  stuff out, and what classifies as certain types of property.

25  Q.   Okay.  And with that training, how long is that?

366

1    A.   It is probably -- could take about two hours depending on
2    how quickly you go through the training.
3    Q.   Okay.  And with that training, do they teach you about the
4    Driver's Privacy Protection Act and how to deal with that
5    private information?
6    A.   I don't believe so.
7    Q.   Okay.  But you have to take the training in order to get a
8    user name and password, correct?
9    A.   I believe so.
10   Q.   Okay.  But you are taught about the Driver's Protection
11   Policy Act, correct?
12   A.   At some point.  It's a long training.  I don't know the
13   exact -- It could be one or two slides in it.  I don't know.
14   Q.   But they present the law to you at some point?
15   A.   I would assume so.
16   Q.   Okay.  And then after you get --  You take the training.  Do
17   you have to take a test?
18   A.   It is part of the training.  It is like little modules.  You
19   can answer five questions I think after a section.
20   Q.   Okay.  So you have to take each module so it is, like, five
21   tests with each module?
22   A.   Roughly yes.
23   Q.   You have to pass those tests, right?
24   A.   Correct.
25   Q.   Then once you pass, I assume you get a user name and

1  password; is that correct?

2  A.   Initially yes.  Every time you pass you don't get a new user

3  name or log in.  It just renews your previous account.

4  Q.   As part of that training, you know, you're not supposed to,

5  you know, give your user name and log in to anybody, correct?

6  A.   Correct.

7  Q.   And you're not to give anyone that doesn't have access to

8  this system your information for them to have access to the

9  system, correct?

10  A.   Correct.

11  Q.   Okay.  And so it's important in taking this training, you've

12  learned that in order to obtain, use, disclose a person's

13  personal information, you have to have a permissible purpose to

14  do this, correct?

15  A.   I would assume that's in training.  I don't remember the

16  exact verbiage that they use in the training, but I assume it's

17  in there.

18  Q.   Let me ask you.  Do you know that in order for you to

19  obtain, use, or disclose information that comes from DOT

20  records, that you have to do that for a purpose permitted under

21  the law?

22  A.   Correct.

23  Q.   Okay.  So with regards to Robert Agnew, was he being

24  investigated in June 5th of 2020?

25  A.   June 5th, no.  But later on, yes.

368

1  Q.  Was he ever charged with an offense?

2  A.  I believe so.

3  Q.  What offense?

4  A.  I believe domestic violence, stalking.

5  Q.  Okay.  Did you submit that evidence to your attorney because

6  -- Sorry.

7  A.  That was not my case.  I knew he was charged with that, but

8  that was not my case.

9  Q.  But you didn't submit that to your attorneys this new

10 information?

11        MS. BAYNARD:  Objection, argumentative, and that

12 information has never been requested.

13        MS. MOTLEY:  Your Honor, that's absolutely not true.

14        THE COURT:  The objection is sustained.  As to the

15 later, the question is fine.  No commentary.  The testimony is

16 fine.  This question is for attorneys.

17        MS. MOTLEY:  Thank you.

18 Q.  So you're aware that you did not disclose that information

19 to your attorneys, correct?

20 A.  I did not provide that, no.

21 Q.  You didn't provide that information to us either?

22 A.  I don't believe so.

23 Q.  So this is the first time that you're communicating this to

24 where your attorneys are listening to this and we're listening

25 to this, correct?

369

1   A.   From my recollection, yes.

2   Q.   So let's go to Tristiana Walls, page 7.

3   A.   Okay.

4   Q.   When did you obtain her driver's license information?  Can I

5   withdraw that?  When did you obtain her driver's license

6   information?

7   A.   Again, I can't remember the exact date.

8   Q.   Okay.  Do you remember the exact date for obtaining

9   anybody's driver's license information?

10  A.   Again, that was three years ago.  I don't remember the exact

11  date of when I ran every single person.

12  Q.   Okay.  We're just talking about these 44 plaintiffs, right?

13  A.   Correct.

14  Q.   You knew about this court date for a while, correct?

15  A.   Correct.

16  Q.   Okay.  So you knew that we were going to focus on the

17  plaintiffs with regards to this matter?

18            MS. BAYNARD:  Objection, relevance, argumentative.

19            THE COURT:  Overruled.

20            THE WITNESS:  Correct.

21  Q.   And so with regards to Tristiana Walls, you have no idea

22  when her information was obtained?

23  A.   No, I have no way of backtracking in the TIME System to

24  identify when specific people were run.

25  Q.   Right.  But you're the one that ran her name, correct?

370

1    A.  Correct.

2    Q.  Was she ever charged with a crime?

3    A.  I don't know.

4    Q.  Was she ever arrested?

5    A.  I don't know.

6    Q.  Was she ever investigated?

7    A.  I don't know.

8    Q.  You don't know why you obtained her information, correct?

9    A.  I was asked by Captain Vetter to start identifying people.

10   What happens beyond that is beyond the scope of my job.

11   Q.  So just to be clear, you were asked by Captain Vetter to

12   identify people, correct?

13   A.  Correct.

14   Q.  Captain Vetter never said go into the DOT system and get

15   people's information, correct?

16   A.  Correct.

17   Q.  You did that on your own, correct?

18   A.  Correct.

19   Q.  And the pictures on the right of this document, those were

20   from open source, is that accurate?

21   A.  Yes.

22   Q.  And so with regards to Tristiana Walls, you don't know why

23   you obtained her DOT picture, correct?

24   A.  The exact reason would likely have been throughout the

25   course of the investigation of the July 7th investigation at the

371

1    Cheese Cake Factory, the DOT information would likely have

2    occurred after that.

3              Again, I can't give you the exact date.  But my

4    process was to identify them through social media and then go to

5    the DOT to verify the identity of the social media accounts.

6    Q.  Is your testimony today you know for a fact that you

7    obtained her information July of 2020?

8    A.  Not July.  Sometime after July 7th would be an assumption.

9    Q.  Okay.  So why did you bring up the Cheese Cake Factory?

10   A.  That's when the photo on the right is from.

11   Q.  Okay.  The photo on the right you got from her social media?

12   A.  Not necessarily her social media but other people filming

13   the incident throughout the time that that was there.

14   Q.  But you can't say for certain why you obtained her

15   information or when you obtained her information, correct?

16             MS. BAYNARD:  Compound, asked and answered.

17             THE COURT:  Excuse me.  Can you rephrase that

18   question, Ms. Motley.

19   Q.  Let's go to Tracy Cole.  When did you obtain her information

20   from the DOT records?

21   A.  Again, I can't narrow down the exact date.

22   Q.  So was it June 5th of 2020?

23   A.  Unlikely.

24   Q.  Sorry?

25   A.  Unlikely.

372

1    Q.  Was it June 6th of 2020?

2    A.  I don't know, sorry.

3    Q.  June 7th of 2020?

4    A.  Again, I have no way of backtracking in the DOT TIME System

5    exactly when I ran people's information.

6    Q.  Do you understand that the information that's obtained by

7    the DOT is sensitive information and personal information from

8    people?

9    A.  Yes.

10   Q.  Do you understand that you have a duty as a person that has

11   access to this information to obtain it for a purpose permitted

12   by the law?

13   A.  Yes.

14   Q.  Okay.  And you can't tell us the date.  This is now the

15   third person.  You cannot tell us a date when you obtained Tracy

16   Cole's information from the DOT?

17   A.  The specific date, no.

18   Q.  And you also have the -- under Tracy Cole's name the 5th

19   line, it says DOT address of 10-11-2014.  Do you see that?

20   A.  Yes.

21   Q.  So you also obtained her DOT address, correct?

22   A.  Correct.

23   Q.  And then you see next to her name there's her date of birth,

24   correct?

25   A.  Correct.

373

1    Q.   And you also obtained her date of birth from the DOT,

2    correct?

3    A.   Unlikely.

4    Q.   Where do you think you got it from?

5    A.   Likely C-Cap, open source.  In order to run somebody through

6    the DOT, you need to have a date of birth prior to running them

7    in the DOT.

8    Q.   Are you aware that C-Cap does not keep people's dates of

9    birth?

10   A.   That is incorrect, they do.

11          MS. MOTLEY:  Your Honor, is there a way to look up

12   C-Cap Tracy Cole so that we can --

13          THE COURT:  You can keep asking your questions.

14   Ms. Motley, you can take that up during a break.

15          MS. MOTLEY:  Thank you.

16   Q.   Put a pin on Tracy Cole.  Your testimony today is that her

17   complete date of birth is in C-Cap?

18   A.   I don't know if it is exactly in C-Cap.  I said it was

19   potentially in C-Cap or other open source information.

20   Q.   Where was Tracy Cole's information, date of birth, in open

21   source that you found it to put on this document, what open

22   source?

23   A.   I don't remember the exact source.

24   Q.   Let's look at Lauryn Cross since we're on this page.  You

25   see her date of birth of June 7th of 2000?

374

1  A.  Correct.

2  Q.  Did you get that from the DOT?

3  A.  Unlikely.

4  Q.  Which open source did you get her date of birth from?

5  A.  That could come from again C-Cap is one potential.  It could

6  come from Facebook.  Somebody mentioning because Facebook has a

7  spot for their date of birth.  Instagram.  There is a system in

8  our Pro Phoenix, our record's management system.

9  Q.  Excuse me.  We're asking specifically to Lauryn Cross.  Your

10  testimony is she put her date of birth, month, date, year

11  potentially on social media.  Is that what you're saying?

12          MS. BAYNARD:  Objection.  Misstates his testimony.

13          MS. MOTLEY:  That's what I am asking.

14          THE COURT:  Again, Ms. Motley, just respond to the

15  objection to me.  The objection is overruled.  Mr. Ratkowski may

16  answer.

17          THE WITNESS:  Can you repeat the question?

18  Q.  Sure.  For Lauryn Cross, her date of birth, do you see it on

19  this document?

20  A.  Yes.

21  Q.  And where did you get her specific date of birth from?

22  A.  I can't say specifically where without having to relook at

23  information from her Facebook page.  Again, it was three years

24  ago.

25  Q.  Okay.  So let's look at -- And you said with regards to the

375

1    process of you creating this document, you got people's

2    information from open source through Facebook, correct?

3    A.  Correct.

4    Q.  And that's how you did it for everybody?

5    A.  I believe so, yes.

6    Q.  So the -- I'm trying to understand the steps.  You go

7    through their social media, correct?

8    A.  Correct.

9    Q.  Of the 44 plaintiffs?

10   A.  Is that a question?

11   Q.  Yes.

12   A.  Yes.

13   Q.  Okay.  And from that, you go on their social media.  And

14   then what happens?

15   A.  I start looking through the social media publically

16   available information that they post on their Facebook page,

17   Instagram, Twitter, YouTube pages, various social media cites

18   and try to identify videos of them at a specific incident that

19   we were looking at that I was asked to identify people from.

20          And then once I find the video, find a photo of some

21   kind or they tag themselves in a video or photo saying, hey, it

22   was nice to see you or, hey, that's me, then I would try to

23   verify the user name.

24          The user name isn't always 100 percent accurate on

25   Facebook.  Different spellings, different names, names that even

1    related to their information.  So when you try to verify a

2    person's information through social media, there's a couple

3    different steps to verify the name.

4         The first step is to look at the URL.  In the URL

5    sometimes Facebook will have their name up there, and that name

6    is the original name that they created the log in account for.

7    So if they have a completely different name on Facebook that is

8    visible, that can be changed, but the URL does not get changed.

9         So from there, I would attempt to identify and verify

10   what their actual name was and to try to verify --  trying to

11   get a name that I could try to check for the date of birth

12   through other sources, which would include again C-Cap would be

13   a big one, our records system, our open source information.  A

14   lot of times people's date of birth is in Google as well, so I

15   would try to verify the information from the social media

16   accounts through various steps like I just testified to to try

17   to narrow down the exact a person that I could actually verify

18   their identity on.

19   Q.  And this is all based on people engaged in protesting,

20   correct?

21   A.  Yes.

22   Q.  And you were never physically present there yourself?

23   A.  Correct.

24   Q.  And you were looking through social media?

25   A.  Correct.

1   Q.   And every single plaintiff on this list you went through

2   their social media first, correct?

3   A.   Yes.

4   Q.   Okay.  So Tracy Cole does not have social media on her, so

5   you didn't go through her social media, correct?

6   A.   Correct.

7   Q.   So then now we'll move on.  Let's go to --  So let's go to

8   let's see, Tiffany Stark.  She's toward the end.

9          THE COURT:  Ms. Motley for the record and also to

10  follow along with you if you have give us a page number, please.

11         MS. MOTLEY:  No problem.

12         THE COURT:  Thank you.

13         MS. MOTLEY:  Page 24.

14         THE COURT:  Thank you.

15  Q.   You heard testimony from Tiffany Stark yesterday, correct?

16  A.   Correct.

17  Q.   So you put her on this target list, right?

18  A.   On this list, yes.

19  Q.   Why did you obtain her DOT personal information?

20  A.   She was identified as being at multiple protests as a

21  potential witness.

22  Q.   So what date did you do that?

23  A.   I don't remember that date.

24  Q.   No one told you to go in and get Tiffany Stark's DOT

25  information?

1    A.   Correct.

2    Q.   No one instructed you to do this, correct?

3    A.   Correct.

4    Q.   As far as you know, you heard testimony that Tiffany Stark

5    was never questioned by anybody, correct?

6    A.   Correct.

7    Q.   Your testimony that she's never been arrested, correct?

8    A.   Based on her testimony, yes.

9    Q.   You heard testimony yesterday that she was never ticketed

10   for anything, right?

11   A.   Based on her testimony, yes.

12   Q.   So there's no investigation that you're aware of of Tiffany

13   Stark, correct?

14   A.   That I am aware of.  I can't say for sure.

15   Q.   You're the one that put her on this list and got her DOT

16   information, right?

17   A.   Correct.

18   Q.   Thank you.  So let's go to --  Let's see.  Now, let's go to

19   Mary Kachelski, page 15.

20   A.   Okay.

21   Q.   Why didn't you number this document?

22   A.   I am kind of regretting that right now.

23   Q.   Now, this document you would agree contains a lot of

24   sensitive personal information of these 44 plaintiffs?

25   A.   Correct.

379

1    Q.  Okay.  You never put on this document confidential, right?

2    A.  I don't believe so.

3    Q.  You never put on any versions of this document that this is

4    a confidential document, correct?

5    A.  I don't believe so.

6    Q.  You never put on this document that this is law enforcement

7    sensitive, correct?

8    A.  I don't believe so.

9    Q.  How many people received this document?

10   A.  I don't know the exact number of people that I contacted.

11   Q.  Excuse me.  My question is how many people received this

12   document?

13   A.  Again, I believe I testified I don't know that number.

14   Q.  You don't know that number.  You don't know if everyone that

15   received this document should receive this document, right?

16              MS. BAYNARD:  Objection, form.

17              THE COURT:  Overruled.  You may answer if he knows.

18   Q.  Can you repeat the question?

19   A.  Sure.

20   Q.  You don't know if everyone who received this document should

21   have received this document?

22   A.  Everyone I personally sent it to I believe should have

23   received the document.  I don't know if anyone sent it to other

24   people.  That's beyond me.

25   Q.  Did you ask anyone that you sent this document to whether

1  they sent it along to anyone else?

2  A.  No.

3  Q.  Did you tell anyone that you sent this document to that this

4  information came from the DOT?

5  A.  I don't believe so.

6  Q.  I am sorry, you said --

7  A.  I don't believe so.

8  Q.  Sorry.  You did not tell anyone that you sent this document

9  to that this information came from the DOT, correct?

10  A.  Correct.

11  Q.  Some of the people that you directly sent it to, you're not

12  100 percent certain that they themselves had access to DOT

13  records as well, correct?

14  A.  I assumed they did because they are all law enforcement, but

15  I can't verify.  I've never asked them.

16  Q.  You've identified seven crime analysts who are not law

17  enforcement that you sent this document to, correct?

18  A.  Correct.

19  Q.  And at least for those seven, you don't know if they have

20  access to the DOT TIME System as well, correct?

21  A.  I can't verify because I've never asked them.

22  Q.  So that's a no?

23  A.  Correct.

24  Q.  So let's look at Mary Kachelski.  She's the top one.  Why

25  did you obtain her DOT information?

381

1   A.  I believe she was present at the Mayfair Mall incident that

2   lead to interaction with a now former Wauwatosa Police Officer

3   where a shot was fired at his house, and she was identified as a

4   potential witness.

5   Q.  That's what you believe or you know?

6   A.  That's my recollection.  That's what I believe it is.

7   Q.  And so why do you have her daughter on here?

8   A.  She was always with her.  Again, my recollection is that she

9   was being --  She was a potential witness, and her daughter was

10  always with her as well as a potential witness to the incident

11  as well.

12  Q.  So explain to me how you were able to specifically obtain

13  Mary Kachelski's information based on her daughter's picture

14  being on social media?

15              MS. BAYNARD:  Objection to the form of the question.

16              MS. MOTLEY:  Your Honor, maybe it is not a --

17              THE COURT:  You can rephrase it, Ms. Motley.

18  Q.  Sure.  So you testified how you would obtain people's

19  information is you would get their picture from their social

20  media which is all the pictures on the right-hand side, correct?

21  A.  Correct.

22  Q.  So for Mary Kachelski, her right-hand side picture, that is

23  not of her?

24  A.  No.

25  Q.  So how did you obtain her information?  How did you find out

1  that that was her?

2  A.  Again, her daughter was always with her.  She was identified

3  through the course of the investigation of the shooting incident

4  that occurred at an officer's residence as a potential witness.

5  Her daughter again was present.  I identified her through other

6  videos.  I believe she may have tagged herself in a couple

7  videos as well.  So as you can see her Facebook page is on this

8  document as well.

9  Q.  Now, you're certain she was a witness for this incident that

10  you mention, correct?

11  A.  Again, I can't be 100 percent certain but I believe so, yes.

12  Q.  Would it surprise you to know that according to the police

13  reports that we received, she was not identified at all at that

14  incident.

15  A.  Again, I don't know.

16  Q.  But --  What date did you obtain her information from the

17  DOT?

18  A.  Again, I can't testify to the exact date.  That was three

19  years ago.

20  Q.  And you also can't testify to whether or not she was a

21  witness to this incident you keep mentioning?

22         MS. BAYNARD:  Objection, asked and answered.

23         MS. MOTLEY:  Your Honor, this witness is giving

24  testimony about an incident --

25         THE COURT:  The objection is overruled.  You may

1  answer and then move on.

2          THE WITNESS:  Can you repeat the question?

3      (Question read by the reporter.)

4          THE WITNESS:  I can't testify with 100 percent

5  certainty.

6  Q.  So you're not sure why you obtained her photograph then,

7  correct?

8  A.  To the best of my knowledge, it was for the investigation.

9  Again, I can't say with 100 percent.

10  Q.  Let's go to Gabriella Vitucci.  Why did you obtain her

11  information?

12  A.  She was consistently presenting at multiple incidences as a

13  potential witness to incidents that occurred throughout the

14  summer.

15  Q.  So every single person you put on this list is based on

16  them, you watching social media and believing that they were at

17  some event; is that accurate?

18  A.  Yeah.

19  Q.  This all occurred in 2020?

20  A.  Yes.

21  Q.  So from June 5th of 2020 until when?

22  A.  I believe we kind of stopped --  I kind of stopped

23  monitoring social media consistently around November or December

24  of 2020 because we weren't quite sure if the protests were going

25  to stop within the city and believed they had a goal of getting

1    365 days.  So I'm not 100 percent sure the exact date, but it

2    was around November or December where I essentially was tasked

3    with other things.

4    Q.  And you would agree that and how often did you use this list

5    when you created it June 5th of 2020 until?

6    A.  I don't believe I specifically used the list.  The process

7    was I would identify people, put them on this list.  And then

8    the investigators would then ultimately use it to determine

9    whatever they needed them for their investigations.

10   Q.  So how many times did you add to this document?

11   A.  However many people there are.

12   Q.  So 204 times you added to this document?

13          MS. BAYNARD:  Objection, misstates --  assumes facts

14   not in evidence.

15          THE COURT:  Sustained.

16   Q.  How many times did you add to this document?

17          MS. BAYNARD:  Same objection.

18          THE COURT:  This question --

19          MS. BAYNARD:  It has been asked and answered.

20          THE COURT:  It was asked how many times?

21          MS. MOTLEY:  This is a very important question.  This

22   witness is testifying that, you know, everyone that he put on

23   this document essentially was connected with protesting.  And

24   now, he's testifying that we need to know how many times he

25   himself used this document.

385

1          THE COURT:  I understand the purpose of your question.

2    My only -- I sustained the objection.  I thought he had already

3    been asked this question.  I'll allow him to answer, so we can

4    move on.  I thought he had been asked this question again.

5    Please go ahead and ask it again.

6          MS. MOTLEY:  Thank you.

7    Q.   So Mr. Ratkowski, I want you to take your time answering

8    this question.  If you need to refer to the document and count

9    the number of people.  Could you please answer how many times

10   did you use this document?

11   A.   I would say around 200.

12   Q.   Around 200.  How many did you count?

13   A.   I counted 197 based on this document.

14   Q.   So you counted -- So you used this document 197 times; is

15   that correct?

16   A.   About that, yes.

17   Q.   Thank you.  So with regards to this document, let's go to --

18   Let's go to John Larry, please.  Page 6, please.

19          THE COURT:  Thank you.

20   Q.   Now, you would agree investigating people solely for their

21   speech would be improper, correct?

22   A.   Correct.

23   Q.   You would agree that it would be improper to investigate

24   people for writing letters to the Wauwatosa politicians about

25   grievances they have?

386

1    A.   For that specific purpose, yes.

2    Q.   And you would agree that --  Well, I want to turn to John

3    Larry.  So what date was his DOT information obtained?

4    A.   Generally, I can't specify the exact date on when his

5    information was run.  I remember him being involved in the

6    cheese cake incident from July 7th, about that time.

7    Q.   Okay.  You noted that Mr. Larry was on the new Wauwatosa Ad

8    Hoc Committee?

9    A.   Correct.

10   Q.   Why did you put that?

11   A.   Because I was asked to identify those members by Detective

12   John Milotzky.

13   Q.   I'm sorry?

14   A.   I was asked to identify members of that committee and

15   provide information to Detective Milotzky.  I don't know why he

16   wanted that information.

17   Q.   So did Mr. Milotzky say that he wanted you to go into John

18   Larry's DOT information to get his date of birth and his DMV

19   photograph as well?

20   A.   I don't recall.

21   Q.   And on his entry, you also note his -- the car he drives and

22   the make and model of his car, right?

23   A.   Correct.

24   Q.   So again John Larry was not being investigated for any

25   crimes when you added him to this list, correct?

387

1    A.   I believe he was identified as a potential witness.  Again,
2    I don't know what the detectives were doing with their
3    investigations.
4    Q.   But again, did you ask them if they wanted John Larry's DOT
5    information?
6    A.   No, it is kind of common practice.
7    Q.   So these detectives, they all have access to the TIME System
8    correct?
9    A.   Correct.
10   Q.   So if they wanted his DOT records, they could have accessed
11   it themselves, correct?
12   A.   Correct.
13   Q.   And did you ever --  Did anyone ever tell you that this
14   information on this list for these 44 plaintiffs, that this was
15   an issue that you were getting their private information?
16   A.   No.
17   Q.   Okay.  And you didn't put next to any of these 44
18   plaintiffs' information DOT sensitive, correct?
19   A.   Correct.
20   Q.   Okay.  Now, I'd like to go to --  Do you recall on July 9th
21   of 2020 sending an email that you're going to ID people who are
22   sending a letter to the Wauwatosa Common Council?
23   A.   Can I see the email?
24            MS. MOTLEY:  Your Honor, may I approach?
25            THE COURT:  You may.

1        MS. MOTLEY:  Exhibit 189, it is in the binder.  Let me
2   know when you're ready.
3   A.  I should be okay.
4   Q.  So do you recall sending this email July 9th of 2020?  Can
5   you please explain what this document is?
6   A.  Yes, it is an email that I sent to our command staff
7   sergeants and above and some detectives in reference to a letter
8   that will be sent.  It says, "This letter will be sent to city
9   hall today at 3:30 by a subject.  I'm going to work on
10  identifying or ID'g all the names at the end of the letter."
11  Then, it goes on to indicate some of the names that are on the
12  back end of this letter.

13        This was in response to the Cheese Cake Factory
14  incident because this letter was posted on social media before
15  it got sent to the city hall, so it was publically available on
16  Facebook prior to city hall receiving it which is why I said
17  this letter will be sent.

18        And then this was again in reference to the Cheese
19  Cake Factory because my thought process for using this document
20  to assist in the identification of people at the Cheese Cake
21  Factory.  Because it says on July 7th, we assembled at Mayfair
22  Mall in the Cheese Cake Factory to peacefully protest so my
23  thought was these individuals at the end of this letter were
24  self identifying as being at the Cheese Cake Factory that we
25  were investigating.

389

1  Q.  Okay.  With regards to this letter, the people put their
2  names on this letter, right?
3  A.  They did, yes.
4  Q.  And this letter went to the Wauwatosa Common Council, right?
5  A.  At some point I believe it did.  I can't say for certain.  I
6  never saw any letter that they actually received.
7  Q.  This letter was dated July 9, 2020, correct?
8  A.  The email, yes.
9  Q.  And the letter is dated July 9, 2020, correct, page 3?
10  A.  Yes.
11  Q.  Okay.  And you stated that you're going to ID everybody who
12  is on this letter, correct?
13  A.  That was my intention, yes.
14  Q.  So did you go into everyone's DOT record that's on this
15  letter?
16  A.  No because I likely could not verify the date of birth.
17          MS. MOTLEY:  Could we please publish for the jury
18  Exhibit 189.
19          MS. BAYNARD:  I have an objection.
20          THE COURT:  Ms. Baynard has the floor.
21          MS. BAYNARD:  My first objection is to the document
22  has named individuals who are not plaintiffs and hasn't been
23  redacted.  Also Dominick Ratkowski -- It is several pages but
24  starting at pages 3 through 8 are the documents that Dominick
25  Ratkowski did not draft.

390

1        With regards to the email on page 1, I believe the

2   information there is redacted, then they can publish it to the

3   jury.

4        THE COURT:  For now, Ms. Motley, can you reframe the

5   question as to any plaintiffs' names that are on the end of the

6   letter is what we're getting at.

7        MS. MOTLEY:  Sure, Your Honor.

8   Q.  With regard to this specific letter, how many names are on

9   this letter at the end, just the number.

10  A.  I believe I counted 88.

11  Q.  I'm sorry?

12  A.  I believe I counted 88.

13  Q.  Eighty-eight.  So let's just talk specifically about

14  plaintiffs.  For many of the plaintiffs and I'll go through each

15  one that you put on the target list if we can get that up again,

16  please.  Let's just talk.  This letter, what is this document,

17  the letter specific that's on -- attached to this email, what is

18  this letter?

19  A.  It's my understanding that it was a letter that somebody

20  drafted for --  as a complaint of some kind.  I don't --  I

21  would have to reread the entire letter.

22  Q.  Okay.  Let me give you a better question.  Have you ever

23  read this entire letter?

24  A.  Yes, likely about three years ago.

25  Q.  And so you just can't recall what this letter is?

1  A.  The specifics again I would have to reread it to refresh my
2  memory.
3  Q.  Okay.  So this letter is a document that was sent to the
4  Wauwatosa Common Council, correct?
5              MS. BAYNARD:  Asked and answered.
6              MS. MOTLEY:  I'm trying to refresh his memory.
7              THE COURT:  You may answer it.
8              THE WITNESS:  Based on the email, I believe it was
9  sent to the common council.  I don't know if it physically was
10  or not.
11  Q.  This letter discusses generally speaking different
12  grievances that 88 people in the community may have with regards
13  to, you know, Wauwatosa and what was going on in Wauwatosa?
14              MS. BAYNARD:  Objection to the form of the question
15  and foundation.  It's more argument than --
16              MS. MOTLEY:  Your Honor, I'm trying to avoid sitting
17  here and watching Mr. Ratkowski read a letter for the next half
18  an hour and trying to short circuit this for the jurors.
19              MS. BAYNARD:  It is a letter that he didn't draft that
20  he says he hasn't read in three years.  He doesn't know if it
21  actually got sent to the common council.  I think if we ask him
22  questions about it, he should read it.
23              MS. MOTLEY:  Your Honor, based on this letter he's
24  saying, you know, to identify people and then went into people's
25  DOT records.  It's relevant to this specific action.  It is

392

1    again why we're here.

2            THE COURT:  Mr. Ratkowski, to the best of your

3    recollection, what's the nature of this letter?

4            THE WITNESS:  The best of my knowledge it is a letter

5    addressing grievances.  At least one person who drafted it and

6    potentially signed by all these individual leading to the city.

7            THE COURT:  Ms. Motley has --

8            MR. SCHWAB:  Your Honor, can we have a sidebar?

9            THE COURT:  We can wait, Mr. Schwab, as to a sidebar.

10   You can ask your next question.

11   Q.  You would agree that based off of this document that you

12   then went into to obtain information for some of the people that

13   are on this letter at the end.

14   A.  I likely would have tried finding their Facebook pages.

15   Based on just reading over the names, some of the names look

16   like Facebook names so likely it would have been communicated

17   through Facebook.  I believe that is where I received this

18   information.  This letter is an individual who authored it

19   posted it on his Facebook page which is why I'm not sure if it

20   actually was sent to the common council.  I didn't know if he

21   actually did send it or not.

22   Q.  Okay.  Thank you.  You would agree it is not proper to, you

23   know, go in people's DOT records or plaintiffs' DOT records

24   because they wrote a letter to the common council?

25   A.  For that specific reason, no.

393

1          THE COURT:  Ms. Motley, I am going to interrupt you

2     right there.  Why don't we stand up and have a shake.  We've

3     been listening for a good while.

4     Q.  So with regard to this document, you are the only one that

5     could add to this document?

6     A.  I am sorry, which document?

7     Q.  The target list.

8     A.  Yes.

9     Q.  And with regards to this document, you never deleted anyone

10    off of this document, correct?

11    A.  I don't recall.

12    Q.  Do you recall when you testified at your deposition that you

13    actually said that you never deleted anyone off of this

14    document?

15         MS. BAYNARD:  Objection, improper impeachment.

16         THE COURT:  Lay a foundation if the witness has --

17    Q.  Do you recall being deposed on June 23rd of 2021?

18    A.  Yes.

19    Q.  And do you recall in that deposition being asked, did you

20    ever delete anyone off of this list?

21    A.  Yes.

22    Q.  And do you recall what your answer was?

23    A.  I don't recall specifically.  If I said I never deleted

24    anyone, then I would assume that would be more recent than three

25    years later.

394

1  Q.  So you would agree that your testimony at the deposition on

2  June 23rd of 2021, you had a better recollection of why you

3  created this list, correct?

4  A.  I would assume so, yes.

5  Q.  You would have a better recollection of what the purpose of

6  this document, correct?

7  A.  Yes.

8  Q.  And you have a better recollection of, you know, why you

9  obtained these specific plaintiffs' information from their DOT

10  records, correct?

11  A.  Most likely.

12  Q.  You'd have a better memory from June 23rd of 2021 compared

13  to now as to why you obtained plaintiffs' information from their

14  DOT records, correct?

15  A.  Most likely.

16  Q.  Did you ever tell anybody that you shared this document with

17  that you know they should --  that they should keep it safe?

18          MS. BAYNARD:  Objection, asked and answered.

19          THE COURT:  We have heard this line of question

20  before.  Go ahead.  I'll allow it, but we have heard this line

21  of question through Mr. Ratkowski.

22  Q.  Did you ever tell anyone that you shared this document with

23  that they should keep it safe?

24  A.  No.

25  Q.  Did you --  And on September 24th of 2020, you shared this

395

1    document with Brian Conte, correct?

2    A.   Sorry, what was the date?

3    Q.   September 24th of 2020, Exhibit 203.

4    A.   Am I able to see the document?

5    Q.   Just answer the question first.

6    A.   I don't recall the exact date.  If I could see the document,

7    that would refresh my memory.

8         MS. MOTLEY:  Your Honor, is it okay if he sees the

9    document?

10        THE COURT:  You may approach him.

11   Q.   If you could please pull up Exhibit 2033.

12   A.   203?

13   Q.   204, I'm sorry.

14   A.   Yes, I remember.

15   Q.   Okay.  So you sent --  Could you please explain for the jury

16   what you're looking at?

17   A.   Yes, it's an email sent to Detective Brian Conte at the

18   Milwaukee County Sheriff's Department indicating that there was

19   a group of people who walked onto the highway the night before,

20   so that would have been on September 24th, and I was sending it

21   to him as an information sharing system to a network that we

22   have in order for to help him identify people who were on the

23   freeway the night before blocking traffic and doing what the

24   sheriffs would end up having to do based on the investigation

25   that they were working on that night.

396

1    Q.  Okay.  So you added a lot.  My question was, what does this

2    email say?

3    A.  You want me to read the whole email?

4         MS. MOTLEY:  Your Honor, I ask that we be allowed to

5    publish this exhibit to the jury.

6         THE COURT:  Any objection?

7         MS. MOTLEY:  Exhibit 204.

8         THE COURT:  It is received and may be published.

9    Q.  This email reads -- Can you please read it for the jury.

10   A.  Yes, ma'am.  "Morning, Brian.  I attached the list of the

11   People's Revolution members that I have been working on.  It

12   identifies a large chunk of the people who were on I94 last

13   night.  Let me know if you guys need help ID'g people.  Feel

14   free to pass this along to who you think would find it useful."

15   Q.  So before you send this email, Mr. Conte did not ask for you

16   to send the target list, correct?

17   A.  I don't recall.  We were working on multiple investigations

18   together regarding this because he was a detective for Milwaukee

19   County Sheriff's Office.  I work with him constantly sharing

20   information.

21   Q.  Great.  So my question is, before you sent this email,

22   Mr. Conte did not ask you to specifically send this target list,

23   correct?

24        MS. BAYNARD:  Objection, asked and answered.

25        MS. MOTLEY:  He has not answered.

397

1        THE COURT:  You may answer, Mr. Ratkowski.

2        THE WITNESS:  I don't remember if he specifically

3    asked me to send the list.

4    Q.  You don't recall that?

5    A.  No.

6    Q.  With regards to you sending the document, you sent

7    essentially a version of this target list, correct?

8    A.  Yes.

9    Q.  Okay.  And so was Tracy Cole there?

10   A.  I don't know.

11   Q.  Was Kamila Ahmed there?

12   A.  I don't know.

13   Q.  Was Andrew Aaron there?

14   A.  I don't know.

15   Q.  Robert Agnew?

16   A.  I don't know.

17   Q.  Jacqueline Bogenberger?

18   A.  I don't know.

19   Q.  Lavita Booker?

20   A.  I don't know.

21   Q.  Rebecca Burrell?

22   A.  I don't know.

23   Q.  Raine Cich?

24   A.  I don't know.

25   Q.  Taleavia Cole?

1   A.  I don't know.

2   Q.  Tahudah Cole?

3   A.  I don't know.

4   Q.  Taleavia Cole?

5   A.  I don't know.

6   Q.  Steven Conklin?

7   A.  I don't know.

8   Q.  You already answered Tracy Cole.  Was she there?

9   A.  I don't know.

10  Q.  Lauryn Cross?

11  A.  I don't know.

12  Q.  Erik Fanning?

13  A.  I don't know.

14  Q.  Jessica Fenner?

15  A.  I don't know.

16  Q.  Christine Groppi?

17  A.  Again, I don't know.

18  Q.  Gaige Grosskruetz?

19  A.  I don't know.

20  Q.  Joseph Hayes?

21  A.  I don't know.

22  Q.  Adante Jordan?

23  A.  I don't know.

24  Q.  Mary Kachelski?

25  A.  I don't know.

1    Q.   Sean Kafer?

2    A.   I don't know.

3    Q.   Joe Koepp?

4    A.   I don't know.

5    Q.   John Larry?

6    A.   I don't know.

7    Q.   Alex Larson?

8    A.   I don't know.

9    Q.   Sonora Larson?

10   A.   I don't know.

11   Q.   Vaun Mayes?

12   A.   I don't know.

13   Q.   Molly Nilssen?

14   A.   I don't know.

15   Q.   Shawn Page?

16   A.   I don't know.

17   Q.   Carmen Palmer?

18   A.   I don't know.

19   Q.   Oscar Rodriguez?

20   A.   I don't know.

21   Q.   Rosalind Rogers?

22   A.   I don't know.

23   Q.   Madeline Schweitzer?

24   A.   I don't know.

25   Q.   Mariah Smith?

400

```
1   A.  I don't know.

2   Q.  Peter Sparks?

3   A.  I don't snow.

4   Q.  Tiffany Stark?

5   A.  I don't know.

6   Q.  Angel Vega?

7   A.  I don't know.

8   Q.  Gabriella Vitucci?

9   A.  I don't know.

10  Q.  Tristiana Walls?

11  A.  I don't know.

12  Q.  Oscar Walton?

13  A.  I don't know.

14  Q.  Jayden Welch?

15  A.  I don't know.

16  Q.  Britta Welch?

17  A.  I don't know.

18  Q.  Brandon Wilborn?

19  A.  I don't know.

20  Q.  Trisha Wilson?

21  A.  I don't know.

22  Q.  Kathelyn Wojnar?

23  A.  I don't know.

24  Q.  You don't know if any of the 44 plaintiffs was there,

25  correct?
```

401

1    A.  Correct.

2    Q.  Despite not knowing, you sent their personal information

3    that you got from the DOT records to Brian Conte on

4    September 9th of 2020, correct?

5    A.  Yes.

6    Q.  You sent this information on September 24th of 2020,

7    correct?

8    A.  Yes.

9    Q.  And then you said in this email, feel free to pass this

10   along to who you think would find it useful?

11   A.  Correct.

12   Q.  You wrote this email?

13   A.  Correct.

14   Q.  Who else did Brian Conte send this to?

15   A.  I don't know.  I trusted him to use it for his

16   investigation.

17   Q.  But you didn't say that.  You didn't say you should use this

18   for your specific investigation, correct?

19   A.  Correct.

20   Q.  Okay.  And did you ever check back in with him to make sure

21   that he used these 44 plaintiffs' names who I just mentioned for

22   his investigation?

23   A.  No.

24   Q.  Okay.  And did you ever check back with him to make sure

25   that he wasn't misusing the personal information that you

1  obtained from these 44 plaintiffs' DMV records.  Did you ever
2  check back in with regards to that?
3              MS. BAYNARD:  Objection, compound.
4              MS. MOTLEY:  I will rephrase.
5              THE COURT:  Please do.
6  Q.  Did you ever check back in with Mr. Conte to see how he used
7  the information from the target list after the September 24,
8  2020, email?
9  A.  I don't believe so, no.
10  Q.  Did you ever tell Brian Conte that he should not feel free
11  to pass this along to who you think would find it useful?
12  A.  Again, I trusted him to use it for his investigations and to
13  only share it with his detectives.
14  Q.  Right.  But you gave him the information of 44 people that
15  you have no idea if they were even at this specific place the
16  night before September 24th of 2020, correct?
17  A.  Yes.
18  Q.  Okay.  Thank you.  So let's talk about --
19             THE COURT:  Ms. Motley if you allow me to interrupt
20  you.  It appears you are about to change chapters.  So let's
21  take time for our afternoon 15-minute break.  It is kind of warm
22  in here.  I will see about adjusting the temperature as well.
23  Let's take a 15-minute break, please.
24             BAILIFF:  All rise for the jury.
25       (Jury excused.)

403

1          THE COURT:  Be seated everyone.  Mr. Ratkowski, you

2   may take a 15-minute break and use the facilities.  Mr. Schwab,

3   you had requested a sidebar.  I denied the sidebar because we

4   had so many sidebars this morning that took us off track, and I

5   was trying to hold down until we have a break.  You wish to be

6   heard.

7          MR. SCHWAB:  It was to alert the Court that one of the

8   jurors was falling asleep without embarrassing such juror.

9          THE COURT:  I saw you looking in the jury box.  I did

10  notice a juror looking tired.  That's why I then asked that we

11  all stand for a shake to wake us up.  I do feel very warm up

12  here.  People in the back are shaking their heads no.  I'm

13  wondering if the jury box is hot too.  We'll check the

14  temperature here.  Please take --  Ms. Baynard, you have

15  something as well?

16         MS. BAYNARD:  Your Honor, I just want to put on the

17  record that the plaintiffs are no longer intending to call Barry

18  Weber.  And so not that he responded to the subpoena, but I

19  would ask the Court release him from the subpoena so that we

20  don't have to.  It is not our responsibility to try to contact

21  him again.

22         THE COURT:  All right.  Ms. Motley, you had mentioned

23  at side bar as well earlier this morning; is that correct?

24         MS. MOTLEY:  That's correct.

25         THE COURT:  Then Mr. Weber is released from the

1    subpoena.  Anything else?

2            MR. WIRTH:  Just for traffic control purposes, Judge.

3    We're going to call Mr. Ratkowski back in our case in chief.

4    This is getting to the point where everybody is going like this

5    and it will help to change up witnesses if nothing else.

6            THE COURT:  Anything else for the good of the order?

7    Take 15-minute break.  Be back in our seats at 2:15, please.

8        (Brief recess taken.)

9        (Back on the record.)

10           THE COURT:  Counsel, ready to proceed?

11           MR. SCHWAB:  I think before we get into that, we're

12   prepared to stipulate to the admission of a certain number of

13   documents that we can just take care of if that is okay.

14           THE COURT:  Are you ready to put them on the record

15   now?

16           MR. SCHWAB:  Yes.

17           THE COURT:  Go ahead, proceed.

18           MR. SCHWAB:  That would be 198 and 199.

19           MR. WIRTH:  Are they the same thing as in 1001?

20           MR. SCHWAB:  I apologize.

21           THE COURT:  We're not ready.  Please bring the jury

22   out.

23       (Jury enters.)

24           THE COURT:  All right.  Back on the record.

25   Ms. Motley, you may continue.

405

1          MS. MOTLEY:  Thank you, Your Honor.  Can we please
2     pull back up Exhibit 204?
3     **(By Ms. Motley.)**
4     Q.  Mr. Ratkowski, just because we took a break, I just want to,
5     you know, do the last question.  So again, this is an email you
6     sent September 24th of 2020, correct?
7     A.  Correct.
8     Q.  Thank you.  And you agree that with regards to this version
9     of the target list, that you're not --  you don't know or did
10    not know that any of the 44 plaintiffs were, you know, at I94
11    the night prior, correct?
12    A.  Correct.
13    Q.  And you sent this list to Mr. Conte?
14          MS. BAYNARD:  Objection, asked and answered.
15          THE COURT:  I think you need to move on.  This is the
16    last question on this, and you need to move on.
17    Q.  Yes.  You're aware according to your responsibility with a
18    person with access to people's DOT records that every time you
19    disclose their information, you need to have a permissible
20    purpose, correct?
21    A.  Correct.
22    Q.  You did not know with these 44 plaintiffs -- Sorry, I'll
23    move on.  So let's move on to do you recall an email from
24    July 8th of 2020 in which you sent it to several people and the
25    email is titled List of Top Protestors?

406

1    A.  Could I see the document?

2            MS. MOTLEY:  Your Honor, may I?

3            THE COURT:  You may approach.

4    Q.  If you could go to Exhibit 209.

5    A.  Okay.

6    Q.  And this email you say here's a list with photos and

7    addresses of the main people who are constantly posting videos,

8    photos and comments, correct?

9    A.  Correct.

10   Q.  And on this email, you sent a version of the target list,

11   correct?

12   A.  I sent a version titled Main People Involved.

13   Q.  But it was a version of this document, correct?

14   A.  Correct.

15   Q.  Okay.  Thank you.  And how many people did you disclose the

16   --  this document to on July 8th of 2020?

17   A.  I counted 34 Wauwatosa officers.

18   Q.  Thirty-four people you disclosed to on July 8, 2020?

19   A.  That's what I counted.

20   Q.  Okay.  Thank you.  And the people and this document --

21           MS. MOTLEY:  Your Honor, is it okay to publish the

22   first page of 209 to the jury?

23           THE COURT:  The first page, yes.

24   Q.  So before you sent this document, you were identifying

25   people who were constantly posting photos, videos and comments,

407

1  correct?

2  A.  Correct.

3  Q.  You weren't investigating them for a crime?

4  A.  Incorrect.

5  Q.  What crime were you investigating them for?

6  A.  I was assisting officers who were investigating the July 7th

7  Cheese Cake Factory incident.

8  Q.  Cheese Cake Factory what?

9  A.  The disorderly protest that occurred at the Cheese Cake

10  Factory on July 7th.

11  Q.  So that was a protest, correct?

12  A.  Correct.

13  Q.  Was Tracy Cole charged with a crime?

14  A.  I don't know.

15  Q.  Was Khalil Coleman charged with a crime with the Cheese Cake

16  Factory?

17  A.  I don't know.

18  Q.  Was Brandon Wilborn charged with a crime with regards to the

19  Cheese Cake Factory?

20  A.  I don't know.

21  Q.  Mariah Smith?

22  A.  I don't know.

23  Q.  Rebecca Burrell?

24  A.  I don't know.

25  Q.  Jacqueline Bogenberger?

1  A.  I don't know.

2  Q.  Andrew Aaron?

3  A.  I don't know.

4  Q.  Taleavia Cole?

5  A.  I don't know.

6  Q.  Lauryn Cross?

7  A.  I don't know.

8  Q.  Vaun Mays?

9  A.  I don't know.

10  Q.  Okay.  But you shared their personal information of the

11  plaintiffs that I named to 34 people on July 8th of 2020,

12  correct?

13  A.  Correct.

14  Q.  And you don't know if they were even being investigated,

15  correct?

16  A.  They were being investigated for the incident at the Cheese

17  Cake Factory on July 7th.

18  Q.  You know that for a fact that these people that I just named

19  were all being investigated for the Cheese Cake Factory?

20  A.  To the best of my recollection, yes.

21  Q.  Who else can we talk to to vouch for what you're saying?

22  A.  I believe Captain Vetter, Captain Shane Wrucke, any of my

23  bosses, any of the detectives on here.

24  Q.  So you were here when Lauryn Cross testified yesterday,

25  correct?

409

1   A.   Correct.

2   Q.   And you heard her testimony that she was never ticketed for

3   anything, correct?

4   A.   Correct.

5   Q.   And you heard her testimony that she was never questioned

6   for anything, correct?

7   A.   Correct.

8   Q.   And you heard her testimony that she was never asked or ever

9   interrogated for having committed a crime, correct?

10  A.   Correct.

11  Q.   She's one of the people that I just named that you put on

12  this target list on July 8th of 2020 and gave it to 34 people,

13  correct?

14  A.   I missed --  I don't remember exactly the names of the

15  people that you just listed off.  There were a lot of names.  If

16  you said that then yes.

17  Q.   So just so you know because we're trying to be very careful

18  with the personal information on this document, so I apologize

19  that we're not giving you all the documents with the list.  But

20  I think defense counsel can agree --

21         MS. BAYNARD:  I have a question.  The exhibit he's

22  looking at doesn't have the version of the list behind.  It is

23  just the email.

24         MS. MOTLEY:  That's correct because we didn't know

25  what to publish or not publish because of the sensitivity of

410

1    everything.

2    Q.  So for this July 8, 2020 email with the target list

3    attached, Lauryn Cross is one of the people that is also on the

4    list?

5              MS. BAYNARD:  Objection, foundation.  The exhibit in

6    front of him doesn't include the list.

7              MS. MOTLEY:  Your Honor --

8              THE COURT:  On Exhibit 209; is that correct?

9              MS. MOTLEY:  That's correct.

10              THE COURT:  My version does have attachments with it.

11    Mr. Ratkowski's does not have attachments with it?

12              MS. MOTLEY:  I can approach, Your Honor.  The issue is

13    what we were unsure to give to the witnesses in terms of the

14    list so --

15              THE COURT:  You may approach him to see if the

16    attachments are with his version.

17              MS. MOTLEY:  Great.  Thank you.

18              MS. BAYNARD:  I want to be clear, I'm fine with

19    admitting or publishing the face of the email.  But if Dominick

20    Ratkowski is going to be asked about the email, I would expect

21    it to be a complete exhibit whether that's shown to the jury or

22    not.

23              THE COURT:  All right.  I've already allowed page 1 to

24    be published.  The attachment will not be published.  But if

25    you're asking about specific plaintiffs, you may direct the

411

1    witness to the page of the attachment and ask him about that

2    individual.

3              MS. MOTLEY:  Yes, Your Honor.  Thank you.

4    Q.  With regards to Exhibit 209 on the second page --  sorry on

5    the 4th page of this document.  Second person down is Lauryn

6    Cross?

7    A.  Yes.

8    Q.  And so you heard testimony from her yesterday, correct?

9    A.  Correct.

10   Q.  Okay.  Her testimony she said she had never been, you know,

11   charged or convicted of a crime, correct?

12   A.  Correct.

13   Q.  And she said no police officer has ever reached out to her

14   as a witness, a suspect or anything with regards to a crime,

15   correct?

16   A.  Correct.

17   Q.  Okay.  And so if you look at your first page of this

18   document, your e-mail.  She wasn't someone that was being

19   investigated with regard to the Cheese Cake Factory.

20   A.  It was my understanding that she was.

21   Q.  Did Shane Wrucke or Captain Vetter tell that you Lauryn

22   Cross was being investigated with regard to the Cheese Cake

23   Factory?

24   A.  I was asked to identify people involved in the Cheese Cake

25   Factory incident.  What the detectives do with the information I

1    provide to them is beyond the scope of my employment.

2    Q.  So you're being asked to provide information with regards to

3    the Cheese Cake Factory.  That's what your testimony is?

4    A.  Correct.

5    Q.  Okay.  So this email seems to suggest that you're

6    voluntarily giving this information.  Here is a list with photos

7    and addresses of the main people who are constantly posting

8    videos photos and comments?

9        MS. BAYNARD:  Objection to the form of the question.

10   Q.  I'm not done yet.  Did someone ask you to --  Was this in

11   response to an email?

12   A.  I don't know.  I would have probably forwarded the email if

13   it were.  But because I was working with the detectives to

14   identify individuals, I wanted to keep all the detectives

15   informed of my progress on identifying for their investigation.

16   Q.  Okay.  But it's your testimony today you're not sure who

17   they were investigating, correct?

18   A.  Correct.

19   Q.  It's your testimony that they didn't say go into the DOT

20   records and get Lauryn Cross' specific personal information,

21   correct?

22   A.  Correct.

23   Q.  Okay.  Now, let's move on to July 13th of 2020.  July 13th

24   of 2020, you sent an email to a Mr. Benke.  Do you recall that?

25   A.  Could I see the email?

1      MS. MOTLEY:  Sure.  Is it okay if the witness looks at

2  Exhibit 250?

3      THE COURT:  Yes.  Direct the witness to the exhibit

4  you want to prior to starting the questions so he's already

5  there with you.

6      MS. MOTLEY:  I'm sorry.  Thank you.

7      THE COURT:  What was the number?

8      MS. MOTLEY:  250.  Excuse me, Your Honor, I ask for --

9  I'm going to go through several emails with him.  Is it okay if

10  I say could you look at this exhibit before I begin question?

11      THE COURT:  Yes, Ms. Motley.  That will help us move

12  things along.

13  Q.  It is small.

14  A.  I'm there.

15  Q.  This July 13, 2020 email, could you please read what it

16  says.

17  A.  Which part?

18  Q.  The I am thinking.

19  A.  "I am thinking you may want this as well."  I am sorry, it

20  is really small.  "I am compiling a list of people who are

21  constantly involved in protests.  If you guys have names, please

22  let me know."

23      MS. MOTLEY:  Your Honor, I ask that this Exhibit

24  Number 250 be published to the jury.

25      THE COURT:  That first page?

1    MS. MOTLEY:  Yes, please.

2    THE COURT:  Any objection?

3    MS. BAYNARD:  No objection to the first page.

4    THE COURT:  The first page may be published.

5 Q.  So this email on July 13th of 2020, you sent is to Adam

6 Benke?

7 A.  Correct.

8 Q.  Adam Benke is not --  was not at least at that time a

9 Wauwatosa Police Officer, correct?

10 A.  Correct.

11 Q.  And you sent Mr. Benke the target list, correct?

12 A.  Correct.

13 Q.  And when you sent it to him, he had not asked for it.  You

14 voluntarily gave it to him?

15 A.  Incorrect.

16 Q.  Please explain.

17 A.  He was investigating a squad crash.  He was a Brookfield

18 detective.  He was investigating a squad crash that occurred on

19 July 7th where the individual that he asked me to identify was

20 present as well at that incident, and he was investigating

21 multiple people who were involved in the squad crash that

22 occurred on I believe Mayfair North Avenue right by the Cheese

23 Cake Factory.

24 Q.  So Mr. Benke was investigating a squad crash that happened

25 on July 7th of 2020.  Is that what I'm understanding?

415

1   A.   Yes.

2   Q.   It involved an individual, correct?

3   A.   Yes.

4   Q.   Okay.  Who was that?

5   A.   I believe it was an individual who later on in the email a

6   little bit further down in the email with a user -- Facebook

7   user name Don Corleon who is identified as Lafayette A Brown.

8   And that individual, I believe, was being investigated with

9   Brookfield -- by Brookfield.

10  Q.   Okay.  I'm glad you skipped to his name, but there are six

11  other names he identified, correct?

12  A.   Incorrect.

13  Q.   Okay.

14       MS. MOTLEY:  Your Honor, I'm sorry.  I'm trying to not

15  cross any lines here.  These six people on the email are not

16  plaintiffs, so are we allowed to say their names or no?

17       THE COURT:  You can ask the witness if any of the six

18  people named are plaintiffs in the case.

19       MS. MOTLEY:  Thank you.

20  Q.   Are any of the six people that are on this email, are they

21  plaintiffs to this case?

22  A.   It doesn't seem like it, no.

23  Q.   Okay.  And so you sent the target list to Mr. Benke because

24  of these six people being involved in this crash or some

25  incident involving a squad car, correct?

416

1    A.   Involving that incident, yes.

2    Q.   So Khalil Coleman, he's not one of the six people, correct?

3    A.   No.

4    Q.   Brandon Wilborn who is also a plaintiff is not part of the

5    six people, correct?

6    A.   Yes.

7    Q.   Mariah Smith is not part of the six people, correct?

8    A.   Correct.

9    Q.   Rebecca Burrell not part of the six people, correct?

10   A.   Correct.

11   Q.   Jacqueline Bogenberger is not part of the six people,

12   correct?

13        MS. BAYNARD:  Objection, asked and answered.  He

14   doesn't think any of the six people are named plaintiffs.  From

15   looking at the names on here, they are not.

16        MS. MOTLEY:  Your Honor, as the Court is aware, the

17   DPPA violations are individual violation.  Every time he

18   disclosed particular plaintiffs' information without a

19   permissible purpose is a violation.  That is why I keep naming

20   the individual plaintiffs.  It is not everybody.  The list is

21   growing.

22        THE COURT:  Objection overruled.  You may proceed.

23        MS. MOTLEY:  Thank you.

24   Q.   I believe we were at Jacqueline Bogenberger is not one of

25   the six people, correct?

417

1    A.   Correct.

2    Q.   Andrew Aaron is not part of the six people, correct?

3    A.   Correct.

4    Q.   Joseph Hayes is not part of the six people, correct?

5    A.   Correct.

6    Q.   Taleavia Cole is not part of the six people, correct?

7    A.   Correct.

8    Q.   Lauryn Cross is not part of the six people, correct?

9    A.   Correct.

10   Q.   Tracy Cole is not part of the six people, correct?

11   A.   Correct.

12   Q.   And you gave the plaintiffs that I named their information

13   also to Mr. Benke on July 13th of 2020, correct?

14   A.   Correct.

15   Q.   Okay.  Thank you.  So let's move on.  Let's go to --  Please

16   turn to Exhibit 200.  So Exhibit 200, could you please explain

17   what this email is?

18   A.   Yes.  It is an email to two Burlington detectives regarding

19   a disruptive protest that occurred at a school board meeting

20   where a large number of the people were related to protests up

21   in Wauwatosa as well, and I believe that they were investigating

22   that incident as well for potential citations.

23   Q.   Okay.

24        MS. MOTLEY:  So Your Honor, may we publish

25   Exhibit 200, please?

418

1          THE COURT:  Page 1.

2          MS. MOTLEY:  Page 1.

3          MS. BAYNARD:  I want to make sure he has a complete

4    version of the exhibit, right.

5          THE COURT:  Yes, you may publish page 1 of 200.

6    Q.  So this exhibit on November 10th, you sent an email to two

7    people, correct?

8    A.  Yes.

9    Q.  Okay.  And with this email, it was sent to people with an at

10   Burlington email address, correct?

11   A.  Correct.

12   Q.  And you state, "I attach a list of known People's Revolution

13   members."  Do you see that?

14   A.  Correct.

15   Q.  Okay.  You stated that this group has been targeting

16   Milwaukee Wauwatosa area for 150 days.  Do you see that as well?

17   A.  Correct.

18   Q.  And you state that they were at this school board meeting,

19   and that you were asking if they needed to identify anybody,

20   correct?

21   A.  Correct.

22   Q.  So you voluntarily sent this list to these two people in

23   Burlington, correct?

24   A.  Incorrect.  This is an email in response to a phone call I

25   had with Detective Rachel Sells from Burlington.  And the email

419

1   is kind of reiterating what we talked about in the phone call.

2   Q.  Do you recall being deposed on June 23rd of 2021?

3   A.  Yes.

4   Q.  And do you recall being deposed on July 27th of 2021?

5   A.  Yes.

6   Q.  Do you recall us asking you for all the people that received

7   this list?

8   A.  Yes.

9   Q.  Okay.  Do you recall ever mentioning to us that you received

10  a phone call from -- I'm sorry -- this woman asking for --  Let

11  me just take a step back.  In your phone call with -- I'm sorry,

12  what was her name?

13  A.  Rachael Sells.

14  Q.  In your phone call with Ms. Sells, did she ask for the

15  target list?

16  A.  I asked her if she needed help identifying individuals.

17  Q.  You voluntarily gave this list to her, correct?

18  A.  She responded to my request or my asking her if she needed

19  help identifying people, and she said yes.

20  Q.  Did you ask her if she had access to the DOT Record TIME

21  System?

22  A.  No, I just assumed because she is a detective she does.

23  Q.  You didn't ask her that?

24  A.  No.

25  Q.  But she would not have known about this target list unless

1  you first told her you had it, correct?

2  A.  Possibly.  I don't know what her involvement was with other

3  incidences, but it would be unlikely.

4  Q.  Okay.  You were sort of advertising that you created a

5  target list, correct?

6  A.  I was assisting them in their investigation.

7  Q.  Okay.  And so was Tracy Cole at that Burlington School Board

8  meeting?

9  A.  I don't recall.

10  Q.  Okay.  I am going to do this the fast way.  Was any of the

11  44 plaintiffs at this Burlington School Board meeting on

12  November 10th of 2020?

13  A.  I believe plaintiff Vaun Mays, Kamila Ahmed, those off the

14  top of my head.

15  Q.  So you said Vaun Mayes, Kamila Ahmed, anyone else?

16  A.  Off the top of my head, those are the two I remember.

17  Q.  Would it refresh your memory if you look through that list

18  and see who you remember as being at that school board meeting?

19  A.  Probably wouldn't.  It was about two and-a-half years ago.

20  Q.  Okay.  Is attending a school board meeting, is that a crime?

21  A.  No.

22  Q.  Okay.  Is attending a school board meeting --  attending a

23  school board meeting warrant an investigation?

24  A.  There was a police response because of the protests

25  involved.  I believe Burlington sent a couple officers to try to

421

1    maintain order at the school board meeting because they had to

2    stop the school board meeting because of the protests.

3    Q.  Were you there?

4    A.  I observed a Facebook video.

5    Q.  And so what did you observe Andrew Aaron do at the school

6    board meeting to send his personal information to them?

7    A.  I don't recall him being there.

8    Q.  So you don't recall him being there?

9    A.  I don't remember.

10   Q.  Okay.  Robert Agnew, what was he doing at the school board

11   meeting?

12   A.  I don't remember.

13   Q.  Okay.  Kamila Ahmed, what was she doing at the school board

14   meeting?

15   A.  I believe she was yelling at one of the school board

16   members.

17   Q.  Okay.  Do you know if she was ever charged with a crime for

18   being at Burlington?

19   A.  No.

20   Q.  Does Burlington have Internet access?

21   A.  I assume so.

22   Q.  Okay.  So these officers have access to the TIME System

23   themselves, correct?

24   A.  I don't know.

25   Q.  You assume the detective you sent this to probably does,

422

1    right?

2    A.  Correct.

3    Q.  So she didn't need your list necessarily to get Kamila

4    Ahmed's information, correct?

5    A.  She would likely have needed the information to identify her

6    to get her DOT information.

7    Q.  Did she ever come to you specifically and say hey, here's a

8    picture of Kamila.  Who is this?  She was at the Burlington

9    meeting?

10   A.  That specific, no.

11   Q.  Did she ever ask for Kamila's date of birth information?

12   A.  I don't think so.

13   Q.  Did she say we need to have her driver's license photo?

14   A.  I don't remember.

15   Q.  Did she say we need to have her home address?

16   A.  Again, I don't remember.

17   Q.  Those were three pieces of information that you got from the

18   DOT for Kamila, correct, page 11?

19   A.  I don't know where I got her address from.

20   Q.  But it notes as of February 25, 2018 for every other entry

21   for plaintiffs, it says DOT as of and a date?

22   A.  That could have came from a C-Cap entry, a TRO entry.  They

23   have dates on when the addresses are updated.

24   Q.  Great.  You don't know if you got her address from the DOT?

25   A.  Correct.

423

1    Q.  Where did you get her date of birth?

2    A.  I don't know specifically her date of birth.

3    Q.  But you definitely got her picture on the left-hand side

4    from her motor vehicle record, right?

5    A.  Yes.

6    Q.  So let's move on.  Jackie Bogenberger.  Was she at the

7    Burlington meeting?

8    A.  I don't recall.

9    Q.  Lavita Booker?

10   A.  I don't recall.

11   Q.  Rebecca Burrell, page 2.

12   A.  I don't remember off the top of my head.

13   Q.  Raine Cich?

14   A.  I don't remember.

15   Q.  Khalil Coleman?

16   A.  I don't remember.

17   Q.  Tahudah Cole?

18   A.  I don't remember.

19   Q.  Taleavia Cole?

20   A.  I don't remember.

21   Q.  Tracy Cole?

22   A.  I don't remember.

23   Q.  Steven Conklin.

24   A.  He may have been, but I don't remember.

25   Q.  Okay.  Lauryn Cross?

424

1   A.   I don't remember.

2   Q.   Erik Fanning?

3   A.   I don't remember.

4   Q.   Jessica Fenner?

5   A.   I don't recall.

6   Q.   Christine Groppi?

7   A.   I don't recall.

8   Q.   Gaige Grosskreutz?

9   A.   I don't remember.

10   Q.   Joseph Hayes?

11   A.   I don't remember.

12   Q.   I'm going to read some names and then you tell me if you

13   recall them being there.  Adante Jordan, Mary Kachelski, Sean

14   Kafer, Joseph Koepp.  Do you recall if they were there any of

15   those?

16   A.   Joey Koepp may have been, but I don't remember off the top

17   of my head.

18   Q.   Joey Koepp may have been there.  I will read five more

19   names.  John Larry, Alex Larson, Sonora Larson, Molly Nilssen,

20   Shawn Page.

21   A.   I don't remember.

22   Q.   Carmen Palmer, Oscar Rodriguez, Rosalind Rogers, Madeline

23   Schweitzer, Mariah Smith?

24   A.   Mariah Smith and Rosalind Rogers may have been, but I don't

25   remember.

425

1   Q.  Peter Sparks, Tiffany Stark, Angel Vega, Gabriella Vitucci,

2   Tristiana Walls.

3   A.  I don't remember.

4   Q.  Oscar Walton, Jayden Welch, Britta Welch, Brandon Wilborn,

5   Trisha Wilson and Katelyn Wojnar.

6   A.  I don't remember.

7   Q.  One thing you didn't do with this email is name any of the

8   plaintiffs that were at this meeting, correct?

9   A.  Correct.

10  Q.  Okay.  So even those that you may recall, you're not

11  100 percent certain that they were actually there, correct?

12  A.  Correct.

13  Q.  And so again Burlington --  You volunteered to Burlington

14  that you had the document that you created, the target list.

15  And based on your conversation, you gave this to them?

16          MS. BAYNARD:  Objection, asked and answered.

17          THE COURT:  Sustained as to compound.

18          MS. MOTLEY:  Sorry.

19  Q.  For all the people that were not at this Burlington School

20  Board meeting, you had no legitimate law enforcement function to

21  give their personal information from their DOT records to these

22  two people, correct?

23          MS. BAYNARD:  Objection, compound.

24          THE COURT:  Overruled.  It may be answered.

25          THE WITNESS:  Can you repeat the question?

426

1    Q.  For all the people whom I named, the plaintiffs that weren't

2    at this school board meeting, you had --  You did not have a

3    legitimate law enforcement purpose to provide their personal

4    information for their DOT records to these two people on

5    November 10th of 2020, correct?

6    A.  It was my understanding that they were investigating the

7    incident involving many of the people that may have been up in

8    Wauwatosa throughout 2020, and it was --  I didn't sift through

9    the Facebook video that I observed and identify every single

10   person who was there.  It was --  I provided them the

11   information for their investigation so they could go through the

12   video and identify and take their legal action that they needed

13   to.

14   Q.  So it's your testimony that they were also investigating

15   Wauwatosa protests, these two people?

16   A.  No.  The protests that occurred in Burlington involved the

17   same roughly about the same people involved in the Wauwatosa,

18   and there's part of the collaborative information sharing

19   network between law enforcement agencies.

20   Q.  Okay.  So my question is, your answer before was that they

21   were --  I guess I'm confused with your answer.  So with regards

22   to Burlington just to be clear, they were not investigating any

23   activity or protests in Wauwatosa when you sent this email on

24   November 10, 2020, correct?

25   A.  Correct.

427

1    Q.   Okay.  So this email where you attach the target list was in

2    relation to the school board meeting in Burlington, correct?

3    A.   Correct.

4    Q.   So people who were not at this school board meeting then

5    they could not be investigated for being at a school board

6    meeting that they weren't present for, correct?

7              MS. BAYNARD:  Object to the form of the question.

8              THE COURT:  Overruled.

9              THE WITNESS:  Can you repeat it?

10   Q.   Sure.  If a plaintiff was not at this meeting for

11   Burlington, then these two people should not have gotten their

12   personal information, correct?

13   A.   Because the list was one single document and I didn't go

14   through each video to identify everyone who was there, it was

15   sent to them as an intelligence document, part of the

16   information sharing for them to work on their investigation,

17   identify people who were there, relevant people who were there

18   and then throughout the course of their investigation.

19   Q.   Even though a person was at this school board meeting,

20   there's nothing in this email that says any crimes were

21   committed, correct?

22   A.   In the specific email, no.

23   Q.   And so people that were not --  So you treated this list as

24   though if there's a protest, then you have the right to just

25   send this personal information, whether a person was there or

428

1    not, correct?

2    A.   That is part of the information sharing system between law

3    enforcement.  We have a tendency to share a bunch of

4    intelligence information back and forth.  And because this

5    investigation, this incident occurred involving people that I

6    recognized, I sent them the information as part of that

7    information sharing system.

8    Q.   Okay.  So you recognize people, but you didn't call her and

9    say hey, these were the plaintiffs that were at that meeting,

10   correct?

11              MS. BAYNARD:  Objection, asked and answered.

12              MS. MOTLEY:  We never asked this question.

13              THE COURT:  Please address your answers to me.  The

14   objection is overruled.  It is addressed.  Future objections to

15   me.

16              THE WITNESS:  Can you repeat it again?  I'm sorry.

17              MS. MOTLEY:  Could you read that back?

18       (Question read by reporter.)

19   Q.   Did you ever explain to these two people whom you sent this

20   email to that a lot of the people, the plaintiffs, may not have

21   been there, but I'm just giving you their personal information?

22   A.   I don't recall specifically saying that.

23   Q.   Okay.  Do you understand that as part of your training to

24   have access to DOT information, that you are required to

25   disclose people's personal information only if there is a

429

1   purpose permitted by the law.  Are you aware of that?

2   A.  Yes.

3   Q.  So if you're giving information to people as part of an

4   investigation and you don't know if those people were there, do

5   you understand that that is not a purpose permitted under the

6   DPPA?

7               MS. BAYNARD:  Objection, argumentative.

8               THE COURT:  Sustained.

9   Q.  It sounds like you treated this list --  Well, it sounds

10  like with regards to plaintiffs' personal information, you would

11  just voluntarily give it to people if there was a protest that

12  you may have observed on social media.  Is that accurate?

13              MS. BAYNARD:  Argumentative, asked and answered.

14              THE COURT:  Overruled.

15              THE WITNESS:  I'm sorry, can you repeat?

16  Q.  It sounds like that as relates to this target list that if

17  you observed some type of protest on social media, that you

18  would just share it voluntarily with people.  Is that accurate?

19  A.  Not 100 percent.  I would --  If there was a protest

20  involving some of the people that I recognize, I would reach out

21  to those -- to a detective at that agency and see if they would

22  like intelligence that we've gathered from our incidences so we

23  can share that information and they can use it throughout the

24  course of their investigation.

25  Q.  Okay.  But you never communicated to the people whom you

1    provided this document to who was present or who wasn't present

2    for whatever incident you were forwarding this information for?

3    A.  Correct.

4    Q.  Okay.  Let's move on.  Let's go please to Exhibit 198,

5    please.

6    A.  I am there.

7    Q.  Could you please explain for the jury what you're looking

8    at?

9    A.  This is an email to two Racine County Sheriffs regarding the

10   same email we just talked about.

11           MS. MOTLEY:  Your Honor, I ask we publish Exhibit 198

12   to the jury.

13           THE COURT:  Any objection to publishing this one page

14   email?

15           MS. BAYNARD:  No objection.

16           THE COURT:  It is received, and may be published.

17   Q.  So this is another email you sent to two different people

18   regarding the same Burlington School Board meeting on

19   November 10, 2020, correct?

20   A.  Correct.

21   Q.  And again for all the plaintiffs that I named, you aren't

22   sure if they were present for this school board meeting,

23   correct?

24   A.  Correct.

25   Q.  And just to clarify even if they were present for this

431

1    school board meeting, to your knowledge none of the plaintiffs

2    were charged or questioned as committing a crime, correct?

3    A.  To my knowledge.

4    Q.  But you were just sharing 44 plaintiffs' information again,

5    isn't that accurate?

6    A.  Again, it was involved in their investigation.  I was

7    sharing intelligence that we gathered throughout the course of

8    2020 with them for their investigation.

9    Q.  How is it intelligent to share people's information that

10   weren't present for an event?

11   A.  Because I don't know if they were present, and it is the

12   responsibility -- From my understanding, it would have been

13   their investigation to identify who was there and who wasn't.

14   Q.  So you don't know --  It's your understanding that you can

15   just share people's or you did share plaintiffs' personal

16   information.  It doesn't matter if they were present or not, but

17   you can do that and that's okay.

18   A.  I assumed it was for their investigation.  I was helping

19   with their investigation.

20   Q.  Did you ever have a conversation with Susan Conley or Andrew

21   Willis and explain to them that you're not even sure if any of

22   these plaintiffs were at this meeting?

23   A.  Specifically them, no.

24   Q.  Did you ever have a conversation with Susan Conley, Andrew

25   Willis and tell them where you got this information of the 44

432

1  plaintiffs from to put them on this document that you sent?

2  A.  No.

3  Q.  Did you have a conversation with anybody whom you sent this

4  document to outside of Wauwatosa and explain to them where you

5  got this information that you put on this document of the 44

6  plaintiffs?

7  A.  Regarding typically where I got the information, I don't

8  believe so.

9  Q.  So they don't know necessarily that you got this from the

10  DOT?

11         MS. BAYNARD:  Objection, asked and answered.

12         THE COURT:  Sustained.

13  Q.  Would you want to be on this document?

14         MS. BAYNARD:  Objection, argumentative.

15         THE COURT:  Sustained.

16  Q.  Do you think you had a right to share 44 plaintiffs'

17  personal information with Susan Conley and Andrew Willis on

18  November 10th of 2020?

19  A.  I believed it was a part --  I believed it was a part of

20  their investigation, so I believe that was for a law enforcement

21  purpose that I was understanding.

22  Q.  Did they --  You voluntarily gave them this document,

23  correct?

24  A.  Correct.

25  Q.  And they didn't ask for it, correct?

433

1  A.  These individuals I don't believe so.  I believe I was

2  directed to them by Rachael -- Detective Sells from Burlington.

3  Q.  So you just gave them this document, and they didn't know

4  that it existed before you gave it to them, correct?

5  A.  Likely.

6  Q.  Did you tell them that the information on here was

7  sensitive?

8  A.  I don't recall.  I don't think so.

9  Q.  Did you tell them anything with regards to this document in

10  terms of to not share it with anybody?

11  A.  I don't believe so.

12  Q.  Do you understand the Driver's Policy Protection Act?

13  A.  Yes.

14  Q.  What do you understand about it?

15  A.  That we have the ability to look up individual's information

16  if we have a law enforcement purpose.

17  Q.  Do you understand the other part where people have a right

18  for their privacy to be protected unless there is a permissible

19  purpose to obtain their information from the DMV?

20  A.  Yes.

21  Q.  And with these plaintiffs, is it your testimony today that

22  it didn't matter if they were at an event.  But because you work

23  in law enforcement, you can just share their personal

24  information?

25          MS. BAYNARD:  Objection, argumentative, asked and

434

1    answered specifically with this document she's referencing.

2          MS. MOTLEY:  Your Honor, I think his testimony today

3    has demonstrated --

4          THE COURT:  You may narrow and make it specific,

5    Ms. Motley.

6    Q.  With regards to these 44 plaintiffs Mr. Ratkowski, do they

7    have a right to their private information not being disclosed

8    from the DOT?

9    A.  Based on the DPPA, yes.

10   Q.  And for these 44 plaintiffs, they have a right to and that

11   right goes to their information being disclosed to anybody,

12   correct?

13   A.  Again, I believe you can share it with law enforcement

14   agencies.  We have a law enforcement purpose.

15   Q.  You believe as long as you're sharing this document with a

16   law enforcement agency or sharing 44 plaintiffs' personal

17   information whether they're being investigated or not, it's

18   okay.

19         MS. BAYNARD:  Objection, Your Honor, asked and

20   answered.

21         THE COURT:  Sustained, previously answered.

22   Q.  Let's take one of the plaintiffs as an example.  I believe

23   you stated that Tracy Cole was not at this Burlington School

24   Board meeting, correct?

25   A.  I don't recall her.

435

1    Q.  Okay.  And just for the record, it was a school board

2    meeting, right?

3    A.  Yeah.

4    Q.  So people are expected to go to meetings, right?

5    A.  Correct.

6    Q.  Okay.  And you don't work for Burlington, right?

7    A.  I do not.

8    Q.  You're not a law enforcement officer?

9    A.  I am not.

10        MS. BAYNARD:  Objection, asked and answered.

11        THE COURT:  Excuse me.  There's an objection.  The

12   objection is overruled.  You may answer the question.

13        THE WITNESS:  I am not an officer.

14   Q.  Okay.  And you do understand that protesting is a

15   constitutional right, correct?

16   A.  Correct.

17   Q.  Do you believe that these 44 plaintiffs by virtue of them

18   protesting, that you don't have to protect their private

19   information from their DMV records?

20   A.  Can you rephrase that?

21   Q.  Sure.  Do you believe these 44 plaintiffs have a right to

22   their personal information from their DOT records being

23   protected also by you?

24   A.  Yes.

25   Q.  So what did you do to protect these 44 plaintiffs' personal

436

1  information from their DMV records?

2  A.  I only sent their information to law enforcement personnel

3  with the understanding that they understand the privacy as well

4  that they wouldn't share it among random people that weren't in

5  law enforcement.

6  Q.  How would they understand the privacy if you didn't

7  communicate that to them?

8  A.  Because it is common practice in law enforcement to

9  understand private information based on not to share information

10  with random citizens.

11  Q.  So you think because this is what you know that everyone

12  whom you shared this document with knows that as well?

13          MS. BAYNARD:  Objection, asked and answered.

14          THE COURT:  Sustained.

15  Q.  Brian Conte on September 24th of 2020, you told him to feel

16  free to pass this along to whomever you think would find this

17  useful, correct?

18  A.  Correct.

19  Q.  Who did he send it to?

20  A.  I don't know.  I don't know if he even sent it to anyone.

21  Q.  Do you know if 44 plaintiffs' information went outside the

22  State of Wisconsin?

23  A.  I don't know.

24  Q.  Do you know if 2,000 people received 44 plaintiffs'

25  information?

1          MS. BAYNARD:  Objection, Your Honor, relevance.

2          MS. MOTLEY:  Your Honor, I'm trying to go to the

3   willful reckless with regards to the DPPA.

4          THE COURT:  What's the foundation for the question?

5   This 2,000, what's the foundation?

6          MS. MOTLEY:  Your Honor, what I'm trying to

7   demonstrate is Mr. Ratkowski created a list with plaintiffs'

8   personal information.

9          THE COURT:  I believe --  I believe you asked

10  Mr. Ratkowski previously whether he knew once he sent it to a

11  person who else they sent it to.

12         MS. MOTLEY:  Correct.

13         THE COURT:  So that line of question he already

14  answered it, but you may wrap that up.  Does he know once it

15  passes his hand who else was it sent to, does he know that?

16         MS. BAYNARD:  Your Honor as well relevance, any

17  secondary disclosure is not what were here for today.

18         MS. MOTLEY:  That's not --

19         THE COURT:  You may ask that question.  Let's wrap up

20  this chapter.

21         MS. MOTLEY:  Sure, Your Honor.

22  Q.  So back to the point.  With regards to 44 plaintiffs'

23  information, you never told anyone that this information came

24  from the DOT records, correct?

25  A.  Apart from the notations, no.

1    Q.  With regards to these 44 plaintiffs' information, you never

2    told anyone whom you disclosed or at least the five people that

3    we showed that you disclosed this information to, that this was

4    confidential information, correct?

5    A.  Correct.

6    Q.  And you used this document with 44 plaintiffs' information

7    at least 197 times, correct?

8    A.  I believe that's what I stated.

9            MS. MOTLEY:  Thank you.  I have nothing further.

10           THE COURT:  Thank you, Ms. Motley.  Ms. Baynard.

11           MS. BAYNARD:  As we already stated on the record, we

12   intend calling Dominick Ratkowski in our case in chief.

13           THE COURT:  Mr. Ratkowski, you may step down.  As

14   Mr. Ratkowski is stepping down, let's all stand and stretch.

15   Ms. Motley, your next witness.

16           MS. MOTLEY:  We'd like to call Katie Schuh with the

17   DOJ.

18           Katie Schuh, being first duly sworn to tell the truth,

19   the whole truth, and nothing but the truth, testified as

20   follows:  Clerk lurk please be stated state and spell your full

21   name for the record

22           THE WITNESS:  Hi.  My name is Katie Schuh, K-a-t-i-e,

23   S-c-h-u-h.

24   **DIRECT EXAMINATION BY MS. MOTLEY:**

25   Q.  Good afternoon, Ms. Schuh.  Thank you for being here today.

439

1   Could you please explain your job duties at the Department of

2   Justice.

3   A.   Sure.  I am the Deputy Director of the Crime Information

4   Bureau at the Department of Justice.

5   Q.   And what are some of your job duties?

6   A.   So the crime information bureau houses four different areas,

7   the Firearms Unit, the CCW Licenses of the State of Wisconsin,

8   the Criminal History Repository and the Wisconsin TIME System.

9   Q.   And with regards to the Wisconsin TIME System, we've heard a

10  little bit about that.  Is that the system by which there are

11  DOT records in that system?

12  A.   Yes.  The TIME System is a network that connects law

13  enforcement to various databases, DOT being one of those

14  databases.

15  Q.   In order to have access to the TIME System, you have to be a

16  law enforcement or how do you get access to the TIME System?

17  A.   Law enforcement or criminal justice agencies that meet the

18  definition of a law enforcement or criminal justice agency as

19  defined by the Code of Federal Regulations.

20  Q.   Okay.  And there's a training to have access to the TIME

21  System, correct?

22  A.   Yes, that's required.

23  Q.   And are you part of that training?

24  A.   Yes.

25  Q.   In what way?

1    A.  I oversee the time and technical unit which sets the

2    training on a yearly basis.  It updates the training for law

3    enforcement and publishes the training on an annual basis on

4    line and in-person training.  We have trainers that go out and

5    train and so we oversee the content of those training courses

6    and make sure that everything is up to date and correct.

7    Q.  And how often does someone have to take the training in

8    order to have access to the TIME System?

9         MR. WIRTH:  Judge, we're going to object.  This was

10   part of a pretrial motion.  This witness was identified for a

11   limited purpose to authenticate documents.  We're now going into

12   training.  We're going into accreditation.  This material is not

13   what the Court permitted for this witness.

14        THE COURT:  Sustained, consistent with the pretrial

15   ruling.  You may continue.

16        MS. MOTLEY:  Your Honor, may I make a record?

17        THE COURT:  Yes, you may.  We'll make a record at

18   sidebar real quickly.

19      (Sidebar discussion.)

20        MS. MOTLEY:  Your Honor, this witness -- There's been

21   testimony that of how people have access to the TIME System.  It

22   is inconsistent with exactly how people actually have access to

23   the TIME System.  We're allowed to impeach other witnesses.  We

24   weren't expecting to talk about the DOT records, but we didn't

25   expect for there to be inconsistent testimony as to how one goes

1    to the TIME System, accesses specific DOT information, and so

2    that's why going in with her who is a trainer of the TIME System

3    to address those statements that we are allowed to impeach

4    witnesses with.

5            MR. WIRTH:  In response.  This witness was already

6    struck once and was resurrected on the idea that they would be

7    here to identify documents, authenticate them, not that they

8    would give substantive testimony on the training, practices and

9    procedures with the TIME System or the record keeping with the

10   Department of Transportation.

11           What we're doing now is we are doing exactly what the

12   defense was concerned about.  We're using this witness as a

13   substantive witness in an environment where she was offered as

14   an occasion witness.

15           THE COURT:  All right.  Consistent with the pretrial

16   ruling, Ms. Motley, you had represented that this would be a

17   very brief witness, very brief witness to authenticate DOJ

18   records and nothing more, so I'm going to stand by that ruling.

19           And as already noted, this witness was already

20   excluded for late disclosure, late naming as a witness, but I

21   had reconsidered it in light of the argument that plaintiffs

22   made that this is limited purpose, brief, no skin in the game,

23   nothing substantive, just some records.  So consistent with

24   that, that's the questioning you should do and move on.

25           (Back on the record.)

442

1          MS. MOTLEY:  Your Honor, I'm going to take the

2    questions from the table.

3          THE COURT:  Yes, please take your time.

4    Q.  Ms. Schuh, do you recall providing documents to myself as

5    well as or actually to myself in relation to the TIME System?

6    A.  I recall responding to subpoenaed records as part of the

7    opens record request, yes.

8    Q.  Do you recall us in that subpoena asking for the documents

9    pertaining to I don't know if you've seen the list but the

10   plaintiffs in this matter?

11   A.  There was a list of about 60 or so different names on

12   different time periods.  Yes, I recall.

13   Q.  And were those documents made in the ordinary course of

14   business?

15   A.  Yes.

16   Q.  Are those documents true and correct copies of the

17   information that was obtained from the TIME System?

18   A.  Yes.

19   Q.  And could you please explain the documents that you provided

20   to us as a result of that subpoena?

21   A.  Sure.  So there were two different versions of the document.

22   We provided I believe a spreadsheet that showed a list of the

23   queries that were made pursuant to the names that were attached

24   in the subpoenaed records, and then we attached the responsive

25   records that the law enforcement officer would query, the name

                                                              443

1    they had received in response to their query.

2    Q.  As part of the documents that you provided, there are DOT

3    records in those documents, correct?

4    A.  Yes.

5    Q.  And as part of the documents that you provided, how can you

6    differentiate between the DOT records versus non-DOT records?

7    A.  The way that our system is built, configured, there is a

8    line item in the excel spreadsheet that says this is the DOT

9    response.  When you click on a hyperlink to that, it will take

10   you to the response that the Wisconsin DOT returned in response

11   to the record that was queried on the previous page, so you'll

12   see the name and the officer that queried it.  You'll see this

13   was the DOT line.  You click on a hyperlink, and it will take

14   you to the record that DOT responded with.

15   Q.  Thank you.  And as part of that response with regards to the

16   record itself, the DOT records, do they indicate for instance

17   things such as the status of someone's license?

18   A.  Yes.  If there is a valid hit response where DOT returned a

19   record that contained a record based on the name that was

20   submitted, you get a copy of their driver's license, and it

21   contains all of the information that would normally display on

22   your driver's license, including the status of the license.

23   Q.  And what are some other things that would be within those

24   records in a TIME System that would come up from the DOT?

25   A.  So the TIME System is just the network that connects law

1    enforcement to the different databases.  So when an officer

2    submits a query and selects either DOT or pulls up the form and

3    submits the query that is programmed to go to the DOT, DOT will

4    do a search of their database, based on the information that is

5    provided upon the query, and DOT will return the responsive

6    record.

7              So in the DOT record response, you'll see the header

8    information, you will see the license information including last

9    name, first name, height, weight, date of birth, address, and

10   then you'll see the license status.  You'll also see prior

11   convictions or their driver's license history shows up there.

12   Also see potentially if they've moved out of state or if they've

13   had a former name or anything that's on their driver's history.

14   Q.  Thank you.  Just to be clear.  Within the DOT documents,

15   you'll see their driver's license status, their height, weight,

16   address, any convictions?

17   A.  Yes.

18   Q.  And eye color, hair color.  Is that also included in that?

19   A.  Yes.

20   Q.  And in relation to the subpoena, I'd like to read some names

21   to verify that these are the records that you gave us for

22   particular people?

23   A.  Okay.

24   Q.  So I have that you gave us information for Andrew Aaron?

25   A.  I don't recall all of the names on the subpoena.  It was a

1   while ago, but I do know that based on the subpoena, we provided

2   records that related to all of the names on the subpoena.

3   Q.  Okay.  So I'm just going to read the names for the record if

4   that's okay?

5           THE COURT:  You may.

6   Q.  And what I'm referring to is what's in plaintiffs' Exhibits

7   25 through 130.

8           THE COURT:  Does the witness have that before her?  It

9   is exhibit --  What is the exhibit number again?

10          MS. MOTLEY:  Twenty-five.

11          THE COURT:  Yes.  Ms. Knowlton, if you help the

12  witness locate it in the binder.

13  Q.  Ms. Schuh, to clarify within those DOT records, is a

14  person's driver's license number; is that correct?

15  A.  Yes.

16  Q.  Thank you.  So the documents that you provided to us

17  starting with 25, did you provide to us Andrew Aaron's

18  information?

19  A.  Yes.

20  Q.  And that would be and for everyone we're talking about the

21  TIME System log and the log spreadsheet?

22  A.  Yes.

23  Q.  Did you provide Kamila Ahmed's information?

24  A.  Yes.

25  Q.  Robert Agnew?

446

1    A.  Yes.

2    Q.  Isiah Baldwin?

3    A.  Yes.

4    Q.  Jacqueline Bogenberger?

5    A.  Yes.

6    Q.  Lavita Booker, we have the TIME System log?

7    A.  Yes.

8    Q.  Rebecca Burrell?

9    A.  Rebecca Wigley.

10   Q.  Rebecca Burrell Wigley thank you.  Number 39, Raine Cich?

11   A.  Yes.

12   Q.  Forty-one, Khalil Coleman?

13   A.  Yes.

14   Q.  Forty-three, Tahudah Cole?

15   A.  Yes.

16   Q.  Forty-five, Taleavia Cole?

17   A.  Yes.

18   Q.  Forty-seven, Tracy Cole?

19   A.  Yes.

20   Q.  Forty-nine, Steven Conklin?

21   A.  Yes.

22   Q.  Fifty-one, Lauryn Cross?

23   A.  Yes.

24   Q.  Fifty-three, Erik Fanning?

25   A.  Yes.

1  Q.  Fifty-five, Jessica Fenner?

2  A.  Yes.

3  Q.  Fifty-seven, Alex Larson?

4  A.  It appears there were no records found responsive to that

5  name.

6  Q.  Thank you.  Fifty-nine, Christine Groppi?

7  A.  Yes.

8  Q.  Sixty-one, Gaige Grosskreutz?

9  A.  Yes.

10  Q.  Sixty-three, Joseph Hayes?

11  A.  Yes.

12  Q.  Sixty-five, Adante Jordan?

13  A.  Yes.

14  Q.  Sixty-seven, Mary Kachelski?

15  A.  Yes.

16  Q.  Sixty-nine, Sean Kafer?

17  A.  Yes.

18  Q.  Seventy-one, Joey Koepp?

19  A.  Yes.

20  Q.  Seventy-three, John Larry?

21  A.  Yes.

22  Q.  Seventy-five, Joanna Geisler?

23  A.  Yes.

24  Q.  Seventy-seven, Sonora Larson?

25  A.  Yes.

448

1   Q.  Seventy-nine, Vaun Mays?

2   A.  Yes.

3   Q.  Eighty-one, Molly Nilssen?

4   A.  Yes.

5   Q.  Eighty-three, Shawn Page?

6   A.  Yes.

7   Q.  Eighty-five, Carmen Palmer?

8   A.  Yes.

9   Q.  Eighty-seven, Oscar Concepcion Rodriguez?

10  A.  Yes.

11  Q.  Eighty-nine, Rosalind Rogers?

12  A.  Yes.

13  Q.  Ninety-one, Angel Vega?

14  A.  Yes.

15  Q.  Ninety-three, Madeline Schweitzer?

16  A.  Appears there were no records found responsive to that name.

17  Q.  Thank you.  Ninety-four, Mariah Smith?

18  A.  Yes.

19  Q.  Ninety-five, Peter Sparks?

20  A.  Yes.

21  Q.  Ninety-seven, Tiffany Stark?

22  A.  Yes.

23  Q.  Ninety-nine, Gabriella Vitucci?

24  A.  Yes.

25  Q.  Now 104, Angeletta Carson?

449

1    A.  Yes.

2    Q.  106, Jill Ferguson?

3    A.  Yes.

4    Q.  108, Destiny Jones?

5    A.  Yes.  It looks like there were no records found responsive

6    to that name.

7    Q.  Thank you.  109, Lazarito Matheu?

8    A.  Yes.

9    Q.  111, Leah Porter?

10   A.  Yes.

11   Q.  113, Nathan Sable?

12   A.  Yes.

13   Q.  115, Christina Vitolo-Haddad?

14   A.  Yes.

15   Q.  117, Oscar Walton?

16   A.  Yes.

17   Q.  119, Jayden Welch?

18   A.  Yes.

19   Q.  121, Britta Welch?

20   A.  Yes.

21   Q.  123, Suzanne Wells?

22   A.  Yes.

23   Q.  125, Brandon Wilborn?

24   A.  Yes.

25   Q.  127 Trisha Wilson?

450

1    A.  Yes.

2    Q.  129 Sonja Worthy?

3    A.  Yes.  It appears there were no records found responsive to

4    that name.

5    Q.  130, Tristiana Walls?

6    A.  Yes.  And it also appears there were no records responsive

7    to that name.

8    Q.  186, Kathelyn Wojnar?

9    A.  This ends at 150.

10   Q.  Sorry 150.  Okay.  So for all the records that we named,

11   these are all kept in the ordinary course of business?

12   A.  Yes.

13          MS. MOTLEY:  Your Honor, we ask these records be

14   authenticated for the record.

15          THE COURT:  Any objection?

16          MR. WIRTH:  We have no objection to authentication,

17   Judge.

18          MS. MOTLEY:  Your Honor, we also ask all the records

19   be admitted to the Court.

20          THE COURT:  Any objection?

21          MR. WIRTH:  We do object to that, Your Honor.

22          THE COURT:  I will take up argument on that later.

23   Reserve argument on that.  Anything further, Ms. Motley?

24   Q.  Yes a couple things.  With regard to the driver's license

25   number, that is only found in the DOT records with the TIME

1  System, correct?

2          MR. WIRTH:  Let me object to that, Judge.  It goes

3  beyond this witness' stated purpose for testimony.

4          MS. MOTLEY:  Your Honor, I believe it doesn't.  She's

5  here to discuss the records and what's in the records in terms

6  of when we look at those records, you know, what we should be

7  looking for.

8          THE COURT:  What we should be looking for.

9          MS. MOTLEY:  In terms of the driver's license numbers,

10  that that's something that's in the DOT records.  For instance,

11  it is not in a CIB record.

12          THE COURT:  You're describing what's contained in the

13  records she has brought?

14          MS. MOTLEY:  Correct.

15          THE COURT:  You can ask what her is contained in the

16  records she's brought.

17  Q.  And with regard to the records that you brought as it

18  relates to the DOT records, is the driver's license numbers only

19  in the DOT records of the records you brought?

20  A.  So the records that I brought are records that are

21  responsive to the queries that were submitted by law

22  enforcement.  The queries that were submitted by law enforcement

23  did not pertain just to DOT.  There were also different

24  databases that they searched.

25          Within those databases, the driver's license number

452

1    can be found outside of the DOT records, for instance in an NCIC

2    wanted person file or in a CIB wanted person record.

3    Q.   But in terms of when we look at those databases of which you

4    provided within the database, how do we know what's in -- what

5    is the DOT report?

6    A.   The DOT prefaced by DOT.

7    Q.   It says DOT on the document?

8    A.   Yes.

9    Q.   How do we know that that DOT record has ended in the

10   documents that you provided in the record?

11   A.   There is a page that says page 1 of 2, and it says end of

12   record.

13   Q.   Okay.  Thank you.

14          MS. MOTLEY:  I have nothing further.

15          THE COURT:  Thank you.  Anything?

16   **CROSS EXAMINATION BY MR. WIRTH:**

17   Q.   Ms. Schuh, I have very, very few questions for you.  As

18   you've just testified, driver's license numbers can be found in

19   databases other than the DOT database, correct?

20   A.   Correct.

21   Q.   With respect to the documents you brought into the courtroom

22   or you produced in response to the subpoena, what is the start

23   date of those documents?

24   A.   It depends.  Our logs are only maintained for a period of

25   about 15 months.  So I believe when this was queried, our

1  records went back to October 10th of 2020.  Currently, our

2  database goes back to November 10th of 2021.

3  Q.  So with respect to the records that were produced in

4  response to the subpoena that was served on you, there are no

5  records that predate October of 2020, correct?

6  A.  I believe that is correct.

7  Q.  So nothing in that binder would in any fashion indicate an

8  inquiry of the TIME System DOT category for any individual

9  before October of 2020?

10  A.  Correct.

11  Q.  The inquiries made to the TIME System will indicate an

12  organization that does a query search?

13  A.  Correct.

14  Q.  Is there anything in the record that indicates which

15  individual within the organization did the query?

16  A.  Yes.

17  Q.  And that's in a category that is essentially a code,

18  correct?

19  A.  It is.  It is in the operator slash user ID field.

20  Q.  What that inquiry tells is that operator made a query?

21  A.  Correct.

22  Q.  It does not tell for what purpose, correct?

23  A.  No.  There is occasionally a spot for a purpose code or

24  intention line, and you could infer from the intention line for

25  what purpose the query was run.

454

1    Q.   And in most instances it's a request for a database that's

2    being searched?

3    A.   Correct.

4    Q.   This request to search a database could be the CIB?

5    A.   Correct.

6    Q.   Could be the NCIC?

7    A.   Correct.

8    Q.   Does the TIME System connect to the TLO System?

9    A.   No.

10   Q.   Then DOT is one of the categories?

11   A.   Yes.

12   Q.   Are there other categories?

13   A.   Yes.

14   Q.   What are the other categories?

15   A.   C-Cap; NCIC; NLETS; III; Wisconsin Criminal History; DOT;

16   DOC; Department of Transportation; Department of Corrections;

17   Department of Natural Resources; the in-state hot files, which

18   we call our CIB reports; NCIC hot files, which are their wanted

19   missing person records; III, which is the FBI's criminal history

20   database called the Interstate Identification Index; Wisconsin

21   Criminal History Database; C-Cap, which is court records; and

22   then in a few instances the Protect database, which is the DEA's

23   Case Management System.

24   Q.   So an inquiry by a record seeker could produce results --

25   could produce data from as many as a dozen different databases?

455

1    A.   Correct.

2              MR. WIRTH:  I have nothing further.

3              THE COURT:  Ms. Motley, anything further?

4              MS. MOTLEY:  Yes please Your Honor.  Just a few.

5    **REDIRECT EXAMINATION BY MS. MOTLEY:**

6    Q.   So it's your testimony as it relates to the DOT, the

7    document that you provided to us today, when it comes from

8    different sources, it is separated from each source, correct?

9    A.   So when a law enforcement officer submits a query, they

10   submit the query, and they receive responses.  The responses

11   that they received are based on the query that they submit.  And

12   you can see based on the header information or based on like a

13   line when the different databases switch so you can see here is

14   the DOT response to my query, here's where my DOT response ends.

15   Here is where the NCIC starts.  Here is where the NCIC response

16   ends and so on and so forth.

17   Q.   They are not all mixed in together.  It is clear which

18   agency you're drawing that data from with the documents?

19   A.   So it could be all mixed in.  It depends on the application

20   that you're looking at, but we do differentiate.  So it is up to

21   the end user to be looking and making sure that they are

22   receiving all the proper responses from the different data

23   sources.

24   Q.   But in order to get this information, like for instance a

25   driver's license status, is that something that is specific to

1  the DOT database?

2  A.  A driver's license status, yes.  You would have to query DOT

3  to find out the status of a driver's license.  The other data

4  services would not contain the status of a driver's license.

5  Q.  And with regards to the height, weight, hair color, eye

6  color, whether or not someone this a donor, is that specific,

7  the date that a driver's license is issued or expired, is that

8  specific also to the DOT?

9  A.  So the date the driver's license is issued yes, that is

10  specific to the DOT records.  However height, weight, eye color,

11  all of that is not specific to DOT.

12  Q.  When you go into the TIME System if you want to get DOT

13  records, do you have to check a box to get that?

14  A.  That depends on the application that's being used.  So to

15  elaborate, our eTIME application, our web-based application

16  allows you to check boxes.  Say I want to check this different

17  data source, I want to search this different data source, so the

18  user selects the box and then submits the query, and they

19  receive responses from all the different data services that they

20  check the box for.

21      Our Portal 100 Application, which is a software

22  application, has forms.  You pull up a form, the 1781 form, and

23  the form is configured behind scenes to take the different

24  information that's put in the form and search pre-configured

25  databases, and then they receive the response back.

457

1    Q.  Okay.  So just to be clear, if you want to go to the DOT

2    database, you have to either check a box or do the form,

3    correct?

4    A.  Yes.

5    Q.  Okay.

6            MS. MOTLEY:  I have nothing further.  Thank you.

7            THE COURT:  All right.  Thank you, Ms. Schuh.  You may

8    step down.  Ms. Motley, your next witness.

9        (Witness excused.)

10           MS. MOTLEY:  Your Honor, we'd like to call Matthew

11   Stippich to the stand.

12           THE COURT:  Can you call another witness?  There is a

13   matter that has to be addressed.

14           MS. MOTLEY:  Sure.  Can we please get two minutes to

15   confer?

16           THE COURT:  Yes.

17           MS. MOTLEY:  Your Honor, we'd like to call John Larry

18   to the stand, please.

19           THE COURT:  You may proceed.

20           John Larry, being first duly sworn to tell the truth,

21   the whole truth, and nothing but the truth, testified as

22   follows:

23           THE CLERK:  Please be seated.  State and spell your

24   full name for the record.

25           THE WITNESS:  John Larry.  J-o-h-n, L-a-r-r-y.

                                                          458

1    **DIRECT EXAMINATION BY MR. SCHWAB:**

2    Q.  Good afternoon, Mr. Larry.

3    A.  Good afternoon, sir.

4    Q.  Can you tell me where you currently live?

5    A.  I currently live in Wauwatosa, Wisconsin.

6    Q.  And how long have you lived in Wauwatosa?

7    A.  Going on seven years now this coming July.

8    Q.  Okay.  What do you currently do for work?

9    A.  I am a Midland High School Principal.

10   Q.  And what education do you have to go through to become a

11   principal?

12   A.  It depends.  The school I'm currently employed at is a

13   private school, and so it differs from private to public to

14   charter.

15   Q.  So tell me about your educational experience?

16   A.  I have a Bachelor of Arts degree in Communication Arts.  I

17   have a Master's Degree in Educational Studies and a Terminal

18   Degree as an Education Specialist.

19   Q.  A terminal degree, does that mean that you did extra

20   schooling after your masters?

21   A.  Correct.

22   Q.  Something just shy of a Ph.D.?

23   A.  Yes.

24   Q.  Tell me how did you become involved in marches during the

25   summer of 2020?

459

1    A.   Well after the incident occurred with George Floyd, I came
2    across a group of individuals who were marching, lifting up
3    their voices in the Milwaukee County area, and was curious to
4    know what was it about and so started marching with a large
5    group of individuals around different parts of Southeastern
6    Wisconsin.
7    Q.   Okay.  Did you start during the George Floyd protest in
8    downtown Milwaukee?
9    A.   Near downtown or so.  Like, I'm trying to remember.  I know
10   one of the main streets was Center Street, so that's where it
11   started.
12   Q.   Okay.  At some point, would you say you became involved with
13   a group known as TPR?
14   A.   Yes.  I started marching as an individual with the group at
15   large, yes.
16   Q.   And, approximately, how many marches would you say you went
17   on?
18   A.   A lot.  Probably 200 plus.
19   Q.   And were these short, long marches?
20   A.   In depended on the weather outside and so forth.  Some would
21   be miles and miles.  Others would be maybe a few miles.  This
22   just depended on the day and what the plans were for the day.
23   Q.   Broadly speaking, what would a march look like?  Run me
24   through the start, the meeting and however it began and kind of
25   how it ends.

460

1   A.   People would meet up at a certain location.  And then, you

2   know, there would be snacks provided, boards or signs being

3   made, and then we would circle around together and someone would

4   speak.  I would say, like, a motivational speaker in a sense,

5   tell us kind of what we were about to embark on.  And then we

6   would just start.  And then again depending on the day to go

7   several hours, it can go a couple hours.  It could be an hour.

8   It just depended from day-to-day.

9   Q.   And what was the say profile, what types of people did you

10  find yourself marching with on a day-to-day basis?

11  A.   People from just all over, different ethnic groups,

12  different socio-economic statuses, just common people.  It was a

13  combination of people coming together from all walks of life for

14  one common purpose, which was to exercise our right to assemble

15  and march around.

16  Q.   Did you see children there?

17  A.   Yes, I did.

18  Q.   Chalk art?

19  A.   Yes.

20  Q.   Signs?

21  A.   Yes.

22  Q.   Chants?

23  A.   Yes.

24  Q.   In all of your experiences, did you ever see any property

25  destruction?

461

1  A.  I did not witness any property destruction.

2  Q.  You said you went to maybe 200 protests?

3  A.  200 plus.

4  Q.  Did you ever see any graffiti?

5  A.  No.  If you consider chalk art graffiti, I suppose.

6  Q.  Fair enough.  Did you see any violence?

7  A.  No.

8  Q.  And you --  Did anyone from the police ever reach out to you

9  to interview you about any of the protests you'd been involved

10  in?

11  A.  No.

12  Q.  Anyone ever show up at your door?

13  A.  Yes.

14  Q.  Who?

15  A.  There was a situation where a few squad cars and officers

16  from the Wauwatosa Police Department came to my door under the

17  person you could say was the lead, was Lieutenant Farina showed

18  up at my door, walked across my lawn and knocked.  I knew they

19  were coming because a family member had told me, oh, look

20  there's officers walking across the lawn.  And so went out,

21  opened the door and Lieutenant Farina handed me a piece of paper

22  which was like a ticket.  Granted the ticket that he handed me

23  in person he could have chose to mail it, place it in my

24  mailbox, but I took it as --

25          MS. BAYNARD:  Objection, Your Honor, relevance.

1    Lieutenant Farina is not a defendant here.  And whether or not

2    he handed Mr. Larry a citation or delivered it to him is

3    irrelevant.

4              THE COURT:  I think Mr. Larry has the question that

5    preceded it which was he ever interviewed.  He answered that,

6    and he answered he received a ticket.  You can move on to the

7    next question.

8    Q.  Okay.  For this ticket for the date on which the alleged

9    offense occurred, were you ever placed in handcuffs?

10   A.  No.

11   Q.  Were you ever taken to a station?

12   A.  No.

13   Q.  Were you ever stopped by a police officer?

14   A.  No.

15   Q.  You wouldn't say you were arrested?

16   A.  No, never.

17   Q.  At this moment, he didn't ask you about any incidents, any

18   protests you'd ever been at?

19   A.  No.

20   Q.  Now, you actually --  Have you had a chance to review your

21   entry and your personal information that was shared in this

22   target list?

23   A.  Yes.

24   Q.  Okay.  And in fact, there's a notation on it that says ad

25   hoc committee, correct?

463

1    A.   Yes.

2    Q.   Can you tell me what you understand that notation to mean?

3              MS. BAYNARD:  Objection, Your Honor.  Mr. Larry can't

4    testify as to why Dominick Ratkowski put any notation on the

5    list.

6              THE COURT:  Sustained.

7    Q.   Okay.  In your service as a member of the Wauwatosa

8    community, did you ever serve on any commissions within the

9    government?

10   A.   I did.

11   Q.   Tell me what was the name of that commission?

12   A.   It was the Governor Affairs Ad Hoc Committee.

13   Q.   What was the purpose of the committee?

14   A.   The purpose of the committee was to --  to deal with

15   policing and also systemic inequities if you will.

16   Q.   And when did you serve on this commission?

17   A.   Starting June of 2020.

18   Q.   Okay.  So based on your own experience and knowledge based

19   on your service on the commission, this was formed in response

20   to this movement or rather this summer of protests?

21   A.   Yes.

22   Q.   And it related directly to policing in Wauwatosa?

23   A.   Yes.

24   Q.   How many members were on the committee, your commission?

25             MS. BAYNARD:  Objection, relevance.

1          THE COURT:  I'll allow limited question on this.

2    Mr. Larry has already explained the purpose of the commission,

3    so just I'll allow this question as a context question but we

4    can move on.

5          MR. SCHWAB:  If you mind giving me just a little

6    leeway, it is relevant.

7          THE COURT:  I will give you leeway into setting up

8    context, but you don't need to go further into it.

9    Q.   How big was this commission?

10   A.   There were a total of eight members on this ad hoc

11   committee.

12   Q.   Were some members that were elected?

13   A.   Yes, there were four alder persons and four members of the

14   community.

15   Q.   And were there any representatives from the police force?

16   A.   There was but not consistently.  There was one meeting that

17   we had and Captain Vetter was present, but that was pretty much

18   it.  Yeah, in fact because we didn't have a consistent

19   representative or member from the Wauwatosa Police Department,

20   it slowed the wheels of the mission and purpose for which the ad

21   hoc committee had been designed.

22   Q.   And did you guys end up coming to any recommendations as

23   part of this commission?

24         MS. BAYNARD:  Objection, Your Honor.  Again,

25   relevance.  This has little to nothing to do to the DPPA claims

465

1  that we are here for today with all due respect to Mr. Larry and

2  his time.

3      THE COURT:  I'll allow limited questioning on this

4  because it was testimony that there was a notation with regard

5  to this committee.  I will allow limited testimony for that

6  reason.

7      THE WITNESS:  Your question again, I'm sorry.

8  Q.  Sure.  Did this committee come to any recommendations for

9  the City of Wauwatosa?

10 A.  Yes.  There was a study I believe that was done back in

11 either 2015 or 2016 which would --

12     MS. BAYNARD:  Objection, Your Honor.  I am

13 anticipating the testimony that Mr. Larry is getting into, and

14 it involves matters that are not relevant to the issues in this

15 case and more go to what the ad hoc committee was doing,

16 recommendations in the study that they had done for the

17 Wauwatosa Police Department.

18     THE COURT:  Mr. Schwab, is there a way to rephrase

19 this question to global summary of this report?

20     MR. SCHWAB:  I think this goes to purpose,

21 retaliation.

22     THE COURT:  Why don't we approach very quickly on

23 that.

24     MR. SCHWAB:  I was going to end it at this question

25 about the recommendation.

1          THE COURT:  Why don't we approach quickly on that,

2    please.

3          (Sidebar discussion.)

4          MR. WIRTH:  This is getting into the -- I am

5    anticipating the testimony where the testimony is going to go is

6    there was -- He was on a commission, an outside agency, to kind

7    of audit police policy and stuff that may come up with

8    recommendations for the police department.  That has nothing to

9    do with the DPPA claims.

10         MR. SCHWAB:  I am unfamiliar with that.  My

11   understanding is that they recommended body cameras.

12         THE COURT:  Yes.  Don't need to go into the details of

13   specifics.  Here is the connection.  Conte made an issue of this

14   by noting on the list.  And your theory is that Mr. Larry was

15   targeted because of his participation in this committee, and

16   you've been allowed to tell his membership in it, what the

17   committee does.  You can globally elicit just globally the work

18   of the committee.  You've done some of that.  We don't need to

19   go to into specifics.  You still get to make the argument he was

20   targeted because of his membership in this committee.

21         MR. SCHWAB:  It just goes to why the police would

22   target.  They don't show up but also the relevance -- There's

23   also an important fact that we will get into which is that

24   Mr. Larry's DOT records were looked up as part of that ad hoc

25   committee investigation prior to him being added to the TPR

1  list, so this goes to his purpose for looking up Mr. Larry, when

2  did he first look up Mr. Larry?  It was not in response to an

3  incident.  It was investigating the ad hoc committee.

4          THE COURT:  Excuse me for a second.  Can Mr. Larry

5  testify as to when his DOT records were pulled, right?  He

6  can't.  He doesn't have that knowledge.  You have nothing to do

7  with that.

8          MR. SCHWAB:  He was -- About my understanding, he was

9  going to answer -- about to answer we recommended body worn

10  cameras.

11          THE COURT:  We don't need the details.  He already

12  testified that the committee was about policing and systemic

13  inequities.  You get a sense of the work of the committee.  You

14  don't need to go through his report.

15          MR. SCHWAB:  I will move on.

16          THE COURT:  Thank you.

17     (Back on the record.)

18  (**By Mr. Schwab**.)

19  Q.  So Mr. Larry, we've heard that you marched in excess of 200

20  times.  We've heard that you served on a commission.  We've

21  heard, in fact, you live in Wauwatosa.  Did you engage in any

22  other activity that summer relating to redressing your

23  government?

24          MS. BAYNARD:  Objection, Your Honor.  Again relevance.

25          THE COURT:  I'll overrule.

468

1          THE WITNESS:  Engaging in any activity as far as?  I'm

2    sorry.

3    Q.  Did you ever go to a common council?

4    A.  Yes, I did.  I went to several common council members.

5    Matter of fact, the way I actually became or was solicited to be

6    a part of this Governor Affairs Ad Hoc Committee is because of

7    my presence and vocalizing --  vocalizing just different

8    thoughts and opinions of what was being spoke about, how the

9    meetings were being ran and so forth like during those meetings

10   so yes.

11   Q.  Did you speak with any elected officials?

12   A.  Yes.

13   Q.  Did you ever write any letters?

14   A.  I have.  I composed emails to several local government

15   officials such as the mayor, alder persons, even the chief of

16   police at that time of the Wauwatosa Police Department.

17   Q.  And when you're out marching, did you ever commit any

18   crimes?

19   A.  No.

20   Q.  No violence, nothing like that?

21   A.  Not at all.

22   Q.  Did you ever, you know, shout your driver's license at a

23   police officer?

24   A.  Absolutely not.

25   Q.  Did you ever shout your address at a police officer?

469

1   A.   No.

2   Q.   Did you ever tell a police officer your home address?

3   A.   No.

4   Q.   Did you ever consent to the use or disclosure of your

5   driver's license picture?

6   A.   No.

7   Q.   Did you consent to the use or disclosure of your home

8   address?

9   A.   No.

10          MS. BAYNARD:  Objection, Your Honor.  We talked about

11  this in pretrial filings that you were going to bar any

12  testimony about consents because it is irrelevant to the DPPA

13  claims.

14          THE COURT:  I'll allow Mr. Schwab to wrap up this

15  chapter.

16  Q.   Now, at some point, you learned that you had been included

17  in this target list; is that correct?

18  A.   Yes.

19  Q.   How did that feel when you learned that?

20  A.   Um.  Well, it can be -- I think I thought here I am

21  exercising my First Amendment right, the right to peacefully

22  assemble and lift my voice as a Wauwatosa community resident,

23  which is small, and marching with other individuals who are just

24  trying to bring to the forefront or call attention to

25  inequities, inequalities, issues with public safety during the

1  time where it was evident that in some people's mind certain

2  lives don't matter.

3        MS. BAYNARD:  Objection, Your Honor.  We are getting

4  outside of the scope of relevant testimony, and it is unfairly

5  prejudicial.  Mr. Larry has made his point about what he's

6  protesting for, and this is becoming cumulative and

7  unnecessarily cumulative.

8        THE COURT:  Mr. Larry is explaining how he felt.  I

9  think he finished that answer so your next question, Mr. Schwab.

10        MR. SCHWAB:  I am not sure, were you finished with

11  your answer?

12        THE WITNESS:  I was not.  If I can proceed.

13        THE COURT:  You may finish your answer.

14        THE WITNESS:  Thank you.  And to in some ways be a

15  part of a list where you're viewed or looked at as a domestic

16  terrorist, right.  That's what was going through my mind and

17  like how would that impact seeking employment or travels.

18        MS. BAYNARD:  Objection.  This directly relates to a

19  Motion in Limine precluding these witnesses from the scope of

20  the alleged damages.  We're talking about how this would impact

21  work history, and I believe you sustained the same objection for

22  a witness earlier.

23        THE COURT:  All right.  Mr. Larry, if you could very

24  succinctly wrap up your sentence.

25        THE WITNESS:  Just travels, employment and just being

471

1   alert all the more and aware of, like, when law enforcement

2   passes by when I'm traveling in my vehicle.  It causes more, I

3   don't know how to explain it, where more of an alertness,

4   awareness or in a sense of could this be the day that I'm pulled

5   over and not make it home to my family.

6   Q.   Thank you.

7            MR. SCHWAB:  No further questions.

8            THE COURT:  Thank you.

9   **CROSS EXAMINATION BY MS. BAYNARD:**

10  Q.   Mr. Larry, you received a citation for disorderly conduct.

11  I believe you testified about it earlier, correct?

12  A.   I received a citation yes from Lieutenant Farina.

13  Q.   It was for disorderly conduct?

14  A.   Yes.

15  Q.   Okay.  I believe you testified that I think counsel asked

16  you if you ever yelled at a police officer.  Would it surprise

17  you if there was body cam of you yelling at a police officer?

18  A.   If I remember correctly, I was asked did I ever yell out

19  personal information not yell at a police officer.

20  Q.   Okay.  Would it surprise you if there was body cam of you

21  yelling your address at a police officer?

22  A.   Could you --

23  Q.   So --

24            MR. SCHWAB:  Objection, Your Honor, foundation.

25            MS. BAYNARD:  This goes directly to a question he

472

1   asked.

2           MR. SCHWAB:  I am saying relevance.

3           THE COURT:  This is cross examination.  I will allow

4   the question.  It relates to a direct question on direct.

5   Q.  Okay.  So on your direct, your counsel asked whether or not

6   you had ever given your phone number to a police officer or your

7   address.  Do you recall that testimony?

8   A.  Yes.

9   Q.  Okay.  Would it surprise you if there was body cam of you

10  yelling --

11          MR. SCHWAB:  Objection, Your Honor.  Foundation as to

12  the testimony that is about to try to enter without foundation.

13          THE COURT:  Okay.  I will reserve ruling on the

14  objection.  I will allow Ms. Baynard to finish her question, and

15  we'll address this later.

16  Q.  So I am not sure if I finished the question?

17          THE COURT:  You may finish the question.

18  Q.  So would it surprise you if there was body cam video of you

19  yelling your address and identifying yourself on an officer's

20  body camera?

21          THE WITNESS:  Do I answer?

22          THE COURT:  Yes.

23          THE WITNESS:  I don't recall.  I don't recall yelling

24  information, personal or private information.  I don't recall.

25  Q.  Do you recall yelling at an officer?

1   A.   I recall being vocal with an officer just as I would be
2   vocal while participating in the protest and saying certain
3   names and so forth.
4   Q.   Okay.  You were given a citation, the disorderly conduct
5   citation.  Did that relate to the protest on August 14, 2020 and
6   I believe it was near 70th and Etna?
7   A.   I'm not 100 percent sure.  If you could restate the
8   question.
9   Q.   I guess I'm trying to figure out -- We earlier entered a
10  portion of the record.  I don't want to go through that again.
11  I just want to confirm that the disorderly conduct citation you
12  received was related to the August 14, 2020 protest that you
13  were at?
14  A.   It's possible, but I would also say that that citation was
15  dropped.
16  Q.   Okay.  That was not my question.  My question was you were
17  issued the citation as it relates to the 8-14-2020 protest?
18  A.   I don't recall, but I do recall for sure that for certain it
19  was a citation that was dropped.  Whatever the reason or purpose
20  of it was for if it was disorderly conduct, it was dropped.
21  Q.   Okay.  And were you --  Did you I think you said 200 days?
22  A.   200 plus.
23  Q.   200 days plus.  Were you at the protest at the Cheese Cake
24  Factory on 7-7?
25  A.   I was present at Mayfair Mall where the Cheese Cake Factory

474

1    is located.

2    Q.  Were you ever inside the Cheese Cake Factory when it was

3    shut down on 7-7?

4    A.  I was not.

5         MS. BAYNARD:  I have nothing further, Mr. Larry.

6    Thank you.

7         THE COURT:  Mr. Schwab, anything further?

8         MR. SCHWAB:  No further questions, Your Honor.

9         THE COURT:  Mr. Larry, thank you.  You may step down

10   sir.

11      (Witness excused.)

12         THE COURT:  Next witness other than the witness I need

13   to address.

14         MS. MOTLEY:  Your Honor, we'd like to call that next

15   witness if possible.

16         THE COURT:  Can you call your next witness after that.

17         MS. MOTLEY:  We'd like to call Mary Kachelski, please.

18         Mary Kachelski, being first duly sworn to tell the

19   truth, the whole truth, and nothing but the truth, testified as

20   follows:

21         THE CLERK:  State and spell your full name for the

22   record.

23         THE WITNESS:  Hi.  Mary Kachelski, M-a-r-y,

24   K-a-c-h-e-l-s-k-i.

25   **DIRECT EXAMINATION BY MS. MOTLEY:**

475

1    Q.   Good afternoon, Ms. Kachelski.  Just to be clear, you are a

2    plaintiff in this matter; is that correct?

3    A.   Correct.

4    Q.   Could you please talk to the jury, explain to them what you

5    do for a living?

6    A.   I'm a high school teacher at Milwaukee High School of the

7    Arts.  I teach science.

8    Q.   Okay.  How long have you been doing that?

9    A.   Since 2007.

10   Q.   Okay.  And what city do you live in?

11   A.   I live in Wauwatosa.

12   Q.   Okay.  And so in June 5, 2020, did you also live in

13   Wauwatosa?

14   A.   Yeah.

15   Q.   Okay.  And did you ever participate in any protests in

16   Wauwatosa in 2020?

17   A.   Many.

18   Q.   Okay.  Did you ever participate --  Did you ever go to

19   Burlington on November 10th of 2020 for a school board meeting?

20   A.   No, I do all my stuff in Wauwatosa.

21   Q.   Okay.  Did you ever go to Mensah's residence in 2020?

22   A.   No, I generally march around my neighborhood.

23   Q.   Have you ever been ticketed for protesting anywhere?

24   A.   Well, so yes.  I got a ticket that I didn't know I was

25   getting that said -- I'm sorry.  It said I needed a parade

476

1  permit to walk down the street protesting.  We didn't even know

2  it was a protest that day.  We were taking the dog out, and my

3  daughter was like, hey, they are protesting.  We can do it for a

4  little while, and we have to eat dinner.  So it was 70th and

5  Clark on my ticket that I got in the mail.  And I live on 72nd

6  and Meineke, so legitimately it was four blocks from our house

7  and the ticket said I needed a parade permit --

8  Q.  Okay.

9  A.  -- to join the protest.

10  Q.  Okay.  And do you recall the date that you received that

11  ticket?

12  A.  I don't remember the date.  I know it was the Tuesday before

13  the Wednesday of the Mensah decision, so I don't have that date

14  memorialized.  I just remember getting it in the mail on a

15  Tuesday so but shortly after.  We were protesting on a

16  Wednesday, and I got it six days later.

17  Q.  Do you recall if you received this ticket in September of

18  2020?

19  A.  Gosh, I'm sorry.  I think so.  I was teaching at the time,

20  so it would have been around then.

21  Q.  Okay.  And you said you received it in the mail, correct?

22  A.  Correct, yeah.

23  Q.  Were you ever arrested for protesting?

24  A.  No.

25  Q.  Were you ever criminally charged for protesting?

477

1  A.  No.

2  Q.  And the ticket that you received for I believe you said

3  permit, what happened with that?

4  A.  It got dismissed.

5  Q.  Okay.  When you were -- When you've attended a protest, did

6  you ever shout your height?

7  A.  No.

8  Q.  Did you ever tell any law enforcement officers your weight?

9  A.  No.

10  Q.  Did you ever tell any law enforcement officers your driver's

11  license number?

12  A.  No.

13  Q.  What I'd like to do is to show what's been admitted into

14  evidence, Exhibit Number 411.  Sorry 311.

15          THE COURT:  Yes.

16  Q.  Now, Ms. Kachelski, do you recognize that picture on the

17  right that is sort of across from your driver's license photo?

18  A.  Yes.

19  Q.  Who is that a picture of?

20  A.  My daughter.  I'm good.

21  Q.  Do you recall when that picture was taken?

22  A.  Um no.  Honestly, it is a really bad picture, so I didn't

23  take it.  It's got to be at a protest.  Carry was very, very

24  invested in the fact that a kid the age of the people who mommy

25  teaches got killed at the mall where we go to movies.

478

1          MS. BAYNARD:  Objection, Your Honor.

2          THE COURT:  Sustained.  So hold on, Ms. Kachelski.

3    The objection is sustained.  Go ahead, Ms. Motley.

4          MS. BAYNARD:  Your Honor, can I move to strike the

5    testimony as well?

6          MS. MOTLEY:  Your Honor, the question was how did she

7    feel, you know, when was that picture taken.  She was answering

8    that question.

9    A.  We were protesting a lot.

10         THE COURT:  Ms. Kachelski, you have to wait for

11   questions.  I'll rule on that later.  You may continue.

12   Q.  Ms. Kachelski, it says on here that something --  It says

13   Tosa Moms Tackling Racism.  What is that?

14   A.  Okay.  So George Floyd freaked out a lot of people.

15         MS. BAYNARD:  Objection, Your Honor.  Sorry,

16   Ms. Kachelski.  Objection, Your Honor.  I don't know if we need

17   to have a sidebar on this but it goes directly to one of the

18   Motions in Limine that we have in this case precluding testimony

19   about unrelated police incidents.

20         MS. MOTLEY:  Your Honor, if I may speak.  I don't

21   think that's accurate that this goes to one of the Motions in

22   Limine.  I think the plaintiffs sort of experiences of why they

23   are on this target list, it is relevant to this matter.  There

24   hasn't been a Motion in Limine that people can't discuss, you

25   know, how they feel about being on the list or why they are on

479

1   the list.

2           THE COURT:  Thank you, Ms. Motley.  Ms. Kachelski, if

3   you could answer the question about the purpose.  The question

4   is what is Wauwatosa Moms Tackling Racism.  It's a very focused

5   question, not globally.

6           THE WITNESS:  Okay.  So it is in response to George

7   Floyd saying he called for his mama.  And so all of these moms

8   were, like, talking to each other, and that hit a lot of people.

9   So we're like we are all suburban moms.  What can we do?  And so

10  they made this group, like, my neighbors, and some of them I

11  didn't know at all and turns out that a lot of people really

12  cared.

13          So it is a group of women who live in Wauwatosa.  In

14  the beginning, we had people who weren't Wauwatosa residents and

15  we are, like, okay we are getting too big here.  It just has to

16  be Wauwatosa people and Wauwatosa moms and what are we going to

17  do in Wauwatosa.  Okay, is that good?

18          THE COURT:  Thank you.  Next question, Ms. Motley.

19  Q.  Ms. Kachelski, how do you feel about your information being

20  on this target list?

21  A.  Really freaked out.

22  Q.  Why?

23  A.  It is creepy.  It is kind of -- That is my daughter.  We

24  went to a lot of protest, many, many protests.  That is a

25  picture from a protest.  She was another person who was freaked

480

1    out of this horrible thing that happened.

2            MS. BAYNARD:  Objection.

3            THE COURT:  Objection is sustained.  Next question.

4    Ms. Kachelski, please listen and answer only the question posed

5    to you.  Thank you.

6    Q.  So sorry as the Judge instructed, please just answer the

7    questions specific.

8    A.  Got it.

9    Q.  So the question was if I may, how do you feel about being on

10   this document?

11   A.  Attacked, violated, freaked out, creeped out.

12   Q.  Have you ever been contacted by any law enforcement officers

13   in relation to a crime?

14   A.  No.

15   Q.  Have you ever been questioned as a witness for any crimes by

16   any officers?

17   A.  Well, I did have an attempted armed robbery once when I was

18   picking up my daughter, and that had nothing to do with a

19   protest, but it was a police officer who was talking to me.

20   Q.  Do you recall when that was?

21   A.  February 5, 2021.

22   Q.  So other than February 5th of 2021, in 2020 were you ever

23   contacted by any law enforcement officers with regard to you

24   being a witness to a crime?

25   A.  No.

1    Q.   Were you ever contacted by any law enforcement officers with

2    regards to any investigations involving any matters?

3    A.   No.

4              MS. MOTLEY:   Thank you.   I have nothing further.

5              THE COURT:   Thank you, Ms. Motley.   Ms. Baynard.

6    **CROSS EXAMINATION BY MS. BAYNARD:**

7    Q.   Ms. Kachelski, you were issued a citation you believe

8    sometime in September of 2020 for not having a permit or a

9    parade permit?

10   A.   How it read on the citation was special permit required.

11   Q.   Did you have to --   So how did you receive that citation?

12   A.   Mail.

13   Q.   It was received --   You received it by mail.   Ms. Kachelski,

14   did you attend a protest on 8-14-2020?   It seems like you were

15   at a lot of them, but it was near 70th and Etna if that

16   refreshes your recollection at all.

17   A.   Okay.   So this is a little weird but sometimes I couldn't

18   protest and so I would bring water because the Wauwatosa Moms

19   Tackling Racism would bring big things of water, cookies and

20   Gatorade.   And so that day the mom who was delivering the water

21   was late, so I wasn't there to protest.   I'm like, hey, I've got

22   to get this water down here.   And so I don't know, is like

23   dropping off water protesting?

24   Q.   I just asked if you were in attendance at that event?

25   A.   I was there.

482

1          MS. BAYNARD:  I have nothing further.

2          THE COURT:  Anything further?  Very briefly.

3   **REDIRECT EXAMINATION BY MS. MOTLEY:**

4   Q.  I have one question.  Did you ever consent to your

5   daughter's photograph to be on the target list?

6          MS. BAYNARD:  Objection, Your Honor.

7          MS. MOTLEY:  The stipulation is that none of the

8   plaintiffs consented to their information being on the target

9   list.  Her daughter is on this list.

10         MS. BAYNARD:  Her daughter.

11         THE COURT:  Her daughter is not a plaintiff in this

12  case.  Any other questions?

13         MS. MOTLEY:  I have nothing further.  Thank you.

14         THE COURT:  Thank you so much, Ms. Kachelski.

15     (Witness excused.)

16         MR. SCHWAB:  We will like to call Matthew --

17         THE COURT:  Ladies and Gentlemen of the Jury, I have

18  several matters that I said I will take up later.  What I'll do

19  this evening is let you out of school a little bit early so I

20  can stay and keep working with the lawyers.  And then tomorrow,

21  please report at 8:30.  We do roll call.  I suppose you do roll

22  call.  We will get in the courtroom and get to work again.

23         As were you previously instructed, please don't talk

24  to each other about the case.  Do not talk to anyone else about

25  the case.  Do not do any research about the case.  I think by

1  now you know the rest of my speech very well.  Thank you for

2  your attention again today and have a good evening.

3          BAILIFF:  All rise for the jury.

4      (Jury excused.)

5          THE COURT:  As to witness Stippich, we discussed

6  Mr. Stippich along with another common council person, I think

7  it is Heather Kuhl, K-u-h-l.  And I had reserved ruling on

8  whether they would be allowed to testify until after

9  Mr. Ratkowski had testified, so I'm surprised that you had

10  called him in court, Ms. Motley, when we had not addressed the

11  matter.

12          I know you were juggling a lot of law, but the ruling

13  was outstanding.  Yesterday when we talked about Mr. Stippich,

14  my understanding from counsel was that Mr. Stippich and

15  Mr. Stippich and Ms. Kuhl, I'm not sure about Mr. Stippich and

16  Ms. Kuhl, but Mr. Stippich was also on this committee that

17  Mr. Larry just testified about, and it is the same committee

18  that Mr. Ratkowski noted in --  noted in Mr. Larry's entry in

19  the list in dispute.

20          And I heard from Attorney Schwab that Mr. Stippich was

21  going to testify in part about one, the work of the committee

22  and two, I believe also about this other list, this list of

23  members of the ad hoc committee.  Counsel, did I get that

24  correctly?

25          MS. MOTLEY:  Your Honor, that is correct.  However, we

484

1  would not have him testify as to the work of the committee.  I
2  believe plaintiff John Larry did that sufficiently.
3        THE COURT:  So can you please make a proffer as to
4  what you would have him testify about if called to testify.
5        MS. MOTLEY:  Thank you, Your Honor, and I apologize
6  for saying his name.  I certainly wasn't trying to disrespect
7  the Court in that way.  I honestly just forgot.
8        With regard to Mr. Stippich, I believe there's been
9  testimony from Mr. Ratkowski that he was told by certain persons
10 within the Wauwatosa Police Department to identify different
11 people at different events.  I believe that was sort of his
12 words.  Mr. Stippich was actually the chair of this ad hoc
13 committee that Mr. Larry was on.  And you know, he never, you
14 know, I believe the testimony we can get from him is whether or
15 not he instructed as the chair of this committee for anyone on
16 this committee to be, you know, identified by any of the
17 defendants.  I believe that goes to the DPPA claims for purpose.
18 I also think it potentially goes to willful reckless behavior.
19       THE COURT:  Thank you, Ms. Motley.  Who is handling
20 this, Mr. Wirth?
21       MR. WIRTH:  Judge, my recollection is the Court
22 reserved ruling on whether Mr. Stippich and Ms. Kuhl would be
23 permitted to testify because the proffer of evidence that they
24 would in some fashion suggest that the one plaintiff, Mr. Larry,
25 was added to the list because of his participation in this

485

1  commission in some form of retribution or some form of isolation

2  or identification.

3          What the Court said is we'll hear from Mr. Ratkowski.

4  If he says, well, he got on the list because of his

5  participation on the commission, then we would introduce the

6  evidence or at least entertain introducing evidence from

7  Mr. Stippich and Ms. Kuhl.  That did not happen.

8          So the Court reserved its ruling until after it heard

9  from Mr. Ratkowski.  Mr. Ratkowski did not in any fashion tie

10 Mr. Larry's presence on the list to his participation in the

11 commission and therefore what we're doing is what the Court has

12 repeatedly cautioned.  We're doing a trial within a trial.  Why

13 did the four members of the commission end up on the list, some

14 not end up on the list?  And the defense continues to believe

15 that's both irrelevant, immaterial, unfairly prejudicial, and it

16 is just not --  It's not the DPPA claim of Mr. Larry.

17         THE COURT:  Thank you.  Ms. Motley.

18         MS. MOTLEY:  Your Honor, I believe, you know, before

19 yesterday we did sort of anticipate obviously Mr. Ratkowski

20 testifying.  The fact that he testified today frankly for the

21 first time that he was told to create this list is new

22 testimony.  He mentioned that, you know, people told him to do

23 this.  That's brand new, and so Ratkowski's notations on this

24 document, especially as it relates to John Larry, goes to his

25 stand of mind.  It goes to his purpose.

1         You know, he didn't also remember a lot of things.

2  Perhaps Mr. Stippich will remember as the chair of this

3  committee whether or not he also requested of Mr. Ratkowski to

4  look up Mr. Larry.  We're not going into anybody else on this

5  committee.  It is really specific to Mr. Larry.

6         And as this Court, you know, understands, every DPPA

7  violation of a use, a disclosure or attachment goes to that

8  specific person.  Especially as it relates to John Larry, that

9  is what Mr. Stippich will be testifying to.

10        THE COURT:  Thank you, Ms. Motley.  So the parties are

11  correct.  This is as to Mr. Larry.  And as to Mr. Larry,

12  Mr. Ratkowski did testify that he was asked to identify and

13  provide information regarding this new Wauwatosa ad hoc

14  committee, but he specifically testified as to a name of the

15  person who asked him to do so, and the name he testified to was

16  John Milotzky.  I apologize.  This is not reading from a

17  transcript.  This is reading from my notes, so I don't have a

18  correct spelling of the name.  So the name he gave was John

19  Milotzky, not any other members of this ad hoc committee.

20        So if Mr. Stippich would be brought in to rebut that,

21  he did not tell Mr. Ratkowski to generate a list of members of

22  this committee.  This is wholly irrelevant and not responsive to

23  --  not responsive to the testimony provided by Ratkowski.

24        To the extent further that Mr. Ratkowski, in fact,

25  does put this ad hoc committee in the mix because he noted on

1   the list next to Mr. Larry, both sides were able to question him

2   about that notation.

3           Additionally, Mr. Larry additionally importantly

4   Mr. Larry himself was able to testify about the membership in

5   this committee, the work and purpose of this committee and give

6   the jury a taste of the flavor of this committee.  To the extent

7   that plaintiff Larry would want to argue that he is on the list

8   because of his work on that committee, he has made that record,

9   so Mr. Stippich will not be allowed to testify.

10          MS. MOTLEY:  Your Honor, if I may make a record.

11          THE COURT:  Please.

12          MS. MOTLEY:  The way I understand Mr. Ratkowski's

13  testimony was is that he provided this information to John

14  Milotzky who by the way is another Wauwatosa Police Officer.  So

15  not that he was directed to get this information, but he

16  provided the information to Mr. Milotzky the committee members

17  including John Larry.

18          THE COURT:  Thank you for making that correction.  You

19  are correct.  As I am rereading the notes, he testified I was

20  asked to identify and I provided it to John Milotzky, so you are

21  correct.  But I do not think that it changes the ruling as he

22  did not testify any member of this committee asked him to do so.

23  It does not change it, so it would not be rebuttal to that

24  testimony nor would it open the door for the defendant to have a

25  good faith basis to argue, well, the committee asked him to do

488

1  that.  There's no factual record basis for them to ask them

2  that.

3       And repeatedly Mr. Ratkowski was asked as to either

4  each plaintiff who asked you to do this, who asked you to do

5  that, so plaintiff have the record to make the necessary

6  argument.

7       As the parties know under Rule 43 even relevant

8  evidence can be excluded for specific reasons.  And one of them

9  is confusion of the jury.  We have a side trial by another list

10  about another committee that's not really central.  The central

11  function of this evidence about the notation is it allowed

12  Mr. Larry to advance his position that he is on that list

13  because of his membership because of the work.  He has that in

14  evidence, so it would confuse the jury why we're having a side

15  trial.

16       Furthermore 43 allows exclusion of evidence for waste

17  of time, delay.  I find this would further delay this already

18  lengthy trial without adding benefit that is adding to facts

19  that will assist this jury in deciding the two questions that

20  they will be given at the end of the trial.  So this ruling

21  applies to Mr. Stippich.  If Ms. Kuhl was also on the list for

22  similar reason, this ruling also applies to her as well.

23       MS. MOTLEY:  Your Honor, with regards to Ms. Kuhl, she

24  is sort of a dual role.  She's a Wauwatosa resident that also

25  participated in numerous protests and things like that.  So we

489

1   would want to go into that with Ms. Kuhl regarding that.  She

2   was at some of the similar protests that we heard, you know,

3   other plaintiffs being at.

4           THE COURT:  Ms. Motley, you can make your record as to

5   what that testimony would serve and advance in this trial given

6   the issues at trial.

7           MS. MOTLEY:  Your Honor, I think it would serve the

8   fact that I think it's --  Well, we believe that it's clear that

9   this was a TPR target list.  We believe there's certain people

10  that Mr. Ratkowski was targeting, and Ms. Kuhl who was at

11  protests like other people, she was not put on this list and so

12  I think that goes to willful reckless.

13          THE COURT:  Thank you.  Does the defense wish to be

14  heard?

15          MR. WIRTH:  No.  Obviously, Judge, we'll object to

16  that.  It crosses about three of the lines in this case

17  including evidence from a non-plaintiff, including evidence

18  attributable to plaintiffs from a non-plaintiff, and it would

19  involve us having on the defense side to now bring in evidence

20  about why people aren't on the list, so it's irrelevant.  It's

21  immaterial, and it is prejudicial.

22          THE COURT:  All right.  So as I understand it, the

23  proffer is that Ms. Kuhl would advance the ball on the question

24  of the third element of the claim, which is not permissible use

25  or not legitimate law enforcement use.  So Ms. Kuhl, I have not

1    heard that she would proffer any specific information as to the

2    thinking of the defendant Ratkowski or defendant Roy as to their

3    use, so I also find that this evidence is excludable under 43.

4    It is questionable under 41.

5           Under 43 whereas in addition to the reasons I have

6    stated for Mr. Stippich, it appears that if it's being offered

7    to challenge what the plaintiff has already shown, that look

8    what these plaintiffs have in common for being on this list, it

9    would be cumulative because the plaintiffs have already

10   questioned -- raised that question through several witnesses who

11   have already testified, including most importantly the defendant

12   Ratkowski who is the key here.

13          MS. MOTLEY:  Thank you.

14          THE COURT:  On the list you had provided yesterday,

15   you also have printed Lavita Booker.  Do you intend calling her?

16          MS. MOTLEY:  Your Honor, at some point we do intend on

17   calling her; however, probably starting tomorrow.

18          THE COURT:  All right.  And yesterday you had on the

19   list Ms. Rebecca Burrell also known as Rebecca Wigley.  You had

20   her on the list for day one.  She was not called.  Do you still

21   intend to call her?

22          MS. MOTLEY:  Your Honor, we believe so but probably

23   not in the morning.  So probably won't be the beginning witness.

24          THE COURT:  All right.  Please give me your list for

25   tomorrow morning.

491

1          MS. MOTLEY:  Your Honor, I think we'd like to -- I

2     know with the IT we have to get that together, so we'd like to

3     call them perhaps in the afternoon.

4          THE COURT:  By them, you are referring to the

5     witnesses that you are calling by video, Ms. Motley?

6          MS. MOTLEY:  That's correct.

7          THE COURT:  They are --

8          MS. MOTLEY:  They are Diane Nelson and Erik Schneider.

9          THE COURT:  Have their information been already

10     provided to IT so that IT can send them the zoom link so we can

11     be ready to go?

12          MS. MOTLEY:  Their information will be provided to

13     them.  I wasn't sure if they were going tomorrow afternoon or

14     Thursday morning, so as I understood I need to give them the

15     exhibits beforehand which I definitely will do so, yes.

16          THE COURT:  All right.  It is very important when

17     those two witnesses are ready to go one, they be sequence so we

18     do both video back to back.  That's my understanding from IT to

19     make it easier for plugging in and plugging out.  One and two it

20     has to be ready to go.  It has to be ready to go.  We cannot

21     have the jury waiting due to technological difficulties.

22          MS. BAYNARD:  I am just wondering if the plaintiffs

23     can explain why Diane Nelson would be have any information

24     relevant to the DPPA claims.

25          THE COURT:  I don't know who Ms. Nelson is.  Who is

492

1    Ms. Nelson?

2            MS. MOTLEY:  Ms. Nelson is a law enforcement officer

3    like every law enforcement officer that is on the document.  She

4    received the target list.

5            THE COURT:  So Ms. Nelson is on the list -- on the

6    witness list because she's a recipient of the list?

7            MS. BAYNARD:  Not from Dominick Ratkowski.

8            THE COURT:  Mr. Ratkowski did testify, Ms. Motley, and

9    I think part of the issue that we're having with --  Part of the

10   issue we're having, Ms. Motley, you submitted a witness list the

11   first version of over 130 names.  And then I had asked that you

12   revise in a focused manner.  You resubmitted a very identical

13   list only slightly shorter.  And with that list the description

14   of the witnesses were -- well, they have relevant information as

15   to matters in the complaint.

16           We are well beyond the complaint.  This is game day

17   trial.  And so trial is not discovery time.  You have to be able

18   to proffer what these witnesses are being called for.  It is not

19   acceptable to say I don't know what they're going to say or they

20   may --  I need to know what these witnesses are being proffered

21   for so I can rule accordingly.

22           MS. MOTLEY:  Your Honor, just for the record, we have,

23   you know, participated in discovery.  This is not plaintiffs --

24   We didn't give the target list out.  You know, Mr. Ratkowski

25   testified.  He testified he doesn't know who received it.  He

1  doesn't know how many people received it.  Every time he

2  obtained, used, or disclosed any plaintiffs' information,

3  disclosed or this list went to somebody, that is on him.  And so

4  I would like very much for the witness list to be less than 100

5  and so people -- but the fact of the matter is he gave this

6  document to over 100 people.

7        THE COURT:  My point was to the specific witnesses you

8  were going to call, I'm asking for a proffer of what are they

9  going to --  I'm hearing an objection that they don't have

10  relevant information that they receive it and what -- What are

11  they going to testify to?

12        MR. SCHWAB:  Your Honor, if I may shed some light

13  hopefully.  This is an individual who received this list from

14  Mr. Conte who if you recall Mr. Ratkowski said feel free to

15  share with whoever you would like.  And this is to go to how

16  widespread that sharing turned out to be, and that goes to a

17  number of things, including the recklessness how Mr. Ratkowski

18  treated plaintiffs' personal information, and that is relevant

19  to punitive damages.

20        THE COURT:  All right.  I see Mr. Wirth's hand being

21  raised.

22        MR. WIRTH:  Yes.  The Wisconsin's statute that permits

23  mutual aid mutual assistance also contains within it a provision

24  that once the assistance is offered what the responsibility for

25  the effects of that assistance become the requestor.

494

1          So what we're doing now is we're saying we really at

2     660313.  What we're doing now is we're saying Ratkowski offered

3     assistance as he's permitted to do to Conte.  Conte offered

4     assistance to Hennepin County.  That's not Ratkowski.

5          And so what we're now doing is saying the effect of

6     the assistance beyond the assistance itself is now becoming

7     relevant to the trial, and it isn't.  There's no such magic

8     talisman as it goes to willful and reckless.  Evidence has to be

9     relevant, and it has to be material.  Because when we go beyond

10     what the lawsuit is about and when we start forcing the defense

11     to try the actions of people who are not in the lawsuit, we run

12     afoul of not only 403 but 401.  So we obviously would object to

13     that information.

14          THE COURT:  All right.  Ms. Motley, do I see you

15     raising your hand?

16          MS. MOTLEY:  Yes, Your Honor.  I believe the testimony

17     from Mr. Ratkowski with relation to Brian Conte is that he

18     provided plaintiffs' personal information to him, and he didn't

19     know if any one of the plaintiffs was involved in the I94

20     incident and just gave their personal information.

21          Mr. Ratkowski through his testimony clearly stated he

22     put no guard rails on this personal information.  He didn't say

23     it is confidential.  He didn't tell people not to share this.

24     To cite the mutual assistance statute I understand that, but

25     that's not to say, you know, there's no investigation here.  If

495

1  they are assisting with something -- in order for you to assist

2  with something, you have to know that there's something to

3  assist with with regards to these specific 44 plaintiffs.

4           What Ratkowski did, he did the opposite of what you're

5  supposed do in law enforcement or with dealing with law

6  enforcement.  He invited them to share confidential information.

7  He invited them to share personal information of these 44

8  plaintiffs.  And Diane Nelson who got it from the person that

9  Mr. Ratkowski said share it with whomever, she is a relevant

10 witness, and I believe she goes to willful and reckless

11 behavior, and this is on Mr. Ratkowski.

12          I believe it is relevant to the DPPA claim and

13 relevant specific to these 44 plaintiffs.  This isn't a trial

14 within a trial argument.  This is specific to the DPPA claims

15 for these 44 plaintiffs which he acknowledged on the stand that

16 the person that he gave it to he has no idea why he gave these

17 particular plaintiffs' information to him.

18          THE COURT:  All right.  So you've already established

19 that with Mr. Ratkowski.  So what does Ms. Nelson add?

20          MR. SCHWAB:  She speaks to the extensiveness to which

21 this list was apparently broadcast out.  She's out of state.  I

22 don't know.  We'd like to ask her did you ever ask for this or

23 was this just shared from Mr. Conte upon the -- as we've seen

24 the invitation for Mr. Ratkowski to share it with whoever.  That

25 goes to the extensiveness.

496

1    I would argue at least potentially for the purpose of

2    the jury the recklessness with which Mr. Ratkowski treated

3    plaintiffs' personal information.  I think most people would

4    understand that or at least it is reasonable for a juror to

5    believe and understand that their information being shared with

6    Minneapolis when they've never been there or when the plaintiffs

7    have never been there, that goes to the degree of which and the

8    extensiveness which this list was shared.

9         THE COURT:  Okay.  So the question is not so much the

10   extensiveness of which this list was shared.  I understand what

11   you're saying.  I'm looking at the punitive damage instruction.

12   As you all know upon proof of willful and reckless disregard of

13   the law, an action is willful if the defendant knew that he was

14   violating the DPPA or was indifferent as to whether his actions

15   violated the DPPA.

16        And so you asked Ratkowski questions about that.  And

17   action is reckless disregard for law taken with knowledge that

18   it may violate the law.  So you've asked Ratkowski about his

19   state of mind.  So I'm just wondering so what you're offering

20   evidence is impact.  And evidence of impact doesn't show

21   Ratkowski's state of mind, which is what the punitive damage

22   instruction is going to.

23        MR. SCHWAB:  No, Your Honor, you're exactly correct.

24   It goes to damages.  It is relevant to the question of damages

25   of how much the jury they want to punish him for his

497

1    recklessness.

2            THE COURT:  All right.  So I will take Ms. Nelson

3    under consideration.  And Mr. Schneider, who is he and what

4    would he bring to us?

5            MR. SCHWAB:  Mr. Schneider is one of the recipients of

6    the drop box link.  He is on the that email list that was sent

7    out.

8            THE COURT:  Any objection as to Mr. Schneider?

9            MR. WIRTH:  I don't know, Judge.  Why would he be

10   offered?  Is it he?  Why would he be offered as a witness?

11   We've stipulated that the emails went out or that the email went

12   out to the recipients.  So what does Mr. Schneider add to the

13   trial?

14           MS. MOTLEY:  Your Honor, if I may.

15           THE COURT:  Yes.

16           MS. MOTLEY:  They've stipulated that the emails went

17   out.  They have not -- They refuse to stipulate that it went out

18   to 16 people.  So if they're willing to stipulate it went to 16

19   people, that would be helpful.  The second thing is it goes to

20   willful reckless behavior.  Erik Schneider has been in

21   discovery.  He's someone that submitted an open records request.

22   He did not ask for any of these 44 plaintiffs' information but

23   received all of their personal information to which he did not

24   ask for.

25           So we have asked defendants to streamline this.  As

1    the Court rightfully wants and they won't even stipulate to 16
2    people receiving the drop box link, which seems like an obvious
3    stipulation.
4           MS. BAYNARD:  We didn't disagree to stipulating but
5    the drop box link was received by however many people.
6           MR. WIRTH:  It was the wording of the stipulation,
7    Your Honor.  It was that Joseph Roy shared --  I forgot the
8    wording.  It was he shared protected information or something
9    and what we stip --  We offered several times to stipulate to
10   the fact Joseph Roy sent an email on January 7th to the
11   recipients shown with the drop box link.  I don't know what more
12   we can do.  I don't want to stipulate to -- to share as though
13   it's just here you go.
14          We stipulated that the email was on the 7th.  It went
15   to the people listed in the email and it had the drop box link
16   in it.
17          MS. MOTLEY:  Your Honor, if I may.  First of all, we
18   wouldn't be so reckless on our side knowing how adversarial this
19   whole case would have been to ask them to stipulate to personal
20   information of plaintiffs being sent.  We don't send that
21   stipulation.  We simply said are you willing to stipulate that
22   16 people received the drop box link.  He keeps saying
23   recipients.  The fear is he's going to say, well, five of these
24   emails is actually of one person.
25          It's clear it went to 16 people, and that's why I

499

1    don't understand Attorney Baynard said she's willing to

2    stipulate.  Attorney Wirth is not.  We're trying to streamline

3    this.

4          THE COURT:  Thank you, Ms. Motley.  Let me just read

5    the current stipulation and the parties can tell me what's

6    missing for each side on the stipulation that does not serve

7    your purposes.  So the Stipulation Number 2 on January 7, 2021.

8    Joseph Roy released unredacted documents by providing a drop box

9    link to documents which included Wauwatosa Police Department

10   police reports, citations, squad and body camera video as well

11   as videos and records produced by other agencies.

12         So Ms. Motley from the plaintiffs' perspective, what's

13   missing from the stipulation such that Mr. Schneider's testimony

14   is necessary?  Is it the number 16?

15         MS. MOTLEY:  We are asking that after drop box link

16   that you add two words, 16 persons.

17         THE COURT:  Thank you.  Mr. Wirth.

18         MR. WIRTH:  The concept is correct that there were 16

19   names but a couple of the names were both WTMJ, that kind of

20   thing.  We don't have to argue that there were 16 persons

21   because there were 16 email addresses on the email.  Why is that

22   not factual?

23         THE COURT:  Okay.  So does the one WTMJ twice --

24         MS. MOTLEY:  No, this is two people with WTMJ people.

25         THE COURT:  So there are two different people.  Why

500

1    aren't they 16 people, Mr. Wirth?

2           MR. WIRTH:  They were 16 people, and we can argue the

3    fact of that.

4           THE COURT:  If there's 16 people, I don't see why --

5    I don't see daylight between your positions, right.  There's 16

6    people.  We agree to that.  I don't know what else you have

7    disagreement of.

8           MR. WIRTH:  Sure.

9           THE COURT:  So can I am looking at stipulation 2.  And

10   what Ms. Motley you offered by providing a drop box link to 16

11   people.

12          MS. MOTLEY:  That's correct.

13          THE COURT:  We can insert that into the document.

14          MS. KNOWLTON:  Semantically we did send this to adopt

15   exactly the language that Attorney Wirth was suggesting.  We

16   sent that last Friday.  So it would read on January 7, 2021,

17   Joseph Roy released unredacted documents by email to 16

18   recipients, people by providing a drop box link to the occupant.

19          MR. WIRTH:  I think that's what we agreed to.

20          THE COURT:  She's adding the 16 people.  I'm hearing

21   no objection to that.

22          MR. WIRTH:  Correct.

23          THE COURT:  All right.  We have a stipulation.  If

24   that could be revised because I will read the stipulations as,

25   you know, as part of the instruction on stipulations.  What else

501

1   do we have for this evening?

2           MS. KNOWLTON:  I have an additional housekeeping

3   quickly.  Just that the 215 -- Exhibit 215 at page 16 was

4   entered and received by Your Honor.  However, the bottom of 216

5   which is the entry regarding plaintiff John Larry carried over

6   to the top of page 217, so we would just like to clarify and

7   make a very clean record that admitted received document of John

8   Larry's entry, just John Larry's entry spans both page 16 and

9   17.

10          THE COURT:  Thank you.  I did see that.  Ms. Knowlton,

11  any objection to that?

12          MR. WIRTH:  No Judge.  We conferred on that.

13          THE COURT:  So that is received.  Exhibit 215 pages

14  the Larry entry which was bottom of page 16 to the top of page

15  17 is admitted.  Mr. Schwab, you were entering some stipulated

16  to exhibits into the record.  Are you ready to do that?  You're

17  not ready.

18          MR. SCHWAB:  We have agreement on some.  I don't know

19  if you want to do two batches.  We can do this before we start

20  tomorrow.

21          THE COURT:  We can put those on the record.  I have on

22  my list as to exhibit, the DOT records.  There was no objection

23  to authenticity, but there was an objection to admission.  That

24  is receipt of her documents, and I have reserved to take that up

25  at the end of the day.  Mr. Wirth, you wish to be heard on your

502

1   objection?

2          MR. WIRTH:  My objection is that they be admitted into

3   evidence because as the testimony revealed, there are no

4   documents from Ms. Schuh that precede October of 2020.

5   Consequently, the documents don't in any fashion add to the

6   evidence in this case about anybody who was added to the list

7   prior to that, anybody whose DOT information may or may not be

8   appearing in that list.  So I get --  So the objection to the

9   admissibility is relevance.  And I'm not quite sure how the

10  plaintiffs anticipate using those records.  If they can

11  elaborate on that.

12         I might be able to suggest to the Court that the

13  objection be withdrawn, but for right now the objection is

14  relevancy.

15         THE COURT:  Ms. Motley.

16         MS. MOTLEY:  Your Honor, with regards to those

17  documents, I mean it's the data.  You know, there's data that's

18  on the target list, excuse me, information that was obtained

19  that data on the target list in addition to some of the

20  documents released by defendant Roy, some of the data that was

21  after October 1st of 2020.  It's relevant to, you know, his

22  testimony and the documents that were released by him as well,

23  and so that's the relevance of it.

24         That's why we had her testify and submit those

25  documents.  I didn't want to waste her time or the Court's time

503

1    to go over what this says -- what that says, but she

2    sufficiently has noted in her testimony where the DOT records

3    are within the data that we have for these plaintiffs.

4            THE COURT:  As to the date issue that Mr. Wirth raises

5    that no record that was produced predate October 2020?

6            MS. MOTLEY:  That's correct.  None of the records that

7    she produced predate October 10, 2020; however, the data does

8    predate October 1st of 2020.

9            For instance if a person received a driver's license

10   you know in 2019, that information -- that data is in their DOT

11   record.  They were issued a driver's license on April 2nd of

12   2019.  So even though the data, you know, they ran it -- What it

13   means is basically they ran the data on October 10th of 2020.

14   And if there's anything new like for instance if they had

15   anything from you know October you know 2nd of 2020, that

16   information wouldn't be there.  It goes to the data.  So there

17   is sort of dates before that.  It is when she ran the

18   information in the TIME System.  I don't know if I am making

19   sense.

20           THE COURT:  I am a little bit unclear, Ms. Motley,

21   only because she used the word no record predate, not that her

22   search.  I think her testimony was about the records not when

23   the search was done, so I'm unclear.

24           MS. MOTLEY:  So the way the data works is that the

25   October -- There's two sets of data that she gave us.  She gave

1    us a spreadsheet.  And on that spreadsheet, it identifies the

2    operators that may have looked somebody up and the date that

3    they did that, so that's on the spreadsheet.

4            And so for that spreadsheet, it only goes from

5    October 1st of 2020 until, you know, 15 months in terms of who

6    the operator was that went into the TIME System to look up a

7    particular person.

8            The second set of data is the raw data.  It's the

9    information that was in the actual TIME System such as the

10   specific DOT records.  What is in there?  So in that broad data,

11   you may see a person receive their driver's license in 2019, so

12   her testimony as to what went from October 1 of 2020 to

13   15-months was in regards to the spreadsheet.  That for the

14   spreadsheet, they could only tell who the operator was that

15   tried to obtain that data from October 1st of 2020 until

16   15 months after.

17           THE COURT:  Thank you.  Anything further?

18           MR. WIRTH:  Judge, the additional objection about

19   foundation now has to be made because none of us knows what that

20   data means.  There was no witness to testify what that data

21   means or where it came from or why it's in there or what this

22   15-month period is.  The risk of confusion, the risk of

23   attorneys arguing about what data shows rather than witnesses

24   precludes this information as admitted exhibits.

25           MS. MOTLEY:  Your Honor.

505

1              THE COURT:  Ms. Motley.

2              MS. MOTLEY:  I believe that's what her testimony

3       precisely was.  She very clearly indicated that anything within

4       the data that talks about has the person's driver's license

5       issue date, anything within the data that has a line with, you

6       know, beginning record, end record, has the status of a person's

7       driver's license.  You know, we're talking about a half a page

8       of data where it literally has what's on your driver's license

9       but in printed form.  And you know that's what that data is and

10      it tells you, you know, when your address for instance when your

11      information was updated.  That's what's important, that half

12      page data.  I do believe she testified to that so that we can

13      say okay, this is from the DOT and that was the purpose of her

14      testimony.

15             THE COURT:  Okay.  I'll ask that the parties confer on

16      this one only cause she testified that there's other information

17      that can be found in her database, right.  So what appears to be

18      relevant is information from the DOT and she said there can be a

19      query line.  The parties can confirm that and see if there's a

20      limiting instruction that could potentially address the purpose

21      of this data.  The parties can consult on that.

22             And also I guess we will have to reflect the time

23      period that she testified to, and I will then consider it then.

24      I don't think we can give the jury a bunch of data that's

25      confusing.

506

1          Now, Ms. Schuh's testimony is in evidence and the jury

2    heard her so they can consider her testimony, but this data

3    itself I have some concern about given the scope of what she

4    says is in there and the limitation that she put on it as to no

5    records predate October 2020.  All right.  So the parties can

6    please confer.  See if there's a limiting instruction that can

7    address this.

8          I believe that's what I have as to matters that I have

9    objections that I had taken under advisement this afternoon's

10   testimony.  Ms. Motley, do you recall or Mr. Schwab or

11   Ms. Knowlton, do you recall anything else?

12        MS. MOTLEY:  No, Your Honor.

13        THE COURT:  Mr. Wirth and Ms. Baynard, do you recall

14   anything else?

15        MR. WIRTH:  I don't think so, Judge.

16        THE COURT:  All right.  Turning back to our witness.

17   We will take up the issue of Ms. Nelson.  You need to address

18   that so you know if you can call her by video.  Has

19   Mr. Schneider been -- Has Mr. Schneider been eliminated with

20   this stipulation of 16 people recipients?

21        MS. MOTLEY:  Your Honor, with regard to the 16 people,

22   this was sort of one thing that we discussed is try to have a

23   few exemplars so we don't have 16 people coming in, so we'd like

24   to call two or three people if that's okay with Mr. Schneider

25   being one of those people.

507

1          THE COURT:  I had interrupted with other matters.

2    Give me the rest of the line up for tomorrow.  If you could

3    continue with that, please.

4          MS. MOTLEY:  Joseph Roy, Sean Kafer, Peter Sparks.

5          THE COURT:  Mr. Kafer.

6          MS. MOTLEY:  Yes.

7          THE COURT:  Peter Sparks plaintiff?

8          MS. MOTLEY:  Yes.

9          THE COURT:  Anyone else?

10          MS. MOTLEY:  We were anticipating calling James

11    Gutenberg.

12          THE COURT:  Plaintiff?

13          MS. MOTLEY:  No, he's a witness.  He is one of the

14    recipients of the drop box.

15          THE COURT:  Next.

16          MS. MOTLEY:  Molly Collins.

17          THE COURT:  Plaintiff?

18          MS. MOTLEY:  No, she's a recipient of the drop box.

19          THE COURT:  Next, Ms. Motley.

20          MS. MOTLEY:  Your Honor, if we could visit that

21    tomorrow.  We have plaintiffs here, but we would anticipate

22    calling Diane Nelson and Erik Schneider.  We have that as part

23    of our line up.

24          THE COURT:  All right.  See everyone tomorrow morning

25    at 8:30.  Let's be ready with the first witness in the box at

508

1  8:30.  Thank you everyone.  Please have a restful evening.

2          BAILIFF:  All rise.

3      (Whereupon proceeding was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

509

C E R T I F I C A T E

        I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified June 21, 2023.

/s/Susan Armbruster

Susan Armbruster

<center>

Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov

</center>

510