UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------------

ANDREW AARON, et al,                )
                                    )
                  Plaintiffs,       )      Case No. 20-CV-1660
                                    )      Milwaukee, Wisconsin
       vs.                          )
                                    )      May 5, 2023
 DOMINICK RATKOWSKI & JOSEPH ROY,   )      8:42 a.m.
                                    )
                  Defendants.       )      **VOLUME 5**
                                    )
--------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE NANCY JOSEPH
UNITED STATES MAGISTRATE JUDGE, and a jury.

APPEARANCES:

 For the Plaintiff
 ANDREW AARON, et al:              Motley Legal Services
                                   By: Ms. Kimberly Motley
                                   PO Box 1433
                                   Matthews, North Carolina 28106
                                   Ph: 704-765-4887
                                   kcmotley@gmail.com

                                   Ascend Counsel, LLC
                                   By: Mr. Edward Milo Schwab
                                   2401 South Downing
                                   Denver, Colorado 80210
                                   Ph: 303-888-4407
                                   Milo@ascendcounsel.com

                                   Knowlton Law Group, LLC
                                   By: Ms. Katheryn L. Knowlton
                                   7219 West Center Street
                                   Milwaukee, WI  53210
                                   Ph: 414-202-2444
                                   Kate@knowltonlawgroup.com

978

CONTINUED APPEARANCES:

For the Defendants
DOMINICK RATKOWSKI &
JOSEPH ROY:                     Wirth & Baynard
                                By: Mr. Joseph M Wirth &
                                Ms. Jasmyne M Baynard
                                9898 West Bluemound Road - Ste 2
                                Wauwatosa, WI  53226
                                Ph: 414-291-7979
                                jmw@battys.com
                                jmb@battys.com

U.S. Official Reporter:      SUSAN ARMBRUSTER, RPR, RMR,
Transcript Orders:           Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

979

```
        T-R-A-N-S-C-R-I-P-T   I-N-D-E-X


                                         Page

JURY INSTRUCTIONS CONFERENCE:            981 -  984

JURY INSTRUCTIONS:                       985 -  992

                   CLOSING ARGUMENTS

CLOSING ARGUMENT BY MR. SCHWAB:          992 - 1004
CLOSING ARGUMENT BY MR. WIRTH:          1004 - 1020
CLOSING ARGUMENT BY MS. MOTLEY:         1020 - 1035

JURY INSTRUCTIONS:                      1035 - 1043

VERDICT:                                1069 - 1071
```

1                        P R O C E E D I N G S

2              THE COURT:  Good morning, everyone.

3              THE CLERK:  Judge Nancy Joseph is on the bench calling

4   Case No. 20-CV-1660, Andrew Aaron, et al v. Dominick Ratkowski,

5   et al.  Matter for continuation of jury trial.  Appearances

6   please for the plaintiff.

7              MS. MOTLEY:  Kimberly Motley appear in person with

8   Attorneys Milo Schwab and Kathryn Knowlton.

9              THE COURT:  Good morning to you all.

10             MR. WIRTH:  Judge, the defendants appear by Wirth and

11  Baynard.  Joseph With and Jasmyne Baynard appearing.

12             THE COURT:  Good morning to you as well.  We had three

13  matters that I took under advisement last night.  Regarding the

14  jury instructions, they have now been distributed to you.

15             So to make the record, one, plaintiffs had requested a

16  punitive damages instruction as to both damages.  Last night I

17  heard arguments from the parties on the issue.  After

18  considering the arguments and most importantly and reviewing the

19  evidence that has been presented to the jury, I do think it is

20  appropriate to submit the instruction to the jury as I find

21  there is sufficient evidence for them to consider this.  In

22  thinking about this, I spent a lot of time thinking about it.

23  It was helpful to me to think this through the lens of the

24  Rule 50(a) standard in that the evidence is to be looked at in

25  favor of the non-moving parties in this case, the plaintiffs.

                                                                 981

1    And in considering Rule 50(a) standard, the Court is

2    not to settle any credibility issues. That's for the jury. So

3    thinking it through that way because even with some of the mens

4    rea elements that I questioned the parties about last night in

5    discussing this, so much of it is tied with some credibility

6    determinations that the jury will have to make. So I do find it

7    is appropriate that they make that finding, so that's on page 24

8    of the final instructions that you received.

9    The second issue I took under advisement last night

10    was the *Senne* case, S-e-n-n-e, language that plaintiff had

11    requested. I did grant that language. It's on page 23 under

12    permissible use. But please note I edited to conform with the

13    Seventh Circuit law.

14    The law in the Seventh Circuit is broader than what

15    plaintiff had proposed. The plaintiff had proposed the language

16    same purpose, and the law is that it be the exception.

17    Additional disclosures et cetera must be compatible with the

18    purpose of the exception. So that is what is reflected. So

19    that is the law for the case. So to -- *Senne* is not the law and

20    should not be argued to the jury as such.

21    Third thing I took under advisement last night is

22    defendant had requested verification instruction. And language

23    as we had talked about came from *New Richmond*, which in turn

24    cited to *Dahlstrom*. One of the things we talked about last

25    night whether or not there was binding authority as the

1  Wisconsin Court of Appeals case on *New Richmond* is persuasive
2  authority in this case, but the Seventh Circuit case law is
3  binding on this Court and it is clear on this point, and that
4  language has been incorporated on page 22 of the final
5  instructions.
6          And because I had not -- did not have this language
7  before, I will now read it into the record as well as the
8  citations for *Dahlstrom*.
9          Page 22 under the paragraph that defines motor vehicle
10 records.  It reads, "The DPPA protects only personal information
11 that has been obtained from motor vehicle records.  The DPPA
12 does not apply to identical information so long as that
13 information flows from a source other than motor vehicle
14 records."  That is directly from *Dahlstrom*, and the citation for
15 *Dahlstrom* is 777 F.3d 937.  The pinpoint cite is 949 for that
16 proposition.  So that is the law of the circuit regarding
17 identical information.  With that, are the parties ready for
18 closing?
19         MS. MOTLEY:  Your Honor, I do have one thing.  I
20 apologize about this.  Exhibit 223 I wanted to make sure that
21 that was also in the record.  With my notes I didn't see that it
22 was.  I believe that was entered in.
23         Defendant Roy, he was shown it and we talked about it.
24 I believe you published it.  That is the open records request
25 from Hillary Mintz, three pages.  He actually read from the

983

1   first page of that document.

2           THE COURT:  Is there an objection as to 223?

3           MS. BAYNARD:  We're just taking a look at it.

4           MR. WIRTH:  It looks like the other record request,

5   Judge.  We don't object.

6           THE COURT:  With no objection, the number is 223; is

7   that correct?  That is received.  Anything further, Ms. Motley?

8           MS. MOTLEY:  No, Your Honor.

9           THE COURT:  Mr. Wirth.

10          MR. WIRTH:  No, Judge.  Thank you.

11          THE COURT:  All right.  With that I will bring the

12  jury out.  I remind counsel our conversation last night on the

13  instruction to be reasonable, the time.  And more importantly,

14  the instruction that the arguments be tethered both to law and

15  facts.

16          I do not want to entertain sidebars during the closing

17  arguments.  Your final opportunity to talk directly to the jury

18  so please tether your arguments consistent with the law, the

19  facts and the rulings in this case.

20          MR. SCHWAB:  Your Honor, I know since there is no

21  time, I'm going to be relatively brief.  But just want to make

22  sure we're reserving the opportunity to offer some rebuttal

23  closing.  We would otherwise reserve time.  Just want to be

24  clear about that.

25          THE COURT:  Yes, you will have your opportunity for

984

1  rebuttal.  Thank you for reminding me of that.  Rebuttal is not

2  a second closing argument.  Rebuttal is rebuttal.

3          THE COURT:  Please bring the jury out.

4      (Jury enters.)

5          THE CLERK:  Judge Nancy Joseph is on the bench calling

6  Case No. 20-CV-1660, Andrew Aaron, et al v. Dominick Ratkowski,

7  et al.  Appearances remain the same.

8          THE COURT:  Good morning to the attorneys.  Good

9  morning to everyone in court, and good morning to you, Members

10 of the Jury.  We have reached the point of the case where you

11 will hear closing arguments from the lawyers.  And before you do

12 that, I will give you instructions which is the law that is

13 applicable to the case.

14         The way I will do this this morning is I will give you

15 some preliminary instructions, invite the attorneys to make

16 their closing arguments and give you some concluding

17 instructions that you will have.

18         For the instructions, I like to come down from the

19 mountain top and bring the law to you rather than sitting up

20 here, so I will do so.

21         Good morning again, Members of the Jury.  So you will

22 receive copies of the instructions to have with you in the jury

23 room.  When you receive them, you will see that the instructions

24 are organized in three chapters for you.  So the first chapter

25 is general instructions, most of which I gave you at the start

1    of the trial to have you listen to the evidence.  And the second

2    chapter is specific to the claims in the lawsuit.  And the third

3    is the final instructions you will get from me before you retire

4    to the deliberation room.

5            First instruction.  Functions of the Court and the

6    jury.  Members of the Jury, you have seen and heard all the

7    evidence.  Before you hear the arguments of attorneys, I will

8    instruct you on the law.  After the attorneys will present their

9    arguments, I will give you additional concluding instructions.

10           You have two duties as a jury.  Your first duty is to

11   decide the facts from the evidence in the case.  This is your

12   job and yours alone.

13           Your second duty is to apply the law that I give you

14   to the facts.  You must follow these instructions even if you

15   disagree with them.  Each of the instructions is important.  You

16   must follow all of them.  Perform these duties fairly and

17   impartially.  Do not allow sympathy or prejudice to influence

18   you.

19           You should not be influenced by any person's race,

20   color or sex.  Nothing I say now and nothing I said or did

21   during the trial is meant to indicate any opinion on my part

22   about what the facts are or about what your verdict should be.

23           Evidence.  The evidence consists of the testimony of

24   the witnesses, the exhibits admitted in evidence and

25   stipulations.  In this case, the parties have agreed to eight

1   stipulations.

2          First.  On or around June 5, 2020, Dominick Ratkowski,

3   a civilian crime analyst hired by the City of Wauwatosa, created

4   a list;

5          Two.  On January 17, 2021, Joseph Roy released

6   unredacted documents by email to 16 people by providing a drop

7   box link to documents which included Wauwatosa Police Department

8   Police reports, citations, squad and body camera video as well

9   as videos and reports produced from other agencies;

10         Three.  Defendant Ratkowski did not get consent from

11  any plaintiff to obtain, use or disclose that personal

12  information from their motor vehicle records;

13         Four.  The defendant Ratkowski knowingly obtained,

14  used or disclosed 44 plaintiffs' personal information;

15         Five.  All of the plaintiffs' photos on the left side

16  of the list are driver's license photographs;

17         Six.  The driver's license photographs on the list are

18  from motor vehicle records;

19         Seven.  DOT means Department of Transportation;

20         Eight.  The parties stipulate that no witness will

21  speak for another.  But the plaintiffs may without objection

22  cite generalized experience testimony from one plaintiff as an

23  example of feelings that additional plaintiffs may share.  You

24  must treat these facts at having been proved for the purpose of

25  this case.

987

1          What is not evidence.  Certain things are not to be

2     considered as evidence.  I will list them for you.

3          First, if I told you to disregard any testimony or

4     exhibit or struck any testimony or exhibit from the record, such

5     testimony or exhibits are not evidence and must not be

6     considered;

7          Second, anything that you may have seen or heard

8     outside the courtroom is not evidence and must be entirely

9     disregarded;

10         Third, questions and objections or comments by the

11    lawyers are not evidence.  Lawyers have a duty to object when

12    they believe a question is improper.  You should not be

13    influenced by any objection, and you should not infer from my

14    rulings that I have any view as to how you should decide the

15    case;

16         Fourth, the lawyers' opening statements and closing

17    arguments to you are not evidence.  Their purpose is to discuss

18    the issues and the evidence.  If the evidence as you remember it

19    differs from what the lawyers said, your memory is what counts.

20         Note taking.  Any notes you may have taken during this

21    trial are only aids to your memory.  The notes are not evidence.

22    If you have not taken notes, you should rely on your independent

23    recollection of the evidence and not be unduly influenced by the

24    notes of other jurors.  Notes are not entitled to any greater

25    weight than the recollections or impressions of each juror about

988

1    the testimony.

2         Consideration of all evidence regardless of who

3    produced.  In determining whether any fact has been proved, you

4    should consider all the evidence bearing on the questions

5    regardless of who introduced it.

6         Weighing the evidence.  You should use common sense

7    and weigh the evidence and consider the evidence in light of

8    your own observations in life.  In our lives, we often look at

9    one fact and conclude from it another fact exists.  In law, we

10   call this inference.  A jury is allowed to make reasonable

11   inferences.  Any inference you make must be reasonable and must

12   be based on the evidence in the case.

13        Definition of direct and circumstantial evidence.  You

14   may have heard the phrases direct and circumstantial evidence.

15   Direct evidence is proof that does not require an inference such

16   as the testimony of someone who claims to have personal

17   knowledge of a fact.

18        Circumstantial evidence is proof of a fact or series

19   of facts that tends to show that some other fact is true.  As an

20   example, direct evidence that it is raining is testimony from a

21   witness who says I was outside a minute ago, and I saw it

22   raining.

23        Circumstantial evidence that it is raining is the

24   observation of someone entering the room carrying a wet

25   umbrella.  The law makes no distinction between the weight to be

1  given to either direct or circumstantial evidence.  You should

2  decide how much weight to give any evidence.  In reaching your

3  verdict, you should consider all the evidence in the case,

4  including the circumstantial evidence.

5          Testimony of witnesses.  Deciding what to believe.

6  You must decide whether the testimony of each of the witnesses

7  is truthful and accurate in part, in whole or not at all.  You

8  also must decide what weight if any you give to the testimony of

9  each witness.

10          In evaluating the testimony of any witness including

11  any party to the case, you may consider, among other things, the

12  ability and opportunity the witness had to see, hear, or know

13  the things that the witness testified about; the witness'

14  memory; any interest, bias or prejudice the witness may have;

15  the witness' intelligence; the manner of the witness while

16  testifying; and the reasonableness of the witness' testimony in

17  light of all the evidence in the case.

18          Prior inconsistent statements or acts.  You may

19  consider statements given by a party or witness under oath

20  before trial of evidence --  as evidence of the truth of what he

21  said in the earlier statements as well as in deciding what

22  weight to give his testimony.

23          With respect to other witnesses, the law is different.

24  If you decide that before trial one of these witnesses made a

25  statement not under oath or acted in a manner that is

990

1   inconsistent with his or her testimony here in court, you may

2   consider the earlier statement or conduct in deciding whether

3   the witness' testimony here in court was true and what weight to

4   give to the witness' testimony here in court.

5          In considering a prior inconsistent statement or

6   conduct, you should consider whether it was simply an innocent

7   error or an intentional falsehood and whether it concerns an

8   important fact or an important detail.

9          Number of witnesses.  You may find the testimony of

10  one witness or a few witnesses more persuasive than the

11  testimony of a larger number.  You need not accept the testimony

12  of the larger number of witnesses.

13         Absence of evidence.  The law does not require any

14  party to call as a witness every person who might have knowledge

15  of the facts related to this trial.  Similarly, the law does not

16  require any party to present as exhibits all papers and things

17  mentioned during this trial.

18         Multiple claims, multiple plaintiffs, multiple

19  defendants.  You must give separate consideration to each claim

20  and each party in this case.  Although there are two defendants,

21  it does not follow that if one is liable, the other is also

22  liable.  Although there are 57 plaintiffs, it does not follow if

23  one is successful the others are too.  In considering a claim

24  against a defendant, you must not consider evidence admitted

25  only against the other defendant or only as to other claims.

991

1          Demonstrative exhibits.  Certain demonstrative

2    exhibits have been shown to you.  Those presentations are used

3    for convenience and to help explain the facts in the case.  They

4    are not themselves evidence or proof of any facts.

5          Burden of proof.  When I say a party must prove

6    something by a preponderance of the evidence or when I use the

7    expression if you find or if you decide, this is what I mean.

8    When you have considered all the evidence in the case, you must

9    be persuaded that it is more probably true than not true.

10          Judge's comment to lawyer.  I have a duty to caution

11    or warn an attorney who does something that I believe is not in

12    keeping with the rules of evidence or procedure.  You are not to

13    draw any inferences against the side whom I may caution or warn

14    during the trial.

15          So this concludes our first chapter, the general

16    instructions.  I will go back on the bench, and then I will

17    invite the attorneys to make their closing arguments.

18          THE COURT:  Mr. Schwab.

19          MR. SCHWAB:  Thank you, Your Honor.

20          THE COURT:  You may proceed, Mr. Schwab.

21          MR. SCHWAB:  Thank you, Your Honor.  Ladies and

22    Gentlemen of the Jury, good morning.  It's been a long week.

23    Some of this has been slow and tedious.  But before we get

24    going, I want to thank you.  Thank you for giving up your week,

25    for spending it here with us going through at times dozens of

992

1    names and dozens of records.  But the reason we did that and the

2    reason you're here is because this is important.

3            You heard from nine plaintiffs.  And as you've seen

4    many more have been in the courtroom everyday.  That's because

5    what you're here to do today is important.

6            Now, you've heard testimony over of the past four days

7    about disclosures and use and access of people's personal,

8    private, driver's license information.  You've seen how that

9    information has been used and disclosed.  This isn't normal.

10   The way that these two individuals treated plaintiffs'

11   information is not normal.

12           It is not normal to build a target list based solely

13   on someone's participation in a protest, and it is certainly not

14   normal for that to be done by an employee of a police

15   department.

16           You heard testimony yesterday from Mr. Wrucke.  They

17   never created another list like that.  In fact, the only time

18   they created a list is in an investigation of a hostage

19   situation.  They don't keep a list of the Elks Club.  They don't

20   keep a list of political opponents.  Thank God.  I don't want

21   the police department to do that.  If they need no get in

22   contact with you, then that is the appropriate time to get your

23   contact information, to reach out to you.

24           Government employees should not target us on the basis

25   of our speech, and they should not invade our right to privacy

1   in order to do so. That's ultimately what this case is about,

2   about the right to privacy. It is about a right to be secure in

3   our personal information and know that that information is not

4   going to be misused by the government and by the employees and

5   not to be misused for improper purposes.

6           Mr. Ratkowski had no legitimate function, no

7   legitimate purpose for accessing or obtaining or using and/or

8   disclosing plaintiffs' addresses, their driver's license

9   pictures. He had pictures of them. He didn't need to go get

10  more pictures. And you heard, his testimony is, this is normal,

11  this is the normal things we do, and I didn't mean to target

12  them. That was a mistake.

13          You see his own language. That's not a mistake. That

14  is not a normal thing to write if you don't mean to target

15  people. He just said the quiet part out loud, and now he's

16  getting called to account. He didn't know this email would come

17  out when he wrote it, and that's why he wrote it.

18          Now, he came in here and told you, gave you testimony,

19  told you that, in fact, he built in response -- in response to

20  incidents. That is because he needs you to believe that.

21  Without that, without the fact that the idea that this was in

22  response to incidents, he knows that he loses. He knows that

23  there is no proper purpose if it is not investigating or

24  deterrence or preventing crime.

25          He offered testimony that each person was out and he

1    gave a specific date.  And throughout the entire record, he

2    speaks not to the need to investigate a particular incident, but

3    about completing a list of people who are consistently involved

4    in protests, about building a list of active protesters.

5         If there was one email one in which he said here are

6    the people who were at this incident here or a supervisor saying

7    I need you to look into July 7th, you would have seen it.  You

8    can bet they would have shown it to you.  It doesn't exist.  It

9    doesn't exist because his purpose was not to respond to

10   incidents but was building a list of active protesters.

11        This is actually one of his first emails on this, and

12   what does he say?  It is about people who are consistently

13   posting videos, photos and comments.  This is after the day he

14   says the Cheese Cake Factory happened.  Is there anything about

15   this email that suggests he's investigating an incident?  He's

16   talking about social media.  He's talking about what people are

17   posting on line, not these people were seen at an event.

18        These are the people that are posting.  These are the

19   people that are showing up to express their constitutionally

20   protected rights and posting on line and being tagged on line

21   and commenting on line.

22        This isn't in relation to an incident.  This isn't in

23   response to an incident.  This was because they showed up to

24   protest, and it wasn't just limited to this.  Eighty-eight

25   concerned citizens wrote a letter to their government saying

1  these are our concerns, these are our grievances.  What was his

2  response?  I am going to ID all of the names at the end of the

3  letter.  Can you imagine what it must feel like for these

4  peoples to find out when they wrote a letter to their government

5  asking for change, someone in the police department started

6  investigating them for it?  Someone on the police department

7  investigated them for writing a letter to their government.

8  This isn't normal.

9          And it is not limited just to this.  As you heard, he

10  investigated John Larry.  You saw Mr. Larry, the principal of a

11  high school.  Mr. Larry served on an ad hoc committee on

12  policing and systematic citizen members.  What did defendant

13  Ratkowski do?  He created an investigative file on him that

14  included his work, his education, his wife's name and birth

15  date, and he sent that to other people, including Mr. Vetter the

16  captain.  I forget his position, the captain who you met.  Just

17  in case someone asks for proof that they are in the People's

18  Revolution, I attached their Facebook information as members of

19  the group.

20          What legitimate police purpose could there be for

21  investigating people for their participation on an ad hoc

22  committee on policing and systematic change?  There is none.

23          What is the through line?  The People's Revolution.

24  The People's Revolution is what connects these two things.  His

25  accessing, his using, his disclosing of people's personal

1    private information.  It wasn't just limited to this one list.

2    He went and did it in this case, too.

3         This was not investigation of an incident.  This was a

4    group that was called together by the government to consider

5    policy changes, and he investigated them too, and he let the

6    police department know that these people were also involved in

7    the People's Revolution, and they wanted to give them the proof.

8         And you heard him testify that when he gave his

9    deposition when he was not a defendant, he agreed.  The sole

10   qualification for making your way onto this list was mere

11   affiliation, affiliation with one protest group.  It wasn't

12   incidents.  It wasn't to investigate.  It wasn't because they

13   committed a crime or might commit a crime or had been violent or

14   might be violent.  Mere affiliation.

15        But I'll tell you what you also didn't hear this week,

16   why he needed their addresses.  His justification is for

17   building a list, but not why he needed that information.  You

18   heard multiple of the supervisors get up there and say we always

19   have access to this information.  If they needed to go reach out

20   to people, they needed to go knock on those people's door, they

21   could have accessed that address at the time they needed it.

22   Every single one of these plaintiffs, all 44 on Mr. Ratkowski's

23   claims, had their DOT addresses put into the system

24   prospectively.  There's no justification for that.  He didn't

25   have a legitimate law enforcement purpose for accessing and

1    using their home addresses.  He didn't have a legitimate purpose

2    for accessing their driver's license pictures and using that in

3    the list.  Even if the list was okay, it is not.  You have to

4    have a justification for using and obtaining that particular

5    data, and you didn't even hear an offer as to why he did that.

6    Because there is no answer.  Because there is no answer.

7    Because he didn't need that data.  He didn't need it.  Nobody

8    knocked on anybody's doors.  Nobody contacted any of these

9    plaintiffs.  They didn't need that data.  It was just part of a

10   target list.

11        Now, if you look at the target list, and I'm sure

12   you've been itching to look at it.  And in a few minutes when

13   you go back in there, you'll be able to ask for it.  You'll

14   notice that there are entries that aren't even related to people

15   or cannot reasonably be related to any incident, any

16   investigation.  Why do they need to know the people's movement

17   was renting a loft somewhere, a meeting space?  Why would they

18   possibly need to know that to investigate an incident at Cheese

19   Cake Factory?  Why would they possibly need to know who is a

20   core member if they were investigating an incident in the past

21   to try to identify people who may have violated some ordinance?

22        And as you notice for everyone's address, it says DOT

23   as of.  You know where they got that information.  You know

24   where he got that information.  There's no reason to put that

25   Mr. Larry was a member of the ad hoc committee.  That's not an

998

1  investigation.  That is in support of building a list of active

2  protestors.  It all makes sense.  It all makes sense.  And it

3  all works together if you just go to what the most obvious

4  answer is.

5          And why did he create a page targeting the Cole

6  family?  What possible investigatory purpose could there be for

7  creating a page titled Cole family?  What possible investigatory

8  purpose could there be for labeling people as photographers?

9  What possible investigatory purpose would there be for putting

10  the pictures of children on this list?

11          Now, when you go back there, you're going to get a

12  verdict form for each defendant.  I'm going to go through how

13  we'd like you to fill out the verdict form for Mr. Ratkowski, I

14  apologize.

15          So Mr. Ratkowski built this list.  He obtained

16  people's personal information all for improper purposes, and

17  then he sent it around to 34 people outside of Wauwatosa Police

18  Department and who knows how many within.  And we do not even

19  know the full extent of how far this thing has been shared.  We

20  heard testimony from a detective from Minneapolis who was sent

21  this list not by Mr. Ratkowski but by Mr. Conte who

22  Mr. Ratkowski encouraged to share it around.

23          Not only did he target these people, not only did he

24  invade their privacy, he was reckless with that information.  He

25  didn't protect it.  There's not an email out there where he says

999

1    be careful with this.  Hey, this is confidential.  This is

2    restricted information.  This is for law enforcement purposes

3    only.  Now, it is a protestors involved list.  Share it around.

4    Out of state already.  She didn't know why she got it.

5          Now, when you go back there, we're going to ask to you

6    check yes for every single punishment.  For every single

7    plaintiff, we're going to ask you for one obtainment for when he

8    went and got it, for when he went and got each plaintiffs'

9    personal information out of the motor vehicle records, which has

10   been stipulated.  And we're going to ask you to put 35 in there.

11   35 disclosures.

12         The number of uses, I am going to leave that to you.

13   But you did hear him testify on the second day of trial that he

14   used it 197 times.  You heard him testify yesterday that he was

15   in this document five to 750 hours that year working everyday

16   prowling social media, looking for more information that he

17   could put into this list.  He was using this list constantly.

18         I apologize, 44.  Now, just to return your attention

19   to this argument that he made that these were in response to

20   specific incidents.  That's what he needs you to believe.  If

21   you don't believe that, you have to find for the plaintiffs.

22   That's why he made that argument.  That's why he made that list.

23   That's why he won't acknowledge what is in those emails, what is

24   in his prior testimony.  If that's true if this was a list of

25   protestors if this was not to investigate something, then he

1  loses.

2      Now, I'm going to turn our attention to the second

3  defendant, Mr. Roy.  You recall Mr. Roy took the stand on

4  Wednesday.  He is the head or was the head of the Open Records

5  Department for the Wauwatosa Police Department during this time

6  period.  And on January 7th of 2021, he sent a dump of documents

7  to 16 different people and specifically told them that the

8  documents are being provided unredacted and then put it in a

9  drop box link.  This isn't normal.  This is not how open records

10  works.  You don't send all of the records that you might be

11  producing to all of the people that you might be producing all

12  at once.

13      You respond to the requests, and you give the

14  documents that are requested.  You heard testimony I got a lot

15  more documents than I asked for.  I only asked for this one

16  ticket, and I got everyone's personal information.

17      Now, Mr. Roy's entire defense is that he couldn't

18  possibly know where this information came from.  That's it.  Do

19  you believe that he didn't know where this information came

20  from?  You should decide for him.  If you believe that he does

21  know and he did know at that time where this information came

22  from, you got to rule for the plaintiffs.

23      Now, if you recall that long tedious time when I had

24  to go through 50 citations like this and you go through that

25  address under Ms. Bogenberger's name, her height, weight, hair

1  color, eye color and driver's license number just to confirm

2  from him that he was now here this week telling you that he

3  didn't know where it came from.

4          And I pulled up that video.  This was the document he

5  was looking at in that video.  This is the information he was

6  looking at.

7      (Whereupon tape is played.)

8          His own words.  He knew.  He knows how the system

9  works.  This information is auto filled from DOT records, yet he

10 had the gall to come in here and tell you he couldn't possibly

11 know.

12         Then, we turn to those arrest records, those

13 narratives of arrest citations.  Larry's DOT record shows him to

14 be five-foot 11, 250-pounds; Welch's DOT record shows him to be

15 six-foot tall; Kafer's DOT record shows him to be six-feet one;

16 Coleman's DOT record has him at five-foot six; Ahmed's DOT

17 record has her at five-foot, one inch; Vitucci's record as her

18 at five-two; Wilborn's DOT record has him at five-four; Hayes

19 DOT record has him to be five-seven; Larson's DOT record has him

20 at five-ten.

21         Even when he was confronted with this, he could not

22 acknowledge what is painfully obvious, that any person would

23 know where this information comes from.  When we give our height

24 and weight and eye color and hair color to the DMV, that

25 information, that personal information, is supposed to be

1    protected.  It is private information.

2              Now, you're going to get a similar form for Mr. Roy.

3    We're not saying that he obtained these records from DOT.  We're

4    not saying that he used these records from DOT.  It is clear

5    that he disclosed records from the Department of Transportation,

6    motor vehicle records that he knew to be from there, and he did

7    it 16 times for each of the plaintiffs, 16 times.

8              Ladies and Gentlemen, these two individuals were given

9    the opportunity to come in here and tell you their story.

10   Instead, they told a different story, a different one from their

11   previous depositions, a different one from the record.  They

12   invaded the plaintiffs' personal information.  They invaded that

13   right to privacy, and they can't even accept accountability here

14   today.  They'll offer anything to get out of it.  They'll offer

15   anything to get out of it.

16             But you know what? You have the proof.  You have the

17   citations.  You have those arrest records.  You have the target

18   list.  You have his email sending out.  They are all in

19   evidence.  You have them.  Look at them and fill out this

20   verdict form and fill out Mr. Ratkowski's verdict form as I show

21   you.  When you say yes to both of those, on both of those forms

22   for each plaintiff when you say yes, you're going to turn to one

23   more question.

24             Is there an award that we should give plaintiffs, each

25   plaintiff, to send a message to Mr. Ratkowski, to send a message

1  to Mr. Roy, to send a message that you don't treat peoples'

2  privacy so flippantly, that you don't do this, that this isn't

3  normal, and that they knew what they were doing.  Or at the very

4  least were reckless how they treated these plaintiffs' personal

5  private information.  I'm not going to give you a number.  I

6  trust you.  I trust you to come to a decision together on what

7  amount will send a message and tell people and tell these two

8  people don't do this.  Thank you.

9        THE COURT:  Thank you, Mr. Schwab.  Mr. Wirth.

10        MR. WIRTH:  Thank you, Your Honor.  Good morning,

11  Ladies and Gentlemen of the Jury.  As I began the week, I will

12  end it as such.  We need to hear both sides.  We cannot --  You

13  cannot get distracted in this case by the efforts to use emotion

14  and anger and accusation as the substitute for evidence.

15        What I'm going to do in this closing argument is

16  review with you the evidence and the law.  And as I look back on

17  the evidence in this case, I cannot remember a single

18  plaintiffs' witness, not one, who has defined for you what a

19  motor vehicle record is.

20        This is a Driver's Privacy Protection Act case, a DPPA

21  case.  The only evidence, the only data that is at stake in this

22  case is motor vehicle records.  That suggests two possibilities.

23  Either they don't know what the definition of a motor vehicle

24  record is, and there's a table of three competent attorneys.  I

25  seriously doubt what that is or they don't like the answer.

1    A motor vehicle record is defined to include a

2  prohibition that the state department shall not knowingly

3  disclose a motor vehicle record except as provided.  If it is a

4  motor vehicle record, it isn't protected, and there is an

5  important distinction at work in this case.  A motor vehicle

6  record is not the same as personal information.

7    You heard throughout this week that the plaintiffs

8  would like to equate the two.  Our personal information was

9  released.  Our personal information was in that citation.  Our

10  personal information was on that list.  Personal information is

11  not a motor vehicle record.

12    For instance, this is a driver's license.  What's on

13  the driver's license is personal information.  The driver's

14  license is not a motor vehicle record.  The motor vehicle record

15  is stored at the Department of Transportation in Madison.  That

16  is where the motor vehicle records are.  Unless it comes from

17  there, it is not a protected piece of evidence, piece of

18  evidence that is at stake in this lawsuit.

19    We have to get away from arguing if there's personal

20  information that's being released, it is a violation of the

21  DPPA.  It is not.  The idea about this distinction is that the

22  Act was put in place to protect us from having our motor vehicle

23  information obtained from the state.

24    You heard Katie Schuh tell you that there are a dozen

25  different places where our personal information can be accessed.

1005

1  You heard Lieutenant Roy, Captain Vetter, you heard Dominick
2  Ratkowski tell you that there are additional ways that the
3  police in their reporting can come up with personal information
4  including self reporting.

5       I am not sure there's a disconnect here because you
6  heard some questioning during the testimony of plaintiffs.  Did
7  you ever shout out your name?  Did you ever shout out your
8  address?  Did you ever shout out your license information or
9  your height or your weight?  That's not self reporting.  Being
10 stopped by a police officer at a civil disturbance such that a
11 citation can be issued and asking you for your driver's license
12 and you providing it to them, that is self reporting.  That is
13 not motor vehicle record information.  It is private information
14 for sure, but it didn't come from Madison.  It came from the
15 person holding the license saying here's my license.  That is
16 self reporting.  That's one of the ways.

17      You also heard that there are databases like the NCIC,
18 which is kind of a federal level, that keeps track of people who
19 have had law enforcement contact.  CIB, which is the state
20 level, that has had contact with police departments.  You've
21 heard things like the DNR has our information, and you've also
22 heard that an officer who logs into the TIME System.  Katie
23 Schuh can check all those boxes to make sure that the
24 information he or she is looking for pops up.  Is it one of the
25 12, the DOT?  It certainly is, but there are 11 other sources --

1    at least 11 other sources, including this self reporting, that

2    can communicate personal information, not motor vehicle records.

3         The DPPA protects only personal information from motor

4    vehicle records.  The law requires that for the plaintiffs'

5    personal information to be protected by the DPPA, the personal

6    information that you heard for four days, they're upset about,

7    this is the DPPA lawsuit.  It is only protected by the DPPA if

8    that information must come from motor vehicle records.  If there

9    is identical information if a person is looked up in the system

10   that flows from another source, the 12 we've talked about

11   including self reporting, it is not protected by the DPPA.

12        This lawsuit isn't a referendum on big brother is

13   watching us.  This lawsuit is about the DPPA and whether the

14   plaintiffs have proven to the certainty that the Court has

15   instructed you that every piece of information about which they

16   complain came only from the motor vehicle department, only from

17   the Department of Transportation, not from anywhere else.

18        Here's what you heard from the witnesses who actually

19   testified about these things.  Motor vehicle record means any

20   record that pertains to a motor vehicle operator's permit, motor

21   vehicle title, motor vehicle registration, identification card

22   issued by the Department of Motor Vehicles.

23        In other words, the record is what's back in Madison

24   pertaining to our driver's license, pertaining to our Wisconsin

25   identification license.

1007

1          Self reporting and I didn't make this big enough.  But

2    on these citations that were blown up for you, shown for you,

3    gone through one at a time where it says something like

4    defendant cooperated with verbal ID and confirmed it with his

5    DOT photo.

6          MS. MOTLEY:  Sorry to interrupt.

7          MR. WIRTH:  Wrong example.  But the idea that the

8    citations in there that have I cooperated, I turned over my

9    photo ID.  I apologize.  That is not a motor vehicle record.

10   That is what's called self reporting.  Thank you.

11         You were just shown this for Mr. Larry.  John Larry is

12   wearing a red number seven.  Larry's DOT record shows him to be

13   five-eleven, 250, brown eyes, black hair.  The plaintiffs want

14   you to believe that because this has DOT record, it came from

15   the DOT.

16         There's another example because the motor vehicle

17   record must be the only source of the information.  What police

18   are permitted to do is gather the information.  Dominick

19   Ratkowski testified about it for two days and then verified it

20   with DOT records because the law says that if the DOT record is

21   just identical to what you've collected in other ways, it is not

22   actionable under the DPPA.

23         This is not a violation of the DPPA if Larry's DOT

24   record shows what they have gathered in their investigation

25   through other sources.  The DOT designation does not mean the

1    DOT was the sole source of that information.

2           Now, there is a little more understanding that this is

3    not private information in this lawsuit.  It is DPPA protected

4    motor vehicle information.  Let's talk about what Dominick

5    Ratkowski did.

6           Personal information does not include information on

7    driving violations.  Some of the citations that you were shown

8    during the presentation by the plaintiffs for certain

9    plaintiffs -- let me just make sure that I've identified one

10   properly -- were what are called Wisconsin Uniform Citations.

11   Those are driving violations citations.  You saw several

12   plaintiffs whose inclusion in the data dump were moving

13   violations, driving violations.  Those are not protected DPPA

14   documents.

15          In fact, the only record that the parties agree on,

16   the only stipulation that the parties agree on are that the

17   driver's license photos on the left side of Dominick Ratkowski's

18   list.  That came from the DOT.  That he pulled up from the DOT.

19   We all agree those driver's license photos were sourced from the

20   DOT and are motor vehicle records.

21          But what you heard Mr. Ratkowski testify to is why did

22   he get that information?  He pulled up that information to

23   verify the information, the identities, the location of the

24   people that he had already found through what he calls open

25   source materials.  That is not a violation of the DPPA.  Police

1    can call up your driver's license to verify stuff that they've

2    gotten from open source material without it being a violation of

3    the DPPA.

4           And I have to stop here because I am about to start

5    talking about this list that Dominick Ratkowski prepared.

6    Dominick Ratkowski's assignment was to gather information on

7    people as the summer of 2020 was beginning to produce 100 days

8    of marches, protests at various locations, at private

9    businesses.

10          You heard the way Dominick Ratkowski's mind works is

11   he does a list.  There was some mention in closing that I can't

12   let go about a second list.  There is no second list.  There is

13   no evidence in this case of a second list involving an inclusion

14   committee.  That to the extent that the plaintiffs believe

15   something happened outside this courtroom, there was no evidence

16   permitted regarding this inside the courtroom.

17          It is not our burden of proof here to demonstrate a

18   purpose for each plaintiff that was included on the Ratkowski

19   list, but we did.  We had Mr. Ratkowski go through and explain

20   in each time, in each circumstance, in each evidence -- as a

21   result of each incident why people were added to the list.

22          Here's another example of what cannot be DOT records.

23   The citations, and there were a lot of them in the evidence in

24   this case that include -- Phone numbers don't come from the DOT.

25   The DOT doesn't produce phone numbers when you access their

1010

1  records.  That's what all of the officers who access this system
2  have told you.

3       So far if you're keeping track, the citations upon
4  which the plaintiffs base their DPPA lawsuit include self
5  reporting, telephone numbers references to DOT without
6  references to DOT being the source of the material.  They
7  involve data that is not protected.

8       Dominick Ratkowski is a civilian crime analyst
9  employed by the City of Wauwatosa Police Department, and the
10 effort -- the repeated effort in this case to cast crime
11 analysts as somehow not qualified to receive this exchange of
12 information between departments is incorrect.

13      The DPPA specifically says that a private person
14 acting on behalf of the Wauwatosa Police Department, actually
15 the law enforcement entity in carrying out its functions.  A
16 crime analyst is someone qualified to receive and exchange the
17 information.  When we're talking about information in this case,
18 the only thing we're talking about is the photographs down the
19 left side of the list.

20      You heard Mr. Ratkowski, and I caution myself that we
21 are only referring to incidents in the abstract.  You heard
22 Mr. Ratkowski.  You heard Captain Vetter.  You heard Lieutenant
23 Roy.  You heard Captain Wrucke tell you that the summer of 2020
24 was a tumultuous time in the City of Wauwatosa.  There were
25 incidents involving the Cheese Cake Factory at Mayfair.  There

1    were incidents involving a march slash procession that caused

2    traffic elements.  There was an incident involving the mayor's

3    house.  There was an incident involving a former police

4    officer's home.  After each of those incidents is when Dominick

5    would go back in and in response to the incident add to the

6    list.

7              The list, as you heard him say, was to identify and

8    anticipate witnesses, leaders.  The suggestion that there's no

9    reason to have the core members identified, you heard Captain

10   Vetter say that he contacted the core members ahead of these

11   events to try to make sure that everybody understood the ground

12   rules so that there would be public safety.

13             Videographers, what I call memorialists, people who

14   would routinely videotape or live stream or preserve the videos

15   as many as 300 different marches.  That's why they are on the

16   list.  Contact, planning, ability to elicit cooperation so that

17   everybody's right to protest, everybody's right to publically

18   assemble in a lawful manner and express their opinions coincide

19   with the rights of others to lawfully enjoy their community,

20   their yards, their roads.

21             Never once in any sense was a plaintiff in this case

22   prevented from exercising that constitutional right.  In fact,

23   you heard the plaintiffs in this case testify that in that

24   summer, they protested 90 times, 300 times, 100 times.  Without

25   trying to be flip about it, if this had been a target list, it

1012

1    was a lousy target list because it didn't stop anything.  What

2    it did, what it was good at is exchanging information so that

3    law enforcement could prepare in each of the communities that

4    borders Wauwatosa for the undertaking, the deployment of

5    manpower, the planning for street closures, the ability to make

6    sure or access for public service was still available.  That is

7    what the document was for.

8         That document was never once exchanged with anyone

9    other than law enforcement.  It was a law enforcement document.

10   And you heard every police personnel who testified in this case

11   tell you that that is a vital function of law enforcement, the

12   ability to communicate.  While there are jurisdictional

13   boundaries, there are no walls.  The communities have to

14   communicate.  The communities have to cooperate.

15        That list was never distributed publically.  The

16   question is why was it distributed at all?  Well, you heard the

17   testimony.  Because that is the ability to cooperate, the

18   ability to exchange information.  I'll give you information that

19   protects your community.  You give me information that protects

20   my community.

21        The suggestion that that information not be exchanged

22   unless you know everyone on the list is involved in what is

23   being sought is impossible.  That's not now data is exchanged by

24   law enforcement agencies.  We can't send the data out to New

25   Berlin and say we're pretty sure -- we know these are the four

1013

1    people that you're probably interested in.  We don't know that.

2            Dominick said I recognized a couple people, and I told

3    New Berlin, here is the list.  See if this helps you.  It is a

4    luxury to stand here three years later and say, well, I know

5    that these plaintiffs weren't involved in New Berlin, weren't

6    involved in Milwaukee, weren't involved in Brookfield.  That's

7    not the timeframe that you examine.  The timeframe that you

8    examine for why it was distributed is the timeframe that

9    includes when the decisions were being made.

10            I am not even sure why this was raised but the

11    suggestion was Dominick said that he only started the list as a

12    method of monitoring protests.  What he actually testified under

13    oath -- Dominick Ratkowski was deposed twice.  So you decided to

14    create a list of known protestors on your own?  Yes because that

15    is a part of the open source information and planning processes,

16    to plan for potential violence, to identify witnesses, victims

17    and suspects of any potential violence that came out of a

18    protest.  It is a part of the intel gathering process to

19    identify people who are actively involved in a specific

20    incident.

21            Of course he started the list in response to

22    incidents.  Of course he added to the list in response to

23    incidents.  That's what he was doing for six months in the

24    summer of 2020.

25            So what are the permissible purposes for accessing the

1014

1    very limited amount of data in this case that is actually

2    covered by the DPPA?  Law enforcement agency in carrying out its

3    functions, planning, anticipation, response, personnel,

4    monitoring, following up on prosecution, mailing citations, all

5    law enforcement functions.  Exchanging information with

6    surrounding communities in exchange for their information, all

7    part of law enforcement functions.  The DPPA permits this.  The

8    DPPA permits the exchange of, transfer, distribution of this

9    data as long as in correspondence with a state statute that

10   permits it for public safety.

11         Wisconsin has a state statute, what's called the

12   mutual assistance statute.  Upon the request of any law

13   enforcement agency, the law enforcement personnel of any other

14   law enforcement may assist the requesting agency.  There is a

15   state statute that permits the transfer of this data.

16         You have to ask yourself as jurors when you are given

17   the special verdict form with respect to Dominick Ratkowski's

18   list, is there any data on there that you are certain to at the

19   level that the Court will instruct you that is Department of

20   Motor Vehicle information that couldn't have come from anywhere

21   else, that didn't come from anywhere else?

22         I will recommend to you that the only evidence of that

23   are the driver's license photos, and that the driver's license

24   photos were collected for a purpose permitted by the DPPA.

25         So when you are asked to answer the special verdict

1  question with respect to Dominick Ratkowski, you will see that

2  it asks did he collect this data obtain, use or distribute this

3  data with no law enforcement purpose?  You will answer the 44

4  plaintiffs no because he did have a law enforcement purpose.

5      Next I'll turn to Mr. Roy, Lieutenant Roy.  You were

6  told that the method of his open records production is unusual.

7  There has been no witness in this case who testified that the

8  manner of Joseph Roy's open records production was unusual.

9  None.  Argument is not evidence.

10      The Court has already told you that.  Joseph Roy

11  entertained a dual purpose, a dual commitment on January 7,

12  2021, and he's protected in that dual purpose by the language of

13  the DPPA, which states that it protects information from

14  employees who shall not knowingly disclose that information.

15      So there are -- This kind of dual obligation under the

16  public records open records law and the DPPA.  Open records law

17  is state statute.  There is a public records shall be construed

18  in every instance with a presumption of complete public access

19  consistent with the conduct of government business.

20      The denial of public access generally is contrary to

21  the public interest and only in an exceptional case may access

22  be denied.

23      Joseph Roy's duty is to disclose public records.  Yes,

24  he has to temper that duty against what is required by the DPPA,

25  but the DPPA is a specific exception.  It exempts motor vehicle

1    records.

2           With respect to the records that Joseph Roy disclosed,

3    plaintiffs have two things they must prove.  Must prove.  First,

4    that the information in the citations could only have come from

5    Madison, from connecting to Madison and downloading the

6    information.  Not only can they not prove that, but a good

7    section of the citations that they blew up and asked Joseph Roy

8    about are self evident, not Department of Transportation

9    records.

10          The ones with telephone numbers.  The ones that

11   include self identification.  The ones that are moving traffic

12   violations.  Those are self evident, not protected by the DPPA.

13   The plaintiffs to whom those citations belong have not proven

14   their case from the basis.

15          Did Joseph Roy testify that there is a way to have

16   citations for arrests self populate?  Yeah, they played his

17   deposition testimony when he said that.  Mr. Roy testified when

18   he was here on the stand that he was explaining a way that that

19   happens.  That's a way that the issue or the citation can

20   connect directly to the Department of Transportation.  It will

21   auto populate if you do that.

22          What is the next logical question that should have

23   been asked?  Are there other ways?  If that question had been

24   asked, that's the question I asked him.  You would have heard

25   him say yeah, there are about a dozen other ways that

1    information can get into those citations.

2           So suggesting that and we concede the Department of

3    Transportation connection is one way for that information to get

4    into those citations.  The difficulty however is there's nothing

5    about the citation that shows that occurred.  The citation is --

6    I forgot one of the cases used the word agnostic.

7           The citation itself does not profess where its data

8    came from.  You can't look at the citation and say that's DOT

9    because it's not.  There are a dozen different ways for those

10   citations.

11          So we are at day five of the trial.  And what the

12   plaintiffs are suggesting to you is that the DOT information

13   could have been one of 12 ways that that information got into

14   the citation.  That is a failure of proof.  At this point in a

15   trial, you are supposed to be convinced that is the only way

16   that information got in there.

17          The second layer of proof with respect to the DPPA

18   claim against Joseph Roy is that he knew that was --  that DOT

19   records were the only source of information that could be in

20   those reports, including the ones that have phone numbers, are

21   moving violations, including the incident reports that say that

22   the people cooperated and gave their IDs and identified

23   themselves.  The documents, the evidence itself, arrest records,

24   CIB searches, the --  The citations to DOT within those reports

25   cannot be shown to be anything other than a verification.  And

1018

1  because of that, that means that the questions on behalf of

2  Joseph Roy need to be answered no for two reasons.

3          First, there's been a failure of proof that the only

4  source of the information is DOT records.

5          And second, that Joseph Roy could look at that

6  information and know it was only one of 12 sources that created

7  that information.  That has not been proven in this lawsuit.

8          With respect to the email that was sent on January 7,

9  2021 one email, yes, 16 recipients.  But that doesn't answer the

10  question of whether it was a knowing disclosure.

11          So I will wrap it up.  As I have suggested, at this

12  stage in this kind of trial, I get it.  Our side is like the dry

13  evidence side, and the plaintiffs side is the emotional side,

14  emotion, tears, one guy that was outraged.  Don't substitute for

15  evidence.

16          That's fine on YouTube and on streaming and on

17  websites, and it is absolutely fine in terms of demonstrations

18  and marches and expressing our public opinion and private

19  opinion in a public setting challenging our government,

20  challenging our police department.  Absolutely fine outside the

21  courtroom.

22          Inside the courtroom evidence is proof.  Inside the

23  courtroom truth controls because it has to been proven not just

24  argued.  There isn't evidence in this case that any DPPA

25  violations have occurred.  Was personal information disclosed?

1    Yes, it was.  Is that a balancing act in our state that requires

2    personal private information to be disclosed on some occasions?

3    Yes, it is.

4          So when you get to the two questions one for Ratkowski

5    one for Roy, you will need to go through each of the plaintiffs

6    and answer no because both of those questions ask whether the

7    plaintiffs have proven to you that (a), there was no law

8    enforcement function served by the list.  Of course there was.

9    And (b), that Joseph Roy --  that the data could only have come

10   from the Department of Transportation and Joe Roy knew it.

11         As you have probably seen, the plaintiffs will not

12   listen to me, and they don't have to.  But they have to listen

13   to you.  They have to listen to the group of people charged with

14   upholding the law even in uncomfortable circumstances.  They

15   have to listen to the truth.

16         So I will ask you again, Ladies and Gentlemen, let

17   your verdict speak the truth whatever that truth may be.  Thank

18   you very much.

19         THE COURT:  Thank you, Mr. Wirth.  Mr. Schwab, am I

20   calling on you again?  I am calling on Ms. Motley.

21         MR. SCHWAB:  Ms. Motley will do the rebuttal.

22         MS. MOTLEY:  Your Honor, before I give my remarks, I

23   ask for a brief sidebar.  I don't want to say anything

24   inappropriate when I give my rebuttal.

25         THE COURT:  Is it something we can make a record of

1020

1    after your rebuttal?

2            MS. MOTLEY:  Yes.  Good morning.  Thank you all for

3    listening to everything that's been presented before you.  I

4    know plaintiffs appreciate at it.  The defendants appreciate at

5    it, and I certainly know the Court appreciates it as well.

6            This is an extraordinarily important case, and only

7    you can decide whether or not defendant Ratkowski and defendant

8    Roy violated the DPPA.  We've talked at you.  We've run to the

9    sidebars a million times.  We probably annoyed you this week.

10   But now it is up to you to make the decision on whether they

11   violated, and we believe that not only did they violate the

12   DPPA, but they did so willfully and recklessly.

13           This case is not about data.  This case is about

14   peoples' personal, private information that every single one of

15   these 57 plaintiffs has a right, has a legal right to be

16   protected.

17           So let's talk about sort of what Attorney Wirth just

18   went through.  On June 5, 2020, Dominick Ratkowski created a

19   list.  We know that he created this target list that you guys

20   have been seeing.  You have sort of seen it up here, different

21   snatches of different pages.  You've seen us hold it up.  You

22   have a right to request this information so you can see it for

23   yourself to see what is in this document.

24           It is a fact that there is the driver's license

25   information of 44 plaintiffs.  That's a fact.  Every picture on

1   the right that you see the plaintiffs is their driver's license

2   picture.  And the fact that Dominick Ratkowski decided on his

3   own, which he testified to, to go into their DMV records simply

4   because they were protesting, that is a violation.  That is not

5   an exception to the DPPA.  It is never a law enforcement

6   function, a legitimate law enforcement function to violate the

7   DPPA or to violate your First Amendment right to freedom of

8   speech.

9           Now, thankfully you're going to get some jury

10  instructions, and the Judge already went over those with you.

11  And the jury instructions are going to instruct you on how

12  certain things are defined.  Jury instruction page 22 defines

13  what is personal information from a driver's record.  Personal

14  information is a person's address.  Personal information is a

15  person's date of birth.  You'll see on this document as Attorney

16  Schwab noted, it says DOT address for 38 plaintiffs on this

17  document.  DOT, which we all know means Department of

18  Transportation.

19          They want to argue to you say don't believe what your

20  lying eyes see.  You'll got in your jury instructions, and

21  you'll have this in the back.  Also on page 22, it defines what

22  is highly restricted personal information.  An individual's

23  photograph.  Your driver's license photograph is highly

24  restricted personal information.  That's the law.  That is the

25  law, and you will see it.  You will be able to hold it.  It is

1022

1    on page 22 of this jury instruction.

2            We know with regards to the DPPA it says a person who

3    knowingly obtains, uses or discloses personal information from a

4    motor vehicle record for a purpose not permitted under the DPPA

5    shall be liable to the individual to whom the information

6    pertains.  That is the law in black and white, Ladies and

7    Gentlemen.

8            We talked about in opening what does obtain, use or

9    disclose mean?  We heard Dominick Ratkowski testify, and we've

10    heard the plaintiffs testify he obtained their driver's license

11    photos.  That is indisputable.  We heard that he used those

12    photos.  He logged into his computer, typed in his user name,

13    typed in his password.  Then, he took the photo and he put it on

14    a piece of paper.  That is use.  That is swiping that credit

15    card.  He said they swiped that credit card 197 times.

16            Now, when you go to the back, you're going to get a

17    special verdict form.  And you know with all this tech that

18    we've been doing, it is going to be kind of nice to put pen to

19    paper I have to say.  This is what it's going to look like,

20    okay.

21            You're first going to be asked, did Ratkowski

22    knowingly obtain, use or disclose personal information from a

23    motor vehicle record for a purpose not permitted by the DPPA?

24    That's a yes or no question.  For all 44 plaintiffs, that is a

25    yes, y-e-s, for everybody.

1        Then, you will have to determine how many times.  How

2  many times did he obtain plaintiffs' personal information?

3  Well, we know that's one, right.  He went into the system and he

4  typed in his user name and password, and he obtained their

5  information.  That's one.  Plus how many times did he swipe that

6  credit card?

7        Dominick Ratkowski we saw him count with regards to

8  the target list how many times he swiped that credit card, and

9  he said he used that document 197 times, that document that

10  contained 44 plaintiffs' personal information and highly

11  restricted personal information.  So that's 197.  And how many

12  times did he disclose it?

13        How many times did he disclose it?  We heard

14  Mr. Ratkowski talk about he disclosed it 34 times to people

15  outside the Wauwatosa Police Department.  That's 34, plus 34.

16  So you add that up.  198, 232 times.  232 times Mr. Ratkowski

17  obtained, used or disclosed these 44 plaintiffs' personal

18  information from their motor vehicle records.  We believe he did

19  so willfully and recklessly.

20        Now, you heard about what is a motor vehicle record.

21  I believe Attorney Wirth misspoke.  This is something you're

22  also going to get in your jury instructions.  The definition of

23  a motor vehicle record is a driver's license.

24        Jury instruction page 22.  It says, a motor vehicle

25  record means any record that pertains to a motor vehicle

1024

1  operator permit, motor vehicle title, motor vehicle registration

2  or identification card issued by the DMV.  Your driver's license

3  is a motor vehicle record, Ladies and Gentlemen, and you will

4  have this definition in the back.

5       We saw Tracy Cole's motor vehicle record.  We saw

6  Tracy Cole's motor vehicle record information was put on this

7  target list.  She has a different address, but her entry on the

8  target list, that is the same address as is on her motor vehicle

9  record or her driver's license.  She doesn't live at that DOT

10  address anymore.

11       MR. WIRTH:  Judge, can we do a rebuttal?

12       THE COURT:  I'll take that up later, Mr. Wirth.

13  Ms. Motley, you may continue.

14       MR. WIRTH:  I am objecting.  This is not rebuttal.  I

15  will put it that way.

16       THE COURT:  Objection is noted.  The jury will be

17  properly instructed.  Ms. Motley, you may continue.

18       MS. MOTLEY:  Thank you.

19       THE COURT:  Briefly, Ms. Motley, as it is rebuttal.

20       MS. MOTLEY:  I understand.  I understand he defined a

21  motor vehicle was not a driver's license.

22       THE COURT:  You may continue, Ms. Motley.

23       MS. MOTLEY:  So we've seen in black and white a motor

24  vehicle record.  So when you're deciding whether Ratkowski

25  knowingly obtained, used or disclosed personal information and

1  their argument is he did so with a purpose not permitted by the

2  DPPA.  We believe the evidence has shown that.  Permissible

3  uses.

4         Now, you heard from Attorney Wirth that when

5  Mr. Ratkowski used this information, it was permissible.  You

6  will get the jury instruction page 23 that will say this

7  sentence.  It is the last sentence on page 23.  If a permissible

8  use attaches to any obtainment, use, or disclosure of motor

9  vehicle record information, any further use or disclosure must

10 be compatible with the purpose of the exception.

11        So how do you break this down?  So in order for the

12 argument to be as Attorney Wirth said that he used this for law

13 enforcement function, law enforcement needs to know that

14 function.

15        So for instance, when he's telling people to share

16 that freely and they don't know what this document is or why

17 they need to share it, that is not a law enforcement function.

18 If he's telling people to -- just giving it to people without

19 explaining what's on this information where this information is

20 coming from, why they need this information, that is not a law

21 enforcement function.

22        You heard Attorney Wirth also talk about this law

23 enforcement mutual assistance, Wisconsin Statute 66.0313.  They

24 have flashed this really quickly and let it go away.  Let's

25 unpack this.

1026

1        According to this statute (2) it says, "Upon the

2    request --  request of any law enforcement agency, including

3    county law enforcement agencies as provided in 59.28, the law

4    enforcement personnel of any law enforcement agency may assist

5    the requesting agency within the latter's jurisdiction."  They

6    have to request it.  They didn't request it.

7        Thirty-four people that Dominick Ratkowski disclosed

8    this information to outside the Wauwatosa Police Department did

9    not request to get this target list.  And guess what?  If they

10   wanted this information, if they needed to look up the

11   information, they could have gone into the TIME System

12   themselves.  He went out and advertised that he had this

13   document and didn't tell them what was in this document or where

14   this information came from or why are these people on this

15   document.

16       As Attorney Wirth noted, we heard from by zoom from

17   Hennepin County.  Detective Nelson testified.  She's never even

18   heard of Wauwatosa.  She didn't know who Dominick Ratkowski was.

19   She didn't request this document.  The person that she was maybe

20   interested in was not one of the plaintiffs.  She got it from

21   the guy that Dominick Ratkowski said feel free to pass this

22   along.

23       Verification.  You heard that a lot and Attorney Wirth

24   mentioned that, right.  This is also -- I believe this is also

25   in your jury instruction.  According to 18 USC 2721(3)

1027

1   for verification where they are saying repeated verify, verify,

2   verify, verify.  I don't understand why they are saying that.

3   They agree the picture on the piece of paper is from peoples'

4   driver's license, but this is rebuttal.  I have to rebut what he

5   just said.

6          So verification.  For the use in the normal course of

7   business by a legitimate business or his agents, employees or

8   contractors.  But only (A) to verify the accuracy of personal

9   information submitted by the individual -- submitted by the

10  person to the business or its agents, employees or contractors.

11  You didn't hear one single plaintiff that said they submitted

12  their information.  You didn't hear that.

13         Subsection (B), if such information as so submitted is

14  not correct or is no longer correct, to obtain the correct

15  information, but only --  only for the purpose of preventing

16  fraud by, pursuing legal remedies against, or recovering on a

17  debt or security interest against the individual.

18         That verification argument is not valid.  We heard

19  from Peter Sparks.  Attorney Wirth forgot his name.  He said the

20  man that got upset.  That man is Peter Sparks.  I don't condone

21  his behavior in court.  But you know what?  His feelings are

22  valid.  You heard him testify he protested one time, and that

23  man that got upset had his driver's license information

24  unlawfully given to multiple people, 34 people and used 197

25  times according to Mr. Ratkowski, and he has the right to be

1028

1    protected as well.  His information has the right to be

2    protected as well.  This is not a case about politics.  It is a

3    case about privacy.  About privacy.

4           Attorney Wirth suggested that, you know, this is an

5    emotional case.  I think he's correct with that.  He's correct

6    this is a lousy target list.  Yep, it is.  We agree with that.

7    We can stipulate to that right now.  I'll sign it no problem.

8    This list is lousy.

9           We heard from Tracy Cole, and we heard some of the

10   emotions of some of the plaintiffs that came here and talked

11   about, you know, what being targeted or how they felt by being

12   on this document.  And honestly, Ladies and Gentlemen, it

13   doesn't matter what this document is called.  You can call it

14   the target list, the Ratkowski list, the protestor list, the

15   Mork and Mindy list.  It doesn't matter.  It is about 44

16   plaintiffs' information that was repeatedly misused willfully

17   and recklessly.

18          This may have well be divided 44 ways.  Because when

19   you are back there and you are going through the special verdict

20   form, you're going to have to decide for each individual

21   plaintiff.

22          We went over this that we believe strongly that

23   Dominick Ratkowski violated the DPPA.  He did it repeatedly.

24   These are the different emails.  You have the right to this

25   information if you so choose.  We heard about Burlington.  He

1029

1    gave it to four people that none of these people were being

2    investigated to his knowledge.  None of them were being looked

3    at by Burlington, but they sent it to four people on

4    November 10th.

5           As Attorney Wirth just argued, this list was building.

6    They had the fully formed list by November 10th of 2020.  All

7    these 44 plaintiffs were disclosed to four people in Burlington.

8           March 31st we know that Diane Nelson received the

9    target list.  She testified to that.  We believe the evidence

10   shows that Dominick Ratkowski's repeated willful and reckless

11   violation of the DPPA, there needs to be a message sent to him

12   to stop him from doing this again.  I believe that his willful

13   reckless behavior was demonstrated with Diane Nelson who

14   testified from Hennepin County.  She received this list she said

15   on March 31st of 2021.

16          You heard Attorney Wirth talk about Captain Vetter.

17   You heard Attorney Wirth say that Dominick Ratkowski was only

18   working on this thing for six months.  That's not true.  That's

19   not true.  The information doesn't lie.  This is the target

20   list.  Page 1.  Page 1 of this target list.  Look at Khalil

21   Coleman's picture on the right.  He doesn't have a picture on

22   the left, right.  Exhibit 1001 which is their exhibit, page 456.

23   This is the last version of the target list, the November 10th

24   version of the target list.  His picture is there.  The version

25   we have his picture is not there.  This wasn't just a six-month

1 project. This thing is a living document and still lives on.

2 We heard about John Larry. Now, with regards to

3 defendant Roy. As Attorney Wirth made the argument that, you

4 know, he was verifying. He was verifying. You heard what he

5 said. You saw what you saw. The facts are the facts. It says

6 DOT records. I don't know how much clearer we need to be.

7 For at least ten plaintiffs, Exhibit 215, it says DOT

8 record on their document that he released publically. For

9 Exhibit 214, he testified in the depositions that the DOT

10 information auto populates in. He knows that, and he testified

11 to it under oath when he wasn't a defendant in this matter.

12 And for many of the plaintiffs like Jill Ferguson who

13 testified, her information auto populated in when she was

14 arrested. By the way arrested for a non-criminal citation,

15 civil ticket. For Molly Nilssen, she testified as well.

16 Now, Attorney Wirth made mention about the Open

17 Records Law, and I believe he mentioned about how Luke Vetter,

18 Captain Vetter, excuse me. He gave a little infomercial about

19 the Open Records Law and his feelings on it. This case isn't

20 about Open Records Law.

21 And the US Constitution Supremacy Cause Article VI

22 paragraph 2 basically stands for the proposition that the US

23 Constitution is commonly referred to as a supremacy clause. It

24 establishes that the federal constitution and federal law

25 generally takes precedent over state laws and even state

1031

1  constitutions.  We shouldn't even have to talk about this, but

2  unfortunately since Attorney Wirth brought it up, I get to rebut

3  it.

4        We are here in this beautiful courthouse in this

5  beautiful federal courthouse to decide whether or not the DPPA,

6  which is a federal law, was violated.  The Open Records Law is

7  Wisconsin state law.  We are not here to legislate on which law

8  is better than the other.

9        But according to the Constitution, federal law trumps

10  state law and that is why you're here.  You are here to judge

11  whether or not these two defendants violated the DPPA.

12        Knowing.  Now, with regard to Joseph Roy, he said --

13  The argument I believe Attorney Wirth just made is he didn't

14  know.  He didn't type it in himself yet he only just testified

15  that he knew that it auto populates in.  But on page 22 of your

16  jury instructions, it defines knowingly for you.

17        And it says, a person who acts knowingly if he has

18  actual knowledge -- actual knowledge of the facts giving rise to

19  the violation or if a reasonable person acting in a circumstance

20  and exercising reasonable care would have that knowledge.

21        Joseph Roy has been working for the Wauwatosa Police

22  Department for a number of years.  He was in charge of the Open

23  Records Division on January 7th of 2021.  He is not a stupid

24  man.  He knows how to read.  You don't get into that position

25  unless you have intelligence, obviously.  He knew, and he knew

1032

1    and he said he knew.  It says it on the document.  He testified

2    where that information comes from.

3         Now, we believe that the behavior of Joseph Roy was

4    willful reckless.  Attorney Wirth talked about how Wauwatosa is

5    the sunshine law, whatever he said, that you heard testimony how

6    you know they are supposed to be open and giving to open

7    records, right.  And all this information of plaintiffs was

8    disclosed to 16 people.  That credit card was swiped 16 times

9    for 32 plaintiffs.  Their personal information went to 16

10   people.

11        But in order for an open records request to be valid

12   or even make sense, you need to make a request.  We heard

13   testimony from when I was questioning defendant Roy, we went

14   over Exhibit 223.  This was requested by Hillary Mintz.  She

15   asked for a copy of the separation agreement for Officer Joseph

16   Mensah.  That was not in the request.  That's a stipulation.  It

17   was citations, records, squad videos and other videos.

18        You heard from Attorney Guckenberg.  He said he was

19   looking for the citation for his client Mark Frayley.  That was

20   not in the request, and he got all this information of all these

21   other plaintiffs.  It is not an open records request if you

22   don't make the request.

23        Now, these are the plaintiffs.  They are real people

24   whose information was really violated, and it was violated in a

25   way that was willfully and recklessly.  This is who they are,

1   and this is how Dominick Ratkowski saw them.  This is what he

2   did to them.  He violated their privacy repeatedly, willfully

3   recklessly, and so did defendant Roy.

4          Now, the burden is on the plaintiffs.  Our burden is

5   by the preponderance of the evidence, which means is it more

6   likely true than not?  So if you believe that we are over

7   50 percent, 50.001 percent in making arguments in terms of they

8   violated the DPPA, then you must find for us, the plaintiffs.

9          This is not a case about politics.  This is a case

10  about privacy.  You're also to be asked on the special verdict

11  form did we prove by a preponderance of the evidence that

12  Dominick Ratkowski acted willfully or in reckless disregard of

13  the law?  We believe that answer should be yes.  I think the

14  evidence has shown that.

15         You're going to have to decide what amount of punitive

16  damage should be awarded against Ratkowski to send him a

17  message.  Was his behavior willful and reckless?  You're going

18  to get the same questions with regards to Joseph Roy.  Was his

19  behavior willful and reckless?  We believe it was.  We believe

20  it was.

21         You're also going to be asked what amount of punitive

22  damages should be awarded against Roy as well as Ratkowski.  We

23  ask that you extend a message to Dominick Ratkowski, send a

24  message to Joseph Roy when deciding punitive damages.  This is

25  not normal.  Both defendants violated the DPPA willfully and

1034

1   recklessly, and I thank you very much for your time and for your

2   diligence and your diligent note taking.  We ask that you come

3   back with a verdict that states that our plaintiffs are entitled

4   to their right to privacy.  Thank you.

5          THE COURT:  Thank you, Ms. Motley.  Ladies and

6   Gentlemen of the Jury, you now have heard the attorneys closing

7   arguments, so I will continue the instructions that you will

8   receive to do your deliberations into the jury room.

9          The Driver's Privacy Protection Act elements of the

10  claim.  As you have heard, the claims before you are based on a

11  federal law known as the Driver's Privacy Act or DPPA, which is

12  included in the United States Code 18 USC 2721 to 2725.

13         The DPPA provides that a person who knowingly obtains,

14  discloses or uses personal information from a motor vehicle

15  record for a purpose not permitted under the DPPA shall be

16  liable to the individual to whom the information pertains.  To

17  establish that the defendants violated the DPPA, plaintiffs must

18  prove each of the following.

19         One, the defendants knowingly obtained, disclosed or

20  used personal information;

21            Two, from a motor vehicle record;

22            Three, for a purpose not permitted by the DPPA.  If

23  you determine that the plaintiffs proved that the defendants

24  knowingly obtained, used or disclosed plaintiffs' personal

25  information from a motor vehicle record for a purpose not

1035

1 permitted by the DPPA, it is up to you to determine the number

2 of times that happened.

3 Some relevant definitions. Knowing. A person acts

4 knowingly if he has actual knowledge of the facts giving rise to

5 the violation or if a reasonable person acting in circumstances

6 and exercising reasonable care would have that knowledge.

7 Personal information. Personal information means

8 information that identifies an individual including an

9 individual's photograph; Social Security Number; driving

10 identification number; name; address, but not the five digit zip

11 code; telephone number; medical disability information; but does

12 not include information on vehicular accidents; driving

13 violations and driver status.

14 Highly restricted personal information. Highly

15 reflected personal information means an individual's photograph

16 or image, Social Security Number, medical or disability

17 information.

18 Motor vehicle record. Motor vehicle record means any

19 record that pertains to motor vehicle operator permit, motor

20 vehicle title, motor vehicle registration or identification card

21 issued by the Department of Motor Vehicles.

22 The DPPA protects only personal information that has

23 been obtained from motor vehicle records. The DPPA does not

24 apply to identical information so long as that information flows

25 from a source other than the motor vehicle records.

1036

1     Permissible uses.  The DPPA defines permissible uses

2  in relevant part as follows.  For use by any government agency,

3  including any court or law enforcement agency, in carrying out

4  its function or any private person or entity acting on behalf of

5  federal, state, local agency in carrying out its functions.

6     For any other use specifically authorized under the

7  law of the state that holds the record if such use is related to

8  the operation of a motor vehicle or public safety.  If a

9  permissible use attaches to any obtainment, use or disclosure

10  motor vehicle information, any further use or disclosure must be

11  compatible with the purpose of the exception.

12     Punitive damages.  If you find that the defendant is

13  liable for a violation of the DPPA, then you have the discretion

14  to award punitive damages.  The purpose of punitive damages are

15  to punish a defendant for his conduct and to serve as an example

16  or warning to the defendants and others not to engage in similar

17  conduct in the future.

18     Plaintiff must prove by a preponderance of the

19  evidence that punitive damages should be assessed against

20  defendants.  You may assess punitive damages only upon proof of

21  willful or reckless disregard of the law.

22     An action is willful if defendant knew that he was

23  violating the DPPA or was indifferent as to whether his action

24  violated the DPPA.  An action is in reckless disregard of the

25  law if taken with knowledge that it may violate the law.

1037

1        If you find that punitive damages are appropriate,

2   then you must use sound reason in setting the amount of those

3   damages.  Punitive damages, if any, should be in an amount

4   sufficient to fulfill the purposes I have described to you but

5   should not reflect bias, prejudice or sympathy toward either

6   party.

7        In determining the amount of any punitive damages, you

8   should consider the following.  The reprehensibility of the

9   defendants' conduct, the impact of the defendants' conduct on

10  plaintiff, the relationship between plaintiff and defendant, and

11  the likelihood that the defendant would repeat the conduct if an

12  award of punitive damages is not made.

13       The fact that I have instructed you on the matter of

14  punitive damages should not be considered as suggesting any view

15  of the Court as to which party is entitled to your verdict in

16  this case.  Instructions on punitive damages have been given

17  solely for your guidance.

18       Coming to the final instructions.  This case will be

19  submitted to you in the form of a special verdict form which has

20  been prepared for your convenience.  Mr. Miller, if you please

21  distribute the special verdict form to the jury.  All right.  If

22  you follow along with me.

23       So as you see on the special verdict form, it has the

24  caption, the name of the case.  And it reads We, the Jury,

25  empaneled and sworn to try the issues in this action being

1  directed to the Court the following questions submitted to us

2  for verdict find and answer as follows.

3          Question one.  For each plaintiff, the defendant,

4  Dominick Ratkowski, knowingly obtained, used or disclosed

5  plaintiffs' personal information from a motor vehicle record for

6  a purpose not permitted by the DPPA.  You will complete the box

7  yes or no.

8          If you write yes in any boxes, write in how many times

9  total.  Please go with me to page 3 for question two.  Question

10 two.  For each plaintiff, the defendant, Joseph Roy, knowingly

11 disclosed plaintiffs' personal information from a motor vehicle

12 record for a purpose not permitted by the DPPA.  Complete the

13 box yes or no.  If you write yes in any boxes, write in how many

14 times total.

15         Question three on page 4.  Did plaintiffs prove by a

16 preponderance of the evidence that defendant, Dominick

17 Ratkowski, acted willfully or in reckless disregard of the law?

18 There is a slot for you to answer yes or no.

19         Question four.  If you answer yes to Question Number 3

20 above, what amount of punitive damages should be awarded against

21 plaintiff Ratkowski?

22         Question five.  Did plaintiffs prove by a

23 preponderance of the evidence that defendant, Joseph Roy, acted

24 willfully or in reckless disregard of the law?  Again, there's a

25 slot for you to answer yes or no.

1039

1    Question six.  If you answered yes to Question Number

2    5, what amount of punitive damages should be awarded against

3    Roy?  And there's a slot for you to answer.

4    Please sign and date the final page of this verdict

5    form which will be signed by your foreperson and dated.

6    You will note that certain questions in the special

7    verdict form are to be answered only if you answered the

8    previous question in a particular manner; therefore, it is

9    extremely important that you read each question very carefully

10   before you answer it.  Do not needlessly answer questions.

11   Your duty is to answer the questions in the special

12   verdict form which according to the evidence and my instructions

13   you're required to answer in order to arrive at a completed

14   verdict.

15   It then becomes my duty to direct judgment according

16   to law and according to the facts as you have found from them.

17   You are to answer the questions in the special

18   verdicts form solely upon the evidence received in this trial.

19   You are to be guided by the instructions and your own sound

20   judgment in considering the evidence in the case and in

21   answering each question.

22   You must not concern yourselves about whether your

23   answer will be favorable to one party or the other nor what the

24   final result of the lawsuit may be.  Your verdict must represent

25   the considered judgment of each juror.

1040

1    In order to return a verdict, it is necessary that

2  each juror agree.  Your verdict as to each question you are

3  required to answer in order to arrive at a completed verdict

4  must be unanimous.  You should make every reasonable effort to

5  reach a verdict.  In doing so, you should consult with one

6  another, express your own views and listen to the opinions of

7  your fellow jurors.

8    Discuss your differences with an open mind.  Do not

9  hesitate to reexamine your own views and change your opinions if

10 you come to believe it is wrong, but you should not surrender

11 your honest beliefs about the weight or effect of evidence

12 solely because of the opinions of your fellow jurors or for the

13 purpose of returning a unanimous verdict.

14    Each of you should give fair and equal consideration

15 to all evidence and deliberate with the goal of reaching an

16 agreement which is consistent with the individual judgment of

17 each juror.  You are impartial judges of the facts.  Your sole

18 interest is determined whether the plaintiffs have proved their

19 case by a preponderance of the evidence.

20    Members of the Jury, this case is ready to be formally

21 turned over to you.  You will consider the case fairly,

22 honestly, impartially and in light of reason and common sense.

23 Give each question in the verdict your careful and conscientious

24 consideration.

25    In answering each question, free your minds of all

1   feelings of sympathy, bias or prejudice.  This case has taken a

2   great deal of time and effort to prepare and try.  There is no

3   reason to think that it could be better tried or that another

4   jury is better qualified to decide it.  It is important

5   therefore that you reach a verdict if you can do so consciously.

6          Nothing said in this instructions and nothing in the

7   verdict form prepared for your convenience is meant to suggest

8   or convey in any way or manner as to what verdict I think you

9   should find.  What the verdict shall be is your sole and

10  exclusive duty and responsibility.  Let your verdict speak the

11  truth, whatever the truth may be.

12         If it becomes necessary during your deliberations to

13  communicate with me, you may send a note through the bailiff

14  signed by your foreperson or by one or more Members of the Jury.

15  No Member of the Jury should attempt to communicate with me by

16  any means other than a signed writing.  I will never communicate

17  with you, with any Members of the Jury on any subject touching

18  the merits of the case or otherwise other than in writing or

19  orally here in open court.

20         You will note from the oath that the bailiff --  the

21  oath about to be taken by the bailiff that he too as well as

22  other persons are forbidden to communicate in any way or manner

23  with any Member of the Jury on any subject touching on the

24  merits of the case.  Bare in mind also that you are never to

25  reveal to any person, not even me, how the jury stands

1042

1   numerically or otherwise on the questions before you until after

2   you have reached a unanimous verdict.

3   Upon your return to the jury room, your first duty to

4   be to select a foreperson who will preside over your

5   deliberations. Complete the special verdict form with the

6   answers you have agreed upon and serve as your spokesperson here

7   in court. His or her vote however is entitled to no greater

8   weight than the vote of any other juror.

9   During the course of your deliberations, you are

10  should assume the attitude of judges of the facts rather than

11  partisans or advocates. Your highest contribution to the

12  administration of justice is to ascertain the facts in this case

13  and return a verdict accordingly.

14  When your deliberations are concluded and your answers

15  inserted in the verdict form, the foreperson will sign and date

16  the verdict and all of you will return with your verdict here in

17  open court. If the CSO will approach and stand.

18  (Whereupon the CSO is sworn in.)

19  THE COURT: All right. Mr. Miller, if you please

20  distribute the jury instruction packets to the jurors. Please

21  all rise for the jury. The jury may be escorted to the

22  deliberation room.

23  (Jury excused.)

24  THE COURT: I believe both Mr. Wirth as Ms. Motley

25  asked to be heard during closing argument. Ms. Motley.

1          MS. MOTLEY:  Your Honor, I think it is moot.  I erred

2    on the side of caution just didn't bring up -- I didn't say

3    something in my closing that I thought would be an issue so I

4    left it out.

5          THE COURT:  Thank you, Ms. Motley.  Mr. Wirth.

6          MR. WIRTH:  It is probably moot now, Judge.  It is

7    more along the lines of I guess it can be probably could have

8    been a corrective instruction.  It turned into an argument about

9    the wording.  I do know that the law says that a driver's

10   license isn't a motor vehicle record.  There is case law on

11   that, but it can be couched in terms of the argument about what

12   the instruction means.

13         THE COURT:  Thank you, Mr. Wirth.  The jury has been

14   properly instructed on the relevant law.  I think that will

15   address that concern.  I ask that you attorneys please give your

16   contact information to court staff.  You may leave the building

17   if you wish, but just be available to be reached.  If there is a

18   question from the jury that I can reach you and do a phone

19   conference or if you're around get back in the courtroom

20   whatever is easier.  If you need to leave it is okay for us to

21   do by telephone on the record as well.

22         As we break for lunch and let the jury do their work,

23   I want to assess where all the admitted evidence is and I have

24   everything in order to send to the jury room.  I will have the

25   parties double check that I have everything.

1          MR. SCHWAB:  Do you have everything is filed in the
2     system or the book reflects the binders reflect accurately?
3          THE COURT:  Yeah so the not all exhibits -- not all
4     binders were admitted.  So if you could pull the admitted
5     evidence into one location so we have it so jurors ask for a
6     particular item, I have it lined up and ready to go.  So does
7     that answer your question, Mr. Schwab?
8          MR. SCHWAB:  Yeah, I think so.  You would like us to
9     make sure we compile a binder of all admitted evidence and take
10    out the non-admitted.
11         THE COURT:  Even if it is not in a binder, have it
12    packed up ready to go if we are looking for it if requested by
13    the jury.
14         MR. SCHWAB:  Thank you.  Anything from the defense?
15         MR. WIRTH:  No Judge.  We have the exhibit that we're
16    putting in place redacted.  So I guess my only concern is that
17    what's proposed to go to the jury be in its redacted form.
18         THE COURT:  Yes, that's why I asked the attorneys to
19    check make sure it is in the form that has been redacted and
20    approved by the Court to go in.  Have it in one place to get our
21    hands on it if it is requested and in the proper form.
22         Before we break -- Lastly before we break, I want to
23    congratulate both sides for getting their case to the jury.  I
24    know that preparing for jury trial is a lot of work, and both
25    sides put in tremendous hours, passion, sweat into the case, and

1045

1   now it is in the hands of the jury.  Thank you.  Have a good

2   break.

3        (Lunch recess taken.)

4        (Back on the record.)

5             THE CLERK:  Judge Nancy Joseph is back on the bench

6   calling Case No. 20-CV-1660, Andrew Aaron, et al v. Dominick

7   Ratkowski, et al.  Appearances remain the same.

8             THE COURT:  Thank you.  We have a question from the

9   jury or note from the jury.  The jurors are requesting the

10  following evidence.  Exhibit 311 as admitted in the court,

11  contents of drop box link sent by Joseph as admitted to

12  evidence.  Permissible uses of DPPA.  We think there are 14.

13            So as to 311, it will go in.  It is admitted into

14  evidence.  I want to make sure I have the right one to send in.

15  Contents of the drop box link sent Joseph as was admitted into

16  evidence.  I think this concerns the exhibit that had the stack

17  of citations and the exhibit that had the incident reports.

18  Either party want to be heard on that?  In other words, am I

19  right?

20            MS. MOTLEY:  I believe it is Exhibit 214 is the

21  citations and then Exhibit 215, but it is just that one incident

22  report I believe redacted.

23            THE COURT:  I want to make sure.  Again whatever I am

24  sending in is one the proper exhibits and properly redacted.

25  Who has that for us?

1      MR. SCHWAB:  We're going through 214 and pulling out

2  non-plaintiffs, non-parties just to make sure.

3      THE COURT:  If you can pull that out.  As for

4  permissible uses of the DPPA, we think there are 14.  I think

5  the answer to that is to refer to your jury instructions.

6  Either side wish to be heard?

7      MS. MOTLEY:  No, Your Honor.

8      MR. WIRTH:  No.  The jury instructions included the

9  two.  Is that what we're taking about?

10      THE COURT:  They are asking for permissible uses of

11  the DPPA.  The jury instruction has a section on that.

12      MR. WIRTH:  Okay.

13      THE COURT:  All right.  So because it will take you

14  some time to pull the Roy exhibits, we're going to send in a

15  note with what we have already so we don't keep them waiting.

16      MR. WIRTH:  What are we sending in now?  I am trying

17  to take notes.

18      THE COURT:  311.

19      MS. KNOWLTON:  We have that.

20      THE COURT:  Please show that to Mr. Wirth to make sure

21  to confirm that I have the right one.

22      MS. KNOWLTON:  We do have -- You're saying when asking

23  about 215 and 214, 214 is set.  But 215 we have to quick redact.

24      THE COURT:  Mr. Wirth, any objection to the version of

25  311 that's going in?

1          MR. WIRTH:  No objections to 311.  As soon as I see

2     214, I assume I won't have objections there either.

3          THE COURT:  CSO, please go ahead and submit

4     Exhibit 311 to the jury and others are coming.

5          MR. WIRTH:  There are two exhibits with the incident

6     reports.  Weren't there 215 and 216?

7          MS. BAYNARD:  Your Honor, was there a specific exhibit

8     or want the contents of the Roy disclosure?

9          THE COURT:  So I will read it.  Contents of drop box

10     link sent by Joseph as was admitted into evidence.

11          MS. MOTLEY:  Your Honor, I'm sorry.  Weren't there

12     certain pages of 215 admitted?  I don't recall if the whole

13     thing was admitted.

14          MS. BAYNARD:  I thought two pages were.

15          MR. WIRTH:  Weren't there seven or eight people I went

16     through on closing?

17          MR. SCHWAB:  I don't know what 216 will look like from

18     a redaction standpoint.

19          MR. WIRTH:  216 is definitely admitted.  I don't know

20     what we're going to do about redacting it.

21          MS. MOTLEY:  It is 300 pages.

22          THE COURT:  316 is the stack of reports, incident

23     reports.

24          MR. WIRTH:  216.

25          THE COURT:  I mean 216.

1          MS. KNOWLTON:  If we can ask the Court check on 216,

2    215 and 217.

3          THE COURT:  216 is not in.  Our record show 216 is not

4    in evidence.

5          MS. KNOWLTON:  I need to worry about redacting this

6    for a non-party.  I apologize.  I have a redacted version of

7    215.  I have this.

8          MR. WIRTH:  215 is 335 pages.

9          MS. MOTLEY:  I don't think this whole thing --

10          THE CLERK:  For 215, I have all subject to redaction.

11          MS. KNOWLTON:  I have the redacted one.

12          THE COURT:  You may approach.

13          MS. KNOWLTON:  This was the redacted one given to the

14    witness.

15       (Brief recess taken.)

16       (Back on the record.)

17          THE COURT:  We are back on the record in Case

18    No. 20-CV-1660 with the same appearance for the attorneys.  Are

19    we all set with the exhibits?

20          MS. KNOWLTON:  Your Honor, we have already given 311

21    to the jury.  There's agreement that 214 was properly redacted.

22    The issue and why we had this delay is that the published

23    version of 215, which was again already published in full to the

24    jury during several examinations, is what was printed and

25    provided, and defense is now saying that they want a different

1  redacted version of 215.

2          MR. WIRTH:  Judge, from the defense perspective, 215

3  was an exhibit in the case.  And the announcement was that it

4  was redacted 20 pages.  There was an obvious miscommunication

5  that it was apparently redacted.  We assumed it was redacted to

6  20 pages.  The 20 pages were redacted.  It went from a 335-page

7  exhibit to about five lines.

8          From the defense perspective, the redactions are of

9  information pertaining to the plaintiff and relevant to the

10  defense in this case since it talks about --  takes out any

11  reference to how plaintiffs were identified before.  The

12  Department of Transportation information was placed in the

13  report.

14          THE COURT:  All right.  One second, please.  So 214 is

15  agreed upon?

16          MS. KNOWLTON:  Yes.

17          THE COURT:  Where is 214 physically?  Is that correct

18  Mr. Wirth, no objection to 214?

19          MR. WIRTH:  That is correct.

20          THE COURT:  CSO, you may submit 214 for the jury.  Can

21  you identify what 214 is?

22          MS. KNOWLTON:  It is actually the citations.

23          MR. WIRTH:  It is the citations redacted to just

24  plaintiffs.

25          THE COURT:  Thank you.  All right.  Let's talk about

1050

1  215 are the incident reports.

2  MS. KNOWLTON:  215 as it has been published to the

3  jury already in the redacted format that you have and again

4  that's the copy that was also at the witness box.  When this was

5  being used, it was published in this form.  I simply printed off

6  exactly what had already been published to the jury.  That's

7  what is before you.

8  My frustration right now is that if objections were to

9  be made, they certainly should have been made at that time.  To

10  have now us looking at a differently redacted version when this

11  has already been published to the jury seems to undermine the

12  whole process of the --

13  THE COURT:  If you could pass me the --

14  MR. WIRTH:  The easy solution, Judge, would have been

15  to give us a copy of it.

16  THE CLERK:  This is the previous 214.

17  MS. KNOWLTON:  The copy I gave you was the pre-printed

18  one that was used in front of the jury.

19  THE COURT:  I have in hand two 215.

20  MS. BAYNARD:  You have two of the same document.  I

21  just have the first six pages.  I can give you the pages 7

22  through 20.

23  THE COURT:  Okay.  So I have 215 with the first page

24  looking redacted as I am holding it up.  And another version of

25  215 with that first page not blocked out.

1          MS. KNOWLTON:  Correct.

2          THE COURT:  So what is the issue here?

3          MS. KNOWLTON:  During the court actual trial, the one

4     published to the jury is the one you have under your left hand

5     with the fully redacted first page.  So the issue here is

6     apparently defense counsel is now raising new concerns with an

7     exhibit that's already been published to the jury.

8          THE COURT:  Thank you.  Is it as to this first page

9     only?

10          MR. WIRTH:  No Judge.  What you'll see is that what

11     you're holding I think in your right hand is redacted of all

12     non-plaintiffs.  The exhibit that was submitted 215 is

13     335 pages, and the redacted 20 pages was only given to the

14     witness.  And so when it says it was published, it was probably

15     put up on the screen, but the redacted version is not --  The

16     redacted version we assume was the 20 pages redacted the way

17     everything in this case has been redacted, and it is not that.

18          MS. BAYNARD:  I believe the discussion on the record,

19     we both went up and went through it with the court reporter, was

20     that it was going to be redacted to exclude non-plaintiffs.

21     That was our understanding.  We are fine with it being redacted

22     to exclude anybody who is not a plaintiff.  But the version that

23     is the 215 if you go through the large portions blocked out,

24     that redacts plaintiffs.  And, you know, the 215 that was filed

25     is our bates numbers that span 355 pages.  So we're really not

1052

1    trying to be difficult.  That was the first time I've seen that

2    version of the document.

3         MS. KNOWLTON:  Your Honor, this is true that it is

4    20 pages of their documents, but it was 20 pages of their

5    documents that was published that was subject to testimony that

6    they fully -- had full opportunity to do any cross examination

7    with.  They've had the fully unredacted version for far longer

8    than we have.

9         If they had questions at the time or they didn't think

10   that we published already to the jury was appropriate, they

11   already had their opportunity to make that objection.  This is

12   unbelievably confusing for the jury if they know this is what

13   they thought they saw and now they are getting something

14   completely different.  By the way, no testimony has been offered

15   to support.

16        MS. BAYNARD:  The jury did not see that entirety of

17   215.  If you look at the court reporter's record, we talked

18   about John Larry section, the bottom of page 16 and 17, and we

19   come back on the record and we talked about we were fine with

20   215 in a redacted form.

21        The redacted version was never sent to defendants.

22   When I redacted the emails that in the case the jury asked for

23   them, I sent them over to the plaintiffs, and they sent me back

24   we want this additional redaction.  So we had an agreement

25   before we came here.  That document is redacted to exclude

1  plaintiffs' information.

2       THE COURT:  As I am looking at this document now, I do

3  recall the publication of page 16 and 17 as to Mr. Larry when he

4  testified, and we had the conversation that that page spilled

5  over page 16 had spilled over onto the next page, page 17, but I

6  don't recall the testimony about the remainder of this.

7       MR. SCHWAB:  Your Honor, if you recall when defendant

8  Roy was on the stand and I kept walking him through DOT records

9  as of, that's from this document.  Everything else was redacted

10  out for the purposes of the jury.

11       That was the document in evidence.  You know, there is

12  that additional issues.  A lot of this is hearsay.  There's

13  documents that were not written by any person that testified,

14  certainly not by a defendant.  And moreover, this is an effort

15  at a side trial, just an attempt to try to get prejudicial

16  information in.  I do not know how --  I don't know.  I reviewed

17  these videos, and they clearly depict Aaron resisting arrest by

18  pulling away from officers.  And when they fall to the ground,

19  Aaron continues to try to push up off the ground.  It took three

20  officers to physically control Aaron's efforts to resist arrest.

21       I don't know how that's relevant to what defendant Roy

22  knew about the province of these records.  If they want to point

23  to a place where it says I surveyed TLO records and verified

24  those records through DOT, I would agree.

25       If they have some site to that to say he would have a

1   reasonable basis for believing that the records did not come

2   from DOT, sure.  But trying to get these entire records in is an

3   effort to drag our plaintiffs through the mud on wholly

4   irrelevant topics and things that we did not have the

5   opportunity to discuss because (a) we were trying to keep this

6   trial focused on the question of DOT records.  But also because

7   they didn't make an objection at the right time.

8           MR. WIRTH:  Judge, here's the -- Through a review of

9   the videos and comparison to known subjects from prior

10  incidents, many of the protestors were able to be identified.

11  Protestors were identified utilizing a combination of open

12  source information as well as police reports and databases.

13  That is the defense.

14          MS. KNOWLTON:  There is no plaintiff information

15  attached to that.

16          THE COURT:  Here's the problem for me now.  The trial

17  has concluded.  Exhibits have been received, and we're still

18  fighting about admitted evidence.  It's been received.  And

19  during the court final pretrial, during the trial, I entertained

20  objections.  So I --  I don't know if I can do anything about an

21  exhibit that was already admitted.

22          MS. BAYNARD:  Your Honor, it was not admitted in the

23  version that you are looking at.  We stipulated to the admission

24  of 215 except for Larry pages to 215 with redactions from the

25  plaintiffs.

1    I went through with the court reporter to Attorney

2    Wirth's objection to it subject to redactions of non-plaintiffs.

3    This version of 215 and --  Truly even some of the document I

4    didn't realize that they didn't have back pages until I went up

5    on the stand to look for something, and I was like, oh, the

6    attachments aren't to this.

7          When we were preparing, I am looking at plaintiffs'

8    exhibit list with the bates ranges.  We get here, it is shorter.

9    That's fine.  We entered it through stipulation the entirety of

10   it to exclude non-parties, not to exclude all of the information

11   that they don't want going back to the jury.  That's not what we

12   agreed to have excluded.

13         We agreed to take out non-plaintiffs just like we did

14   with the list with all of the email attachments that I sent to

15   them for -- to make sure they were okay with the redactions.

16   That is what we've taken out, non-plaintiffs.

17         THE COURT:  But Ms. Baynard, you also know that

18   incident records are also different when they have narrative,

19   right?

20         MS. BAYNARD:  I understand it can be yes, Your Honor.

21   If we're going to have a situation where now it's, well, they

22   stipulated to this being admitted and they didn't, then I guess

23   we did not stipulate to a document being admitted in that

24   fashion.

25         We stipulated to it being admitted to redactions of

1  plaintiffs' information -- sorry non-plaintiffs' information.

2  So that was in the course of going through some of the exhibits,

3  we were -- we don't have a problem with them whatever.  If now

4  we get to determine the redactions and we were never provided

5  them, those redactions, I think if you go back through the

6  record, the version that was looked at was John Larry's portion.

7  So then fine, send John Larry's portion back.  We're

8  not in agreement to the redacted version as plaintiffs' have

9  written Exhibit 215 on.  I am not even sure which witness it was

10 completely gone through with.

11 THE COURT:  Go ahead, Ms. Knowlton.

12 MS. KNOWLTON:  It was gone through with multiple

13 witnesses which is why this is also so disturbing.  They're

14 simply asking for a do over because they didn't use their

15 opportunity in the procedure and in the process of a trial

16 should be seriously undertaken.  If an exhibit is coming in and

17 being used during testimony and you have a different idea of how

18 or what information that should -- how that should look, that's

19 your opportunity to make that argument.  It has been published.

20 We didn't do this in secret.  We didn't do this in any

21 underhanded manner.

22 Yes, there have been on-going redactions of things,

23 but this is something that when we took out the information and

24 published it to the jury, they did no other follow-up testimony

25 to say, wait, that's not the complete document.  So that ship

1    has sailed to be quite frank, and it would be unduly burdensome

2    and confusing to the jury to not have what they actually saw be

3    the exhibit that actually goes back to the jury room.

4         MS. BAYNARD:  Your Honor, we're talking about the

5    exhibits that were provided in this binder, the ones that we

6    downloaded that were filed.  We're going off of the exhibit list

7    from the beginning, the exhibit list.  So the suggestion it

8    should be undertaken with -- Being serious.  I guess I didn't

9    realize I had to go double check to make sure that their

10   exhibits that they have here matched the binder.

11        I realized it when I saw we're looking at an exhibit

12   that is supposed to be this long, and the plaintiff has one page

13   of it.  So it was brought up.  Then you have 20 pages only.

14        Well, the one we have downloaded marked Plaintiffs'

15   Exhibit 15 on your exhibit list is 355.  And then we agreed to

16   the bates, the 20 page bates range, that's fine, but we did not

17   agree to the redacted version that is now being used as an

18   exhibit, and we were never provided that.

19        THE COURT:  So we are having a trial about exhibits

20   after the trial after the jury has been instructed after I had

21   asked counsel to confirm versions of exhibits throughout the

22   trial.  So I am now to go back through the transcript to find

23   this document and retrace the record is what I am being asked to

24   do.

25        MS. KNOWLTON:  We're certainly not asking to you do

1    that.  Again, for the record, we were simply offering the

2    exhibit to go back to the jury as being the exhibit that was

3    actually used and actually already published.  There's nothing

4    that has changed from that.  There is certainly nothing that was

5    not available to defense since using the exhibit.

6         Absolutely we introduced the John Larry portion on

7    Tuesday and then the full document did come in on Wednesday.

8    And that part of it has been messy, but I do -- One of the

9    reasons something was different in the folder out of respect for

10   some of the sensitivity of some of the documents.  That is all

11   we were trying to comply with.  That is the only thing.  This

12   exhibit is the printed version of what was published to the

13   jury, no additional changes were made.

14        THE COURT:  Ms. Baynard, do you dispute 215 that is

15   Ms. Knowlton has proffered to me is the one that was submitted

16   to published before the jury?

17        MS. BAYNARD:  Your Honor, I don't think we saw --

18   When they published it to the jury and showed portions with Sean

19   Kafer and John Larry, it wasn't the whole document.  So if we're

20   agreeing this came in through stipulation, we stipulated to

21   being redacted to exclude non-plaintiffs.

22        So what would have been simple is hey, we want to use

23   this redacted version like I did and send it over.  I am

24   supposed to I guess know that they are going to redact it to

25   take out things beyond non-plaintiffs.

1059

1    MS. MOTLEY:  Your Honor, if I may.

2    THE COURT:  Yes.

3    MS. MOTLEY:  I have a solution.  I would -- My

4  solution is to go back to the jury only the pages that have been

5  published to them, which I believe is the bottom of page 16 the

6  top of page 17.  And then I believe Attorney Schwab went through

7  some pages with the witness Joseph Roy.

8    Perhaps I know for other exhibits we have taken out

9  pages here and there.  We can do the same with this, just send

10  back to the jury the pages that were published to them.

11    THE COURT:  Ms. Baynard.

12    MS. BAYNARD:  I would agreeable to that.

13    THE COURT:  Can this be done now?

14    MR. WIRTH:  We know it is 16 and 17.

15    MS. MOTLEY:  The bottom of page 16.

16    THE COURT:  Top of page 17.

17    MR. WIRTH:  I can redact this right now and send it to

18  Evan.

19    MS. KNOWLTON:  I think that is unnecessary if that is

20  what was published.  If there's pages they want to take off of

21  that already printed version, that would save a lot of time.

22    MR. WIRTH:  I do know that elements of page 16 and

23  elements of page 17 were essentially positioned on the screen so

24  they couldn't be seen.  I think Milo had clips -- snidbits out

25  of it, so I don't know what pages those snidbits were from.

1        MS. MOTLEY:  To be clear, we were talking about the
2   information that was actually published.
3        MR. SCHWAB:  Mr. Larry comes out of page 28878.
4        MR. WIRTH:  Give me two seconds here.  I've got it
5   starting with arrested ten.
6        THE COURT:  Excuse me, counsel.  I am going to step
7   off the bench and give you time to prepare this.
8        MR. WIRTH:  Thanks Judge.  I think this is five
9   minute.
10      (Brief recess taken.)
11      (Back on the record.)
12       THE COURT:  We are back on the record, Case
13  No. 20-CV-1660, with the same attorney appearances.  Counsel,
14  are you ready on this exhibit issue?
15       MS. KNOWLTON:  Yes.
16       MR. WIRTH:  Yes.
17       THE COURT:  For the record, please identify the
18  exhibit number.  I believe it is 215.
19       MS. KNOWLTON:  All set.
20       THE COURT:  Ms. Knowlton, for the record if you could.
21  It is a revised version.  If you could read the --  Is it bate
22  stamps at the bottom of it or how it is identified otherwise?
23       MS. KNOWLTON:  With 215.  So it actually starts at
24  bates number 28878 through 28890 plus 28892 and stops at 28893.
25       THE COURT:  Ms. Baynard, is this acceptable to the

1061

1  defense?

2         MS. BAYNARD:  Sure.

3         THE COURT:  That will be sent in to the jury.  CSO, I

4  also have a note for the jury before in goes in just to put on

5  the record.  As to Exhibit 311 requested that was sent in, as to

6  the request that contents of drop box link sent by Joseph as

7  admitted into evidence, 214 was previously sent.  And now a

8  revised 215 is being sent.  As to the last question permissible

9  uses of the DPPA, I am sending a note which reads as to

10 permissible uses of the DPPA, please consult with jury

11 instructions.  Thank you, everyone.

12    (Brief recess taken.)

13    (Back on the record.)

14        THE COURT:  We are back on the record, Case

15 No. 20-CV-1660.  I have Ms. Knowlton for the plaintiff.

16 Mr. Wirth and Ms. Baynard for the defense.  I have a note from

17 the jury.  Could we see Exhibit 213?

18        MS. KNOWLTON:  We have that.

19        THE COURT:  If you please show it to defendants.

20        MS. BAYNARD:  That's fine.

21        THE COURT:  May I see it please, Ms. Knowlton?  All

22 right.  CSO, if you please render this to the jury.  Thank you

23 everyone.  We'll stand down.

24    (Brief recess taken.)

25    (Back on the record.)

1           THE COURT:  Please be seated.  We're back on the

2    record, Case No. 20-CV-1660.  We have another question from the

3    jury.  Reads, I am requesting all exhibits where the Wauwatosa

4    Police Department received open records request emails.

5           MS. KNOWLTON:  I have those as numbers 14, 17, 18, 20,

6    21, 22.

7           MS. BAYNARD:  Are those in evidence?

8           MS. KNOWLTON:  I only have what's in evidence.

9           THE COURT:  Our records show that they are.

10          MS. KNOWLTON:  These are just the requests, the

11   requests received by Wauwatosa.

12          THE COURT:  Ms. Baynard, is there an objection?

13          MS. BAYNARD:  No.

14          THE COURT:  CSO, you may please render those to the

15   jury.

16      (Brief recess taken.)

17      (Back on the record.)

18          THE COURT:  Case No. 20-CV-1660, back on the record

19   with Ms. Knowlton from the plaintiff and Mr. Wirth from the

20   defense.

21          MS. KNOWLTON:  I apologize, Your Honor.  There were

22   two additional requests that had already been entered.

23   Mr. Wirth has already reviewed them, and we're prepared to just

24   let them go forward to the jury.

25          THE COURT:  Mr. Wirth, do you wish to be heard?

1          MR. WIRTH:  No, we stipulate to that going back.

2          THE COURT:  CSO, please render that to the jury.

3          THE CLERK:  223 and 224.

4          MS. KNOWLTON:  Correct.

5          THE COURT:  Thank you.  While we are still on the

6    record, do you have a sense of how many more admitted exhibits

7    that we have?  I know we had a lot but not all were admitted and

8    received.

9          MS. KNOWLTON:  From plaintiffs' exhibits there's only

10   20 remaining.  They have the others.

11         THE COURT:  Mr. Wirth.

12         MR. WIRTH:  I am trying to check my chart against

13   what's being requested, and I believe that that is the one

14   binder of admitted.

15         MS. KNOWLTON:  This is the plaintiffs' admitted.  I

16   believe this is the defendants, but the defendants only had two

17   admitted, but they are very large so those are two.

18         MR. WIRTH:  We have transferred the one to the

19   redacted version of it.

20         THE COURT:  Thank you.  So the reason I raised the

21   question, the jury can have access to all admitted evidence.  So

22   one way of approaching this is to send them everything.  One of

23   the reasons I wait for them to request it is sometimes they

24   don't want to see everything.  Sometimes they want to see

25   specific ones.  This one with heavy redacted I wanted to stay

1  here to give the parties a chance to make sure everything that

2  is going on -- going into them has been properly redacted and

3  actually that was received, et cetera, et cetera.

4            Do the party have any objection to sending them all in

5  or waiting for them to ask for them?  Do the parties have a

6  view?

7            MS. MOTLEY:  Your Honor, given the hour, I would

8  prefer if they would just ask for things to be completely

9  honest.  I don't want to --  I know they have a job to do.  I

10 think that is what I would like if they ask for evidence then

11 fine.

12           THE COURT:  Mr. Wirth.

13           MR. WIRTH:  I would agree.  There's probably a risk

14 of, you know, after a couple hours of deliberation introducing a

15 couple hundred more pages of documents, that might make them

16 start over.

17           THE COURT:  All right.  I wanted to raise it as one

18 possibility.  We will wait and take directions from our jury.

19           MR. SCHWAB:  Did they ask for all documents?

20           MR. WIRTH:  They are asking for bits and pieces, and

21 the Judge's suggestion is rather than having everybody come back

22 every 20 minutes, it seems like they are on the open records

23 part of the case, let's put it that way.

24           MR. SCHWAB:  I apologize.

25           THE COURT:  Okay.  All right.  I'll stand down.  We'll

1    wait for further instructions from the jury.  Thank you

2    everyone.

3         (Brief recess taken.)

4         (Back on the record.)

5         THE COURT:  Case No. 20-CV-1660, we are on the record

6    with all plaintiffs' counsel and both defendants' counsel.  I

7    have a question from the jury.  Are height, weight, hair color

8    and eye color considered as personal information pertaining to

9    the DPPA?  Page 22 of our jury instruction does have the

10   definition of personal information.  Anyone --  It does not

11   include the specifics.

12        It reads, personal information is information that

13   identifies an individual.  My, you know, my default but my

14   practice is generally refer the jury back to the jury

15   instructions.  Either side wish to be heard?

16        MS. BAYNARD:  I am pulling up your instructions.

17        MS. MOTLEY:  Your Honor, I sort of agree with the

18   Court.  I think the jury instructions are the jury instructions.

19   I don't think they have to figure it out, I guess.

20        THE COURT:  Mr. Wirth, wish to be heard?

21        MR. WIRTH:  I agree, Judge.  For better for worse, the

22   Court instructs them on the law, and they've got to do what the

23   Court tells them.

24        THE COURT:  I will respond please consult the jury

25   instructions.  Do the parties have a view of instructing them to

1   definition of personal information in the jury instruction or do

2   you prefer to be the general, please consult the jury

3   instruction?

4           MR. WIRTH:  Like tell them it is on page 22, that kind

5   of thing?

6           THE COURT:  I could say page 22.  I could say please

7   see definition or please see personal information.

8           MS. KNOWLTON:  I think that's considerate.

9           MS. MOTLEY:  I have no problem with that.

10          MR. WIRTH:  Fine.  Is there a number for the jury

11  instruction that contains that?

12          THE COURT:  It is page numbered and they also have

13  titles.  So page 22 is the definitions page and the second entry

14  is the personal information entry.

15          MR. WIRTH:  My only concern is if they have to read

16  them in conjunction.  I would just say the jury instruction at

17  page 22 have the definition.

18          MR. SCHWAB:  Your Honor, just briefly.  There is

19  Seventh Circuit authority that specifically says individual's

20  date of birth, height, weight, hair color, fall within the range

21  of personal information.

22          THE COURT:  Yes.

23          MR. SCHWAB:  I worry they are seeking clarification,

24  and there is on-point clarification that is binding on this

25  Court.  And, you know, this is not a question.  It's not --  It

1067

1    is a question of law in the legal sense.  There's not a question

2    behind it, though.  It's pretty established.  I think that it

3    would be reasonable for the Court to actually just respond

4    affirmatively yes.

5               THE COURT:  Mr. Wirth or Ms. Baynard.

6               MR. WIRTH:  I don't think we can do that, Judge.  If

7    it was a specific question with respect to a misunderstanding of

8    an instruction, but this is in addition to an instruction.  And

9    frankly, I don't know what Mr. Schwab is citing to.  I am not

10   saying he's wrong.  I just don't even know.

11              At this point unless they come out --  Unless it turns

12   out they've got another question saying can you please tell us

13   again, I think the default is always the first time around you

14   tell them read the instructions.

15              THE COURT:  All right.  I am familiar with the line of

16   cases from the Seventh Circuit defining personal information

17   that identifies individuals to include those descriptors that

18   the jurors are requesting.  But because we did not include them

19   in the original instruction, it is an amendment at this point,

20   so I will just defer them to page 22 of the jury instructions

21   and we'll see if they have additional questions and take it from

22   there.  Thank you everyone.

23        (Brief recess taken.)

24        (Back on the record.)

25              THE COURT:  Counsel, I understand we have a verdict

1   from the jury.  Ready to have them brought out, plaintiff?

2              MS. MOTLEY:  Yes, Your Honor.

3              THE COURT:  For the defense?

4              MR. WIRTH:  Yes.

5              THE COURT:  CSO please bring the jury in, please.

6       (Jury enters.)

7              THE CLERK:  Judge Nancy Joseph on the bench calling

8   Case No. 20-CV-1660, Andrew Aaron, et al v. Dominick Ratkowski,

9   et al.  Appearances remain the same.

10             THE COURT:  Good afternoon, Members of the Jury.  I

11  understand that you have reached a verdict.  And is the

12  foreperson ready to turn the verdict?

13             FOREPERSON:  Yes.

14             THE COURT:  CSO collect that, please.  Mr. Romel, if

15  you please publish the verdict.

16             THE CLERK:  We, the Jury, empaneled and sworn to try

17  the issue in this action being directed by the Court to answer

18  the following question submitted to us by the verdict find and

19  answer as follows.

20             Question Number 1.  For each plaintiff, did defendant,

21  Dominick Ratkowski, knowingly obtain, use or disclose

22  plaintiffs' personal information from a motor vehicle record for

23  a purpose not permitted by the DPPA?  Complete the box yes or

24  no.  If you answer yes in the box, write how many times.  Answer

25  to all plaintiffs no.

1069

1    Question Number 2.  For each plaintiff, did defendant,

2  Joseph Roy, knowingly disclose plaintiffs' personal information

3  from a motor vehicle record for a purpose not permitted by the

4  DPPA?  Complete the boxes, yes or no.  If you write yes in the

5  box, write in how many times total.  Answer to all no.

6    Question Number 3.  Did plaintiffs prove by a

7  preponderance of the evidence that defendant, Dominick

8  Ratkowski, acted wilfully or in reckless disregard of the law?

9  Answer no.

10   Question Number 4.  Did plaintiffs prove by a

11  preponderance of the evidence that defendant, Joseph Roy, acted

12  willfully and in reckless disregard of the law?  Answer no.

13  Signed by the foreperson on today's date, May 5, 2023.

14   THE COURT:  Mr. Romel, please poll the jury by number.

15   THE CLERK:  Juror Number 3, was this and is this your

16  verdict?  If so answer, I do.

17   JUROR:  I do.

18   THE CLERK:  Juror Number 4, was this and is this your

19  verdict?  If so, answer I do.

20   JUROR:  I do.

21   THE COURT:  Juror Number 8, was this and is this your

22  verdict?  If so answer, I do.

23   JUROR:  I do.

24   THE CLERK:  Juror Number 11, was this and is this your

25  verdict?  If so, answer I do.

1070

1          JUROR:  I do.

2          THE CLERK:  Juror Number 12, was this and is this your

3     verdict?  If so answer, I do.

4          JUROR:  I do.

5          THE COURT:  Juror Number 13, was this and is this your

6     verdict?  If so, answer I do.

7          JUROR:  I do.

8          THE CLERK:  Juror Number 15, was this and is this your

9     verdict?  If so, answer I do.

10         JUROR:  I do.

11         THE COURT:  Juror Number 17, was this and is this your

12    verdict?  If so, answer I do.

13         JUROR:  I do.

14         THE COURT:  Members of the Jury, on behalf of the

15    Court and the parties, we do thank you for your service.  At

16    this time, I'll ask the CSO to escort you back to the jury

17    deliberation and await further instructions.  Please stand for

18    the jury.

19       (Jury excused.)

20         THE COURT:  Ms. Motley, anything further for this

21    evening?

22         MS. MOTLEY:  I don't believe so, Your Honor.

23         THE COURT:  Mr. Wirth, anything further for this

24    evening?

25         MR. WIRTH:  Judge, I'll need to make sure -- As a

1   housekeeping matter, I assume the Court will set a time for any

2   motions after verdict, but the defense would move for judgment

3   on the verdict.

4         THE COURT:  All right.  At this time it is late in the

5   hour, you are all exhausted.  The Court will be in touch to

6   address any further matters and any further scheduling.  Please

7   have a good evening.

8         BAILIFF:  All rise.

9     (Whereupon proceeding was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter

4    for the United States District Court for the Eastern District of

5    Wisconsin, do hereby certify that the foregoing pages are a true

6    and accurate transcription of my original machine shorthand

7    notes taken in the aforementioned matter to the best of my skill

8    and ability.

9

10   Signed and Certified June 28, 2023.

11   /s/Susan Armbruster

12   Susan Armbruster

13

14                    Susan Armbruster, RPR, RMR
                   United States Official Reporter
15                 517 E Wisconsin Ave., Rm 200A,
                        Milwaukee, WI 53202
16             Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25